Maxwell V. Pritt (SBN 253155)
mpritt@bsfllp.com
Joshua I. Schiller (SBN 330653)
jischiller@bsfllp.com
Beko O. Reblitz-Richardson (SBN 238027)
brichardson@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:    (415) 293-6800
Facsimile:    (415) 293-6899

*Counsel for Plaintiff California Insurance Company, a
New Mexico corporation*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA INSURANCE COMPANY, a New Mexico corporation,<br><br>Plaintiff,<br><br>v.<br><br>INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA RICARDO LARA, in his official capacity; CALIFORNIA DEPARTMENT OF INSURANCE DEPUTY COMMISSIONER KENNETH SCHNOLL, in his official capacity; CALIFORNIA DEPARTMENT OF INSURANCE DEPUTY COMMISSIONER BRYANT HENLEY, in his official capacity; and DOES 1-20.<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF:**<br><br>**(1) VIOLATION OF COMMERCE CLAUSE**<br>**(2) VIOLATION OF PLAINTIFF'S RIGHT TO DUE PROCESS**<br>**(3) EQUITABLE RELIEF FROM DEFENDANTS' UNLAWFUL TAKING**<br><br>**DEMAND FOR JURY TRIAL** |

California Insurance Company, a New Mexico corporation, by and through its attorneys, alleges, on personal knowledge of its own acts and status, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This lawsuit arises from the unlawful and bad faith actions of the Insurance Commissioner of the State of California, Ricardo Lara ("Commissioner"), California Department of Insurance ("CDI") Deputy Commissioner Kenneth Schnoll ("Schnoll"), and CDI Deputy Commissioner Bryant Henley ("Henley," and together with the Commissioner and Schnoll, "Defendants"), who sought and obtained a conservatorship of California Insurance Company, a California corporation ("CIC"), to obstruct the merger of CIC and Plaintiff, a New Mexico corporation.  As detailed herein, Defendants have unlawfully obtained and abused their authority to interfere with interstate commerce and cause substantial, ongoing, and irreparable harm to Plaintiff.

2.      On October 9, 2019, after a full hearing attended by Defendants' agents, the New Mexico Superintendent of Insurance issued an order (the "New Mexico Approval Order") approving CIC's redomestication from California to New Mexico via a merger with Plaintiff (the "CIC Merger").  Defendants' agents were present at the hearing and did not object to the CIC Merger. Shortly thereafter, the New Mexico Secretary of State finalized the merger under New Mexico law, and Plaintiff became the legal owner of all former assets of CIC, including its outstanding insurance policies.

3.      The New Mexico Secretary of State approved the CIC Merger in part based on representations by the Defendants' agents, in a conference call on October 9, 2019, that "because of CIC's considerable capital, surplus, and deposits, the proposed merger presented no risk to California policyholders."  To ensure that there could be no risk to California policyholders, the New Mexico Approval Order also stated that Plaintiff would "assume and be liable for any and all liabilities of" CIC and "maintain the current deposit of [CIC] with the [CDI] for the benefit of its policyholders."

4.      On November 4, 2019, in an abrupt about-face, Defendants unlawfully applied to the Superior Court of California, County of San Mateo (the "California State Court"), *ex parte*, for an

order granting themselves a conservatorship over CIC, to obstruct the approved CIC Merger. Defendants did so without informing the state court in their *ex parte* application that the Commissioner appeared at the New Mexico merger hearing and did not object to CIC re-domesticating in New Mexico, and in a conference call on October 9, 2019 had even represented that the merger presented no risk to California policyholders. Defendants also did not inform the California State Court that the CIC Merger was effective under New Mexico law, and accordingly a conservation of CIC would prohibit the transfer to Plaintiff of assets to which it was legally entitled as a matter of law. That same day, on November 4, 2019, based on Defendants' false and misleading application, the California State Court approved the CIC conservatorship (the "Conservation Order").

5.      Since then, Defendants have continued to wage a bad faith campaign to harm Plaintiff and prevent Plaintiff from establishing its business in New Mexico and other states. Despite Plaintiff's best efforts, and despite the New Mexico Secretary of State order finalizing the merger, Plaintiffs has been unable to obtain any assets of CIC or build its business in New Mexico and other states. Defendants have prohibited CIC from transferring any assets across state lines to their legal owner, Plaintiff, and complying with the Secretary of State's order and the New Mexico Approval Order. Defendants have harmed Plaintiff and continue to take steps to harm Plaintiffs and obstruct its efforts to establish itself in New Mexico.

6.      Moreover, in October 2020, Defendants filed an application for approval of a non-consensual rehabilitation plan in the California State Court (the "Rehabilitation Plan") that would impose severe punitive measures on CIC with no connection to the purported reason for imposing the conservatorship in the first place. Among other things, the Rehabilitation Plan seeks to require CIC to (1) transfer and reinsure its entire "book of California business" to an unaffiliated competitor, and (2) force CIC and its affiliates to settle over 40 separate civil legal proceedings on arbitrary terms dictated by the Commissioner, where valid defenses in those proceedings currently exist. CIC's "book of California business" consists of valid and binding insurance agreements between CIC and its policyholders. The value of those policies is the rightful property of Plaintiff in light of

the CIC Merger.  Approval of the Rehabilitation Plan is currently pending with the California State Court.

7.     Defendants' vendetta against CIC and Plaintiff is fueled by a belief that this Court and others have made incorrect rulings in separate litigation between CIC policyholders, on the one hand, and CIC and other affiliated entities, on the other hand, regarding a Reinsurance Participation Agreement ("RPA") entered into between these policyholders and Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA"), which was a CIC affiliate at the time.  The CDI believed that the RPA should have been filed with them and decided that, because it had not been, it was therefore void.  But to the apparent dissatisfaction of Defendants, this Court in 2019 found that this policyholder litigation is not suitable for class treatment and rejected policyholders' claims that the RPA is void as a matter of law.  *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, Nos. 2:16-cv-158 WBS AC, 2:16-cv-1211 WBS AC, 2019 WL 358517 (E.D. Cal. Jan. 29, 2019); *Pet Food Express, Ltd. v. Applied Underwriters, Inc.*, No. 2:16-CV-01211 WBS AC, 2019 WL 4318584 (E.D. Cal. Sept. 12, 2019).  This Court's rulings are in part what prompted Defendants to take steps to forum shop and find a California state court to obstruct the CIC Merger in their ongoing efforts to harm Plaintiff.

8.     There is and can be no valid basis for Defendants' continued efforts to undermine the flow of interstate commerce and the approved CIC Merger, as Defendants have acknowledged that "CIC's financial status has remained stable" and that "CIC's AM Best credit rating remains at its pre-conservation A (Excellent) level."  The New Mexico Approval Order provides significant protections for California policyholders in connection with the CIC Merger, and there is no justification for Defendants' continued and relentless efforts to block the lawful and approved CIC Merger.  Indeed, the stated "grounds" for the conservation order have long since been removed, if they ever existed, and the Conservation Order should have been vacated long ago under California Insurance Code § 1012.

9.     With this action, Plaintiff seeks relief based on Defendants' unconstitutional acts in blocking the CIC Merger.  Defendants are not permitted to violate foundational federal constitutional principles to "correct" what they perceive were mistaken rulings by the courts

(including this Court), to satisfy personal vendettas, or attempt to rehabilitate their political reputations.  Defendants' conduct also impermissibly burdens interstate commerce in violation of the Commerce Clause of the United States Constitution.  Defendants cannot prohibit an interstate merger where they lack a sufficiently legitimate local interest in keeping an insurance company in-state, as Defendants successfully and routinely regulate many insurers domiciled and headquartered in other states via a Certificate of Authority.

10.   Plaintiff has been left with no other adequate forum to challenge the Commissioner's bad faith, unconstitutional overreach.  Defendants' unprecedented action in blocking an interstate merger by locking up CIC's assets in an indefinite conservatorship has caused and is continuing to cause Plaintiff to suffer unmeasurable and irreparable harm.  The conservation has served to deny Plaintiff access to its rightful assets and the ability to transact business for over a year.  Without access to CIC's assets, including accounts, deposits, and policy contracts, Plaintiff cannot build and carry out its business in New Mexico and other states.  Instead, Plaintiff must watch helplessly from the sidelines as Defendants exercise control over the operations of a business that should legally be in Plaintiff's hands.

11.   Furthermore, Plaintiff is subject to significant regulatory penalties in New Mexico because of Defendants' conduct.  On January 5, 2021, the New Mexico Superintendent of Insurance, the Honorable Russell Toal, ordered Plaintiff to show cause as to why administrative penalties, including substantial fines and the revocation of Plaintiff's Certificate of Authority to transact insurance, should not issue for Plaintiff's failure to comply with the provisions of the New Mexico Insurance Code requiring New Mexico-based insurers to keep their records and assets in New Mexico.  As long as Defendants continue to hold Plaintiff's assets hostage under the Conservation Order, however, Plaintiff has no means of complying with the applicable provisions of the New Mexico Insurance Code.

**THE PARTIES**

12.   Plaintiff is a New Mexico corporation with its principal place of business in Santa Fe, New Mexico.  Plaintiff is regulated by the New Mexico Office of Superintendent of Insurance, and is licensed to do business in New Mexico.  Plaintiff is owned by North American Casualty Co.,

1   through an indirect parent relationship.  AU Holding Company, Inc. owns North American Casualty

2   Co.  Steven Menzies owns 100% of AU Holding Company, Inc.

3          13.     Defendant Ricardo Lara is the Commissioner of the California Department of

4   Insurance ("CDI") and is a citizen of and an elected official in California, who on information and

5   belief currently resides in and/or is domiciled in Sacramento County.

6          14.     Defendant Kenneth Schnoll is Deputy Commissioner and General Counsel of CDI.

7   Schnoll is a citizen of and an elected official in California, who on information and belief currently

8   resides in and/or is domiciled in Sacramento County.

9          15.     Defendant Bryant Henley is Deputy Commissioner of CDI.  Henley is a citizen of

10  and an elected official in California, who on information and belief currently resides in and/or is

11  domiciled in Sacramento County.

12         16.     Plaintiffs bring their claims against the Commissioner, Schnoll, and Henley

13  (collectively, "Defendants" or the "Commissioner") in the official capacities of their titles as

14  described above.

15         17.     The true names of Defendants DOES 1-20, inclusive, whether individual, corporate,

16  associate, or otherwise, are unknown to Plaintiff.  Plaintiff is informed and believes and thereon

17  alleges that each of the DOE Defendants is in some manner affiliated with the Commissioner or

18  CDI.

19                                **RELEVANT NON-PARTIES**

20         18.     Non-party CIC is a California corporation that was regulated by CDI.  On October

21  9, 2019 the New Mexico Office of Superintendent of Insurance approved CIC's merger with

22  Plaintiff.  Despite this merger, Defendants sought and have maintained an improper conservation

23  over CIC in California State Court, and now exercise control over the merged assets of CIC and

24  Plaintiff.  Since October 10, 2019, CIC has been indirectly wholly owned by Steven Menzies.

25         19.     Non-party AUCRA is a New Mexico company regulated by the Office of

26  Superintendent of Insurance and was previously an Iowa domiciled company regulated by the Iowa

27  Division of Insurance.  AUCRA is indirectly wholly owned by Steven Menzies.

28

**JURISDICTION AND VENUE**

20.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Plaintiff's claims arise under the Commerce, Due Process, and Takings Clauses of the United States Constitution, and the Civil Rights Act, 42 U.S.C. § 1983.

21.     This Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

22.     This Court additionally has jurisdiction and discretion to award attorneys' fees under 42 U.S.C. § 1988(b).

23.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(2).   Defendants are considered to reside in this district because this is where they perform their official duties.

**FACTUAL BACKGROUND**

**A.     The EquityComp® Program and Settlement with the Commissioner, and This Court's Decision Upholding the Program.**

24.     CIC was founded in 2004 to write and issue workers' compensation insurance policies.  CIC grew into a company with over a billion dollars in assets and over $600 million in capital and surplus.  CIC is licensed to do business in 26 states, and has consistently received an A or A+ rating by A.M. Best.  CIC insures employers for workers' compensation insurance throughout the United States and has been recognized as a leader in the workers' compensation marketplace.

25.     Before 2016, CIC participated in offering a workers' compensation program to California employers called EquityComp®.   EquityComp® was a loss sensitive workers' compensation insurance program that both provided participant employers with workers' compensation insurance coverage required under California law and gave employers the opportunity to share in underwriting profits if their claims loss experience was favorable.  The profit sharing component was offered through a separate agreement, the RPA, with a separate company, AUCRA, which allowed the policyholder to participate in a reinsurance captive.  EquityComp® was granted a Patent by the U.S. Patent Office in 2011 (No. US 7,908,157 B1).

26.     CDI examined EquityComp® through no less than five financial and market conduct examinations over the course of a decade, and was fully aware of its existence, structure, and how it operated, including its "risk sharing features" and "accompanying Profit Sharing Plan." *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, 2017 WL 4652758, at *5 (E.D. Cal. Oct. 17, 2017) (Shubb, J.).   CDI therefore was well aware of EquityComp®'s structure, that AUCRA had separate profit-sharing agreements with employers that AUCRA did not file with CDI.

27.     Nonetheless, on June 20, 2016, then-Commissioner Dave Jones issued a Decision and Order holding that the RPA was an unfiled collateral agreement in violation of California Insurance Code § 11658 (among other Insurance Code provisions).   The Commissioner then issued a Notice of Hearing and Order to Cease and Desist on June 28, 2016, seeking an order requiring CIC and AUCRA to cease and desist from issuing policies incorporating the RPA.   CIC filed a Verified Petition for Peremptory Writ of Mandate (the "Writ Proceeding") challenging the June 20 Order.

28.     While the Writ Proceeding was pending in the Los Angeles Superior Court, the parties executed a Stipulated Consent Cease and Desist Order on September 6, 2016, in which the parties agreed, among other things, that AUCRA could continue to enforce existing RPAs subject to small changes to the arbitral forum and run-off loss adjustment factor provisions.   And on June 2, 2017, CDI, CIC, and AUCRA entered into a settlement agreement (the "2017 Settlement Agreement") through which the parties agreed to dismiss the Writ Proceeding and that an Amended RPA would be filed allowing new RPAs to issue under EquityComp®.   The agreement also stated, "The CDI currently contemplates no additional action as to CIC or AUCRA related to the EquityComp® program."

29.     The 2017 Settlement Agreement left disputes over the prior RPA to private litigants and the courts.   (The CDI still allowed complaints to be filed in its Administrative Hearing Bureau, in which CDI purported to invalidate RFPs, but these rulings were subject to review by writ in the courts.)   In the 2017 Settlement Agreement, the CDI specifically agreed that there was a "good faith dispute" over the RPA that was to be decided by the courts.   In the years that followed, certain California employers who entered into EquityComp® sued CIC, AUCRA, and other affiliates of

CIC seeking an order that the RPA was void.  The CDI never sought to intervene or otherwise dispute the rulings of California courts, including this court, in the EquityComp® litigation.

30.     That litigation included lawsuits brought in this Court that resulted in denial of class certification to California employers that entered into EquityComp®.  *Shasta Linen Supply*, 2019 WL 358517, *7 (finding that "a class action is not superior to other available methods for fairly and efficiently adjudicating the controversy").  This Court also held that the prior RPAs were not void as a matter of law and granted summary judgment for CIC against Pet Food Express, the plaintiff EquityComp® participant.  *Pet Food Express*, 2019 WL 4318584.  The Court's Order was not appealed.

31.     CIC and its affiliates have defeated class actions relating to EquityComp® in California, New York, and Nebraska, and, out of scores of lawsuits, no adverse judgment has been entered against CIC.

**B.     Defendants Fail to Approve or Disapprove of the Sale of CIC on the Business Day Before the Closing Deadline Without Prior Notice and Despite Having Had Five Months to Consider the Application.**

32.     In January 2019, Menzies, who was an indirect owner of 11.5% of CIC's shares, entered into an agreement with Berkshire Hathaway Inc. ("Berkshire")—which at that time owned 81% of the holding company that indirectly owned CIC, AU Holding Company, Inc.—to purchase Berkshire's interest in CIC (the "Berkshire/Menzies Agreement").

33.     The Berkshire/Menzies Agreement included a $50 million "breakup fee" if the transaction could not be completed by September 30, 2019.  Menzies and CIC immediately set about informing Defendants of the proposed sale, including the closing date and $50 million penalty, and filing all the necessary paperwork to obtain the CDI's approval in time to ensure timely completion of the deal.

34.     To allow ample time for approval, Menzies, as the ultimate controlling person proposed to acquire control of CIC, submitted a "Form A" on April 9, 2019, more than five months before the sale closing deadline of September 30, 2019 ("First Form A").

35.     A "Form A" submission to insurance regulators is used when a person proposes to acquire control of an insurer by offering to acquire voting securities.  The First Form A explained that Menzies, who was the President and Chief Executive Officer of CIC, was offering to acquire control of CIC through transactions with Berkshire, the indirect parent of CIC.

36.     The First Form A explained that the Berkshire/Menzies Agreement was valued at over $700 million and was structured by Berkshire to require closing with all regulatory approvals on or before September 30, 2019, or Menzies would forfeit a $50 million non-refundable deposit ("break-up fee").  The First Form A therefore put the Commissioner on notice that time was of the essence and approval was necessary not later than September 30.

37.     After an initial review of the First Form A, the CDI requested that Menzies provide supplemental information.  Menzies promptly agreed to do so.  At no point did the CDI indicate the review process could not be completed by September 30, 2019.  Menzies thus agreed to withdraw the First Form A and refile.

38.     CDI then requested additional information—including information the CDI previously found unnecessary—and Menzies agreed to submit another Form A.

39.     Menzies submitted a third Form A on September 7, 2019 ("Third Form A").

40.     CDI then sought limited additional information, in communications dated September 13, 19 and 24, 2019.

41.     Menzies timely provided the requested documents and clarification.  Each response included a request to meet and confer with CDI on any other outstanding matters to ensure that the September 30, 2019 closing deadline would be met.

42.     CDI never at any point in this process suggested it would be unable to complete the Form A review prior to Berkshire's September 30, 2019 closing deadline.

43.     On September 24, Laszlo Komjathy, Jr. ("Komjathy"), a CDI attorney, requested copies of corporate resolutions for what appeared to be the final paperwork necessary for approval. CIC provided those resolutions to the CDI on September 25.  Komjathy did not indicate any requests were outstanding.  Accordingly, Menzies and CIC initiated preparations for the September 30, 2019

1    closing.  CIC also obtained approval from the CDI's counterparts in Iowa, Texas, and Hawaii, which

2    were necessary to close the transaction.

3           44.    Without prior notice or indication, on the afternoon of Friday, September 27, 2019,

4    the final business day before the September 30, 2019 Berkshire deadline, Komjathy e-mailed CIC,

5    stating CDI would "neither approve nor disapprove the pending application prior to September 30,

6    2019," which put Menzies at imminent risk of forfeiting the $50 million deposit.  In his cover e-mail,

7    Komjathy indicated he was "out of the office" on Friday, September 27, directed CIC to contact

8    Bryant Henley with any questions, and made no mention of the substantial financial risk to Menzies

9    that Defendants created with their dilatory review process.

10          45.    Multiple attempts to reach Henley and CDI's General Counsel, Kenneth Schnoll,

11   were made immediately after receiving the September 27 email.  Those calls were not returned.

12   Thus, on the last business day before Berkshire's September 30 transaction deadline—a deadline

13   the CDI knew full well would result in the forfeiture of $50 million—CDI notified Menzies that its

14   point regulator was "out of the office," and the person appointed to take his place refused to return

15   any calls.

16   **C.   Defendants Offer No Objection to CIC's Proposal to Redomesticate to New Mexico**
17        **by Merger, and the New Mexico Superintendent of Insurance and Two Other States**
          **Approve the Merger.**
18

19          46.    Facing a $50 million penalty for delaying the Agreement's consummation, Menzies

20   and CIC negotiated a short, 10-day extension of the closing.  The extension alone cost $10 million,

21   in addition to the previously approved purchase price, and was not credited against the purchase

22   price.

23          47.    Over the following days, numerous additional calls to multiple CDI officials went

24   unanswered.  Accordingly, Menzies contacted the New Mexico Superintendent of Insurance, John

25   G. Franchini ("Superintendent Franchini" or "Superintendent"), to determine if the transaction could

26   instead be approved under the supervision of New Mexico's Insurance Department.

27          48.    Superintendent Franchini proposed to re-domesticate CIC to New Mexico whereby

28   a New Mexico entity would acquire CIC by merger under an expedited approval process, permitting

the sale approval and closing before the extended deadline.  With no alternative, CIC and Menzies worked with the Superintendent to finalize the sale and obtain all necessary approvals, including the formation and licensing of Plaintiff as a new entity in New Mexico, which would ultimately merge with CIC.

49.     Superintendent Franchini informed Defendants of this process, communicating with the Commissioner and other pertinent insurance departments to obtain approvals.  The communications culminated in a conference call between state regulatory agencies and a Form A approval hearing (required by statute) on October 9, 2019, of which Defendants were provided advance notice.  Insurance regulators from New Mexico, Texas, and California (with representatives of the CDI) participated in the October 9 conference call and California attended the Form A approval hearing which followed.  At least three CDI senior officials represented Defendants at the October 9 hearing (including Komjathy).  The CDI officials were *specifically asked whether they objected to the merger or the sale's consummation*, yet none objected during the pre-hearing conference call or the in hearing itself, during which the Superintendent approved the merger. Rather, CDI representatives told the Superintendent that "because of CIC's considerable capital, surplus and deposits, *the proposed merger presented no risks to California policyholders*."

50.     The hearing officer recommended the approval of CIC's Form A, and Superintendent Franchini issued an Order approving the merger ("Order of Approval").  The Order of Approval noted that CDI participated in the hearing and did not object.  A copy of the Order of Approval was sent to the Commissioner by e-mail the same day.  Again the Commissioner did not object.  The Order of Approval is attached as Exhibit A to this Complaint.

51.     Following Superintendent Franchini's Order, Berkshire sent the Chief Staff Counsel for the New Mexico Department of Insurance and the Commissioner, through Komjathy, an e-mail that advised, based on the lack of objection being made at the Form A approval hearing, that Berkshire planned to proceed with the scheduled closing the next day, on October 10, 2019.  Once again, Defendants did not object.

52.     The Commissioner, through CDI's attorney representatives, also attended an earlier Form A telephonic hearing hosted by Iowa state regulators on September 17, 2019, during which the Iowa regulators likewise approved the Berkshire/Menzies Agreement.

53.     Superintendent Franchini's Order of Approval stated, among other things, that Plaintiff must

> assume and be liable for any and all liabilities of California Insurance Company including, but not limited to any issued policies as if such policies were issued directly by California Insurance Company, [ ] and . . . maintain the current deposit of California Insurance Company with the California Department of Insurance for the benefit of its policyholders.

54.     The "current deposit of California Insurance Company with the California Department of Insurance" was, at the time, $248 million.  This amount constituted over 100% of the required amount under CDI's regulations given the measure of CIC's issued policy risks in California.

55.     As part of the merger, CIC's California-issued Certificate of Insurance—that is, its license to sell and service insurance in the state—could have transferred to Plaintiff.  Cal. Ins. Code § 709.5.  And because CDI asserts jurisdiction regulating the sale and servicing of insurance policies in California by any company operating with a California Certificate of Insurance, redomestication of CIC via its merger with Plaintiff should have caused no concern.  That result is fully consistent with and supported by CDI's stated determination that the merger "presented no risks to California policyholders."

**D.     After the Merger's Approval, Defendants Put CIC Into Conservation Without Prior Warning and Based on False Pretenses.**

56.     On the evening of October 9, 2019, while executives of CIC and Plaintiff were en route to New York to close the following day, Defendants, through Komjathy, sent CIC an e-mail alleging Menzies and CIC had abandoned the Third Form A due to the anticipated merger.  The e-mail gave Menzies 10 business days from October 9, 2019 to voluntarily withdraw the Third Form

A.  The CDI, however, did not object to the merger that New Mexico's Superintendent Franchini had already approved.

57.     Nine days after New Mexico's approval of the merger, Komjathy asserted for the first time in an October 18, 2019 letter that due to the merger of CIC into Plaintiff, CIC's certificate of authority "will be extinguished by operation of law and the surviving entity will not be qualified to transact insurance in California."  This assertion came without any warning.  There was no prior notice that the CDI intended to take this position, and there was no legal basis for it.

58.     Superintendent Franchini issued a statement disagreeing with public statements by the Commissioner that the merger had not been fully effected.  In a press release dated October 24, 2019, Superintendent Franchini stated among other things that Plaintiff was "well positioned to continue [CIC's] insurance operations, maintain its staff, and protect its policyholders and claimants."  This press release is attached as Exhibit B to this Complaint.

59.     Following the October 18 letter, Menzies and Defendants entered into discussions to resolve Defendants' belated and unfounded concerns about the merger.  During those talks, Defendants never informed Plaintiff they were contemplating *ex parte* court intervention.

60.     On November 4, 2019, without notice to CIC or Plaintiff and without justification given the timeline of events and Menzies' consistent cooperation, the Commissioner filed an *ex parte* application in the California State Court requesting the extraordinary remedy of placing CIC in conservation under the Commissioner's authority (the "Application").

61.     Defendants obtained approval of the conservatorship on false pretenses.  Specifically, Defendants claimed there was urgency because Plaintiff, as a New Mexico corporation, purportedly lacked authority to transact insurance business in California and, therefore, "if CIC is permitted to consummate the illegal merger, CIC policyholders in California will be left holding policies of a non-admitted insurer."  Defendants, however, had already represented to the New Mexico Superintendent of Insurance that the merger would ***not*** harm policyholders and did not object to the merger before, during, or after the New Mexico Form A hearing, even when provided with clear opportunities to do so.  Defendants did not inform the California State Court of these facts, nor that CIC had $250 million on deposit with the CDI.

62.     The *ex parte* Application contained other misrepresentations.  It falsely portrayed the Form A application as containing "material deficiencies" when the Commissioner instead kept asking for more information and admitted the merger would cause no harm to CIC's policyholders. Further, Defendants have never identified what information they did not have when, on the eve of closing, they informed CIC that it lacked sufficient information to approve or disapprove the transaction.

63.     Additionally, the Application misrepresented the history of EquityComp® as the Commissioner's sole purported example of CIC engaging in a "pattern of flouting California regulatory processes designed to protect California policyholders from unfair and deceptive practices."   The Commissioner thereby failed to inform California State Court of the 2017 Settlement Agreement, in which CDI approved an amended RPA with only minor changes, and the parties agreed the "good faith dispute" over the legality of the existing RPA would be left to subsequent private litigation.

64.     Defendants also failed to inform the California State Court about judicial decisions, including from this Court, stating that the challenged RPA provisions were lawful.  In addition to this Court, other courts have rejected the argument that CIC flouted the regulatory process in connection with EquityComp®.  Most recently, for example, in November 2019, the Honorable Henry Walsh of the California Superior Court in the County of Ventura issued a written decision after a full trial on the merits affirming the enforceability of CIC's policies against a challenge by one of its insureds who claimed the policies "flouted" the regulatory process.  *Roadrunner Management, et al. v. Applied Underwriters*, et al., No. 56-2017-00493931-CU-CO-VTA (Nov. 12, 2019).

65.     Additionally, as held by this Court in prior litigation, it *cannot* be inferred that CIC "actively concealed the structure of the insurance program or the existence of the RPA from regulators, plaintiffs, or the public generally."  *Shasta Linen Supply*, 2017 WL 4652758, at *5 ("*Shasta Linen*").  This Court further found that CIC had "disclosed in program documents that the RPA is not a filed retrospective rating plan, and detailed how the profit sharing would work," that

"it [] appear[ed] that the [CDI] was aware of the RPA's existence," and that CIC described the RPA's operation in its annual Reports of Examination over the course of many years.

66.    Indeed, Defendants have been regularly informed about EquityComp® since its inception.  Starting in 2006, CDI examined EquityComp® and was fully aware of its operation. CDI did not object to its sale, nor its marketing.  In a report of examination of CIC for the year ending on December 31, 2006 and signed by the Commissioner ("2006 Examination Report"), CDI described the program's structure in detail:

> The profit sharing plan is similar to an incurred loss retro plan.  The profit sharing plan allows the insured to share in the benefit of good loss experience at the risk of bearing the cost of unfavorable loss experience, within the limits of the plan.  Under the profit sharing plan, the profit and risk components are accounted for through protected cell accounts in the Company's affiliated captive risk facility, Applied Underwriters Captive Risk Assurance Company.

67.    CDI reviewed and reported on the EquityComp® program over the next eight years without objection, then entered into the 2017 Settlement Agreement that recognized a "good faith dispute" over the legality of parts of the EquityComp® RPA, not a pattern of "flouting" any law or regulation.

68.    The Commissioner failed to disclose any of this information in the Application.

69.    On November 4, 2019, based upon the Commissioner's misrepresentations and omissions, the *ex parte* nature of the proceeding that ensured a one-sided presentation, and in light of the highly deferential standard of review that applies to those proceedings, the California State Court entered the Commissioner's proposed order *ex parte*, imposing a conservatorship over CIC, placing it under Defendants' control pursuant to California Insurance Code § 1011(c) (the "Conservation Order").  That provision permits a conservatorship where an entity, "without first obtaining the consent in writing of the [C]ommissioner, has transferred, or attempted to transfer, substantially its entire property or business or, without consent, has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person."  The Conservation Order, in addition to the

1    financial damage referenced above, has also caused significant harm to the goodwill value of

2    Plaintiffs' businesses.

3        70.    In a press release issued November 6, 2019, two days after the California State Court

4    issued the Conservation Order, Superintendent Franchini stated among other things that (1) CDI

5    attorneys had already stated in writing that completion of the merger would result in CIC ceasing to

6    exist, (2) the Conservation Order was ineffective because it was issued against CIC, an entity which

7    had been extinguished in the CIC Merger effective October 9, 2019, and (3) the Conservation Order

8    could not supersede his office's authority over Plaintiff as the surviving entity.  The November 6,

9    2019 press release is attached as Exhibit C to this Complaint.

10   **E.    Defendants Impose Bad Faith, Unreasonable Demands For the CIC Merger.**

11       71.    Soon after the Conservation Order was issued, CIC filed an application to vacate it,

12   on November 14, 2019 ("Application to Vacate").  After negotiations between CIC and Defendants,

13   Defendants once again acted in bad faith by agreeing (1) that the Commissioner would publicly

14   confirm, among other things, that the conservation effort was based on regulatory issues, not

15   financial impairment, and (2) "to negotiate in good faith to ameliorate the adverse consequences to

16   CIC of the conservation."  Based upon that agreement and Defendants' representations that it would

17   take no further action harmful to CIC in the conservation, CIC withdrew its application to vacate

18   the conservatorship of CIC on the understanding that Defendants would work with Plaintiff and

19   CIC, in good faith, to resolve their dispute and lift the conservatorship as expeditiously as possible.

20       72.    Defendants again failed to live up to their agreement or act in good faith.  The

21   Commissioner did not make the public statements, as he agreed to, about the nature of the

22   conservatorship and CIC's good financial standing.  Indeed, the Commissioner did nothing to help

23   alleviate harm to Plaintiff and CIC arising from the conservatorship.

24       73.    On the contrary, Defendants did not even begin to discuss the substance of their

25   purported regulatory issues with Plaintiff or CIC for five-and-a-half weeks after the Conservation

26   Order, despite CIC's repeated requests to negotiate.  By the time Defendants finally sent CIC an

27   initial "rehabilitation" proposal on December 13, 2019, Plaintiff and CIC had experienced

28

1    irreparable harm as a result of Defendants' unlawful acts, including in connection with the

2    Conservation Order obtained by the Commissioner's misrepresentations.

3         74.    Despite Plaintiff's repeated and good faith attempts to address Defendants' concerns

4    and put an end to the conservation of CIC and the ongoing harms it is causing to Plaintiff, CIC was

5    forced to file a motion to vacate the conservatorship in the California State Court on January 21,

6    2020 ("Motion to Vacate Conservatorship").   CIC originally noticed the Motion to Vacate

7    Conservatorship for February 20, 2020, but acquiesced to the Commissioner's second request for a

8    continuance.  The court then *sua sponte* continued the hearing further in order to rule first on several

9    motions to seal that CIC and the Commissioner had filed.  Then, due to COVID-19 court closures,

10   the California State Court vacated the hearing date entirely, and it was not re-noticed until August

11   6, 2020.  For over six months CIC remained in conservation limbo with no ability to challenge the

12   conservation.

13        75.    Finally, the California State Court heard the Motion to Vacate Conservatorship on

14   August 6, 2020.  The California State Court entered an Order denying the Motion to Vacate

15   Conservatorship ("Denial Order") without the full hearing required by California Insurance Code

16   § 1012 and as a matter of due process.  The California State Court did not make any of the findings

17   necessary to determine whether the conditions for the Conservation Order ever existed, continued

18   to exist, or had been removed pursuant to California Insurance Code §§ 1012 and 1011(c).

19        76.    Even before the California state court could hear CIC's Motion to Vacate

20   Conservatorship, and while the parties were still engaged in what were supposed to be good faith

21   negotiations, the Commissioner began filing motions threatening to draw up and release a non-

22   consensual "rehabilitation" plan.  On July 6, 2020, the Commissioner filed a motion seeking an

23   order setting procedures for court approval of such a Plan.  On July 30, the California State Court

24   granted the motion and entered the Commissioner's order verbatim (the "Rehabilitation Plan

25   Order").

26        77.    The Rehabilitation Plan Order allows the Commissioner to issue a broad-sweeping

27   written notice to all CIC policyholders and other third parties and members of the public of the

28

---

17                                                    COMPLAINT

1   Rehabilitation Plan, *before* the California State Court has even reviewed that plan, let alone

2   approved its provisions, even preliminarily.

3         78.    In proposing rehabilitation plans in this case, Defendants have never sought to

4   address the purported wrong of attempting to effect a merger without approval.  Defendants know

5   they had months to approve the Berkshire/Menzies Agreement and admitted that there would be no

6   harm to policyholders from the CIC Merger.  And they know Plaintiff and CIC were entirely willing

7   to address their concerns during the parties' discussions before Defendants filed the Application.

8   Defendants cut those discussions short by ceasing to communicate and seeking *ex parte* relief.

9   Defendants could easily craft a rehabilitation plan to address any alleged concern arising from the

10   CIC Merger and quickly end the conservatorship, but Defendants never had interest in that type of

11   plan.

12         79.    Instead, on October 19, 2020, Defendants filed an application for approval of the

13   Rehabilitation Plan in the California State Court.

14         80.    Defendants' application consists of the Rehabilitation Plan, a legal memorandum,

15   declarations from two CDI employees, and the declaration of Larry J. Lichtenegger, a plaintiffs'

16   attorney with a lengthy history of filing lawsuits against CIC, and who has a vested interest in the

17   Rehabilitation Plan.

18         81.    Defendants' application acknowledges that "CIC's financial status has remained

19   stable," and that "CIC's AM Best credit rating remains at its pre-conservation A (Excellent) level."

20   Nonetheless, the Rehabilitation Plan contains draconian terms that will cause Plaintiff millions of

21   dollars in losses.

22         82.    *First*, Defendants seek to require CIC to transfer and reinsure its "book of California

23   business" to "another California-admitted insurer."  "CIC's book of California business" consists of

24   valid and binding insurance agreements between CIC and its policyholders that have taken years to

25   accumulate, which are the rightful property of Plaintiff in light of the CIC Merger.

26         83.    These agreements contemplate the provision of insurance services in exchange for

27   the payment of premiums.  By forcing the transfer of CIC's California business to another insurer,

28

1  the Commissioner would cause Plaintiff to lose millions of dollars in anticipated revenue from those

2  agreements.

3       84.     *Second,* the Rehabilitation Plan also seeks to force CIC and its affiliates to settle over

4  40 separate "pending" legal proceedings regarding the EquityComp® program on unreasonable and

5  arbitrary terms dictated by the Commissioner and for which otherwise valid defenses exist.

6       85.     Under the Rehabilitation Plan, every plaintiff "will be offered an opportunity to make

7  an election to settle any Pending Litigation or Subsequent Litigation."  For each such plaintiff, CIC

8  must pay "or cause to be paid" any of three restitution amounts, at the plaintiff's election.  Moreover,

9  the Rehabilitation Plan prohibits CIC from collecting any amounts under the policy above a

10  specified amount.  Finally, the Rehabilitation Plan gives plaintiffs the option of prohibiting CIC

11  from collecting "any charges under the RPA."

12       86.     This part of the Rehabilitation Plan threatens to effect an unconstitutional transfer of

13  contract and other property rights from one set of private litigants (CIC and, by virtue of the CIC

14  Merger, Plaintiff) to another set of private litigants (the policyholders).  It would deprive CIC and

15  Plaintiff of their due process rights to litigate their claims.

16       87.     While such an order would be unconstitutional under any circumstances, the forced

17  transfer of wealth it entails is still more obvious where various courts have recognized the

18  correctness of CIC's legal positions.  *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*,

19  Nos. 2:16-cv-158 WBS AC, 2:16-cv-1211 WBS AC, 2019 WL 358517 (E.D. Cal. Jan. 29, 2019);

20  *Pet Food Express, Ltd. v. Applied Underwriters, Inc.*, No. 2:16-CV-01211 WBS AC, 2019 WL

21  4318584 (E.D. Cal. Sept. 12, 2019); *Roadrunner Management, et al. v. Applied Underwriters*, et

22  al., No. 56-2017-00493931-CU-CO-VTA (Nov. 12, 2019).

23       88.     Incredibly, the Rehabilitation Plan's settlement requirements purport to extend to

24  EquityComp® policyholders who never made a claim or filed a lawsuit challenging the

25  EquityComp® program, increasing CIC's potential liabilities rather than conserving CIC.  Section

26  VIII of the Rehabilitation Plan's Schedule 2.6 ("Terms for Settling Pending and Subsequent

27  Litigation") allows every EquityComp® participant or policyholder to make a claim for a settlement

28  whether or not they had ever complained about the EquityComp® program.  The plan therefore

invites new claimants and, without any hearings or evidence, provides them options to "settle" and collect money from CIC.

89.     To date, at least 40 EquityComp® RPA-related cases have been filed.  As a result of the forced settlements in the Rehabilitation Plan, Plaintiff (as the legal holder of CIC's rights and liabilities by virtue of the CIC merger) stands to pay out millions of dollars to settle litigation that remains fully contested and which CDI already agreed ought to be decided through private litigation.

90.     Furthermore, in some proceedings implicated by the Rehabilitation Plan, CIC is in fact owed money by private litigants.  Under the terms of the Rehabilitation Plan, then, CIC (and therefore Plaintiff) would be forced to relinquish its right to those funds and instead pay out "restitution" according to a formula dictated by the Commissioner.

91.     The Defendants' Rehabilitation Plan requirements ignore the necessarily divergent facts and circumstances involved in each private litigation.  They would reward frivolous litigation by plaintiff policyholders and would undermine multiple court decisions—including decisions by this Court—that have already found no merit to those plaintiffs' claims, including three failed federal class actions and a number of arbitration and lawsuit wins by CIC.

92.     As an illustration, in the *Roadrunner* case identified above, the plaintiff sought to avoid paying both the filed and approved rate charges for its CIC workers' compensation policies and the amounts due under the EquityComp® program.  The case went to trial without a jury in October 2019.  On November 12, 2019, the court issued a "Statement of Intended Decision" denying the plaintiffs' claims and holding that CIC and the other defendants *were entitled to a judgment of $340,419 on their cross-claims*.  No further proceedings have occurred in the *Roadrunner* case after the Ventura County court was advised of the November 4, 2019 Conservation Order.  The Rehabilitation Plan, if applied to the *Roadrunner* judgment, would nullify it.

93.     *Stovall's Inn v. Applied Underwriters, Inc., et al.*, JAMS arbitration No. 120005573, is another example where Defendants' unreasonable demand would reward frivolous claims and force CIC and its co-defendants to give up substantive rights.  In that arbitration, the claimant has demanded that it be excused from paying insurance premiums owed to CIC and has demanded over $9 million in purported damages because of alleged overpayment of $1.3 million in premium.  These

types of claims have been soundly rejected in other arbitrations.  Stovall's refusal to pay the premiums under its CIC policies is also directly contrary to the CDI's own decisions and precedent upholding the enforceability of those workers' compensation policies.  But Defendants' proposal to resolve the conservatorship would require CIC to settle the Stovall's matter and accept a less favorable result than CIC otherwise could obtain if the matter were decided on its merits.  The same is true for numerous other cases in which other plaintiffs or claimants allege damages based on theories the courts have rightly rejected.  For example, in *Charter Oak Oil Co., Inc. v. Applied Underwriters, Inc., et al.*, in the United States District Court, District of Connecticut, the plaintiff is demanding that it be excused from paying filed and approved insurance rates for CIC, asking for essentially free insurance.

94.     Two California Insurance Commissioners in at least nine administrative matters, including Defendant Commissioner Lara, also have written detailed opinions holding CIC policyholders are bound to pay the CIC policies' premiums even if other parts of the EquityComp® programs are voided.

95.     Finally, Defendants also have not even made the barest attempt to demonstrate compliance with state law or the proportionality of this condition to the actions that purportedly necessitated the Conservation Order.  Section 1037 of the California Insurance Code authorizes conservators to settle actions "against that person upon such terms and conditions as the commissioner shall deem to be most advantageous to the estate of the person being administered" or "otherwise dealt with" under the relevant provisions of law.  Moreover, the Commissioner does not even attempt to suggest that these terms are "most advantageous" to the estate, claiming instead that they are "fair and equitable."  Nor could the Commissioner credibly make such an argument when, as discussed above, court decisions have regularly rejected the Commissioner's and private plaintiffs' position.

96.     This condition also has nothing to do with the alleged violation that gave rise to this proceeding.  It does nothing to "rehabilitate" CIC to force CIC to settle litigation on disadvantageous terms.  The Commissioner asserts in paragraph 25 of the affidavit of Joseph Holloway (submitted with the Rehabilitation Plan) that the pending litigation "was one of the main issues that held up the

Commissioner's approval of Mr. Menzies' Form A form."  If so, it only further confirms that the Commissioner's abuse of power extends back to the original delay.  The litigation should have had nothing to do with approving the CIC Merger, given that the Commissioner himself has admitted the merger presented no risks to policyholders, and that there was no dispute the new company would be adequately capitalized.  The Holloway affidavit thus confirms the Commissioner was using the merger as a lever to coerce CIC into adopting the Commissioner's desired litigation outcome.

**F.    Defendants' Actions Have Caused and Are Causing Irreparable Harm to Plaintiff.**

97.    The considerable harm to Plaintiff's business and future prospects from Defendants' actions, including the Conservation Order, conservatorship, and Rehabilitation Plan, far outweighs any benefits thereof.

98.    *First*, the Rehabilitation Plan conditions that Defendants seek to impose would force a transfer of assets from CIC to policyholders through forced resolution of currently contested disputes, including disputes in which CIC have already won sums of money.  This injury would irreparably harm Plaintiff if the Plan is approved.

99.    *Second*, Defendants' effort to strip CIC of its California business would likewise inflict harm on Plaintiff because of its property interest in CIC's assets by virtue of the CIC Merger. Plaintiff projects a decrease of millions of dollars in profits through 2024 due to the coerced loss of CIC's California business.

100.    *Third*, the conservatorship has caused stays of pending private litigation, including one in which CIC (and therefore Plaintiff) was due a favorable judgment of $340,419.

101.    *Fourth*, Plaintiff is subject to severe regulatory penalties in New Mexico due to the conservatorship that Defendants sought and maintain over CIC, including fines of thousands of dollars and the suspension or revocation of Plaintiff's certificate of authority to transact insurance.

102.    On January 5, 2021, the New Mexico Superintendent of Insurance issued a Notice to Show Cause ("Show Cause Order") stating "[i]t has been over 14 months since [the Superintendent] authorized CIC New Mexico to transact the business of insurance in the state of New Mexico as a domestic insurer," and "CIC New Mexico has failed to establish and maintain a principal place of

business in this state and has failed to keep its original books, records, documents, accounts, vouchers and other assets within New Mexico, in violation of §§ 59A-34-10(A) and 59A-34-12(A) NMSA 1978." The order compels Plaintiff to show cause within 30 days as to "why it should not be fined in accordance with § 59A-1-18 NMSA 1978 and why its certificate of authority should not be suspended or revoked for its continued violation of §§ 59A-34-10(A) and 59A-34-12(A) NMSA 1978" for violations of the New Mexico Insurance Code. The Show Cause Order is attached as Exhibit D to this Complaint.

103.    The Show Cause Order further notes that "[p]ursuant to § 59A-1-18 NMSA 1978, the Superintendent may issue an administrative penalty of up to five thousand dollars ($5,000) for each violation of the New Mexico Insurance Code, except that if the violation is found to be willful and intentional, the penalty may be up to ten thousand dollars ($10,000) for each violation. Furthermore, pursuant to §59A-5-26 NMSA 1978, the Superintendent may suspend or revoke an insurer's certificate of authority to transact the business of insurance for any violation of the New Mexico Insurance Code."

104.    The Show Cause Order also states that if Plaintiff "fails to comply" with its provisions "within thirty (30) days, the Superintendent will issue a final order fining CIC New Mexico and revoking its certificate of authority to transact the business of insurance in the state of New Mexico."

105.    Plaintiff cannot comply with the New Mexico Insurance Code while its assets are held captive by Plaintiffs' conservation of CIC in California State Court. In order to "keep at its principal place of business in [New Mexico] its original books, records, documents, accounts and vouchers" and "keep its assets within [New Mexico]" as required under NMSA 1978 §§ 59A-34-10 and 12, Plaintiff must have access to and control over the business records and assets, including deposit funds and policy contracts, that are currently held hostage in the California conservation of CIC.

106.    Absent immediate relief from this Court, Plaintiff will be fined and have its license to transact insurance revoked by the New Mexico Superintendent of Insurance. Its entire business will be decimated.

107.   *Fifth,* the ongoing conservatorship has damaged and will continue to impose irreparable damage to CIC's goodwill and credit.  A conservatorship naturally (if erroneously here) undermines the confidence of market participants, including brokers and existing and potential insureds, in the financial soundness of those who are subject to it.  As a result, brokers representing insureds and potential insureds of CIC have called CIC seeking information about its status and expressing concern about the conservatorship's impact, and whether there is a financial concern about CIC and Plaintiff.  Employees are confused as to their role and the future at CIC and Plaintiff.  Policyholders have expressed concern and confusion about their policies and coverages with CIC and Plaintiff.  Defendants have admitted in correspondence that the Conservatorship already has created "adverse consequences to CIC…."  Plaintiff estimates that the conservatorship has cost it millions of dollars in lost profits to date.

108.   Furthermore, any downgrade to CIC's AM Best "A" rating due to conservatorship concerns could render it impossible for Plaintiff to operate and compete in the market.  This risk is not just theoretical.  AM Best stated on November 13, 2019 that its rating of CIC is "under review with negative implications," and that it is "AM Best's intent to complete a comprehensive review of the groups' balance sheet strength, operating performance, business profile, and enterprise risk management over the near term and to resolve the current under review with negative implications status once all regulatory disputes are resolved."  Because of CIC's excellent financial stability and the fact that the conservation is "regulatory" rather than financial, AM Best has thus far refrained from lowering its rating, but the conservation represents a continuing threat.

109.   In other words, CIC's A rating is in jeopardy because of the unjustified conservatorship and Rehabilitation Plan, which threaten even more harm to Plaintiff.  As a practical matter, the appointment of a conservator (and now the filed Rehabilitation Plan) creates the false impression in the marketplace that the Commissioner's concerns about CIC are financial when they are not, eroding confidence in CIC, and clouding Plaintiff's future prospects.  Reinsurance is necessary for CIC to operate and cannot reasonably be expeditiously replaced if cancelled.  On December 2, 2019, State National Insurance Company ("State National"), with whom CIC has a reinsurance relationship, notified CIC that the Conservation Order raised "significant concern,"

despite being informed it was unrelated to CIC's financial condition.  State National also expressed concern about the effect of the Order on the AM Best rating for CIC and its affiliates, and informed CIC the matter was now under review by State National's Security Committee.   Thus, CIC's reinsurance contracts and future prospects are at risk from the false impression that CIC is under financial strain.

110.    Plaintiff is without an effective remedy to address this irreparable harm.  Plaintiff is not a party to the conservatorship proceeding.  Even those who are parties to it have limited ability to influence its result given its heavily deferential standard of review and the limited opportunity for discovery.

111.    These limited opportunities for a hearing and for discovery have been clear throughout the case.  Defendants submitted the Application *ex parte*.  Further, on September 15, 2020, the California State Court denied CIC's Motion to Vacate Conservatorship without making any factual or legal findings.  The California State Court also set a briefing schedule for approval of a rehabilitation plan.  Defendants told CIC that if it did not "voluntarily" agree to their version of a rehabilitation plan, then they would seek a court order approving an even more draconian and harmful version of the plan.  This is the epitome of bad faith and abuse of power.  Defendants have now followed through on their threat with the filing of the Rehabilitation Plan.

112.    The Rehabilitation Plan threatens to force CIC, and therefore Plaintiff, to incur liability for lawsuits and unmade claims that it otherwise would choose not to incur.  Like imposition of the conservatorship, the threat of liability in the Rehabilitation Plan immediately diminished the goodwill, borrowing power, and financial strength and planning capabilities of Plaintiff.  These harms are not contingent on further action by the California State Court

## FIRST CAUSE OF ACTION
**Unlawful Burden on Interstate Commerce in Violation of the Dormant Commerce Clause, Article 1, § 8, cl. 3 of the United States Constitution**
**(Against All Defendants)**

113.    Plaintiff incorporates all preceding paragraphs into this cause of action by reference as though fully restated herein.

114.    Commissioner Lara is an elected official of the State of California who at all relevant times has purported to act under color of state law.  He has exercised and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

115.    Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law.  They have exercised and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

116.    Defendants, by virtue of their positions at the California Department of Insurance, are responsible for implementing the California Insurance Code.

117.    California Insurance Code § 1011(c) provides as follows: "The superior court of the county in which the principal office of a person described in Section 1010 is located, upon the filing by the commissioner of the verified application showing any of the conditions in this subdivision exist [. . .] shall issue its order vesting title to all of the assets of that person, wheresoever situated, in the commissioner or his or her successor in office, in his or her official capacity, and direct the commissioner forthwith to take possession of all of its books, records, property, real and personal, and assets, and to conduct, as conservator, the business of the person, or so much thereof as to the commissioner may seem appropriate, and enjoining the person and its officers, directors, agents, servants, and employees from the transaction of its business or disposition of its property until any of the following further order of the court: [. . .] That the person, without first obtaining the consent in writing of the commissioner, has transferred, or attempted to transfer, substantially its entire property or business or, without consent, has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person."

118.    Section 1011(c) of the California Insurance Code, as applied to the merger of CIC, a California entity, and Plaintiff, a New Mexico entity, constitutes an unlawful burden on interstate commerce in violation of the Commerce Clause of the United States Constitution, Article I, Section

8, Clause 3, because it discriminates against interstate mergers and restrains insurance products from entering interstate commerce.

119.    Section 1011(c) of the California Insurance Code, as applied to the merger of CIC with Plaintiff, does not advance a legitimate local purpose that cannot be served by other nondiscriminatory measures.   Out-of-state insurers, including workers' compensation insurers, routinely provide coverage to California residents and businesses while domiciled or headquartered in other states.   Moreover, the Commissioner could provide an identical level of protection to California policyholders by simply allowing CIC to merge with Plaintiff, and then requiring Plaintiff to satisfy all of the CDI's standard requirements for an out-of-state insurer to do business in California.   The Commissioner has never alleged in any forum that CIC or Plaintiff is incapable of fulfilling those standard requirements.

120.    The Commissioner has obtained a conservatorship over CIC under California Insurance Code Section 1011(c) and maintained the conservatorship in bad faith and in violation of law in order to block the interstate merger of CIC and Plaintiff.

121.    Plaintiff has been unable to reap the benefit of its merger with CIC due to Defendants' unlawful obstruction, harming Plaintiff irreparably.   As a direct and proximate cause of Defendants' actions, Plaintiff has been prevented from accessing the corporate assets of CIC, to which it has a legal right, preventing Plaintiff from conducting any business whatsoever.

122.    Furthermore, Plaintiff is subject to adverse regulatory consequences in New Mexico because of Defendants' obstruction of CIC's interstate merger with Plaintiff and unlawful and bad faith requisition of Plaintiff's assets.   Plaintiff faces substantial monetary penalties and the revocation of its license to transact insurance due to its inability to comply with the New Mexico Insurance Code.   Plaintiff has no way to comply with the applicable New Mexico Insurance Code provisions without access to the assets that Defendants have been and continue to hold in conservation.

123.    Defendants have demanded onerous concessions from CIC and Plaintiff in exchange for the Commissioner's consent to the merger of CIC and Plaintiff under the California Insurance Code, including a demand that CIC and Plaintiff relinquish economically valuable rights to defend

pending litigation and release any and all claims against the Commissioner, both of which would harm Plaintiff's business.

124.    Section 1011(c) of the California Insurance Code, as applied to the interstate merger of CIC and Plaintiff, is unconstitutional, and Plaintiff seeks a declaration of its rights with regard to this controversy.

**SECOND CAUSE OF ACTION**
**Violation of Plaintiff's Right to Due Process Pursuant to the Fourteenth**
**Amendment to the Constitution of the United States; 42 U.S.C. § 1983**
**(Against All Defendants)**

125.    Plaintiff incorporates all preceding paragraphs into this cause of action by reference as though fully restated herein.

126.    Commissioner Lara is an elected official of the State of California who at all relevant times has purported to act under color of state law.  He has exercised and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

127.    Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

128.    To the extent any conduct alleged in this Complaint was undertaken by a subordinate of Defendants, such conduct was taken with their actual and/or constructive knowledge thereof.

129.    Defendants, and their subordinates, have violated and continue to violate Plaintiff's constitutional due process rights by, *inter alia*, obtaining a conservatorship over CIC, an entity that had legally merged with Plaintiff, without prior notice to CIC or Plaintiff or opportunity for them to be heard.   Defendants achieved this deprivation through knowingly false pretenses, misrepresentations, and omissions of material fact.  The conservatorship has deprived Plaintiff of its liberty and property interests as described in this complaint, including without limitation by preventing CIC from transferring its assets to Plaintiff.  Defendants also continue to deprive Plaintiff

of its property and liberty without due process by maintaining the conservatorship in bad faith and failing to negotiate in good faith with Plaintiff.

130.     Defendants further seek to deprive Plaintiff of its right to due process by imposing as a condition of lifting the conservatorship (1) the loss of CIC's "book of California business" by transferring it to an unaffiliated, competing insurance company, and (2) the loss of Plaintiff's right to defend and prosecute claims in ongoing private litigation.

131.     Defendants have further violated the due process rights of Plaintiff by depriving it of property and liberty interests even though Plaintiff is not being conserved.   Nor does the Commissioner have conservation authority over Plaintiff, which is not a California corporation.

132.     As a direct and proximate result of Defendants' direct interference in Plaintiff's business, and related actions, inactions, and failures, Plaintiff has been and is still being deprived of its constitutional right to due process of law.

### THIRD CAUSE OF ACTION
**Equitable Relief from a Taking in Violation of the Fifth and Fourteenth Amendments of the United States Constitution; 42 U.S.C. § 1983**
**(Against All Defendants)**

133.     Plaintiff incorporates all preceding paragraphs into this cause of action by reference as though fully restated herein.

134.     The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides: "nor shall private property be taken for public use, without just compensation."

135.     Plaintiff has a property interest in the rights and assets of CIC pursuant to the October 9, 2019 order of the New Mexico Superintendent of Insurance approving the merger of CIC into Plaintiff.

136.     Commissioner Lara is an elected official of the State of California who at all relevant times has purported to act under color of state law.  He has exercised and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

137. Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law. They have exercised and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

138. To the extent any conduct alleged in this complaint was undertaken by a subordinate of Defendants, such conduct was taken with their actual and/or constructive knowledge thereof.

139. Defendants seek to take Plaintiff's valuable property rights and transfer them to policyholders by requiring the settlement of ongoing litigation involving CIC and policyholders. Further, Defendants are unconstitutionally conditioning the lifting of the harm caused by the conservatorship on the deprivation of Plaintiffs' valuable property rights even though there is no reasonable nexus or proportionality between those two conditions.

140. Defendants, and their subordinates, also have effected an unlawful taking of Plaintiff's property interest in the assets of CIC by obtaining a conservatorship over CIC in violation of law and by maintaining the conservatorship in bad faith to the detriment of Plaintiff's rights. The conservatorship has prevented CIC from transferring its assets to Plaintiff. The Commissioner has admitted CIC's only alleged misconduct justifying imposition of the conservatorship—merging with Plaintiff—presented no risks to California policyholders or anyone else. For an entire year of negotiations after imposition of the conservatorship, CDI threatened that if CIC did not accept a proposed "consensual" rehabilitation plan, CIC and Plaintiff should expect an "even worse" non-consensual plan.

141. The conservatorship and Rehabilitation Plan do not protect the public. At all relevant times CIC has been solvent. The conservatorship and Rehabilitation Plan merely secure a political benefit for the Commissioner and the other Defendants, and provide an unearned financial benefit to private attorneys prosecuting pending EquityComp® disputes with whom the Commissioner has aligned himself and CDI.

142. Furthermore, Defendants have used and are using the Commissioner's conservatorship and control over CIC to coerce CIC into agreeing to a Rehabilitation Plan, which would (1) transfer CIC's "book of California business" by transferring it to an unaffiliated,

competing insurance company, and (2) require CIC to forego economically valuable rights to defend pending and future litigation.  This will necessarily deprive Plaintiff of the value of those rights, which it inherited by virtue of the CIC Merger.

143.    Defendants' actions have directly and adversely impacted Plaintiff.  Defendants' interference with CIC's reputation in the marketplace through his conservatorship has reduced CIC's policy renewals and overall business, in which Plaintiff has a property interest by virtue of the CIC Merger.

144.    Plaintiff was not afforded the opportunity to challenge imposition of the conservatorship, which was imposed on an *ex parte* basis, despite the fact that that Defendants knew exactly how to contact Plaintiff and the relevant non-parties.

145.    There is no other adequate forum for Plaintiff to challenge the constitutionality of the conservatorship or the Rehabilitation Plan.

146.    Defendants have not paid just compensation to Plaintiff for Defendants' actions.  The forced distribution of property rights from one private party to another may be enjoined regardless of the availability of just compensation.

147.    In light of the United States Supreme Court decision *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019), Plaintiff is entitled to bring a constitutional claim under § 1983 without first bringing a state lawsuit, even when state court actions addressing the underlying behavior may be available.

148.    Without relief from Defendants' unlawful taking of Plaintiff's property interest in the assets of CIC, Plaintiff will continue to suffer economic harm from Defendants' actions.

149.    Plaintiff is entitled to injunctive relief enjoining Defendants from continuing the Commissioner's bad-faith conservatorship.

## **PRAYER FOR RELIEF**

WHEREFORE, in connection with the preceding paragraphs, Plaintiff respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief:

A.      An Order declaring Defendants' actions, as alleged, constitute a violation of the Dormant Commerce Clause;

1      B.      An Order declaring Defendants' actions, as alleged, violate Plaintiff's right to due

2  process under the Fourteenth Amendment to the United States Constitution;

3      C.      An Order declaring Defendants' actions, as alleged, constitute an unlawful taking of

4  Plaintiff's property interests in violation of the Fifth and Fourteenth Amendments to the United

5  States Constitution;

6      D.      An Order directing Defendants to take all necessary steps to prevent further harm to

7  Plaintiff;

8      E.      An Order for reasonable attorneys' fees under 42 U.S.C. § 1988(b); and

9      F.      Such other relief as the Court may deem just and appropriate.

10                          **DEMAND FOR JURY TRIAL**

11      Plaintiff demands a jury trial on all issues so triable.

12

13  Dated:  January 6, 2021                  Respectfully submitted,

14

15                              By:  _/s/ Maxwell V. Pritt_____
                                Maxwell V. Pritt (SBN 253155)
16                              mpritt@bsfllp.com
                                Joshua I. Schiller (SBN 330653)
17                              jischiller@bsfllp.com
                                Beko O. Reblitz-Richardson (SBN 238027)
18                              brichardson@bsfllp.com
                                BOIES SCHILLER FLEXNER LLP
19                              44 Montgomery Street, 41st Floor
                                San Francisco, CA 94104
20                              Telephone: (415) 293-6800
                                Facsimile: (415) 293-6899

21                              *Counsel for Plaintiff California Insurance*
                                *Company, a New Mexico corporation*
22

23

24

25

26

27

28

                                    32                          COMPLAINT