1

MICHAEL J. STRUMWASSER (SBN 58413)
DALE K. LARSON (SBN 266165)
CAROLINE CHIAPPETTI (SBN 319547)
JULIA MICHEL (SBN 331864)
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
Email: mstrumwasser@strumwooch.com
Email: dlarson@strumwooch.com
Email: cchiappetti@strumwooch.com
Email: jmichel@strumwooch.com

CYNTHIA J. LARSEN (SBN 123994)
JUSTIN GIOVANNETTONE (SBN 293794)
MARK C. SMITH (SBN 319003)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California  95814-4497
Telephone:  (916) 447-9200
Facsimile:  (916) 329-4900
Email: clarsen@orrick.com
Email: jgiovannettone@orrick.com

*Attorneys for all Defendants
in their official capacities as, or on
behalf of, the Conservator of CIC*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

17

18

| | |
|---|---|
| CALIFORNIA INSURANCE COMPANY, a New Mexico corporation, | Case No. 2:21-cv-00030-WBS-AC |
| | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| Plaintiff, | |
| v. | Date:        May 17, 2021 |
| | Time:        1:30 pm |
| INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA RICARDO LARA, in his official capacity; *et al.*, | Judge:       Hon. William B. Shubb |
| | Courtroom:   5, 14th Floor |
| | Action Filed: January 6, 2021 |
| Defendants. | |

19

20

21

22

23

24

25

26

27

28

Printed on Recycled Paper

*CALIFORNIA INSURANCE COMPANY V. INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA*
*DEFENDANTS' REQUEST FOR JUDICIAL NOTICE ISO MOTION TO DISMISS*
*CASE NO.: 2:21-CV-00030-WBS-AC*

## TABLE OF CONTENTS

Table of Authorities ........................................... 4

Discussion .................................................... 12

I.      Exhibit 1: Letter from Laszlo Komjathy, California
        Department of Insurance, to Jeffrey Silver, dated
        October 9, 2019 ....................................... 12

II.     Exhibit 2: The Conservation Order ...................... 14

III.    Exhibit 3: Order Denying Respondent's Verified
        Application to Vacate the November 4 Order Appointing
        the Commissioner as Conservator ....................... 15

IV.     Exhibit 4: California Secretary of State Business Entity
        Profile for CIC ....................................... 16

V.      Exhibit 5: CIC's 2020 Annual Statement Filed With CDI .... 17

VI.     Exhibit 6: Order Setting Briefing Schedule, Hearing
        Date, and Procedures for Conservator's Application for
        Order Approving Rehabilitation Plan for California
        Insurance Company in the CIC Superior Court Action
        (Procedural Order) .................................... 18

VII.    Exhibit 7: Stipulation and Order to Continue Certain
        Briefing Deadlines for the Conservator's Rehabilitation
        Plan .................................................. 19

VIII.   Exhibit 8: Declaration of Joseph Holloway in Support of
        Conservator's Application for Approval of Rehabilitation
        Plan .................................................. 19

IX.     Exhibits 9, 10, 11, and 12: AM Best Press Releases dated
        June 10, 2020, July 11, 2019, and October 30, 2019;
        WCIRB Quarterly Experience Report, dated September 30,
        2020 .................................................. 23

X.      Exhibit 13: *Ex Parte* Application for Order Appointing
        Insurance Commissioner As Conservator (Conservation
        Application) .......................................... 27

XI.     Exhibit 14 & 15: [Redacted] Memorandum of Points and
        Authorities in Support of Application to Vacate Order
        Appointing Insurance Commissioner as Conservator and
        [Redacted] Respondent California Insurance Company,
        Inc.'s Reply In Support Of Its Application to Vacate
        Conservatorship ....................................... 28

XII.    Exhibit 16: Order Denying Petition for Writ of Mandate,
        *California Insurance Company v. Superior Court of
        California, County of San Mateo* ...................... 29

XIII.Exhibit 17: Order Denying CIC's Special Anti-SLAPP Motion to Strike ............................................... 30

Conclusion ............................................... 30

Certificate of Service ...................................... 32

**TABLE OF AUTHORITIES**

**Federal Cases**

*Bautista-Perez v. Holder*,
    681 F. Supp. 2d 1083 (N.D. Cal. 2009) ............ 10, 13, 21

*Committee to Protect Our Agricultural Water v. Occidental
    Oil and Gas Corp.*,
    235 F. Supp. 3d 1132 (E.D. Cal. 2017) ................ 12, 22

*Contreras v. Metro. Life Ins. Co.*,
    No. C07-02597 JSW, 2007 WL 4219167 (N.D. Cal. Nov.
    29, 2007) ................................................. 24

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ............................ 17

*Eclectic Properties East, LLC v. Marcus & Millchap Co.*,
    751 F.3d 990 (9th Cir. 2014) ........................ 26, 27

*Gerritsen v. Warner Brothers Entertainment Inc.*,
    112 F. Supp. 3d 1011 (C.D. Cal. 2015) ................ 11, 16

*Harris v. Cty. of Orange*,
    682 F.3d 1126 (9th Cir. 2012) ...................... passim

*Hyatt v. Yee*,
    871 F.3d 1067 (9th Cir. 2017) .................... 9, 10, 22

*In re American Apparel*,
    855 F. Supp. 2d 1043 (9th Cir. 2012) ................ 24, 25

*Intri-Plex Technologies, Inc. v. Crest Group, Inc.*,
    449 F.3d 1048 (9th Cir. 2007) ........................... 12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................... passim

*Kress v. United States*,
    382 F. Supp. 3d 820 (E.D. Wis. 2019) ................... 26

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ........................... 21

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006) ........................... 10

*Metropolitan Business Management, Inc. v. Allstate Ins.
    Co.*, No. 05-9306, 2009 WL 2424291 (C.D. Cal. Aug. 6,
    2009) .................................................. 17

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...................... 11, 17

*Pacific East Coast Federation of Fishermen's Associations v. U.S. Dept. of the Interior*, 929 F. Supp. 2d 1039 (E.D. Cal. 2013) ........................................ 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........................................ 9

*United States v. 14.02 Acres of Land More or Less*, 547 F.3d 943 (9th Cir. 2008) ............................ 22

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ................. 10, 12, 20, 27

*Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010) ........................... 11

*Wilson v. Kayo Oil Co.*, 563 F.3d 979 (9th Cir. 2009) ........................... 22

*Wynn v. Chanos*, F. Supp. 3d 1228 (N.D. Cal. 2014) ................................ 25

### State Cases

*20th Century Ins. Co. v. Garamendi*, 8 Cal.4th 216 (1994) ................................... 24

### Federal Rules of Civil Procedure

12(b)(1) .............................................. 9, 10, 11
12(b)(6) .............................................. 9, 11

### Federal Rules of Evidence

§ 201 .................................................. passim

### Cal. Ins. Code

§ 900 ................................................... 17
§ 1011(c) ............................................... 13
§ 11658 ................................................. 24
§ 11750.3 ............................................... 23

5

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

**TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Federal Rule of Evidence 201, Defendants California Insurance Commissioner Ricardo Lara (the "Insurance Commissioner" or "Commissioner"), Deputy Insurance Commissioner and General Counsel Kenneth Schnoll, and Deputy Insurance Commissioner and Special Counsel Bryant Henley, in their official capacities (collectively, "Defendants") respectfully request that the Court take judicial notice of the of the following documents, attached hereto as Exhibits 1-17, in support of Defendants' Motion to Dismiss Plaintiff's Complaint for Declaratory and Injunctive Relief ("Complaint" or "Compl."):

1. Letter from Laszlo Komjathy, California Department of Insurance (CDI), to Jeffrey Silver, dated October 9, 2019, a true and correct copy of which is attached hereto as **Exhibit 1.**

2. Order Appointing Insurance Commissioner as Conservator and Restraining Orders (Conservation Order), *Insurance Comm'r v. California Insurance Company*, No. 19-civ-06531 (Super. Ct. San Mateo County, Nov. 4, 2019), a true and correct copy of which is attached hereto as **Exhibit 2.**

3. Order Denying Respondent's Verified Application to Vacate the November 4 Order Appointing the Commissioner as Conservator, *Insurance Comm'r v. California Insurance Company*, No. 19-civ-06531 (Super. Ct. San Mateo County, Aug. 11, 2020), a true and correct copy of which is attached hereto as **Exhibit 3.**

4. California Secretary of State's Business Entity Profile for California Insurance Company (CIC), a California

1       Corporation, as of March 12, 2021, a true and correct copy

2       of which is attached hereto as **Exhibit 4.**

3   5.   Annual Statement of California Insurance Company to the

4       Insurance Department of the State of California for the

5       year ending December 31, 2020, a true and correct copy of

6       which is attached hereto as **Exhibit 5.**

7   6.   Order Setting Briefing Schedule, Hearing Date, and

8       Procedures for Conservator's Application for Order

9       Approving Rehabilitation Plan for California Insurance

10      Company, *Insurance Comm'r v. California Insurance Company*,

11      No. 19-civ-06531 (Super. Ct. San Mateo County, July 30,

12      2020), a true and correct copy of which is attached hereto

13      as **Exhibit 6.**

14   7.   Stipulation and Order to Continue Certain Briefing

15       Deadlines for the Conservator's Rehabilitation Plan,

16      *Insurance Comm'r v. California Insurance Company*, No. 19-

17      civ-06531 (Super. Ct. San Mateo County, Feb. 19, 2021), a

18      true and correct copy of which is attached hereto as

19      **Exhibit 7.**

20   8.   Declaration of Joseph Holloway in Support of Conservator's

21      Application for Approval of the Rehabilitation Plan,

22      *Insurance Comm'r v. California Insurance Company*, No. 19-

23      civ-06531 (Super. Ct. San Mateo County, Oct. 19, 2020), a

24      true and correct copy of which is attached hereto as

25      **Exhibit 8.**

26   9.   AM Best Press Release, *AM Best Downgrades Credit Ratings*

27      *of California Insurance Company and Its Affiliates; Places*

28      *Credit Ratings Under Review*, dated July 11, 2019, a true

and correct copy of which is attached hereto as **Exhibit 9.**

10.  AM Best Press Release, *AM Best Downgrades Issuer Credit Ratings of California Ins. Co. and Affiliates; Maintains Under Review With Negative Implications*, dated October 31, 2019, a true and correct copy of which is attached hereto as **Exhibit 10.**

11.  AM Best Press Release, *AM Best Removes From Under Review With Negative Implications and Affirms Credit Ratings of California Ins Co and Its Affiliates*, dated June 10, 2020, a true and correct copy of which is attached hereto as **Exhibit 11.**

12.  Workers' Compensation Insurance Rating Bureau ("WCIRB"), Quarterly Experience Report, dated September 30, 2020, a true and correct copy of which is attached hereto as **Exhibit 12.**

13.  *Ex Parte* Application for Order Appointing Insurance Commissioner As Conservator; Points and Authorities in Support Thereof, *Insurance Comm'r v. California Insurance Company*, No. 19-cv-06531 (Super. Ct. San Mateo County, Nov. 4, 2019), a true and correct copy of which is attached hereto as **Exhibit 13.**

14.  [Redacted] Memorandum of Points and Authorities in Support of Application to Vacate Order Appointing Insurance Commissioner as Conservator, *Insurance Comm'r v. California Insurance Company*, No. 19-civ-06531 (Super. Ct. San Mateo County, Jan. 21, 2020), a true and correct copy of which is attached hereto as **Exhibit 14.**

15.  [Redacted] Respondent California Insurance Company, Inc.'s

Reply In Support Of Its Application to Vacate Conservatorship, *Insurance Comm'r v. California Insurance Company*, No. 19-civ-06531 (Super. Ct. San Mateo County, Feb. 20, 2020), a true and correct copy of which is attached hereto as **Exhibit 15.**

16. Order Denying Petition for Writ of Mandate, *California Insurance Company v. Superior Court of California, County of San Mateo*, No. A161049 (Cal. Ct. App., Nov. 25, 2020), a true and correct copy of which is attached hereto as **Exhibit 16.**

17. Order Denying Respondent's Special Anti-SLAPP Motion to Strike, *Insurance Comm'r v. California Insurance Company*, No. 19-civ-06531 (Super. Ct. San Mateo County, Feb. 26, 2021), a true and correct copy of which is attached hereto as **Exhibit 17.**

Defendants' motion to dismiss is brought pursuant to both Rules 12(b)(1) and 12(b)(6). When considering a motion to dismiss pursuant to Rule 12(b)(6), a court generally may not consider material outside the complaint when assessing the sufficiency of a complaint, but may look beyond the pleadings "at documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

When considering a facial challenge to jurisdiction under Rule 12(b)(1), the district court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)." *Hyatt v. Yee*, 871 F.3d 1067, 1071, n.15 (9th Cir. 2017) (internal citations omitted). But just as it may when considering a motion to dismiss

under Rule 12(b)(6), the court may look beyond the pleadings at matters subject to judicial notice or documents incorporated into the complaint by reference. *Id.*; *Bautista-Perez v. Holder*, 681 F. Supp. 2d 1083, 1086-87 (N.D. Cal. 2009) (explaining that, when considering a facial challenge pursuant to Rule 12(b)(1), the court may consider whether facts alleged in the complaint "are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions"); *see also Pacific East Coast Federation of Fishermen's Associations v. U.S. Dept. of the Interior*, 929 F. Supp. 2d 1039, 1045 (E.D. Cal. 2013) (construing a Rule 12(b)(1) challenge as facial where parties referenced documents subject to judicial notice and attached to the complaint).

Under the incorporation-by-reference doctrine, a defendant may seek to incorporate a document into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken — or doom — their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "The court may treat such a document as '*part of the complaint*'" and "*may assume that its contents are true* for purposes of a motion to dismiss under Rule 12(b)(6)," *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (emphases added), so long as such assumptions do not only serve to dispute facts set forth in the complaint. *Khoja*, 899 F.3d at 1003.

Under Federal Rule of Evidence 201 ("FRE 201"), a court may take judicial notice of an adjudicative fact that is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b). Accordingly, a court may take judicial notice of matters of public record. *Khoja*, 899 F.3d at 999. On such grounds, courts routinely take judicial notice of documents on file in federal or state courts, *see, e.g., Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (taking judicial notice of a declaration filed by a defendant in a prior litigation); publicly filed corporate disclosure statements, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064, n.7 (9th Cir. 2008); information on government websites, *Gerritsen v. Warner Brothers Entertainment Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015); and press releases and news articles, in order to take notice of "what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

As detailed below, each of the documents described below and attached hereto is properly considered in connection with  (a) Defendants' Motion to Dismiss brought pursuant to Rule 12(b)(1) *or* properly considered in connection with Defendants' Motion to Dismiss brought pursuant to Rule 12(b)(6) under the incorporation-by-reference doctrine, (b) FRE 201, which permits the Court to consider information subject to judicial notice, or (c) both of these doctrines.

**DISCUSSION**

**I.   Exhibit 1: Letter from Laszlo Komjathy, California Department of Insurance, to Jeffrey Silver, dated October 9, 2019**

Exhibit 1 is a letter sent via email on October 9, 2019 from CDI attorney Laszlo Komjathy to CIC General Counsel Jeffrey Silver. Exhibit 1 is properly subject to judicial notice as it constitutes a publicly available "official record" of a government agency.[1] The fact that Komjathy sent this letter to Silver on October 9, 2019 is thus a "matter[] of public record . . . not reasonably subject to dispute." *Harris*, 682 F.3d at 1132; *see also Committee to Protect Our Agricultural Water v. Occidental Oil and Gas Corp.*, 235 F. Supp. 3d 1132, 1152-53 (E.D. Cal. 2017)(taking judicial notice of letters to and from government agencies as matters of public record) (citing *Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 449 F.3d 1048, 1052 (9th Cir. 2007)).

Alternatively, because the Complaint specifically references Exhibit 1 and its contents, the Court may take judicial notice of Exhibit 1 on the grounds that it is incorporated by reference into the Complaint. *See U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (explaining a defendant may seek to incorporate a document into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim").

---

[1] CDI's Form A communications with applicants are confidential under California Insurance Code section 1215.8. However, on October 2, 2020, CIC made Exhibit 12 public by filing it in its unredacted form with the California Court of Appeal in connection with its petition for writ of mandate. Petitioner's Appendix of Exhibits to Petition for Writ of Mandate, Vol. 1, *California Insurance Company v. Superior Court of California, County of San Mateo*, No. A161049 (Cal. Ct. App., Oct. 2, 2020).

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

1    The Complaint relies on Exhibit 1 to support its claim that
2    CDI did not object to CIC's merger with CIC II on October 9, 2019.
3    *See* Compl. ¶ 56 (alleging that, in Komjathy's October 9, 2019
4    letter, "CDI, however, did not object to the merger that New
5    Mexico's Superintendent Franchini had already approved"). The
6    allegation that CDI did not object to the merger, *id.*, is integral
7    to Plaintiff's claim that Defendants violated Plaintiff's right to
8    due process by obtaining the conservatorship without notice to CIC
9    and "through knowingly false pretenses, misrepresentations, and
10   omissions of material fact," Compl. ¶ 129; *see also id.* ¶¶ 57, 61.

11   The doctrine of incorporate by reference, however, "prevents
12   plaintiffs from selecting only portions of documents that support
13   their claims, while omitting portions of those very documents that
14   weaken — or doom — their claims," *Khoja*, 899 F.3d at 1002, as
15   Plaintiff has done here. Plaintiff may not deliberately conceal
16   from the Court the full contents of that letter, which indeed
17   advised CIC that "if the merger by and between CIC and California
18   Insurance Company II is completed without obtaining the prior
19   approval of the California Insurance Commissioner as required by
20   California Insurance Code Section 1215.2 and 1011(c), the
21   applicant will be in violation of California law." In resolving
22   Defendants' Motion to Dismiss, the Court may consider that
23   Plaintiff's allegations are plainly controverted by the text of
24   Exhibit 1 itself. *See Bautista-Perez,* 681 F. Supp. 2d at 1086-87.

25   The Court may also take judicial notice of the fact that
26   Exhibit 1 put Plaintiff on notice of CDI's position that the
27   attempted merger violated California Insurance Code section
28   1011(c) on October 9, 2019. This is relevant to the question of

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

whether Plaintiff has pled a cognizable takings claim, as it
indicates it could not have reasonably expected Defendants would
not enforce the law. *See* Defs.' Mot. to Dismiss ("MTD") at 138-
139. It is also relevant to the question of whether Plaintiff has
pled a cognizable Dormant Commerce Clause claim, as the letter
reflects California's legitimate local interest in ensuring
policyholders do not find themselves left holding policies of a
non-admitted insurer. *See id.* at 98-99.

## II.   Exhibit 2: The Conservation Order

The Court may take judicial notice of Exhibit 2, the
Conservation Order in *Insurance Commissioner v. California
Insurance Company*, No. 19-civ-06531 (Super. Ct. San Mateo County)
(the "CIC Superior Court Action"), as documents filed in state
court proceedings pursuant to FRE 201 are properly subject to
judicial notice because such documents are "matters of public
record" and "not subject to reasonable dispute." *Harris*, 682 F.3d
at 1132.

Alternatively, the Court may take judicial notice of Exhibit
2 pursuant to the incorporation-by-reference doctrine. The
Conservation Order is integral to the Complaint, which is replete
with allegations of financial and reputational injury as a result
of the Order. *See* Compl. ¶¶ 69 ("The Conservation Order, in
addition to the financial damage referenced above, has also caused
significant harm to the goodwill value of Plaintiffs' [*sic*]
businesses."); 73 ("Plaintiff and CIC had experienced irreparable
harm as a result of Defendants' unlawful acts, including in
connection with the Conservation Order obtained by the
Commissioner's misrepresentations."); 97 (alleging harm to

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

1  Plaintiff's business and future prospects from Conservation Order
2  "far outweighs any benefits thereof"). Plaintiff also alleges that
3  Defendants' proposed rehabilitation plan for CIC is contrary to
4  the Conservation Order. *See* Compl. ¶ 95 (alleging that Defendants
5  have not demonstrated proportionality of the Rehabilitation Plan's
6  conditions to the actions necessitating the Conservation Order).
7  Indeed, Plaintiff's causes of action stem in large part from the
8  legal and factual effects of the Conservation Order, and from its
9  allegations that the Conservation lacked a valid basis. The
10  plausibility of Plaintiff's claims thus depends in part on the
11  text of the Conservation Order itself.

12  **III. Exhibit 3: Order Denying Respondent's Verified Application to**
13  **Vacate the November 4 Order Appointing the Commissioner as**
   **Conservator**

14      Exhibit 3 is the order in the CIC Superior Court Action
15  denying CIC's Verified Application to Vacate the Conservation
16  Order. Exhibit 3 is properly subject to judicial notice pursuant
17  to FRE 201 as a document filed a in state court proceeding since
18  such documents are "matters of public record" and "not reasonably
19  subject to dispute." *Harris*, 682 F.3d at 1132.

20      Defendants do not ask the Court to decide that every
21  assertion within Exhibit 3 is judicially noticeable for its truth.
22  *See Khoja*, 899 F.3d at 999. Defendants request that the Court take
23  judicial notice of the operative fact that the Superior Court
24  denied Plaintiff and CIC's Application to Vacate the Conservation
25  and affirmed the Commissioner's grounds for the conservation of
26  CIC. Moreover, Defendants request that the Court take judicial
27  notice of the fact that Exhibit 3 contains a number of statements.
28  First, the Court may take judicial notice of the Superior Court's

statement that "[t]he Conservation Order ensures that Respondents do not again attempt to take CIC and its assets out of California without adequate protection of policyholders and the public," Ex. 3, at 4, thereby showing that the Superior Court's order reflected the Commissioner's proffered rationale for the conservation and upheld the Commissioner's exercise of police power. Second, the Court may take judicial notice of the Superior Court's statement that the Commissioner's proposed course of action – pursuing a Rehabilitation Plan – "is reasonable and sufficient under the circumstances." *Id*. Third, the Court may take judicial notice of the Superior Court's statement that "Respondents attempted to take CIC and its assets out of California." *Id*. Finally, the Court may take judicial notice that the Superior Court referred to conservations arising under California Insurance Code section 1011(c) as an "enforcement tool." *Id*.

That Exhibit 3 contains such statements is "not reasonably subject to dispute" and is properly subject to judicial notice.

**IV.  Exhibit 4: California Secretary of State Business Entity Profile for CIC**

Exhibit 4 is a publicly available business entity profile for CIC, retrieved from the California Secretary of State website on March 12, 2021. Exhibit 4 reflects that CIC has not filed articles of merger with the California Secretary of State, because if so, they would be listed here. The absence of filed articles of merger is "not reasonably subject to dispute" because it can be accurately and readily determined from the records of the Secretary of State website, a source whose accuracy cannot reasonably be questioned. *See Gerritsen,* 112 F. Supp. 3d at 1033 (taking judicial notice of business entity profiles retrieved from

16

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

1  the California Secretary of State's website); *Daniels-Hall v.*
2  *Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) (taking
3  judicial notice of information "publicly available by government
4  entities" where "neither party disputes the authenticity of the
5  web sites or the accuracy of the information displayed therein").
6  This document, and its reflection of records filed by CIC with the
7  California Secretary of State, is thus properly subject to
8  judicial notice pursuant to FRE 201.

9  **V.   Exhibit 5: CIC's 2020 Annual Statement Filed With CDI**

10       Exhibit 5 is CIC's Annual Financial Statement filed with the
11  California Department of Insurance ("CDI") for the year ending
12  December 31, 2020. California Insurance Code section 900 requires
13  insurers to file annual and quarterly financial statements with
14  the CDI. Once filed, CDI makes insurers' annual and quarterly
15  financial statements publicly available. Exhibit 5 and the
16  statements reported by CIC therein are properly subject to
17  judicial notice pursuant to FRE 201 as "matter[s] of public
18  record" that are "capable of accurate and ready determination by
19  resort to sources whose accuracy cannot reasonably be questioned."
20  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049,
21  1064, n.7 (9th Cir. 2008) (taking judicial notice of company's
22  reported stock price history and other publicly available
23  financial documents); *Metropolitan Business Management, Inc. v.*
24  *Allstate Ins. Co.*, No. 05-9306, 2009 WL 2424291, at *3 (C.D. Cal.
25  Aug. 6, 2009) (taking judicial notice of statements made by
26  insurer in its quarterly financial statement on the grounds that
27  insurer "is required by law to provide this information and its
28  officers certify its accuracy").

Defendants request this Court take judicial notice of the fact that CIC filed its 2020 Annual Statement with CDI. This Court may moreover take judicial notice of the fact that, in this Annual Statement, CIC represented in a sworn statement of its officers that CIC is organized under the laws of California and is domiciled in California, and included an organizational chart that shows California Insurance Company of California and California Insurance Company of New Mexico as separate and distinct subsidiaries of North American Casualty Company.

**VI.   Exhibit 6: Order Setting Briefing Schedule, Hearing Date, and Procedures for Conservator's Application for Order Approving Rehabilitation Plan for California Insurance Company in the CIC Superior Court Action (Procedural Order)**

Exhibit 6 is an order in the CIC Superior Court Action. Exhibit 6 is properly subject to judicial notice pursuant to FRE 201 as a document filed in a state court proceeding since such documents are "matters of public record" and "not reasonably subject to dispute." *Harris*, 682 F.3d at 1132.

Defendants do not ask this Court to decide that every assertion within Exhibit 6 is judicially noticeable for its truth. *See Khoja*, 899 F.3d at 999 ("Just because the document itself is subject to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."). Defendants request that this Court take judicial notice of the fact that pursuant to this order, the Superior Court has already established a briefing and hearing schedule for its approval of the Conservator's proposed Rehabilitation Plan, as well as the fact that any rehabilitation plan will only take effect pursuant to an order of the state court. Defendants also

18

request that this Court take judicial notice of the fact that the Procedural Order invites CIC affiliates such as Plaintiff to submit their views or arguments in opposition to the proposed Rehabilitation Plan and to appear at the Superior Court's hearing to present any arguments or modifications. *See* Ex. 6 at ¶¶ 3, 9. These facts are "not reasonably subject to dispute" and are properly subject to judicial notice.

## VII.  Exhibit 7: Stipulation and Order to Continue Certain Briefing Deadlines for the Conservator's Rehabilitation Plan

Exhibit 7 reflects the parties' stipulation and the court's subsequent order continuing briefing deadlines for the Conservator's Rehabilitation Plan in the CIC Superior Court Action. Documents filed in state court proceedings are properly subject to judicial notice pursuant to FRE 201 because such documents are "matters of public record" and "not subject to reasonable dispute." *Harris*, 682 F.3d at 1132. The court may take judicial notice of current deadlines for CIC's position papers and the Conservator's reply, set by the Superior Court, which are "not reasonably subject to dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

## VIII. Exhibit 8: Declaration of Joseph Holloway in Support of Conservator's Application for Approval of Rehabilitation Plan

Exhibit 8 is a declaration filed by Joseph Holloway, the Deputy Insurance Commissioner and Conservation Manager for CIC, in the Superior Court Action. Exhibit 8 is properly subject to judicial notice pursuant to FRE 201, as documents filed in state court proceedings are "matters of public record" and "not subject to reasonable dispute." *Harris*, 682 F.3d at 1132. The Court may

1  take judicial notice of the fact that, as evidenced by Exhibit 8,

2  the Commissioner has presented bases to the Superior Court for the

3  proposal of the Rehabilitation Plan.

4      The Court may also take judicial notice of Exhibit A to

5  Exhibit 8, which is a true and correct copy of the Conservator's

6  proposed Rehabilitation Plan filed in the CIC Superior Court

7  Action. The proposed Rehabilitation Plan is independently the

8  proper subject of judicial notice, as documents filed in state

9  court proceedings pursuant to FRE 201 are properly subject to

10 judicial notice because such documents are "matters of public

11 record" and "not subject to reasonable dispute." *Harris*, 682 F.3d

12 at 1132.

13     Alternatively, the Court may consider the proposed

14 Rehabilitation Plan on the grounds that it is incorporated by

15 reference into the Complaint. *See Ritchie*, 342 F.3d at 907

16 (explaining a defendant may seek to incorporate a document into

17 the complaint "if the plaintiff refers extensively to the document

18 or the document forms the basis of the plaintiff's claim"). "The

19 doctrine prevents plaintiffs from selecting only portions of

20 documents that support their claims, while omitting portions of

21 those very documents that weaken — or doom — their claims." *Khoja*,

22 899 F.3d at 1002.

23     In determining whether Plaintiff's allegations of possible

24 future injury are legally sufficient, the court may consider

25 whether facts alleged in the Complaint "are controverted by

26 exhibits attached to the complaint, matters subject to judicial

27 notice, or documents necessarily relied on by the complaint and

28 whose authenticity no party questions." *Bautista-Perez*, 681 F.

1  Supp. 2d at 1086-87 (citing *Lee v. City of Los Angeles*, 250 F.3d
2  668, 688-89 (9th Cir. 2001)).

3      Plaintiff's allegations of harm caused by the Rehabilitation
4  Plan are at the core of Plaintiff's prayer for relief. *See, e.g.,*
5  Compl. at 31-32, ¶¶ A-D. The Complaint is replete with
6  characterizations of the proposed Rehabilitation Plan's terms and
7  their effects on Plaintiff. *See e.g., id.* at ¶¶ 6, 86-88, 98-99.
8  The Court is thus well within its rights to take judicial notice
9  of the Rehabilitation Plan to determine whether Plaintiff's
10 assertions regarding the Rehabilitation Plan are controverted by
11 the text of the Rehabilitation Plan itself.

12     The Court may also take judicial notice of Exhibits D through
13 G to Exhibit 8, each of which is an official record of a state
14 government agency.[2] These records are precisely the kind of

15

16      [2] Exhibit D is a true and correct copy of a Stipulation and
   Consent Order issued by the Vermont Department of Financial
17 Regulation in *In re Continental Indemnity Company, Applied
   Underwriters, Inc., Applied Risk Services, Inc., and Applied
18 Underwriters Captive Risk Insurance Company, Inc.*, dated October
   30, 2015.
19
20      Exhibit E is a true and correct copy of an Order to Show
   Cause issued by the New Jersey Department of Banking and Insurance
21 in *In the Matter of Proceedings by the Commissioner of Banking and
   Insurance, State of New Jersey, to have Applied Underwriters, et
22 al. cease and desist from selling the EquityComp, SolutionOne, and
   PremierExclusive workers' compensation programs,* dated March 6,
23 2019.
24      Exhibit F is a true and correct copy of a Consent Order
   issued by the New York Department of Financial Services in *In the
25 Matter of Continental Indemnity Company, Applied Underwriters,
   Inc., Applied Risk Services, Inc., Applied Risk Services of NY,
26 Inc., and Applied Underwriters Captive Risk Assurance Company,
   Inc.*, dated July 17, 2019.
27      Exhibit G is a true and correct copy of the Wisconsin Office
   of the Commissioner of Insurance's final report of its Market
28 Conduct Examination of Continental Indemnity Company, dated March

21

matters of public record that are properly subject to judicial

notice, "having been prepared and made public by official

government agencies." *Committee to Protect Our Agricultural Water*,

235 F. Supp. 3d at 1153; *United States v. 14.02 Acres of Land More*

*or Less*, 547 F.3d 943, 955 (9th Cir. 2008) ("[J]udicial notice is

appropriate for records and 'reports of administrative bodies.'").

        The actions of other state regulators, as reflected in

Exhibits D through G, are relevant to the question of whether

Plaintiff's allegations are legally sufficient to establish that

the alleged injuries to their goodwill and credit, Compl. ¶¶ 69,

107, 112, are "fairly traceable" to Defendants' actions. In

resolving this question, the court may rely on undisputed facts or

those judicially noticeable as matters of public record. *See*

*Hyatt*, 871 F.3d at 1071 n.15; *Wilson v. Kayo Oil Co.*, 563 F.3d

979, 980 (9th Cir. 2009). The court may take judicial notice of

Exhibits D through G for the limited purpose of establishing that

state regulators outside of California have taken steps to ban

CIC's EquityComp program and impose penalties on Plaintiff's

affiliates. Specifically, Defendants request this Court take

judicial notice of the following facts contained within Exhibits D

through G:

        -   The legal determination of a state regulator in 2015

            that Plaintiff's affiliate "were not in compliance with

            Vermont insurance laws and regulations" and could be

            subject to administrative action. Ex. 3, Ex. D at 146-

            47.

---

11, 2019.

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

1        - The fact of publicly filed allegations of wrongdoing by

2          a state regulator in New Jersey in March 2019. Ex. 3,

3          Ex. E at 167-72.

4        - The legal determination of a state regulator that

5          Plaintiff's affiliates violated New York state insurance

6          laws in July 2019. Ex 3, Ex. F at 183.

7        - The fact that Plaintiff's affiliate had been subject " a

8          series of regulatory actions taken by Wisconsin

9          regarding the company's workers' compensation line of

10          business" was published in a public Market Conduct

11          Examination in March 2019. Ex. 3, Ex. G at 202-03.

12     These facts are not subject to reasonable dispute because

13 they are "capable of accurate and ready determination by resort

14 to" Exhibits D through G, administrative agency records "whose

15 accuracy cannot reasonably be questioned." FRE 201.

16 **IX.  Exhibits 9, 10, 11, and 12: AM Best Press Releases dated June 10, 2020, July 11, 2019, and October 30, 2019; WCIRB Quarterly Experience Report, dated September 30, 2020**

17

18     Exhibit 9 is a copy of a press release issued by the credit

19 rating agency AM Best on July 11, 2019. Exhibit 10 is a copy of a

20 press release issued by the credit rating agency AM Best on

21 October 31, 2019. Exhibit 11 is a copy of a press release issued

22 by the credit rating agency AM Best on June 10, 2020.

23     Exhibit 12 is the WCIRB's Quarterly Experience Report, as of

24 September 30, 2020.  The WCIRB is California's licensed rating

25 organization for workers' compensation, organized pursuant to the

26 California Insurance Code. *See* Cal. Ins. Code § 11750.3 (stating

27 that a rating organization may be organized for purposes including

28 the provision of "reliable statistics and rating information with

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

respect to workers' compensation insurance" and the exchange of "information and experience data with rating organizations, advisory organizations, and insurers in this and other states, with respect to ratemaking"); § 11658 (requiring insurers to file rates with rating organization). The WCIRB's publicly available quarterly report provides an update on California statewide insurer experience as of the end of each quarter. As a publication of the WCIRB – an entity organized pursuant to statute for the express purpose of providing "reliable statistics" - Exhibit 12 is properly subject to judicial notice as a "matter[] of public record" of which the contents are "not reasonably subject to dispute." *Harris*, 682 F.3d at 1132.

Exhibits 9 through 11 are properly subject to judicial notice as "matters of public record" of which the contents are "not reasonably subject to dispute." *Harris*, 682 F.3d at 1132. Exhibits 16 through 18 are publicly available online and their contents are "capable of accurate and ready determination."  FRE 201. "Courts in the Ninth Circuit routinely take judicial notice of press releases." *In re American Apparel*, 855 F. Supp. 2d 1043, 1062 (9th Cir. 2012) (citing cases). Moreover, other courts have concluded that AM Best publications can be judicially noticed. *See Contreras v. Metro. Life Ins. Co.*, No. C07-02597 JSW, 2007 WL 4219167, at *2 (N.D. Cal. Nov. 29, 2007) (taking judicial notice of AM Best's Insurance Report after concluding it is "an accepted and respected source, which is capable of accurate and ready determination"); *20th Century Ins. Co. v. Garamendi*, 8 Cal.4th 216, 269 n.8 (1994).

Defendants do not ask this Court to take judicial notice of the three press releases for the truth of their contents, but

24

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

merely to note the fact and date of their public announcements. "Taking judicial notice of news reports and press releases is appropriate for showing 'that the market was aware of the information contained in news articles ...'" *In re American Apparel*, 855 F. Supp. 2d at 1062. Defendants' Motion cites Exhibits 16 and 18 for a limited number of plainly judicially noticeable facts:

- that AM Best publicly announced that it placed CIC "under review with negative implications" on July 11, 2019, MTD at 46-47 (citing Ex. 9);

- that AM Best publicly announced why it downgraded CIC's ratings on October 31, 2019, MTD at 47 (citing Ex. 10); and

- that AM Best publicly announced that it removed CIC's downgraded ratings and stated that "the company does continue to operate unencumbered by [the conservation], *id.* (citing Ex. 11).

The fact that each of these statements was published by AM Best on the above-mentioned dates is a matter of public record not reasonably subject to dispute. The Court may thus take judicial notice of these discrete facts. AM Best is a credit-ratings agency that announces its credit-ratings in press releases. These are publicly-announced objective measures that may be judicially noticed without need for further interpretation, as recognized by *Wynn v. Chanos*, F. Supp. 3d 1228, 1236 (N.D. Cal. 2014) (taking judicial notice of SEC filings "not for the truth of the statements they contain, but for the fact that they were filed and provided certain information to the public"). These judicially

25

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

noticeable facts are relevant to whether Plaintiff's allegations
of reduced profits, Compl. ¶ 107, are legally sufficient and
"fairly traceable" to Defendants' actions.

Defendants moreover request judicial notice of one additional
fact reflected in Ex. 11 – that AM Best reported in June 2020 that
the "workers' compensation industry remains under pressure." MTD
at 48 (citing Ex. 11). Defendants also request judicial notice of
the fact, as reflected in Exhibit 12, that industry-average
workers' compensation rates have been declining since 2014. As
federal courts have recognized, the economic outlook of the
country in general, and the condition and outlook of a specific
industry in particular, may properly be the subject of judicial
notice, particularly where, as here, it evinces "a plausible and
innocuous alternative explanation" for Plaintiff's alleged
injuries. *Eclectic Properties East, LLC v. Marcus & Millchap Co.*,
751 F.3d 990, 998 (9th Cir. 2014); *see also Kress v. United
States*, 382 F. Supp. 3d 820, 829-30 (E.D. Wis. 2019) (taking
judicial notice of certain facts related to the economic
recession).

In *Eclectic Properties*, the Ninth Circuit affirmed the
district court's dismissal of a commercial real estate purchaser's
complaint, finding that "the culminating events that harmed
Plaintiffs took place in the midst of a deep national recession
that seriously affected the real estate market." *Id.* at 998.

Taking judicial notice of the dates of the economic
recession, the court noted that Plaintiffs' allegations were all
"consistent with both their theory of liability and this innocent
alternative, that the recession decreased business viability and

26

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

property values." *Id.* at 998-98 & n.6. Defendants likewise ask this Court to take judicial notice of the state of the workers' compensation market, a fact that, if not "generally" known within the trial court's territorial jurisdiction, can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," such as Exhibits 11 and 12. FRE 201(b).

**X.   Exhibit 13: *Ex Parte* Application for Order Appointing Insurance Commissioner As Conservator (Conservation Application)**

The Court may take judicial notice of Exhibit 13, the Conservation Application in the CIC Superior Court Action, as documents filed in state court proceedings pursuant to FRE 201 are properly subject to judicial notice because such documents are "matters of public record" and "not subject to reasonable dispute." *Harris*, 682 F.3d at 1132.

Alternatively, the Court may consider the Conservation Application on the grounds that it is incorporated by reference into the Complaint. *See Ritchie*, 342 F.3d at 907 (explaining a defendant may seek to incorporate a document into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim"). "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken — or doom — their claims." *Khoja*, 899 F.3d at 1002. Plaintiff's allegations of harm caused by the Conservation Application – and allegations of bad-faith underpinning the Conservation Application – are at the core of Plaintiff's prayer for relief. *See* Compl. ¶ 149 (seeking injunctive relief "enjoining Defendants from continuing the

27

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

Commissioner's bad-faith conservatorship); *id.*, at 32, ¶ B; *see also* ¶¶ 1, 10, 56-70 (alleging Defendants put CIC into Conservation based on "false pretenses").

Specifically, Defendants ask this Court to take judicial notice that the Conservation Application alleged that CIC "is in the midst of an attempt to merge with a newly formed New Mexico entity, *thereby transferring* control of CIC without obtaining the Commissioner's approval as required by law. *The Commissioner has filed this application to prevent this illegal transfer* . . . ." That the Conservation Application contained this charge of a wrongful act is a fact both plainly subject to judicial notice and relevant to whether the Conservation is a "civil enforcement proceeding" for the purpose of *Younger* abstention.

**XI. Exhibit 14 & 15: [Redacted] Memorandum of Points and Authorities in Support of Application to Vacate Order Appointing Insurance Commissioner as Conservator and [Redacted] Respondent California Insurance Company, Inc.'s Reply In Support Of Its Application to Vacate Conservatorship**

Exhibit 14 is the opening brief in the CIC Superior Court Action filed by CIC on January 21, 2020 in support of their Application to Vacate the Conservation Order.[3] Exhibit 15 is the reply brief in the CIC Superior Court Action filed by CIC on February 20, 2020 in support of their Application to Vacate the Conservation Order.

Defendants merely ask this Court to take judicial notice of

---

[3] CIC lodged revised redacted versions of its Application to Vacate and accompanying papers on March 12, 2020, in response to the Superior Court's March 12, 2020 Order continuing the hearing on its Motion to File the Application to Vacate Conservatorship Under Seal. Exhibit 13 is a copy of the revised redacted Memorandum of Points and Authorities lodged on that date.

28

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

the facts that Plaintiff and CIC jointly filed their Application to Vacate on January 21, 2021, and filed a reply brief in support of their Application to Vacate on February 20, 2020. To the extent these facts are reflected in Exhibits 14 and 15, they are properly subject to judicial notice pursuant to FRE 201 as documents filed in a state court proceeding are "matters of public record" and "not reasonably subject to dispute." *Harris*, 682 F.3d at 1132.

**XII. Exhibit 16: Order Denying Petition for Writ of Mandate, *California Insurance Company v. Superior Court of California, County of San Mateo***

Exhibit 16 is an order by the California Court of Appeal denying CIC's Petition for Writ of Mandate, which sought interlocutory review of two orders by the Superior Court in the CIC Superior Court Action, including the Superior Court's order denying CIC's Application to Vacate, Ex. 3. Exhibit 16 is properly subject to judicial notice pursuant to FRE 201 as a document filed in a state court proceeding since such documents are "matters of public record" and "not reasonably subject to dispute." *Harris*, 682 F.3d at 1132.

Defendants ask the Court to take judicial notice of the fact, not subject to reasonable dispute, that the California Court of Appeal has issued an order denying CIC's request for review of the Superior Court's order denying CIC's Application to Vacate the conservation. This fact is relevant to the question of whether, by exercising jurisdiction in this case, this Court would interfere with state courts' ability to perform their judicial function and enforce compliance with orders already made.

//

//

*California Insurance Company v. Insurance Commissioner of the State of California*
Defendants' Request For Judicial Notice iso Motion to Dismiss
Case No.: 2:21-cv-00030-WBS-AC

1

### XIII. Exhibit 17: Order Denying CIC's Special Anti-SLAPP Motion to Strike

Exhibit 17 is the Superior Court's Order Denying CIC's Special Anti-SLAPP Motion to Strike in the Superior Court Action, issued on February 26, 2021. Exhibit 17 is properly subject to judicial notice pursuant to FRE 201 as a document filed in a state court proceeding since such documents are "matters of public record" and "not reasonably subject to dispute." *Harris*, 682 F.3d at 1132. Defendants merely ask this Court to take judicial notice of the fact that the Superior Court denied CIC's anti-SLAPP motion, which is a fact plainly discernible from the face of the Superior Court's order.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court take judicial notice of, and consider pursuant to the incorporation-by-reference doctrine and the legal authorities cited herein, Exhibits 1 through 17 attached hereto, and consider them in connection with its adjudication of Defendants' contemporaneously filed Motion to Dismiss.

//

//

DATED:    March 15, 2021          Respectfully submitted,

STRUMWASSER & WOOCHER LLP
Michael J. Strumwasser
Dale K. Larson
Caroline Chiappetti
Julia Michel

ORRICK, HERRINGTON & SUTCLIFFE LLP
Cynthia J. Larsen
Justin Giovannettone
Mark C. Smith

*Attorneys for all Defendants
in their official capacities as, or
on behalf of, the Conservator of CIC*

By  */s/ Michael J. Strumwasser*
        Michael J. Strumwasser

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that on March 15, 2021, I caused to be

3  electronically filed a true and correct copy of the foregoing with

4  the Clerk of the Court using the CM/ECF system and that all

5  counsel of record will be served via the Notice of Electronic

6  Filing generated by CM/ECF.

7                                    _/s/Michael J. Strumwasser_

8                                     Michael J. Strumwasser

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



## RICARDO LARA
CALIFORNIA INSURANCE COMMISSIONER

October 9, 2019

**<u>VIA ELECTRONIC MAIL ONLY</u>        <u>jeffreysilver@silver-law.net</u>**

Jeffrey A. Silver
California Insurance Company
10805 Old Mill Road
Omaha, Nebraska 68154

SUBJECT:  California Insurance Company, a California domestic ("CIC") –
          Form A

Dear Mr. Silver:

Over the course of three separate attempts to file a complete Form A application in California, the California Department of Insurance ("CDI") noted numerous deficiencies in each application submitted for review.  Each filing had serious defects that included numerous misstatements that required several rounds of communications and/or the withdrawal or return of the two prior incomplete applications.

The initial application received on April 9, 2019 lacked material information and was withdrawn.  The second application was submitted on June 12, 2019 was also materially deficient and was returned as incomplete on August 29, 2019.

On September 7, 2019, a third Form A application was submitted to the CDI.  As noted in CDI's letter dated September 27, 2019, numerous questions still exist with respect to the pending litigation against CIC, the potential liability and financial impact that the litigation may have upon CIC and its policyholders.  Due to the numerous unanswered questions of the CDI, the applicant was provided notice that the CDI could neither approve nor disapprove the pending application prior to September 30, 2019, the original closing date for the sale.  Thereafter, a ten day extension of the closing date was granted by Berkshire Hathaway to October 10, 2019.

On October 8, 2019, CDI was informed that a Form A application was filed with the New Mexico Office of the Superintendent of Insurance to merge CIC into a newly formed New Mexico domestic insurer, California Insurance Company II.  Prior to

#1135201.1 CALIFORNIA DEPARTMENT OF INSURANCE
PROTECT • PREVENT • PRESERVE
45 Fremont Street, 24th Floor
San Francisco, CA 94105
Tel: 415-538-4413• Fax: 415-904-5896
Laszlo.Komjathy@insurance.ca.gov

**AA 257**          Exhibit 1, Page 1 of 2

Document received by the CA 1st District Court of Appeal.

Jeffrey A. Silver
October 9, 2019
Page 2

receiving this information, CDI was not advised of the proposed change in CIC's business plan and such revisions were not disclosed to the CDI in connection with the Form A application pending in California.

Because it appears that the applicant abandoned the transaction described in the Form A submitted to the CDI for review, and chose instead to merge CIC into the newly formed New Mexico domestic insurer, California Insurance Company II, and such merger was approved by the New Mexico Superintendent of Insurance on October 9, 2019, the CDI has discontinued its review of the Form A currently pending in California.  Accordingly, unless the Form A pending in California is withdrawn within the next 10 business days, the application will be denied.

You are hereby advised that if the merger by and between CIC and California Insurance Company II is completed without obtaining the prior approval of the California Insurance Commissioner as required by California Insurance Code Section 1215.2 and 1011(c), the applicant will be in violation of California law. Additionally, once the merger is completed, CIC will cease to exist and California Insurance Company II, as an unlicensed insurer is precluded from transacting the business of insurance in California from and after the effective date of the merger unless and until it becomes admitted in California.


Cordially,

Laszlo Komjathy, Jr.
Attorney IV


cc:   Honorable John G. Franchini, Superintendent of Insurance
      Margaret Caffey-Moquin, Chief Staff Counsel
      Jing Yi Chen
      Bernadette Sia
      Michelle Lo
      Carol Frair

Document received by the CA 1st District Court of Appeal.

# EXHIBIT 2



**FILED**
SAN MATEO COUNTY

NOV 04 2019

Clerk of the Superior Court

By_____
DEPUTY CLERK

**Exempt from filing fees pursuant to Government Code section 6103**

1
2
3
4
5
6
7
8
9
10
11

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

12 | INSURANCE COMMISSIONER OF THE
13 | STATE OF CALIFORNIA,

Applicant,

14

15    v.

16 | CALIFORNIA INSURANCE COMPANY, a
California corporation,

17

Respondent.

18
19
20

Case No. **19CIV06531**

**[PROPOSED] ORDER APPOINTING INSURANCE COMMISSIONER AS CONSERVATOR and RESTRAINING ORDERS;**

**[Ins. Code, § 1011]**

Date:    November 4, 2019
Time:    2:00 p.m.
Dept.:



19 – CIV – 06531
ORD
Order
2113732

21
22
23
24
25
26
27
28

Printed on Recycled Paper

[PROPOSED] ORDER APPOINTING INSURANCE COMMISSIONER AS CONSERVATOR AND RESTRAINING ORDERS;

1

[~~PROPOSED~~] ORDER

2     The California Insurance Commissioner's Verified Ex Parte Application for Order Appointing

3     Conservator having been filed herein, it being shown to the Court's satisfaction from said Application

4     that the Commissioner has (1) found that California Insurance Company ("CIC"), a California

5     domiciled insurance company, entered into a transaction the effect of which, if consummated, would

6     merge CIC into and with California Insurance Company II ("CIC II"), a New Mexico domiciled

7     insurance company without first obtaining the consent in writing of the California Insurance

8     Commissioner in violation of California Insurance Code Section 1215.2(a), (2) found that the factual

9     and legal conditions exist to conserve CIC pursuant to Insurance Code section 1011, subdivision (c),

10    and (3) established good cause to believe that the State of California would be prejudiced were it to

11    provide respondent advanced notice of this proceeding in that CIC has within its authority power to at

12    any time complete the ostensible consummation of the transaction, which would have the effect of at

13    least forfeiting CIC's certificate of authority, rendering California policyholders ostensibly insured by

14    an out-of-state insurer without authority to transact insurance in California; and good cause appearing,

15          IT IS HEREBY ORDERED that:

16          1.      The California Insurance Commissioner is hereby appointed as the Conservator of CIC

17    pursuant to section 1011, and is directed to conduct the business of CIC or so much thereof as he may

18    deem appropriate, to pay or defer payment of all proper claims and obligations against CIC accruing

19    prior to or subsequent to his appointment as Conservator, and to act in all ways and exercise all powers

20    necessary or appropriate for the purpose of carrying out this order.

21          2.      CIC, its officers, directors, agents and employees and any person that acts or purports to

22    act on its behalf of any of the foregoing shall be enjoined from taking any actions or filing any

23    document with any governmental entity or any governmental subdivision necessary to consummate

24    the merger of CIC into and with CIC II, to otherwise transfer the domicile of CIC from California to

25    New Mexico, or to otherwise adversely affect the California Certificate of Authority of CIC.

26          3.      David E. Wilson, Special Deputy Insurance Commissioner, is appointed as Deputy

27    Conservator empowered to carry out any and all duties and exercise the authority of the Conservator

28    granted herein and the Insurance Code.  Joseph B. Holloway, Jr. is appointed as Conservation

[PROPOSED] ORDER APPOINTING INSURANCE COMMISSIONER AS CONSERVATOR AND RESTRAINING ORDERS;

1   Manager and Scott Pearce is appointed as Conservation Supervisor empowered to carry out any and all

2   duties and exercise the authority of the Conservator and Deputy Conservator, and as may be delegated

3   by the Conservator and Deputy Conservator.

4       4.     The Conservator's immunity and related protections from claims, suits or liability

5   under applicable law, including but not limited to Government Code section 820.2, shall apply equally

6   to the Deputy Conservator, Conservation Manager and the Conservation Supervisor in their capacities

7   as Receiver of CIC, their successors in office, the Conservation & Liquidation Office ("CLO"), and

8   their agents and employees.

9       5.     The Commissioner as Conservator is authorized to appoint and employ special

10   deputies, estate managers, other professionals, clerks and assistants and to give each of them such

11   power and authority as he may deem necessary and authorizing the Commissioner as Conservator to

12   compensate these persons from the assets of CIC as he may deem appropriate.

13       6.     The Conservator is authorized to assist CIC in addressing their Form A deficiencies

14   with the goal of obtaining Form A approval and settlement of disputes with CDI.

15       7.     CIC is ordered, except upon the express written authorization of the Conservator, not to

16   cancel or otherwise terminate or attempt to cancel or terminate any insurance policy or contract in-

17   force as of the date of this Order, and is ordered to continue to administer such in-force policies and

18   contracts in the ordinary course consistent with past practices.

19       8.     Except as otherwise determined by the Conservator in his or her discretion, any

20   contract or agreement to provide administrative, claims, or other management services to CIC

21   necessary or appropriate for the efficient operations of CIC during the pendency of the conservation

22   shall remain in full force and effect unless rejected, modified or terminated by the Conservator in

23   writing, and unless directed otherwise by the Conservator, each such person or entity shall continue to

24   perform its respective obligations under such contract or agreement during the pendency of the

25   conservation consistent with past practice.

26       9.     The Conservator is authorized, in his or her discretion, to pay or defer payment of some

27   or all proper claims, expenses, liabilities, and obligations of CIC, in whole or in part, accruing prior or

28   subsequent to his appointment as Conservator.

3

[PROPOSED] ORDER APPOINTING INSURANCE COMMISSIONER AS CONSERVATOR AND RESTRAINING ORDERS;

10.    The Conservator is authorized to assume, reject, or modify any executory contracts including, without limitation, any lease, rental or utilization contract or agreement (including any schedule to any such contract or agreement), and any license or other arrangement for the use of computer software of business information systems, to which CIC is a party or as to which CIC agrees to accept an assignment of such contract.

11.    The Conservator is authorized in his or her discretion to take possession of any and all assets of CIC, including books, records, property (both real and personal), accounts, safe deposit boxes, rights of action, and all such assets as may be in the name of CIC, wheresoever situated.

12.    Title to all property and assets of CIC, designated by the Conservator in his or her discretion, including deposits, securities, contracts, rights of actions, books, records, and other assets of every type and nature, and including both those presently in CIC's possession and those that may be discovered hereafter, wheresoever situated, that are necessary or appropriate for the orderly conservation of CIC is to be vested in the Conservator or his or her successor in office, in his official capacity as Conservator.  The Conservator is authorized to deal with such assets in his or her own name as Conservator or in the name of CIC, and all persons are enjoined from interfering with Conservator's possession and title to such assets.

13.    The Conservator is authorized to maintain and invest such of CIC's assets and funds in such a manner as the Conservator determines in his or her discretion is in the best interest of CIC's creditors.

14.    The Conservator is authorized to exercise all the powers of the directors, officers, and managers of CIC, necessary or appropriate for the orderly conservation of CIC whose authorities are suspended except as such powers may be redelegated to them in writing by the Conservator.

15.    CIC, its officers, directors, agents, and employees are enjoined, except upon the express written authorization of the Conservator or as is necessary to continue to administer in the ordinary course consistent with past practices any in-force insurance policies as of the date of this Order, from transacting any of the business of CIC, whether in the State of California or otherwise, disposing of, using, transferring, selling, assigning, canceling, alienating, hypothecating, or concealing in any manner or any way, or assisting any person in any of the foregoing, the property or assets of CIC, or

property or assets in the possession of CIC, of any nature or kind, including claims or causes of action, until further order of the Court. Further, such persons are enjoined from obstructing or interfering with the Conservator's conduct of his or her duties as Conservator.

16.   CIC and its officers, directors, agents and employees are enjoined from issuing any new or renewing any insurance policies except upon the written consent of the Conservator.

17.   All persons are enjoined, except upon the written consent of the Conservator, from instituting, prosecuting, or maintaining any action at law or suit in equity, including but not limited to, actions or proceedings to compel discovery or production of documents or testimony, and matters in arbitration, except for matters before the California Workers' Compensation Appeals Board or equivalent administrative boards in other states, against CIC, or against the Conservator, and from attaching, executing upon, redeeming of or taking any other legal proceedings against any of the property of CIC, and from doing any act interfering with the conduct of said business by the Conservator, except after an order of this Court obtained after reasonable notice to the Conservator.

18.   CIC and all officers, directors, agents, employees, successors, assigns, affiliates of CIC, and other persons acting in concert or participation with CIC shall deliver to and immediately make available to the Conservator those assets, books, records, accounts, records, information, computers, tapes, discs, writings, other recordings of information, equipment, and other property of CIC, wheresoever situated, in said persons' custody or control specified in writing by the Conservator, and further, the aforesaid persons shall disclose verbally, or in writing if requested by the Conservator, the exact whereabouts of the foregoing items if such items are not in the possession custody, or control of said persons.

19.   All officers, directors, trustees, employees, or agents of CIC, or any other person, firm, association, partnership, corporate parent, holding company, affiliate, or other entity in charge of any aspect of CIC's affairs, either in whole or in part, and including but not limited to banks, savings and loan associations, financial or lending institutions, brokers, stock or mutual associations, or any parent, holding company, subsidiary or affiliated corporation, or any other representative acting in concert with CIC, shall cooperate with the Conservator in the performance of his or her duties.

5

[PROPOSED] ORDER APPOINTING INSURANCE COMMISSIONER AS CONSERVATOR AND RESTRAINING ORDERS;

20.     The Conservator is authorized to pay all reasonable costs of taking possession of and conserving CIC (including but not limited to the Conservator's pre-conservation costs in examining CIC's financial condition, and preparing to take possession and conserve CIC, and the attorneys' fees and costs incurred by the Commissioner in bringing and prosecuting this proceeding) out of the funds and assets of CIC.

21.     The Conservator is authorized to pay all reasonable costs of operating CIC as Conservator (including direct and allocated direct costs, direct and allocated general and administrative costs and overhead, and all other allocated costs) out of any and all funds and assets of CIC, and if there are insufficient funds, to pay for the costs out of the Insurance Fund pursuant to Insurance Code section 1035.

22.     All persons who maintain records for CIC, pursuant to written contract or any other agreement, shall maintain such records and deliver to the Conservator such records upon his request.

23.     All agents of CIC, and all brokers who have done business with CIC, shall make remittances of all funds collected by them or in their hands designated by the Conservator in his or her discretion, directly to the Conservator.

24.     All persons having possession of any lists of policyholders of CIC shall deliver such lists to the Conservator upon his or her written request and enjoining all such persons from using any such lists or any information contained therein without the written consent of the Conservator.

25.     The Conservator is authorized to initiate such equitable or legal actions or proceedings in this or other states that the Conservator determines is in his or her discretion are necessary to carry out his or her functions as Conservator.

26.     CIC, its officers, directors, agents and employees are enjoined from disposing of, or assisting any person in the transfer or alienation of, the property or assets of CIC, until further order of this Court.

27.     All persons are enjoined, except with leave of this Court issued after a hearing in which the Conservator has received reasonable notice, from obtaining preferences, judgments, attachments, or other liens, or making any levy against CIC or its assets or property, and from executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other

1  process, for the purpose of impounding or taking possession of or interfering with or creating or

2  enforcing a lien upon any property or assets owned or in the possession of CIC or the Conservator,

3  wheresoever situated, and from doing any act interfering with the conduct of said business by

4  Conservator.

5        28.    All persons are enjoined, except with leave of this Court issued after a hearing in which

6  Conservator has received reasonable notice, from accelerating the due date of any obligation or

7  claimed obligation; exercising any right of set-off; taking, retaining, retaking, or attempting to retake

8  possession of any real or personal property; withholding or diverting any rent or other obligation;

9  doing any act or other thing whatsoever to interfere with the possession of or management by the

10  Conservator of the property and assets, owned or controlled by CIC or in the possession of CIC, or in

11  any way interfering with the Conservator or interfering in any manner during the pendency of this

12  proceeding with the exclusive jurisdiction of this Court over CIC.

13        29.    Any and all provisions of any agreement entered into by and between any third party

14  and CIC that provide in any manner that selection, appointment, or retention of a conservator, receiver,

15  or trustee by any court, or entry of any order such as hereby made, shall be deemed to be or otherwise

16  operate as a breach, violation, event of default, termination, event of dissolution, event of acceleration,

17  insolvency, bankruptcy, or liquidation, shall be stayed, and the assertion of any and all rights and

18  remedies relating thereto shall also be stayed and barred, except as otherwise ordered by this Court.

19  This Court shall retain jurisdiction over any cause of action that has arisen or may otherwise arise

20  under any such provision.

21        30.    All persons are enjoined from wasting the assets of CIC.

22  IT IS SO ORDERED.

23

24  Dated:     November __4__ , 2019

25                      JUDGE OF THE SUPERIOR COURT

26                      GEORGE A. MIRAM

27

28

[PROPOSED] ORDER APPOINTING INSURANCE COMMISSIONER AS CONSERVATOR AND RESTRAINING ORDERS;

# EXHIBIT 3

1   MICHAEL J. STRUMWASSER (SBN 58413)
    DALE K. LARSON (SBN 266165)
2   CAROLINE CHIAPPETTI (SBN 319547)
    STRUMWASSER & WOOCHER LLP
3   10940 Wilshire Boulevard, Suite 2000
    Los Angeles, California 90024
4   Telephone: (310) 576-1233
    Facsimile: (310) 319-0156
5   E-mail: mstrumwasser@strumwooch.com
    E-mail: dlarson@strumwooch.com
6
7   CYNTHIA J. LARSEN (SBN 123994)
    JUSTIN GIOVANNETTONE (SBN 293794)
8   ORRICK, HERRINGTON & SUTCLIFFE LLP
    400 Capitol Mall, Suite 3000
9   Sacramento, California 95814-4497
    Telephone: (916) 447-9200
10  Facsimile: (916) 329-4900
11  E-mail: clarsen@orrick.com
    E-mail: jgiovannettone@orrick.com
12
    *Attorneys for Insurance Commissioner for the*
13  *State of California and as Conservator of*
    *California Insurance Company*
14

**FILED**
**SAN MATEO COUNTY**

AUG 1 1 2020

Clerk of the Superior Court
By _____
          DEPUTY CLERK

**Exempt from filing fees pursuant to**
**Government Code section 6103**

15

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA
17          FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION
18

19  INSURANCE COMMISSIONER OF THE
    STATE OF CALIFORNIA,
20
                              Applicant,
21
22          v.
23  CALIFORNIA INSURANCE COMPANY, a
    California corporation,
24
25                            Respondent.
26
27  _____
28

**Case No. 19-CIV-06531**

[PROPOSED] **ORDER DENYING**
**RESPONDENT'S VERIFIED**
**APPLICATION TO VACATE THE**
**NOVEMBER 4 ORDER APPOINTING THE**
**COMMISSIONER AS CONSERVATOR**

Dept.: 28, Hon. George A. Miram

[PROPOSED] ORDER DENYING RESPONDENT'S VERIFIED APPLICATION TO VACATE
THE NOVEMBER 4 ORDER APPOINTING THE COMMISSIONER AS CONSERVATOR

1

**[PROPOSED] ORDER**

2     The Court, having duly considered the Verified Application ("Application") To

3 Vacate the November 4 Order Appointing Commissioner as Conservator made by

4 Respondent California Insurance Company ("Respondent") and the documents filed with the

5 Court in support of Respondent's Application as well as the documents filed in opposition

6 thereto by the California Insurance Commissioner as Conservator of California Insurance

7 Company ("Conservator"), and having issued its Tentative Ruling on the Application

8 attached hereto as Exhibit A, and thereafter having considered the arguments of counsel for

9 Respondent and for the Conservator made at the hearing on the Application held on August

10 6, 2020,

11     IT IS HEREBY ORDERED that the Tentative Ruling shall be and hereby is adopted

12 as the Order of the Court and accordingly the Application is DENIED in its entirety.

13

14     **SO ORDERED.**

15

16 Dated: _____ **AUG 1 1 2020** _____, 2020

17

18 _____

19     THE HONORABLE GEORGE MIRAM

20

21

22 Approved as to form:

23

24 _____

25 Shand S. Stephens
*Attorney for Respondent*

26 *California Insurance Company*

27

28

# Exhibit A

2:00

LINE: 2

19-CIV-06531     INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA


INSURANCE COMMISSIONER OF THE STATE OF          MICHAEL J. STRUMWASSER
CALIFORNIA                                      SHAND S. STEPHENS
CALIFORNIA INSURANCE COMPANY

**MOTION TO SET ASIDE ORDER**
**TENTATIVE RULING:**

Motion to Vacate is DENIED. Respondents attempted to take CIC and its
assets out of California via a merger without adequate protection of
policyholders and the public and the Conservatorship was ordered on
those grounds. Respondents have failed to demonstrate that the
conditions necessitating conservation no longer exist. In light of
Respondent's prior conduct, the Conservation Order ensures that
Respondents do not again attempt to take CIC and its assets out of
California. While Respondents argue that an injunction is sufficient,
the Commissioner may conserve a company that has "attempted to
transfer, substantially its entire property or business or, without
consent, has entered into any transaction the effect of which is to
merge, consolidate, or reinsure substantially its entire property or
business in or with the property or business of any other person
(§ 1011, subd. (c).) The Legislature has given the Commissioner the
discretion to deal with this case under either section 1011 or section
1215.2 and the choice of enforcement tool is the Commissioner's to
make. (Schwartz v. Poizner (2010) 187 Cal.App.4th 592, 598). Further,
the Commissioner's preference to pursue a Rehabilitation Plan is
reasonable and sufficient under the circumstances.

# EXHIBIT 4

**Dr. Shirley N. Weber**
California Secretary of State

 Business Search - Entity Detail

The California Business Search is updated daily and reflects work processed through Thursday, March 11, 2021. Please refer to document **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity. Not all images are available online.

C0485010    CALIFORNIA INSURANCE COMPANY

| | |
|---|---|
| **Registration Date:** | 02/01/1965 |
| **Jurisdiction:** | CALIFORNIA |
| **Entity Type:** | DOMESTIC STOCK |
| **Status:** | ACTIVE |
| **Agent for Service of Process:** | MICHAEL PERKINS |
| | 80 STONE PINE RD, STE 210 |
| | HALF MOON BAY CA 94019 |
| **Entity Address:** | 950 TOWER LANE, 14TH FLOOR |
| | FOSTER CITY CA 94404 |
| **Entity Mailing Address:** | 950 TOWER LANE, 14TH FLOOR |
| | FOSTER CITY CA 94404 |

🛒 **Certificate of Status**

A Statement of Information is due EVERY year beginning five months before and through the end of February.

| Document Type ⬍ | File Date ⬍ | PDF |
|---|---|---|
| SI-COMPLETE | 03/03/2021 | |
| SI-COMPLETE | 11/27/2019 | |
| AMENDMENT | 07/13/2009 | |
| RESTATED REGISTRATION | 09/04/2007 | |
| AMENDMENT | 03/06/2006 | |
| AMENDMENT | 08/03/2004 | |
| AMENDMENT | 03/28/1996 | |
| AMENDMENT | 09/08/1994 | |
| AMENDMENT | 09/26/1988 | |
| AMENDMENT | 07/28/1978 | Image unavailable. Please request paper copy. |
| REGISTRATION | 02/01/1965 | Image unavailable. Please request paper copy. |

* Indicates the information is not contained in the California Secretary of State's database.

- If the status of the corporation is "Surrender," the agent for service of process is automatically revoked. Please refer to California Corporations Code **section 2114** for information relating to service upon corporations that have surrendered.
- For information on checking or reserving a name, refer to **Name Availability**.
- If the image is not available online, for information on ordering a copy refer to **Information Requests**.
- For information on ordering certificates, status reports, certified copies of documents and copies of documents not currently available in the Business Search or to request a more extensive search for records, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Frequently Asked Questions**.

[ Modify Search ]  [ New Search ]  [ Back to Search Results ]

Exhibit 4, Page 1 of 1

# EXHIBIT 5

# ANNUAL STATEMENT

OF THE

# California Insurance Company

2020

OF

Foster City

IN THE STATE OF

California

TO THE

INSURANCE  DEPARTMENT

OF THE

STATE OF California

FOR THE YEAR ENDED

DECEMBER 31, 2020

**PROPERTY AND CASUALTY**

2020



PROPERTY AND CASUALTY COMPANIES—ASSOCIATION EDITION

# ANNUAL STATEMENT
### For the Year Ended December 31, 2020
OF THE CONDITION AND AFFAIRS OF THE

## California Insurance Company

| | | | | | |
|---|---|---|---|---|---|
| NAIC Group Code | 04962 | 04962 | NAIC Company Code | 38865 | Employer's ID Number 94-1627528 |
| | (Current Period) | (Prior Period) | | | |

Organized under the Laws of **California**, State of Domicile or Port of Entry **California**

Country of Domicile **United States**

Incorporated/Organized **02/01/1965**   Commenced Business **06/13/1980**

Statutory Home Office **950 Tower Lane, 14th Floor** **Foster City, CA, USA 94404**
(Street and Number) / (City or Town, State, Country and Zip Code)

Main Administrative Office **10805 Old Mill Road** **Omaha, NE, USA 68154-2607** **402-827-3424**
(Street and Number) / (City or Town, State, Country and Zip Code) / (Area Code) (Telephone Number)

Mail Address **P.O. Box 3646**, **Omaha, NE, USA 68103-0646**
(Street and Number or P.O. Box) / (City or Town, State, Country and Zip Code)

Primary Location of Books and Records **10805 Old Mill Road** **Omaha, NE, USA 68154-2607** **402-827-3424**
(Street and Number) / (City or Town, State, Country and Zip Code) / (Area Code) (Telephone Number)

Internet Web Site Address **www.auw.com**

Statutory Statement Contact **Robert L. Stafford** **402-827-3424-4094**
(Name) / (Area Code) (Telephone Number) (Extension)

**rstafford@auw.com** **402-827-3432**
(E-Mail Address) / (Fax Number)

## OFFICERS

| Name | Title | Name | Title |
|---|---|---|---|
| Steven M. Menzies | President/Chief Executive Officer | Steven M. Menzies | Treasurer |
| Jeffrey A. Silver | Secretary | | |

## OTHER OFFICERS

| | | | |
|---|---|---|---|
| Justin N. Smith | Vice President | Robert L. Stafford | Vice President |

## DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Jon M. McCright | Steven M. Menzies | Jeffrey A. Silver | Robert L. Stafford |
| Mark M. Tract | | |

State of **Nebraska**

County of **Douglas**   ss

The officers of this reporting entity, being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

| Steven M. Menzies | Steven M. Menzies | Jeffrey A. Silver |
|---|---|---|
| President/Chief Executive Officer | Treasurer | Secretary |

a. Is this an original filing? Yes [ X ]  No [ ]
b. If no,

Subscribed and sworn to before me this **24th** day of **February, 2021**

1. State the amendment number
2. Date filed
3. Number of pages attached

Patricia V. Ahern, Insurance Accounting Supervisor
08/26/2023

General Notary - State of Nebraska
PATRICIA V. AHERN
My Comm. Exp. Aug. 26, 2023.

ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company

# ASSETS

| | | Current Year | | Prior Year |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| | Assets | Nonadmitted Assets | Net Admitted Assets (Cols. 1 - 2) | Net Admitted Assets |
| 1. Bonds (Schedule D) | 430,013,768 | | 430,013,768 | 723,829,430 |
| 2. Stocks (Schedule D): | | | | |
| 2.1 Preferred stocks | | | | |
| 2.2 Common stocks | 46,213,228 | 22,565,533 | 23,647,695 | 24,850,372 |
| 3. Mortgage loans on real estate (Schedule B): | | | | |
| 3.1 First liens | | | | |
| 3.2 Other than first liens | | | | |
| 4. Real estate (Schedule A): | | | | |
| 4.1 Properties occupied by the company (less $ ......0 encumbrances) | 64,882,789 | | 64,882,789 | 7,679,529 |
| 4.2 Properties held for the production of income (less $ ......0 encumbrances) | 1,944,646 | | 1,944,646 | 1,234,991 |
| 4.3 Properties held for sale (less $ ......0 encumbrances) | | | | |
| 5. Cash ($ ......201,946,263 , Schedule E-Part 1), cash equivalents ($ ......88,650,332 , Schedule E-Part 2) and short-term investments ($ ......16,978,330 , Schedule DA) | 307,574,925 | | 307,574,925 | 177,092,940 |
| 6. Contract loans (including $ ......0 premium notes) | | | | |
| 7. Derivatives (Schedule DB) | | | | |
| 8. Other invested assets (Schedule BA) | 191,258,181 | | 191,258,181 | 180,445,445 |
| 9. Receivables for securities | | | | |
| 10. Securities lending reinvested collateral assets (Schedule DL) | | | | |
| 11. Aggregate write-ins for invested assets | | | | |
| 12. Subtotals, cash and invested assets (Lines 1 to 11) | 1,041,887,537 | 22,565,533 | 1,019,322,004 | 1,115,132,707 |
| 13. Title plants less $ ......0 charged off (for Title insurers only) | | | | |
| 14. Investment income due and accrued | 4,354,956 | | 4,354,956 | 4,200,107 |
| 15. Premiums and considerations: | | | | |
| 15.1 Uncollected premiums and agents' balances in the course of collection | | | | |
| 15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due (including $ ......317,664 earned but unbilled premiums) | 47,538,473 | 31,766 | 47,506,707 | 19,675,109 |
| 15.3 Accrued retrospective premiums ($ ......0 ) and contracts subject to redetermination ($ ......0 ) | | | | |
| 16. Reinsurance: | | | | |
| 16.1 Amounts recoverable from reinsurers | 7,714,836 | | 7,714,836 | 9,896,037 |
| 16.2 Funds held by or deposited with reinsured companies | | | | |
| 16.3 Other amounts receivable under reinsurance contracts | | | | |
| 17. Amounts receivable relating to uninsured plans | | | | |
| 18.1 Current federal and foreign income tax recoverable and interest thereon | | | | |
| 18.2 Net deferred tax asset | 14,328,931 | 5,858,272 | 8,470,659 | 7,992,275 |
| 19. Guaranty funds receivable or on deposit | 15,792,935 | | 15,792,935 | 15,934,487 |
| 20. Electronic data processing equipment and software | | | | |
| 21. Furniture and equipment, including health care delivery assets ($ ......0 ) | | | | |
| 22. Net adjustment in assets and liabilities due to foreign exchange rates | | | | |
| 23. Receivables from parent, subsidiaries and affiliates | 932,570 | | 932,570 | 1,191,216 |
| 24. Health care ($ ......0 ) and other amounts receivable | | | | |
| 25. Aggregate write-ins for other-than-invested assets | 1,778,874 | 195,172 | 1,583,702 | 2,221,790 |
| 26. Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 1,134,329,112 | 28,650,743 | 1,105,678,369 | 1,176,243,728 |
| 27. From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | | |
| 28. Total (Lines 26 and 27) | 1,134,329,112 | 28,650,743 | 1,105,678,369 | 1,176,243,728 |
| DETAILS OF WRITE-INS | | | | |
| 1101. | | | | |
| 1102. | | | | |
| 1103. | | | | |
| 1198. Summary of remaining write-ins for Line 11 from overflow page | | | | |
| 1199. Totals (Lines 1101 through 1103 plus 1198) (Line 11 above) | | | | |
| 2501. Policyholder surcharges receivable | 359,655 | | 359,655 | 461,861 |
| 2502. Nebraska sales taxes paid | 10,771 | | 10,771 | 8,548 |
| 2503. Prepaid expenses | 195,172 | 195,172 | | |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | 1,213,276 | | 1,213,276 | 1,751,381 |
| 2599. Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 1,778,874 | 195,172 | 1,583,702 | 2,221,790 |

2

Exhibit 5, Page 3 of 152

# LIABILITIES, SURPLUS AND OTHER FUNDS

| | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|
| 1. Losses (Part 2A, Line 35, Column 8) | 359,399,318 | 344,456,865 |
| 2. Reinsurance payable on paid losses and loss adjustment expenses (Schedule F, Part 1, Column 6) | 7,590,669 | 10,753,639 |
| 3. Loss adjustment expenses (Part 2A, Line 35, Column 9) | 59,743,890 | 61,671,128 |
| 4. Commissions payable, contingent commissions and other similar charges | 2,500,851 | 4,651,219 |
| 5. Other expenses (excluding taxes, licenses and fees) | 1,792,203 | 1,694,464 |
| 6. Taxes, licenses and fees (excluding federal and foreign income taxes) | 829,844 | 1,190,123 |
| 7.1 Current federal and foreign income taxes (including $ .............27,493 on realized capital gains (losses)) | 26,427,655 | 24,052,530 |
| 7.2 Net deferred tax liability | | |
| 8. Borrowed money $ .............0 and interest thereon $ .............0 | | |
| 9. Unearned premiums (Part 1A, Line 38, Column 5) (after deducting unearned premiums for ceded reinsurance of $ .............1,427,689 and including warranty reserves of $ .............0 and accrued accident and health experience rating refunds including $ .............0 for medical loss ratio rebate per the Public Health Service Act) | 39,105,732 | 18,090,876 |
| 10. Advance premium | | |
| 11. Dividends declared and unpaid: | | |
| 11.1 Stockholders | | |
| 11.2 Policyholders | | |
| 12. Ceded reinsurance premiums payable (net of ceding commissions) | 10,665,927 | 7,875,926 |
| 13. Funds held by company under reinsurance treaties (Schedule F, Part 3, Column 20) | | 30,089,500 |
| 14. Amounts withheld or retained by company for account of others | | |
| 15. Remittances and items not allocated | 1,113 | 3,469 |
| 16. Provision for reinsurance (including $ .............0 certified) (Schedule F, Part 3, Column 78) | | 112,347 |
| 17. Net adjustments in assets and liabilities due to foreign exchange rates | | |
| 18. Drafts outstanding | | |
| 19. Payable to parent, subsidiaries and affiliates | | 329 |
| 20. Derivatives | | |
| 21. Payable for securities | | 78,079,876 |
| 22. Payable for securities lending | | |
| 23. Liability for amounts held under uninsured plans | | |
| 24. Capital notes $ .............0 and interest thereon $ .............0 | | |
| 25. Aggregate write-ins for liabilities | 3,952,643 | 2,876,519 |
| 26. Total liabilities excluding protected cell liabilities (Lines 1 through 25) | 512,009,845 | 585,598,810 |
| 27. Protected cell liabilities | | |
| 28. Total liabilities (Lines 26 and 27) | 512,009,845 | 585,598,810 |
| 29. Aggregate write-ins for special surplus funds | | |
| 30. Common capital stock | 4,000,000 | 4,000,000 |
| 31. Preferred capital stock | | |
| 32. Aggregate write-ins for other-than-special surplus funds | | |
| 33. Surplus notes | | |
| 34. Gross paid in and contributed surplus | 54,060,000 | 54,060,000 |
| 35. Unassigned funds (surplus) | 535,608,524 | 532,584,918 |
| 36. Less treasury stock, at cost: | | |
| 36.1 .............0 shares common (value included in Line 30 $ .............0 ) | | |
| 36.2 .............0 shares preferred (value included in Line 31 $ .............0 ) | | |
| 37. Surplus as regards policyholders (Lines 29 to 35, less 36) (Page 4, Line 39) | 593,668,524 | 590,644,918 |
| 38. Totals (Page 2, Line 28, Col. 3) | 1,105,678,369 | 1,176,243,728 |
| **DETAILS OF WRITE-INS** | | |
| 2501. Retroactive reinsurance assumed | 8,757 | 69,493 |
| 2502. Escheat payable | 695,735 | 741,621 |
| 2503. Other liability - related party | 3,248,151 | 2,065,405 |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | | |
| 2599. Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 3,952,643 | 2,876,519 |
| 2901. | | |
| 2902. | | |
| 2903. | | |
| 2998. Summary of remaining write-ins for Line 29 from overflow page | | |
| 2999. Totals (Lines 2901 through 2903 plus 2998) (Line 29 above) | | |
| 3201. | | |
| 3202. | | |
| 3203. | | |
| 3298. Summary of remaining write-ins for Line 32 from overflow page | | |
| 3299. Totals (Lines 3201 through 3203 plus 3298) (Line 32 above) | | |

# STATEMENT OF INCOME

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| **UNDERWRITING INCOME** | | |
| 1. Premiums earned (Part 1, Line 35, Column 4) | 162,031,160 | 231,048,317 |
| DEDUCTIONS: | | |
| 2. Losses incurred (Part 2, Line 35, Column 7) | 100,259,971 | 118,186,639 |
| 3. Loss adjustment expenses incurred (Part 3, Line 25, Column 1) | 30,673,012 | 36,310,877 |
| 4. Other underwriting expenses incurred (Part 3, Line 25, Column 2) | 44,107,303 | 61,216,475 |
| 5. Aggregate write-ins for underwriting deductions | | |
| 6. Total underwriting deductions (Lines 2 through 5) | 175,040,286 | 215,713,991 |
| 7. Net income of protected cells | | |
| 8. Net underwriting gain (loss) (Line 1 minus Line 6 plus Line 7) | (13,009,126) | 15,334,326 |
| **INVESTMENT INCOME** | | |
| 9. Net investment income earned (Exhibit of Net Investment Income, Line 17) | 16,284,436 | 16,728,612 |
| 10. Net realized capital gains (losses) less capital gains tax of $ ........27,493 (Exhibit of Capital Gains (Losses)) | 103,425 | 57,521,079 |
| 11. Net investment gain (loss) (Lines 9 + 10) | 16,387,861 | 74,249,691 |
| **OTHER INCOME** | | |
| 12. Net gain (loss) from agents' or premium balances charged off (amount recovered $ ........0 amount charged off $ ........0 ) | | |
| 13. Finance and service charges not included in premiums | | |
| 14. Aggregate write-ins for miscellaneous income | 304,111 | 10,456 |
| 15. Total other income (Lines 12 through 14) | 304,111 | 10,456 |
| 16. Net income before dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Lines 8 + 11 + 15) | 3,682,846 | 89,594,473 |
| 17. Dividends to policyholders | | |
| 18. Net income, after dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Line 16 minus Line 17) | 3,682,846 | 89,594,473 |
| 19. Federal and foreign income taxes incurred | 2,347,632 | 17,258,633 |
| 20. Net income (Line 18 minus Line 19) (to Line 22) | 1,335,214 | 72,335,840 |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 21. Surplus as regards policyholders, December 31 prior year (Page 4, Line 39, Column 2) | 590,644,918 | 558,491,034 |
| 22. Net income (from Line 20) | 1,335,214 | 72,335,840 |
| 23. Net transfers (to) from Protected Cell accounts | | |
| 24. Change in net unrealized capital gains or (losses) less capital gains tax of $ ........(2,023,533) | (5,303,849) | (16,761,825) |
| 25. Change in net unrealized foreign exchange capital gain (loss) | | |
| 26. Change in net deferred income tax | 1,485,812 | 10,495,420 |
| 27. Change in nonadmitted assets (Exhibit of Nonadmitted Assets, Line 28, Col. 3) | 5,394,082 | (33,803,204) |
| 28. Change in provision for reinsurance (Page 3, Line 16, Column 2 minus Column 1) | 112,347 | (112,347) |
| 29. Change in surplus notes | | |
| 30. Surplus (contributed to) withdrawn from protected cells | | |
| 31. Cumulative effect of changes in accounting principles | | |
| 32. Capital changes: | | |
| 32.1 Paid in | | |
| 32.2 Transferred from surplus (Stock Dividend) | | |
| 32.3 Transferred to surplus | | |
| 33. Surplus adjustments: | | |
| 33.1 Paid in | | |
| 33.2 Transferred to capital (Stock Dividend) | | |
| 33.3 Transferred from capital | | |
| 34. Net remittances from or (to) Home Office | | |
| 35. Dividends to stockholders | | |
| 36. Change in treasury stock (Page 3, Lines 36.1 and 36.2, Column 2 minus Column 1) | | |
| 37. Aggregate write-ins for gains and losses in surplus | | |
| 38. Change in surplus as regards policyholders for the year (Lines 22 through 37) | 3,023,606 | 32,153,884 |
| 39. Surplus as regards policyholders, December 31 current year (Line 21 plus Line 38) (Page 3, Line 37) | 593,668,524 | 590,644,918 |
| **DETAILS OF WRITE-INS** | | |
| 0501. | | |
| 0502. | | |
| 0503. | | |
| 0598. Summary of remaining write-ins for Line 5 from overflow page | | |
| 0599. Totals (Lines 0501 through 0503 plus 0598) (Line 5 above) | | |
| 1401. Other income | 244,036 | 6,192 |
| 1402. Retroactive reinsurance gain / (loss) | 60,075 | 4,264 |
| 1403. | | |
| 1498. Summary of remaining write-ins for Line 14 from overflow page | | |
| 1499. Totals (Lines 1401 through 1403 plus 1498) (Line 14 above) | 304,111 | 10,456 |
| 3701. | | |
| 3702. | | |
| 3703. | | |
| 3798. Summary of remaining write-ins for Line 37 from overflow page | | |
| 3799. Totals (Lines 3701 through 3703 plus 3798) (Line 37 above) | | |

Exhibit 5, Page 5 of 152

# CASH FLOW

| | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|
| **Cash from Operations** | | |
| 1. Premiums collected net of reinsurance | 158,045,572 | 254,869,314 |
| 2. Net investment income | 16,659,518 | 14,189,572 |
| 3. Miscellaneous income | 304,111 | 10,456 |
| 4. Total (Lines 1 through 3) | 175,009,201 | 269,069,342 |
| 5. Benefit and loss related payments | 86,280,847 | 82,072,447 |
| 6. Net transfers to Separate Accounts, Segregated Accounts and Protected Cell Accounts | | |
| 7. Commissions, expenses paid and aggregate write-ins for deductions | 78,977,438 | 91,166,116 |
| 8. Dividends paid to policyholders | | |
| 9. Federal and foreign income taxes paid (recovered) net of $ .............0 tax on capital gains (losses) | | 13,709,584 |
| 10. Total (Lines 5 through 9) | 165,258,285 | 186,948,147 |
| 11. Net cash from operations (Line 4 minus Line 10) | 9,750,916 | 82,121,195 |
| **Cash from Investments** | | |
| 12. Proceeds from investments sold, matured or repaid: | | |
| 12.1 Bonds | 343,964,677 | 326,300,000 |
| 12.2 Stocks | | 165,080,083 |
| 12.3 Mortgage loans | | |
| 12.4 Real estate | | |
| 12.5 Other invested assets | 16,185,977 | 6,233,107 |
| 12.6 Net gains or (losses) on cash, cash equivalents and short-term investments | 5,086 | 21,965 |
| 12.7 Miscellaneous proceeds | | 78,079,876 |
| 12.8 Total investment proceeds (Lines 12.1 to 12.7) | 360,155,740 | 575,715,031 |
| 13. Cost of investments acquired (long-term only): | | |
| 13.1 Bonds | 50,573,026 | 341,195,731 |
| 13.2 Stocks | | 55,849,103 |
| 13.3 Mortgage loans | | |
| 13.4 Real estate | 57,912,915 | 8,914,520 |
| 13.5 Other invested assets | 24,690,220 | 185,900,873 |
| 13.6 Miscellaneous applications | 78,079,876 | |
| 13.7 Total investments acquired (Lines 13.1 to 13.6) | 211,256,037 | 591,860,227 |
| 14. Net increase (decrease) in contract loans and premium notes | | |
| 15. Net cash from investments (Line 12.8 minus Line 13.7 minus Line 14) | 148,899,703 | (16,145,196) |
| **Cash from Financing and Miscellaneous Sources** | | |
| 16. Cash provided (applied): | | |
| 16.1 Surplus notes, capital notes | | |
| 16.2 Capital and paid in surplus, less treasury stock | | |
| 16.3 Borrowed funds | | |
| 16.4 Net deposits on deposit-type contracts and other insurance liabilities | | |
| 16.5 Dividends to stockholders | | 97,000,000 |
| 16.6 Other cash provided (applied) | (28,168,634) | 3,215,050 |
| 17. Net cash from financing and miscellaneous sources (Lines 16.1 to 16.4 minus Line 16.5 plus Line 16.6) | (28,168,634) | (93,784,950) |
| **RECONCILIATION OF CASH, CASH EQUIVALENTS AND SHORT-TERM INVESTMENTS** | | |
| 18. Net change in cash, cash equivalents and short-term investments (Line 11, plus Lines 15 and 17) | 130,481,985 | (27,808,951) |
| 19. Cash, cash equivalents and short-term investments: | | |
| 19.1 Beginning of year | 177,092,940 | 204,901,891 |
| 19.2 End of year (Line 18 plus Line 19.1) | 307,574,925 | 177,092,940 |

5

# UNDERWRITING AND INVESTMENT EXHIBIT
## PART 1 - PREMIUMS EARNED

| | Line of Business | 1<br>Net Premiums<br>Written per<br>Column 6, Part 1B | 2<br>Unearned Premiums<br>Dec. 31 Prior Year -<br>per Col. 3, Last Year's<br>Part 1 | 3<br>Unearned Premiums<br>Dec. 31 Current<br>Year - per Col. 5<br>Part 1A | 4<br>Premiums Earned<br>During Year<br>(Cols. 1 + 2 - 3) |
|---|---|---|---|---|---|
| 1. | Fire | 308,268 | | 241,993 | 66,275 |
| 2. | Allied lines | 2,733,310 | | 2,145,672 | 587,638 |
| 3. | Farmowners multiple peril | | | | |
| 4. | Homeowners multiple peril | 15,385,952 | | 12,067,390 | 3,318,562 |
| 5. | Commercial multiple peril | 4,101,970 | | 2,129,908 | 1,972,062 |
| 6. | Mortgage guaranty | | | | |
| 8. | Ocean marine | | | | |
| 9. | Inland marine | 20,551 | | 16,133 | 4,418 |
| 10. | Financial guaranty | | | | |
| 11.1 | Medical professional liability-occurrence | | | | |
| 11.2 | Medical professional liability-claims-made | | | | |
| 12. | Earthquake | 102,776 | | 80,664 | 22,112 |
| 13. | Group accident and health | | | | |
| 14. | Credit accident and health (group and individual) | | | | |
| 15. | Other accident and health | | | | |
| 16. | Workers' compensation | 105,983,550 | 1,557,655 | 1,071,042 | 106,470,163 |
| 17.1 | Other liability-occurrence | 2,347,412 | 3,714 | 1,335,142 | 1,015,984 |
| 17.2 | Other liability-claims-made | 1,821,967 | 627,072 | 710,030 | 1,739,009 |
| 17.3 | Excess workers' compensation | | | | |
| 18.1 | Products liability-occurrence | | | | |
| 18.2 | Products liability-claims-made | | | | |
| 19.1,19.2 | Private passenger auto liability | 4,352,833 | | 909,735 | 3,443,098 |
| 19.3,19.4 | Commercial auto liability | 36,039,339 | 15,550,668 | 15,703,224 | 35,886,783 |
| 21. | Auto physical damage | 2,051,183 | | 491,648 | 1,559,535 |
| 22. | Aircraft (all perils) | | | | |
| 23. | Fidelity | | | | |
| 24. | Surety | 2,401,029 | | | 2,401,029 |
| 26. | Burglary and theft | | | | |
| 27. | Boiler and machinery | | | | |
| 28. | Credit | | | | |
| 29. | International | | | | |
| 30. | Warranty | 51,100 | | | 51,100 |
| 31. | Reinsurance-nonproportional assumed property | 4,713,090 | | 1,943,132 | 2,769,958 |
| 32. | Reinsurance-nonproportional assumed liability | | | | |
| 33. | Reinsurance-nonproportional assumed financial lines | | | | |
| 34. | Aggregate write-ins for other lines of business | 631,686 | 351,767 | 260,019 | 723,434 |
| 35. | TOTALS | 183,046,016 | 18,090,876 | 39,105,732 | 162,031,160 |
| **DETAILS OF WRITE-INS** | | | | | |
| 3401. | Legal | 631,686 | 351,767 | 260,019 | 723,434 |
| 3402. | | | | | |
| 3403. | | | | | |
| 3498. | Sum. of remaining write-ins for Line 34 from overflow page | | | | |
| 3499. | Totals (Lines 3401 through 3403 plus 3498) (Line 34 above) | 631,686 | 351,767 | 260,019 | 723,434 |

# UNDERWRITING AND INVESTMENT EXHIBIT

## PART 1A - RECAPITULATION OF ALL PREMIUMS

| Line of Business | 1<br>Amount Unearned<br>(Running One Year or<br>Less from Date of<br>Policy)<br>(a) | 2<br>Amount Unearned<br>(Running More Than<br>One Year from Date<br>of Policy)<br>(a) | 3<br>Earned<br>but<br>Unbilled Premium | 4<br>Reserve for Rate<br>Credits and<br>Retrospective<br>Adjustments Based<br>on Experience | 5<br>Total Reserve<br>for<br>Unearned Premiums<br>Cols. 1 + 2 + 3 + 4 |
|---|---|---|---|---|---|
| 1. Fire | 241,993 | | | | 241,993 |
| 2. Allied lines | 2,145,672 | | | | 2,145,672 |
| 3. Farmowners multiple peril | | | | | |
| 4. Homeowners multiple peril | 12,067,390 | | | | 12,067,390 |
| 5. Commercial multiple peril | 2,129,908 | | | | 2,129,908 |
| 6. Mortgage guaranty | | | | | |
| 8. Ocean marine | | | | | |
| 9. Inland marine | 16,133 | | | | 16,133 |
| 10. Financial guaranty | | | | | |
| 11.1 Medical professional liability-occurrence | | | | | |
| 11.2 Medical professional liability-claims-made | | | | | |
| 12. Earthquake | 80,664 | | | | 80,664 |
| 13. Group accident and health | | | | | |
| 14. Credit accident and health (group and individual) | | | | | |
| 15. Other accident and health | | | | | |
| 16. Workers' compensation | 1,071,042 | | | | 1,071,042 |
| 17.1 Other liability-occurrence | 1,335,142 | | | | 1,335,142 |
| 17.2 Other liability-claims-made | 710,030 | | | | 710,030 |
| 17.3 Excess workers' compensation | | | | | |
| 18.1 Products liability-occurrence | | | | | |
| 18.2 Products liability-claims-made | | | | | |
| 19.1,19.2 Private passenger auto liability | 909,735 | | | | 909,735 |
| 19.3,19.4 Commercial auto liability | 15,703,224 | | | | 15,703,224 |
| 21. Auto physical damage | 491,648 | | | | 491,648 |
| 22. Aircraft (all perils) | | | | | |
| 23. Fidelity | | | | | |
| 24. Surety | | | | | |
| 26. Burglary and theft | | | | | |
| 27. Boiler and machinery | | | | | |
| 28. Credit | | | | | |
| 29. International | | | | | |
| 30. Warranty | | | | | |
| 31. Reinsurance-nonproportional assumed property | 1,943,132 | | | | 1,943,132 |
| 32. Reinsurance-nonproportional assumed liability | | | | | |
| 33. Reinsurance-nonproportional assumed financial lines | | | | | |
| 34. Aggregate write-ins for other lines of business | 260,019 | | | | 260,019 |
| 35. TOTALS | 39,105,732 | | | | 39,105,732 |
| 36. Accrued retrospective premiums based on experience | | | | | |
| 37. Earned but unbilled premiums | | | | | |
| 38. Balance (Sum of Lines 35 through 37) | | | | | 39,105,732 |
| DETAILS OF WRITE-INS | | | | | |
| 3401. Legal | 260,019 | | | | 260,019 |
| 3402. | | | | | |
| 3403. | | | | | |
| 3498. Sum. of remaining write-ins for Line 34 from overflow page. | | | | | |
| 3499. Totals (Lines 3401 through 3403 plus 3498) (Line 34 above) | 260,019 | | | | 260,019 |

(a) State here basis of computation used in each case.  Other Liability — Claims Made, Legal (Write-in), Commercial Auto Liability (Occurrence): Daily Pro-Rata Method; All other lines: Monthly Pro-Rata Method.

Exhibit 5, Page 8 of 152

# UNDERWRITING AND INVESTMENT EXHIBIT

## PART 1B - PREMIUMS WRITTEN

| | 1 Direct Business (a) | Reinsurance Assumed | | Reinsurance Ceded | | 6 Net Premiums Written Cols. 1 + 2 + 3 - 4 - 5 |
|---|---|---|---|---|---|---|
| Line of Business | | 2 From Affiliates | 3 From Non-Affiliates | 4 To Affiliates | 5 To Non-Affiliates | |
| 1. Fire | | 308,268 | | | | 308,268 |
| 2. Allied lines | | 2,733,310 | | | | 2,733,310 |
| 3. Farmowners multiple peril | | | | | | |
| 4. Homeowners multiple peril | | 15,385,952 | | | | 15,385,952 |
| 5. Commercial multiple peril | | 6,544,529 | | 2,442,559 | | 4,101,970 |
| 6. Mortgage guaranty | | | | | | |
| 8. Ocean marine | | | | | | |
| 9. Inland marine | | 20,551 | | | | 20,551 |
| 10. Financial guaranty | | | | | | |
| 11.1 Medical professional liability-occurrence | | | | | | |
| 11.2 Medical professional liability-claims-made | | | | | | |
| 12. Earthquake | | 102,797 | | 21 | | 102,776 |
| 13. Group accident and health | | | | | | |
| 14. Credit accident and health (group and individual) | | | | | | |
| 15. Other accident and health | | | | | | |
| 16. Workers' compensation | 92,057,971 | 475,786,322 | 699,488 | 429,373,490 | 33,186,741 | 105,983,550 |
| 17.1 Other liability-occurrence | | 2,359,517 | | 12,105 | | 2,347,412 |
| 17.2 Other liability-claims-made | 1,825,818 | 1,691,589 | | 1,695,440 | | 1,821,967 |
| 17.3 Excess workers' compensation | | | | | | |
| 18.1 Products liability-occurrence | | | | | | |
| 18.2 Products liability-claims-made | | | | | | |
| 19.1,19.2 Private passenger auto liability | | 4,352,833 | | | | 4,352,833 |
| 19.3,19.4 Commercial auto liability | | 90,866,340 | | 54,827,001 | | 36,039,339 |
| 21. Auto physical damage | | 2,302,496 | | 251,313 | | 2,051,183 |
| 22. Aircraft (all perils) | | | | | | |
| 23. Fidelity | | | | | | |
| 24. Surety | 3,430,041 | 3,399,800 | | 4,428,812 | | 2,401,029 |
| 26. Burglary and theft | | | | | | |
| 27. Boiler and machinery | | | | | | |
| 28. Credit | | | | | | |
| 29. International | | | | | | |
| 30. Warranty | 73,000 | 15,315 | | 37,215 | | 51,100 |
| 31. Reinsurance-nonproportional assumed property | XXX | 9,915,796 | | 5,202,706 | | 4,713,090 |
| 32. Reinsurance-nonproportional assumed liability | XXX | | | | | |
| 33. Reinsurance-nonproportional assumed financial lines | XXX | | | | | |
| 34. Aggregate write-ins for other lines of business | 902,409 | 961,380 | | 1,232,103 | | 631,686 |
| 35. TOTALS | 98,289,239 | 616,746,795 | 699,488 | 499,502,765 | 33,186,741 | 183,046,016 |
| DETAILS OF WRITE-INS | | | | | | |
| 3401. Legal | 902,409 | 961,380 | | 1,232,103 | | 631,686 |
| 3402. | | | | | | |
| 3403. | | | | | | |
| 3498. Sum. of remaining write-ins for Line 34 from overflow page | | | | | | |
| 3499. Totals (Lines 3401 through 3403 plus 3498) (Line 34 above) | 902,409 | 961,380 | | 1,232,103 | | 631,686 |

(a) Does the company's direct premiums written include premiums recorded on an installment basis?     Yes  [ X ]  No  [   ]

If yes: 1.  The amount of such installment premiums $                95,488,012

2.  Amount at which such installment premiums would have been reported had they been recorded on an annualized basis $                62,083,289

8

# UNDERWRITING AND INVESTMENT EXHIBIT

## PART 2 - LOSSES PAID AND INCURRED

| | | Losses Paid Less Salvage | | | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | Net Losses Unpaid Current Year (Part 2A, Col. 8) | Net Losses Unpaid Prior Year | Losses Incurred Current Year (Cols. 4 + 5 - 6) | Percentage of Losses Incurred (Col. 7, Part 2) to Premiums Earned (Col. 4, Part 1) |
| Line of Business | Direct Business | Reinsurance Assumed | Reinsurance Recovered | Net Payments (Cols. 1 + 2 - 3) | | | | |
| 1. Fire | | 4,161 | | 4,161 | 21,169 | | 25,330 | 38.2 |
| 2. Allied lines | | 36,898 | | 36,898 | 187,699 | | 224,597 | 38.2 |
| 3. Farmowners multiple peril | | | | | | | | |
| 4. Homeowners multiple peril | | 207,515 | | 207,515 | 1,064,126 | | 1,271,641 | 38.3 |
| 5. Commercial multiple peril | | 180,355 | 13,822 | 166,533 | 691,798 | | 858,331 | 43.5 |
| 6. Mortgage guaranty | | | | | | | | |
| 8. Ocean marine | | | | | | | | |
| 9. Inland marine | | 277 | | 277 | 1,411 | | 1,688 | 38.2 |
| 10. Financial guaranty | | | | | | | | |
| 11.1 Medical professional liability-occurrence | | | | | | | | |
| 11.2 Medical professional liability-claims-made | | | | | | | | |
| 12. Earthquake | | 1,387 | | 1,387 | 7,056 | | 8,443 | 38.2 |
| 13. Group accident and health | | | | | | | | |
| 14. Credit accident and health (group and individual) | | | | | | | | |
| 15. Other accident and health | | | | | | | | |
| 16. Workers' compensation | 60,132,783 | 72,898,471 | 62,709,031 | 70,322,223 | 300,338,469 | 322,167,031 | 48,493,661 | 45.5 |
| 17.1 Other liability-occurrence | | 7,737 | | 7,737 | 547,877 | 7,725 | 547,889 | 53.9 |
| 17.2 Other liability-claims-made | 64,811 | 13,393 | 29,958 | 48,246 | 504,349 | 215,318 | 337,277 | 19.4 |
| 17.3 Excess workers' compensation | | | | | | | | |
| 18.1 Products liability-occurrence | | | | | | | | |
| 18.2 Products liability-claims-made | | | | | | | | |
| 19.1,19.2 Private passenger auto liability | | 777,039 | | 777,039 | 2,001,159 | | 2,778,198 | 80.7 |
| 19.3,19.4 Commercial auto liability | | 12,476,028 | 3,336,853 | 9,139,175 | 38,488,861 | 18,341,255 | 29,286,781 | 81.6 |
| 21. Auto physical damage | | 597,843 | | 597,843 | 356,871 | | 954,714 | 61.2 |
| 22. Aircraft (all perils) | | | | | | | | |
| 23. Fidelity | | | | | | | | |
| 24. Surety | | | | | 2,702,159 | 3,269,693 | (567,534) | (23.6) |
| 26. Burglary and theft | | | | | | | | |
| 27. Boiler and machinery | | | | | | | | |
| 28. Credit | | | | | | | | |
| 29. International | | | | | | | | |
| 30. Warranty | | | | | 7,980 | 9,520 | (1,540) | (3.0) |
| 31. Reinsurance-nonproportional assumed property | XXX | 5,242,889 | 1,318,960 | 3,923,929 | 12,001,151 | | 15,925,080 | 574.9 |
| 32. Reinsurance-nonproportional assumed liability | XXX | | | | | | | |
| 33. Reinsurance-nonproportional assumed financial lines | XXX | | | | | | | |
| 34. Aggregate write-ins for other lines of business | 120,794 | 18,655 | 54,893 | 84,556 | 477,183 | 446,324 | 115,415 | 16.0 |
| 35. TOTALS | 60,318,388 | 92,462,648 | 67,463,517 | 85,317,519 | 359,399,318 | 344,456,866 | 100,259,971 | 61.9 |
| DETAILS OF WRITE-INS | | | | | | | | |
| 3401. Legal | 120,794 | 18,655 | 54,893 | 84,556 | 477,183 | 446,324 | 115,415 | |
| 3402. | | | | | | | | |
| 3403. | | | | | | | | |
| 3498. Sum. of remaining write-ins for Line 34 from overflow page | | | | | | | | |
| 3499. Totals (Lines 3401 through 3403 + 3498) (Line 34 above) | 120,794 | 18,655 | 54,893 | 84,556 | 477,183 | 446,324 | 115,415 | 16.0 |

6

# UNDERWRITING AND INVESTMENT EXHIBIT

### PART 2A - UNPAID LOSSES AND LOSS ADJUSTMENT EXPENSES

| | Reported Losses | | | | Incurred But Not Reported | | | Net Losses Unpaid | Net Unpaid Loss Adjustment Expenses |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Line of Business | Direct | Reinsurance Assumed | Deduct Reinsurance Recoverable | Net Losses Excl. Incurred But Not Reported (Cols. 1 + 2 - 3) | Direct | Reinsurance Assumed | Reinsurance Ceded | Net Losses Unpaid (Cols. 4 +5 + 6 - 7) | Net Unpaid Loss Adjustment Expenses |
| 1. Fire | | 6,787 | | 6,787 | | 14,382 | | 21,169 | 1,726 |
| 2. Allied lines | | 60,178 | | 60,178 | | 127,521 | | 187,699 | 15,305 |
| 3. Farmowners multiple peril | | | | | | | | | |
| 4. Homeowners multiple peril | | 338,444 | | 338,444 | | 725,682 | | 1,064,126 | 87,814 |
| 5. Commercial multiple peril | 510,000 | 237,933 | 510,000 | 237,933 | | 453,865 | | 691,798 | 108,783 |
| 6. Mortgage guaranty | | | | | | | | | |
| 8. Ocean marine | | | | | | | | | |
| 9. Inland marine | | 452 | | 452 | | 959 | | 1,411 | 115 |
| 10. Financial guaranty | | | | | | | | | |
| 11.1 Medical professional liability-occurrence | | | | | | | | | |
| 11.2 Medical professional liability-claims-made | | | | | | | | | |
| 12. Earthquake | | 2,262 | | 2,262 | | 4,794 | | 7,056 | 575 |
| 13. Group accident and health | | | | | | | | (a) | |
| 14. Credit accident and health (group and individual) | | | | | | | | | |
| 15. Other accident and health | | | | | | | | (a) | |
| 16. Workers' compensation | 79,007,806 | 116,431,587 | 80,431,980 | 115,007,413 | 181,739,167 | 186,531,220 | 182,939,331 | 300,338,469 | 54,681,008 |
| 17.1 Other liability-occurrence | | 55,253 | | 55,253 | | 492,624 | | 547,877 | 113,208 |
| 17.2 Other liability-claims-made | 132,522 | 116,373 | 132,522 | 116,373 | 296,492 | 387,976 | 296,492 | 504,349 | 112,430 |
| 17.3 Excess workers' compensation | | | | | | | | | |
| 18.1 Products liability-occurrence | | | | | | | | | |
| 18.2 Products liability-claims-made | | | | | | | | | |
| 19.1,19.2 Private passenger auto liability | | 814,301 | | 814,301 | | 1,186,858 | | 2,001,159 | 263,254 |
| 19.3,19.4 Commercial auto liability | | 17,284,101 | | 17,284,101 | | 21,204,760 | | 38,488,861 | 4,042,658 |
| 21. Auto physical damage | | 112,513 | | 112,513 | | 244,358 | | 356,871 | 43,715 |
| 22. Aircraft (all perils) | | | | | | | | | |
| 23. Fidelity | | | | | | | | | |
| 24. Surety | | | | | 3,860,226 | 2,702,159 | 3,860,226 | 2,702,159 | 165,934 |
| 26. Burglary and theft | | | | | | | | | |
| 27. Boiler and machinery | | | | | | | | | |
| 28. Credit | | | | | | | | | |
| 29. International | | | | | | | | | |
| 30. Warranty | | | | | 11,400 | 7,980 | 11,400 | 7,980 | 313 |
| 31. Reinsurance-nonproportional assumed property | XXX | 4,757,747 | | 4,757,747 | XXX | 7,243,404 | | 12,001,151 | |
| 32. Reinsurance-nonproportional assumed liability | XXX | | | | XXX | | | | |
| 33. Reinsurance-nonproportional assumed financial lines | XXX | | | | XXX | | | | |
| 34. Aggregate write-ins for other lines of business | 258,886 | 181,222 | 258,887 | 181,221 | 422,807 | 295,962 | 422,807 | 477,183 | 107,052 |
| 35. TOTALS | 79,909,214 | 140,399,153 | 81,333,389 | 138,974,978 | 186,330,092 | 221,624,504 | 187,530,256 | 359,399,318 | 59,743,890 |
| **DETAILS OF WRITE-INS** | | | | | | | | | |
| 3401. Legal | 258,886 | 181,222 | 258,887 | 181,221 | 422,807 | 295,962 | 422,807 | 477,183 | 107,052 |
| 3402. | | | | | | | | | |
| 3403. | | | | | | | | | |
| 3498. Sum of remaining write-ins for Line 34 from overflow page | | | | | | | | | |
| 3499. Totals (Lines 3401 through 3403 + 3498) (Line 34 above) | 258,886 | 181,222 | 258,887 | 181,221 | 422,807 | 295,962 | 422,807 | 477,183 | 107,052 |

(a) Including $ .................................... for present value of life indemnity claims.

10

# UNDERWRITING AND INVESTMENT EXHIBIT

## PART 3 - EXPENSES

| | 1<br>Loss Adjustment<br>Expenses | 2<br>Other Underwriting<br>Expenses | 3<br>Investment<br>Expenses | 4<br>Total |
|---|---|---|---|---|
| 1. Claim adjustment services: | | | | |
| 1.1 Direct | 4,173,180 | | | 4,173,180 |
| 1.2 Reinsurance assumed | 2,465,393 | | | 2,465,393 |
| 1.3 Reinsurance ceded | (6,367,981) | | | (6,367,981) |
| 1.4 Net claim adjustment services (1.1 + 1.2 - 1.3) | 13,006,554 | | | 13,006,554 |
| 2. Commission and brokerage: | | | | |
| 2.1 Direct, excluding contingent | | 7,382,735 | | 7,382,735 |
| 2.2 Reinsurance assumed, excluding contingent | | 15,146,566 | | 15,146,566 |
| 2.3 Reinsurance ceded, excluding contingent | | 14,081,906 | | 14,081,906 |
| 2.4 Contingent-direct | | 101,177 | | 101,177 |
| 2.5 Contingent-reinsurance assumed | | (5,516,922) | | (5,516,922) |
| 2.6 Contingent-reinsurance ceded | | (535,883) | | (535,883) |
| 2.7 Policy and membership fees | | | | |
| 2.8 Net commission and brokerage (2.1 + 2.2 - 2.3 + 2.4 + 2.5 - 2.6 + 2.7) | | 3,567,533 | | 3,567,533 |
| 3. Allowances to manager and agents | | | | |
| 4. Advertising | | 1,674,580 | | 1,674,580 |
| 5. Boards, bureaus and associations | | 1,679,443 | | 1,679,443 |
| 6. Surveys and underwriting reports | | 5,434 | | 5,434 |
| 7. Audit of assureds' records | | 55,290 | | 55,290 |
| 8. Salary and related items: | | | | |
| 8.1 Salaries | 5,808,841 | 10,613,263 | | 16,422,104 |
| 8.2 Payroll taxes | 474,635 | 765,642 | | 1,240,277 |
| 9. Employee relations and welfare | 1,612,449 | 2,946,085 | | 4,558,534 |
| 10. Insurance | 2,647,451 | 4,837,127 | | 7,484,578 |
| 11. Directors' fees | | | | |
| 12. Travel and travel items | 22,414 | 484,569 | | 506,983 |
| 13. Rent and rent items | 1,014,722 | 1,853,986 | | 2,868,708 |
| 14. Equipment | 22,879 | 41,801 | | 64,680 |
| 15. Cost or depreciation of EDP equipment and software | 403,077 | 736,457 | | 1,139,534 |
| 16. Printing and stationery | 124,286 | 227,082 | | 351,368 |
| 17. Postage, telephone and telegraph, exchange and express | 795,788 | 1,453,975 | | 2,249,763 |
| 18. Legal and auditing | 4,720,307 | 8,624,416 | 499,288 | 13,844,011 |
| 19. Totals (Lines 3 to 18) | 17,646,849 | 35,999,150 | 499,288 | 54,145,287 |
| 20. Taxes, licenses and fees: | | | | |
| 20.1 State and local insurance taxes deducting guaranty association credits of $          0 | | 3,338,766 | | 3,338,766 |
| 20.2 Insurance department licenses and fees | | 856,542 | 461 | 857,003 |
| 20.3 Gross guaranty association assessments | | 259,665 | | 259,665 |
| 20.4 All other (excluding federal and foreign income and real estate) | | 49,820 | | 49,820 |
| 20.5 Total taxes, licenses and fees (20.1 + 20.2 + 20.3 + 20.4) | | 4,504,793 | 461 | 4,505,254 |
| 21. Real estate expenses | | | | |
| 22. Real estate taxes | | | | |
| 23. Reimbursements by uninsured plans | | | | |
| 24. Aggregate write-ins for miscellaneous expenses | 19,609 | 35,827 | | 55,436 |
| 25. Total expenses incurred | 30,673,012 | 44,107,303 | 499,749 (a) | 75,280,064 |
| 26. Less unpaid expenses-current year | 59,743,890 | 5,122,898 | | 64,866,788 |
| 27. Add unpaid expenses-prior year | 61,671,128 | 7,515,740 | 20,066 | 69,206,934 |
| 28. Amounts receivable relating to uninsured plans, prior year | | | | |
| 29. Amounts receivable relating to uninsured plans, current year | | | | |
| 30. TOTAL EXPENSES PAID (Lines 25 - 26 + 27 - 28 + 29) | 32,600,250 | 46,500,145 | 519,815 | 79,620,210 |
| **DETAILS OF WRITE-INS** | | | | |
| 2401. Misc Expense | 5,075 | 9,272 | | 14,347 |
| 2402. Interest Expense | 14,534 | 26,555 | | 41,089 |
| 2403. | | | | |
| 2498. Summary of remaining write-ins for Line 24 from overflow page | | | | |
| 2499. Totals (Lines 2401 through 2403 plus 2498) (Line 24 above) | 19,609 | 35,827 | | 55,436 |

(a) Includes management fees of $           33,808,935           to affiliates and $                          to non-affiliates.

## EXHIBIT OF NET INVESTMENT INCOME

| | | 1<br>Collected<br>During Year | 2<br>Earned<br>During Year |
|---|---|---|---|
| 1. | U.S. Government bonds | (a) .......11,813,292 | .......10,860,656 |
| 1.1 | Bonds exempt from U.S. tax | (a) .......1,979,965 | .......3,542,519 |
| 1.2 | Other bonds (unaffiliated) | (a) .......1,292,594 | .......1,248,039 |
| 1.3 | Bonds of affiliates | (a) | |
| 2.1 | Preferred stocks (unaffiliated) | (b) | |
| 2.11 | Preferred stocks of affiliates | (b) | |
| 2.2 | Common stocks (unaffiliated) | | |
| 2.21 | Common stocks of affiliates | | |
| 3. | Mortgage loans | (c) | |
| 4. | Real estate | (d) | |
| 5. | Contract loans | | |
| 6. | Cash, cash equivalents and short-term investments | (e) .......826,470 | .......595,904 |
| 7. | Derivative instruments | (f) | |
| 8. | Other invested assets | .......717,015 | .......537,067 |
| 9. | Aggregate write-ins for investment income | | |
| 10. | Total gross investment income | 16,629,336 | 16,784,185 |
| 11. | Investment expenses | (g) | .......499,288 |
| 12. | Investment taxes, licenses and fees, excluding federal income taxes | (g) | .......461 |
| 13. | Interest expense | (h) | |
| 14. | Depreciation on real estate and other invested assets | (i) | |
| 15. | Aggregate write-ins for deductions from investment income | | |
| 16. | Total deductions (Lines 11 through 15) | | .......499,749 |
| 17. | Net investment income (Line 10 minus Line 16) | | 16,284,436 |

| **DETAILS OF WRITE-INS** | | | |
|---|---|---|---|
| 0901. | | | |
| 0902. | | | |
| 0903. | | | |
| 0998. | Summary of remaining write-ins for Line 9 from overflow page | | |
| 0999. | Totals (Lines 0901 through 0903 plus 0998) (Line 9 above) | | |
| 1501. | | | |
| 1502. | | | |
| 1503. | | | |
| 1598. | Summary of remaining write-ins for Line 15 from overflow page | | |
| 1599. | Totals (Lines 1501 through 1503 plus 1598) (Line 15 above) | | |

(a) Includes $ .......1,423,675 accrual of discount less $ .......1,973,518 amortization of premium and less $ .......112,733 paid for accrued interest on purchases.
(b) Includes $ .......accrual of discount less $ .......amortization of premium and less $ .......paid for accrued dividends on purchases.
(c) Includes $ .......accrual of discount less $ .......amortization of premium and less $ .......paid for accrued interest on purchases.
(d) Includes $ .......for company's occupancy of its own buildings; and excludes $ .......interest on encumbrances.
(e) Includes $ .......239,708 accrual of discount less $ .......amortization of premium and less $ .......paid for accrued interest on purchases.
(f) Includes $ .......accrual of discount less $ .......amortization of premium.
(g) Includes $ .......investment expenses and $ .......investment taxes, licenses and fees, excluding federal income taxes, attributable to segregated and Separate Accounts.
(h) Includes $ .......interest on surplus notes and $ .......interest on capital notes.
(i) Includes $ .......depreciation on real estate and $ .......depreciation on other invested assets.

## EXHIBIT OF CAPITAL GAINS (LOSSES)

| | | 1<br>Realized<br>Gain (Loss)<br>On Sales or<br>Maturity | 2<br>Other<br>Realized<br>Adjustments | 3<br>Total Realized Capital<br>Gain (Loss)<br>(Columns 1 + 2) | 4<br>Change in<br>Unrealized Capital<br>Gain (Loss) | 5<br>Change in<br>Unrealized Foreign<br>Exchange Capital<br>Gain (Loss) |
|---|---|---|---|---|---|---|
| 1. | U.S. Government bonds | .......125,832 | | .......125,832 | | |
| 1.1 | Bonds exempt from U.S. tax | | | | | |
| 1.2 | Other bonds (unaffiliated) | | | | | |
| 1.3 | Bonds of affiliates | | | | | |
| 2.1 | Preferred stocks (unaffiliated) | | | | | |
| 2.11 | Preferred stocks of affiliates | | | | | |
| 2.2 | Common stocks (unaffiliated) | | | | (9,635,875) | |
| 2.21 | Common stocks of affiliates | | | | | |
| 3. | Mortgage loans | | | | | |
| 4. | Real estate | | | | | |
| 5. | Contract loans | | | | | |
| 6. | Cash, cash equivalents and short-term investments | .......5,086 | | .......5,086 | | |
| 7. | Derivative instruments | | | | | |
| 8. | Other invested assets | | | | 2,308,493 | |
| 9. | Aggregate write-ins for capital gains (losses) | | | | | |
| 10. | Total capital gains (losses) | 130,918 | | 130,918 | (7,327,382) | |
| **DETAILS OF WRITE-INS** | | | | | | |
| 0901. | | | | | | |
| 0902. | | | | | | |
| 0903. | | | | | | |
| 0998. | Summary of remaining write-ins for Line 9 from overflow page | | | | | |
| 0999. | Totals (Lines 0901 through 0903 plus 0998) (Line 9 above) | | | | | |

Exhibit 5, Page 13 of 152

# EXHIBIT OF NONADMITTED ASSETS

| | 1<br>Current Year Total<br>Nonadmitted Assets | 2<br>Prior Year Total<br>Nonadmitted Assets | 3<br>Change in Total<br>Nonadmitted Assets<br>(Col. 2 - Col. 1) |
|---|---|---|---|
| 1. Bonds (Schedule D) | | | |
| 2. Stocks (Schedule D): | | | |
|   2.1 Preferred stocks | | | |
|   2.2 Common stocks | 22,565,533 | 30,998,731 | 8,433,198 |
| 3. Mortgage loans on real estate (Schedule B): | | | |
|   3.1 First liens | | | |
|   3.2 Other than first liens | | | |
| 4. Real estate (Schedule A): | | | |
|   4.1 Properties occupied by the company | | | |
|   4.2 Properties held for the production of income | | | |
|   4.3 Properties held for sale | | | |
| 5. Cash (Schedule E-Part 1), cash equivalents (Schedule E-Part 2) and short-term investments (Schedule DA) | | | |
| 6. Contract loans | | | |
| 7. Derivatives (Schedule DB) | | | |
| 8. Other invested assets (Schedule BA) | | | |
| 9. Receivables for securities | | | |
| 10. Securities lending reinvested collateral assets (Schedule DL) | | | |
| 11. Aggregate write-ins for invested assets | | | |
| 12. Subtotals, cash and invested assets (Lines 1 to 11) | 22,565,533 | 30,998,731 | 8,433,198 |
| 13. Title plants (for Title insurers only) | | | |
| 14. Investment income due and accrued | | | |
| 15. Premiums and considerations: | | | |
|   15.1 Uncollected premiums and agents' balances in the course of collection | | | |
|   15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due | 31,766 | 72,919 | 41,153 |
|   15.3 Accrued retrospective premiums and contracts subject to redetermination | | | |
| 16. Reinsurance: | | | |
|   16.1 Amounts recoverable from reinsurers | | | |
|   16.2 Funds held by or deposited with reinsured companies | | | |
|   16.3 Other amounts receivable under reinsurance contracts | | | |
| 17. Amounts receivable relating to uninsured plans | | | |
| 18.1 Current federal and foreign income tax recoverable and interest thereon | | | |
| 18.2 Net deferred tax asset | 5,858,272 | 2,827,311 | (3,030,961) |
| 19. Guaranty funds receivable or on deposit | | | |
| 20. Electronic data processing equipment and software | | | |
| 21. Furniture and equipment, including health care delivery assets | | | |
| 22. Net adjustment in assets and liabilities due to foreign exchange rates | | | |
| 23. Receivables from parent, subsidiaries and affiliates | | | |
| 24. Health care and other amounts receivable | | | |
| 25. Aggregate write-ins for other-than-invested assets | 195,172 | 145,864 | (49,308) |
| 26. Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 28,650,743 | 34,044,825 | 5,394,082 |
| 27. From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | |
| 28. Total (Lines 26 and 27) | 28,650,743 | 34,044,825 | 5,394,082 |
| **DETAILS OF WRITE-INS** | | | |
| 1101. | | | |
| 1102. | | | |
| 1103. | | | |
| 1198. Summary of remaining write-ins for Line 11 from overflow page | | | |
| 1199. Totals (Lines 1101 through 1103 plus 1198) (Line 11 above) | | | |
| 2501. | | | |
| 2502. | | | |
| 2503. *Prepaid Expenses* | 195,172 | 145,864 | (49,308) |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | | | |
| 2599. Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 195,172 | 145,864 | (49,308) |

Exhibit 5, Page 14 of 152

**Notes to the Financial Statements**

**1.  Summary of Significant Accounting Policies and Going Concern**

A.  Accounting Practices

The accompanying financial statements of California Insurance Company ("the Company") have been prepared in conformity with accounting practices prescribed or permitted by the California Department of Insurance ("CDI") and the National Association of Insurance Commissioners ("NAIC").

The CDI requires its domiciled insurance companies to prepare their statutory financial statements in accordance with the NAIC's *Statement of Statutory Accounting Principles* ("SSAP") subject to any deviations prescribed or permitted by the CDI.

Differences between the CDI and the NAIC Statement of Statutory Accounting Principles ("SAP") affect the Company in relation to investment restrictions.  The CDI requires that the amount of miscellaneous investments the Company invests in does not exceed the lesser of 5% of admitted assets or 50% of the excess of admitted assets over the sum of capital paid up, liabilities and the required surplus (California Insurance Code, Section 1210).  The NAIC SAP does not have these investment restrictions.  Prescribed practice amounts totaled $22,565,533 and $30,998,731 as of December 31, 2020 and December 31, 2019, respectively.  The chart below illustrates the effect of the prescribed practice on the Company's net income and surplus.

|  | SSAP # | F/S Page | F/S Line # | 2020 | 2019 |
|---|---|---|---|---|---|
| Net Income |  |  |  |  |  |
| (1) State basis (Page 4, Line 20, Columns 1 & 2) | XXX | XXX | XXX | $     1,335,214 | $   72,335,840 |
| (2) State prescribed practices that are an increase / (decrease) from NAIC SAP: |  |  |  |  |  |
| (3) State permitted practices that are an increase / (decrease) from NAIC SAP: |  |  |  |  |  |
| (4) NAIC SAP (1-2-3=4) | XXX | XXX | XXX | $     1,335,214 | $   72,335,840 |
| Surplus |  |  |  |  |  |
| (5) State basis (Page 3, Line 37, Columns 1 & 2) | XXX | XXX | XXX | $   593,668,524 | $  590,644,918 |
| (6) State prescribed practices that are an increase / (decrease) from NAIC SAP: |  |  |  |  |  |
| Non-admitted unaffiliated common stock | 00 | Assets | 2.2 | (22,565,533) | (30,998,731) |
| (7) State permitted practices that are an increase / (decrease) from NAIC SAP: |  |  |  |  |  |
| (8) NAIC SAP (5-6-7=8) | XXX | XXX | XXX | $   616,234,057 | $  621,643,649 |

B.  Use of Estimates in the Preparation of the Financial Statements

The preparation of financial statements requires management to make estimates and assumptions that affect the amounts reported in these financial statements and notes. Actual results could differ from those estimates.

C.  Accounting Policy

Direct, assumed, and ceded workers' compensation premiums are written and earned as collected per the installment method in accordance with *SSAP, No. 53 – Property-Casualty Contracts – Premiums,* of the *Accounting Practices and Procedures Manual.* Unearned premium reserves have only been established for the workers' compensation line with regard to assumed residual markets mandatory pooling. For Federal Tax purposes the installment method of recording premium is not recognized. As a result, unearned premium has been calculated as if the pro-rata method has been used, and has been recorded as a temporary item within deferred tax assets.

Direct employment practices legal insurance and warranty premiums are earned over the term and life of the related policies. All assumed lines of business other than workers' compensation pursuant to an intercompany pooling agreement (see Note 26) are earned over the term and life of the related policies. Unearned premium reserves are established to cover the unexpired portion of premiums written on these policies.

The Company's participation in involuntary risk pools ("residual markets") is mandatory and generally a function of its proportionate share of the voluntary market, by line of insurance, in each state in which it does business. The Company's participation in mandatory residual markets requires it to record premiums, losses and expenses in the same manner as it would record similar, voluntary business that is written by the Company. In addition to its proportional share of losses and expenses incurred by the residual market facility, the Company is responsible for its share of any otherwise unrecoverable obligations of other residual market participants.

Expenses incurred in connection with acquiring new insurance business, including such acquisition costs as sales commissions, are charged to operations as incurred.  Expenses incurred are reduced for ceding allowances as received or receivable.

Net investment income earned consists primarily of interest less investment related expense.  Interest is recognized on an accrual basis.  Net realized capital gains (losses) are recognized using the specific identification method when securities are sold, redeemed or otherwise disposed.

In addition, the Company uses the following accounting policies:

(1)  Short-Term Investments

Short-term investments are stated at amortized cost.

(2)  Bonds

Investment grade bonds not backed by other loans are stated at amortized cost using the scientific method. Non-investment grade bonds not backed by other loans are stated at the lower of amortized value or fair value.

(3)  Common Stocks

Common stocks are stated at fair value which approximates cost.

(4)  Preferred stocks - Not Applicable

(5)  Mortgage loans - Not Applicable

(6)  Loan-backed securities

Exhibit 5, Page 15 of 152

**Notes to the Financial Statements**

1.  **Summary of Significant Accounting Policies and Going Concern (Continued)**

   U.S. government agency mortgage-backed securities are stated at amortized cost.

   (7)  Investments in subsidiaries, controlled and affiliated entities - Not Applicable

   (8)  Investments in joint ventures, partnerships and limited liability companies

   Investments in limited liability companies are valued using the audited U.S. GAAP equity method.  Real estate investments that are occupied by the Company or held for the production of income are stated at depreciated cost less encumbrances. Loans are stated at their unpaid principal balances.

   (9)  Derivatives - Not Applicable

   (10) Investment income as a factor in the premium deficiency calculation - Not Applicable

   (11) Liabilities for losses and loss/claim adjustment expenses

   The liabilities for estimated losses and loss adjustment expenses ("LAE") represent the estimated liabilities for reported claims plus those incurred but not yet reported and the related estimated claim expenses. The liabilities for estimated losses and LAE are determined using case-basis evaluations and statistical analyses and represent estimates of the ultimate net cost of all claims incurred through December 31 of each year. Although considerable variability is inherent in such estimates, management believes that the liability for estimated losses and LAE is adequate. The estimates are continually reviewed and adjusted as necessary. These adjustments are included in current operations and are accounted for as changes in estimates.

   (12) Changes in capitalization policy - Not Applicable

   (13) Pharmaceutical rebate receivables - Not Applicable

   D.  Going Concern - Not Applicable

2.  **Accounting Changes and Corrections of Errors** - Not Applicable

3.  **Business Combinations and Goodwill**

   A.  Statutory Purchase Method - Not Applicable

   B.  Statutory Merger - Not Applicable

   C.  Impairment Loss - Not Applicable

4.  **Discontinued Operations** - Not Applicable

5.  **Investments**

   A.  Mortgage Loans, including Mezzanine Real Estate Loans - Not Applicable

   B.  Debt Restructuring - Not Applicable

   C.  Reverse Mortgages - Not Applicable

   D.  Loan-Backed Securities

   (1)  Assumptions regarding prepayments on loan-backed securities were determined by using data provided to the Company from our broker.

   (2)  Loan-backed and structured securities with a recognized other-than-temporary impairment (OTTI) - Not Applicable

   (3)  Securities held that were other-than-temporarily impaired due to the present value of cash flows expected to be collected was less than the amortized cost of securities - Not Applicable

   (4)  All impaired securities for which an OTTI has not been recognized in earnings as a realized loss - Not Applicable

   (5)  Support for concluding impairments are not other-than-temporary - Not Applicable

   E.  Dollar Repurchase Agreements and/or Securities Lending Transactions - Not Applicable

   F.  Repurchase Agreements Transactions Accounted for as Secured Borrowing - Not Applicable

   G.  Reverse Repurchase Agreements Transactions Accounted for as Secured Borrowing - Not Applicable

   H.  Repurchase Agreements Transactions Accounted for as a Sale - Not Applicable

   I.  Reverse Repurchase Agreements Transactions Accounted for as a Sale - Not Applicable

   J.  Real Estate - Not Applicable

   K.  Low-Income Housing Tax Credits (LIHTC) - Not Applicable

Annual Statement for the Year 2020 of the California Insurance Company
Case 2:21-cv-00030-WBS-AC   Document 24   Filed 03/15/21   Page 68 of 472
Notes to the Financial Statements

**5.  Investments (Continued)**

L.  Restricted Assets

(1)  Restricted assets (including pledged)

| | Gross (Admitted & Nonadmitted) Restricted | | | | | | | Current Year | | | |
| | Current Year | | | | | | | | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| Restricted Asset Category | Total General Account (G/A) | G/A Supporting Protected Cell Account Activity | Total Protected Cell Account Restricted Assets | Protected Cell Account Assets Supporting G/A Activity | Total (1 + 3) | Total From Prior Year | Increase / (Decrease) (5 - 6) | Total Nonadmitted Restricted | Total Admitted Restricted (5-8) | Gross (Admitted & Nonadmitted) Restricted to Total Assets, % | Admitted Restricted to Total Admitted Assets, % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| a. Subject to contractual obligation for which liability is not shown | $ | $ | $ | $ | $ | $ | $ | $ | $ | % | % |
| b. Collateral held under security lending agreements | | | | | | | | | | | |
| c. Subject to repurchase agreements | | | | | | | | | | | |
| d. Subject to reverse repurchase agreements | | | | | | | | | | | |
| e. Subject to dollar repurchase agreements | | | | | | | | | | | |
| f. Subject to dollar reverse repurchase agreements | | | | | | | | | | | |
| g. Placed under option contracts | | | | | | | | | | | |
| h. Letter stock or securities restricted as to sale - excluding FHLB capital stock | | | | | | | | | | | |
| i. FHLB capital stock | | | | | | | | | | | |
| j. On deposit with states | 488,195,098 | | | | 488,195,098 | 514,664,008 | (26,468,910) | | 488,195,098 | 43.038 | 44.153 |
| k. On deposit with other regulatory bodies | 499,557 | | | | 499,557 | 497,438 | 2,119 | | 499,557 | 0.044 | 0.045 |
| l. Pledged as collateral to FHLB (including assets backing funding agreements) | | | | | | | | | | | |
| m. Pledged as collateral not captured in other categories | | | | | | | | | | | |
| n. Other restricted assets | | | | | | | | | | | |
| o. Total restricted assets | $ 488,694,655 | $ | $ | $ | $ 488,694,655 | $ 515,161,446 | $ (26,466,791) | $ | $ 488,694,655 | 43.082 % | 44.198 % |

(2)  Detail of assets pledged as collateral not captured in other categories (contracts that share similar characteristics, such as reinsurance and derivatives, are reported in the aggregate) - Not Applicable

(3)  Detail of other restricted assets (contracts that share similar characteristics, such as reinsurance and derivatives, are reported in the aggregate) - Not Applicable

(4)  Collateral received and reflected as assets within the reporting entity's financial statements - Not Applicable

M.  Working Capital Finance Investments - Not Applicable

N.  Offsetting and Netting of Assets and Liabilities - Not Applicable

O.  5GI Securities - Not Applicable

P.  Short Sales - Not Applicable

Q.  Prepayment Penalty and Acceleration Fees - Not Applicable

**6.  Joint Ventures, Partnerships and Limited Liability Companies**

A.  Investments in Joint Ventures, Partnerships or Limited Liability Companies that Exceed 10% of Admitted Assets - Not Applicable

B.  Impaired Investments in Joint Ventures, Partnerships and Limited Liability Companies - Not Applicable

**7.  Investment Income**

A.  Due and Accrued Income Excluded from Surplus

The Company does not admit investment income due and accrued if amounts are over 90 days past due.

14.2

**Notes to the Financial Statements**

**7.   Investment Income (Continued)**

    B.   Total Amount Excluded - Not Applicable

**8.   Derivative Instruments** - Not Applicable

**9.   Income Taxes**

    A.   Components of the Net Deferred Tax Asset/(Liability)

        (1)   Change between years by tax character

| | 2020 | | | 2019 | | | Change | | |
|---|---|---|---|---|---|---|---|---|---|
| | (1)<br>Ordinary | (2)<br>Capital | (3)<br>Total<br>(Col 1+2) | (4)<br>Ordinary | (5)<br>Capital | (6)<br>Total<br>(Col 4+5) | (7)<br>Ordinary<br>(Col 1-4) | (8)<br>Capital<br>(Col 2-5) | (9)<br>Total<br>(Col 7+8) |
| (a) Gross deferred tax assets | $ 15,587,943 | $ 2,023,534 | $ 17,611,477 | $ 15,064,692 | $ | $ 15,064,692 | $ 523,251 | $ 2,023,534 | $ 2,546,785 |
| (b) Statutory valuation allowance adjustments | | | | | | | | | |
| (c) Adjusted gross deferred tax assets (1a - 1b) | 15,587,943 | 2,023,534 | 17,611,477 | 15,064,692 | | 15,064,692 | 523,251 | 2,023,534 | 2,546,785 |
| (d) Deferred tax assets nonadmitted | 3,834,738 | 2,023,534 | 5,858,272 | 2,827,311 | | 2,827,311 | 1,007,427 | 2,023,534 | 3,030,961 |
| (e) Subtotal net admitted deferred tax asset (1c - 1d) | 11,753,205 | $ — | 11,753,205 | 12,237,381 | $ | 12,237,381 | (484,176) | $ — | (484,176) |
| (f) Deferred tax liabilities | 3,282,546 | | 3,282,546 | 4,245,106 | | 4,245,106 | (962,560) | | (962,560) |
| (g) Net admitted deferred tax asset/(net deferred tax liability) (1e - 1f) | $ 8,470,659 | $ — | $ 8,470,659 | 7,992,275 | $ | $ 7,992,275 | 478,384 | $ — | 478,384 |

        (2)   Admission calculation components SSAP No. 101

| | 2020 | | | 2019 | | | Change | | |
|---|---|---|---|---|---|---|---|---|---|
| | (1)<br>Ordinary | (2)<br>Capital | (3)<br>Total<br>(Col 1+2) | (4)<br>Ordinary | (5)<br>Capital | (6)<br>Total<br>(Col 1-4) | (7)<br>Ordinary<br>(Col 1-4) | (8)<br>Capital<br>(Col 2-5) | (9)<br>Total<br>(Col 7+8) |
| (a) Federal income taxes paid in prior years recoverable through loss carrybacks | $ 8,470,659 | $ | $ 8,470,659 | $ 7,992,274 | $ | $ 7,992,274 | 478,385 | $ | 478,385 |
| (b) Adjusted gross deferred tax assets expected to be realized (excluding the amount of deferred tax assets from 2(a) above) after application of the threshold limitation (lesser of 2(b)1 and 2(b)2 below) | | | | | | | | | |
|    1.   Adjusted gross deferred tax assets expected to be realized following the balance sheet date | | | | | | | | | |
|    2.   Adjusted gross deferred tax assets allowed per limitation threshold | XXX | XXX | 87,779,680 | XXX | XXX | 91,717,026 | XXX | XXX | (3,937,346) |
| (c) Adjusted gross deferred tax assets (excluding the amount of deferred tax assets from 2(a) and 2(b) above) offset by gross deferred tax liabilities | 3,282,546 | | 3,282,546 | 4,245,107 | | 4,245,107 | (962,561) | | (962,561) |
| (d) Deferred tax assets admitted as the result of application of SSAP No. 101. Total (2(a) + 2(b) + 2(c)) | $ 11,753,205 | $ | $ 11,753,205 | $ 12,237,381 | $ | $ 12,237,381 | (484,176) | $ | (484,176) |

        (3)   Ratio used as basis of admissibility

| | 2020 | 2019 |
|---|---|---|
| (a) Ratio percentage used to determine recovery period and threshold limitation amount | 1,190.892 % | 1,275.638 % |
| (b) Amount of adjusted capital and surplus used to determine recovery period and threshold limitation in 2(b)2 above | $ 585,197,865 | $ 582,652,643 |

        (4)   Impact of tax-planning strategies

            (a)   Determination of adjusted gross deferred tax assets and net admitted deferred tax assets, by tax character as a percentage

| | 2020 | | 2019 | | Change | |
|---|---|---|---|---|---|---|
| | (1)<br>Ordinary | (2)<br>Capital | (3)<br>Ordinary | (4)<br>Capital | (5)<br>Ordinary<br>(Col. 1-3) | (6)<br>Capital<br>(Col. 2-4) |
| 1.   Adjusted gross DTAs amount from Note 9A1(c) | $ 15,587,943 | $ 2,023,534 | $ 15,064,692 | $ | $ 523,251 | $ 2,023,534 |
| 2.   Percentage of adjusted gross DTAs by tax character attributable to the impact of tax planning strategies | % | % | % | % | % | % |
| 3.   Net admitted adjusted gross DTAs amount from Note 9A1(e) | $ 11,753,205 | $ — | $ 12,237,381 | $ | $ (484,176) | $ — |
| 4.   Percentage of net admitted adjusted gross DTAs by tax character admitted because of the impact of tax planning strategies | % | % | % | % | % | % |

Exhibit 5, Page 18 of 152

**Notes to the Financial Statements**

**9.   Income Taxes (Continued)**

     (b)   Use of reinsurance-related tax-planning strategies

         Does the company's tax-planning strategies include the use of reinsurance? ................................................ No ..........

B.   Regarding Deferred Tax Liabilities That Are Not Recognized - Not Applicable

C.   Major Components of Current Income Taxes Incurred

| | (1)<br>2020 | (2)<br>2019 | (3)<br>Change (1-2) |
|---|---|---|---|
| Current income taxes incurred consist of the following major components: | | | |
| 1.   Current Income Tax | | | |
|   (a)   Federal | $ 2,347,632 | $ 17,258,633 | $ (14,911,001) |
|   (b)   Foreign | | | |
|   (c)   Subtotal | $ 2,347,632 | $ 17,258,633 | $ (14,911,001) |
|   (d)   Federal income tax on net capital gains | 27,493 | 15,290,413 | (15,262,920) |
|   (e)   Utilization of capital loss carry-forwards | | | |
|   (f)   Other | | | |
|   (g)   Federal and foreign income taxes incurred | $ 2,375,125 | $ 32,549,046 | $ (30,173,921) |

| | (1)<br>2020 | (2)<br>2019 | (3)<br>Change (1-2) |
|---|---|---|---|
| 2.   Deferred Tax Assets | | | |
|   (a)   Ordinary | | | |
|     (1)   Discounting of unpaid losses | $ 11,661,475 | $ 11,623,314 | $ 38,161 |
|     (2)   Unearned premium reserve | 3,926,468 | 3,441,378 | 485,090 |
|     (3)   Policyholder reserves | | | |
|     (4)   Investments | | | |
|     (5)   Deferred acquisition costs | | | |
|     (6)   Policyholder dividends accrual | | | |
|     (7)   Fixed assets | | | |
|     (8)   Compensation and benefits accrual | | | |
|     (9)   Pension accrual | | | |
|     (10)  Receivables - nonadmitted | | | |
|     (11)  Net operating loss carry-forward | | | |
|     (12)  Tax credit carry-forward | | | |
|     (13)  Other (including items less than 5% of total ordinary tax assets) | | | |
|       (99)  Subtotal | $ 15,587,943 | $ 15,064,692 | $ 523,251 |
|   (b)   Statutory valuation allowance adjustment | | | |
|   (c)   Nonadmitted | 3,834,738 | 2,827,311 | 1,007,427 |
|   (d)   Admitted ordinary deferred tax assets (2a99 - 2b - 2c) | $ 11,753,205 | $ 12,237,381 | $ (484,176) |
|   (e)   Capital | | | |
|     (1)   Investments | $ 2,023,534 | $ | $ 2,023,534 |
|     (2)   Net capital loss carry-forward | | | |
|     (3)   Real estate | | | |
|     (4)   Other (including items <5% of total capital tax assets) | | | |
|       (99)  Subtotal | $ 2,023,534 | $ | $ 2,023,534 |
|   (f)   Statutory valuation allowance adjustment | | | |
|   (g)   Nonadmitted | 2,023,534 | | 2,023,534 |
|   (h)   Admitted capital deferred tax assets (2e99 - 2f - 2g) | – | | – |
|   (i)   Admitted deferred tax assets (2d + 2h) | $ 11,753,205 | $ 12,237,381 | $ (484,176) |

Annual Statement for the Year 2020 of the California Insurance Company
Case 2:21-cv-00030-WBS-AC   Document 24   Filed 03/15/21   Page 71 of 472
Notes to the Financial Statements

**9.   Income Taxes (Continued)**

| | | (1) 2020 | (2) 2019 | (3) Change (1-2) |
|---|---|---|---|---|
| 3. | Deferred Tax Liabilities | | | |
| (a) | Ordinary | | | |
| (1) | Investments | $ 250,567 | $ 524,752 | $ (274,185) |
| (2) | Fixed assets | 22,596 | 20,197 | 2,399 |
| (3) | Deferred and uncollected premium | | | |
| (4) | Policyholder reserves | | | |
| (5) | Other (including items <5% of total ordinary tax liabilities)† | 3,009,383 | 3,700,157 | (690,774) |
| (99) | Subtotal | $ 3,282,546 | $ 4,245,106 | $ (962,560) |
| (b) | Capital | | | |
| (1) | Investments | $ | $ | $ |
| (2) | Real estate | | | |
| (3) | Other (including items <5% of total capital tax liabilities) | | | |
| (99) | Subtotal | $ | $ | $ |
| (c) | Deferred tax liabilities (3a99 + 3b99) | $ 3,282,546 | $ 4,245,106 | $ (962,560) |
| 4. | Net deferred tax assets/liabilities (2i - 3c) | $ 8,470,659 | $ 7,992,275 | $ 478,384 |

| | (1) 2020 | (2) 2019 | (3) Change (1-2) |
|---|---|---|---|
| † Items >5% of total ordinary tax liabilities included in Other | | | |
| TCJA transition adjustment to loss reserve discounts | $ 1,887,219 | $ 2,264,663 | (377,444) |
| Safe harbor adjustment to premium acquisition expenses | 1,122,164 | 1,435,494 | (313,330) |

D.   Among the More Significant Book to Tax Adjustments

| | 2020 | Effective Tax Rate |
|---|---|---|
| Provision computed at statutory rate | $ 779,171 | 21.000 % |
| | | |
| Current Tax on Unrealized LLC Income | 437,288 | 11.786 |
| Tax Exempt Interest (net of proration) | (557,947) | -15.038 |
| Meals & Entertainment | 13,122 | 0.354 |
| Penalties | 10,640 | 0.287 |
| Other - Rounding | 2 | — |
| True-Up of Prior Year's Liability | 207,038 | 5.580 |
| Total | $ 889,314 | 23.969 % |

| | 2020 | Effective Tax Rate |
|---|---|---|
| Federal and foreign income tax incurred | $ 2,347,632 | 63.273 % |
| Realized Capital Gains/(Loss) Tax | 27,493 | 0.741 |
| Change in deferred income taxes | (1,485,811) | -40.045 |
| Total statutory income taxes | $ 889,314 | 23.969 % |

E.   Operating Loss and Tax Credit Carryforwards

(1)   Unused loss carryforwards available - Not Applicable

(2)   Income tax expense available for recoupment

The following is the amount of federal income taxes incurred in the current year and each preceding year, which are available for recoupment in the event of future net losses:

| | Ordinary | Capital | Total |
|---|---|---|---|
| 2018 | $ | $ | $ |
| 2019 | 31,752,530 | | 31,752,530 |
| 2020 | 2,168,087 | | 2,168,087 |

(3)   Deposits admitted under IRC Section 6603 - Not Applicable

F.   Consolidated Federal Income Tax Return

(1)   The Company joins with a group of approximately 40 affiliated companies in the filing of a consolidated federal income tax return by AU Holding Company, Inc., the common parent company of the Group.

(2)   In addition, a complementary method is used which results in reimbursement by profitable affiliates to loss affiliates for tax benefits generated by loss affiliates. In the event the Company incurs a net operating loss in a future year in which the Group reports consolidated taxable income, the Company will be entitled to reimbursement (from other profitable members of the Group) for the income tax benefits attributable to the loss. All federal income taxes allocated to the Company for the current and preceding year may be recoverable in the event future net operating losses are reported for both the Company and on a consolidated basis for the Group, depending upon the magnitude of such losses.

### Notes to the Financial Statements

**9.   Income Taxes (Continued)**

G.   Federal or Foreign Income Tax Loss Contingencies

The Company does not have any tax loss contingencies for which it is reasonably possible that the total liability will significantly increase within twelve months of the reporting date.

H.   Repatriation Transition Tax (RTT) - Not Applicable

I.   Alternative Minimum Tax (AMT) Credit - Not Applicable

**10.   Information Concerning Parent, Subsidiaries, Affiliates and Other Related Parties**

A.   Nature of Relationships

The Company is a wholly owned subsidiary of North American Casualty Co. ("NAC"; "Direct Parent"), a subsidiary of AU Holding Company, Inc. ("AUH"; "Indirect Parent").  NAC became the Direct Parent of the Company on December 29, 2006 pursuant to approval of a Form A filing with the CDI and became a member of Berkshire Hathaway, Inc. in 2006. Through a series of transactions with Berkshire Hathaway, Inc. and a stockholder in AUH, through multiple Form As, Steven Menzies became the owner of 100% of AUH, the Ultimate Parent, on October 10, 2019 and indirectly the 100% owner of the Company.

B.   Significant Transactions and Changes in Terms of Intercompany Arrangements

The Company has an Agency Agreement in place with a related party, Applied Risk Services, Inc. (ARS) in which ARS receives premium and assessments from policyholders and pays commissions to brokers on behalf of the Company, which has been submitted and approved by the CDI. ARS receives no fee for performing these services. These arrangements require that intercompany balances be settled within 30 day.

The following chart contains the transactions during the period ending  December 31, 2020 that are greater than ½% of admitted assets.

| (1) Date of Transaction | (2) Explanation of Transaction | (3) Reporting Entity | (4) Name of Affiliate or Related Party | (5) Description of Assets Received by Reporting Entity | (6) Statement Value of Assets Received by Reporting Entity | (7) Description of Assets Transferred by Reporting Entity | (8) Statement Value of Assets Transferred by Reporting Entity |
|---|---|---|---|---|---|---|---|
| 1/31/2020 | January Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | December Premium Payment | $   9,794,669 | | |
| 2/29/2020 | February Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | January Premium Payment | $   9,685,347 | | |
| 3/31/2020 | March Wire Transfer from ARS | California Insurance Company. | Applied Risk Services, Inc. | February Premium Payment | $  11,998,082 | | |
| 3/31/2020 | | California Insurance Company | Applied Underwriters, Inc. | | | March Home office reimbursement/cost allocation agreement | $   13,928,020 |
| 4/28/2020 | April Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | March Premium Payment | $   7,387,559 | | |
| 5/28/2020 | May Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | April Premium Payment | $   6,026,043 | | |
| 6/29/2020 | June Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | May Premium Payment | $   7,594,933 | | |
| 6/30/2020 | Wire Transfer to AUI | California Insurance Company | Applied Underwriters, Inc. | | | June Home office reimbursement/cost allocation agreement | $   6,283,618 |
| 7/31/2020 | July Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | June Premium Payment | $   6,806,002 | | |
| 7/31/2020 | Wire Transfer to AUI | California Insurance Company | Applied Underwriters, Inc. | | | July Home office reimbursement/cost allocation agreement | $   6,354,606 |
| 8/31/2020 | August Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | July Premium Payment | $   7,852,897 | | |
| 9/29/2020 | September Wire Transfer from ARS | California Insurance Company. | Applied Risk Services, Inc. | August Premium Payment | $   6,641,530 | | |
| 9/30/2020 | Wire Transfer to AUI | California Insurance Company | Applied Underwriters, Inc. | | | September Home office reimbursement/cost allocation agreement | $   6,519,538 |
| 10/29/2020 | September Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | September Premium Payment | $   6,800,357 | | |
| 10/29/2020 | Wire Transfer to AUI | California Insurance Company | Applied Underwriters, Inc. | | | October Home office reimbursement/cost allocation agreement | $   30,235,801 |
| 11/27/2020 | October Wire Transfer from ARS | California Insurance Company | Applied Risk Services, Inc. | October Premium Payment | $   7,716,541 | | |
| 12/30/2020 | November Wire Transfer from ARS | California Insurance Company. | Applied Risk Services, Inc. | November  Premium Payment | $   6,759,665 | | |
| 11/27/2020 | Wire Transfer to AUI | California Insurance Company | Applied Underwriters, Inc. | | | November Home office reimbursement/cost allocation agreement | $   8,141,020 |
| 12/31/2020 | Wire Transfer to AUI | California Insurance Company | Applied Underwriters, Inc. | | | December Home office reimbursement/cost allocation agreement | $   5,000,000 |

Effective November 1, 2020, the Companies in the Second Pooling Agreement agreed to add Amendement No. 5 to the change the lead company from California Insurance Company ("CIC") to Continental Indemnity Company ("CNI").  This change did not result in any changes to the participation percentages (see Note 26)

C.   Transactions With Related Party Who Are Not Reported on Schedule Y

(1)   Detail of material related party transactions

| Ref # | Date of Transaction | Name of Related Party | Nature of Relationship | Type of Transaction | Written Agreement (Yes/No) | Due Date | Reporting Period Date Amount Due From (To) |
|---|---|---|---|---|---|---|---|
| ........1..... | 03/31/2020.. | Applied Underwriters | Related Party ......... | Loan.................... | ....YES......... | 03/31/2021.. | $.... 4,300,000 |
| ........2..... | 10/10/2020.. | Applied Underwriters | Related Party ......... | Loan.................... | ....YES......... | 10/10/2021.. | 15,000,000 |

Exhibit 5, Page 21 of 152

**10. Information Concerning Parent, Subsidiaries, Affiliates and Other Related Parties (Continued)**

(2) Detail of material related party transactions involving services

| Ref # | Name of Related Party | Overview Description | Amount Charged | Amount Based on Allocation of Costs or Market Rates | Amount Charged Modified or Waived (Yes/No) |
|---|---|---|---|---|---|
| 1 | Applied Underwriters, Inc | Cost Agreement | $ 48,298,479 | $ 48,298,479 | NO |
| Total | | | $ 48,298,479 | $ 48,298,479 | |

(3) Detail of material related party transactions involving exchange of assets and liabilities - Not Applicable

(4) Detail of amounts owed to/from a related party

| Ref # | Name of Related Party | Aggregate Reporting Period Amount Due From | Aggregate Reporting Period (Amount Due To) | Amount Offset in Financial Statement (if qualifying) | Net Amount Recoverable / (Payable) by Related Party | Admitted Recoverable |
|---|---|---|---|---|---|---|
| 1 | Applied Underwriters, Inc | $ — | $ (3,103,375) | $ — | $ (3,103,375) | $ — |
| 2 | Applied Risk Services, Inc | — | (144,776) | — | (144,776) | — |
| Total | | $ — | $ (3,248,151) | $ — | $ (3,248,151) | $ — |

D. Amounts Due To or From Related Parties

All balances are settled within 30 days.

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Due to Applied Underwriters, Inc. | $ 3,103,375 | $ 2,065,405 |
| Due to Applied Risk Services, Inc. | $ 144,776 | $ - |
| Total | $ 3,248,151 | $ 2,065,405 |

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Due from Applied Risk Services, Inc. | $ - | $ 14,707 |
| Due from Continental Indemnity Company | $ 560 | $ 502,151 |
| Due from Illinois Insurance Company | $ 306,975 | $ 238,888 |
| Due from Pennsylvania Insurance Company | $ 312,602 | $ 218,089 |
| Due from Texas Insurance Company | $ 312,433 | $ 232,088 |
| Total | $ 932,570 | $ 1,205,923 |

E. Management, Service Contracts, Cost Sharing Arrangements

Management, Service Contracts, Cost Sharing Arrangements management, claims processing, premium processing, and data processing services for the Company at actual cost, pursuant to a Management Services Agreement for rent, salaries, and general administrative expenses, which has been submitted and approved by the CDI. The Company shares these costs as part of its Second Pooling Agreement with its affiliates, Continental Indemnity Company ("CNI"), Pennsylvania Insurance ("PIC"), Illinois Insurance Company ("IIC"), and Texas Insurance Company ("TIC").

F. Guarantees or Contingencies - Not Applicable

G. Nature of Relationships that Could Affect Operations - Not Applicable

H. Amount Deducted for Investment in Upstream Company - Not Applicable

I. Detail of Investments in Affiliates Greater Than 10% of Admitted Assets - Not Applicable

J. Write-Down for Impairments of Investments in Subsidiary Controlled or Affiliated Companies - Not Applicable

K. Foreign Subsidiary Value Using CARVM - Not Applicable

L. Downstream Holding Company Value Using Look-Through Method - Not Applicable

M. All SCA Investments - Not Applicable

N. Investment in Insurance SCAs - Not Applicable

O. SCA and SSAP No. 48 Entity Loss Tracking - Not Applicable

**11. Debt**

A. Debt, Including Capital Notes - Not Applicable

B. FHLB (Federal Home Loan Bank) Agreements - Not Applicable

**12. Retirement Plans, Deferred Compensation, Postemployment Benefits and Compensated Absences and Other Postretirement Benefit Plans**

A. Defined Benefit Plan - Not Applicable

B. Investment Policies and Strategies of Plan Assets - Not Applicable

14.7

**Notes to the Financial Statements**

**12. Retirement Plans, Deferred Compensation, Postemployment Benefits and Compensated Absences and Other Postretirement Benefit Plans (Continued)**

    C.    Fair Value of Each Class of Plan Assets - Not Applicable

    D.    Expected Long-Term Rate of Return for the Plan Assets - Not Applicable

    E.    Defined Contribution Plans - Not Applicable

    F.    Multiemployer Plans - Not Applicable

    G.    Consolidated/Holding Company Plans - Not Applicable

    H.    Postemployment Benefits and Compensated Absences - Not Applicable

    I.    Impact of Medicare Modernization Act on Postretirement Benefits (INT 04-17) - Not Applicable

**13. Capital and Surplus, Dividend Restrictions and Quasi-Reorganizations**

    A.    Outstanding Shares

         The Company has 40,000 shares of $100 par value common stock authorized, issued and outstanding.

    B.    Dividend Rate of Preferred Stock - Not Applicable

    C.    Dividend Restrictions

         Under the insurance regulations of the CDI, the maximum amount of dividends that the Company may pay to shareholders in a twelve-month period is limited to the greater of 10% of the most recent year-end policyholders' surplus or the net income of that same year-end while maintaining a minimum of $5,200,000 of capital and surplus. Accordingly, the maximum dividend payout to shareholders that may be made in 2021 without prior approval of the CDI is $59,366,852.

    D.    Ordinary Dividends - Not Applicable

    E.    Amount of Ordinary Dividends That May Be Paid

         Within the limitations of (3) above, there are no restrictions placed on the portion of the Company's profits that may be paid as ordinary dividends to stockholders.

    F.    Restrictions on Unassigned Surplus

         There are no restrictions on the unassigned funds of the Company other than those described in paragraph (3) above.

    G.    Surplus Advances - Not Applicable

    H.    Stock Held for Special Purposes - Not Applicable

    I.    Changes in Special Surplus Funds

         The Company holds no special surplus funds.

    J.    Unassigned Funds (Surplus)

         The portion of unassigned funds (surplus) represented by cumulative unrealized capital gains (losses) is $(7,327,383) less applicable deferred taxes of $2,023,534 for a net balance of $(5,303,849).

    K.    Company-Issued Surplus Debentures or Similar Obligations - Not Applicable

    L.    Impact of Any Restatement Due to Prior Quasi-Reorganizations - Not Applicable

    M.    Effective Date(s) of Quasi-Reorganizations in the Prior 10 Years - Not Applicable

**14. Liabilities, Contingencies and Assessments**

    A.    Contingent Commitments - Not Applicable

    B.    Assessments

         (1)    Liability and Related Asset

             The Company is subject to guaranty fund and other assessments by the states in which it writes business. Most assessments are accrued either at the time of assessment or in the case of premium-based assessments, at the time the premiums were written, or in the case of loss-based assessments, at the time the losses are incurred.

             The Company has on deposit with the state of California $15,167,577 for their guaranty fund at December 31, 2020. This asset is included in the guaranty funds receivable or on deposit (Page 2, Line 19).

             The Company has accrued a liability for guaranty funds and other assessments in the amount of $191,623 and a related premium tax credit asset of $625,358 at December 31, 2020. The liability is included in the taxes, licenses, and fees and is expected to be paid over the next five years. The asset is included in the guaranty funds receivable and is expected to be realized over the next five years. These amounts represent management's best estimates based on information received from the states in which the Company writes business and may change due to many factors including the Company's share of the ultimate cost of current insurer insolvencies.

             The Company has accrued a liability for premium-based assessments of $197,657 and a related admitted receivable for policy surcharges of $359,655 at December 31, 2020. The liability is included in taxes, licenses, and fees and is expected to be paid over the next five years. The asset is included in aggregate write-ins for other than invested assets, and is expected to be realized over the next year.

Exhibit 5, Page 23 of 152

**Notes to the Financial Statements**

**14.  Liabilities, Contingencies and Assessments (Continued)**

(2)  Assets (Liabilities) recognized from paid and accrued premium tax offsets and policy surcharges

| | | |
|---|---|---:|
| a. | Assets recognized from paid and accrued premium tax offsets and policy surcharges, prior year-end | $ ....... 1,174,607 |
| b. | Decreases current year: | |
| | Premium tax offsets applied | $ ....... 963,875 |
| | Policy surcharges collected | 4,946,871 |
| c. | Increases current year: | |
| | Premium tax offsets accrued | $ ....... 876,486 |
| | Policy surcharges accrued | 4,844,665 |
| d. | Assets recognized from paid and accrued premium tax offsets and policy surcharges, current year-end | $   985,012 |

(3)  Guaranty fund liabilities and assets related to long-term care insolvencies - Not Applicable

C.  Gain Contingencies - Not Applicable

D.  Claims Related Extra Contractual Obligation and Bad Faith Losses Stemming from Lawsuits - Not Applicable

E.  Product Warranties - Not Applicable

F.  Joint and Several Liabilities - Not Applicable

G.  All Other Contingencies

At December 31, 2020 and December 31, 2019, the Company had admitted assets of $47,506,707 and $19,675,109, respectively in premiums receivable (Page 2, Line 15.2) due from ceding insurers and its agent ARS. This amount, less any earned but unbilled premium, will be collected within 30 days. The Company routinely assesses the collectability of these receivables. Based upon the Company's experience, as of December 31, 2020 any uncollectible premium receivables are not expected to exceed the nonadmitted amounts totaling $31,766 and therefore, no additional provisions for uncollectible amounts have been recorded. The potential for any additional loss is not believed to be material to the Company's financial position.

Lawsuits arise against the Company in the normal course of business. Contingent liabilities arising from litigation, income taxes, and other matters are not considered material in relation to the financial position of the Company. The Company is contingently liable under certain structured settlement agreements (see Note 27A). The Company does not have any asset that it considers to be impaired.

**15.  Leases**

A.  Lessee Operating Lease - Not Applicable

B.  Lessor Leases - Not Applicable

**16.  Information About Financial Instruments With Off-Balance-Sheet Risk And Financial Instruments With Concentrations of Credit Risk**

1.  Face Amount of the Company's Financial Instruments with Off-Balance-Sheet Risk - Not Applicable

2.  Nature of Terms - Not Applicable

3.  Exposure to Credit Related Losses - Not Applicable

4.  Collateral Policy - Not Applicable

**17.  Sale, Transfer and Servicing of Financial Assets and Extinguishments of Liabilities**

A.  Transfers of Receivables Reported as Sales - Not Applicable

B.  Transfers and Servicing of Financial Assets - Not Applicable

C.  Wash Sales - Not Applicable

**18.  Gain or Loss to the Reporting Entity from Uninsured Plans and the Uninsured Portion of Partially Insured Plans**

A.  ASO Plans - Not Applicable

B.  ASC Plans - Not Applicable

C.  Medicare or Other Similarly Structured Cost Based Reimbursement Contract - Not Applicable

**19.  Direct Premium Written/Produced by Managing General Agents/Third Party Administrators** - Not Applicable

**20.  Fair Value Measurements**

A.  Fair Value Measurement

(1)  Fair value measurements at reporting date

| Description for each class of asset or liability | Level 1 | Level 2 | Level 3 | Net Asset Value (NAV) | Total |
|---|---|---|---|---|---|
| a. | Assets at fair value | | | | |
| Cash equivalents - Money market mutual funds | $ ....... | $ ....... | $ ....... | $ ....... 667,344 | $ ....... 667,344 |
| Common stock - Industrial and miscellaneous | | | 23,647,695 | | 23,647,695 |
| Total assets at fair value/NAV | $ | $ | $   23,647,695 | $   667,344 | $   24,315,039 |
| b. | Liabilities at fair value | | | | |
| Total liabilities at fair value | $ | $ | $ | $ | $ |

(2)  Fair value measurements in Level 3 of the fair value hierarchy

14.9

## Notes to the Financial Statements

### 20. Fair Value Measurements (Continued)

| Description | Ending balance as of 12/31/2019 | Transfers Into Level 3 | Transfers Out of Level 3 | Total Gains and (Losses) Included in Net Income | Total Gains and (Losses) Included in Surplus | Purchases | Issuances | Sales | Settlements | Ending Balance for 12/31/2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **a.** Assets | | | | | | | | | | |
| Common stock - Industrial and miscellaneous | $ 24,850,372 | $ 2,378,070 | $ (3,580,747) | $ | $ | $ | $ | $ | $ | $ 23,647,695 |
| Total assets | $ 24,850,372 | $ 2,378,070 | $ (3,580,747) | $ | $ | $ | $ | $ | $ | $ 23,647,695 |
| **b.** Liabilities | | | | | | | | | | |
| Total liabilities | $ | $ | $ | $ | $ | $ | $ | $ | $ | |

(3) The Company's policy is to recognize transfers in and out of Level 3 as of the actual date of the event or change in circumstances that caused the transfer.

(4) Common stocks carried at fair value at Level 3 are based primarily on valuation techniques that are believed to be used by market participants. Unobservable inputs require management to make certain projections and assumptions about the information that would be used by market participants in pricing assets. The Company has no assets or liabilities measured at fair value in the Level 2 category.

(5) Derivatives - Not Applicable

B. Other Fair Value Disclosures - Not Applicable

C. Fair Values for All Financial Instruments by Level 1, 2 and 3

| Type of Financial Instrument | Aggregate Fair Value | Admitted Assets | Level 1 | Level 2 | Level 3 | Net Asset Value (NAV) | Not Practicable (Carrying Value) |
|---|---|---|---|---|---|---|---|
| Land (occupied or for income) | $ 66,827,435 | $ 66,827,435 | $ | $ | $ 66,827,435 | $ | $ |
| Loans | 25,066,893 | 25,066,893 | | | 25,066,893 | | |
| Bonds | 433,340,141 | 430,013,768 | | 433,340,141 | | | |
| Common stocks | 23,647,695 | 23,647,695 | | | 23,647,695 | | |
| Cash, cash equivalents, and short-term investments | 307,605,045 | 307,574,925 | 201,946,263 | 104,991,438 | | 667,344 | |

D. Not Practicable to Estimate Fair Value - Not Applicable

E. Nature and Risk of Investments Reported at NAV

In 2018, the Company began utilizing NAV as the valuation method of all its money market funds. The money market funds owned by the Company are comprised of high quality, short-term investments and it is very unlikely any of these funds would be sold at a price other than NAV.

### 21. Other Items

A. Unusual or Infrequent Items - Not Applicable

B. Troubled Debt Restructuring - Not Applicable

C. Other Disclosures

On November 4, 2019, CIC was placed into Conservation by virtue of an ex parte Order of Conservation. CIC has challenged the Conservation Order . The Conservation is under the auspices of the California Conservation and Liquidation Office ("CCLO"). CCLO has repeatedly confirmed that the Conservation involves a regulatory issue and not a financial issue and CIC is authorized to operate in the ordinary course of business, issue new and renewal workers' compensation policies and participate in the intercompany reinsurance pool. CCLO has confirmed the foregoing in multiple communications to A.M. Best and A.M. Best has confirmed the Company's A rating.

D. Business Interruption Insurance Recoveries - Not Applicable

E. State Transferable and Non-Transferable Tax Credits - Not Applicable

F. Subprime-Mortgage-Related Risk Exposure - Not Applicable

G. Insurance-Linked Securities (ILS) Contracts - Not Applicable

H. The Amount That Could Be Realized on Life Insurance Where the Reporting Entity is Owner and Beneficiary or Has Otherwise Obtained Rights to Control the Policy - Not Applicable

### 22. Events Subsequent

Subsequent events have been considered through February 22, 2021, the date of issuance of these statutory financial statements.

*Type I. Recognized Subsequent Events - Not Applicable*

*Type II. Nonrecognized Subsequent Events - Not Applicable*

### 23. Reinsurance

A. Unsecured Reinsurance Recoverables

The Company has unsecured aggregate recoverable for losses (paid and unpaid, including IBNR), loss adjustment expenses and unearned premiums, less ceded balances, that exceed 3% of policyholders' surplus with the following reinsurers at December, 31 2020.

**23. Reinsurance (Continued)**

Individual Reinsurers with Unsecured Reinsurance Recoverables Exceeding 3% of Policyholder Surplus

Individual Reinsurers Who Are Not Members of a Group

| FEIN | Reinsurer Name | Unsecured Amount |
|---|---|---|
| 31-1191023 | Continental Indemnity Company | $ 333,880,155 |

Individual Reinsurers Who Are Members of a Group

All Members of the Groups Shown above with Unsecured Reinsurance Recoverables

B.  Reinsurance Recoverable in Dispute - Not Applicable

C.  Reinsurance Assumed and Ceded

   (1)  Maximum amount of return commission that would have been due reinsurers if all of the company's reinsurance was canceled or if the company's insurance assumed was canceled - Not Applicable

   (2)  The additional or return commission, predicated on loss experience or on any other form of profit sharing arrangements in this statement as a result of existing contractual arrangements is accrued as follows:

      Per the Second Pooling Agreement, the Company assumes commission sliding scale adjustments from the lead company. The lead company holds the payable/receivable for commission sliding scale adjustments.

   (3)  Risks attributed to each of the company's protected cells - Not Applicable

D.  Uncollectible Reinsurance - Not Applicable

E.  Commutation of Ceded Reinsurance - Not Applicable

F.  Retroactive Reinsurance

   (1)  Retroactive reinsurance agreements that transfer liabilities for losses that have already occurred and that will generate special surplus transactions

      Effective December 31, 2008, the Company entered into a Retroactive Reinsurance Agreement with former affiliate National Liability and Fire Insurance Company ("NLF"). The following are the amounts assumed under this agreement at and for the period ended December 31, 2020.

     (a)  Reserves transferred

| | Reported Company | |
|---|---|---|
| | Assumed | Ceded |
| 1.  Initial reserves | $ (1,105,687) | $ |
| 2.  Adjustments - prior year(s) | 1,036,195 | |
| 3.  Adjustment - current year | 60,735 | |
| 4.  Current total | $ (8,757) | $ |

     (b)  Consideration paid or received

| | Assumed | Ceded |
|---|---|---|
| 1.  Initial consideration | $ 2,523,456 | $ |
| 2.  Adjustments - prior year(s) | (3,020,337) | |
| 3.  Adjustments - current year | (660) | |
| 4.  Current total | $ (497,541) | $ |

     (c)  Paid losses reimbursed or recovered

| | Assumed | Ceded |
|---|---|---|
| 1.  Prior year(s) | $ (3,038,807) | $ |
| 2.  Current year | (620) | |
| 3.  Current total | $ (3,039,427) | $ |

     (d)  Special surplus from retroactive reinsurance

| | Assumed | Ceded |
|---|---|---|
| 1.  Initial surplus gain or loss | $ 1,417,769 | $ |
| 2.  Adjustments - prior year(s) | (1,984,142) | |
| 3.  Adjustments - current year | 60,075 | |
| 4.  Current year restricted surplus | (506,298) | |
| 5.  Cumulative total transferred to unassigned funds | $ | $ |

**23.   Reinsurance (Continued)**

(e)   All cedents and reinsurers involved in all transactions included in summary totals above

| Company | Assumed Amount | Ceded Amount |
|---|---|---|
| National Liability and Fire Insurance Company - 20052 | $          8,757 | $ |
| Total | $          8,757 | $ |

(f)   Total Paid Loss/LAE amounts recoverable (for authorized, reciprocal jurisdiction, unauthorized and certified reinsurers), any amounts more than 90 days overdue (for authorized, reciprocal jurisdiction, unauthorized and certified reinsurers), and for amounts recoverable the collateral held (for authorized, unauthorized and certified reinsurers) as respects amounts recoverable from unauthorized reinsurers

(1)   Authorized reinsurers

(2)   Unauthorized reinsurers - Not Applicable

(3)   Certified reinsurers - Not Applicable

(4)   Reciprocal Jurisdiction Reinsurers

G.   Reinsurance Accounted for as a Deposit - Not Applicable

H.   Disclosures for the Transfer of Property and Casualty Run-Off Agreements

(1)   Concurrent with the purchase of the Company from Coregis Group, Inc. on March 24, 2003, the Company entered into a reinsurance agreement related to run-off policies that were written prior to the sale of the Company for Commercial Multiple Peril and Other Liability – Occurrence lines of business. On April 30, 2007, Coregis Group, Inc. merged with and into Westport Insurance Corporation. The Company is recording these run-off direct losses and reserves and ceding this business 100% back to Westport Insurance Corporation.

(2)   At and for the period ended December 31, 2020, the amount of direct and ceded losses and LAE incurred is $358,575 and the related balance sheet direct and ceded loss and LAE reserves are $549,723. No consideration was paid.

I.   Certified Reinsurer Rating Downgraded or Status Subject to Revocation - Not Applicable

J.   Reinsurance Agreements Qualifying for Reinsurer Aggregation - Not Applicable

K.   Reinsurance Credit - Not Applicable

**24.   Retrospectively Rated Contracts & Contracts Subject to Redetermination**

A.   Method Used to Estimate - Not Applicable

B.   Method Used to Record - Not Applicable

C.   Amount and Percent of Net Retrospective Premiums - Not Applicable

D.   Medical Loss Ratio Rebates Required Pursuant to the Public Health Service Act - Not Applicable

E.   Calculation of Nonadmitted Retrospective Premium - Not Applicable

F.   Risk-Sharing Provisions of the Affordable Care Act (ACA)

(1)   Accident and health insurance premium subject to the Affordable Care Act risk-sharing provisions

Did the reporting entity write accident and health insurance premium which is subject to the Affordable Care Act risk sharing provisions? NO

(2)   Impact of Risk-Sharing Provisions of the Affordable Care Act on admitted assets, liabilities and revenue for the current year - Not Applicable

(3)   Roll-forward of prior year ACA risk-sharing provisions for the following asset (gross of any nonadmission) and liability balances, along with the reasons for adjustments to prior year balance - Not Applicable

(4)   Roll-forward of risk corridors asset and liability balances by program benefit year - Not Applicable

(5)   ACA risk corridors receivable as of reporting date - Not Applicable

**25.   Changes in Incurred Losses and Loss Adjustment Expenses**

A.   Reasons for Changes in the Provision for Incurred Loss and Loss Adjustment Expenses Attributable to Insured Events of Prior Years

The estimated cost of loss and LAE attributable to insured events of prior years increased by $12,128,000 during 2020.  This increased the current calendar year losses and LAE incurred by this amount as shown in the chart below.  The deficiency of 12,128,000 is approximately 3% of the unpaid losses and LAE of $406,128,000 at prior year end.  The majority of this increase occurred in the commercial auto/truck liability line of business.  The last two columns display which parts of this deficiency are attributable to the defense and cost containment ("DCC") portion of LAE and the adjusting and other expense ("AO") portion of LAE.

**25. Changes in Incurred Losses and Loss Adjustment Expenses (Continued)**

| Schedule P Lines of Business (000s omitted) | Current Calendar Year Losses & LAE Incurred | Current Loss Year Losses and LAE Incurred Sch. P - Part 1 | Total Deficiency (Redundancy) | Loss and DCC Deficiency (Redundancy) Sch. P - Part 2 | Impact of AO on Total Deficiency (Redundancy) |
|---|---|---|---|---|---|
| December 31, 2020 | | | | | |
| Farmowners multiple peril, homeowners multiple | $  1,365 | $  1,365 | $  - | $  - | $  - |
| Private passenger auto liability | $  3,042 | $  2,222 | $  820 | $  820 | $  - |
| Commercial auto/truck liability | $  33,541 | $  20,589 | $  12,952 | $  12,719 | $  233 |
| Workers' compensation | $  74,154 | $  79,322 | $  (5,168) | $  (8,759) | $  3,591 |
| Commercial multiple peril | $  1,009 | $  725 | $  284 | $  285 | $  (1) |
| Other liability - Occurrence | $  663 | $  496 | $  167 | $  167 | $  - |
| Other liability - Claims-made | $  543 | $  733 | $  (190) | $  (165) | $  (25) |
| Special property | $  280 | $  279 | $  1 | $  - | $  1 |
| Auto physical damage | $  1,011 | $  919 | $  92 | $  93 | $  (1) |
| Fidelity and surety | $  (599) | $  1,160 | $  (1,759) | $  (1,648) | $  (111) |
| Reinsurance - non-proportional assumed property | $  15,925 | $  10,990 | $  4,935 | $  4,935 | $  - |
| Warranty | $  (1) | $  5 | $  (6) | $  (7) | $  1 |
| **Totals** | **$  130,933** | **$  118,805** | **$  12,128** | **$  8,440** | **$  3,688** |

B. Significant Changes in Methodologies and Assumptions Used in Calculating the Liability for Unpaid Losses and Loss Adjustment Expenses - Not Applicable

**26. Intercompany Pooling Arrangements**

A. On January 1, 2015, the Company entered into a Second Pooling Agreement with affiliates Continental Indemnity Company ("CNI"), Illinois Insurance Company ("IIC"), Pennsylvania Insurance Company ("PIC"), and Texas Insurance Company ("TIC"). The Company was the lead company taking a 70% share, while CNI takes a 15% share, and IIC, PIC, and TIC each take a 5% share. The Second Pooling Agreement was previously approved by the CDI, the Iowa Insurance Division, and the Texas Department of Insurance. On November 1, 2020, in an administrative change, CNI was made the lead company in the Second Pooling Agreement per Addendum No. 5.

B. All direct business written by each of the pool participants is subject to pooling.  Business assumed from non-affiliates is also subject to pooling.

C. Cession to most outside reinsurers, subject to the pooling agreement, is ceded by CNI, the lead company, and then the net remaining business is pooled back to the other members of the pool, with the exception of the Minnesota Workers' Compensation Reinsurance Association business that is ceded on CNI and any run-off business on the Company, CNI, PIC, and TIC from prior to joining the pool (see Note 23H).

D. Each pool participant has a contractual right of direct recovery from each non-affiliated reinsurer for business that is covered by the Second Pooling Agreement.

E. There are no discrepancies related to the pooled business between the assumed and ceded reinsurance schedules of the pool participants.

F. There is no provision for reinsurance or write-offs of uncollectible reinsurance for any ceded reinsurance contract subject to the pool.

G. Amounts due to/from the pool participants at December 31, 2020 are as follows:

| Name of Insurer | NAIC Company Code | Amounts Receivable | Amounts Payable |
|---|---|---|---|
| Continental Indemnity Company | 28258 | $  42,134,859 | $  18,089,965 |
| Illinois Insurance Company | 35246 | $  306,975 | $  - |
| Pennsylvania Insurance Company | 21962 | $  312,602 | $  - |
| Texas Insurance Company | 16543 | $  312,433 | $  - |
| **Totals** | | **$  43,066,869** | **$  18,089,965** |

**27. Structured Settlements**

A. Reserves Eliminated by Annuities and Unrecorded Loss Contingencies

The Company has purchased annuities from insurers under which the workers' compensation claimant is the payee (see Note 14F). These annuities have been used to reduce unpaid losses. The Company has contingent liabilities should the issuers of the annuity fail to perform under the terms of the annuity. Reserves eliminated due to the purchase of annuities and the contingent liabilities should the issuers of the annuity fail to perform under the terms of the annuity at December 31, 2020 are reflected in the following chart.

| Loss Reserves Eliminated by Annuities | Unrecorded Loss Contingencies |
|---|---|
| $.......................... 4,233,419 | $.......................... 8,159,652 |

B. Aggregate Statement Value of Annuities Due from Life Insurers Equaling or Exceeding 1% of Policyholders' Surplus - Not Applicable

**28. Health Care Receivables**

A. Pharmaceutical Rebate Receivables - Not Applicable

**28. Health Care Receivables (Continued)**

    B.   Risk-Sharing Receivables - Not Applicable

**29. Participating Policies** - Not Applicable

**30. Premium Deficiency Reserves**

Premium deficiency reserves and the related expense are recognized when it is probable that losses, LAE and policy maintenance costs under a group of existing contracts will exceed net earned premiums, reinsurance recoveries, and anticipated investment incomes. The Company performed an evaluation as of February 4, 2021. Due to the collection of premiums by the installment method in accordance with *SSAP, No. 53 − Property-Casualty Contracts − Premiums*, of the *Accounting Practices and Procedures Manual* for the workers' compensation and surety lines of business and low loss ratios in the other liability, warranty and legal (write-in) lines no such reserves were required at December 31, 2020.

| | | |
|---|---|---|
| 1. | Liability carried for premium deficiency reserves: | $— |
| 2. | Date of the most recent evaluation of this liability: | 02/04/2021 |
| 3. | Was anticipated investment income utilized in the calculation? | NO |

**31. High Deductibles** - Not Applicable

**32. Discounting of Liabilities For Unpaid Losses or Unpaid Loss Adjustment Expenses**

    A.   Tabular Discount - Not Applicable

    B.   Nontabular Discount - Not Applicable

    C.   Rates used for discounting - Not Applicable

**33. Asbestos/Environmental Reserves**

    A.   Does the company have on the books, or has it ever written an insured for which you have identified a potential for the existence of, a liability due to asbestos losses? - Not Applicable

    B.   Amount of the Ending Reserves for Bulk + IBNR Included in A (Loss & LAE) - Not Applicable

    C.   Amount of the Ending Reserves for Loss Adjustment Expenses Included in A (Case, Bulk + IBNR) - Not Applicable

    D.   Does the company have on the books, or has it ever written an insured for which you have identified a potential for the existence of, a liability due to environmental losses? - Not Applicable

    E.   Amount of the Ending Reserves for Bulk + IBNR Included in D (Loss & LAE) - Not Applicable

    F.   Amount of the Ending Reserves for Loss Adjustment Expenses Included in D (Case, Bulk + IBNR) - Not Applicable

**34. Subscriber Savings Accounts** - Not Applicable

**35. Multiple Peril Crop Insurance** - Not Applicable

**36. Financial Guaranty Insurance**

    A.   Financial Guaranty Insurance Contracts - Not Applicable

    B.   Schedule of Insured Financial Obligations at the End of the Period - Not Applicable

# GENERAL INTERROGATORIES

## PART 1 - COMMON INTERROGATORIES

### GENERAL

1.1 Is the reporting entity a member of an Insurance Holding Company System consisting of two or more affiliated persons, one or more of which is an insurer?　　Yes [ X ]　No [ ]

If yes, complete Schedule Y, Parts 1, 1A and 2.

1.2 If yes, did the reporting entity register and file with its domiciliary State Insurance Commissioner, Director or Superintendent or with such regulatory official of the state of domicile of the principal insurer in the Holding Company System, a registration statement providing disclosure substantially similar to the standards adopted by the National Association of Insurance Commissioners (NAIC) in its Model Insurance Holding Company System Regulatory Act and model regulations pertaining thereto, or is the reporting entity subject to standards and disclosure requirements substantially similar to those required by such Act and regulations?　　Yes [ X ]　No [ ]　N/A [ ]

1.3 State Regulating?　California...........................................................................................................................................................................

1.4 Is the reporting entity publicly traded or a member of a publicly traded group?　　Yes [ ]　No [ X ]

1.5 If the response to 1.4 is yes, provide the CIK (Central Index Key) code issued by the SEC for the entity/group.　　.......................................

2.1 Has any change been made during the year of this statement in the charter, by-laws, articles of incorporation, or deed of settlement of the reporting entity?　　Yes [ ]　No [ X ]

2.2 If yes, date of change:　　.......................................

3.1 State as of what date the latest financial examination of the reporting entity was made or is being made.　　.......................12/31/2017

3.2 State the as of date that the latest financial examination report became available from either the state of domicile or the reporting entity. This date should be the date of the examined balance sheet and not the date the report was completed or released.　　.......................12/31/2017

3.3 State as of what date the latest financial examination report became available to other states or the public from either the state of domicile or the reporting entity.  This is the release date or completion date of the examination report and not the date of the examination (balance sheet date).　　.......................05/17/2019

3.4 By what department or departments?　California Department of Insurance.......................................................................................................

3.5 Have all financial statement adjustments within the latest financial examination report been accounted for in a subsequent financial statement filed with Departments?　　Yes [ X ]　No [ ]　N/A [ ]

3.6 Have all of the recommendations within the latest financial examination report been complied with?　　Yes [ X ]　No [ ]　N/A [ ]

4.1 During the period covered by this statement, did any agent, broker, sales representative, non-affiliated sales/service organization or any combination thereof under common control (other than salaried employees of the reporting entity) receive credit or commissions for or control a substantial part (more than 20 percent of any major line of business measured on direct premiums) of:

　　　4.11 sales of new business?　　Yes [ ]　No [ X ]

　　　4.12 renewals?　　Yes [ ]　No [ X ]

4.2 During the period covered by this statement, did any sales/service organization owned in whole or in part by the reporting entity or an affiliate, receive credit or commissions for or control a substantial part (more than 20 percent of any major line of business measured on direct premiums) of:

　　　4.21 sales of new business?　　Yes [ ]　No [ X ]

　　　4.22 renewals?　　Yes [ ]　No [ X ]

5.1 Has the reporting entity been a party to a merger or consolidation during the period covered by this statement?　　Yes [ ]　No [ X ]

If yes, complete and file the merger history data file with the NAIC.

5.2 If yes, provide the name of the entity, NAIC company code, and state of domicile (use two letter state abbreviation) for any entity that has ceased to exist as a result of the merger or consolidation.

| 1<br>Name of Entity | 2<br>NAIC Company Code | 3<br>State of Domicile |
|---|---|---|
| .................................... | .................... | .................... |
| .................................... | .................... | .................... |
| .................................... | .................... | .................... |
| .................................... | .................... | .................... |

6.1 Has the reporting entity had any Certificates of Authority, licenses or registrations  (including corporate registration, if applicable) suspended or revoked by any governmental entity during the reporting period?　　Yes [ ]　No [ X ]

6.2 If  yes, give full information　　..........................................................................................................................................................

7.1 Does any foreign (non-United States) person or entity directly or indirectly control 10% or more of the reporting entity?　　Yes [ ]　No [ X ]

7.2 If yes,

　　　7.21 State the percentage of foreign control　　.................................................%

　　　7.22 State the nationality(s) of the foreign person(s) or entity(s); or if the entity is a mutual or reciprocal, the nationality of its manager or attorney-in-fact and identify the type of entity(s) (e.g., individual, corporation, government, manager or attorney-in-fact).

| 1<br>Nationality | 2<br>Type of Entity |
|---|---|
| .................................... | .................................... |
| .................................... | .................................... |
| .................................... | .................................... |
| .................................... | .................................... |

15

# GENERAL INTERROGATORIES

8.1   Is the company a subsidiary of a bank holding company regulated by the Federal Reserve Board?      Yes [   ]   No [ X ]

8.2   If response to 8.1 is yes, please identify the name of the bank holding company.

8.3   Is the company affiliated with one or more banks, thrifts or securities firms?      Yes [   ]   No [ X ]

8.4   If response to 8.3 is yes, please provide the names and locations (city and state of the main office) of any affiliates regulated by a federal financial regulatory services agency [i.e. the Federal Reserve Board (FRB), the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC) and the Securities Exchange Commission (SEC)] and identify the affiliate's primary federal regulator.

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Affiliate Name | Location (City, State) | FRB | OCC | FDIC | SEC |
| | | | | | |

9.   What is the name and address of the independent certified public accountant or accounting firm retained to conduct the annual audit?
   RSM US LLP, 1299 Farnam Street, Suite 530, Landmark Center, Omaha, NE 68102..................................................................................

10.1   Has the insurer been granted any exemptions to the prohibited non-audit services provided by the certified independent public accountant requirements as allowed in Section 7H of the Annual Financial Reporting Model Regulation (Model Audit Rule), or substantially similar state law or regulation?      Yes [   ]   No [ X ]

10.2   If the response to 10.1 is yes, provide information related to this exemption:

10.3   Has the insurer been granted any exemptions related to the other requirements of the Annual Financial Reporting Model Regulation as allowed for in Section 18A of the Model Regulation, or substantially similar state law or regulation?      Yes [   ]   No [ X ]

10.4   If the response to 10.3 is yes, provide information related to this exemption:

10.5   Has the reporting entity established an Audit Committee in compliance with the domiciliary state insurance laws?      Yes [ X ] No [   ] N/A [   ]

10.6   If the response to 10.5 is no or n/a, please explain

11.   What is the name, address and affiliation (officer/employee of the reporting entity or actuary/consultant associated with an actuarial consulting firm) of the individual providing the statement of actuarial opinion/certification?
   Justin N. Smith, FCAS, MAAA, PhD, Vice President of AUI, 950 Tower Lane, Suite 1400, Foster City, CA 94404.................................................

12.1   Does the reporting entity own any securities of a real estate holding company or otherwise hold real estate indirectly?      Yes [ X ]   No [   ]

                                       12.11 Name of real estate holding company    N/A...........................................

                                         12.12 Number of parcels involved    ............................................4

                                         12.13 Total book/adjusted carrying value    $ ........................168,135,934

12.2   If yes, provide explanation
   The Company is part of four limited liability companies that own land in Omaha, Nebraska & Bainbridge, Georgia...................................

13.   FOR UNITED STATES BRANCHES OF ALIEN REPORTING ENTITIES ONLY:

13.1   What changes have been made during the year in the United States manager or the United States trustees of the reporting entity?

13.2   Does this statement contain all business transacted for the reporting entity through its United States Branch on risks wherever located?    Yes [   ]   No [   ]

13.3   Have there been any changes made to any of the trust indentures during the year?    Yes [   ]   No [   ]

13.4   If answer to (13.3) is yes, has the domiciliary or entry state approved the changes?    Yes [   ] No [   ] N/A [   ]

14.1   Are the senior officers (principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions) of the reporting entity subject to a code of ethics, which includes the following standards?    Yes [ X ]   No [   ]

         a. Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

         b. Full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the reporting entity;

         c. Compliance with applicable governmental laws, rules and regulations;

         d. The prompt internal reporting of violations to an appropriate person or persons identified in the code; and

         e. Accountability for adherence to the code.

14.11   If the response to 14.1 is no, please explain:

14.2   Has the code of ethics for senior managers been amended?      Yes [   ]   No [ X ]

14.21   If the response to 14.2 is yes, provide information related to amendment(s).

14.3   Have any provisions of the code of ethics been waived for any of the specified officers?      Yes [   ]   No [ X ]

14.31   If the response to 14.3 is yes, provide the nature of any waiver(s).

# GENERAL INTERROGATORIES

15.1  Is the reporting entity the beneficiary of a Letter of Credit that is unrelated to reinsurance where the issuing or confirming bank is not on the SVO Bank List?  Yes [  ]  No [ X ]

15.2  If the response to 15.1 is yes, indicate the American Bankers Association (ABA) Routing Number and the name of the issuing or confirming bank of the Letter of Credit and describe the circumstances in which the Letter of Credit is triggered.

| 1 American Bankers Association (ABA) Routing Number | 2 Issuing or Confirming Bank Name | 3 Circumstances That Can Trigger the Letter of Credit | 4 Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## BOARD OF DIRECTORS

16.  Is the purchase or sale of all investments of the reporting entity passed upon either by the board of directors or a subordinate committee thereof?  Yes [ X ]  No [  ]

17.  Does the reporting entity keep a complete permanent record of the proceedings of its board of directors and all subordinate committees thereof?  Yes [ X ]  No [  ]

18.  Has the reporting entity an established procedure for disclosure to its board of directors or trustees of any material interest or affiliation on the part of any of its officers, directors, trustees or responsible employees that is in conflict or is likely to conflict with the official duties of such person?  Yes [ X ]  No [  ]

## FINANCIAL

19.  Has this statement been prepared using a basis of accounting other than Statutory Accounting Principles (e.g., Generally Accepted Accounting Principles)?  Yes [  ]  No [ X ]

20.1  Total amount loaned during the year (inclusive of Separate Accounts, exclusive of policy loans):
- 20.11 To directors or other officers  $.................................................
- 20.12 To stockholders not officers  $.................................................
- 20.13 Trustees, supreme or grand (Fraternal only)  $.................................................

20.2  Total amount of loans outstanding at the end of year (inclusive of Separate Accounts, exclusive of policy loans):
- 20.21 To directors or other officers  $.................................................
- 20.22 To stockholders not officers  $.................................................
- 20.23 Trustees, supreme or grand (Fraternal only)  $.................................................

21.1  Were any assets reported in this statement subject to a contractual obligation to transfer to another party without the liability for such obligation being reported in the statement?  Yes [  ]  No [ X ]

21.2  If yes, state the amount thereof at December 31 of the current year:
- 21.21 Rented from others  $.................................................
- 21.22 Borrowed from others  $.................................................
- 21.23 Leased from others  $.................................................
- 21.24 Other  $.................................................

22.1  Does this statement include payments for assessments as described in the *Annual Statement Instructions* other than guaranty fund or guaranty association assessments?  Yes [  ]  No [ X ]

22.2  If answer is yes:
- 22.21 Amount paid as losses or risk adjustment  $.................................................
- 22.22 Amount paid as expenses  $.................................................
- 22.23 Other amounts paid  $.................................................

23.1  Does the reporting entity report any amounts due from parent, subsidiaries or affiliates on Page 2 of this statement?  Yes [ X ]  No [  ]

23.2  If yes, indicate any amounts receivable from parent included in the Page 2 amount?  $.................................................

## INVESTMENT

24.01  Were all the stocks, bonds and other securities owned December 31 of current year, over which the reporting entity has exclusive control, in the actual possession of the reporting entity on said date? (other than securities lending programs addressed in 24.03)  Yes [ X ]  No [  ]

24.02  If no, give full and complete information, relating thereto

24.03  For securities lending programs, provide a description of the program including value for collateral and amount of loaned securities, and whether collateral is carried on or off-balance sheet. (an alternative is to reference Note 17 where this information is also provided)

Not applicable.................................................................................................................................................................

24.04  For the reporting entity's securities lending program, report amount of collateral for conforming programs as outlined in the Risk-Based Capital Instructions.  $.................................................

24.05  For the reporting entity's securities lending program, report amount of collateral for other programs.  $.................................................

24.06  Does your securities lending program require 102% (domestic securities) and 105% (foreign securities) from the counterparty at the outset of the contract?  Yes [  ]  No [  ]  NA [ X ]

24.07  Does the reporting entity non-admit when the collateral received from the counterparty falls below 100%?  Yes [  ]  No [  ]  NA [ X ]

24.08  Does the reporting entity or the reporting entity's securities lending agent utilize the Master Securities Lending Agreement (MSLA) to conduct securities lending?  Yes [  ]  No [  ]  NA [ X ]

15.2

# GENERAL INTERROGATORIES

24.09  For the reporting entity's securities lending program, state the amount of the following as of December 31 of the current year:

    24.091    Total fair value of reinvested collateral assets reported on Schedule DL, Parts 1 and 2    $...............................................

    24.092    Total book adjusted/carrying value of reinvested collateral assets reported on Schedule DL, Parts 1 and 2    $...............................................

    24.093    Total payable for securities lending reported on the liability page    $...............................................

25.1  Were any of the stocks, bonds or other assets of the reporting entity owned at December 31 of the current year not exclusively under the control of the reporting entity or has the reporting entity sold or transferred any assets subject to a put option contract that is currently in force? (Exclude securities subject to Interrogatory 21.1 and 24.03).    Yes [ X ]  No [   ]

25.2  If yes, state the amount thereof at December 31 of the current year:

    25.21    Subject to repurchase agreements    $...............................................

    25.22    Subject to reverse repurchase agreements    $...............................................

    25.23    Subject to dollar repurchase agreements    $...............................................

    25.24    Subject to reverse dollar repurchase  agreements    $...............................................

    25.25    Placed under option agreements    $...............................................

    25.26    Letter stock or securities restricted as to sale – excluding FHLB Capital Stock    $...............................................

    25.27    FHLB Capital Stock    $...............................................

    25.28    On deposit with states    $...............488,195,098

    25.29    On deposit with other regulatory bodies    $...............499,557

    25.30    Pledged as collateral – excluding collateral pledged to an FHLB    $...............................................

    25.31    Pledged as collateral to FHLB – including assets backing funding agreements    $...............................................

    25.32    Other    $...............................................

25.3  For category (25.26) provide the following:

| 1<br>Nature of Restriction | 2<br>Description | 3<br>Amount |
| --- | --- | --- |
| ............................................... | ............................................... | ............................ |
| ............................................... | ............................................... | ............................ |

26.1  Does the reporting entity have any hedging transactions reported on Schedule DB?    Yes [   ]  No [ X ]

26.2  If yes, has a comprehensive description of the hedging program been made available to the domiciliary state?    Yes [   ]  No [   ]  N/A [ X ]
If no, attach a description with this statement.

LINES 26.3 through 26.5: FOR LIFE/FRATERNAL REPORTING ENTITIES ONLY:

26.3  Does the reporting entity utilize derivatives to hedge variable annuity guarantees subject to fluctuations as a result of interest rate sensitivity?    Yes [   ]  No [   ]

26.4  If the response to 26.3 is YES, does the reporting entity utilize:

    26.41    Special accounting provision of SSAP No. 108    Yes [   ]  No [   ]

    26.42    Permitted accounting practice    Yes [   ]  No [   ]

    26.43    Other accounting guidance    Yes [   ]  No [   ]

26.5  By responding YES to 26.41 regarding utilizing the special accounting provisions of SSAP No. 108, the reporting entity attests to the following:    Yes [   ]  No [   ]

- The reporting entity has obtained explicit approval from the domiciliary state.

- Hedging strategy subject to the special accounting provisions is consistent with the requirements of VM-21.

- Actuarial certification has been obtained which indicates that the hedging strategy is incorporated within the establishment of VM-21 reserves and provides the impact of the hedging strategy within the Actuarial Guideline Conditional Tail Expectation Amount.

- Financial Officer Certification has been obtained which indicates that the hedging strategy meets the definition of a Clearly Defined Hedging Strategy within VM-21 and that the Clearly Defined Hedging Strategy is the hedging strategy being used by the company in its actual day-to-day risk mitigation efforts.

27.1  Were any preferred stocks or bonds owned as of December 31 of the current year mandatorily convertible into equity, or, at the option of the issuer, convertible into equity?    Yes [   ]  No [ X ]

27.2  If yes, state the amount thereof at December 31 of the current year.    $...............................................

28.  Excluding items in Schedule E – Part 3 – Special Deposits, real estate, mortgage loans and investments held physically in the reporting entity's offices, vaults or safety deposit boxes, were all stocks, bonds and other securities, owned throughout the current year held pursuant to a custodial agreement with a qualified bank or trust company in accordance with Section 1, III – General Examination Considerations, F. Outsourcing of Critical Functions, Custodial or Safekeeping agreements of the NAIC *Financial Condition Examiners Handbook*?    Yes [ X ]  No [   ]

28.01  For agreements that comply with the requirements of the NAIC *Financial Condition Examiners Handbook*, complete the following:

| 1<br>Name of Custodian(s) | 2<br>Custodian's Address |
| --- | --- |
| First National Capital Markets............................... | 1620 Dodge Street, Omaha, NE 68197-1089................. |
| Union Bank of California............................................... | 350 California Street, 6th Floor, San Francisco, CA 94104........... |
| Wells Fargo Securities............................................... | 608 Second Avenue South, Minneapolis, MN 55402........... |

Exhibit 5, Page 33 of 152

# GENERAL INTERROGATORIES

28.02 For all agreements that do not comply with the requirements of the NAIC *Financial Condition Examiners Handbook*, provide the name, location and a complete explanation:

| 1<br>Name(s) | 2<br>Location(s) | 3<br>Complete Explanation(s) |
|---|---|---|
| | | |

28.03 Have there been any changes, including name changes, in the custodian(s) identified in 28.01 during the current year?    Yes [ ]  No [ X ]

28.04 If yes, give full and complete information relating thereto:

| 1<br><br>Old Custodian | 2<br><br>New Custodian | 3<br>Date of<br>Change | 4<br><br>Reason |
|---|---|---|---|
| | | | |

28.05 Investment management – Identify all investment advisors, investment managers, broker-dealers, including individuals that have the authority to make investment decisions on behalf of the reporting entity. For assets that are managed internally by employees of the reporting entity, note as such. ["…that have access to the investment accounts"; "…handle securities"]

| 1<br>Name of Firm or Individual | 2<br>Affiliation |
|---|---|
| Robert Stafford, Senior V.P. - manages assets............... | I............................................... |
| RVK - investment advisor................................. | U............................................... |

28.0597 For those firms/individuals listed in the table for Question 28.05, do any firms/individuals unaffiliated with the reporting entity (i.e., designated with a "U") manage more than 10% of the reporting entity's invested assets?    Yes [ X ]  No [ ]

28.0598 For firms/individuals unaffiliated with the reporting entity (i.e., designated with a "U") listed in the table for Question 28.05, does the total assets under management aggregate to more than 50% of the reporting entity's invested assets?    Yes [ ]  No [ X ]

28.06 For those firms or individuals listed in the table for 28.05 with an affiliation code of "A" (affiliated) or "U" (unaffiliated), provide the information for the table below.

| 1<br>Central Registration<br>Depository Number | 2<br>Name of Firm or<br>Individual | 3<br>Legal Entity<br>Identifier (LEI) | 4<br><br>Registered With | 5<br>Investment Management<br>Agreement (IMA) Filed |
|---|---|---|---|---|
| 18005................ | RVK................ | | SEC................ | NO................ |
| | | | | |

29.1 Does the reporting entity have any diversified mutual funds reported in Schedule D - Part 2 (diversified according to the Securities and Exchange Commission (SEC) in the Investment Company Act of 1940 [Section 5 (b) (1)])?    Yes [ ]  No [ X ]

29.2 If yes, complete the following schedule:

| 1<br>CUSIP # | 2<br>Name of Mutual Fund | 3<br>Book/Adjusted Carrying Value |
|---|---|---|
| | | |
| | | |
| | | |
| 29.2999  TOTAL | | |

29.3 For each mutual fund listed in the table above, complete the following schedule:

| 1<br>Name of Mutual Fund<br>(from above table) | 2<br>Name of Significant Holding<br>of the Mutual Fund | 3<br>Amount of Mutual Fund's<br>Book/Adjusted Carrying Value<br>Attributable to the Holding | 4<br><br>Date of Valuation |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

15.4

## GENERAL INTERROGATORIES

30. Provide the following information for all short-term and long-term bonds and all preferred stocks. Do not substitute amortized value or statement value for fair value.

| | 1<br>Statement (Admitted)<br>Value | 2<br>Fair Value | 3<br>Excess of Statement<br>over Fair Value (-),<br>or Fair Value<br>over Statement (+) |
|---|---|---|---|
| 30.1 Bonds | 534,975,086 | 538,331,578 | 3,356,492 |
| 30.2 Preferred Stocks | | | |
| 30.3 Totals | 534,975,086 | 538,331,578 | 3,356,492 |

30.4 Describe the sources or methods utilized in determining the fair values:

The Company uses a pricing service, ICE Data Services, to determine fair values in addition to utilizing First National Capital Markets for the fair value of the Douglas County Nebraska SID 583 holdings.

31.1 Was the rate used to calculate fair value determined by a broker or custodian for any of the securities in Schedule D? Yes [ X ] No [ ]

31.2 If the answer to 31.1 is yes, does the reporting entity have a copy of the broker's or custodian's pricing policy (hard copy or electronic copy) for all brokers or custodians used as a pricing source? Yes [ X ] No [ ]

31.3 If the answer to 31.2 is no, describe the reporting entity's process for determining a reliable pricing source for purposes of disclosure of fair value for Schedule D:

32.1 Have all the filing requirements of the *Purposes and Procedures Manual of the NAIC Investment Analysis Office* been followed? Yes [ X ] No [ ]

32.2 If no, list exceptions:

33. By self-designating 5GI securities, the reporting entity is certifying the following elements of each self-designated 5GI security:
    a. Documentation necessary to permit a full credit analysis of the security does not exist or an NAIC CRP credit rating for an FE or PL security is not available.
    b. Issuer or obligor is current on all contracted interest and principal payments.
    c. The insurer has an actual expectation of ultimate payment of all contracted interest and principal.
    Has the reporting entity self-designated 5GI securities? Yes [ ] No [ X ]

34. By self-designating PLGI securities, the reporting entity is certifying the following elements of each self-designated PLGI security:
    a. The security was purchased prior to January 1, 2018.
    b. The reporting entity is holding capital commensurate with the NAIC Designation reported for the security.
    c. The NAIC Designation was derived from the credit rating assigned by an NAIC CRP in its legal capacity as an NRSRO which is shown on a current private letter rating held by the insurer and available for examination by state insurance regulators.
    d. The reporting entity is not permitted to share this credit rating of the PL security with the SVO.
    Has the reporting entity self-designated PLGI securities? Yes [ ] No [ X ]

35. By assigning FE to a Schedule BA non-registered private fund, the reporting entity is certifying the following elements of each self-designated FE fund:
    a. The shares were purchased prior to January 1, 2019.
    b. The reporting entity is holding capital commensurate with the NAIC Designation reported for the security.
    c. The security had a public credit rating(s) with annual surveillance assigned by an NAIC CRP in its legal capacity as an NRSRO prior to January 1, 2019.
    d. The fund only or predominantly holds bonds in its portfolio.
    e. The current reported NAIC Designation was derived from the public credit rating(s) with annual surveillance assigned by an NAIC CRP in its legal capacity as an NRSRO.
    f. The public credit rating(s) with annual surveillance assigned by an NAIC CRP has not lapsed.
    Has the reporting entity assigned FE to Schedule BA non-registered private funds that complied with the above criteria? Yes [ ] No [ X ]

36. By rolling/renewing short-term or cash equivalent investments with continued reporting on Schedule DA, Part 1 or Schedule E Part 2 (identified through a code (%) in those investment schedules), the reporting entity is certifying to the following:
    a. The investment is a liquid asset that can be terminated by the reporting entity on the current maturity date.
    b. If the investment is with a nonrelated party or nonaffiliated then it reflects an arms-length transaction with renewal completed at the discretion of all involved parties.
    c. If the investment is with a related party or affiliate, then the reporting entity has completed robust re-underwriting of the transaction for which documentation is available for regulator review.
    d. Short-term and cash equivalent investments that have been renewed/rolled from the prior period that do not meet the criteria in 36.a -36.c are reported as long-term investments.
    Has the reporting entity rolled/renewed short-term or cash equivalent investments in accordance with these criteria? Yes [ ] No [ ] NA [ X ]

## OTHER

37.1 Amount of payments to trade associations, service organizations and statistical or rating bureaus, if any? $ 1,333,303

37.2 List the name of the organization and the amount paid if any such payment represented 25% or more of the total payments to trade associations, service organizations, and statistical or rating bureaus during the period covered by this statement.

| 1<br>Name | 2<br>Amount Paid |
|---|---|
| NCCI Holdings, Inc. | $ 586,707 |

# GENERAL INTERROGATORIES

38.1  Amount of payments for legal expenses, if any?   $ ...............................9,604,593

38.2  List the name of the firm and the amount paid if any such payment represented 25% or more of the total payments for legal expenses during the period covered by this statement.

| 1<br>Name | 2<br>Amount Paid |
|---|---|
| DLA Piper LLP (US)............................................................................................ | $................8,438,233 |

39.1  Amount of payments for expenditures in connection with matters before legislative bodies, officers, or departments of government, if any? $ ...................................3,500

39.2  List the name of the firm and the amount paid if any such payment represented 25% or more of the total payment expenditures in connection with matters before legislative bodies, officers, or departments of government during the period covered by this statement.

| 1<br>Name | 2<br>Amount Paid |
|---|---|
| Hector Balderas for Attorney General............................................................. | $.......................3,500 |

# GENERAL INTERROGATORIES
## PART 2 - PROPERTY & CASUALTY INTERROGATORIES

1.1 Does the reporting entity have any direct Medicare Supplement Insurance in force? ................................................................................................ Yes [ ] No [ X ]

1.2 If yes, indicate premium earned on U. S. business only. ................................................................................ $........................................

1.3 What portion of Item (1.2) is not reported on the Medicare Supplement Insurance Experience Exhibit? ................................ $........................................

     1.31 Reason for excluding

     ....................................................................................................................................................................................................................

1.4 Indicate amount of earned premium attributable to Canadian and/or Other Alien not included in Item (1.2) above. ................ $........................................

1.5 Indicate total incurred claims on all Medicare Supplement insurance. ......................................................................... $........................................

1.6 Individual policies:

                                 Most current three years:

                                   1.61 Total premium earned .................... $........................................

                                   1.62 Total incurred claims .................... $........................................

                                   1.63 Number of covered lives .................... ........................................

                                 All years prior to most current three years:

                                   1.64 Total premium earned .................... $........................................

                                   1.65 Total incurred claims .................... $........................................

                                   1.66 Number of covered lives .................... ........................................

1.7 Group policies:

                                   Most current three years:

                                   1.71 Total premium earned .................... $........................................

                                   1.72 Total incurred claims .................... $........................................

                                   1.73 Number of covered lives .................... ........................................

                                 All years prior to most current three years:

                                   1.74 Total premium earned .................... $........................................

                                   1.75 Total incurred claims .................... $........................................

                                   1.76 Number of covered lives .................... ........................................

2. Health Test:

| | | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|---|
| 2.1 | Premium Numerator | $ ........................................ | $ ........................................ |
| 2.2 | Premium Denominator | $ ................162,031,160 | $ ................231,048,317 |
| 2.3 | Premium Ratio (2.1/2.2) | ........................................ | ........................................ |
| 2.4 | Reserve Numerator | $ ........................................ | $ ........................................ |
| 2.5 | Reserve Denominator | $ ................465,839,609 | $ ................434,972,508 |
| 2.6 | Reserve Ratio (2.4/2.5) | ........................................ | ........................................ |

3.1 Did the reporting entity issue participating policies during the calendar year? ........................................................................................ Yes [ ] No [ X ]

3.2 If yes, provide the amount of premium written for participating and/or no-participating policies during the calendar year:

                                   3.21 Participating policies................................ $........................................

                                   3.22 Non-participating policies........................ $........................................

4. For Mutual reporting entities and Reciprocal Exchanges only:

4.1 Does the reporting entity issue assessable policies?........................................................................................................................ Yes [ ] No [ ]

4.2 Does the reporting entity issue non-assessable policies?.................................................................................................................. Yes [ ] No [ ]

4.3 If assessable policies are issued, what is the extent of the contingent liability of the policyholders?........................................................ ..................... %

4.4 Total amount of assessments paid or ordered to be paid during the year on deposit notes or contingent premiums. ................ $........................................

5. For Reciprocal Exchanges Only:

5.1 Does the exchange appoint local agents?.................................................................................................................................... Yes [ ] No [ ]

5.2 If yes, is the commission paid:

                                   5.21 Out of Attorney's-in-fact compensation............... Yes [ ] No [ ] N/A [X]

                                   5.22 As a direct expense of the exchange................... Yes [ ] No [ ] N/A [X]

5.3 What expenses of the Exchange are not paid out of the compensation of the Attorney-in-fact?

     ....................................................................................................................................................................................................................

5.4 Has any Attorney-in-fact compensation, contingent on fulfillment of certain conditions, been deferred?........................................ Yes [ ] No [ ]

5.5 If yes, give full information

     ....................................................................................................................................................................................................................

**16**

# GENERAL INTERROGATORIES
## PART 2 - PROPERTY & CASUALTY INTERROGATORIES

6.1 What provision has this reporting entity made to protect itself from an excessive loss in the event of a catastrophe under a workers' compensation contract issued without limit of loss: ..............................................................................................................................................................................

Effective 1/1/2020 the Company has renewed its Terrorism Workers' Compensation Excess of Loss Reinsurance Cover...............................

6.2 Describe the method used to estimate this reporting entity's probable maximum insurance loss, and identify the type of insured exposures comprising that probable maximum loss, the locations of concentrations of those exposures and the external resources (such as consulting firms or computer software models), if any, used in the estimation process:

The Company consults with an outside consultant, Guy Carpenter, on exposure using its models from RMS and AIR. Effective 1/1/2020 the Company has renewed its Terrorism Workers' Compensation Excess of Loss Reinsurance Cover.

6.3 What provision has this reporting entity made (such as a catastrophic reinsurance program) to protect itself from an excessive loss arising from the types and concentrations of insured exposures comprising its probable maximum property insurance loss?.......................................................

The consultant referenced in 6.2 above includes an analysis of street address exposure. Based on those results, the Company has determined to discontinue its catastrophe reinsurance, except for a Terrorism Workers' Compensation Excess of Loss Reinsurance Cover.

6.4 Does the reporting entity carry catastrophe reinsurance protection for at least one reinstatement, in an amount sufficient to cover its estimated probable maximum loss attributable to a single loss event or occurrence?.......................................................    Yes [ ]   No [ X ]

6.5 If no, describe any arrangements or mechanisms employed by the reporting entity to supplement its catastrophe reinsurance program or to hedge its exposure to unreinsured catastrophic loss

A PML analysis determined this exposure to be minimal. Effective 1/1/2020, the Company has renewed its Terrorism Workers' Compensation Excess of Loss Reinsurance Cover...........................................................................................................................................

7.1 Has the reporting entity reinsured any risk with any other entity under a quota share reinsurance contract that includes a provision that would limit the reinsurer's losses below the stated quota share percentage (e.g., a deductible, a loss ratio corridor, a loss cap, an aggregate limit or any similar provision)?.......................................................    Yes [ ]   No [ X ]

7.2 If yes, indicate the number of reinsurance contracts containing such provisions..........................................................................................

7.3 If yes, does the amount of reinsurance credit taken reflect the reduction in quota share coverage caused by any applicable limiting provision(s)?.......................................................    Yes [ ]   No [ ]

8.1 Has this reporting entity reinsured any risk with any other entity and agreed to release such entity from liability, in whole or in part, from any loss incurred on this risk, or portion thereof, reinsured?.......................................................    Yes [ ]   No [ X ]

8.2 If yes, give full information

9.1 Has the reporting entity ceded any risk under any reinsurance contract (or under multiple contracts with the same reinsurer or its affiliates) for which during the period covered by the statement: (i) it recorded a positive or negative underwriting result greater than 5% of prior year-end surplus as regards policyholders or it reported calendar year written premium ceded or year-end loss and loss expense reserves ceded greater than 5% of prior year-end surplus as regards policyholders; (ii) it accounted for that contract as reinsurance and not as a deposit; and (iii) the contract(s) contain one or more of the following features or other features that would have similar results:

    (a) A contract term longer than two years and the contract is noncancellable by the reporting entity during the contract term;

    (b) A limited or conditional cancellation provision under which cancellation triggers an obligation by the reporting entity, or an affiliate of the reporting entity, to enter into a new reinsurance contract with the reinsurer, or an affiliate of the reinsurer;

    (c) Aggregate stop loss reinsurance coverage;

    (d) A unilateral right by either party (or both parties) to commute the reinsurance contract, whether conditional or not, except for such provisions which are only triggered by a decline in the credit status of the other party;

    (e) A provision permitting reporting of losses, or payment of losses, less frequently than on a quarterly basis (unless there is no activity during the period); or

    (f) Payment schedule, accumulating retentions from multiple years or any features inherently designed to delay timing of the reimbursement to the ceding entity.......................................................    Yes [ ]   No [ X ]

9.2 Has the reporting entity during the period covered by the statement ceded any risk under any reinsurance contract (or under multiple contracts with the same reinsurer or its affiliates), for which, during the period covered by the statement, it recorded a positive or negative underwriting result greater than 5% of prior year-end surplus as regards policyholders or it reported calendar year written premium ceded or year-end loss and loss expense reserves ceded greater than 5% of prior year-end surplus as regards policyholders; excluding cessions to approved pooling arrangements or to captive insurance companies that are directly or indirectly controlling, controlled by, or under common control with (i) one or more  unaffiliated policyholders of the reporting entity, or (ii) an association of which one or more unaffiliated policyholders of the reporting entity is a member where:

    (a) The written premium ceded to the reinsurer by the reporting entity or its affiliates represents fifty percent (50%) or more of the entire direct and assumed premium written by the reinsurer based on its most recently available financial statement; or

    (b) Twenty–five percent (25%) or more of the written premium ceded to the reinsurer has been retroceded back to the reporting entity or its affiliates in a separate reinsurance contract.......................................................    Yes [ ]   No [ X ]

9.3 If yes to 9.1 or 9.2, please provide the following information in the Reinsurance Summary Supplemental Filing for General Interrogatory 9:

    (a) The aggregate financial statement impact gross of all such ceded reinsurance contracts on the balance sheet and statement of income;

    (b) A summary of the reinsurance contract terms and indicate whether it applies to the contracts meeting the criteria in 9.1 or 9.2; and

    (c) A brief discussion of management's principle objectives in entering into the reinsurance contract including the economic purpose to be achieved.

9.4 Except for transactions meeting the requirements of paragraph 36 of *SSAP No. 62R - Property and Casualty Reinsurance*, has the reporting entity ceded any risk under any reinsurance contract (or multiple contracts with the same reinsurer or its affiliates) during the period covered by the financial statement, and either:

    (a) Accounted for that contract as reinsurance (either prospective or retroactive) under statutory accounting principles ("SAP") and as a deposit under generally accepted accounting principles ("GAAP"); or

    (b) Accounted for that contract as reinsurance under GAAP and as a deposit under SAP?.......................................................    Yes [ ]   No [ X ]

9.5 If yes to 9.4, explain in the Reinsurance Summary Supplemental Filing for General Interrogatory 9 (Section D) why the contract(s) is treated differently for GAAP and SAP.

9.6 The reporting entity is exempt from the Reinsurance Attestation Supplement under one or more of the following criteria:

    (a) The entity does not utilize reinsurance; or,    Yes [ ]   No [ X ]

    (b) The entity only engages in a 100% quota share contract with an affiliate and the affiliated or lead company has filed an attestation supplement; or    Yes [ ]   No [ X ]

    (c) The entity has no external cessions and only participates in an intercompany pool and the affiliated or lead company has filed an attestation supplement.    Yes [ ]   No [ X ]

10. If the reporting entity has assumed risks from another entity, there should be charged on account of such reinsurances a reserve equal to that which the original entity would have been required to charge had it retained the risks.  Has this been done?    Yes [X] No [ ] N/A [ ]

16.1

# GENERAL INTERROGATORIES

## PART 2 - PROPERTY & CASUALTY INTERROGATORIES

11.1 Has the reporting entity guaranteed policies issued by any other entity and now in force:................................................................ Yes [ ] No [ X ]

11.2 If yes, give full information
.............................................................................................................................................................................................................................

12.1 If the reporting entity recorded accrued retrospective premiums on insurance contracts on Line 15.3 of the asset schedule, Page 2, state the amount of corresponding liabilities recorded for:

     12.11 Unpaid losses.............................................................................................................................. $..................................................

     12.12 Unpaid underwriting expenses (including loss adjustment expenses)................................................. $..................................................

12.2 Of the amount on Line 15.3, Page 2, state the amount that is secured by letters of credit, collateral and other funds?................................ $..................................................

12.3 If the reporting entity underwrites commercial insurance risks, such as workers' compensation, are premium notes or promissory notes accepted from its insureds covering unpaid premiums and/or unpaid losses?............................................................................................................. Yes [ ] No [X] N/A [ ]

12.4 If yes, provide the range of interest rates charged under such notes during the period covered by this statement:

     12.41 From............................................................................................................................................................................................... %

     12.42 To.................................................................................................................................................................................................. %

12.5 Are letters of credit or collateral and other funds received from insureds being utilized by the reporting entity to secure premium notes or promissory notes taken by a reporting entity, or to secure any of the reporting entity's reported direct unpaid loss reserves, including unpaid losses under loss deductible features of commercial policies?........................................................................................................................................ Yes [ ] No [ X ]

12.6 If yes, state the amount thereof at December 31 of current year:

     12.61 Letters of Credit.......................................................................................................................... $..................................................

     12.62 Collateral and other funds........................................................................................................... $..................................................

13.1 Largest net aggregate amount insured in any one risk (excluding workers' compensation):.................... $................................7,000,000

13.2 Does any reinsurance contract considered in the calculation of this amount include an aggregate limit of recovery without also including a reinstatement provision?............................................................................................................................................................................ Yes [ ] No [ X ]

13.3 State the number of reinsurance contracts (excluding individual facultative risk certificates, but including facultative programs, automatic facilities or facultative obligatory contracts) considered in the calculation of the amount. ...................................................................................1

14.1 Is the reporting entity a cedant in a multiple cedant reinsurance contract?.............................................................................................. Yes [ X ] No [ ]

14.2 If yes, please describe the method of allocating and recording reinsurance among the cedants:

*The reinsurance is recorded on the lead company of the Second Pooling agreement, prior to cession to the intercompany pool.....*

14.3 If the answer to 14.1 is yes, are the methods described in item 14.2 entirely contained in the respective multiple cedant reinsurance contracts?........................................................................................................................................................................................................ Yes [ ] No [ X ]

14.4 If the answer to 14.3 is no, are all the methods described in 14.2 entirely contained in written agreements?................................................ Yes [ X ] No [ ]

14.5 If the answer to 14.4 is no, please explain:
.............................................................................................................................................................................................................................

15.1 Has the reporting entity guaranteed any financed premium accounts?..................................................................................................... Yes [ ] No [ X ]

15.2 If yes, give full information
.............................................................................................................................................................................................................................

16.1 Does the reporting entity write any warranty business? ............................................................................................................................ Yes [ X ] No [ ]

If yes, disclose the following information for each of the following types of warranty coverage:

| | 1<br>Direct Losses<br>Incurred | 2<br>Direct Losses<br>Unpaid | 3<br>Direct Written<br>Premium | 4<br>Direct Premium<br>Unearned | 5<br>Direct Premium<br>Earned |
|---|---|---|---|---|---|
| 16.11 Home | $ .................. | $ .................. | $ .................. | $ .................. | $ .................. |
| 16.12 Products | $ .................. | $ .................. | $ .................. | $ .................. | $ .................. |
| 16.13 Automobile | $ .................. | $ .................. | $ .................. | $ .................. | $ .................. |
| 16.14 Other* | $ .............(2,200) | $ .............11,400 | $ .............73,000 | $ .................. | $ .................. |

     * Disclose type of coverage:

# GENERAL INTERROGATORIES
## PART 2 - PROPERTY & CASUALTY INTERROGATORIES

17.1 Does the reporting entity include amounts recoverable on unauthorized reinsurance in Schedule F – Part 3 that is exempt from the statutory provision for unauthorized reinsurance? ........................................................................................................................................................... Yes [ ] No [ X ]

Incurred but not reported losses on contracts in force prior to July 1, 1984, and not subsequently renewed are exempt from the statutory provision for unauthorized reinsurance. Provide the following information for this exemption:

| | | |
|---|---|---|
| 17.11 | Gross amount of unauthorized reinsurance in Schedule F – Part 3 exempt from the statutory provision for unauthorized reinsurance............. | $................................................. |
| 17.12 | Unfunded portion of Interrogatory 17.11........................................................ | $................................................. |
| 17.13 | Paid losses and loss adjustment expenses portion of Interrogatory 17.11 | $................................................. |
| 17.14 | Case reserves portion of Interrogatory 17.11................................................ | $................................................. |
| 17.15 | Incurred but not reported portion of Interrogatory 17.11............................... | $................................................. |
| 17.16 | Unearned premium portion of Interrogatory 17.11......................................... | $................................................. |
| 17.17 | Contingent commission portion of Interrogatory 17.11.................................. | $................................................. |

18.1 Do you act as a custodian for health savings accounts? ................................................................................................................................... Yes [ ] No [ X ]

18.2 If yes, please provide the amount of custodial funds held as of the reporting date. ................................................................. $.................................................

18.3 Do you act as an administrator for health savings accounts? ............................................................................................................................. Yes [ ] No [ X ]

18.4 If yes, please provide the balance of the funds administered as of the reporting date. ............................................................ $.................................................

19. Is the reporting entity licensed or chartered, registered, qualified, eligible or writing business in at least two states? ................................................ Yes [ X ] No [ ]

19.1 If no, does the reporting entity assume reinsurance business that covers risks residing in at least one state other than the state of domicile of the reporting entity? ....................................................................................................................................................................................... Yes [ ] No [ ]

16.3

# FIVE-YEAR HISTORICAL DATA

Show amounts in whole dollars only, no cents; show percentages to one decimal place, i.e., 17.6.

| | 1<br>2020 | 2<br>2019 | 3<br>2018 | 4<br>2017 | 5<br>2016 |
|---|---|---|---|---|---|
| **Gross Premiums Written (Page 8, Part 1B, Cols. 1, 2 & 3)** | | | | | |
| 1. Liability lines (Lines 11.1, 11.2, 16, 17.1, 17.2, 17.3, 18.1, 18.2, 19.1, 19.2 & 19.3, 19.4) | 669,639,878 | 372,338,303 | 427,547,452 | 575,402,691 | 681,745,985 |
| 2. Property lines (Lines 1, 2, 9, 12, 21 & 26) | 5,467,422 | | | | |
| 3. Property and liability combined lines (Lines 3, 4, 5, 8, 22 & 27) | 21,930,481 | | | | |
| 4. All other lines (Lines 6, 10, 13, 14, 15, 23, 24, 28, 29, 30 & 34) | 8,781,945 | 5,739,753 | 6,943,391 | 7,785,177 | 8,161,448 |
| 5. Nonproportional reinsurance lines (Lines 31, 32 & 33) | 9,915,796 | | | | |
| 6. Total (Line 35) | 715,735,522 | 378,078,056 | 434,490,843 | 583,187,868 | 689,907,433 |
| **Net Premiums Written (Page 8, Part 1B, Col. 6)** | | | | | |
| 7. Liability lines (Lines 11.1, 11.2, 16, 17.1, 17.2, 17.3, 18.1, 18.2, 19.1, 19.2 & 19.3, 19.4) | 150,545,101 | 241,659,997 | 257,979,215 | 302,032,884 | 249,278,142 |
| 8. Property lines (Lines 1, 2, 9, 12, 21 & 26) | 5,216,088 | | | | |
| 9. Property and liability combined lines (Lines 3, 4, 5, 8, 22 & 27) | 19,487,922 | | | | |
| 10. All other lines (Lines 6, 10, 13, 14, 15, 23, 24, 28, 29, 30 & 34) | 3,083,815 | 4,017,828 | 4,860,373 | 5,449,624 | 5,713,014 |
| 11. Nonproportional reinsurance lines (Lines 31, 32 & 33) | 4,713,090 | | | | |
| 12. Total (Line 35) | 183,046,016 | 245,677,825 | 262,839,588 | 307,482,508 | 254,991,156 |
| **Statement of Income (Page 4)** | | | | | |
| 13. Net underwriting gain (loss) (Line 8) | (13,009,126) | 15,334,326 | 41,288,157 | 86,660,303 | 70,657,973 |
| 14. Net investment gain (loss) (Line 11) | 16,387,861 | 74,249,691 | 13,326,966 | 41,984,075 | 9,351,412 |
| 15. Total other income (Line 15) | 304,111 | 10,456 | 107,255 | (278,349) | (182,958) |
| 16. Dividends to policyholders (Line 17) | | | | | |
| 17. Federal and foreign income taxes incurred (Line 19) | 2,347,632 | 17,258,633 | 9,078,131 | 31,139,348 | 24,802,566 |
| 18. Net income (Line 20) | 1,335,214 | 72,335,840 | 45,644,247 | 97,226,681 | 55,023,861 |
| **Balance Sheet Lines (Pages 2 and 3)** | | | | | |
| 19. Total admitted assets excluding protected cell business (Page 2, Line 26, Col. 3) | 1,105,678,369 | 1,176,243,728 | 1,094,728,581 | 1,021,392,125 | 851,052,205 |
| 20. Premiums and considerations (Page 2, Col. 3) | | | | | |
| 20.1 In course of collection (Line 15.1) | | | | | |
| 20.2 Deferred and not yet due (Line 15.2) | 47,506,707 | 19,675,109 | 30,838,281 | 46,031,136 | 57,023,041 |
| 20.3 Accrued retrospective premiums (Line 15.3) | | | | | |
| 21. Total liabilities excluding protected cell business (Page 3, Line 26) | 512,009,845 | 585,598,810 | 536,237,547 | 398,794,454 | 322,387,690 |
| 22. Losses (Page 3, Line 1) | 359,399,318 | 344,456,865 | 311,611,570 | 264,352,308 | 199,196,779 |
| 23. Loss adjustment expenses (Page 3, Line 3) | 59,743,890 | 61,671,128 | 57,722,091 | 50,450,390 | 43,708,385 |
| 24. Unearned premiums (Page 3, Line 9) | 39,105,732 | 18,090,876 | 3,461,368 | 3,465,611 | 4,316,645 |
| 25. Capital paid up (Page 3, Lines 30 & 31) | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | |
| 26. Surplus as regards policyholders (Page 3, Line 37) | 593,668,524 | 590,644,918 | 558,491,034 | 622,597,671 | 528,664,515 |
| **Cash Flow (Page 5)** | | | | | |
| 27. Net cash from operations (Line 11) | 9,750,916 | 82,121,195 | 115,479,876 | 140,499,349 | 81,751,404 |
| **Risk-Based Capital Analysis** | | | | | |
| 28. Total adjusted capital | 593,668,524 | 590,644,918 | 558,491,034 | 622,597,671 | 528,664,515 |
| 29. Authorized control level risk-based capital | 49,139,454 | 45,675,406 | 30,937,869 | 28,205,238 | 22,292,273 |
| **Percentage Distribution of Cash, Cash Equivalents and Invested Assets** | | | | | |
| (Page 2, Col. 3)(Item divided by Page 2, Line 12, Col. 3) x 100.0 | | | | | |
| 30. Bonds (Line 1) | 42.2 | 64.9 | 68.9 | 64.0 | 61.7 |
| 31. Stocks (Lines 2.1 & 2.2) | 2.3 | 2.2 | 11.1 | 14.0 | 16.1 |
| 32. Mortgage loans on real estate (Lines 3.1 and 3.2) | | | | | |
| 33. Real estate (Lines 4.1, 4.2 & 4.3) | 6.6 | 0.8 | | | |
| 34. Cash, cash equivalents and short-term investments (Line 5) | 30.2 | 15.9 | 20.0 | 22.0 | 21.8 |
| 35. Contract loans (Line 6) | | | | | |
| 36. Derivatives (Line 7) | | | | | |
| 37. Other invested assets (Line 8) | 18.8 | 16.2 | | | |
| 38. Receivables for securities (Line 9) | | | | | 0.4 |
| 39. Securities lending reinvested collateral assets (Line 10) | | | | | |
| 40. Aggregate write-ins for invested assets (Line 11) | | | | | |
| 41. Cash, cash equivalents and invested assets (Line 12) | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| **Investments in Parent, Subsidiaries and Affiliates** | | | | | |
| 42. Affiliated bonds, (Sch. D, Summary, Line 12, Col. 1) | | | | | 15,733,325 |
| 43. Affiliated preferred stocks (Sch. D, Summary, Line 18, Col. 1) | | | | | |
| 44. Affiliated common stocks (Sch. D, Summary, Line 24, Col. 1) | | | | | |
| 45. Affiliated short-term investments (subtotals included in Schedule DA Verification, Col. 5, Line 10) | | | | | |
| 46. Affiliated mortgage loans on real estate | 66,827,435 | 8,914,520 | | | |
| 47. All other affiliated | 185,491,288 | 174,678,552 | | | |
| 48. Total of above Lines 42 to 47 | 252,318,723 | 183,593,072 | | | 15,733,325 |
| 49. Total Investment in parent included in Lines 42 to 47 above | | | | | |
| 50. Percentage of investments in parent, subsidiaries and affiliates to surplus as regards policyholders (Line 48 above divided by Page 3, Col. 1, Line 37 x 100.0) | 42.5 | 31.1 | | | 3.0 |

# FIVE-YEAR HISTORICAL DATA
### (Continued)

| | 1<br>2020 | 2<br>2019 | 3<br>2018 | 4<br>2017 | 5<br>2016 |
|---|---|---|---|---|---|
| **Capital and Surplus Accounts** (Page 4) | | | | | |
| 51. Net unrealized capital gains (losses) (Line 24) | (5,303,849) | (16,761,825) | (11,359,497) | 10,580,489 | 6,952,220 |
| 52. Dividends to stockholders (Line 35) | | | (97,000,000) | | |
| 53. Change in surplus as regards policyholders for the year (Line 38) | 3,023,606 | 32,153,884 | (64,106,637) | 93,933,156 | 59,825,938 |
| **Gross Losses Paid** (Page 9, Part 2, Cols. 1 & 2) | | | | | |
| 54. Liability lines (Lines 11.1, 11.2, 16, 17.1, 17.2, 17.3, 18.1, 18.2, 19.1, 19.2 & 19.3, 19.4) | 146,370,262 | 207,069,323 | 216,674,586 | 279,504,696 | 273,242,281 |
| 55. Property lines (Lines 1, 2, 9, 12, 21 & 26) | 640,566 | | | | |
| 56. Property and liability combined lines (Lines 3, 4, 5, 8, 22 & 27) | 387,870 | | | | 103,200 |
| 57. All other lines (Lines 6, 10, 13, 14, 15, 23, 24, 28, 29, 30 & 34) | 139,449 | 124,150 | 144,782 | 208,004 | 551,743 |
| 58. Nonproportional reinsurance lines (Lines 31, 32 & 33) | 5,242,889 | | | | |
| 59. Total (Line 35) | 152,781,036 | 207,193,473 | 216,819,368 | 279,712,700 | 273,897,224 |
| **Net Losses Paid** (Page 9, Part 2, Col. 4) | | | | | |
| 60. Liability lines (Lines 11.1, 11.2, 16, 17.1, 17.2, 17.3, 18.1, 18.2, 19.1, 19.2 & 19.3, 19.4) | 80,294,420 | 85,254,439 | 76,084,863 | 58,185,592 | 35,379,745 |
| 61. Property lines (Lines 1, 2, 9, 12, 21 & 26) | 640,566 | | | | |
| 62. Property and liability combined lines (Lines 3, 4, 5, 8, 22 & 27) | 374,048 | | | | |
| 63. All other lines (Lines 6, 10, 13, 14, 15, 23, 24, 28, 29, 30 & 34) | 84,556 | 86,905 | 101,348 | 145,603 | 386,220 |
| 64. Nonproportional reinsurance lines (Lines 31, 32 & 33) | 3,923,929 | | | | |
| 65. Total (Line 35) | 85,317,519 | 85,341,344 | 76,186,211 | 58,331,195 | 35,765,965 |
| **Operating Percentages** (Page 4)<br>(Item divided by Page 4, Line 1) x 100.0 | | | | | |
| 66. Premiums earned (Line 1) | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 67. Losses incurred (Line 2) | 61.9 | 51.2 | 47.0 | 40.0 | 33.2 |
| 68. Loss expenses incurred (Line 3) | 18.9 | 15.7 | 14.3 | 10.0 | 10.4 |
| 69. Other underwriting expenses incurred (Line 4) | 27.2 | 26.5 | 23.0 | 21.9 | 28.7 |
| 70. Net underwriting gain (loss) (Line 8) | (8.0) | 6.6 | 15.7 | 28.1 | 27.6 |
| **Other Percentages** | | | | | |
| 71. Other underwriting expenses to net premiums written (Page 4, Lines 4 + 5 - 15 divided by Page 8, Part 1B, Col. 6, Line 35 x 100.0) | 23.9 | 24.9 | 23.0 | 22.0 | 28.9 |
| 72. Losses and loss expenses incurred to premiums earned (Page 4, Lines 2 + 3 divided by Page 4, Line 1 x 100.0) | 80.8 | 66.9 | 61.3 | 50.0 | 43.6 |
| 73. Net premiums written to policyholders' surplus (Page 8, Part 1B, Col. 6, Line 35 divided by Page 3, Line 37, Col. 1 x 100.0) | 30.8 | 41.6 | 47.1 | 49.4 | 48.2 |
| **One Year Loss Development** ($000 omitted) | | | | | |
| 74. Development in estimated losses and loss expenses incurred prior to current year (Schedule P, Part 2-Summary, Line 12, Col. 11) | 8,440 | (13,704) | 384 | (3,491) | 13,877 |
| 75. Percent of development of losses and loss expenses incurred to policyholders' surplus of prior year end (Line 74 above divided by Page 4, Line 21, Col. 1 x 100.0) | 1.4 | (2.5) | 0.1 | (0.7) | 3.0 |
| **Two Year Loss Development** ($000 omitted) | | | | | |
| 76. Development in estimated losses and loss expenses incurred 2 years before the current year and prior year (Schedule P, Part 2 - Summary, Line 12, Col. 12) | (19,100) | (5,361) | (5,488) | 11,911 | (3,942) |
| 77. Percent of development of losses and loss expenses incurred to reported policyholders' surplus of second prior year end (Line 76 above divided by Page 4, Line 21, Col. 2 x 100.0) | (3.4) | (0.9) | (1.0) | 2.5 | (1.0) |

NOTE: If a party to a merger, have the two most recent years of this exhibit been restated due to a merger in compliance with the disclosure requirements of *SSAP No. 3 - Accounting Changes and Correction of Errors*?     Yes [ ]   No [ ]

If no, please explain

..........................................................................................................................................................................

18



**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

EXHIBIT OF PREMIUMS AND LOSSES (Statutory Page 14)

| NAIC Group Code 04962 | BUSINESS IN THE STATE OF Consolidated | | | | | DURING THE YEAR 2020 | | | | NAIC Company Code 38865 | |

| Line of Business | 1 Direct Premiums Written | 2 Direct Premiums Earned | 3 Dividends Paid or Credited to Policyholders on Direct Business | 4 Direct Unearned Premium Reserves | 5 Direct Losses Paid (deducting salvage) | 6 Direct Losses Incurred | 7 Direct Losses Unpaid | 8 Direct Defense and Cost Containment Expense Paid | 9 Direct Defense and Cost Containment Expense Incurred | 10 Direct Defense and Cost Containment Expense Unpaid | 11 Commissions and Brokerage Expenses | 12 Taxes, Licenses and Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Fire | | | | | | | | | | | | |
| 2.1 Allied lines | | | | | | | | | | | | |
| 2.2 Multiple peril crop | | | | | | | | | | | | |
| 2.3 Federal flood | | | | | | | | | | | | |
| 2.4 Private crop | | | | | | | | | | | | |
| 2.5 Private flood | | | | | | | | | | | | |
| 3. Farmowners multiple peril | | | | | | | | | | | | |
| 4. Homeowners multiple peril | | | | | | | | | | | | |
| 5.1 Commercial multiple peril (non-liability portion) | | | | | | | | | | | | |
| 5.2 Commercial multiple peril (liability portion) | | | | | | 510,000 | 510,000 | 6,000 | 25,000 | 19,000 | | |
| 6. Mortgage guaranty | | | | | | | | | | | | |
| 8. Ocean marine | | | | | | | | | | | | |
| 9. Inland marine | | | | | | | | | | | | |
| 10. Financial guaranty | | | | | | | | | | | | |
| 11. Medical professional liability | | | | | | | | | | | | |
| 12. Earthquake | | | | | | | | | | | | |
| 13. Group accident and health (b) | | | | | | | | | | | | |
| 14. Credit A & H (group and individual) | | | | | | | | | | | | |
| 15.1 Collectively renewable A & H (b) | | | | | | | | | | | | |
| 15.2 Non-cancelable A & H (b) | | | | | | | | | | | | |
| 15.3 Guaranteed renewable A & H (b) | | | | | | | | | | | | |
| 15.4 Non-renewable for stated reasons only (b) | | | | | | | | | | | | |
| 15.5 Other accident only | | | | | | | | | | | | |
| 15.6 Medicare Title XVIII exempt from state taxes or fees | | | | | | | | | | | | |
| 15.7 All other A & H (b) | | | | | | | | | | | | |
| 15.8 Federal Employees Health Benefits Plan premium (b) | | | | | | | | | | | | |
| 16. Workers' compensation | 92,057,971 | 92,057,971 | | | 60,132,783 | 19,205,321 | 260,746,973 | 11,889,155 | 3,953,050 | 45,745,221 | 7,483,913 | 2,449,127 |
| 17.1 Other liability-Occurrence | | | | | | | | | | | | |
| 17.2 Other Liability-Claims-Made | 1,825,818 | 1,944,954 | | 776,682 | 64,811 | 186,227 | 429,014 | | | | | 50,049 |
| 17.3 Excess workers' compensation | | | | | | | | | | | | |
| 18. Products liability | | | | | | | | | | | | |
| 19.1 Private passenger auto no-fault (personal injury protection) | | | | | | | | | | | | |
| 19.2 Other private passenger auto liability | | | | | | | | | | | | |
| 19.3 Commercial auto no-fault (personal injury protection) | | | | | | | | | | | | |
| 19.4 Other commercial auto liability | | | | | | (150,000) | | 7,777 | | (95,912) | | |
| 21.1 Private passenger auto physical damage | | | | | | | | | | | | |
| 21.2 Commercial auto physical damage | | | | | | | | | | | | |
| 22. Aircraft (all perils) | | | | | | | | | | | | |
| 23. Fidelity | | | | | | | | | | | | |
| 24. Surety | 3,430,041 | 3,430,041 | | | | (810,766) | 3,860,226 | | | | | 97,682 |
| 26. Burglary and theft | | | | | | | | | | | | |
| 27. Boiler and machinery | | | | | | | | | | | | |
| 28. Credit | | | | | | | | | | | | |
| 29. International | | | | | | | | | | | | |
| 30. Warranty | 73,000 | 73,000 | | | | (2,200) | 11,400 | | | | | 2,079 |
| 34. Aggregate write-ins for other lines of business | 902,409 | 1,033,477 | | 371,455 | 120,794 | 164,883 | 681,693 | | | | | 25,699 |
| 35. TOTAL (a) | 98,289,239 | 98,539,443 | | 1,148,137 | 60,318,388 | 19,103,465 | 266,239,306 | 11,902,932 | 3,882,138 | 45,764,221 | 7,483,913 | 2,624,636 |
| **DETAILS OF WRITE-INS** | | | | | | | | | | | | |
| 3401. Legal | 902,409 | 1,033,477 | | 371,455 | 120,794 | 164,883 | 681,693 | | | | | 25,699 |
| 3402. | | | | | | | | | | | | |
| 3403. | | | | | | | | | | | | |
| 3498. Summary of remaining write-ins for Line 34 from overflow page | | | | | | | | | | | | |
| 3499. Totals (Lines 3401 through 3403 Plus 3498) (Line 34 above) | 902,409 | 1,033,477 | | 371,455 | 120,794 | 164,883 | 681,693 | | | | | 25,699 |

(a) Finance and service charges not included in Lines 1 to 35 $ ...........................................

(b) For health business on indicated lines report: Number of persons insured under PPO managed care products ........................................... and number of persons insured under indemnity only products ...........................................

19.GT

# SCHEDULE F - PART 1

**Assumed Reinsurance as of December 31, Current Year ($000 Omitted)**

| 1 | 2 | 3 | 4 | 5 | Reinsurance On | | | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 6 | 7 | 8 | | | | | | Amount of Assets Pledged or Compensating Balances to Secure Letters of Credit | Amount of Assets Pledged or Collateral Held in Trust |
| ID Number | NAIC Company Code | Name of Reinsured | Domiciliary Jurisdiction | Assumed Premium | Paid Losses and Loss Adjustment Expenses | Known Case Losses and LAE | Cols. 6 +7 | Contingent Commissions Payable | Assumed Premiums Receivable | Unearned Premium | Funds Held By or Deposited With Reinsured Companies | Letters of Credit Posted | | |
| Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | |
| 31-1191023 | 28258 | CONTINENTAL IND CO | NM | 608,928 | 7,424 | 149,456 | 156,880 | | 39,537 | 39,106 | | | | |
| 58-1811419 | 35246 | ILLINOIS INS CO | NM | 1,856 | | | | | | | | | | |
| 23-1471444 | 21962 | PENNSYLVANIA INS CO | NM | 5,961 | | | | | | | | | | |
| 75-1906915 | 16543 | TEXAS INS CO | TX | 1 | | | | | | | | | | |
| 0199999 - Total Affiliates - U.S. Intercompany Pooling | | | | 616,747 | 7,424 | 149,456 | 156,880 | | 39,537 | 39,106 | | | | |
| Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | |
| Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | |
| Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | |
| Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | |
| 0899999 - Total Affiliates - Total Affiliates | | | | 616,747 | 7,424 | 149,456 | 156,880 | | 39,537 | 39,106 | | | | |
| Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | |
| 47-0355979 | 20087 | NATIONAL IND CO | NE | | | 4 | 4 | | | | | | | |
| 36-2403971 | 20052 | NATIONAL LIAB & FIRE INS CO | CT | | | 8 | 8 | | | | | | | |
| 0999999 - Total Other U.S. Unaffiliated Insurers | | | | | | 13 | 13 | | | | | | | |
| Pools and Associations - Mandatory Pools, Associations or Other Similar Facilities | | | | | | | | | | | | | | |
| AA-9992118 | 00000 | NATIONAL WORKERS COMP REINS POOL | NY | 699 | 167 | 1,548 | 1,714 | | 484 | 280 | | | | |
| 1099999 - Pools and Associations - Mandatory Pools, Associations or Other Similar Facilities | | | | 699 | 167 | 1,548 | 1,714 | | 484 | 280 | | | | |
| Pools and Associations - Voluntary Pools, Associations or Other Similar Facilities | | | | | | | | | | | | | | |
| 1299999 - Pools and Associations - Total Pools and Associations | | | | 699 | 167 | 1,548 | 1,714 | | 484 | 280 | | | | |
| Other Non-U.S. Insurers | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| 9999999 Totals | | | | 617,446 | 7,591 | 151,016 | 158,607 | | 40,020 | 39,385 | | | | |

20

## SCHEDULE F - PART 2
**Premium Portfolio Reinsurance Effected or (Canceled) during Current Year**

| 1<br>ID<br>Number | 2<br>NAIC<br>Company<br>Code | 3<br><br>Name of Company | 4<br><br>Date of Contract | 5<br><br>Original Premium | 6<br>Reinsurance<br>Premium |
|---|---|---|---|---|---|
| 0199999 Total Reinsurance Ceded by Portfolio | | | | | |
| 0299999 Total Reinsurance Assumed by Portfolio | | | | | |

NONE

Exhibit 5, Page 45 of 152

# SCHEDULE F - PART 3
### Ceded Reinsurance as of December 31, Current Year ($000 Omitted)

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|----|----|----|----|----|
| | | | | | | Reinsurance Recoverable On | | | | | | | | | | Reinsurance Payable | | | |
| ID Number | NAIC Company Code | Name of Reinsurer | Domiciliary Jurisdiction | Special Code | Reinsurance Premiums Ceded | Paid Losses | Paid LAE | Known Case Loss Reserves | Known Case LAE Reserves | IBNR Loss Reserves | IBNR LAE Reserves | Unearned Premiums | Contingent Commissions | Cols. 7 through 14 Totals | Amount in Dispute Included in Column 15 | Ceded Balances Payable | Other Amounts Due to Reinsurers | Net Amount Recoverable From Reinsurers Cols. 15 - [17 + 18] | Funds Held By Company Under Reinsurance Treaties |
| Authorized - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | | |
| 31-1191023 | 28258 | CONTINENTAL IND CO | NM | | 472,592 | 7,571 | 134 | 80,467 | 8,109 | 186,843 | 49,329 | 1,428 | | 333,880 | | | 10,666 | | 323,215 |
| 56-1811419 | 35246 | ILLINOIS INS CO | NM | | 9,181 | | | | | | | | | | | | | | |
| 23-1471444 | 21962 | PENNSYLVANIA INS CO | NM | | 9,181 | | | | | | | | | | | | | | |
| 0199999 - Total Authorized - Affiliates - U.S. Intercompany Pooling | | | | | 490,953 | 7,571 | 134 | 80,467 | 8,109 | 186,843 | 49,329 | 1,428 | | 333,880 | | | 10,666 | | 323,215 |
| Authorized - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | | | |
| 45-3353082 | 14144 | APPLIED UNDERWRITERS CAPTIVE RISK AS | NM | | (631) | | | | | | | | | | | | | | |
| 0399999 - Total Authorized - Affiliates - U.S. Non-Pool - Other | | | | | (631) | | | | | | | | | | | | | | |
| 0499999 - Total Authorized - Affiliates - U.S. Non-Pool - Total | | | | | (631) | | | | | | | | | | | | | | |
| Authorized - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | | | |
| Authorized - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | | | |
| 0899999 - Total Authorized - Affiliates - Total Authorized - Affiliates | | | | | 490,322 | 7,571 | 134 | 80,467 | 8,109 | 186,843 | 49,329 | 1,428 | | 333,880 | | | 10,666 | | 323,215 |
| Authorized - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | | |
| 06-0237820 | 20699 | ACE PROP & CAS INS CO | PA | | 391 | | | | | | | | | | | | | | |
| 06-1430254 | 10348 | ARCH REINS CO | DE | | 2,239 | | | | | | | | | | | | | | |
| 22-2005057 | 26921 | EVEREST REINS CO | DE | | 1,411 | | | | | | | | | | | | | | |
| 13-4924125 | 10227 | MUNICH REINS AMER INC | DE | | 4,294 | | | | | | | | | | | | | | |
| 47-0698507 | 23680 | ODYSSEY REINS CO | CT | | 705 | | | | | | | | | | | | | | |
| 31-0542366 | 10677 | THE CINCINNATI INS CO | OH | | 537 | | | | | | | | | | | | | | |
| 47-0355979 | 20087 | NATIONAL IND CO | NE | | | 10 | | 357 | .19 | 637 | .89 | | | 1,111 | | | | | 1,111 |
| 13-2768872 | 32190 | CONSTITUTION INS CO | NY | | 6,509 | | | | | | | | | | | | | | |
| 48-0921045 | 39845 | WESTPORT INS CORP | MO | | | | | 510 | .19 | | .21 | | | 550 | | | | | 550 |
| 0999999 - Total Authorized - Other U.S. Unaffiliated Insurers | | | | | 16,085 | 10 | | 867 | 38 | 637 | 110 | | | 1,661 | | | | | 1,661 |
| Authorized - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | | | |
| Authorized - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | | | |
| Authorized - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | | | |
| AA-1127084 | 00000 | LLOYD'S SYNDICATE NUMBER 1084 | GBR | | 117 | | | | | | .5 | | | 5 | | | | | 5 |
| AA-1120337 | 00000 | ASPEN INS UK LTD | GBR | | | | | | | | .8 | | | 8 | | | | | 8 |
| AA-1128001 | 00000 | LLOYD'S SYNDICATE NUMBER 2001 | GBR | | 26 | | | | | | | | | | | | | | |
| AA-1128609 | 00000 | LLOYD'S SYNDICATE NUMBER 609 | GBR | | 5 | | | | | | | | | | | | | | |
| AA-1128020 | 00000 | LLOYD'S SYNDICATE NUMBER 2020 | GBR | | | | | | | | .16 | | | 16 | | | | | 16 |
| AA-1128003 | 00000 | LLOYD'S SYNDICATE NUMBER 2003 | GBR | | 662 | | | | | | | | | | | | | | |
| 1299999 - Total Authorized - Other Non-U.S. Insurers | | | | | 809 | | | | | | 28 | | | 28 | | | | | 28 |
| Authorized - Protected Cells | | | | | | | | | | | | | | | | | | | |
| 1499999 - Total Authorized Excluding Protected Cells (Sum of 0899999, 0999999, 1099999, 1199999 and 1299999) | | | | | 507,217 | 7,580 | 134 | 81,333 | 8,147 | 187,508 | 49,439 | 1,428 | | 335,570 | | | 10,666 | | 324,904 |
| Unauthorized - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | | |
| 75-1906915 | 16543 | TEXAS INS CO | TX | | 9,181 | | | | | | | | | | | | | | |
| 1599999 - Total Unauthorized - Affiliates - U.S. Intercompany Pooling | | | | | 9,181 | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - U.S. Non--Pool - Other | | | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | | | |
| 2299999 - Total Unauthorized - Affiliates - Total Unauthorized - Affiliates | | | | | 9,181 | | | | | | | | | | | | | | |
| Unauthorized - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | | |
| Unauthorized - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | | | |
| Unauthorized - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | | | |
| Unauthorized - Other non-U.S. Insurers | | | | | | | | | | | | | | | | | | | |
| AA-3190339 | 00000 | RENAISSANCE REINS LTD | BMU | | | | | | | | 22 | | | 22 | | | | | 22 |
| AA-3771000 | 00000 | UNITED INS CO | CYM | | 16,292 | | | | | | | | | | | | | | |
| 2699999 - Total Unauthorized - Other Non-U.S. Insurers | | | | | 16,292 | | | | | | 22 | | | 22 | | | | | 22 |
| Unauthorized - Protected Cells | | | | | | | | | | | | | | | | | | | |
| 2899999 - Total Unauthorized Excluding Protected Cells (Sum of 2299999, 2399999, 2499999, 2599999 and 2699999) | | | | | 25,473 | | | | | | 22 | | | 22 | | | | | 22 |
| Certified - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | | |

# SCHEDULE F - PART 3

Ceded Reinsurance as of December 31, Current Year ($000 Omitted)

| 1 | 2 | 3 | 4 | 5 | 6 | Reinsurance Recoverable On | | | | | | | | | 16 | Reinsurance Payable | | 19 | 20 |
| | | | | | | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 17 | 18 | | |
| ID Number | NAIC Company Code | Name of Reinsurer | Domiciliary Jurisdiction | Special Code | Reinsurance Premiums Ceded | Paid Losses | Paid LAE | Known Case Loss Reserves | Known Case LAE Reserves | IBNR Loss Reserves | IBNR LAE Reserves | Unearned Premiums | Contingent Commissions | Cols. 7 through 14 Totals | Amount in Dispute Included in Column 15 | Ceded Balances Payable | Other Amounts Due to Reinsurers | Net Amount Recoverable From Reinsurers Cols. 15 - [17 + 18] | Funds Held By Company Under Reinsurance Treaties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Certified - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S) - Captive | | | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | | | |
| Certified - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | | |
| Certified - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | | | |
| Certified - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | | | |
| Certified - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | | | |
| Certified - Protected Cells | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Protected Cells | | | | | | | | | | | | | | | | | | | |
| 5799999 - Total Authorized, Unauthorized, Reciprocal Jurisdiction and Certified Excluding Protected Cells (Sum of 1499999, 2899999, 4299999 and 5699999) | | | | | | 532,690 | 7,580 | 134 | 81,333 | 8,147 | 187,530 | 49,439 | 1,428 | | 335,592 | | 10,666 | | 324,926 |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| 9999999 Totals | | | | | | 532,690 | 7,580 | 134 | 81,333 | 8,147 | 187,530 | 49,439 | 1,428 | | 335,592 | | 10,666 | | 324,926 |

22.1

Exhibit 5, Page 47 of 152

# SCHEDULE F - PART 3 (Continued)

### Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
### (Credit Risk)

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 21 Multiple Beneficiary Trusts | 22 Letters of Credit | 23 Issuing or Confirming Bank Reference Number | 24 Single Beneficiary Trusts & Other Allowable Collateral | 25 Total Funds Held, Payables & Collateral | 26 Net Recoverable Net of Funds Held & Collateral | 27 Applicable Sch. F Penalty (Col. 78) | 28 Total Amount Recoverable From Reinsurers Less Penalty (Cols. 15 - 27) | 29 Stressed Recoverable (Col. 28 * 120%) | 30 Reinsurance Payable & Funds Held (Cols. 17+18+20; but not in excess of Col. 29) | 31 Stressed Net Recoverable (Cols. 29 - 30) | 32 Total Collateral (Cols. 21 + 22 + 24, not in Excess of Col. 31) | 33 Stressed Net Recoverable Net of Collateral Offsets (Cols. 31 - 32) | 34 Reinsurer Designation Equivalent | 35 Credit Risk on Collateralized Recoverables (Col. 32 * Factor Applicable to Reinsurer Designation Equivalent in Col. 34) | 36 Credit Risk on Uncollateralized Recoverables (Col. 33 * Factor Applicable to Reinsurer Designation Equivalent in Col. 34) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Authorized - Affiliates - U.S. Intercompany Pooling** | | | | | | | | | | | | | | | | | |
| 31-1191023 | CONTINENTAL IND CO | | | | | 10,666 | 323,215 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 58-1811419 | ILLINOIS INS CO | | | | | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 23-1471444 | PENNSYLVANIA INS CO | | | | | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 0199999 | Total Authorized - Affiliates - U.S. Intercompany Pooling | | | | XXX | 10,666 | 323,215 | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| **Authorized - Affiliates - U.S. Non-Pool - Captive** | | | | | | | | | | | | | | | | | |
| **Authorized - Affiliates - U.S. Non-Pool - Other** | | | | | | | | | | | | | | | | | |
| 45-3353082 | APPLIED UNDERWRITERS CAPTIVE RISK AS | | | | | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 0399999 | Total Authorized - Affiliates - U.S. Non-Pool - Other | | | XXX | | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 0499999 | Total Authorized - Affiliates - U.S. Non-Pool - Total | | | XXX | | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| **Authorized - Affiliates - Other (Non-U.S.) - Captive** | | | | | | | | | | | | | | | | | |
| **Authorized - Affiliates - Other (Non-U.S.) - Other** | | | | | | | | | | | | | | | | | |
| 0899999 | Total Authorized - Affiliates - Total Authorized - Affiliates | | | | XXX | 10,666 | 323,215 | | | | | | | | XXX | | |
| **Authorized - Other U.S. Unaffiliated Insurers** | | | | | | | | | | | | | | | | | |
| 06-0237820 | ACE PROP & CAS INS CO | | | | | | | | | | | | | | 1 | | |
| 06-1430254 | ARCH REINS CO | | | | | | | | | | | | | | 2 | | |
| 22-2005057 | EVEREST REINS CO | | | | | | | | | | | | | | 2 | | |
| 13-4924125 | MUNICH REINS AMER INC | | | | | | | | | | | | | | 2 | | |
| 47-0698507 | ODYSSEY REINS CO | | | | | | | | | | | | | | 3 | | |
| 31-0542366 | THE CINCINNATI INS CO | | | | | | | | | | | | | | 2 | | |
| 47-0359979 | NATIONAL IND CO | | | | | | 1,111 | | 1,111 | 1,334 | | 1,334 | | 1,334 | 1 | | 48 |
| 13-2798872 | CONSTITUTION INS CO | | | | | | | | | | | | | | 3 | | |
| 48-0921045 | WESTPORT INS CORP | | | | | | 550 | | 550 | 660 | | 660 | | 660 | 2 | | 27 |
| 0999999 | Total Authorized - Other U.S. Unaffiliated Insurers | | | XXX | | | 1,661 | | 1,661 | 1,993 | | 1,993 | | 1,993 | XXX | | 75 |
| **Authorized - Pools - Mandatory Pools** | | | | | | | | | | | | | | | | | |
| **Authorized - Pools - Voluntary Pools** | | | | | | | | | | | | | | | | | |
| **Authorized - Other Non-U.S. Insurers** | | | | | | | | | | | | | | | | | |
| AA-1127084 | LLOYD'S SYNDICATE NUMBER 1084 | | | | | | 5 | | 5 | 6 | | 6 | | 6 | 6 | | 1 |
| AA-1120337 | ASPEN INS UK LTD | | | | | | 8 | | 8 | 9 | | 9 | | 9 | 3 | | |
| AA-1128001 | LLOYD'S SYNDICATE NUMBER 2001 | | | | | | | | | | | | | | 6 | | |
| AA-1128609 | LLOYD'S SYNDICATE NUMBER 609 | | | | | | | | | | | | | | 6 | | |
| AA-1128020 | LLOYD'S SYNDICATE NUMBER 2020 | | | | | | 16 | | 16 | 19 | | 19 | | 19 | 6 | | 3 |
| AA-1128003 | LLOYD'S SYNDICATE NUMBER 2003 | | | | | | | | | | | | | | 6 | | |
| 1299999 | Total Authorized - Other Non-U.S. Insurers | | | XXX | | | 28 | | 28 | 34 | | 34 | | 34 | XXX | | 4 |
| **Authorized - Protected Cells** | | | | | | | | | | | | | | | | | |
| 1499999 | Total Authorized Excluding Protected Cells (Sum of 0899999, 0999999, 1199999 and 1299999) | | | XXX | | 10,666 | 324,904 | | 1,689 | 2,027 | | 2,027 | | 2,027 | XXX | | 79 |
| **Unauthorized - Affiliates - U.S. Intercompany Pooling** | | | | | | | | | | | | | | | | | |
| 75-1906915 | TEXAS INS CO | | | | | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 1599999 | Total Unauthorized - Affiliates - U.S. Intercompany Pooling | | | | XXX | | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| **Unauthorized - Affiliates - U.S. Non-Pool - Captive** | | | | | | | | | | | | | | | | | |
| **Unauthorized - Affiliates - U.S. Non-Pool - Other** | | | | | | | | | | | | | | | | | |
| **Unauthorized - Affiliates - Other (Non-U.S.) - Captive** | | | | | | | | | | | | | | | | | |
| **Unauthorized - Affiliates - Other (Non-U.S.) - Other** | | | | | | | | | | | | | | | | | |
| 2299999 | Total Unauthorized - Affiliates - Total Unauthorized - Affiliates | | | | XXX | | | | | | | | | | XXX | | |
| **Unauthorized - Other U.S. Unaffiliated Insurers** | | | | | | | | | | | | | | | | | |
| **Unauthorized - Pools - Mandatory Pools** | | | | | | | | | | | | | | | | | |

23

# SCHEDULE F - PART 3 (Continued)

### Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
### (Credit Risk)

23.1

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 21 Multiple Beneficiary Trusts | 22 Letters of Credit | 23 Issuing or Confirming Bank Reference Number | 24 Single Beneficiary Trusts & Other Allowable Collateral | 25 Total Funds Held, Payables & Collateral | 26 Net Recoverable Net of Funds Held & Collateral | 27 Applicable Sch. F Penalty (Col. 78) | 28 Total Amount Recoverable From Reinsurers Less Penalty (Cols. 15-27) | 29 Stressed Recoverable (Col. 28 * 120%) | 30 Reinsurance Payable & Funds Held (Cols. 17+18+20; but not in excess of Col. 29) | 31 Stressed Net Recoverable (Cols. 29-30) | 32 Total Collateral (Cols. 21+22+24, not in Excess of Col. 31) | 33 Stressed Net Recoverable Net of Collateral Offsets (Cols. 31-32) | 34 Reinsurer Designation Equivalent | 35 Credit Risk on Collateralized Recoverables (Col. 32 * Factor Applicable to Reinsurer Designation Equivalent in Col. 34) | 36 Credit Risk on Uncollateralized Recoverables (Col. 33 * Factor Applicable to Reinsurer Designation Equivalent in Col. 34) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unauthorized - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | |
| Unauthorized - Other non-U.S. Insurers | | | | | | | | | | | | | | | | | |
| AA-3190339 | RENAISSANCE REINS LTD | | 230 | 001 | | 22 | | | 22 | 26 | | 26 | 26 | | 2 | 1 | |
| AA-3771000 | UNITED INS CO | | | | | | | | | | | | | | 6 | | |
| 2699999 | Total Unauthorized - Other Non-U.S. Insurers | | 230 | XXX | | 22 | | | 22 | 26 | | 26 | 26 | | XXX | 1 | |
| Unauthorized - Protected Cells | | | | | | | | | | | | | | | | | |
| 2899999 | Total Unauthorized Excluding Protected Cells (Sum of 2299999, 2399999, 2499999, 2599999 and 2699999) | | 230 | XXX | | 22 | | | 22 | 26 | | 26 | 26 | | XXX | 1 | |
| Certified - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S) - Captive | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | |
| Certified - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | |
| Certified - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | |
| Certified - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | |
| Certified - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | |
| Certified - Protected Cells | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Protected Cells | | | | | | | | | | | | | | | | | |
| 5799999 | Total Authorized, Unauthorized, Reciprocal Jurisdiction and Certified Excluding Protected Cells (Sum of 1499999, 2899999, 4299999 and 5699999) | | 230 | XXX | | 10,688 | 324,904 | | 1,711 | 2,053 | | 2,053 | 26 | 2,027 | XXX | 1 | 79 |
| 9999999 Totals | | | 230 | XXX | | 10,688 | 324,904 | | 1,711 | 2,053 | | 2,053 | 26 | 2,027 | XXX | 1 | 79 |

# SCHEDULE F - PART 3 (Continued)

### Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
### (Aging of Ceded Reinsurance)

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 37 Current | 38 1 – 29 Days | 39 30 – 90 Days | 40 91 – 120 Days | 41 Over 120 Days | 42 Total Overdue Cols. 38 + 39 + 40 + 41 | 43 Total Due Cols. 37 + 42 (In total should equal Cols. 7 + 8) | 44 Total Recoverable on Paid Losses & LAE Amounts in Dispute Included in Col. 43 | 45 Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts in Dispute Included in Cols. 40 & 41 | 46 Total Recoverable on Paid Losses & LAE Amounts Not in Dispute (Cols. 43 – 44) | 47 Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts Not in Dispute (Cols. 40 + 41 – 45) | 48 Amounts Received Prior 90 Days | 49 Percentage Overdue Col. 42/Col. 43 | 50 Percentage of Amounts More Than 90 Days Overdue Not in Dispute (Col. 47/ [Cols. 46 + 48]) | 51 Percentage More Than 120 Days Overdue (Col. 41/ Col. 43) | 52 Is the Amount in Col. 50 Less Than 20% (Yes or No) | 53 Amounts in Col. 47 for Reinsurers with Values Less Than 20% in Col. 50 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Authorized - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | |
| 31-1191023 | CONTINENTAL INS CO | 7,705 | | | | | | 7,705 | | | 7,705 | | | | | | YES | |
| 58-1811419 | ILLINOIS INS CO | | | | | | | | | | | | | | | | YES | |
| 23-1471444 | PENNSYLVANIA INS CO | | | | | | | | | | | | | | | | YES | |
| 0199999 | Total Authorized - Affiliates - U.S. Intercompany Pooling | 7,705 | | | | | | 7,705 | | | 7,705 | | | | | | XXX | |
| Authorized - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | | |
| Authorized - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | | |
| 45-3353082 | APPLIED UNDERWRITERS CAPTIVE RISK AS | | | | | | | | | | | | | | | | YES | |
| 0399999 | Total Authorized - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | XXX | |
| 0499999 | Total Authorized - Affiliates - U.S. Non-Pool - Total | | | | | | | | | | | | | | | | XXX | |
| Authorized - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | | |
| Authorized - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | | |
| 0899999 | Total Authorized - Affiliates - Total Authorized - Affiliates | 7,705 | | | | | | 7,705 | | | 7,705 | | | | | | XXX | |
| Authorized - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | |
| 06-0237820 | ACE PROP & CAS INS CO | | | | | | | | | | | | | | | | YES | |
| 06-1430254 | ARCH REINS CO | | | | | | | | | | | | | | | | YES | |
| 22-2005057 | EVEREST REINS CO | | | | | | | | | | | | | | | | YES | |
| 13-4924125 | MUNICH REINS AMER INC | | | | | | | | | | | | | | | | YES | |
| 47-0698507 | ODYSSEY REINS CO | | | | | | | | | | | | | | | | YES | |
| 31-0542366 | THE CINCINNATI INS CO | | | | | | | | | | | | | | | | YES | |
| 47-0355979 | NATIONAL IND CO | 10 | | | | | | 10 | | | 10 | | | | | | YES | |
| 13-2798872 | CONSTITUTION INS CO | | | | | | | | | | | | | | | | YES | |
| 48-0921045 | WESTPORT INS CORP | | | | | | | | | | | | | | | | YES | |
| 0999999 | Total Authorized - Other U.S. Unaffiliated Insurers | 10 | | | | | | 10 | | | 10 | | | | | | XXX | |
| Authorized - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | | |
| Authorized - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | | |
| Authorized - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | | |
| AA-1127084 | LLOYD'S SYNDICATE NUMBER 1084 | | | | | | | | | | | | | | | | YES | |
| AA-1120337 | ASPEN INS UK LTD | | | | | | | | | | | | | | | | YES | |
| AA-1128001 | LLOYD'S SYNDICATE NUMBER 2001 | | | | | | | | | | | | | | | | YES | |
| AA-1126609 | LLOYD'S SYNDICATE NUMBER 609 | | | | | | | | | | | | | | | | YES | |
| AA-1128020 | LLOYD'S SYNDICATE NUMBER 2020 | | | | | | | | | | | | | | | | YES | |
| AA-1128003 | LLOYD'S SYNDICATE NUMBER 2003 | | | | | | | | | | | | | | | | YES | |
| 1299999 | Total Authorized - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | XXX | |
| 1499999 | Total Authorized Excluding Protected Cells (Sum of 0899999, 0999999, 1099999, 1199999 and 1299999) | 7,715 | | | | | | 7,715 | | | 7,715 | | | | | | XXX | |
| Unauthorized - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | |
| 75-1906915 | TEXAS INS CO | | | | | | | | | | | | | | | | YES | |
| 1599999 | Total Unauthorized - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | XXX | |
| Unauthorized - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | | |
| 2299999 | Total Unauthorized - Affiliates - Total Unauthorized - Affiliates | | | | | | | | | | | | | | | | XXX | |

24

# SCHEDULE F - PART 3 (Continued)

### Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
### (Aging of Ceded Reinsurance)

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 37 Current | 38 1 – 29 Days | 39 30 – 90 Days | 40 91 – 120 Days | 41 Over 120 Days | 42 Total Overdue Cols. 38 + 39 + 40 + 41 | 43 Total Due Cols. 37 + 42 (In total should equal Cols. 7 + 8) | 44 Total Recoverable on Paid Losses & LAE Amounts in Dispute Included in Col. 43 | 45 Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts in Dispute Included in Cols. 40 & 41 | 46 Total Recoverable on Paid Losses & LAE Amounts Not in Dispute (Cols. 43 – 44) | 47 Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts Not in Dispute (Cols. 40 + 41 – 45) | 48 Amounts Received Prior 90 Days | 49 Percentage Overdue Col. 42/Col. 43 | 50 Percentage of Amounts More Than 90 Days Overdue Not in Dispute (Col. 47/ [Cols. 46 + 48]) | 51 Percentage More Than 120 Days Overdue (Col. 41/ Col. 43) | 52 Is the Amount in Col. 50 Less Than 20% (Yes or No) | 53 Amounts in Col. 47 for Reinsurers with Values Less Than 20% in Col. 50 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unauthorized – Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | |
| Unauthorized – Pools – Mandatory Pools | | | | | | | | | | | | | | | | | | |
| Unauthorized – Pools – Voluntary Pools | | | | | | | | | | | | | | | | | | |
| Unauthorized – Other non-U.S. Insurers | | | | | | | | | | | | | | | | | | |
| AA-3190339 | RENAISSANCE REINS LTD. | | | | | | | | | | | | | | | | YES | |
| AA-3771000 | UNITED INS CO. | | | | | | | | | | | | | | | | YES | |
| 2699999 – Total Unauthorized – Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | XXX | |
| Unauthorized – Protected Cells | | | | | | | | | | | | | | | | | | |
| 2899999 – Total Unauthorized Excluding Protected Cells (Sum of 2299999, 2399999, 2499999, 2599999 and 2699999) | | | | | | | | | | | | | | | | | XXX | |
| Certified – Affiliates – U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | |
| Certified – Affiliates – U.S. Non-Pool – Captive | | | | | | | | | | | | | | | | | | |
| Certified – Affiliates – U.S. Non-Pool – Other | | | | | | | | | | | | | | | | | | |
| Certified – Affiliates – Other (Non-U.S) – Captive | | | | | | | | | | | | | | | | | | |
| Certified – Affiliates – Other (Non-U.S.) – Other | | | | | | | | | | | | | | | | | | |
| Certified – Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | |
| Certified – Pools – Mandatory Pools | | | | | | | | | | | | | | | | | | |
| Certified – Pools – Voluntary Pools | | | | | | | | | | | | | | | | | | |
| Certified – Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | | |
| Certified – Protected Cells | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Affiliates – U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Affiliates – U.S. Non-Pool – Captive | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Affiliates – U.S. Non-Pool – Other | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Affiliates – Other (Non-U.S.) – Captive | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Affiliates – Other (Non-U.S.) – Other | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Pools – Mandatory Pools | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Pools – Voluntary Pools | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction – Protected Cells | | | | | | | | | | | | | | | | | | |
| 5799999 – Total Authorized, Unauthorized, Reciprocal Jurisdiction and Certified Excluding Protected Cells (Sum of 1499999, 2899999, 4299999 and 5699999) | | 7,715 | | | | | 7,715 | | | 7,715 | | | | | | | XXX | |
| 9999999 Totals | | 7,715 | | | | | 7,715 | | | 7,715 | | | | | | | XXX | |

24.1

# SCHEDULE F - PART 3 (Continued)

Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
(Provision for Reinsurance for Certified Reinsurers)

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 54 Certified Reinsurer Rating (1 through 6) | 55 Effective Date of Certified Reinsurer Rating | 56 Percent Collateral Required for Full Credit (0% through 100%) | 57 Catastrophe Recoverables Qualifying for Collateral Deferral | 58 Net Recoverables Subject to Collateral Requirements for Full Credit (Col. 19 − Col. 57) | 59 Dollar Amount of Collateral Required (Col. 56 * Col. 58) | 60 Percent of Collateral Provided for Net Recoverables Subject to Collateral Requirements ([Col. 20+Col. 21+Col. 22+Col. 24]/Col. 58) | 61 Percent Credit Allowed on Net Recoverables Subject to Collateral Requirements (Col. 60 / Col. 56, not to exceed 100%) | 62 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts in Dispute (Col. 45 * 20%) | 63 Amount of Credit Allowed for Net Recoverables (Col. 57+[Col. 58 * Col. 61]) | 64 Provision for Reinsurance with Certified Reinsurers Due to Collateral Deficiency (Col. 19 − Col. 63) | 65 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts Not in Dispute (Col. 47 * 20%) | 66 Total Collateral Provided (Col. 20+Col. 21+Col.22+ Col. 24; not to Exceed Col. 63) | 67 Net Unsecured Recoverable for Which Credit is Allowed (Col. 63-Col. 66) | 68 20% of Amount in Col. 67 | 69 Provision for Overdue Reinsurance Ceded to Certified Reinsurers (Greater of [Col. 62 + Col. 65] or Col. 68; not to Exceed Col. 63) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Authorized - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | |
| 31-1191023 | CONTINENTAL IND CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 58-1811419 | ILLINOIS INS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 23-1477444 | PENNSYLVANIA INS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 0199999 - Total Authorized - Affiliates - U.S. Intercompany Pooling | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Authorized - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | |
| Authorized - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | |
| 45-3353082 | APPLIED UNDERWRITERS CAPTIVE RISK AS | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 0399999 - Total Authorized - Affiliates - U.S. Non-Pool - Other | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 0499999 - Total Authorized - Affiliates - U.S. Non-Pool - Total | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Authorized - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | |
| Authorized - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | |
| 0899999 - Total Authorized - Affiliates - Total Authorized - Affiliates | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Authorized - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | |
| 06-0237820 | ACE PROP & CAS INS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 06-1430254 | ARCH REINS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 22-2005057 | EVEREST REINS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 13-4924125 | MUNICH REINS AMER INC | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 47-0698507 | ODYSSEY REINS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 31-0542366 | THE CINCINNATI INS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 47-0355979 | NATIONAL IND CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 13-2798872 | CONSTITUTION INS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 48-0921045 | WESTPORT INS CORP | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 0999999 - Total Authorized - Other U.S. Unaffiliated Insurers | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Authorized - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | |
| Authorized - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | |
| Authorized - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | |
| AA-1127084 | LLOYD'S SYNDICATE NUMBER 1084 | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| AA-1120337 | ASPEN INS UK LTD | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| AA-1128001 | LLOYD'S SYNDICATE NUMBER 2001 | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| AA-1126609 | LLOYD'S SYNDICATE NUMBER 609 | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| AA-1128020 | LLOYD'S SYNDICATE NUMBER 2020 | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| AA-1128003 | LLOYD'S SYNDICATE NUMBER 2003 | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 1299999 - Total Authorized - Other Non-U.S. Insurers | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Authorized - Protected Cells | | | | | | | | | | | | | | | | | |
| 1499999 - Total Authorized Excluding Protected Cells (Sum of 0899999, 0999999, 1099999, 1199999 and 1299999) | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Unauthorized - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | |
| 75-1906915 | TEXAS INS CO | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 1599999 - Total Unauthorized - Affiliates - U.S. Intercompany Pooling | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Unauthorized - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | |
| Unauthorized - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | |
| 2299999 - Total Unauthorized - Affiliates - Total Unauthorized - Affiliates | | XXX | XXX | XXX | | XXX | XXX | | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |

Exhibit 5, Page 52 of 152

# SCHEDULE F - PART 3 (Continued)

### Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
### (Provision for Reinsurance for Certified Reinsurers)

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 54 Certified Reinsurer Rating (1 through 6) | 55 Effective Date of Certified Reinsurer Rating | 56 Percent Collateral Required for Full Credit (0% through 100%) | 57 Catastrophe Recoverables Qualifying for Collateral Deferral | 58 Net Recoverables Subject to Collateral Requirements for Full Credit (Col. 19 – Col. 57) | 59 Dollar Amount of Collateral Required (Col. 56 * Col. 58) | 60 Percent of Collateral Provided for Net Recoverables Subject to Collateral Requirements ([Col. 20+Col. 21+Col. 22+Col. 24]/Col. 58) | 61 Percent Credit Allowed on Net Recoverables Subject to Collateral Requirements (Col. 60 / Col. 56, not to exceed 100%) | 62 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts in Dispute (Col. 45 * 20%) | 63 Amount of Credit Allowed for Net Recoverables (Col. 57+[Col. 58 * Col. 61]) | 64 Provision for Reinsurance with Certified Reinsurers Due to Collateral Deficiency (Col. 19 – Col. 63) | 65 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts Not in Dispute (Col. 47 * 20%) | 66 Total Collateral Provided (Col. 20+Col. 21+Col.22+ Col. 24; not to Exceed Col. 63) | 67 Net Unsecured Recoverable for Which Credit is Allowed (Col. 63-Col. 66) | 68 20% of Amount in Col. 67 | 69 Provision for Overdue Reinsurance Ceded to Certified Reinsurers (Greater of [Col. 62 + Col. 65] or Col. 68; not to Exceed Col. 63) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unauthorized - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | |
| Unauthorized - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | |
| Unauthorized - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | |
| Unauthorized - Other non-U.S. Insurers | | | | | | | | | | | | | | | | | |
| AA-3190339 | RENAISSANCE REINS LTD. | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| AA-3771000 | UNITED INS CO. | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 2699999 - Total Unauthorized - Other Non-U.S. Insurers | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Unauthorized - Protected Cells | | | | | | | | | | | | | | | | | |
| 2899999 - Total Unauthorized Excluding Intercompany Pooling Protected Cells (Sum of 2299999, 2399999, 2499999, 2599999 and 2699999) | | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| Certified - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | |
| Certified - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | |
| Certified - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | |
| Certified - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | |
| Certified - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | |
| Certified - Protected Cells | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Other U.S. Unaffiliated Insurers | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Mandatory Pools | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Voluntary Pools | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Other Non-U.S. Insurers | | | | | | | | | | | | | | | | | |
| Reciprocal Jurisdiction - Protected Cells | | | | | | | | | | | | | | | | | |
| 9999999 Totals | | XXX | XXX | XXX | | | XXX | XXX | | | | | | | | | |

25.1

# SCHEDULE F - PART 3 (Continued)

Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
(Total Provision for Reinsurance)

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 70 — 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts Not in Dispute (Col. 47 * 20%) | 71 — Provision for Reinsurance with Unauthorized Reinsurers Due to Collateral Deficiency (Col. 26) | 72 — Provision for Overdue Reinsurance from Unauthorized Reinsurers and Amounts in Dispute (Col. 70 + 20% of the Amount in Col. 16) | 73 — Complete if Col. 52 = "Yes"; Otherwise Enter 0. 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts Not in Dispute + 20% of Amounts in Dispute ([Col. 47 * 20%] + [Col. 45 * 20%]) | 74 — Complete if Col. 52 = "No"; Otherwise Enter 0. Greater of 20% of Net Recoverable Net of Funds Held & Collateral, or 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due (Greater of Col. 26 * 20% or [Col. 40 + 41] * 20%) | 75 — Provision for Amounts Ceded to Authorized and Reciprocal Jurisdiction Reinsurers (Cols. 73 + 74) | 76 — Provision for Amounts Ceded to Unauthorized Reinsurers (Cols. 71 + 72 Not in Excess of Col. 15) | 77 — Provision for Amounts Ceded to Certified Reinsurers (Col. 64 + 69) | 78 — Total Provision for Reinsurance (Cols. 75 + 76 + 77) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Authorized - Affiliates - U.S. Intercompany Pooling** | | | | | | | | | | |
| 31-1191023.... | CONTINENTAL IND CO | | XXX | XXX | | | | XXX | XXX | |
| 58-1811419.... | ILLINOIS INS CO | | XXX | XXX | | | | XXX | XXX | |
| 23-1471444.... | PENNSYLVANIA INS CO | | XXX | XXX | | | | XXX | XXX | |
| 0199999 - Total Authorized - Affiliates - U.S. Intercompany Pooling | | | XXX | XXX | | | | XXX | XXX | |
| **Authorized - Affiliates - U.S. Non-Pool - Captive** | | | | | | | | | | |
| **Authorized - Affiliates - U.S. Non-Pool - Other** | | | | | | | | | | |
| 45-3353082.... | APPLIED UNDERWRITERS CAPTIVE RISK AS | | XXX | XXX | | | | XXX | XXX | |
| 0399999 - Total Authorized - Affiliates - U.S. Non-Pool - Other | | | XXX | XXX | | | | XXX | XXX | |
| 0499999 - Total Authorized - Affiliates - U.S. Non-Pool - Total | | | XXX | XXX | | | | XXX | XXX | |
| **Authorized - Affiliates - Other (Non-U.S.) - Captive** | | | | | | | | | | |
| **Authorized - Affiliates - Other (Non-U.S.) - Other** | | | | | | | | | | |
| 0899999 - Total Authorized - Affiliates - Total Authorized - Affiliates | | | XXX | XXX | | | | XXX | XXX | |
| **Authorized - Other U.S. Unaffiliated Insurers** | | | | | | | | | | |
| 06-0237820.... | ACE PROP & CAS INS CO | | XXX | XXX | | | | XXX | XXX | |
| 06-1430254.... | ARCH REINS CO | | XXX | XXX | | | | XXX | XXX | |
| 22-2005057.... | EVEREST REINS CO | | XXX | XXX | | | | XXX | XXX | |
| 13-4924125.... | MUNICH REINS AMER INC | | XXX | XXX | | | | XXX | XXX | |
| 47-0698507.... | ODYSSEY REINS CO | | XXX | XXX | | | | XXX | XXX | |
| 31-0542366.... | THE CINCINNATI INS CO | | XXX | XXX | | | | XXX | XXX | |
| 47-0355979.... | NATIONAL IND CO | | XXX | XXX | | | | XXX | XXX | |
| 13-2798872.... | CONSTITUTION INS CO | | XXX | XXX | | | | XXX | XXX | |
| 48-0921045.... | WESTPORT INS CORP | | XXX | XXX | | | | XXX | XXX | |
| 0999999 - Total Authorized - Other U.S. Unaffiliated Insurers | | | XXX | XXX | | | | XXX | XXX | |
| **Authorized - Pools - Mandatory Pools** | | | | | | | | | | |
| **Authorized - Pools - Voluntary Pools** | | | | | | | | | | |
| **Authorized - Other Non-U.S. Insurers** | | | | | | | | | | |
| AA-1127084.... | LLOYD'S SYNDICATE NUMBER 1084 | | XXX | XXX | | | | XXX | XXX | |
| AA-1120337.... | ASPEN INS UK LTD | | XXX | XXX | | | | XXX | XXX | |
| AA-1128001.... | LLOYD'S SYNDICATE NUMBER 2001 | | XXX | XXX | | | | XXX | XXX | |
| AA-1128609.... | LLOYD'S SYNDICATE NUMBER 609 | | XXX | XXX | | | | XXX | XXX | |
| AA-1128020.... | LLOYD'S SYNDICATE NUMBER 2020 | | XXX | XXX | | | | XXX | XXX | |
| AA-1128003.... | LLOYD'S SYNDICATE NUMBER 2003 | | XXX | XXX | | | | XXX | XXX | |
| 1299999 - Total Authorized - Other Non-U.S. Insurers | | | XXX | XXX | | | | XXX | XXX | |
| **Authorized - Protected Cells** | | | | | | | | | | |
| 1499999 - Total Authorized Excluding Protected Cells (Sum of 0899999, 0999999, 1099999, 1199999 and 1299999) | | | XXX | XXX | | | | XXX | XXX | |
| **Unauthorized - Affiliates - U.S. Intercompany Pooling** | | | | | | | | | | |
| 75-1906915.... | TEXAS INS CO | | | | XXX | XXX | XXX | | XXX | |
| 1599999 - Total Unauthorized - Affiliates - U.S. Intercompany Pooling | | | | | XXX | XXX | XXX | | XXX | |
| **Unauthorized - Affiliates - U.S. Non-Pool - Other** | | | | | | | | | | |
| **Unauthorized - Affiliates - Other (Non-U.S.) - Captive** | | | | | | | | | | |
| **Unauthorized - Affiliates - Other (Non-U.S.) - Other** | | | | | | | | | | |
| 2299999 - Total Unauthorized - Affiliates - Total Unauthorized - Affiliates | | | | | XXX | XXX | XXX | | XXX | |

26

# SCHEDULE F - PART 3 (Continued)

Ceded Reinsurance as of December 31, Current Year ($000 Omitted)
(Total Provision for Reinsurance)

| ID Number From Col. 1 | Name of Reinsurer From Col. 3 | 70 — 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts Not in Dispute (Col. 47 * 20%) | Provision for Unauthorized Reinsurance | | Provision for Overdue Authorized and Reciprocal Jurisdiction Reinsurance | | Total Provision for Reinsurance | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 71 — Provision for Reinsurance with Unauthorized Reinsurers Due to Collateral Deficiency (Col. 26) | 72 — Provision for Overdue Reinsurance from Unauthorized Reinsurers and Amounts in Dispute (Col. 70 + 20% of the Amount in Col. 16) | 73 — Complete if Col. 52 = "Yes"; Otherwise Enter 0  20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due Amounts in Dispute + 20% of Amounts in Dispute ([Col. 47 * 20%] + [Col. 45 * 20%]) | 74 — Complete if Col. 52 = "No"; Otherwise Enter 0  Greater of 20% of Net Recoverable Net of Funds Held & Collateral, or 20% of Recoverable on Paid Losses & LAE Over 90 Days Past Due (Greater of Col. 26 * 20% or [Col. 40 + 41] * 20%) | 75 — Provision for Amounts Ceded to Authorized and Reciprocal Jurisdiction Reinsurers (Cols. 73 + 74) | 76 — Provision for Amounts Ceded to Unauthorized Reinsurers (Cols. 71 + 72 Not in Excess of Col. 15) | 77 — Provision for Amounts Ceded to Certified Reinsurers (Col. 64 + 69) | 78 — Total Provision for Reinsurance (Cols. 75 + 76 + 77) |
| Unauthorized - Other U.S. Unaffiliated Insurers | | | | | | | | | | |
| Unauthorized - Pools - Mandatory Pools | | | | | | | | | | |
| Unauthorized - Pools - Voluntary Pools | | | | | | | | | | |
| Unauthorized - Other non-U.S. Insurers | | | | | | | | | | |
| AA-3190339 | RENAISSANCE REINS LTD | | | | XXX | XXX | XXX | | XXX | |
| AA-3771000 | UNITED INS CO | | | | XXX | XXX | XXX | | XXX | |
| 2699999 - Total Unauthorized - Other Non-U.S. Insurers | | | | | XXX | XXX | XXX | | XXX | |
| Unauthorized - Protected Cells | | | | | | | | | | |
| 2899999 - Total Unauthorized Excluding Protected Cells (Sum of 2299999, 2399999, 2499999, 2599999 and 2699999) | | | | | XXX | XXX | XXX | | XXX | |
| Certified - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | |
| Certified - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | |
| Certified - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | |
| Certified - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | |
| Certified - Other U.S. Unaffiliated Insurers | | | | | | | | | | |
| Certified - Pools - Mandatory Pools | | | | | | | | | | |
| Certified - Pools - Voluntary Pools | | | | | | | | | | |
| Certified - Other Non-U.S. Insurers | | | | | | | | | | |
| Certified - Protected Cells | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Intercompany Pooling | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Captive | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - U.S. Non-Pool - Other | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Captive | | | | | | | | | | |
| Reciprocal Jurisdiction - Affiliates - Other (Non-U.S.) - Other | | | | | | | | | | |
| Reciprocal Jurisdiction - Other U.S. Unaffiliated Insurers | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Mandatory Pools | | | | | | | | | | |
| Reciprocal Jurisdiction - Pools - Voluntary Pools | | | | | | | | | | |
| Reciprocal Jurisdiction - Other Non-U.S. Insurers | | | | | | | | | | |
| Reciprocal Jurisdiction - Protected Cells | | | | | | | | | | |
| 5799999 - Total Authorized, Unauthorized, Reciprocal Jurisdiction and Certified Excluding Protected Cells (Sum of 1499999, 2899999, 4299999 and 5699999) | | | | | | | | | | |
| 9999999 Totals | | | | | | | | | | |

26.1

Exhibit 5, Page 55 of 152

# SCHEDULE F - PART 4

**Issuing or Confirming Banks for Letters of Credit from Schedule F, Part 3 ($000 Omitted)**

| Issuing or Confirming Bank Reference Number | Letters of Credit Code | American Bankers Association (ABA) Routing Number | Issuing or Confirming Bank Name | Letters of Credit Amount |
|---|---|---|---|---|
| ...001 | ...1 | 073000228 | Wells Fargo | 230 |
| | | | | |
| Total | | | | 230 |

27

# SCHEDULE F - PART 5
### Interrogatories for Schedule F, Part 3 (000 Omitted)

A. Report the five largest provisional commission rates included in the cedant's reinsurance treaties.  The commission rate to be reported is by contract with ceded premium in excess of $50,000:

| | 1<br>Name of Reinsurer | 2<br>Commission Rate | 3<br>Ceded Premium |
|---|---|---|---|
| 1. | United Insurance Company | 41.000 | 16,292 |
| 2. | Munich Reinsurance America Inc | 37.000 | 4,294 |
| 3. | Arch Reinsurance Co | 37.000 | 2,239 |
| 4. | Everest Reinsurance Company | 37.000 | 1,411 |
| 5. | Odyssey American Reinsurance Corporation | 37.000 | 705 |

B. Report the five largest reinsurance recoverables reported in Schedule F, Part 3.Column 15, due from any one reinsurer (based on the total recoverables), Schedule F, Part 3, Line 9999999, Column 15, the amount of ceded premium, and indicate whether the recoverables are due from an affiliated insurer.

| | 1<br>Name of Reinsurer | 2<br>Total Recoverables | 3<br>Ceded Premiums | 4<br>Affiliated |
|---|---|---|---|---|
| 6. | California Insurance Company | 333,880 | 472,592 | Yes [ X ] No [ ] |
| 7. | Applied Underwriters Captive Risk Assurance Co | 1,111 | | Yes [ X ] No [ ] |
| 8. | Westport Insurance Corporation | 550 | | Yes [ ] No [ X ] |
| 9. | Renaissance RE Ltd | 22 | | Yes [ ] No [ X ] |
| 10. | Lloyd's Syndicate 2020 | 16 | | Yes [ ] No [ X ] |

NOTE:  Disclosure of the five largest provisional commission rates should exclude mandatory pools and joint underwriting associations.

28

# SCHEDULE F - PART 6

Restatement of Balance Sheet to Identify Net Credit for Reinsurance

| | 1<br>As Reported<br>(Net of Ceded) | 2<br>Restatement<br>Adjustments | 3<br>Restated<br>(Gross of Ceded) |
|---|---|---|---|
| ASSETS (Page 2, Col. 3) | | | |
| 1. Cash and invested assets (Line 12) | 1,019,322,004 | | 1,019,322,004 |
| 2. Premiums and considerations (Line 15) | 47,506,707 | | 47,506,707 |
| 3. Reinsurance recoverable on loss and loss adjustment expense payments (Line 16.1) | 7,714,836 | (7,714,836) | |
| 4 Funds held by or deposited with reinsured companies (Line 16.2) | | | |
| 5. Other assets | 31,134,822 | | 31,134,822 |
| 6. Net amount recoverable from reinsurers | | 324,925,729 | 324,925,729 |
| 7. Protected cell assets (Line 27) | | | |
| 8. Totals (Line 28) | 1,105,678,369 | 317,210,893 | 1,422,889,262 |
| LIABILITIES (Page 3) | | | |
| 9. Losses and loss adjustment expenses (Lines 1 through 3) | 426,733,877 | 326,449,131 | 753,183,008 |
| 10. Taxes, expenses, and other obligations (Lines 4 through 8) | 31,550,553 | | 31,550,553 |
| 11. Unearned premiums (Line 9) | 39,105,732 | 1,427,689 | 40,533,421 |
| 12. Advance premiums (Line 10) | | | |
| 13. Dividends declared and unpaid (Line 11.1 and 11.2) | | | |
| 14. Ceded reinsurance premiums payable (net of ceding commissions) (Line 12) | 10,665,927 | (10,665,927) | |
| 15. Funds held by company under reinsurance treaties (Line 13) | | | |
| 16. Amounts withheld or retained by company for account of others (Line 14) | | | |
| 17. Provision for reinsurance (Line 16) | | | |
| 18. Other liabilities | 3,953,756 | | 3,953,756 |
| 19. Total liabilities excluding protected cell business (Line 26) | 512,009,845 | 317,210,893 | 829,220,738 |
| 20. Protected cell liabilities (Line 27) | | | |
| 21. Surplus as regards policyholders (Line 37) | 593,668,524 | x x x | 593,668,524 |
| 22. Totals (Line 38) | 1,105,678,369 | 317,210,893 | 1,422,889,262 |

NOTE: Is the restatement of this exhibit the result of grossing up balances ceded to affiliates under 100 percent reinsurance or pooling arrangements? Yes [ X ] No [ ]

If yes, give full explanation:
See Note 26 in the Notes to the Financial Statements in regards to the Company's Intercompany Pooling Agreement

ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company

Schedule H - Part 1
# NONE

Schedule H - Part 2
# NONE

Schedule H - Part 3
# NONE

Schedule H - Part 4
# NONE

Schedule H - Part 5 - Health Claims
# NONE

# SCHEDULE P - ANALYSIS OF LOSSES AND LOSS EXPENSES
## SCHEDULE P - PART 1 - SUMMARY

**($000 Omitted)**

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | 12 Number of Claims Reported Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 + 9) | |
| 1. Prior | XXX | XXX | XXX | 1,202 | .3 | 180 | .61 | 119 | .69 | 5 | 1,368 | XXX |
| 2. 2011 | 159,417 | 56,600 | 102,817 | 69,520 | 55,467 | 7,823 | 5,025 | 6,409 | | 2,780 | 23,261 | XXX |
| 3. 2012 | 220,517 | 101,867 | 118,650 | 89,216 | 75,967 | 10,375 | 7,035 | 7,026 | | 3,733 | 23,615 | XXX |
| 4. 2013 | 345,872 | 164,241 | 181,631 | 145,598 | 103,478 | 16,506 | 11,789 | 9,425 | | 4,411 | 56,261 | XXX |
| 5. 2014 | 488,908 | 264,465 | 224,443 | 210,257 | 167,407 | 24,641 | 19,496 | 12,916 | | 7,075 | 60,911 | XXX |
| 6. 2015 | 533,062 | 266,830 | 266,232 | 208,659 | 168,034 | 26,228 | 20,709 | 16,111 | | 6,387 | 62,255 | XXX |
| 7. 2016 | 483,585 | 227,972 | 255,613 | 171,919 | 135,862 | 23,612 | 18,378 | 17,599 | | 3,781 | 58,889 | XXX |
| 8. 2017 | 409,084 | 100,750 | 308,334 | 129,769 | 58,656 | 18,554 | 8,461 | 18,721 | | 2,578 | 99,927 | XXX |
| 9. 2018 | 313,481 | 41,320 | 272,161 | 96,500 | 31,725 | 14,155 | 4,901 | 19,491 | .81 | 1,234 | 93,439 | XXX |
| 10. 2019 | 250,207 | 24,931 | 225,276 | 63,518 | 10,826 | 8,937 | 1,488 | 17,296 | .173 | 199 | 72,263 | XXX |
| 11. 2020 | 201,993 | 39,962 | 162,031 | 20,741 | 4,598 | 2,595 | 788 | 8,965 | | 19 | 26,916 | XXX |
| 12. Totals | XXX | XXX | XXX | 1,206,900 | 812,023 | 153,604 | 98,131 | 134,077 | 322 | 32,203 | 584,105 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 Number of Claims Outstanding Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | | | |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | |
| 1. | 7,186 | 2,207 | 6,039 | 1,777 | 259 | 111 | 1,105 | 851 | 265 | 21 | 8 | 9,887 | XXX |
| 2. | 2,275 | 173 | 2,635 | 950 | 89 | 25 | 534 | 636 | 81 | | 17 | 3,830 | XXX |
| 3. | 2,526 | 778 | 5,482 | 1,948 | 126 | 43 | 824 | 1,062 | 102 | | 35 | 5,228 | XXX |
| 4. | 7,462 | 3,989 | 10,668 | 5,102 | 355 | 229 | 2,189 | 2,063 | 231 | | 116 | 9,523 | XXX |
| 5. | 10,743 | 7,288 | 19,615 | 10,303 | 654 | 557 | 3,973 | 2,818 | 577 | | 687 | 14,598 | XXX |
| 6. | 17,832 | 6,677 | 26,405 | 13,548 | 1,112 | 439 | 5,324 | 3,748 | 1,005 | | 1,444 | 27,265 | XXX |
| 7. | 22,001 | 7,748 | 33,857 | 13,720 | 1,165 | 439 | 6,170 | 4,088 | 1,288 | | 1,901 | 38,487 | XXX |
| 8. | 23,559 | 4,714 | 36,114 | 9,104 | 1,705 | 458 | 7,202 | 2,699 | 1,580 | | 2,990 | 53,186 | XXX |
| 9. | 27,394 | 5,017 | 40,556 | 8,362 | 2,517 | 610 | 7,879 | 1,966 | 2,462 | | 3,674 | 64,852 | XXX |
| 10. | 38,614 | 3,406 | 57,211 | 6,671 | 3,427 | 400 | 9,632 | 1,350 | 3,340 | | 2,272 | 100,398 | XXX |
| 11. | 27,587 | 6,210 | 67,621 | 14,293 | 3,518 | 990 | 11,218 | 3,095 | 6,535 | 1 | 2,440 | 91,890 | XXX |
| 12. | 187,181 | 48,206 | 306,202 | 85,777 | 14,925 | 4,302 | 56,049 | 24,375 | 17,467 | 21 | 15,584 | 419,143 | XXX |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 9,241 | 646 |
| 2. | 89,365 | 62,274 | 27,091 | 56.1 | 110.0 | 26.3 | | | | 3,787 | 43 |
| 3. | 115,676 | 86,833 | 28,843 | 52.5 | 85.2 | 24.3 | | | | 5,282 | (54) |
| 4. | 192,433 | 126,649 | 65,784 | 55.6 | 77.1 | 36.2 | | | | 9,039 | 484 |
| 5. | 283,377 | 207,869 | 75,508 | 58.0 | 78.6 | 33.6 | | | | 12,767 | 1,831 |
| 6. | 302,675 | 213,155 | 89,520 | 56.8 | 79.9 | 33.6 | | | | 24,012 | 3,253 |
| 7. | 277,611 | 180,235 | 97,376 | 57.4 | 79.1 | 38.1 | | | | 34,391 | 4,095 |
| 8. | 237,204 | 84,092 | 153,112 | 58.0 | 83.5 | 49.7 | | | | 45,856 | 7,330 |
| 9. | 210,953 | 52,662 | 158,291 | 67.3 | 127.4 | 58.2 | | | | 54,572 | 10,280 |
| 10. | 201,975 | 24,314 | 177,661 | 80.7 | 97.5 | 78.9 | | | | 85,748 | 14,650 |
| 11. | 148,779 | 29,974 | 118,805 | 73.7 | 75.0 | 73.3 | | | | 74,704 | 17,186 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 359,399 | 59,743 |

Note: Parts 2 and 4 are gross of all discounting, including tabular discounting. Part 1 is gross of only nontabular discounting, which is reported in Columns 32 and 33 of Part 1. The tabular discount, if any, is reported in the Notes to Financial Statements, which will reconcile Part 1 with Parts 2 and 4.

33

## SCHEDULE P - PART 2 - SUMMARY

| Years in Which Losses Were Incurred | INCURRED NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | DEVELOPMENT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 One Year | 12 Two Year |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | | |
| 1. Prior | 62,289 | 57,456 | 56,540 | 47,912 | 46,020 | 44,247 | 42,517 | 41,704 | 41,979 | 42,100 | 121 | 396 |
| 2. 2011 | 34,129 | 22,666 | 23,484 | 22,339 | 22,758 | 21,596 | 20,939 | 21,696 | 21,152 | 20,601 | (551) | (1,095) |
| 3. 2012 | XXX | 23,653 | 24,246 | 27,094 | 26,264 | 24,899 | 24,066 | 23,435 | 22,862 | 21,715 | (1,147) | (1,720) |
| 4. 2013 | XXX | XXX | 52,812 | 52,750 | 51,056 | 54,891 | 55,118 | 55,954 | 57,237 | 56,128 | (1,109) | 174 |
| 5. 2014 | XXX | XXX | XXX | 59,978 | 49,145 | 60,499 | 60,000 | 60,679 | 61,254 | 62,015 | 761 | 1,337 |
| 6. 2015 | XXX | XXX | XXX | XXX | 65,175 | 68,162 | 69,687 | 72,189 | 71,805 | 72,404 | 599 | 215 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 82,111 | 80,586 | 75,259 | 75,381 | 78,489 | 3,108 | 3,230 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 140,467 | 142,848 | 136,349 | 132,811 | (3,537) | (10,037) |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 148,018 | 140,060 | 136,419 | (3,641) | (11,599) |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 143,362 | 157,198 | 13,836 | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 103,305 | XXX | XXX |
| 12. Totals | | | | | | | | | | | 8,440 | (19,100) |

## SCHEDULE P - PART 3 - SUMMARY

| Years in Which Losses Were Incurred | CUMULATIVE PAID NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Number of Claims Closed With Loss Payment | 12 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | | |
| 1. Prior | 000 | 2,885 | 15,276 | 19,325 | 23,443 | 26,353 | 28,074 | 29,345 | 31,140 | 32,457 | XXX | XXX |
| 2. 2011 | 3,544 | 1,110 | 7,822 | 9,038 | 11,723 | 13,209 | 14,216 | 15,069 | 16,309 | 16,853 | XXX | XXX |
| 3. 2012 | XXX | (10,369) | 1,237 | 5,606 | 9,701 | 12,851 | 14,827 | 15,566 | 16,013 | 16,589 | XXX | XXX |
| 4. 2013 | XXX | XXX | 11,483 | 21,207 | 28,209 | 37,421 | 41,166 | 43,121 | 45,134 | 46,836 | XXX | XXX |
| 5. 2014 | XXX | XXX | XXX | 5,789 | 15,740 | 28,523 | 36,982 | 41,188 | 46,162 | 47,995 | XXX | XXX |
| 6. 2015 | XXX | XXX | XXX | XXX | 4,901 | 12,801 | 28,313 | 36,040 | 41,077 | 46,144 | XXX | XXX |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 2,985 | 17,033 | 29,514 | 35,955 | 41,291 | XXX | XXX |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 19,068 | 54,383 | 71,374 | 81,206 | XXX | XXX |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 22,296 | 56,449 | 74,029 | XXX | XXX |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 23,860 | 60,140 | XXX | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 17,950 | XXX | XXX |

## SCHEDULE P - PART 4 - SUMMARY

| Years in Which Losses Were Incurred | BULK AND IBNR RESERVES ON NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | 40,347 | 32,023 | 24,145 | 16,845 | 12,707 | 9,990 | 6,860 | 5,708 | 4,895 | 4,516 |
| 2. 2011 | 21,302 | 13,645 | 9,182 | 7,233 | 5,700 | 4,248 | 3,544 | 2,946 | 2,166 | 1,583 |
| 3. 2012 | XXX | 25,632 | 14,484 | 13,384 | 9,510 | 6,680 | 5,015 | 4,604 | 3,890 | 3,295 |
| 4. 2013 | XXX | XXX | 34,125 | 23,045 | 16,094 | 11,914 | 8,989 | 7,823 | 7,430 | 5,263 |
| 5. 2014 | XXX | XXX | XXX | 43,451 | 24,100 | 19,811 | 14,351 | 12,702 | 10,987 | 10,467 |
| 6. 2015 | XXX | XXX | XXX | XXX | 48,863 | 36,427 | 23,691 | 20,034 | 17,588 | 14,432 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 64,938 | 43,472 | 30,082 | 25,275 | 22,220 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 93,492 | 63,750 | 41,561 | 31,513 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 96,046 | 57,550 | 38,106 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 84,973 | 58,823 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 61,451 |

# SCHEDULE P - PART 1A - HOMEOWNERS/FARMOWNERS
($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | | | | | | | | | | | | |
| 4. 2013 | | | | | | | | | | | | |
| 5. 2014 | | | | | | | | | | | | |
| 6. 2015 | | | | | | | | | | | | |
| 7. 2016 | | | | | | | | | | | | |
| 8. 2017 | | | | | | | | | | | | |
| 9. 2018 | | | | | | | | | | | | |
| 10. 2019 | | | | | | | | | | | | |
| 11. 2020 | 3.319 | | 3.319 | 208 | | 6 | | | | | 213 | 179 |
| 12. Totals | XXX | XXX | XXX | 208 | | 6 | | | | | 213 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | |
| 9. | | | | | | | | | | | | | |
| 10. | | | | | | | | | | | | | |
| 11. | 338 | | 726 | | 13 | | 75 | | | | | 1,152 | 109 |
| 12. | 338 | | 726 | | 13 | | 75 | | | | | 1,152 | 109 |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | | | | | | | | | | | |
| 9. | | | | | | | | | | | |
| 10. | | | | | | | | | | | |
| 11. | 1,365 | | 1,365 | 41.1 | | 41.1 | | | | 1,064 | 88 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 1,064 | 88 |

# SCHEDULE P - PART 1B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL
### ($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | Number of Claims Reported Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | 12 |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | Number of Claims Reported Direct and Assumed |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | | | | | | | | | | | | |
| 4. 2013 | | | | | | | | | | | | |
| 5. 2014 | | | | | | | | | | | | |
| 6. 2015 | | | | | | | | | | | | |
| 7. 2016 | | | | | | | | | | | | |
| 8. 2017 | | | | | | | | | | | | |
| 9. 2018 | | | | 140 | | | | | | | 140 | |
| 10. 2019 | | | | 54 | | | | | | | 54 | |
| 11. 2020 | 4,644 | 1,201 | 3,443 | 583 | | | | | | | 583 | |
| 12. Totals | XXX | XXX | XXX | 777 | | 1 | | | | | 778 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | |
| 9. | 25 | | 53 | | 1 | | 8 | | | | | 87 | |
| 10. | 278 | | 214 | | 14 | | 33 | | | | | 539 | |
| 11. | 668 | 157 | 1,733 | 814 | 20 | | 202 | 63 | 48 | | | 1,639 | |
| 12. | 971 | 157 | 2,001 | 814 | 35 | | 242 | 63 | 48 | | | 2,264 | |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | | | | | | | | | | | |
| 9. | 227 | | 227 | | | | | | | 78 | 8 |
| 10. | 593 | | 593 | | | | | | | 492 | 47 |
| 11. | 3,255 | 1,033 | 2,222 | 70.1 | 86.0 | 64.5 | | | | 1,431 | 208 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 2,001 | 263 |

Exhibit 5, Page 63 of 152

# SCHEDULE P - PART 1C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL
### ($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | 8 | 8 | 30 | 30 | | | XXX |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | | | | | | | | | | | | |
| 4. 2013 | | | | | | | | | | | | |
| 5. 2014 | | | | | | | | | | | | |
| 6. 2015 | | | | | | | | | | | | |
| 7. 2016 | | | | | | | | | | | | |
| 8. 2017 | | | | 106 | | 53 | | | | | 159 | |
| 9. 2018 | 9,314 | | 9,314 | 2,966 | 378 | 445 | 53 | 1,446 | 81 | | 4,345 | 238 |
| 10. 2019 | 40,495 | 5,935 | 34,560 | 8,196 | 844 | 1,187 | 134 | 1,323 | 173 | | 9,554 | 942 |
| 11. 2020 | 36,286 | 400 | 35,887 | 2,066 | 77 | 264 | 5 | 138 | | | 2,386 | 509 |
| 12. Totals | XXX | XXX | XXX | 13,333 | 1,299 | 1,956 | 200 | 2,936 | 283 | | 16,444 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | 2 |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | |
| 8. | 69 | | 322 | | 17 | | 49 | | | | | 457 | |
| 9. | 2,063 | 240 | 282 | (121) | 249 | 28 | 76 | (14) | 12 | | | 2,549 | 22 |
| 10. | 10,507 | 1,141 | 11,129 | 1,156 | 879 | 97 | 1,250 | 132 | 84 | | | 21,322 | 147 |
| 11. | 6,109 | 82 | 10,539 | 32 | 413 | 4 | 1,113 | 5 | 153 | | | 18,203 | 268 |
| 12. | 18,748 | 1,464 | 22,271 | 1,066 | 1,557 | 129 | 2,488 | 123 | 249 | | | 42,532 | 439 |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | 616 | | 616 | | | | | | | 391 | 66 |
| 9. | 7,539 | 645 | 6,894 | 81.0 | | 74.0 | | | | 2,226 | 323 |
| 10. | 34,552 | 3,676 | 30,876 | 85.3 | 61.9 | 89.3 | | | | 19,338 | 1,984 |
| 11. | 20,795 | 205 | 20,589 | 57.3 | 51.4 | 57.4 | | | | 16,534 | 1,669 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 38,489 | 4,043 |

37

# SCHEDULE P - PART 1D - WORKERS' COMPENSATION
# (EXCLUDING EXCESS WORKERS' COMPENSATION)
### ($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | 1,202 | 3 | 166 | 47 | 50 | | 5 | 1,368 | XXX |
| 2. 2011 | 154,688 | 56,600 | 98,088 | 69,372 | 55,467 | 7,823 | 5,023 | 6,403 | | 2,780 | 23,108 | 3,976 |
| 3. 2012 | 215,763 | 101,867 | 113,896 | 88,988 | 75,967 | 10,375 | 7,035 | 7,010 | | 3,733 | 23,370 | 5,265 |
| 4. 2013 | 340,179 | 164,241 | 175,938 | 145,374 | 103,478 | 16,506 | 11,789 | 9,408 | | 4,411 | 56,020 | 8,937 |
| 5. 2014 | 482,114 | 264,465 | 217,649 | 209,847 | 167,407 | 24,641 | 19,496 | 12,894 | | 7,075 | 60,478 | 12,237 |
| 6. 2015 | 525,945 | 266,830 | 259,114 | 208,405 | 168,034 | 26,228 | 20,709 | 16,100 | | 6,387 | 61,990 | 12,894 |
| 7. 2016 | 476,193 | 227,972 | 248,221 | 171,695 | 135,862 | 23,612 | 18,378 | 18,378 | | 3,781 | 58,655 | 10,777 |
| 8. 2017 | 401,934 | 100,750 | 301,184 | 129,435 | 58,656 | 18,500 | 8,461 | 18,704 | | 2,578 | 99,522 | 8,677 |
| 9. 2018 | 297,521 | 41,320 | 256,201 | 93,302 | 31,347 | 13,700 | 4,848 | 18,038 | | 1,234 | 88,845 | 6,068 |
| 10. 2019 | 204,038 | 18,994 | 185,043 | 52,638 | 9,982 | 7,729 | 1,354 | 15,966 | | 199 | 67,186 | 4,099 |
| 11. 2020 | 145,080 | 38,610 | 106,470 | 13,447 | 4,521 | 2,312 | 782 | 8,803 | | 19 | 19,259 | 2,639 |
| 12. Totals | XXX | XXX | XXX | 1,185,895 | 810,724 | 151,590 | 97,925 | 130,965 | | 32,203 | 559,800 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | 6,676 | 1,697 | 6,039 | 1,777 | 240 | 92 | 1,105 | 851 | 244 | | 8 | 9,887 | 22 |
| 2. | 2,275 | 173 | 2,635 | 950 | 89 | 25 | 534 | 636 | 81 | | 17 | 3,830 | 8 |
| 3. | 2,526 | 778 | 5,482 | 1,948 | 126 | 43 | 824 | 1,062 | 102 | | 35 | 5,228 | 11 |
| 4. | 7,462 | 3,989 | 10,668 | 5,102 | 355 | 229 | 2,189 | 2,063 | 231 | | 116 | 9,523 | 24 |
| 5. | 10,743 | 7,288 | 19,615 | 10,303 | 654 | 557 | 3,973 | 2,818 | 577 | | 687 | 14,598 | 60 |
| 6. | 17,826 | 6,677 | 26,394 | 13,548 | 1,112 | 439 | 5,324 | 3,748 | 998 | | 1,444 | 27,243 | 103 |
| 7. | 21,998 | 7,748 | 33,736 | 13,720 | 1,165 | 439 | 6,170 | 4,088 | 1,270 | | 1,901 | 38,344 | 131 |
| 8. | 23,486 | 4,714 | 35,545 | 9,104 | 1,688 | 458 | 7,152 | 2,699 | 1,555 | | 2,990 | 52,452 | 160 |
| 9. | 25,186 | 4,776 | 39,684 | 8,483 | 2,267 | 582 | 7,792 | 1,980 | 2,391 | | 3,674 | 61,498 | 246 |
| 10. | 22,945 | 2,265 | 44,719 | 5,514 | 2,532 | 304 | 8,294 | 1,218 | 3,165 | | 2,272 | 72,354 | 326 |
| 11. | 19,953 | 5,965 | 44,673 | 13,410 | 3,061 | 986 | 9,595 | 3,024 | 6,167 | | 2,440 | 60,063 | 636 |
| 12. | 161,077 | 46,069 | 269,190 | 83,858 | 13,287 | 4,154 | 52,951 | 24,186 | 16,783 | | 15,584 | 355,019 | 1,727 |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 9,241 | 646 |
| 2. | 89,211 | 62,274 | 26,937 | 57.7 | 110.0 | 27.5 | | | | 3,787 | 43 |
| 3. | 115,431 | 86,833 | 28,597 | 53.5 | 85.2 | 25.1 | | | | 5,282 | (54) |
| 4. | 192,192 | 126,649 | 65,543 | 56.5 | 77.1 | 37.3 | | | | 9,039 | 484 |
| 5. | 282,945 | 207,869 | 75,076 | 58.7 | 78.6 | 34.5 | | | | 12,767 | 1,831 |
| 6. | 302,387 | 213,155 | 89,232 | 57.5 | 79.9 | 34.4 | | | | 23,996 | 3,246 |
| 7. | 277,234 | 180,235 | 96,999 | 58.2 | 79.1 | 39.1 | | | | 34,267 | 4,077 |
| 8. | 236,065 | 84,092 | 151,973 | 58.7 | 83.5 | 50.5 | | | | 45,213 | 7,239 |
| 9. | 202,360 | 52,017 | 150,343 | 68.0 | 125.9 | 58.7 | | | | 51,611 | 9,887 |
| 10. | 160,178 | 20,637 | 139,541 | 78.5 | 108.6 | 75.4 | | | | 59,886 | 12,469 |
| 11. | 108,011 | 28,688 | 79,322 | 74.4 | 74.3 | 74.5 | | | | 45,250 | 14,813 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 300,338 | 54,681 |

38

# SCHEDULE P - PART 1E - COMMERCIAL MULTIPLE PERIL

**($000 OMITTED)**

| Years in Which Premiums Were Earned and Losses Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | 6 | 6 | 39 | 39 | | | XXX |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | | | | | | | | | | | | |
| 4. 2013 | | | | | | | | | | | | |
| 5. 2014 | | | | | | | | | | | | |
| 6. 2015 | | | | | | | | | | | | |
| 7. 2016 | | | | | | | | | | | | |
| 8. 2017 | | | | 2 | | 1 | | | | | | 3 |
| 9. 2018 | | | | 17 | | 4 | | | | | | 21 |
| 10. 2019 | | | | 99 | | 18 | | | | | | 117 |
| 11. 2020 | 1,972 | | 1,972 | 49 | | 5 | | 15 | | | 68 | 2 |
| 12. Totals | XXX | XXX | XXX | 167 | | 33 | 6 | 54 | 39 | | 209 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | 510 | 510 | | | 19 | 19 | | | 21 | 21 | | | 3 |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | |
| 9. | 3 | | 3 | | | | 1 | | | | | 7 | |
| 10. | 76 | | 47 | | 3 | | 12 | | | | | 137 | |
| 11. | 159 | | 404 | | 5 | | 72 | | 17 | | | 656 | 2 |
| 12. | 748 | 510 | 454 | | 27 | 19 | 85 | | 37 | 21 | | 801 | 5 |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | 3 | | 3 | | | | | | | | |
| 9. | 28 | | 28 | | | | | | | 6 | 1 |
| 10. | 254 | | 254 | | | | | | | 122 | 14 |
| 11. | 725 | | 725 | 36.7 | | 36.7 | | | | 563 | 93 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 692 | 109 |

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

Schedule P - Part 1F - Med Pro Liab Occ
# NONE

Schedule P - Part 1F - Med Pro Liab Clm
# NONE

Schedule P - Part 1G - Special Liability
# NONE

# SCHEDULE P - PART 1H - SECTION 1 - OTHER LIABILITY - OCCURRENCE

($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | Number of Claims Reported Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | 12 |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | 4 | 5 | 6 | 7 | 8 | 9 | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| | | | | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | | | | | | | | | | | | |
| 4. 2013 | | | | | | | | | | | | |
| 5. 2014 | | | | | | | | | | | | |
| 6. 2015 | | | | | | | | | | | | |
| 7. 2016 | | | | | | | | | | | | |
| 8. 2017 | | | | | | | | | | | | |
| 9. 2018 | 4 | | 4 | | | | | | | | | |
| 10. 2019 | 26 | 2 | 23 | 2 | | 1 | | | | | 3 | |
| 11. 2020 | 1,016 | | 1,016 | 6 | | 1 | | | | | 7 | |
| 12. Totals | XXX | XXX | XXX | 8 | | 2 | | | | | 10 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | |
| 9. | | | 2 | | | | | | | | | 2 | |
| 10. | 19 | | 123 | 1 | | | 29 | | | | | 170 | |
| 11. | 36 | | 369 | | | | 83 | | | | | 489 | |
| 12. | 55 | | 494 | 1 | | | 113 | | | | | 661 | |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | | | | | | | | | | | |
| 9. | 2 | | 2 | 64.1 | | 55.2 | | | | 2 | |
| 10. | 174 | 1 | 173 | 682.1 | 54.0 | 741.4 | | | | 141 | 29 |
| 11. | 496 | | 496 | 48.8 | | 48.8 | | | | 405 | 84 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 548 | 113 |

Exhibit 5, Page 68 of 152

# SCHEDULE P - PART 1H - SECTION 2 - OTHER LIABILITY - CLAIMS-MADE

($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2011 | 1,489 | | 1,489 | 147 | | | | 5 | | | 152 | 6 |
| 3. 2012 | 1,768 | | 1,768 | 229 | | | | 16 | | | 245 | 6 |
| 4. 2013 | 2,145 | | 2,145 | 224 | | | | 17 | | | 241 | 8 |
| 5. 2014 | 2,619 | | 2,619 | 410 | | | | 22 | | | 432 | 11 |
| 6. 2015 | 2,880 | | 2,880 | 254 | | | | 11 | | | 265 | 8 |
| 7. 2016 | 3,039 | | 3,039 | 224 | | | | 10 | | | 234 | 8 |
| 8. 2017 | 3,003 | | 3,003 | 227 | | | | 17 | | | 244 | 8 |
| 9. 2018 | 2,862 | | 2,862 | 82 | | | | 7 | | | 89 | 5 |
| 10. 2019 | 2,490 | | 2,490 | 108 | | | | 7 | | | 116 | 5 |
| 11. 2020 | 2,462 | | 2,462 | 43 | | 1 | | 9 | | | 52 | 6 |
| 12. Totals | XXX | XXX | XXX | 1,948 | | 1 | | 122 | | | 2,070 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | 6 | | 10 | | | | | | 7 | | | 23 | 1 |
| 7. | 3 | | 31 | | | | | | 13 | | | 47 | 1 |
| 8. | 5 | | 25 | | | | | | 13 | | | 43 | 1 |
| 9. | 82 | | 36 | | | | | | 34 | | | 151 | 4 |
| 10. | 57 | | 139 | | | | 14 | | 47 | | | 256 | 5 |
| 11. | 145 | | 444 | | | | 32 | | 60 | | | 681 | 6 |
| 12. | 298 | | 684 | | | | 45 | | 174 | | | 1,201 | 18 |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | 152 | | 152 | 10.2 | | 10.2 | | | | | |
| 3. | 245 | | 245 | 13.9 | | 13.9 | | | | | |
| 4. | 241 | | 241 | 11.2 | | 11.2 | | | | | |
| 5. | 432 | | 432 | 16.5 | | 16.5 | | | | | |
| 6. | 288 | | 288 | 10.0 | | 10.0 | | | | 16 | 7 |
| 7. | 281 | | 281 | 9.3 | | 9.3 | | | | 34 | 13 |
| 8. | 287 | | 287 | 9.5 | | 9.5 | | | | 30 | 13 |
| 9. | 240 | | 240 | 8.4 | | 8.4 | | | | 117 | 34 |
| 10. | 372 | | 372 | 14.9 | | 14.9 | | | | 195 | 61 |
| 11. | 733 | | 733 | 29.8 | | 29.8 | | | | 589 | 92 |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 982 | 219 |

Exhibit 5, Page 69 of 152

# SCHEDULE P-PART 1I - SPECIAL PROPERTY (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, BURGLARY AND THEFT)

### ($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | | | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2019 | | | | | | | | | | | | XXX |
| 3. 2020 | 680 | | 680 | 43 | | 1 | | | | | 44 | XXX |
| 4. Totals | XXX | XXX | XXX | 43 | | 1 | | | | | 44 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | | | |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | | | | | | | | | | | |
| 3. | 70 | | 148 | | 3 | | 15 | | | | | 235 | 9 |
| 4. | 70 | | 148 | | 3 | | 15 | | | | | 235 | 9 |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | 279 | | 279 | 41.0 | | 41.0 | | | | 217 | 18 |
| 4. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 217 | 18 |

# SCHEDULE P - PART 1J - AUTO PHYSICAL DAMAGE
### ($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | Number of Claims Reported Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | 12 |
| | | | Net (Cols. 1 - 2) | 4 | 5 | 6 | 7 | 8 | 9 | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| | Direct and Assumed | Ceded | | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | (7) | | 5 | | | | | (2) | XXX |
| 2. 2019 | | | | 54 | | 2 | | | | | 55 | |
| 3. 2020 | 1,291 | (268) | 1,560 | 551 | | 6 | | | | | 557 | 27 |
| 4. Totals | XXX | XXX | XXX | 598 | | 13 | | | | | 611 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | 1 | | 13 | | | | 2 | | | | | 15 | |
| 2. | 9 | | 12 | | | | 2 | | | | | 24 | |
| 3. | 108 | 6 | 248 | 29 | 3 | | 30 | 2 | 9 | | | 362 | 8 |
| 4. | 118 | 6 | 273 | 29 | 4 | | 33 | 2 | 9 | | | 401 | 8 |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 14 | 2 |
| 2. | 79 | | 79 | | | | | | | 22 | 2 |
| 3. | 955 | 37 | 919 | 74.0 | (13.7) | 58.9 | | | | 322 | 40 |
| 4. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 357 | 44 |

# SCHEDULE P-PART 1K - FIDELITY/SURETY

### ($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2019 | 3,097 | | 3,097 | | | | | | | | | XXX |
| 3. 2020 | 2,420 | 19 | 2,401 | | | | | | | | | XXX |
| 4. Totals | XXX | XXX | XXX | | | | | | | | | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | 796 | | | | | | 41 | | | 837 | |
| 2. | | | 826 | | | | | | 45 | | | 870 | |
| 3. | | | 1,089 | 8 | | | 1 | 1 | 81 | 1 | | 1,160 | |
| 4. | | | 2,710 | 8 | | | 1 | 1 | 167 | 1 | | 2,868 | |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 796 | 41 |
| 2. | 870 | | 870 | 28.1 | | 28.1 | | | | 826 | 45 |
| 3. | 1,171 | 10 | 1,160 | 48.4 | 53.3 | 48.3 | | | | 1,080 | 80 |
| 4. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 2,702 | 166 |

47

# SCHEDULE P-PART 1L - OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)
### ($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2019 | | | | | | | | | | | | XXX |
| 3. 2020 | | | | | | | | | | | | XXX |
| 4. Totals | XXX | XXX | XXX | | | | | | | | | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |

# SCHEDULE P - PART 1M - INTERNATIONAL

($000 OMITTED)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2011 | | | | | | | | | | | | XXX |
| 3. 2012 | | | | | | | | | | | | XXX |
| 4. 2013 | | | | | | | | | | | | XXX |
| 5. 2014 | | | | | | | | | | | | XXX |
| 6. 2015 | | | | | | | | | | | | XXX |
| 7. 2016 | | | | | | | | | | | | XXX |
| 8. 2017 | | | | | | | | | | | | XXX |
| 9. 2018 | | | | | | | | | | | | XXX |
| 10. 2019 | | | | | | | | | | | | XXX |
| 11. 2020 | | | | | | | | | | | | XXX |
| 12. Totals | XXX | XXX | XXX | | | | | | | | | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | |
| 9. | | | | | | | | | | | | | |
| 10. | | | | | | | | | | | | | |
| 11. | | | | | | | | | | | | | |
| 12. | | | | | | | | | | | | | |

NONE

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | | | | | | | | | | | |
| 9. | | | | | | | | | | | |
| 10. | | | | | | | | | | | |
| 11. | | | | | | | | | | | |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |

Exhibit 5, Page 74 of 152

# SCHEDULE P - PART 1N - REINSURANCE - NONPROPORTIONAL ASSUMED PROPERTY

**($000 OMITTED)**

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | 10 | 11 | |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct And Assumed | Ceded | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | Number of Claims Reported Direct and Assumed |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2011 | | | | | | | | | | | | XXX |
| 3. 2012 | | | | | | | | | | | | XXX |
| 4. 2013 | | | | | | | | | | | | XXX |
| 5. 2014 | | | | | | | | | | | | XXX |
| 6. 2015 | | | | | | | | | | | | XXX |
| 7. 2016 | | | | | | | | | | | | XXX |
| 8. 2017 | | | | | | | | | | | | XXX |
| 9. 2018 | | | | | | | | | | | | XXX |
| 10. 2019 | | | | 177 | | | | | | | 177 | XXX |
| 11. 2020 | 2,770 | | 2,770 | 3,747 | | | | | | | 3,747 | XXX |
| 12. Totals | XXX | XXX | XXX | 3,924 | | | | | | | 3,924 | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | | | |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| 1. | | | | | | | | | | | | | XXX |
| 2. | | | | | | | | | | | | | XXX |
| 3. | | | | | | | | | | | | | XXX |
| 4. | | | | | | | | | | | | | XXX |
| 5. | | | | | | | | | | | | | XXX |
| 6. | | | | | | | | | | | | | XXX |
| 7. | | | | | | | | | | | | | XXX |
| 8. | | | | | | | | | | | | | XXX |
| 9. | 35 | | | | | | | | | | | 35 | XXX |
| 10. | 4,723 | | | | | | | | | | | 4,723 | XXX |
| 11. | | | 7,243 | | | | | | | | | 7,243 | XXX |
| 12. | 4,758 | | 7,243 | | | | | | | | | 12,001 | XXX |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | | | | | | | | | | | |
| 9. | 35 | | 35 | | | | | | | 35 | |
| 10. | 4,900 | | 4,900 | | | | | | | 4,723 | |
| 11. | 10,990 | | 10,990 | 396.8 | | 396.8 | | | | 7,243 | |
| 12. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 12,001 | |

Exhibit 5, Page 75 of 152

ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company

Schedule P - Part 1O - Reinsurance

# NONE

Schedule P - Part 1P - Reinsurance

# NONE

Schedule P - Part 1R - Prod Liab Occur

# NONE

Schedule P - Part 1R - Prod Liab Claims

# NONE

Schedule P - Part 1S-Fin./Mtg. Guaranty

# NONE

# SCHEDULE P - PART 1T - WARRANTY

**($000 OMITTED)**

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | Loss Payments | | Defense and Cost Containment Payments | | Adjusting and Other Payments | | Salvage and Subrogation Received | Total Net Paid (Cols. 4 - 5 + 6 - 7 + 8 - 9) | Number of Claims Reported Direct and Assumed |
| | | | | 4 | 5 | 6 | 7 | 8 | 9 | | | |
| | Direct and Assumed | Ceded | Net (Cols. 1 - 2) | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. Prior | XXX | XXX | XXX | | | | | | | | | XXX |
| 2. 2019 | 62 | | 62 | | | | | | | | | |
| 3. 2020 | 51 | | 51 | | | | | | | | | |
| 4. Totals | XXX | XXX | XXX | | | | | | | | | XXX |

| | Losses Unpaid | | | | Defense and Cost Containment Unpaid | | | | Adjusting and Other Unpaid | | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | 21 | 22 | Salvage and Subrogation Anticipated | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding Direct and Assumed |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | | | |
| | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | Direct and Assumed | Ceded | | | |
| 1. | | | | | | | | | | | | | |
| 2. | | | 3 | | | | | | | | | 3 | |
| 3. | | | 5 | | | | | | | | | 5 | |
| 4. | | | 8 | | | | | | | | | 8 | |

| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Nontabular Discount | | 34 | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | Inter-Company Pooling Participation Percentage | 35 | 36 |
| | Direct and Assumed | Ceded | Net | Direct and Assumed | Ceded | Net | Loss | Loss Expense | | Losses Unpaid | Loss Expenses Unpaid |
| 1. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | | |
| 2. | 3 | | 3 | 4.6 | | 4.6 | | | | 3 | |
| 3. | 5 | | 5 | 10.0 | | 10.0 | | | | 5 | |
| 4. | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | 8 | |

56

## SCHEDULE P - PART 2A - HOMEOWNERS/FARMOWNERS

| Years in Which Losses Were Incurred | INCURRED NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | DEVELOPMENT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,365 | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

## SCHEDULE P - PART 2B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 227 | 227 | 227 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 593 | 593 | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,173 | XXX | XXX |
| 12. Totals | | | | | | | | | | | 820 | 227 |

## SCHEDULE P - PART 2C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | 616 | 616 | 616 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | 5,856 | 4,445 | 5,517 | 1,072 | (339) |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 18,611 | 11,031 | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 20,298 | XXX | XXX |
| 12. Totals | | | | | | | | | | | 12,719 | 276 |

## SCHEDULE P - PART 2D- WORKERS' COMPENSATION
### (EXCLUDING EXCESS WORKERS' COMPENSATION)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 60,679 | 56,691 | 56,245 | 47,780 | 45,950 | 44,178 | 42,448 | 41,635 | 41,910 | 42,031 | 121 | 396 |
| 2. 2011 | 32,241 | 21,463 | 22,856 | 21,980 | 22,547 | 21,448 | 20,791 | 21,548 | 21,004 | 20,453 | (551) | (1,095) |
| 3. 2012 | XXX | 21,888 | 23,071 | 26,382 | 25,848 | 24,590 | 23,837 | 23,206 | 22,633 | 21,486 | (1,147) | (1,720) |
| 4. 2013 | XXX | XXX | 50,359 | 51,192 | 50,230 | 54,385 | 54,800 | 55,730 | 57,014 | 55,905 | (1,109) | 174 |
| 5. 2014 | XXX | XXX | XXX | 57,170 | 47,273 | 59,313 | 59,248 | 60,185 | 60,844 | 61,605 | 761 | 1,419 |
| 6. 2015 | XXX | XXX | XXX | XXX | 62,183 | 66,413 | 68,731 | 71,676 | 71,447 | 72,134 | 686 | 458 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 79,280 | 79,021 | 74,442 | 74,920 | 78,140 | 3,220 | 3,698 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 137,845 | 141,361 | 135,540 | 131,714 | (3,826) | (9,647) |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 139,864 | 134,333 | 129,915 | (4,418) | (9,949) |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 122,905 | 120,410 | (2,495) | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 64,351 | XXX | XXX |
| 12. Totals | | | | | | | | | | | (8,759) | (16,266) |

## SCHEDULE P - PART 2E- COMMERCIAL MULTIPLE PERIL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | 3 | 3 | 3 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 28 | 28 | 28 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 254 | 254 | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 693 | XXX | XXX |
| 12. Totals | | | | | | | | | | | 285 | 31 |

Exhibit 5, Page 78 of 152

## SCHEDULE P - PART 2F - SECTION 1 - MEDICAL
## PROFESSIONAL LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | INCURRED NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | DEVELOPMENT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

*NONE*

## SCHEDULE P - PART 2F - SECTION 2 - MEDICAL
## PROFESSIONAL LIABILITY - CLAIMS-MADE

| Years in Which Losses Were Incurred | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

*NONE*

## SCHEDULE P - PART 2G - SPECIAL LIABILITY
## (OCEAN MARINE, AIRCRAFT (ALL PERILS), BOILER AND MACHINERY)

| Years in Which Losses Were Incurred | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

*NONE*

## SCHEDULE P - PART 2H - SECTION 1 - OTHER LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2 | 2 | 2 | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 7 | 173 | 167 | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 495 | XXX | XXX |
| 12. Totals | | | | | | | | | | | 167 | |

## SCHEDULE P - PART 2H - SECTION 2 - OTHER LIABILITY - CLAIMS-MADE

| Years in Which Losses Were Incurred | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 646 | 333 | 115 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | | |
| 2. 2011 | 400 | 305 | 210 | 189 | 147 | 147 | 147 | 147 | 147 | 147 | | |
| 3. 2012 | XXX | 723 | 570 | 432 | 306 | 269 | 229 | 229 | 229 | 229 | | |
| 4. 2013 | XXX | XXX | 884 | 618 | 406 | 340 | 256 | 224 | 224 | 224 | | |
| 5. 2014 | XXX | XXX | XXX | 966 | 762 | 684 | 549 | 413 | 410 | 410 | | (3) |
| 6. 2015 | XXX | XXX | XXX | XXX | 1,140 | 673 | 460 | 303 | 275 | 270 | (4) | (33) |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 914 | 416 | 273 | 232 | 258 | 26 | (15) |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 792 | 374 | 281 | 256 | (25) | (118) |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 599 | 256 | 199 | (57) | (400) |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 423 | 318 | (105) | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 664 | XXX | XXX |
| 12. Totals | | | | | | | | | | | (165) | (568) |

## SCHEDULE P - PART 2I - SPECIAL PROPERTY (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, BURGLARY, AND THEFT)

| Years in Which Losses Were Incurred | INCURRED NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | DEVELOPMENT | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 279 | XXX | XXX |
| 4. Totals | | | | | | | | | | | | |

## SCHEDULE P - PART 2J - AUTO PHYSICAL DAMAGE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 14 | 14 | 14 |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 79 | 79 | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 910 | XXX | XXX |
| 4. Totals | | | | | | | | | | | 93 | 14 |

## SCHEDULE P - PART 2K - FIDELITY, SURETY

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 3,634 | 1,860 | 796 | (1,064) | (2,838) |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,410 | 826 | (584) | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,080 | XXX | XXX |
| 4. Totals | | | | | | | | | | | (1,648) | (2,838) |

## SCHEDULE P - PART 2L - OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 4. Totals | | | | | | | | | | | | |

## SCHEDULE P - PART 2M - INTERNATIONAL



| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

NONE

59

## SCHEDULE P - PART 2N - REINSURANCE
### Nonproportional Assumed Property

| Years in Which Losses Were Incurred | INCURRED NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | DEVELOPMENT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 35 | 35 | 35 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 4,900 | 4,900 | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 10,990 | XXX | XXX |
| 12. Totals | | | | | | | | | | | 4,935 | 35 |

## SCHEDULE P - PART 2O - REINSURANCE
### Nonproportional Assumed Liability

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

NONE

## SCHEDULE P - PART 2P - REINSURANCE
### Nonproportional Assumed Financial Lines

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

NONE



## SCHEDULE P - PART 2R - SECTION 1 - PRODUCTS LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | INCURRED NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | DEVELOPMENT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | One Year | Two Year |
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

NONE

## SCHEDULE P - PART 2R - SECTION 2 - PRODUCTS LIABILITY - CLAIMS-MADE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 12. Totals | | | | | | | | | | | | |

NONE

## SCHEDULE P - PART 2S - FINANCIAL GUARANTY/MORTGAGE GUARANTY

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |
| 4. Totals | | | | | | | | | | | | |

NONE

## SCHEDULE P - PART 2T – WARRANTY

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 11 | 3 | | (3) | (11) |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 6 | 3 | | (3) | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 5 | XXX | XXX | |
| 4. Totals | | | | | | | | | | | (7) | (11) |

61

## SCHEDULE P - PART 3A - HOMEOWNERS/FARMOWNERS

| Years in Which Losses Were Incurred | CUMULATIVE PAID NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Number of Claims Closed With Loss Payment | 12 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 2011 | 2 2012 | 3 2013 | 4 2014 | 5 2015 | 6 2016 | 7 2017 | 8 2018 | 9 2019 | 10 2020 | | |
| 1. Prior | 000 | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 213 | 49 | 21 |

## SCHEDULE P - PART 3B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 000 | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | 140 | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 54 | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 583 | |

## SCHEDULE P - PART 3C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 000 | | | | | | | | | | | (2) |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | 159 | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 247 | 1,180 | 2,980 | 138 | 78 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,087 | 8,404 | 500 | 295 | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 2,247 | 159 | 82 |

## SCHEDULE P - PART 3D - WORKERS' COMPENSATION
### (EXCLUDING EXCESS WORKERS' COMPENSATION)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 000 | 2,821 | 15,207 | 19,255 | 23,373 | 26,284 | 28,005 | 29,276 | 31,070 | 32,388 | 615 | 23 |
| 2. 2011 | 3,514 | 1,000 | 7,689 | 8,890 | 11,574 | 13,061 | 14,068 | 14,921 | 16,161 | 16,705 | 3,274 | 694 |
| 3. 2012 | XXX | (10,436) | 1,030 | 5,377 | 9,472 | 12,623 | 14,598 | 15,337 | 15,784 | 16,360 | 4,378 | 876 |
| 4. 2013 | XXX | XXX | 11,421 | 21,068 | 27,994 | 37,198 | 40,942 | 42,897 | 44,910 | 46,613 | 7,370 | 1,544 |
| 5. 2014 | XXX | XXX | XXX | 5,752 | 15,540 | 28,125 | 36,569 | 40,775 | 45,752 | 47,584 | 10,105 | 2,073 |
| 6. 2015 | XXX | XXX | XXX | XXX | 4,822 | 12,567 | 28,059 | 35,786 | 40,823 | 45,890 | 10,630 | 2,162 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 2,929 | 16,893 | 29,315 | 35,750 | 41,066 | 8,972 | 1,674 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 18,978 | 54,189 | 71,147 | 80,818 | 6,950 | 1,567 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 21,996 | 55,189 | 70,807 | 4,605 | 1,217 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 21,734 | 51,221 | 3,054 | 718 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 10,455 | 1,357 | 647 |

## SCHEDULE P - PART 3E - COMMERCIAL MULTIPLE PERIL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 000 | | | | | | | | | | | (6) |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | 3 | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | 21 | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 117 | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 54 | |

Exhibit 5, Page 83 of 152

## SCHEDULE P - PART 3F - SECTION 1 - MEDICAL
## PROFESSIONAL LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | CUMULATIVE PAID NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Number of Claims Closed With Loss Payment | 12 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | | |
| 1. Prior | .000 | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |

**NONE**

## SCHEDULE P - PART 3F - SECTION 2 - MEDICAL
## PROFESSIONAL LIABILITY - CLAIMS-MADE

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | .000 | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |

**NONE**

## SCHEDULE P - PART 3G - SPECIAL LIABILITY
## (OCEAN MARINE, AIRCRAFT (ALL PERILS), BOILER AND MACHINERY)

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | .000 | | | | | | | | | | XXX | XXX |
| 2. 2011 | | | | | | | | | | | XXX | XXX |
| 3. 2012 | XXX | | | | | | | | | | XXX | XXX |
| 4. 2013 | XXX | XXX | | | | | | | | | XXX | XXX |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | XXX | XXX |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | XXX | XXX |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | XXX | XXX |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | XXX | XXX |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX | XXX |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |

**NONE**

## SCHEDULE P - PART 3H - SECTION 1 - OTHER LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | .000 | | | | | | | | | | 1 | 1 |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 3 | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 7 | |

## SCHEDULE P - PART 3H - SECTION 2 - OTHER LIABILITY - CLAIMS-MADE

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | .000 | 57 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 22 | 2 |
| 2. 2011 | .30 | 108 | 131 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 2 | 4 |
| 3. 2012 | XXX | 66 | 207 | 229 | 229 | 229 | 229 | 229 | 229 | 229 | 4 | 2 |
| 4. 2013 | XXX | XXX | 62 | 138 | 215 | 224 | 224 | 224 | 224 | 224 | 6 | 3 |
| 5. 2014 | XXX | XXX | XXX | 37 | 200 | 398 | 413 | 413 | 410 | 410 | 9 | 2 |
| 6. 2015 | XXX | XXX | XXX | XXX | 79 | 234 | 254 | 254 | 254 | 254 | 6 | 1 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 55 | 140 | 199 | 206 | 224 | 5 | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 90 | 194 | 227 | 227 | 6 | 1 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 54 | 81 | 82 | 1 | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 38 | 109 | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 43 | | |

Exhibit 5, Page 84 of 152

## SCHEDULE P - PART 3I - SPECIAL PROPERTY
## (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, BURGLARY, AND THEFT)

| Years in Which Losses Were Incurred | CUMULATIVE PAID NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Number of Claims Closed With Loss Payment | 12 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | | |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 000 | | | XXX | XXX |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 44 | XXX | XXX |

## SCHEDULE P - PART 3J - AUTO PHYSICAL DAMAGE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 000 | | (2) | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 55 | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 557 | 14 | 5 |

## SCHEDULE P - PART 3K - FIDELITY/SURETY

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 000 | | | XXX | XXX |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |

NONE

## SCHEDULE P - PART 3L - OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 000 | | | XXX | XXX |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |

## SCHEDULE P - PART 3M - INTERNATIONAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 000 | | | | | | | | | | XXX | XXX |
| 2. 2011 | | | | | | | | | | | XXX | XXX |
| 3. 2012 | XXX | | | | | | | | | | XXX | XXX |
| 4. 2013 | XXX | XXX | | | | | | | | | XXX | XXX |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | XXX | XXX |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | XXX | XXX |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | XXX | XXX |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | XXX | XXX |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | XXX | XXX |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |

NONE

64

## SCHEDULE P - PART 3N - REINSURANCE
### NONPROPORTIONAL ASSUMED PROPERTY

| Years in Which Losses Were Incurred | CUMULATIVE PAID NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Number of Claims Closed With Loss Payment | 12 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 2011 | 2 2012 | 3 2013 | 4 2014 | 5 2015 | 6 2016 | 7 2017 | 8 2018 | 9 2019 | 10 2020 | | |
| 1. Prior | ...000 | | | | | | | | | | XXX | XXX |
| 2. 2011 | | | | | | | | | | | XXX | XXX |
| 3. 2012 | ...XXX | | | | | | | | | | XXX | XXX |
| 4. 2013 | ...XXX | ...XXX | | | | | | | | | XXX | XXX |
| 5. 2014 | ...XXX | ...XXX | ...XXX | | | | | | | | XXX | XXX |
| 6. 2015 | ...XXX | ...XXX | ...XXX | ...XXX | | | | | | | XXX | XXX |
| 7. 2016 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | | | XXX | XXX |
| 8. 2017 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | | XXX | XXX |
| 9. 2018 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | XXX | XXX |
| 10. 2019 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | .177 | XXX | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 3,747 | XXX | XXX |

## SCHEDULE P - PART 3O - REINSURANCE
### NONPROPORTIONAL ASSUMED LIABILITY

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | ...000 | | | | | | | | | | XXX | XXX |
| 2. 2011 | | | | | | | | | | | XXX | XXX |
| 3. 2012 | ...XXX | | | | | | | | | | XXX | XXX |
| 4. 2013 | ...XXX | ...XXX | | | | | | | | | XXX | XXX |
| 5. 2014 | ...XXX | ...XXX | ...XXX | | | | | | | | XXX | XXX |
| 6. 2015 | ...XXX | ...XXX | ...XXX | ...XXX | | | | | | | XXX | XXX |
| 7. 2016 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | | | XXX | XXX |
| 8. 2017 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | | XXX | XXX |
| 9. 2018 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | XXX | XXX |
| 10. 2019 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | XXX | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |

NONE

## SCHEDULE P - PART 3P - REINSURANCE
### NONPROPORTIONAL ASSUMED FINANCIAL LINES

| Years in Which Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | ...000 | | | | | | | | | | XXX | XXX |
| 2. 2011 | | | | | | | | | | | XXX | XXX |
| 3. 2012 | ...XXX | | | | | | | | | | XXX | XXX |
| 4. 2013 | ...XXX | ...XXX | | | | | | | | | XXX | XXX |
| 5. 2014 | ...XXX | ...XXX | ...XXX | | | | | | | | XXX | XXX |
| 6. 2015 | ...XXX | ...XXX | ...XXX | ...XXX | | | | | | | XXX | XXX |
| 7. 2016 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | | | XXX | XXX |
| 8. 2017 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | | XXX | XXX |
| 9. 2018 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | | XXX | XXX |
| 10. 2019 | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | ...XXX | | | XXX | XXX |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |

NONE

Exhibit 5, Page 86 of 152

## SCHEDULE P - PART 3R - SECTION 1 - PRODUCTS LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | CUMULATIVE PAID NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Number of Claims Closed With Loss Payment | 12 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | | |
| 1. Prior | 000 | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |

NONE

## SCHEDULE P - PART 3R - SECTION 2 - PRODUCTS LIABILITY - CLAIMS-MADE

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 000 | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |

NONE

## SCHEDULE P - PART 3S - FINANCIAL GUARANTY/MORTGAGE GUARANTY

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 000 | | | XXX | XXX |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | XXX |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | XXX | XXX |

NONE

## SCHEDULE P - PART 3T - WARRANTY

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 000 | | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |

## SCHEDULE P - PART 4A - HOMEOWNERS/FARMOWNERS

| Years in Which Losses Were Incurred | BULK AND IBNR RESERVES ON NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 801 |

## SCHEDULE P - PART 4B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 61 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 247 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,059 |

## SCHEDULE P - PART 4C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | 371 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 3,820 | 1,783 | 493 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 9,311 | 11,091 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 11,616 |

## SCHEDULE P - PART 4D - WORKERS' COMPENSATION
### (EXCLUDING EXCESS WORKERS' COMPENSATION)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 38,907 | 31,377 | 23,919 | 16,782 | 12,707 | 9,990 | 6,860 | 5,708 | 4,895 | 4,516 |
| 2. 2011 | 19,504 | 12,591 | 8,692 | 7,028 | 5,637 | 4,248 | 3,544 | 2,946 | 2,166 | 1,583 |
| 3. 2012 | XXX | 24,043 | 13,594 | 12,958 | 9,340 | 6,618 | 5,015 | 4,604 | 3,890 | 3,295 |
| 4. 2013 | XXX | XXX | 31,873 | 21,794 | 15,549 | 11,699 | 8,906 | 7,823 | 7,430 | 5,692 |
| 5. 2014 | XXX | XXX | XXX | 40,893 | 22,599 | 19,163 | 14,068 | 12,622 | 10,987 | 10,467 |
| 6. 2015 | XXX | XXX | XXX | XXX | 46,160 | 35,073 | 23,077 | 19,781 | 17,491 | 14,422 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 62,307 | 42,139 | 29,468 | 25,025 | 22,098 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 91,077 | 62,491 | 40,984 | 30,894 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 90,074 | 54,649 | 37,013 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 73,952 | 46,281 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 37,834 |

## SCHEDULE P - PART 4E - COMMERCIAL MULTIPLE PERIL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 4 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 58 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 475 |

Exhibit 5, Page 88 of 152

## SCHEDULE P - PART 4F - SECTION 1 - MEDICAL
## PROFESSIONAL LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | BULK AND IBNR RESERVES ON NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

## SCHEDULE P - PART 4F - SECTION 2 – MEDICAL
## PROFESSIONAL LIABILITY - CLAIMS-MADE

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

## SCHEDULE P - PART 4G - SPECIAL LIABILITY
## (OCEAN MARINE, AIRCRAFT (ALL PERILS), BOILER AND MACHINERY)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

## SCHEDULE P - PART 4H - SECTION 1 - OTHER LIABILITY - OCCURRENCE

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2 | 2 | 2 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 7 | 151 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 453 |

## SCHEDULE P - PART 4H - SECTION 2 - OTHER LIABILITY - CLAIMS-MADE

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 487 | 226 | 56 | | | | | | | |
| 2. 2011 | 309 | 156 | 73 | 36 | | | | | | |
| 3. 2012 | XXX | 546 | 284 | 146 | 59 | 21 | | | | |
| 4. 2013 | XXX | XXX | 683 | 310 | 125 | 49 | 20 | | | |
| 5. 2014 | XXX | XXX | XXX | 716 | 391 | 146 | 80 | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | 852 | 278 | 117 | 43 | 15 | 10 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 714 | 184 | 70 | 22 | 31 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 585 | 146 | 50 | 25 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 454 | 93 | 36 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 288 | 152 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 476 |

68

## SCHEDULE P - PART 4I - SPECIAL PROPERTY
## (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, BURGLARY AND THEFT)

| Years in Which Losses Were Incurred | BULK AND IBNR RESERVES ON NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 163 |

## SCHEDULE P - PART 4J - AUTO PHYSICAL DAMAGE

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 15 |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 14 |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 247 |

## SCHEDULE P - PART 4K - FIDELITY/SURETY

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 3,634 | 1,860 | 796 |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,410 | 826 |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,080 |

## SCHEDULE P - PART 4L - OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SCHEDULE P - PART 4M - INTERNATIONAL

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

69

## SCHEDULE P - PART 4N - REINSURANCE
### NONPROPORTIONAL ASSUMED PROPERTY

| Years in Which Losses Were Incurred | BULK AND IBNR RESERVES ON NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 9. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 7.243 |

## SCHEDULE P - PART 4O - REINSURANCE
### NONPROPORTIONAL ASSUMED LIABILITY

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | NONE | | | | | | |
| 6. 2015 | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 9. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SCHEDULE P - PART 4P - REINSURANCE
### NONPROPORTIONAL ASSUMED FINANCIAL LINES

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | NONE | | | | | | |
| 6. 2015 | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 9. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

Exhibit 5, Page 91 of 152

## SCHEDULE P - PART 4R - SECTION 1 - PRODUCTS LIABILITY - OCCURRENCE

| Years in Which Losses Were Incurred | BULK AND IBNR RESERVES ON NET LOSSES AND DEFENSE AND COST CONTAINMENT EXPENSES REPORTED AT YEAR END ($000 OMITTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 2011 | 2 2012 | 3 2013 | 4 2014 | 5 2015 | 6 2016 | 7 2017 | 8 2018 | 9 2019 | 10 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

## SCHEDULE P - PART 4R - SECTION 2 - PRODUCTS LIABILITY - CLAIMS-MADE

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

## SCHEDULE P - PART 4S - FINANCIAL GUARANTY/MORTGAGE GUARANTY

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

## SCHEDULE P - PART 4T - WARRANTY

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 11 | 3 | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 6 | 3 |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 5 |

71

## SCHEDULE P - PART 5A - HOMEOWNERS/FARMOWNERS

### SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 49 |

### SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 109 |

### SECTION 3

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 179 |

Exhibit 5, Page 93 of 152

# SCHEDULE P - PART 5B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

## SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SECTION 3

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

Exhibit 5, Page 94 of 152

# SCHEDULE P - PART 5C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

**SECTION 1**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | | | 1 | (3) |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 118 | 138 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 196 | 500 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 159 |

**SECTION 2**

| Years in Which Premiums Were Earned and Losses Were Incurred | NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | 3 | 3 | 2 | 2 |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 37 | 22 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 370 | 147 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 268 |

**SECTION 3**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | | | | 3 | | | (3) |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 228 | 238 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 694 | 942 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 509 |

Exhibit 5, Page 95 of 152

# SCHEDULE P - PART 5D - WORKERS' COMPENSATION
# (EXCLUDING EXCESS WORKERS' COMPENSATION)

**SECTION 1**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | 1,025 | 236 | 189 | (30) | 56 | 109 | 13 | 19 | 15 | 8 |
| 2. 2011 | 2,096 | 2,860 | 3,092 | 3,177 | 3,216 | 3,245 | 3,254 | 3,264 | 3,271 | 3,274 |
| 3. 2012 | XXX | 2,482 | 3,882 | 4,131 | 4,260 | 4,304 | 4,334 | 4,355 | 4,365 | 4,378 |
| 4. 2013 | XXX | XXX | 4,401 | 6,544 | 6,991 | 7,181 | 7,271 | 7,315 | 7,347 | 7,370 |
| 5. 2014 | XXX | XXX | XXX | 6,402 | 9,035 | 9,619 | 9,890 | 10,011 | 10,066 | 10,105 |
| 6. 2015 | XXX | XXX | XXX | XXX | 6,807 | 9,561 | 10,204 | 10,448 | 10,569 | 10,630 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 5,885 | 8,189 | 8,632 | 8,867 | 8,972 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 4,624 | 6,391 | 6,770 | 6,950 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 3,167 | 4,352 | 4,605 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,185 | 3,054 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,357 |

**SECTION 2**

| Years in Which Premiums Were Earned and Losses Were Incurred | NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | 555 | 346 | 167 | 117 | 76 | 62 | 53 | 39 | 28 | 22 |
| 2. 2011 | 920 | 393 | 161 | 90 | 60 | 32 | 25 | 17 | 10 | 8 |
| 3. 2012 | XXX | 1,445 | 405 | 205 | 97 | 60 | 39 | 24 | 18 | 11 |
| 4. 2013 | XXX | XXX | 1,919 | 686 | 317 | 170 | 98 | 65 | 39 | 24 |
| 5. 2014 | XXX | XXX | XXX | 2,643 | 920 | 452 | 223 | 128 | 90 | 60 |
| 6. 2015 | XXX | XXX | XXX | XXX | 2,661 | 986 | 440 | 245 | 146 | 103 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 2,224 | 769 | 414 | 206 | 131 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 1,695 | 606 | 307 | 160 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,184 | 444 | 246 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 825 | 326 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 636 |

**SECTION 3**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | 215 | 40 | 19 | (90) | 16 | 106 | 8 | 4 | 3 | 1 |
| 2. 2011 | 3,734 | 3,929 | 3,945 | 3,961 | 3,970 | 3,973 | 3,974 | 3,975 | 3,975 | 3,976 |
| 3. 2012 | XXX | 4,862 | 5,177 | 5,221 | 5,245 | 5,250 | 5,256 | 5,261 | 5,262 | 5,265 |
| 4. 2013 | XXX | XXX | 8,248 | 8,802 | 8,866 | 8,901 | 8,917 | 8,926 | 8,930 | 8,937 |
| 5. 2014 | XXX | XXX | XXX | 11,379 | 12,044 | 12,153 | 12,200 | 12,220 | 12,230 | 12,237 |
| 6. 2015 | XXX | XXX | XXX | XXX | 12,041 | 12,713 | 12,820 | 12,863 | 12,884 | 12,894 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 10,015 | 10,606 | 10,711 | 10,746 | 10,777 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 8,095 | 8,574 | 8,643 | 8,677 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 5,740 | 6,013 | 6,068 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 3,861 | 4,099 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,639 |

Exhibit 5, Page 96 of 152

# SCHEDULE P - PART 5E - COMMERCIAL MULTIPLE PERIL

## SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | 1 | | | 2 | (1) | (1) | (1) | 1 | (1) |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | 4 | 6 | 6 | 4 | 3 | | | 1 | | 3 |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2 |

## SECTION 3

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | 2 | 3 | | (6) | (2) | (4) | | | 2 |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2 |

Exhibit 5, Page 97 of 152

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

Schedule P - Part 5F- SN1A
# NONE

Schedule P - Part 5F- SN2A
# NONE

Schedule P - Part 5F- SN3A
# NONE

Schedule P - Part 5F- SN1B
# NONE

Schedule P - Part 5F- SN2B
# NONE

Schedule P - Part 5F- SN3B
# NONE

# SCHEDULE P - PART 5H - OTHER LIABILITY - OCCURRENCE

## SECTION 1A

CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | | 1 | (4) | | | | | 4 |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SECTION 2A

NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | 6 | | 4 | | | | | |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SECTION 3A

CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | | | 6 | | (8) | | | | | 4 |
| 2. 2011 | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

Exhibit 5, Page 99 of 152

# SCHEDULE P - PART 5H - OTHER LIABILITY - CLAIMS-MADE

## SECTION 1B

CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 2011 | 2 2012 | 3 2013 | 4 2014 | 5 2015 | 6 2016 | 7 2017 | 8 2018 | 9 2019 | 10 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 1 | 8 | 7 | | | | 7 | (1) | 1 | 2 |
| 2. 2011 | 1 | | 1 | | 1 | | 2 | | 2 | 4 |
| 3. 2012 | XXX | 1 | | 1 | | 4 | | 4 | 4 | 4 |
| 4. 2013 | XXX | XXX | | | 2 | 2 | 5 | 6 | 6 | 6 |
| 5. 2014 | XXX | XXX | XXX | | | 1 | 6 | 9 | 9 | 9 |
| 6. 2015 | XXX | XXX | XXX | XXX | | | 3 | 6 | 6 | 6 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | 5 | 5 | 5 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | 5 | 6 | 6 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1 | | 1 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

## SECTION 2B

NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 2011 | 2 2012 | 3 2013 | 4 2014 | 5 2015 | 6 2016 | 7 2017 | 8 2018 | 9 2019 | 10 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 24 | 8 | | | | | | | | |
| 2. 2011 | 5 | 4 | 1 | | 1 | | 1 | | | |
| 3. 2012 | XXX | 5 | | 5 | | 1 | | 1 | | |
| 4. 2013 | XXX | XXX | 8 | | 8 | | 4 | 1 | | |
| 5. 2014 | XXX | XXX | XXX | 11 | 9 | | 8 | 3 | | |
| 6. 2015 | XXX | XXX | XXX | XXX | 8 | | 5 | 1 | | 1 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 6 | | 1 | | 1 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 8 | 2 | 1 | 1 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 4 | | 4 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 5 | 5 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 6 |

## SECTION 3B

CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END

| Years in Which Premiums Were Earned and Losses Were Incurred | 1 2011 | 2 2012 | 3 2013 | 4 2014 | 5 2015 | 6 2016 | 7 2017 | 8 2018 | 9 2019 | 10 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | (1) | 1 | |
| 2. 2011 | 5 | | 6 | | 6 | | 6 | | 6 | 6 |
| 3. 2012 | XXX | 6 | | 6 | | 6 | | 6 | | 6 |
| 4. 2013 | XXX | XXX | 8 | | 8 | | 8 | | 8 | 8 |
| 5. 2014 | XXX | XXX | XXX | 11 | 11 | | 11 | 11 | 11 | 11 |
| 6. 2015 | XXX | XXX | XXX | XXX | 6 | | 6 | 8 | | 8 |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 6 | | 6 | | 6 |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 8 | | 8 | 8 |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 5 | | 5 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 5 | 5 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 6 |

Exhibit 5, Page 100 of 152

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

Schedule P - Part 5R- SN1A
# NONE

Schedule P - Part 5R- SN2A
# NONE

Schedule P - Part 5R- SN3A
# NONE

Schedule P - Part 5R- SN1B
# NONE

Schedule P - Part 5R- SN2B
# NONE

Schedule P - Part 5R- SN3B
# NONE

## SCHEDULE P – PART 5T – WARRANTY

### SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS CLOSED WITH LOSS PAYMENT DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

### SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | NUMBER OF CLAIMS OUTSTANDING DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

NONE

### SECTION 3

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE NUMBER OF CLAIMS REPORTED DIRECT AND ASSUMED AT YEAR END | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1. Prior | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 2. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 3. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |

Exhibit 5, Page 102 of 152

## SCHEDULE P - PART 6C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

### SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 24,391 | 24,322 | (68) |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 25,425 | 27,884 | 2,459 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 33,896 | 33,896 |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 36,286 |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | 40,495 | 36,286 | XXX |

### SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | (412) | (421) | (8) |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 6,347 | 6,768 | 421 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | (13) | (13) |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 400 |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | 5,935 | 400 | XXX |

## SCHEDULE P - PART 6D - WORKERS' COMPENSATION
## (EXCLUDING EXCESS WORKERS' COMPENSATION)

### SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | 374 | | | | | | | | | | |
| 2. 2011 | 154,314 | 154,993 | 154,993 | 154,993 | 154,993 | 154,993 | 154,993 | 154,993 | 154,993 | 154,993 | |
| 3. 2012 | XXX | 215,083 | 215,083 | 215,083 | 215,083 | 215,083 | 215,083 | 215,083 | 215,083 | 215,083 | |
| 4. 2013 | XXX | XXX | 340,179 | 340,179 | 340,179 | 340,179 | 340,179 | 340,179 | 340,179 | 340,179 | |
| 5. 2014 | XXX | XXX | XXX | 482,114 | 482,114 | 482,114 | 482,114 | 482,114 | 482,114 | 482,114 | |
| 6. 2015 | XXX | XXX | XXX | XXX | 525,945 | 525,945 | 525,945 | 525,945 | 525,945 | 525,945 | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 476,193 | 476,193 | 476,193 | 476,193 | 476,193 | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 401,934 | 401,934 | 401,934 | 401,934 | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 297,521 | 299,892 | 299,892 | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 201,666 | 203,224 | 1,558 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 143,523 | 143,523 |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 145,080 |
| 13. Earned Premiums (Sc P-Pt 1) | 154,688 | 215,763 | 340,179 | 482,114 | 525,945 | 476,193 | 401,934 | 297,521 | 204,038 | 145,080 | XXX |

### SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | 56,600 | 56,600 | 56,600 | 56,600 | 56,600 | 56,600 | 56,600 | 56,600 | 56,600 | 56,600 | |
| 3. 2012 | XXX | 101,867 | 101,867 | 101,867 | 101,867 | 101,867 | 101,867 | 101,867 | 101,867 | 101,867 | |
| 4. 2013 | XXX | XXX | 164,241 | 164,241 | 164,241 | 164,241 | 164,241 | 164,241 | 164,241 | 164,241 | |
| 5. 2014 | XXX | XXX | XXX | 264,465 | 264,465 | 264,465 | 264,465 | 264,465 | 264,465 | 264,465 | |
| 6. 2015 | XXX | XXX | XXX | XXX | 266,830 | 266,830 | 266,830 | 266,830 | 266,830 | 266,830 | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 227,972 | 227,972 | 227,972 | 227,972 | 227,972 | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 100,750 | 100,750 | 100,750 | 100,750 | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 41,320 | 41,320 | 41,320 | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 18,994 | 18,994 | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 38,610 | 38,610 |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 38,610 |
| 13. Earned Premiums (Sc P-Pt 1) | 56,600 | 101,867 | 164,241 | 264,465 | 266,830 | 227,972 | 100,750 | 41,320 | 18,994 | 38,610 | XXX |

84

## SCHEDULE P - PART 6E - COMMERCIAL MULTIPLE PERIL
### SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | (21) | (21) |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | (16) | (16) |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,009 | 2,009 |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,972 |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | 1,972 | XXX |

### SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | | XXX |

NONE

## SCHEDULE P - PART 6H - OTHER LIABILITY - OCCURRENCE
### SECTION 1A

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | 4 | 4 |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 18 | 6 | (12) |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,028 | 1,028 |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,016 |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | 26 | 1,016 | XXX |

### SECTION 2A

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | 2 | 2 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P–Pt 1) | | | | | | | | | | 2 | | XXX |

85

## SCHEDULE P - PART 6H - OTHER LIABILITY - CLAIMS-MADE
### SECTION 1B

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | 512 | | | | | | | | | | |
| 2. 2011 | 977 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | |
| 3. 2012 | XXX | 1,189 | 1,189 | 1,189 | 1,189 | 1,189 | 1,189 | 1,189 | 1,189 | 1,189 | |
| 4. 2013 | XXX | XXX | 2,145 | 2,145 | 2,145 | 2,145 | 2,145 | 2,145 | 2,145 | 2,145 | |
| 5. 2014 | XXX | XXX | XXX | 2,619 | 2,619 | 2,619 | 2,619 | 2,619 | 2,619 | 2,619 | |
| 6. 2015 | XXX | XXX | XXX | XXX | 2,880 | 2,880 | 2,880 | 2,880 | 2,880 | 2,880 | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | 3,039 | 3,039 | 3,039 | 3,039 | 3,039 | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | 3,003 | 3,003 | 3,003 | 3,003 | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,862 | 2,862 | 2,862 | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,490 | 3,462 | 972 |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 1,490 | 1,490 |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,462 |
| 13. Earned Premiums (Sc P-Pt 1) | 1,489 | 1,768 | 2,145 | 2,619 | 2,880 | 3,039 | 3,003 | 2,862 | 2,490 | 2,462 | XXX |

### SECTION 2B

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | | XXX |

NONE

## SCHEDULE P - PART 6M - INTERNATIONAL
### SECTION 1

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | | XXX |

NONE

### SECTION 2

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | | XXX |

NONE

86

## SCHEDULE P - PART 6N - REINSURANCE - NONPROPORTIONAL ASSUMED PROPERTY

**SECTION 1**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,770 | 2,770 |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 2,770 |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | 2,770 | XXX |

**SECTION 2**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | | XXX |

NONE

## SCHEDULE P - PART 6O - REINSURANCE NONPROPORTIONAL ASSUMED LIABILITY

**SECTION 1**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED DIRECT AND ASSUMED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P-Pt 1) | | | | | | | | | | | XXX |

NONE

**SECTION 2**

| Years in Which Premiums Were Earned and Losses Were Incurred | CUMULATIVE PREMIUMS EARNED CEDED AT YEAR END ($000 OMITTED) | | | | | | | | | | 11 Current Year Premiums Earned |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1. Prior | | | | | | | | | | | |
| 2. 2011 | | | | | | | | | | | |
| 3. 2012 | XXX | | | | | | | | | | |
| 4. 2013 | XXX | XXX | | | | | | | | | |
| 5. 2014 | XXX | XXX | XXX | | | | | | | | |
| 6. 2015 | XXX | XXX | XXX | XXX | | | | | | | |
| 7. 2016 | XXX | XXX | XXX | XXX | XXX | | | | | | |
| 8. 2017 | XXX | XXX | XXX | XXX | XXX | XXX | | | | | |
| 9. 2018 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 10. 2019 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | |
| 11. 2020 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | |
| 12. Total | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | |
| 13. Earned Premiums (Sc P–Pt 1) | | | | | | | | | | | XXX |

NONE

Schedule P - Part 6R - SN1A

# NONE

Schedule P - Part 6R - SN2A

# NONE

Schedule P - Part 6R - SN1B

# NONE

Schedule P - Part 6R - SN2B

# NONE

Schedule P - Part 7A - Section 1

# NONE

Schedule P - Part 7A - Section 2

# NONE

Schedule P - Part 7A - Section 3

# NONE

Schedule P - Part 7A - Section 4

# NONE

Schedule P - Part 7A - Section 5

# NONE

Schedule P - Part 7B - Section 1

# NONE

Schedule P - Part 7B - Section 2

# NONE

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

Schedule P - Part 7B - Section 3

# NONE

Schedule P - Part 7B - Section 4

# NONE

Schedule P - Part 7B - Section 5

# NONE

Schedule P - Part 7B - Section 6

# NONE

Schedule P - Part 7B - Section 7

# NONE

# SCHEDULE P INTERROGATORIES

1. The following questions relate to yet-to-be-issued Extended Reporting Endorsements (EREs) arising from Death, Disability, or Retirement (DDR) provisions in Medical Professional Liability Claims Made insurance policies. EREs provided for reasons other than DDR are not to be included.

1.1 Does the company issue Medical Professional Liability Claims Made insurance policies that provide tail (also known as an extended reporting endorsement, or "ERE") benefits in the event of Death, Disability, or Retirement (DDR) at a reduced charge or at no additional cost?   Yes [ ]  No [ X ]

   If the answer to question 1.1 is "no", leave the following questions blank. If the answer to question 1.1 is "yes", please answer the following questions:

1.2 What is the total amount of the reserve for that provision (DDR Reserve), as reported, explicitly or not, elsewhere in this statement (in dollars)?   $ ......................................................

1.3 Does the company report any DDR reserve as Unearned Premium Reserve per SSAP No. 65?   Yes [ ]  No [ ]

1.4 Does the company report any DDR reserve as loss or loss adjustment expense reserve?   Yes [ ]  No [ ]

1.5 If the company reports DDR reserve as Unearned Premium Reserve, does that amount match the figure on the Underwriting and Investment Exhibit, Part 1A – Recapitulation of all Premiums (Page 7) Column 2, Lines 11.1 plus 11.2?   Yes [ ]  No [ ]  N/A [ ]

1.6 If the company reports DDR reserve as loss or loss adjustment expense reserve, please complete the following table corresponding to where these reserves are reported in Schedule P:

| Years in Which Premiums Were Earned and Losses Were Incurred | DDR Reserve Included in Schedule P, Part 1F, Medical Professional Liability Column 24: Total Net Losses and Expenses Unpaid | |
| --- | --- | --- |
| | 1 Section 1: Occurrence | 2 Section 2: Claims-Made |
| 1.601  Prior...... | | |
| 1.602  2011...... | | |
| 1.603  2012...... | | |
| 1.604  2013...... | | |
| 1.605  2014...... | | |
| 1.606  2015...... | | |
| 1.607  2016...... | | |
| 1.608  2017...... | | |
| 1.609  2018...... | | |
| 1.610  2019 | | |
| 1.611  2020...... | | |
| 1.612  Totals | | |

2. The definition of allocated loss adjustment expenses (ALAE) and, therefore, unallocated loss adjustment expenses (ULAE) was changed effective January 1, 1998. This change in definition applies to both paid and unpaid expenses. Are these expenses (now reported as "Defense and Cost Containment" and "Adjusting and Other") reported in compliance with these definitions in this statement?   Yes [ X ]  No [ ]

3. The Adjusting and Other expense payments and reserves should be allocated to the years in which the losses were incurred based on the number of claims reported, closed and outstanding in those years. When allocating Adjusting and Other expense between companies in a group or a pool, the Adjusting and Other expense should be allocated in the same percentage used for the loss amounts and the claim counts. For reinsurers, Adjusting and Other expense assumed should be reported according to the reinsurance contract. For Adjusting and Other expense incurred by reinsurers, or in those situations where suitable claim count information is not available, Adjusting and Other expense should be allocated by a reasonable method determined by the company and described in Interrogatory 7, below. Are they so reported in this Statement?   Yes [ X ]  No [ ]

4. Do any lines in Schedule P include reserves that are reported gross of any discount to present value of future payments, and that are reported net of such discounts on Page 10?   Yes [ ]  No [ X ]

   If yes, proper disclosure must be made in the Notes to Financial Statements, as specified in the Instructions. Also, the discounts must be reported in Schedule P - Part 1, Columns 32 and 33.

   Schedule P must be completed gross of non-tabular discounting. Work papers relating to discount calculations must be available for examination upon request.

   Discounting is allowed only if expressly permitted by the state insurance department to which this Annual Statement is being filed.

5. What were the net premiums in force at the end of the year for:
   (in thousands of dollars)

   5.1 Fidelity   $ ..............................................

   5.2 Surety   $ ..............................................

6. Claim count information is reported per claim or per claimant (indicate which). ...............................................................CLAIM
   If not the same in all years, explain in Interrogatory 7.

7.1 The information provided in Schedule P will be used by many persons to estimate the adequacy of the current loss and expense reserves, among other things. Are there any especially significant events, coverage, retention or accounting changes that have occurred that must be considered when making such analyses?   Yes [ ]  No [ ]

7.2 An extended statement may be attached.
   See Note 26 in the Notes to Financial Statements in regards to the Company's Intercompany Pooling Agreement ..................................

93

# SCHEDULE T - EXHIBIT OF PREMIUMS WRITTEN

### Allocated By States And Territories

| States, etc. | Active Status (a) | 1<br>Gross Premiums, Including Policy and Membership Fees Less Return Premiums and Premiums on Policies Not Taken<br>2<br>Direct Premiums Written | 3<br>Direct Premiums Earned | 4<br>Dividends Paid or Credited to Policyholders on Direct Business | 5<br>Direct Losses Paid (Deducting Salvage) | 6<br>Direct Losses Incurred | 7<br>Direct Losses Unpaid | 8<br>Finance and Service Charges Not Included in Premiums | 9<br>Direct Premium Written for Federal Purchasing Groups (Included in Col. 2) |
|---|---|---|---|---|---|---|---|---|---|
| 1. Alabama ........... AL | N | | | | | | | | |
| 2. Alaska ............... AK | L | 846,081 | 846,081 | | 211,533 | 82,631 | 643,582 | | |
| 3. Arizona ............. AZ | L | 3,986,057 | 3,986,057 | | 2,485,793 | 1,117,782 | 9,754,633 | | |
| 4. Arkansas .......... AR | N | | | | | | | | |
| 5. California .......... CA | L | 70,195,881 | 70,326,949 | | 45,171,456 | 13,389,064 | 208,712,009 | | |
| 6. Colorado .......... CO | N | | | | | | | | |
| 7. Connecticut ...... CT | L | 4,266,238 | 4,266,238 | | 2,872,564 | 274,865 | 16,517,211 | | |
| 8. Delaware ......... DE | N | | | | | | | | |
| 9. Dist. Columbia ... DC | N | | | | | | | | |
| 10. Florida ............ FL | N | | | | | | | | |
| 11. Georgia .......... GA | L | 2,548,192 | 2,548,192 | | 2,137,366 | 320,918 | 2,659,872 | | |
| 12. Hawaii ............ HI | L | 59,018 | 59,018 | | 50,428 | (40,210) | 212,750 | | |
| 13. Idaho ............. ID | L | 2,153,937 | 2,273,073 | | 315,043 | 413,571 | 634,754 | | |
| 14. Illinois ............ IL | N | | | | | | | | |
| 15. Indiana .......... IN | N | | | | | | | | |
| 16. Iowa .............. IA | L | 502 | 502 | | | (48,039) | 94,135 | | |
| 17. Kansas .......... KS | L | 527 | 527 | | 1,142 | 993 | 34 | | |
| 18. Kentucky ........ KY | N | | | | | | | | |
| 19. Louisiana ........ LA | N | | | | | | | | |
| 20. Maine ............ ME | N | | | | | | | | |
| 21. Maryland ........ MD | N | | | | | | | | |
| 22. Massachusetts .. MA | N | | | | | | | | |
| 23. Michigan ........ MI | N | | | | | | | | |
| 24. Minnesota ...... MN | N | | | | | | | | |
| 25. Mississippi ..... MS | N | | | | | | | | |
| 26. Missouri ........ MO | L | 8,786 | 8,786 | | | | | | |
| 27. Montana ........ MT | L | 65,681 | 65,681 | | 3,829 | (6,406) | (9,348) | | |
| 28. Nebraska ....... NE | N | | | | | | | | |
| 29. Nevada ......... NV | L | 1,025,010 | 1,025,010 | | 827,563 | (1,396,895) | 2,439,987 | | |
| 30. New Hampshire .. NH | N | | | | | | | | |
| 31. New Jersey ..... NJ | L | 344,349 | 344,349 | | 129,155 | 311,184 | 352,579 | | |
| 32. New Mexico ..... NM | N | | | | | | | | |
| 33. New York ....... NY | L | 9,200,575 | 9,200,575 | | 4,307,176 | 4,285,135 | 19,651,808 | | |
| 34. No.Carolina ..... NC | L | 5,084 | 5,084 | | | | | | |
| 35. No.Dakota ...... ND | N | | | | | (21) | 14 | | |
| 36. Ohio ............. OH | N | | | | | | | | |
| 37. Oklahoma ....... OK | N | | | | | | | | |
| 38. Oregon .......... OR | L | 283,275 | 283,275 | | 350,758 | 363,019 | 2,089,374 | | |
| 39. Pennsylvania ... PA | N | | | | | | | | |
| 40. Rhode Island ... RI | N | | | | | | | | |
| 41. So. Carolina .... SC | N | | | | | | | | |
| 42. So. Dakota ...... SD | N | | | | | | | | |
| 43. Tennessee ...... TN | N | | | | | | | | |
| 44. Texas ............ TX | L | 3,095,644 | 3,095,644 | | 1,208,111 | 241,531 | 1,783,951 | | |
| 45. Utah ............. UT | L | 130,898 | 130,898 | | 246,471 | (204,603) | 692,560 | | |
| 46. Vermont ......... VT | N | | | | | | | | |
| 47. Virginia .......... VA | L | | | | | | | | |
| 48. Washington .... WA | L | 69,426 | 69,426 | | | (1,054) | 9,401 | | |
| 49. West Virginia ... WV | N | | | | | | | | |
| 50. Wisconsin ...... WI | L | 4,078 | 4,078 | | | | | | |
| 51. Wyoming ........ WY | N | | | | | | | | |
| 52. American Samoa .. AS | N | | | | | | | | |
| 53. Guam ............ GU | N | | | | | | | | |
| 54. Puerto Rico ..... PR | N | | | | | | | | |
| 55. U.S. Virgin Islands .. VI | N | | | | | | | | |
| 56. Northern Mariana Islands MP | N | | | | | | | | |
| 57. Canada .......... CAN | N | | | | | | | | |
| 58. Aggregate other alien ... OT | XXX | | | | | | | | |
| 59. Totals | XXX | 98,289,239 | 98,539,443 | | 60,318,388 | 19,103,465 | 266,239,306 | | |

| **DETAILS OF WRITE-INS** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 58001. ................................... | XXX | | | | | | | | |
| 58002. ................................... | XXX | | | | | | | | |
| 58003. ................................... | XXX | | | | | | | | |
| 58998. Sum of remaining write-ins for Line 58 from overflow page | XXX | | | | | | | | |
| 58999. Totals (Lines 58001 through 58003 + 58998) (Line 58 above) | XXX | | | | | | | | |

(a) Active Status Counts

L – Licensed or Chartered – Licensed insurance carrier or domiciled RRG ...................................26  R – Registered – Non-domiciled RRGs ..............................................
E – Eligible – Reporting entities eligible or approved to write surplus lines in the state (other
    than their state of domicile – See DSLI) ...........................................  Q – Qualified – Qualified or accredited reinsurer ..............................................
D – Domestic Surplus Lines Insurer (DSLI) – Reporting entities authorized to write surplus
    lines in the state of domicile ...........................................  N – None of the above – Not allowed to write business in the state .....31

(b) Explanation of basis of allocation of premiums by states, etc.


Premiums are allocated to those states where the insured risks are located: main place of employment for Workers' Compensation (including Employers' Liability endorsements) and the principal office location for Employers' Practices Liability (Other Liability), Surety, Warranty, and Legal (Write-in).

Exhibit 5, Page 110 of 152

## SCHEDULE T – PART 2
## INTERSTATE COMPACT – EXHIBIT OF PREMIUMS WRITTEN

Allocated By States and Territories

| States, Etc. | Direct Business Only | | | | | |
|---|---|---|---|---|---|---|
| | 1<br>Life<br>(Group and<br>Individual) | 2<br>Annuities (Group<br>and Individual) | 3<br>Disability<br>Income<br>(Group and<br>Individual) | 4<br>Long-Term Care<br>(Group and<br>Individual) | 5<br>Deposit-Type<br>Contracts | 6<br><br>Totals |
| 1. Alabama ................................AL | | | | | | |
| 2. Alaska ....................................AK | | | | | | |
| 3. Arizona ..................................AZ | | | | | | |
| 4. Arkansas ................................AR | | | | | | |
| 5. California ................................CA | | | | | | |
| 6. Colorado ................................CO | | | | | | |
| 7. Connecticut ...........................CT | | | | | | |
| 8. Delaware ................................DE | | | | | | |
| 9. District of Columbia ...............DC | | | | | | |
| 10. Florida ..................................FL | | | | | | |
| 11. Georgia ................................GA | | | | | | |
| 12. Hawaii ..................................HI | | | | | | |
| 13. Idaho ....................................ID | | | | | | |
| 14. Illinois ..................................IL | | | | | | |
| 15. Indiana .................................IN | | | | | | |
| 16. Iowa .....................................IA | | | | | | |
| 17. Kansas .................................KS | | | | | | |
| 18. Kentucky ..............................KY | | | | | | |
| 19. Louisiana .............................LA | | | | | | |
| 20. Maine ...................................ME | | | | | | |
| 21. Maryland ..............................MD | | | | | | |
| 22. Massachusetts .....................MA | | | | | | |
| 23. Michigan ..............................MI | | | | | | |
| 24. Minnesota ............................MN | | | | | | |
| 25. Mississippi ...........................MS | | | | | | |
| 26. Missouri ...............................MO | | | | | | |
| 27. Montana ...............................MT | | | | | | |
| 28. Nebraska .............................NE | | | NONE | | | |
| 29. Nevada .................................NV | | | | | | |
| 30. New Hampshire ....................NH | | | | | | |
| 31. New Jersey ...........................NJ | | | | | | |
| 32. New Mexico ..........................NM | | | | | | |
| 33. New York ..............................NY | | | | | | |
| 34. North Carolina ......................NC | | | | | | |
| 35. North Dakota ........................ND | | | | | | |
| 36. Ohio .....................................OH | | | | | | |
| 37. Oklahoma ............................OK | | | | | | |
| 38. Oregon .................................OR | | | | | | |
| 39. Pennsylvania ........................PA | | | | | | |
| 40. Rhode Island ........................RI | | | | | | |
| 41. South Carolina .....................SC | | | | | | |
| 42. South Dakota .......................SD | | | | | | |
| 43. Tennessee ...........................TN | | | | | | |
| 44. Texas ...................................TX | | | | | | |
| 45. Utah .....................................UT | | | | | | |
| 46. Vermont ...............................VT | | | | | | |
| 47. Virginia ................................VA | | | | | | |
| 48. Washington ..........................WA | | | | | | |
| 49. West Virginia ........................WV | | | | | | |
| 50. Wisconsin ............................WI | | | | | | |
| 51. Wyoming ..............................WY | | | | | | |
| 52. American Samoa ...................AS | | | | | | |
| 53. Guam ...................................GU | | | | | | |
| 54. Puerto Rico ..........................PR | | | | | | |
| 55. US Virgin Islands ..................VI | | | | | | |
| 56. Northern Mariana Islands ......MP | | | | | | |
| 57. Canada ................................CAN | | | | | | |
| 58. Aggregate Other Alien ...........OT | | | | | | |
| 59. Totals | | | | | | |

Exhibit 5, Page 111 of 152

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

## SCHEDULE Y - INFORMATION CONCERNING ACTIVITIES OF INSURER MEMBERS

## OF A HOLDING COMPANY GROUP

### PART 1 - ORGANIZATIONAL CHART



# SCHEDULE Y
# PART 1A – DETAIL OF INSURANCE HOLDING COMPANY SYSTEM

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Group Code | Group Name | NAIC Company Code | ID Number | Federal RSSD | CIK | Name of Securities Exchange if Publicly Traded (U.S. or International) | Names of Parent, Subsidiaries Or Affiliates | Domiciliary Location | Relationship to Reporting Entity | Directly Controlled by (Name of Entity/Person) | Type of Control (Ownership, Board, Management, Attorney-in-Fact, Influence, Other) | If Control is Ownership Provide Percentage | Ultimate Controlling Entity(ies)/Person(s) | Is an SCA Filing Required? (Y/N) | * |
| 00000 | | 00000 | | | | | Steven Menzies | | UIP | | Ownership | | | N | |
| 00000 | | 00000 | 20-4746240 | | | | AU Holding Company, Inc | DE | UIP | Steven Menzies | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3312003 | | | | AUCRA NEB RE ONE LLC | NE | NIA | Applied Underwriters Captive Risk Assurance Company, Inc | Ownership | 49.9 | Steven Menzies | N | |
| 00000 | | 00000 | 91-2106584 | | | | Applied Group Insurance Holdings, Inc | HI | NIA | AU Holding Company, Inc | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 20-3785366 | | | | North American Casualty Co | NE | UDP | AU Holding Company, Inc | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3295303 | | | | AUCRA Land 1 LLC | NE | NIA | AUCRA NEB RE ONE LLC | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3488475 | | | | CIC Land 4, LLC | NE | DS | California Insurance Company | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3311198 | | | | CIC NEB RE ONE LLC | NE | DS | California Insurance Company | Ownership | 49.9 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3311824 | | | | CIC NEB RE TWO LLC | NE | DS | California Insurance Company | Ownership | 49.9 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3311908 | | | | CIC NEB RE THREE LLC | NE | DS | California Insurance Company | Ownership | 49.9 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3243923 | | | | CIC Land 1, LLC | NE | DS | CIC NEB RE ONE LLC | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3290902 | | | | CIC Land 3, LLC | NE | DS | CIC NEB RE THREE LLC | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3259779 | | | | CIC Land 2, LLC | NE | DS | CIC NEB RE TWO LLC | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3326350 | | | | CNI Land 1, LLC | NE | NIA | CNI NEB RE ONE LLC | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3311709 | | | | CNI NEB RE ONE LLC | NE | NIA | Continental Indemnity Company | Ownership | 49.9 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3399777 | | | | IIC Land 1, LLC | NE | NIA | IIC NEB RE ONE LLC | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-4057482 | | | | IIC NEB RE ONE LLC | NE | NIA | Illinois Insurance Company | Ownership | 49.9 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 40398 | 36-3155373 | | | | Ashmere Insurance Company | FL | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 14144 | 45-3353082 | | | | Applied Underwriters Captive Risk Assurance Company, Inc | NM | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 38865 | 94-1627528 | | | | California Insurance Company | CA | RE | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 84-3264205 | | | | California Insurance Company | NM | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 85-0568732 | | | | Centauri Acquisition Corporation LLC | DE | NIA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 00000 | | 00000 | 45-2689025 | | | | Centauri Specialty Managers, Inc | FL | NIA | Centauri Acquisition Corporation LLC | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 28258 | 31-1191023 | | | | Continental Indemnity Company | NM | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 12040 | 99-0338446 | | | | Commercial General Indemnity, Inc | HI | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 35246 | 58-1811419 | | | | Illinois Insurance Company | NM | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 36382 | 73-1020784 | | | | Oklahoma Property and Casualty Insurance Company | OK | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 21962 | 23-1471444 | | | | Pennsylvania Insurance Company | NM | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |
| 04962 | AU Holding Co Grp | 16543 | 75-1906915 | | | | Texas Insurance Company | TX | IA | North American Casualty Co | Ownership | 100.0 | Steven Menzies | N | |

| Asterisk | Explanation |
|---|---|
| | |

Exhibit 5, Page 113 of 152

# SCHEDULE Y

# PART 2 - SUMMARY OF INSURER'S TRANSACTIONS WITH ANY AFFILIATES

| 1 NAIC Company Code | 2 ID Number | 3 Names of Insurers and Parent, Subsidiaries or Affiliates | 4 Shareholder Dividends | 5 Capital Contributions | 6 Purchases, Sales or Exchanges of Loans, Securities, Real Estate, Mortgage Loans or Other Investments | 7 Income/(Disbursements) Incurred in Connection with Guarantees or Undertakings for the Benefit of any Affiliate(s) | 8 Management Agreements and Service Contracts | 9 Income/(Disbursements) Incurred Under Reinsurance Agreements | 10 * | 11 Any Other Material Activity Not in the Ordinary Course of the Insurer's Business | 12 Totals | 13 Reinsurance Recoverable/(Payable) on Losses and/or Reserve Credit Taken/(Liability) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00000 | 91-2106584 | Applied Group Insurance Holdings, Inc | | | | | | | | | | |
| 14144 | 45-3353082 | Applied Underwriters Captive Risk Assura | | (2,807,421) | | | | (34,455,033) | | | (37,262,454) | (174,207,470) |
| 00000 | 84-3312003 | AU Holding Company, Inc | | (3,500,000) | | | | | | | (3,500,000) | |
| 00000 | 84-3312003 | AUCRA NEB RE ONE LLC | | 2,807,421 | | | | | | | 2,807,421 | |
| 00000 | 84-3264205 | California Insurance Company | | | | | | | | | | |
| 38865 | 94-1627528 | California Insurance Company | | (4,913,898) | | | | 24,038,062 | * | | 19,124,164 | |
| 00000 | 84-3488475 | CIC Land 4, LLC | | 709,656 | | | | | | | 709,656 | |
| 00000 | 84-3311198 | CIC NEB RE ONE LLC | | 1,296,108 | | | | | | | 1,296,108 | |
| 00000 | 84-3311824 | CIC NEB RE TWO LLC | | 811,387 | | | | | | | 811,387 | |
| 00000 | 84-3311908 | CIC NEB RE THREE LLC | | 2,096,747 | | | | | | | 2,096,747 | |
| 00000 | 84-3311709 | CNI NEB RE ONE LLC | | 1,022,079 | | | | | | | 1,022,079 | |
| 12040 | 99-0338446 | Commercial General Indemnity, Inc | | | | | | (537,704) | | | (537,704) | (13,335,680) |
| 28258 | 31-1191023 | Continental Indemnity Company | | (1,022,079) | | | | 10,954,675 | * | | 9,932,596 | 187,543,150 |
| 00000 | 84-4057482 | IIC NEB RE ONE LLC | | 62,247 | | | | | | | 62,247 | |
| 35246 | 58-1811419 | Illinois Insurance Company | (3,500,000) | (62,247) | | | | | * | | (3,562,247) | |
| 00000 | 20-3785366 | North American Casualty Co | 3,500,000 | (24,935,823) | | | | | | | (21,435,823) | |
| 00000 | 85-0568732 | Centauri Acquisition Corporation LLC | | 10,001,000 | | | | | | | 10,001,000 | |
| 36382 | 73-1020784 | Oklahoma Property & Casualty Company | | 3,303,038 | | | | | | | 3,303,038 | |
| 40398 | 36-3155373 | Ashmere Insurance Company | | 15,131,785 | | | | | | | 15,131,785 | |
| 21962 | 23-1471444 | Pennsylvania Insurance Company | | | | | | | * | | | |
| 16543 | 75-1906915 | Texas Insurance Company | | | | | | | * | | | |
| 9999999 Control Totals | | | | | | | | | XXX | | | |

Pooling Arrangement between    Pooling %

| | |
|---|---|
| California Insurance Company | 70.00% |
| Continental Indemnity Company | 15.00% |
| Illinois Insurance Company | 5.00% |
| Pennsylvania Insurance Company | 5.00% |
| Texas Insurance Company | 5.00% |

96

Exhibit 5, Page 114 of 152

# SUPPLEMENTAL EXHIBITS AND SCHEDULES INTERROGATORIES

The following supplemental reports are required to be filed as part of your statement filing unless specifically waived by the domiciliary state. However, in the event that your domiciliary state waives the filing requirement, your response of **WAIVED** to the specific interrogatory will be accepted in lieu of filing a "NONE" report and a bar code will be printed below. If the supplement is required of your company but is not being filed for whatever reason enter **SEE EXPLANATION** and provide an explanation following the interrogatory questions.

**RESPONSES**

**MARCH FILING**

1. Will an actuarial opinion be filed by March 1? .....................YES.....................

2. Will the Supplemental Compensation Exhibit be filed with the state of domicile by March 1? .....................YES.....................

3. Will the confidential Risk-based Capital Report be filed with the NAIC by March 1? .....................YES.....................

4. Will the confidential Risk-based Capital Report be filed with the state of domicile, if required, by March 1? .....................YES.....................

**APRIL FILING**

5. Will the Insurance Expense Exhibit be filed with the state of domicile and the NAIC by April 1? .....................YES.....................

6. Will Management's Discussion and Analysis be filed by April 1? .....................YES.....................

7. Will the Supplemental Investment Risks Interrogatories be filed by April 1? .....................YES.....................

**MAY FILING**

8. Will this company be included in a combined annual statement that is filed with the NAIC by May 1? .....................YES.....................

**JUNE FILING**

9. Will an audited financial report be filed by June 1? .....................YES.....................

10. Will Accountants Letter of Qualifications be filed with the state of domicile and electronically with the NAIC by June 1? .....................YES.....................

**AUGUST FILING**

11. Will the regulator-only (non-public) Communication of Internal Control Related Matters Noted in Audit be filed with the state of domicile and electronically with the NAIC (as a regulator-only non-public document) by August 1? .....................YES.....................

The following supplemental reports are required to be filed as part of your statement filing **if your company is engaged in the type of business covered by the supplement. However, in the event that your company does not transact the type of business for which the special report must be filed, your response of NO to the specific interrogatory will be accepted in lieu of filing a "NONE" report and a bar code will be printed below.** If the supplement is required of your company but is not being filed for whatever reason, enter **SEE EXPLANATION** and provide an explanation following the interrogatory questions.

**MARCH FILING**

12. Will Schedule SIS (Stockholder Information Supplement) be filed with the state of domicile by March 1? .....................NO.....................

13. Will the Financial Guaranty Insurance Exhibit be filed by March 1? .....................NO.....................

14. Will the Medicare Supplement Insurance Experience Exhibit be filed with the state of domicile and the NAIC by March 1? .....................NO.....................

15. Will Supplement A to Schedule T (Medical Professional Liability Supplement) be filed by March 1? .....................NO.....................

16. Will the Trusteed Surplus Statement be filed with the state of domicile and the NAIC by March 1? .....................NO.....................

17. Will the Premiums Attributed to Protected Cells Exhibit be filed by March 1? .....................NO.....................

18. Will the Reinsurance Summary Supplemental Filing for General Interrogatory 9 be filed with the state of domicile and the NAIC by March 1? .....................NO.....................

19. Will the Medicare Part D Coverage Supplement be filed with the state of domicile and the NAIC by March 1? .....................NO.....................

20. Will the confidential Actuarial Opinion Summary be filed with the state of domicile, if required, by March 15 (or the date otherwise specified)? .....................YES.....................

21. Will the Reinsurance Attestation Supplement be filed with the state of domicile and the NAIC by March 1? .....................YES.....................

22. Will the Exceptions to the Reinsurance Attestation Supplement be filed with the state of domicile by March 1? .....................NO.....................

23. Will the Bail Bond Supplement be filed with the state of domicile and the NAIC by March 1? .....................NO.....................

24. Will the Director and Officer Insurance Coverage Supplement be filed with the state of domicile and the NAIC by March 1? .....................NO.....................

25. Will an approval from the reporting entity's state of domicile for relief related to the five-year rotation requirement for lead audit partner be filed electronically with the NAIC by March 1? .....................NO.....................

26. Will an approval from the reporting entity's state of domicile for relief related to the one-year cooling off period for independent CPA be filed electronically with the NAIC by March 1? .....................NO.....................

27. Will an approval from the reporting entity's state of domicile for relief related to the Requirements for Audit Committees be filed electronically with the NAIC by March 1? .....................NO.....................

# SUPPLEMENTAL EXHIBITS AND SCHEDULES INTERROGATORIES

28. Will the Supplemental Schedule for Reinsurance Counterparty Reporting Exception – Asbestos and Pollution Contracts be filed with the state of domicile and the NAIC by March 1? ..................NO..................

**APRIL FILING**

29. Will the Credit Insurance Experience Exhibit be filed with the state of domicile and the NAIC by April 1? ..................NO..................

30. Will the Long-term Care Experience Reporting Forms be filed with the state of domicile and the NAIC by April 1? ..................NO..................

31. Will the Accident and Health Policy Experience Exhibit be filed by April 1? ..................NO..................

32. Will the Supplemental Health Care Exhibit (Parts 1, 2 and 3) be filed with the state of domicile and the NAIC by April 1? ..................NO..................

33. Will the regulator only (non-public) Supplemental Health Care Exhibit's Allocation Report be filed with the state of domicile and the NAIC by April 1? ..................NO..................

34. Will the Cybersecurity and Identity Theft Insurance Coverage Supplement be filed with the state of domicile and the NAIC by April 1? ..................NO..................

35. Will the Life, Health & Annuity Guaranty Association Model Act Assessment Base Reconciliation Exhibit be filed with the state of domicile and the NAIC by April 1? ..................NO..................

36. Will the Adjustment to the Life, Health & Annuity Guaranty Association Model Act Assessment Base Reconciliation Exhibit (if required) be filed with the state of domicile and the NAIC by April 1? ..................NO..................

37. Will the Private Flood Insurance Supplement be filed with the state of domicile and the NAIC by April 1? ..................NO..................

**AUGUST FILING**

38. Will Management's Report of Internal Control Over Financial Reporting be filed with the state of domicile by August 1? ..........SEE EXPLANATION..........

**Explanation:**

12. N/A

13. N/A

14. N/A

15. N/A

16. N/A

17. N/A

18. N/A

19. N/A

22. N/A

23. N/A

24. N/A

25. N/A

26. N/A

27. N/A

28. N/A

29. N/A

30. N/A

31. N/A

32. N/A

33. N/A

34. N/A

Exhibit 5, Page 116 of 152

# SUPPLEMENTAL EXHIBITS AND SCHEDULES INTERROGATORIES

35. N/A

36. N/A

37. N/A

38. The Company does not have $500 million or more in direct written and assumed premiums when excluding assumed premiums booked to reflect a lead company change to an intercompany pooling agreement

**Bar Code:**



| | |
|---|---|
| 12. | 3 8 8 6 5 2 0 2 0 4 2 0 0 0 0 0 0 |
| 13. | 3 8 8 6 5 2 0 2 0 2 4 0 0 0 0 0 0 |
| 14. | 3 8 8 6 5 2 0 2 0 3 6 0 5 9 0 0 0 |
| 15. | 3 8 8 6 5 2 0 2 0 4 4 5 0 0 0 0 0 |
| 16. | 3 8 8 6 5 2 0 2 0 4 9 0 0 0 0 0 0 |
| 17. | 3 8 8 6 5 2 0 2 0 3 8 5 0 0 0 0 0 |
| 18. | 3 8 8 6 5 2 0 2 0 4 0 1 0 0 0 0 0 |
| 19. | 3 8 8 6 5 2 0 2 0 3 6 5 0 0 0 0 0 |
| 22. | 3 8 8 6 5 2 0 2 0 4 0 0 0 0 0 0 0 |
| 23. | 3 8 8 6 5 2 0 2 0 5 0 0 0 0 0 0 0 |
| 24. | 3 8 8 6 5 2 0 2 0 5 0 5 0 0 0 0 0 |
| 25. | 3 8 8 6 5 2 0 2 0 2 2 4 0 0 0 0 0 |
| 26. | 3 8 8 6 5 2 0 2 0 2 2 5 0 0 0 0 0 |
| 27. | 3 8 8 6 5 2 0 2 0 2 2 6 0 0 0 0 0 |
| 28. | 3 8 8 6 5 2 0 2 0 5 5 5 0 0 0 0 0 |
| 29. | 3 8 8 6 5 2 0 2 0 3 0 5 9 0 0 0 |
| 30. | 3 8 8 6 5 2 0 2 0 3 0 6 0 0 0 0 0 |
| 31. | 3 8 8 6 5 2 0 2 0 2 1 0 0 0 0 0 0 |

Exhibit 5, Page 117 of 152

# SUPPLEMENTAL EXHIBITS AND SCHEDULES INTERROGATORIES



# OVERFLOW PAGE FOR WRITE-INS

P002 Additional Aggregate Lines for Page 2 Line 25.
*ASSETS - Assets

| | 1<br>Assets | 2<br>Nonadmitted<br>Assets | 3<br>Net Admitted<br>Assets<br>(Cols. 1 – 2) | 4<br>Net Admitted<br>Assets |
|---|---|---|---|---|
| 2504. Prepaid ceded premiums | | | | |
| 2505. Premium tax receivable | 1,213,276 | | 1,213,276 | 1,736,674 |
| 2506. Other receivable - related party | | | | 14,707 |
| 2597. Summary of remaining write-ins for Line 25 from page 2 | 1,213,276 | | 1,213,276 | 1,751,381 |

Exhibit 5, Page 119 of 152

# SUMMARY INVESTMENT SCHEDULE

| Investment Categories | Gross Investment Holdings | | Admitted Assets as Reported in the Annual Statement | | | |
|---|---|---|---|---|---|---|
| | 1 Amount | 2 Percentage of Column 1 Line 13 | 3 Amount | 4 Securities Lending Reinvested Collateral Amount | 5 Total (Col. 3+4) Amount | 6 Percentage of Column 5 Line 13 |
| 1. Long-Term Bonds (Schedule D, Part 1): | | | | | | |
| 1.01 U.S. governments | 341,145,790 | 32.743 | 341,145,790 | | 341,145,790 | 33.468 |
| 1.02 All other governments | | | | | | |
| 1.03 U.S. states, territories and possessions, etc. guaranteed | | | | | | |
| 1.04 U.S. political subdivisions of states, territories, and possessions, guaranteed | | | | | | |
| 1.05 U.S. special revenue and special assessment obligations, etc. non-guaranteed | 88,867,978 | 8.530 | 88,867,978 | | 88,867,978 | 8.718 |
| 1.06 Industrial and miscellaneous | | | | | | |
| 1.07 Hybrid securities | | | | | | |
| 1.08 Parent, subsidiaries and affiliates | | | | | | |
| 1.09 SVO identified funds | | | | | | |
| 1.10 Unaffiliated bank loans | | | | | | |
| 1.11 Total long-term bonds | 430,013,768 | 41.273 | 430,013,768 | | 430,013,768 | 42.186 |
| 2. Preferred stocks (Schedule D, Part 2, Section 1): | | | | | | |
| 2.01 Industrial and miscellaneous (Unaffiliated) | | | | | | |
| 2.02 Parent, subsidiaries and affiliates | | | | | | |
| 2.03 Total preferred stocks | | | | | | |
| 3. Common stocks (Schedule D, Part 2, Section 2): | | | | | | |
| 3.01 Industrial and miscellaneous Publicly traded (Unaffiliated) | | | | | | |
| 3.02 Industrial and miscellaneous Other (Unaffiliated) | 46,213,228 | 4.436 | 23,647,695 | | 23,647,695 | 2.320 |
| 3.03 Parent, subsidiaries and affiliates Publicly traded | | | | | | |
| 3.04 Parent, subsidiaries and affiliates Other | | | | | | |
| 3.05 Mutual funds | | | | | | |
| 3.06 Unit investment trusts | | | | | | |
| 3.07 Closed-end funds | | | | | | |
| 3.08 Total common stocks | 46,213,228 | 4.436 | 23,647,695 | | 23,647,695 | 2.320 |
| 4. Mortgage loans (Schedule B): | | | | | | |
| 4.01 Farm mortgages | | | | | | |
| 4.02 Residential mortgages | | | | | | |
| 4.03 Commercial mortgages | | | | | | |
| 4.04 Mezzanine real estate loans | | | | | | |
| 4.05 Total valuation allowance | | | | | | |
| 4.06 Total mortgage loans | | | | | | |
| 5. Real estate (Schedule A): | | | | | | |
| 5.01 Properties occupied by company | 64,882,789 | 6.227 | 64,882,789 | | 64,882,789 | 6.365 |
| 5.02 Properties held for production of income | 1,944,646 | 0.187 | 1,944,646 | | 1,944,646 | 0.191 |
| 5.03 Properties held for sale | | | | | | |
| 5.04 Total real estate | 66,827,435 | 6.414 | 66,827,435 | | 66,827,435 | 6.556 |
| 6. Cash, cash equivalents and short-term investments: | | | | | | |
| 6.01 Cash (Schedule E, Part 1) | 201,946,263 | 19.383 | 201,946,263 | | 201,946,263 | 19.812 |
| 6.02 Cash equivalents (Schedule E, Part 2) | 88,650,332 | 8.509 | 88,650,332 | | 88,650,332 | 8.697 |
| 6.03 Short-term investments (Schedule DA) | 16,978,330 | 1.630 | 16,978,330 | | 16,978,330 | 1.666 |
| 6.04 Total cash, cash equivalents and short-term investments | 307,574,925 | 29.521 | 307,574,925 | | 307,574,925 | 30.174 |
| 7. Contract loans | | | | | | |
| 8. Derivatives (Schedule DB) | | | | | | |
| 9. Other invested assets (Schedule BA) | 191,258,181 | 18.357 | 191,258,181 | | 191,258,181 | 18.763 |
| 10. Receivables for securities | | | | | | |
| 11. Securities Lending (Schedule DL, Part 1) | | | | XXX | XXX | XXX |
| 12. Other invested assets (Page 2, Line 11) | | | | | | |
| 13. Total invested assets | 1,041,887,537 | 100.000 | 1,019,322,004 | | 1,019,322,004 | 100.000 |

# SCHEDULE A – VERIFICATION BETWEEN YEARS

**Real Estate**

1. Book/adjusted carrying value, December 31 of prior year.................................................................................................8,914,520
2. Cost of acquired:
   2.1 Actual cost at time of acquisition (Part 2, Column 6)...........................................................................................
   2.2 Additional investment made after acquisition (Part 2, Column 9)..............................57,912,915....................57,912,915
3. Current year change in encumbrances:
   3.1 Totals, Part 1, Column 13............................................................................................................................
   3.2 Totals, Part 3, Column 11............................................................................................................................
4. Total gain (loss) on disposals, Part 3, Column 18..................................................................................................
5. Deduct amounts received on disposals, Part 3, Column 15.......................................................................................
6. Total foreign exchange change in book/adjusted carrying value:
   6.1 Totals, Part 1, Column 15............................................................................................................................
   6.2 Totals, Part 3, Column 13............................................................................................................................
7. Deduct current year's other-than-temporary impairment recognized:
   7.1 Totals, Part 1, Column 12............................................................................................................................
   7.2 Totals, Part 3, Column 10............................................................................................................................
8. Deduct current year's depreciation:
   8.1 Totals, Part 1, Column 11............................................................................................................................
   8.2 Totals, Part 3, Column 9..............................................................................................................................
9. Book/adjusted carrying value at the end of current period (Lines 1+2+3+4-5+6-7-8)..................................................66,827,435
10. Deduct total nonadmitted amounts.......................................................................................................................
11. Statement value at end of current period (Line 9 minus Line 10)................................................................................66,827,435


# SCHEDULE B – VERIFICATION BETWEEN YEARS

**Mortgage Loans**

1. Book value/recorded investment excluding accrued interest, December 31 of prior year................................................
2. Cost of acquired:
   2.1 Actual cost at time of acquisition (Part 2, Column 7).............................................................................................
   2.2 Additional investment made after acquisition (Part 2, Column 8)...............................................................................
3. Capitalized deferred interest and other:
   3.1 Totals, Part 1, Column 12............................................................................................................................
   3.2 Totals, Part 3, Column 11............................................................................................................................
4. Accrual of discount..............................................................................................................................................
5. Unrealized valuation increase (decrease):
   5.1 Totals, Part 1, Column 9..............................................................................................................................
   5.2 Totals, Part 3, Column 8..............................................................................................................................
6. Total gain (loss) on disposals, Part 3, Column 18..................................................................................................
7. Deduct amounts received on disposals, Part 3, Column 15.......................................................................................
8. Deduct amortization of premium and mortgage interest points and commitment fees......................................................
9. Total foreign exchange change in book value/recorded investment excluding accrued interest:
   9.1 Totals, Part 1, Column 13............................................................................................................................
   9.2 Totals, Part 3, Column 13............................................................................................................................
10. Deduct current year's other-than-temporary impairment recognized:
    10.1 Totals, Part 1, Column 11..........................................................................................................................
    10.2 Totals, Part 3, Column 10..........................................................................................................................
11. Book value/recorded investment excluding accrued interest at end of current period (Lines 1+2+3+4+5+6-7-8+9-10)..........
12. Total valuation allowance....................................................................................................................................
13. Subtotal (Line 11 plus Line 12)............................................................................................................................
14. Deduct total nonadmitted amounts.......................................................................................................................
15. Statement value of mortgages owned at end of current period (Line 13 minus Line 14)................................................

NONE

# SCHEDULE BA – VERIFICATION BETWEEN YEARS

## Other Long-Term Invested Assets

| | | |
|---|---|---:|
| 1. | Book/adjusted carrying value, December 31 of prior year | 180,445,445 |
| 2. | Cost of acquired: | |
| | 2.1 Actual cost at time of acquisition (Part 2, Column 8) | 20,000,000 |
| | 2.2 Additional investment made after acquisition (Part 2, Column 9) | 4,690,220 ........ 24,690,220 |
| 3. | Capitalized deferred interest and other: | |
| | 3.1 Totals, Part 1, Column 16 | |
| | 3.2 Totals, Part 3, Column 12 | |
| 4. | Accrual of discount | |
| 5. | Unrealized valuation increase (decrease): | |
| | 5.1 Totals, Part 1, Column 13 | 2,308,493 |
| | 5.2 Totals, Part 3, Column 9 | 2,308,493 |
| 6. | Total gain (loss) on disposals, Part 3, Column 19 | |
| 7. | Deduct amounts received on disposals, Part 3, Column 16 | 16,185,977 |
| 8. | Deduct amortization of premium and depreciation | |
| 9. | Total foreign exchange change in book/adjusted carrying value: | |
| | 9.1 Totals, Part 1, Column 17 | |
| | 9.2 Totals, Part 3, Column 14 | |
| 10. | Deduct current year's other-than-temporary impairment recognized: | |
| | 10.1 Totals, Part 1, Column 15 | |
| | 10.2 Totals, Part 3, Column 11 | |
| 11. | Book/adjusted carrying value at end of current period (Lines 1+2+3+4+5+6-7-8+9-10) | 191,258,181 |
| 12. | Deduct total nonadmitted amounts | |
| 13. | Statement value at end of current period (Line 11 minus Line 12) | 191,258,181 |

# SCHEDULE D – VERIFICATION BETWEEN YEARS

## Bonds and Stocks

| | | |
|---|---|---:|
| 1. | Book/adjusted carrying value, December 31 of prior year | 779,678,533 |
| 2. | Cost of bonds and stocks acquired, Part 3, Column 7 | 50,573,026 |
| 3. | Accrual of discount | 1,423,675 |
| 4. | Unrealized valuation increase (decrease): | |
| | 4.1 Part 1, Column 12 | |
| | 4.2 Part 2, Section 1, Column 15 | |
| | 4.3 Part 2, Section 2, Column 13 | (9,635,875) |
| | 4.4 Part 4, Column 11 | (9,635,875) |
| 5. | Total gain (loss) on disposals, Part 4, Column 19 | 125,832 |
| 6. | Deduction consideration for bonds and stocks disposed of, Part 4, Column 7 | 343,964,677 |
| 7. | Deduct amortization of premium | 1,973,518 |
| 8. | Total foreign exchange change in book/adjusted carrying value: | |
| | 8.1 Part 1, Column 15 | |
| | 8.2 Part 2, Section 1, Column 19 | |
| | 8.3 Part 2, Section 2, Column 16 | |
| | 8.4 Part 4, Column 15 | |
| 9. | Deduct current year's other-than-temporary impairment recognized: | |
| | 9.1 Part 1, Column 14 | |
| | 9.2 Part 2, Section 1, Column 17 | |
| | 9.3 Part 2, Section 2, Column 14 | |
| | 9.4 Part 4, Column 13 | |
| 10. | Total investment income recognized as a result of prepayment penalties and/or acceleration fees, Note 5Q, Line (2) | |
| 11. | Book/adjusted carrying value at end of current period (Lines 1+2+3+4+5-6-7+8-9+10) | 476,226,996 |
| 12. | Deduct total nonadmitted amounts | 22,565,533 |
| 13. | Statement value at end of current period (Line 11 minus Line 12) | 453,661,463 |

# SCHEDULE D - SUMMARY BY COUNTRY

Long-Term Bonds and Stocks **OWNED** December 31 of Current Year

| Description | | | 1<br>Book/Adjusted<br>Carrying Value | 2<br>Fair Value | 3<br>Actual Cost | 4<br>Par Value of Bonds |
|---|---|---|---|---|---|---|
| **BONDS** | 1. | United States | 341,145,790 | 342,970,802 | 341,614,748 | 340,454,000 |
| Governments (including all obligations | 2. | Canada | | | | |
| guaranteed by governments) | 3. | Other Countries | | | | |
| | 4. | Totals | 341,145,790 | 342,970,802 | 341,614,748 | 340,454,000 |
| U.S. States, Territories and Possessions | | | | | | |
| (direct and guaranteed) | 5. | Totals | | | | |
| U.S. Political Subdivisions of States, Territories | | | | | | |
| and Possessions (direct and guaranteed) | 6. | Totals | | | | |
| U.S. Special Revenue and Special Assessment | | | | | | |
| Obligations and all Non-Guaranteed | | | | | | |
| Obligations of Agencies and Authorities of | | | | | | |
| Governments and their Political Subdivisions | 7. | Totals | 88,867,978 | 90,369,338 | 88,909,377 | 87,948,364 |
| Industrial and Miscellaneous, SVO Identified | 8. | United States | | | | |
| Funds, Unaffiliated Bank Loans and Hybrid | 9. | Canada | | | | |
| Securities (unaffiliated) | 10. | Other Countries | | | | |
| | 11. | Totals | | | | |
| Parent, Subsidiaries and Affiliates | 12. | Totals | | | | |
| | **13.** | **Total Bonds** | 430,013,768 | 433,340,140 | 430,524,125 | 428,402,364 |
| **PREFERRED STOCKS** | 14. | United States | | | | |
| Industrial and Miscellaneous (unaffiliated) | 15. | Canada | | | | |
| | 16. | Other Countries | | | | |
| | 17. | Totals | | | | |
| Parent, Subsidiaries and Affiliates | 18. | Totals | | | | |
| | **19.** | **Total Preferred Stocks** | | | | |
| **COMMON STOCKS** | 20. | United States | | | | |
| Industrial and Miscellaneous (unaffiliated) | 21. | Canada | | | | |
| | 22. | Other Countries | 46,213,228 | 46,213,228 | 55,849,103 | |
| | 23. | Totals | 46,213,228 | 46,213,228 | 55,849,103 | |
| Parent, Subsidiaries and Affiliates | 24. | Totals | | | | |
| | **25.** | **Total Common Stocks** | 46,213,228 | 46,213,228 | 55,849,103 | |
| | **26.** | **Total Stocks** | 46,213,228 | 46,213,228 | 55,849,103 | |
| | **27.** | **Total Bonds and Stocks** | 476,226,996 | 479,553,368 | 486,373,228 | |

SI04

# SCHEDULE D - PART 1A - SECTION 1

Quality and Maturity Distribution of All Bonds Owned December 31, at Book/Adjusted Carrying Values by Major Types of Issues and NAIC Designations

| NAIC Designation | 1<br>1 Year or Less | 2<br>Over 1 Year Through 5 Years | 3<br>Over 5 Years Through 10 Years | 4<br>Over 10 Years Through 20 Years | 5<br>Over 20 Years | 6<br>No Maturity Date | 7<br>Total Current Year | 8<br>Col. 7 as a % of Line 11.7 | 9<br>Total from Col. 7 Prior Year | 10<br>% From Col. 8 Prior Year | 11<br>Total Publicly Traded | 12<br>Total Privately Placed (a) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. U.S. Governments | | | | | | | | | | | | |
| 1.1 NAIC 1 | 441,386,876 | 4,720,232 | | | | XXX | 446,107,108 | 83.4 | 740,911,123 | 85.2 | 446,107,108 | |
| 1.2 NAIC 2 | | | | | | XXX | | | | | | |
| 1.3 NAIC 3 | | | | | | XXX | | | | | | |
| 1.4 NAIC 4 | | | | | | XXX | | | | | | |
| 1.5 NAIC 5 | | | | | | XXX | | | | | | |
| 1.6 NAIC 6 | | | | | | XXX | | | | | | |
| 1.7 Totals | 441,386,876 | 4,720,232 | | | | XXX | 446,107,108 | 83.4 | 740,911,123 | 85.2 | 446,107,108 | |
| 2. All Other Governments | | | | | | | | | | | | |
| 2.1 NAIC 1 | | | | | | XXX | | | | | | |
| 2.2 NAIC 2 | | | | | | XXX | | | | | | |
| 2.3 NAIC 3 | | | | | | XXX | | | | | | |
| 2.4 NAIC 4 | | | | | | XXX | | | | | | |
| 2.5 NAIC 5 | | | | | | XXX | | | | | | |
| 2.6 NAIC 6 | | | | | | XXX | | | | | | |
| 2.7 Totals | | | | | | XXX | | | | | | |
| 3. U.S. States, Territories and Possessions, etc., Guaranteed | | | | | | | | | | | | |
| 3.1 NAIC 1 | | | | | | XXX | | | | | | |
| 3.2 NAIC 2 | | | | | | XXX | | | | | | |
| 3.3 NAIC 3 | | | | | | XXX | | | | | | |
| 3.4 NAIC 4 | | | | | | XXX | | | | | | |
| 3.5 NAIC 5 | | | | | | XXX | | | | | | |
| 3.6 NAIC 6 | | | | | | XXX | | | | | | |
| 3.7 Totals | | | | | | XXX | | | | | | |
| 4. U.S. Political Subdivisions of States, Territories and Possessions, Guaranteed | | | | | | | | | | | | |
| 4.1 NAIC 1 | | | | | | XXX | | | | | | |
| 4.2 NAIC 2 | | | | | | XXX | | | | | | |
| 4.3 NAIC 3 | | | | | | XXX | | | | | | |
| 4.4 NAIC 4 | | | | | | XXX | | | | | | |
| 4.5 NAIC 5 | | | | | | XXX | | | | | | |
| 4.6 NAIC 6 | | | | | | XXX | | | | | | |
| 4.7 Totals | | | | | | XXX | | | | | | |
| 5. U.S. Special Revenue & Special Assessment Obligations, etc., Non-Guaranteed | | | | | | | | | | | | |
| 5.1 NAIC 1 | 6,558,354 | 21,205,451 | 16,956,384 | 5,046,727 | | XXX | 49,766,916 | 9.3 | 94,529,923 | 10.9 | 49,766,916 | |
| 5.2 NAIC 2 | | | | | | XXX | | | | | | |
| 5.3 NAIC 3 | | | | | | XXX | | | | | | |
| 5.4 NAIC 4 | | | | | | XXX | | | | | | |
| 5.5 NAIC 5 | | 39,101,062 | | | | XXX | 39,101,062 | 7.3 | 34,124,709 | 3.9 | 39,101,062 | |
| 5.6 NAIC 6 | | | | | | XXX | | | | | | |
| 5.7 Totals | 6,558,354 | 60,306,513 | 16,956,384 | 5,046,727 | | XXX | 88,867,978 | 16.6 | 128,654,632 | 14.8 | 88,867,978 | |

SI05

# SCHEDULE D - PART 1A - SECTION 1 (Continued)

Quality and Maturity Distribution of All Bonds Owned December 31, at Book/Adjusted Carrying Values by Major Types of Issues and NAIC Designations

| NAIC Designation | 1<br>1 Year or Less | 2<br>Over 1 Year Through 5 Years | 3<br>Over 5 Years Through 10 Years | 4<br>Over 10 Years Through 20 Years | 5<br>Over 20 Years | 6<br>No Maturity Date | 7<br>Total Current Year | 8<br>Col. 7 as a % of Line 11.7 | 9<br>Total from Col. 7 Prior Year | 10<br>% From Col. 8 Prior Year | 11<br>Total Publicly Traded | 12<br>Total Privately Placed (a) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **6. Industrial and Miscellaneous (unaffiliated)** | | | | | | | | | | | | |
| 6.1  NAIC 1 | | | | | | XXX | | | | | | |
| 6.2  NAIC 2 | | | | | | XXX | | | | | | |
| 6.3  NAIC 3 | | | | | | XXX | | | | | | |
| 6.4  NAIC 4 | | | | | | XXX | | | | | | |
| 6.5  NAIC 5 | | | | | | XXX | | | | | | |
| 6.6  NAIC 6 | | | | | | XXX | | | | | | |
| 6.7  Totals | | | | | | XXX | | | | | | |
| **7. Hybrid Securities** | | | | | | | | | | | | |
| 7.1  NAIC 1 | | | | | | XXX | | | | | | |
| 7.2  NAIC 2 | | | | | | XXX | | | | | | |
| 7.3  NAIC 3 | | | | | | XXX | | | | | | |
| 7.4  NAIC 4 | | | | | | XXX | | | | | | |
| 7.5  NAIC 5 | | | | | | XXX | | | | | | |
| 7.6  NAIC 6 | | | | | | XXX | | | | | | |
| 7.7  Totals | | | | | | XXX | | | | | | |
| **8. Parent, Subsidiaries and Affiliates** | | | | | | | | | | | | |
| 8.1  NAIC 1 | | | | | | XXX | | | | | | |
| 8.2  NAIC 2 | | | | | | XXX | | | | | | |
| 8.3  NAIC 3 | | | | | | XXX | | | | | | |
| 8.4  NAIC 4 | | | | | | XXX | | | | | | |
| 8.5  NAIC 5 | | | | | | XXX | | | | | | |
| 8.6  NAIC 6 | | | | | | XXX | | | | | | |
| 8.7  Totals | | | | | | XXX | | | | | | |
| **9. SVO Identified Funds** | | | | | | | | | | | | |
| 9.1  NAIC 1 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.2  NAIC 2 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.3  NAIC 3 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.4  NAIC 4 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.5  NAIC 5 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.6  NAIC 6 | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.7  Totals | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| **10. Unaffiliated Bank Loans** | | | | | | | | | | | | |
| 10.1  NAIC 1 | | | | | | XXX | | | | | | |
| 10.2  NAIC 2 | | | | | | XXX | | | | | | |
| 10.3  NAIC 3 | | | | | | XXX | | | | | | |
| 10.4  NAIC 4 | | | | | | XXX | | | | | | |
| 10.5  NAIC 5 | | | | | | XXX | | | | | | |
| 10.6  NAIC 6 | | | | | | XXX | | | | | | |
| 10.7  Totals | | | | | | XXX | | | | | | |

SI06

## SCHEDULE D - PART 1A - SECTION 1 (Continued)

Quality and Maturity Distribution of All Bonds Owned December 31, at Book/Adjusted Carrying Values by Major Types of Issues and NAIC Designations

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAIC Designation | 1 Year or Less | Over 1 Year Through 5 Years | Over 5 Years Through 10 Years | Over 10 Years Through 20 Years | Over 20 Years | No Maturity Date | Total Current Year | Col. 7 as a % of Line 11.7 | Total from Col. 7 Prior Year | % From Col. 8 Prior Year | Total Publicly Traded | Total Privately Placed (a) |
| **11. Total Bonds Current Year** | | | | | | | | | | | | |
| 11.1 NAIC 1 | (d) 447,945,230 | 25,925,683 | 16,956,384 | 5,046,727 | | | 495,874,024 | 92.7 | XXX | XXX | 495,874,024 | |
| 11.2 NAIC 2 | (d) | | | | | | | | XXX | XXX | | |
| 11.3 NAIC 3 | (d) | | | | | | | | XXX | XXX | | |
| 11.4 NAIC 4 | (d) | | | | | | | | XXX | XXX | | |
| 11.5 NAIC 5 | (d) | 39,101,062 | | | | | (c) 39,101,062 | 7.3 | XXX | XXX | 39,101,062 | |
| 11.6 NAIC 6 | (d) | | | | | | (c) | | XXX | XXX | | |
| 11.7 Totals | 447,945,230 | 65,026,745 | 16,956,384 | 5,046,727 | | | (b) 534,975,086 | 100.0 | XXX | XXX | 534,975,086 | |
| 11.8 Line 11.7 as a % of Col. 7 | 83.7 | 12.2 | 3.2 | 0.9 | | | 100.0 | XXX | XXX | XXX | 100.0 | |
| **12. Total Bonds Prior Year** | | | | | | | | | | | | |
| 12.1 NAIC 1 | 476,663,557 | 326,252,254 | 23,910,255 | 8,608,634 | 6,346 | | XXX | XXX | 835,441,046 | 96.1 | 835,441,046 | |
| 12.2 NAIC 2 | | | | | | | XXX | XXX | | | | |
| 12.3 NAIC 3 | | | | | | | XXX | XXX | | | | |
| 12.4 NAIC 4 | | | | | | | XXX | XXX | | | | |
| 12.5 NAIC 5 | | 34,124,709 | | | | | XXX | XXX | (c) 34,124,709 | 3.9 | 34,124,709 | |
| 12.6 NAIC 6 | | | | | | | XXX | XXX | (c) | | | |
| 12.7 Totals | 476,663,557 | 360,376,963 | 23,910,255 | 8,608,634 | 6,346 | | XXX | XXX | (b) 869,565,755 | 100.0 | 869,565,755 | |
| 12.8 Line 12.7 as a % of Col. 9 | 54.8 | 41.4 | 2.7 | 1.0 | 0.0 | | XXX | XXX | 100.0 | XXX | 100.0 | |
| **13. Total Publicly Traded Bonds** | | | | | | | | | | | | |
| 13.1 NAIC 1 | 447,945,230 | 25,925,683 | 16,956,384 | 5,046,727 | | | 495,874,024 | 92.7 | 835,441,046 | 96.1 | 495,874,024 | XXX |
| 13.2 NAIC 2 | | | | | | | | | | | | XXX |
| 13.3 NAIC 3 | | | | | | | | | | | | XXX |
| 13.4 NAIC 4 | | | | | | | | | | | | XXX |
| 13.5 NAIC 5 | | 39,101,062 | | | | | 39,101,062 | 7.3 | 34,124,709 | 3.9 | 39,101,062 | XXX |
| 13.6 NAIC 6 | | | | | | | | | | | | XXX |
| 13.7 Totals | 447,945,230 | 65,026,745 | 16,956,384 | 5,046,727 | | | 534,975,086 | 100.0 | 869,565,755 | 100.0 | 534,975,086 | XXX |
| 13.8 Line 13.7 as a % of Col. 7 | 83.7 | 12.2 | 3.2 | 0.9 | | | 100.0 | XXX | XXX | XXX | 100.0 | XXX |
| 13.9 Line 13.7 as a % of Line 11.7, Col. 7, Section 11 | 83.7 | 12.2 | 3.2 | 0.9 | | | 100.0 | XXX | XXX | XXX | 100.0 | XXX |
| **14. Total Privately Placed Bonds** | | | | | | | | | | | | |
| 14.1 NAIC 1 | | | | | | | | | | | | XXX |
| 14.2 NAIC 2 | | | | | | | | | | | | XXX |
| 14.3 NAIC 3 | | | | | | | | | | | | XXX |
| 14.4 NAIC 4 | | | | | | | | | | | | XXX |
| 14.5 NAIC 5 | | | | | | | | | | | | XXX |
| 14.6 NAIC 6 | | | | | | | | | | | | XXX |
| 14.7 Totals | | | | | | | | | | | | XXX |
| 14.8 Line 14.7 as a % of Col. 7 | | | | | | | | XXX | XXX | XXX | XXX | XXX |
| 14.9 Line 14.7 as a % of Line 11.7, Col. 7, Section 11 | | | | | | | | XXX | XXX | XXX | XXX | |

(a) Includes $ ................................ freely tradable under SEC Rule 144 or qualified for resale under SEC Rule 144A.

(b) Includes $ ................................ current year of bonds with Z designations, and $ ................................ prior year of bonds with Z designations. The letter "Z" means the NAIC designation was not assigned by the Securities Valuation Office (SVO) at the date of the statement.

(c) Includes $ ................................ current year, $ ................................ prior year of bonds with 5GI designations and $ ................................ current year, $ ................................ prior year of bonds with 6* designations. "5GI" means the NAIC designation was assigned by the SVO in reliance on the insurer's certification that the issuer is current in all principal and interest payments. "6*" means the NAIC designation was assigned by the SVO due to inadequate certification of principal and interest payments.

(d) Includes the following amount of short-term and cash equivalent bonds by NAIC designation: NAIC 1$.............104,961,318 ; NAIC 2 $ ................................; NAIC 3 $ ................................; NAIC 4 $ ................................; NAIC 5 $ ................................; NAIC 6 $ ................................

SI07

# SCHEDULE D - PART 1A - SECTION 2

**Maturity Distribution of All Bonds Owned December 31, At Book/Adjusted Carrying Values by Major Type and Subtype of Issues**

| Distribution by Type | 1<br>1 Year or Less | 2<br>Over 1 Year<br>Through 5 Years | 3<br>Over 5 Years<br>Through 10 Years | 4<br>Over 10 Years<br>Through 20 Years | 5<br>Over 20 Years | 6<br>No Maturity<br>Date | 7<br>Total<br>Current Year | 8<br>Col. 7 as a<br>% of Line 11.08 | 9<br>Total from Col. 7<br>Prior Year | 10<br>% From Col. 8<br>Prior Year | 11<br>Total Publicly<br>Traded | 12<br>Total Privately<br>Placed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. U.S. Governments | | | | | | | | | | | | |
| 1.01 Issuer Obligations | 441,386,876 | 4,720,232 | | | | XXX | 446,107,108 | 83.4 | 740,911,123 | 85.2 | 446,107,108 | |
| 1.02 Residential Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 1.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 1.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 1.05 Totals | 441,386,876 | 4,720,232 | | | | XXX | 446,107,108 | 83.4 | 740,911,123 | 85.2 | 446,107,108 | |
| 2. All Other Governments | | | | | | | | | | | | |
| 2.01 Issuer Obligations | | | | | | XXX | | | | | | |
| 2.02 Residential Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 2.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 2.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 2.05 Totals | | | | | | XXX | | | | | | |
| 3. U.S. States, Territories and Possessions, Guaranteed | | | | | | | | | | | | |
| 3.01 Issuer Obligations | | | | | | XXX | | | | | | |
| 3.02 Residential Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 3.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 3.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 3.05 Totals | | | | | | XXX | | | | | | |
| 4. U.S. Political Subdivisions of States, Territories and Possessions, Guaranteed | | | | | | | | | | | | |
| 4.01 Issuer Obligations | | | | | | XXX | | | | | | |
| 4.02 Residential Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 4.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 4.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 4.05 Totals | | | | | | XXX | | | | | | |
| 5. U.S. Special Revenue & Special Assessment Obligations, etc., Non-Guaranteed | | | | | | | | | | | | |
| 5.01 Issuer Obligations | | 39,101,062 | | | | XXX | 39,101,062 | 7.3 | 34,124,709 | 3.9 | 39,101,062 | |
| 5.02 Residential Mortgage-Backed Securities | 6,558,354 | 21,205,451 | 16,956,384 | 5,046,727 | | XXX | 49,766,916 | 9.3 | 94,529,923 | 10.9 | 49,766,916 | |
| 5.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 5.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 5.05 Totals | 6,558,354 | 60,306,513 | 16,956,384 | 5,046,727 | | XXX | 88,867,978 | 16.6 | 128,654,632 | 14.8 | 88,867,978 | |
| 6. Industrial and Miscellaneous | | | | | | | | | | | | |
| 6.01 Issuer Obligations | | | | | | XXX | | | | | | |
| 6.02 Residential Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 6.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 6.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 6.05 Totals | | | | | | XXX | | | | | | |
| 7. Hybrid Securities | | | | | | | | | | | | |
| 7.01 Issuer Obligations | | | | | | XXX | | | | | | |
| 7.02 Residential Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 7.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 7.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 7.05 Totals | | | | | | XXX | | | | | | |
| 8. Parent, Subsidiaries and Affiliates | | | | | | | | | | | | |
| 8.01 Issuer Obligations | | | | | | XXX | | | | | | |
| 8.02 Residential Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 8.03 Commercial Mortgage-Backed Securities | | | | | | XXX | | | | | | |
| 8.04 Other Loan-Backed and Structured Securities | | | | | | XXX | | | | | | |
| 8.05 Affiliated Bank Loans – Issued | | | | | | XXX | | | | | | |
| 8.06 Affiliated Bank Loans – Acquired | | | | | | XXX | | | | | | |
| 8.07 Totals | | | | | | XXX | | | | | | |

SI08

## SCHEDULE D - PART 1A - SECTION 2 (Continued)

Maturity Distribution of All Bonds Owned December 31, at Book/Adjusted Carrying Values by Major Type and Subtype of Issues

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Distribution by Type | 1 Year or Less | Over 1 Year Through 5 Years | Over 5 Years Through 10 Years | Over 10 Years Through 20 Years | Over 20 Years | No Maturity Date | Total Current Year | Col. 7 as a % of Line 11.08 | Total from Col. 7 Prior Year | % From Col. 8 Prior Year | Total Publicly Traded | Total Privately Placed |
| 9. SVO Identified Funds | | | | | | | | | | | | |
| 9.01 Exchange Traded Funds Identified by the SVO........ | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.02 Bond Mutual Funds Identified by the SVO............... | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 9.03 Totals | XXX | XXX | XXX | XXX | XXX | | | | | | | |
| 10. Unaffiliated Bank Loans | | | | | | | | | | | | |
| 10.01 Bank Loans – Issued.................................... | | | | | | XXX | | | | | | |
| 10.02 Bank Loans – Acquired............................... | | | | | | XXX | | | | | | |
| 10.03 Totals | | | | | | XXX | | | | | | |
| 11. Total Bonds Current Year | | | | | | | | | | | | |
| 11.01 Issuer Obligations................................... | 441,386,876 | 43,821,294 | | | | XXX | 485,208,170 | 90.7 | XXX | XXX | 485,208,170 | |
| 11.02 Residential Mortgage-Backed Securities............ | 6,558,354 | 21,205,451 | 16,956,384 | 5,046,727 | | XXX | 49,766,916 | 9.3 | XXX | XXX | 49,766,916 | |
| 11.03 Commercial Mortgage-Backed Securities............ | | | | | | XXX | | | XXX | XXX | | |
| 11.04 Other Loan-Backed and Structured Securities ...... | | | | | | XXX | | | XXX | XXX | | |
| 11.05 SVO Identified Funds................................ | XXX | XXX | XXX | XXX | XXX | XXX | | | XXX | XXX | | |
| 11.06 Affiliated Bank Loans .............................. | | | | | | XXX | | | XXX | XXX | | |
| 11.07 Unaffiliated Bank Loans ........................... | | | | | | XXX | | | XXX | XXX | | |
| 11.08 Totals | 447,945,230 | 65,026,745 | 16,956,384 | 5,046,727 | | | 534,975,086 | 100.0 | XXX | XXX | 534,975,086 | |
| 11.09 Lines 11.08 as a % Col. 7 | 83.7 | 12.2 | 3.2 | 0.9 | | | 100.0 | XXX | XXX | XXX | 100.0 | |
| 12. Total Bonds Prior Year | | | | | | | | | | | | |
| 12.01 Issuer Obligations................................... | 443,007,130 | 332,028,702 | | | | XXX | XXX | XXX | 775,035,832 | 89.1 | 775,035,832 | |
| 12.02 Residential Mortgage-Backed Securities............ | 33,656,427 | 28,348,261 | 23,910,255 | 8,608,634 | 6,346 | XXX | XXX | XXX | 94,529,923 | 10.9 | 94,529,923 | |
| 12.03 Commercial Mortgage-Backed Securities............ | | | | | | XXX | XXX | XXX | | | | |
| 12.04 Other Loan-Backed and Structured Securities ...... | | | | | | XXX | XXX | XXX | | | | |
| 12.05 SVO Identified Funds................................ | XXX | XXX | XXX | XXX | XXX | XXX | XXX | XXX | | | | |
| 12.06 Affiliated Bank Loans .............................. | | | | | | XXX | XXX | XXX | | | | |
| 12.07 Unaffiliated Bank Loans ........................... | | | | | | XXX | XXX | XXX | | | | |
| 12.08 Totals | 476,663,557 | 360,376,963 | 23,910,255 | 8,608,634 | 6,346 | | XXX | XXX | 869,565,755 | 100.0 | 869,565,755 | |
| 12.09 Line 12.08 as a % of Col. 9 | 54.8 | 41.4 | 2.7 | 1.0 | 0.0 | | XXX | XXX | 100.0 | XXX | 100.0 | |
| 13. Total Publicly Traded Bonds | | | | | | | | | | | | |
| 13.01 Issuer Obligations................................... | 441,386,874 | 43,821,296 | | | | XXX | 485,208,170 | 90.7 | 775,035,832 | 89.1 | 485,208,170 | XXX |
| 13.02 Residential Mortgage-Backed Securities............ | 6,558,356 | 21,205,449 | 16,956,384 | 5,046,727 | | XXX | 49,766,916 | 9.3 | 94,529,923 | 10.9 | 49,766,916 | XXX |
| 13.03 Commercial Mortgage-Backed Securities............ | | | | | | XXX | | | | | | XXX |
| 13.04 Other Loan-Backed and Structured Securities ...... | | | | | | XXX | | | | | | XXX |
| 13.05 SVO Identified Funds................................ | XXX | XXX | XXX | XXX | XXX | XXX | | | | | | XXX |
| 13.06 Affiliated Bank Loans .............................. | | | | | | XXX | | | | | | XXX |
| 13.07 Unaffiliated Bank Loans ........................... | | | | | | XXX | | | | | | XXX |
| 13.08 Totals | 447,945,230 | 65,026,745 | 16,956,384 | 5,046,727 | | | 534,975,086 | 100.0 | 869,565,755 | 100.0 | 534,975,086 | XXX |
| 13.09 Line 13.08 as a % of Col. 7. | 83.7 | 12.2 | 3.2 | 0.9 | | | 100.0 | XXX | 100.0 | XXX | 100.0 | XXX |
| 13.10 Line 13.08 as a % of Line 11.08, Col. 7, Section 11 | 83.7 | 12.2 | 3.2 | 0.9 | | | 100.0 | XXX | XXX | XXX | 100.0 | XXX |
| 14. Total Privately Placed Bonds | | | | | | | | | | | | |
| 14.01 Issuer Obligations................................... | | | | | | XXX | | | | | XXX | |
| 14.02 Residential Mortgage-Backed Securities............ | | | | | | XXX | | | | | XXX | |
| 14.03 Commercial Mortgage-Backed Securities............ | | | | | | XXX | | | | | XXX | |
| 14.04 Other Loan-Backed and Structured Securities ...... | | | | | | XXX | | | | | XXX | |
| 14.05 SVO Identified Funds................................ | XXX | XXX | XXX | XXX | XXX | XXX | | | | | XXX | |
| 14.06 Affiliated Bank Loans .............................. | | | | | | XXX | | | | | XXX | |
| 14.07 Unaffiliated Bank Loans ........................... | | | | | | XXX | | | | | XXX | |
| 14.08 Totals | | | | | | XXX | | | | | XXX | |
| 14.09 Line 14.08 as a % of Col. 7. | | | | | | | XXX | XXX | XXX | XXX | XXX | |
| 14.10 Line 14.08 as a % of Line 11.08, Col. 7, Section 11 | | | | | | | XXX | XXX | XXX | XXX | XXX | |

SI09

Case 2:20-cv-09365-FLA-MAA Document 384 Filed 08/15/21 Page 180 of 472

# SCHEDULE DA - VERIFICATION BETWEEN YEARS

Short-Term Investments

| | 1<br>Total | 2<br>Bonds | 3<br>Mortgage Loans | 4<br>Other Short-term<br>Investment Assets(a) | 5<br>Investments in Parent,<br>Subsidiaries and Affiliates |
|---|---|---|---|---|---|
| 1. Book/adjusted carrying value, December 31 of prior year | 42,639,880 | 42,639,880 | | | |
| 2. Cost of short-term investments acquired | 128,880,738 | 128,880,738 | | | |
| 3. Accrual of discount | 76,714 | 76,714 | | | |
| 4. Unrealized valuation increase (decrease) | | | | | |
| 5. Total gain (loss) on disposals | 5,086 | 5,086 | | | |
| 6. Deduct consideration received on disposals | 154,624,088 | 154,624,088 | | | |
| 7. Deduct amortization of premium | | | | | |
| 8. Total foreign exchange change in book/adjusted carrying value | | | | | |
| 9. Deduct current year's other-than-temporary impairment recognized | | | | | |
| 10. Book adjusted carrying value at end of current period (Lines 1+2+3+4+5-6-7+8-9) | 16,978,330 | 16,978,330 | | | |
| 11. Deduct total nonadmitted amounts | | | | | |
| 12. Statement value at end of current period (Line 10 minus Line 11) | 16,978,330 | 16,978,330 | | | |

(a) Indicate the category of such assets, for example, joint ventures, transportation equipment:    0

SI10

ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company

Schedule DB - Part A - Verification

# NONE

Schedule DB - Part B - Verification

# NONE

Schedule DB - Part C - Section 1

# NONE

Schedule DB - Part C - Section 2

# NONE

Schedule DB - Verification

# NONE

# SCHEDULE E – PART 2 – VERIFICATION BETWEEN YEARS

(Cash Equivalents)

| | 1<br><br>Total | 2<br><br>Bonds | 3<br><br>Money Market<br>Mutual Funds | 4<br><br>Other (a) |
|---|---|---|---|---|
| 1. Book/adjusted carrying value, December 31 of prior year......................... | 106,209,401 | 103,096,445 | 3,112,956 | |
| 2. Cost of cash equivalents acquired.................................................. | 862,969,815 | 647,233,564 | 215,736,251 | |
| 3. Accrual of discount....................................................................... | 162,993 | 162,993 | | |
| 4. Unrealized valuation increase (decrease)......................................... | | | | |
| 5. Total gain (loss) on disposals....................................................... | | | | |
| 6. Deduct consideration received on disposals..................................... | 880,691,877 | 662,510,014 | 218,181,863 | |
| 7. Deduct amortization of premium..................................................... | | | | |
| 8. Total foreign exchange change in book/adjusted carrying value.......... | | | | |
| 9. Deduct current year's other-than-temporary impairment recognized..... | | | | |
| 10. Book/adjusted carrying value at end of current period (Lines 1+2+3+4+5-6-7+8-9)... | 88,650,332 | 87,982,988 | 667,344 | |
| 11. Deduct total nonadmitted amounts................................................. | | | | |
| 12. Statement value at end of current period (Line 10 minus Line 11) | 88,650,332 | 87,982,988 | 667,344 | |

(a) Indicate the category of such investments, for example, joint ventures, transportation equipment

Exhibit 5, Page 131 of 152

# SCHEDULE A - PART 1
Showing All Real Estate OWNED December 31 of Current Year

| 1 | 2 | Location | | 5 | 6 | 7 | 8 | 9 | 10 | Change in Book/Adjusted Carrying Value Less Encumbrances | | | | | 16 | 17 |
| | | 3 | 4 | | | | | | | 11 | 12 | 13 | 14 | 15 | | |
| Description of Property | Code | City | State | Date Acquired | Date of Last Appraisal | Actual Cost | Amount of Encumbrances | Book/Adjusted Carrying Value Less Encumbrances | Fair Value Less Encumbrances | Current Year's Depreciation | Current Year's Other-Than-Temporary Impairment Recognized | Current Year's Change in Encumbrances | Total Change in B./A.C.V. (13-11-12) | Total Foreign Exchange Change in B./A.C.V. | Gross Income Earned Less Interest Incurred on Encumbrances | Taxes, Repairs and Expenses Incurred |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Properties occupied by the reporting entity - Health Care Delivery | | | | | | | | | | | | | | | | |
| Properties occupied by the reporting entity - Administrative | | | | | | | | | | | | | | | | |
| Home Office | | Omaha | NE | 10/09/2019 | | 64,882,789 | | 64,882,789 | 64,882,789 | | | | | | | |
| 0299999 - Properties occupied by the reporting entity - Administrative | | | | | | 64,882,789 | | 64,882,789 | 64,882,789 | | | | | | | |
| 0399999 - Total Properties occupied by the reporting entity | | | | | | 64,882,789 | | 64,882,789 | 64,882,789 | | | | | | | |
| Properties held for the production of income | | | | | | | | | | | | | | | | |
| Jackson Towne Farm Lots 312 & 366 | | Bainbridge | GA | 09/19/2019 | | 1,944,646 | | 1,944,646 | 1,944,646 | | | | | | | |
| 0499999 - Properties held for the production of income | | | | | | 1,944,646 | | 1,944,646 | 1,944,646 | | | | | | | |
| Properties held for sale | | | | | | | | | | | | | | | | |
| 0699999 Totals | | | | | | 66,827,435 | | 66,827,435 | 66,827,435 | | | | | | | |

E01

# SCHEDULE A - PART 2

**Showing All Real Estate ACQUIRED and Additions Made During the Year**

| 1 | Location | | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | | | | | | |
| Description of Property | City | State | Date Acquired | Name of Vendor | Actual Cost at Time of Acquisition | Amount of Encumbrances | Book/Adjusted Carrying Value Less Encumbrances | Additional Investment Made After Acquisition |
| Acquired by purchase | | | | | | | | |
| Jackson Towne Farm Lots 312 & 366............ | Bainbridge............ | GA | ...09/19/2019... | Jackson Towne Farms, LLC............ | | | | ...709,655 |
| Home Office............ | Omaha............ | NE | ...10/09/2019... | Applied Underwriters............ | | | | ...57,203,260 |
| 0199999 - Acquired by purchase | | | | | | | | 57,912,915 |
| Acquired by internal transfer | | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| ............ | ............ | | | | | | | |
| 0399999 Totals | | | | | | | | 57,912,915 |

E02

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

Schedule A - Part 3

# NONE

Schedule B - Part 1

# NONE

Schedule B - Part 2

# NONE

Schedule B - Part 3

# NONE

# SCHEDULE BA - PART 1

Showing Other Long-Term Invested Assets OWNED December 31 of Current Year

| 1 CUSIP Identification | 2 Name or Description | 3 Code | 4 City | 5 State | 6 Name of Vendor or General Partner | 7 NAIC Designation, NAIC Designation Modifier & SVO Administrative Symbol | 8 Date Originally Acquired | 9 Type and Strategy | 10 Actual Cost | 11 Fair Value | 12 Book/Adjusted Carrying Value Less Encumbrances | 13 Unrealized Valuation Increase (Decrease) | 14 Current Year's (Depreciation) or (Amortization)/ Accretion | 15 Current Year's Other-Than-Temporary Impairment Recognized | 16 Capitalized Deferred Interest and Other | 17 Total Foreign Exchange Change in B./A.C.V. | 18 Investment Income | 19 Commitment for Additional Investment | 20 Percentage of Ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil and Gas Production - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Oil and Gas Production - Affiliated | | | | | | | | | | | | | | | | | | | |
| Transportation Equipment - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Transportation Equipment - Affiliated | | | | | | | | | | | | | | | | | | | |
| Mineral Rights - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Mineral Rights - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Mortgage Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Mortgage Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Other Fixed Income Instruments - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Other Fixed Income Instruments - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Common Stocks - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Common Stocks - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Affiliated | | | | | | | | | | | | | | | | | | | |
| 000000-00-0 | CIC NEB RE ONE, LLC | | Omaha | NE | Applied Underwriters | XXX | 10/09/2019 | | 40,139,055 | 40,904,977 | 40,904,977 | 563,838 | | | | | | | 49.900 |
| 000000-00-0 | CIC NEB RE TWO, LLC | | Omaha | NE | Applied Underwriters | XXX | 10/09/2019 | | 72,414,097 | 73,778,764 | 73,778,764 | 1,040,626 | | | | | | | 49.900 |
| 000000-00-0 | CIC NEB RE THREE, LLC | | Omaha | NE | Applied Underwriters | XXX | 10/09/2019 | | 50,551,964 | 51,507,547 | 51,507,547 | 704,029 | | | | | | | 49.900 |
| 2299999 - Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Affiliated | | | | | | | | | 163,105,116 | 166,191,288 | 166,191,288 | 2,308,493 | | | | | | | XXX |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Mortgage Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Mortgage Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Other - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Other - Affiliated | | | | | | | | | | | | | | | | | | | |
| Surplus Debentures, etc. - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Surplus Debentures, etc. - Affiliated | | | | | | | | | | | | | | | | | | | |
| Collateral Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| 000000-00-0 | United Holding Corporation | | New York | NY | United Holding Corporation | XXX | 10/23/2019 | | 5,766,893 | 5,766,893 | 5,766,893 | | | | | | 234,836 | | |
| 2999999 - Collateral Loans - Unaffiliated | | | | | | | | | 5,766,893 | 5,766,893 | 5,766,893 | | | | | | 234,836 | | XXX |
| Collateral Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-collateral Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Collateral Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| 000000-00-0 | Applied Underwriters (Related Party) | | Omaha | NE | Applied Underwriters | XXX | 10/10/2019 | | 15,000,000 | 15,000,000 | 15,000,000 | | | | | | 333,758 | | |
| 000000-00-0 | Applied Underwriters (Related Party) | | Omaha | NE | Applied Underwriters | XXX | 03/31/2020 | | 4,300,000 | 4,300,000 | 4,300,000 | | | | | | 41,002 | | |
| 3299999 - Non-collateral Loans - Affiliated | | | | | | | | | 19,300,000 | 19,300,000 | 19,300,000 | | | | | | 374,760 | | XXX |
| Capital Notes - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Capital Notes - Affiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed Federal Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed Federal Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed Federal Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed Federal Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed State Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed State Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed State Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed State Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| All Other Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| All Other Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Working Capital Finance Investment - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Any Other Class of Assets - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Any Other Class of Assets - Affiliated | | | | | | | | | | | | | | | | | | | |
| 4899999 - Subtotals - Unaffiliated | | | | | | | | | 5,766,893 | 5,766,893 | 5,766,893 | | | | | | 234,836 | | XXX |
| 4999999 - Subtotals - Affiliated | | | | | | | | | 182,405,116 | 185,491,288 | 185,491,288 | 2,308,493 | | | | | 374,760 | | XXX |
| 5099999 Totals | | | | | | | | | 188,172,009 | 191,258,181 | 191,258,181 | 2,308,493 | | | | | 609,596 | | XXX |

Book/Adjusted Carrying Value by NAIC Designation Category Footnote:

1A $ .......................... 1B $ .......................... 1C $ .......................... 1D $ .......................... 1E $ .......................... 1F $ .......................... 1G $ ..........................
2A $ .......................... 2B $ .......................... 2C $ ..........................
3A $ .......................... 3B $ .......................... 3C $ ..........................
4A $ .......................... 4B $ .......................... 4C $ ..........................
5A $ .......................... 5B $ .......................... 5C $ ..........................
6 $ ..........................

E07.1

ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company

# SCHEDULE BA - PART 2

**Showing Other Long-Term Invested Assets ACQUIRED AND ADDITIONS MADE December 31 of Current Year**

| 1 CUSIP Identification | 2 Name or Description | 3 City | 4 State | 5 Name of Vendor or General Partner | 6 Date Originally Acquired | 7 Type and Strategy | 8 Actual Cost at Time of Acquisition | 9 Additional Investment Made After Acquisition | 10 Amount of Encumbrances | 11 Percentage of Ownership |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil and Gas Production - Unaffiliated | | | | | | | | | | |
| Oil and Gas Production - Affiliated | | | | | | | | | | |
| Transportation Equipment - Unaffiliated | | | | | | | | | | |
| Transportation Equipment - Affiliated | | | | | | | | | | |
| Mineral Rights - Unaffiliated | | | | | | | | | | |
| Mineral Rights - Affiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Mortgage Loans - Unaffiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Mortgage Loans - Affiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Other Fixed Income Instruments - Unaffiliated | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Other Fixed Income Instruments - Affiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | |
| Full   Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Common Stocks - Unaffiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Common Stocks - Affiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Unaffiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Affiliated | | | | | | | | | | |
| 000000-00-0 | CIC NEB RE ONE, LLC | Omaha | NE | Applied Underwriters | 10/09/2019 | | | 1,423,242 | | .49.900 |
| 000000-00-0 | CIC NEB RE TWO, LLC | Omaha | NE | Applied Underwriters | 10/09/2019 | | | 1,019,225 | | .49.900 |
| 000000-00-0 | CIC NEB RE THREE, LLC | Omaha | NE | Applied Underwriters | 10/09/2019 | | | 2,247,753 | | .49.900 |
| 2299999 - Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Affiliated | | | | | | | | 4,690,220 | | XXX |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Mortgage Loans - Unaffiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Mortgage Loans - Affiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Other - Unaffiliated | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Other - Affiliated | | | | | | | | | | |
| Surplus Debentures, etc. - Unaffiliated | | | | | | | | | | |
| Surplus Debentures, etc. - Affiliated | | | | | | | | | | |
| Collateral Loans - Unaffiliated | | | | | | | | | | |
| Collateral Loans - Affiliated | | | | | | | | | | |
| Non-collateral Loans - Unaffiliated | | | | | | | | | | |
| Non-collateral Loans - Affiliated | | | | | | | | | | |
| 000000-00-0 | Applied Underwriters (Related Party) | Omaha | NE | Applied Underwriters | 03/31/2020 | | 20,000,000 | | | |
| 3299999 - Non-collateral Loans - Affiliated | | | | | | | 20,000,000 | | | XXX |
| Capital Notes - Unaffiliated | | | | | | | | | | |
| Capital Notes - Affiliated | | | | | | | | | | |
| Guaranteed Federal Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | |
| Guaranteed Federal Low Income Housing Tax Credit - Affiliated | | | | | | | | | | |
| Non-Guaranteed Federal Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | |
| Non-Guaranteed Federal Low Income Housing Tax Credit - Affiliated | | | | | | | | | | |
| Guaranteed State Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | |
| Guaranteed State Low Income Housing Tax Credit - Affiliated | | | | | | | | | | |
| Non-Guaranteed State Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | |
| Non-Guaranteed State Low Income Housing Tax Credit - Affiliated | | | | | | | | | | |
| All Other Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | |
| All Other Low Income Housing Tax Credit - Affiliated | | | | | | | | | | |
| Working Capital Finance Investment - Unaffiliated | | | | | | | | | | |
| Any Other Class of Assets - Unaffiliated | | | | | | | | | | |
| Any Other Class of Assets - Affiliated | | | | | | | | | | |
| 4899999 – Subtotals - Unaffiliated | | | | | | | | | | XXX |
| 4999999 – Subtotals - Affiliated | | | | | | | 20,000,000 | 4,690,220 | | XXX |
| 5099999 Totals | | | | | | | 20,000,000 | 4,690,220 | | XXX |

E08

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

## SCHEDULE BA - PART 3

**Showing Other Long-Term Invested Assets DISPOSED, Transferred or Repaid During the Current Year**

| 1 CUSIP Identification | 2 Name or Description | 3 City | 4 State | 5 Name of Purchaser or Nature of Disposal | 6 Date Originally Acquired | 7 Disposal Date | 8 Book/Adjusted Carrying Value Less Encumbrances Prior Year | 9 Unrealized Valuation Increase (Decrease) | 10 Current Year's (Depreciation) or (Amortization)/Accretion | 11 Current Year's Other-Than-Temporary Impairment Recognized | 12 Capitalized Deferred Interest and Other | 13 Total Change in B./A.C.V. (9+10-11+12) | 14 Total Foreign Exchange Change in B./A.C.V. | 15 Book/Adjusted Carrying Value Less Encumbrances on Disposal | 16 Consideration | 17 Foreign Exchange Gain (Loss) on Disposal | 18 Realized Gain (Loss) on Disposal | 19 Total Gain (Loss) on Disposal | 20 Investment Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil and Gas Production - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Oil and Gas Production - Affiliated | | | | | | | | | | | | | | | | | | | |
| Transportation Equipment - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Transportation Equipment - Affiliated | | | | | | | | | | | | | | | | | | | |
| Mineral Rights - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Mineral Rights - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Bonds - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Mortgage Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Mortgage Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Other Fixed Income Instruments - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Registered Private Funds with Underlying Assets Having Characteristics of: Other Fixed Income Instruments - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests that have the Underlying Characteristics of: Fixed Income Instruments - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Fixed Income Instruments - NAIC Designation Not Assigned by the Securities Valuation Office (SVO) - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Common Stocks - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Common Stocks - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Affiliated | | | | | | | | | | | | | | | | | | | |
| 000000-00-0 | CIC NEB RE ONE, LLC | Omaha | NE | Applied Underwriters | 10/09/2019 | 01/31/2020 | 38,842,947 | | | | | | | | 127,134 | | | | |
| 000000-00-0 | CIC NEB RE TWO, LLC | Omaha | NE | Applied Underwriters | 10/09/2019 | 09/30/2020 | 71,602,710 | | | | | | | | 207,838 | | | | |
| 000000-00-0 | CIC NEB RE THREE, LLC | Omaha | NE | Applied Underwriters | 10/09/2019 | 01/31/2020 | 48,455,216 | | | | | | | | 151,005 | | | | |
| 2299999 - Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Real Estate - Affiliated | | | | | | | 158,900,873 | | | | | | | | 485,977 | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Mortgage Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Mortgage Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Other - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Joint Venture, Partnership or Limited Liability Company Interests for Which the Underlying Assets Have the Characteristics of: Other - Affiliated | | | | | | | | | | | | | | | | | | | |
| Surplus Debentures, etc. - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Surplus Debentures, etc. - Affiliated | | | | | | | | | | | | | | | | | | | |
| Collateral Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Collateral Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-collateral Loans - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-collateral Loans - Affiliated | | | | | | | | | | | | | | | | | | | |
| 000000-00-0 | Applied Underwriters (Related Party) | Omaha | NE | Applied Underwriters | 03/31/2020 | 06/26/2020 | | | | | | | | | 2,500,000 | | | | 8,928 |
| 000000-00-0 | Applied Underwriters (Related Party) | Omaha | NE | Applied Underwriters | 03/31/2020 | 10/09/2020 | | | | | | | | | 2,000,000 | | | | 13,638 |
| 000000-00-0 | Applied Underwriters (Related Party) | Omaha | NE | Applied Underwriters | 03/31/2020 | 10/29/2020 | | | | | | | | | 11,200,000 | | | | 84,856 |
| 3299999 - Non-collateral Loans - Affiliated | | | | | | | | | | | | | | | 15,700,000 | | | | 107,420 |
| Capital Notes - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Capital Notes - Affiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed Federal Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed Federal Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed Federal Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed Federal Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed State Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Guaranteed State Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed State Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Non-Guaranteed State Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| All Other Low Income Housing Tax Credit - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| All Other Low Income Housing Tax Credit - Affiliated | | | | | | | | | | | | | | | | | | | |
| Working Capital Finance Investment - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Any Other Class of Assets - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| Any Other Class of Assets - Affiliated | | | | | | | | | | | | | | | | | | | |
| 4499999 – Subtotals - Unaffiliated | | | | | | | | | | | | | | | | | | | |
| 4599999 - Subtotals - Affiliated | | | | | | | 158,900,873 | | | | | | | | 16,185,977 | | | | 107,420 |
| 4699999 Totals | | | | | | | 158,900,873 | | | | | | | | 16,185,977 | | | | 107,420 |

# SCHEDULE D - PART 1

Showing All Long-Term **BONDS** Owned December 31 of Current Year

| 1 | 2 | | Codes | | 6 | 7 | Fair Value | | 10 | 11 | Change in Book / Adjusted Carrying Value | | | | Interest | | | | | Dates | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3 | 4 | 5 | NAIC Designation, NAIC Designation Modifier and SVO Administrative Symbol | | 8 | 9 | | | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| CUSIP Identification | Description | Code | Foreign | Bond CHAR | | Actual Cost | Rate Used to Obtain Fair Value | Fair Value | Par Value | Book/ Adjusted Carrying Value | Unrealized Valuation Increase/ (Decrease) | Current Year's (Amortization)/ Accretion | Current Year's Other Than Temporary Impairment Recognized | Total Foreign Exchange Change In B./A.C.V. | Rate of | Effective Rate of | When Paid | Admitted Amount Due & Accrued | Amount Rec. During Year | Acquired | Stated Contractual Maturity Date |
| **Bonds - U.S. Governments - Issuer Obligations** | | | | | | | | | | | | | | | | | | | | | |
| 912828-4B-3 | United State Treasury Notes | SD | | | 1.A | 6,587,125 | 100.4340 | 6,653,739 | 6,625,000 | 6,621,941 | | 14,901 | | | 2.375 | 2.622 | MS | 46,942 | 157,344 | 08/15/2018 | 03/15/2021 |
| 912828-4B-3 | United State Treasury Notes | SD | | | 1.A | 60,669,703 | 100.4340 | 61,611,115 | 61,345,000 | 61,287,844 | | 277,958 | | | 2.375 | 2.860 | MS | 434,668 | 1,456,944 | 09/26/2018 | 03/15/2021 |
| 912828-4G-2 | United State Treasury Notes | SD | | | 1.A | 27,664,602 | 100.6410 | 28,179,368 | 28,000,000 | 27,960,451 | | 135,651 | | | 2.375 | 2.804 | AO | 142,500 | 665,000 | 10/12/2018 | 04/15/2021 |
| 912828-4P-2 | United State Treasury Notes | SD | | | 1.A | 5,953,980 | 100.9140 | 6,054,846 | 6,000,000 | 5,993,018 | | 18,467 | | | 2.625 | 2.964 | MN | 20,449 | 157,500 | 11/07/2018 | 05/15/2021 |
| 912828-4P-2 | United State Treasury Notes | SD | | | 1.A | 44,966,856 | 100.9140 | 45,587,945 | 45,175,000 | 45,142,753 | | 85,368 | | | 2.625 | 2.840 | MN | 153,963 | 1,185,844 | 11/28/2018 | 05/15/2021 |
| 912828-4T-4 | United State Treasury Notes | SD | | | 1.A | 6,013,519 | 101.1170 | 6,067,032 | 6,000,000 | 6,002,546 | | (5,513) | | | 2.625 | 2.546 | JD | 7,356 | 157,500 | 12/26/2018 | 06/15/2021 |
| 912828-5L-0 | United State Treasury Notes | SD | | | 1.A | 7,477,913 | 102.3750 | 7,371,000 | 7,200,000 | 7,369,594 | | (108,319) | | | 2.875 | 0.165 | MN | 26,876 | 103,500 | 06/11/2020 | 11/15/2021 |
| 912828-5V-4 | United State Treasury Notes | SD | | | 1.A | 31,825,037 | 100.1730 | 31,554,495 | 31,500,000 | 31,521,332 | | (258,482) | | | 2.500 | 1.675 | JJ | 329,552 | 787,500 | 10/28/2019 | 01/31/2021 |
| 912828-5X-4 | United State Treasury Notes | SD | | | 1.A | 19,698,945 | 100.1730 | 19,533,735 | 19,500,000 | 19,516,378 | | (182,567) | | | 2.500 | 1.474 | JJ | 204,008 | 243,750 | 01/31/2020 | 01/31/2021 |
| 912828-6Y-1 | United State Treasury Notes | SD | | | 1.A | 111,720 | 102.3520 | 111,563 | 109,000 | 111,631 | | (89) | | | 1.750 | 0.088 | JD | 89 | | 12/14/2020 | 06/15/2022 |
| 912828-6Y-1 | United State Treasury Notes | SD | | | 1.A | 4,612,292 | 102.3520 | 4,605,822 | 4,500,000 | 4,608,601 | | (3,691) | | | 1.750 | 0.088 | JD | 3,678 | | 12/14/2020 | 06/15/2022 |
| 912828-B5-8 | United State Treasury Notes | SD | | | 1.A | 37,218,912 | 100.1460 | 37,053,835 | 37,000,000 | 37,014,396 | | (174,431) | | | 2.125 | 1.654 | JJ | 329,029 | 786,250 | 10/29/2019 | 07/31/2021 |
| 912828-B9-0 | United State Treasury Notes | SD | | | 1.A | 1,968,481 | 100.2810 | 2,005,618 | 2,000,000 | 1,997,914 | | 12,786 | | | 2.000 | 2.671 | FA | 13,591 | 40,000 | 08/28/2018 | 02/28/2021 |
| 912828-Y2-0 | United State Treasury Notes | SD | | | 1.A | 50,798,516 | 101.3280 | 50,664,050 | 50,000,000 | 50,275,342 | | (505,411) | | | 2.625 | 1.600 | JJ | 606,318 | 1,312,500 | 07/15/2020 | 07/15/2021 |
| 912828-Y2-0 | United State Treasury Notes | SD | | | 1.A | 22,351,347 | 101.3280 | 22,292,182 | 22,000,000 | 22,121,151 | | (222,381) | | | 2.625 | 1.600 | JJ | 266,780 | 577,500 | 12/19/2019 | 07/15/2021 |
| 912828-YC-8 | United State Treasury Notes | SD | | | 1.A | 4,036,876 | 100.9220 | 4,036,878 | 4,000,000 | 4,018,110 | | (22,734) | | | 1.500 | 0.813 | FA | 20,387 | 30,000 | 03/02/2020 | 08/31/2021 |
| 912828-YC-8 | United State Treasury Notes | SD | | | 1.A | 9,654,956 | 100.9220 | 9,587,581 | 9,500,000 | 9,582,788 | | (72,167) | | | 1.500 | 0.179 | FA | 48,419 | 71,250 | 06/05/2020 | 08/31/2021 |
| 0199999 - Bonds - U.S. Governments - Issuer Obligations | | | | | | 341,614,748 | XXX | 342,970,802 | 340,454,000 | 341,145,790 | | (1,010,612) | | | XXX | XXX | XXX | 2,654,605 | 7,732,382 | XXX | XXX |
| **Bonds - U.S. Governments - Residential Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. Governments - Commercial Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. Governments - Other Loan-Backed and Structured Securities** | | | | | | | | | | | | | | | | | | | | | |
| 0599999 - Bonds - U.S. Governments - Subtotals - U.S. Governments | | | | | | 341,614,748 | XXX | 342,970,802 | 340,454,000 | 341,145,790 | | (1,010,612) | | | XXX | XXX | XXX | 2,654,605 | 7,732,382 | XXX | XXX |
| **Bonds - All Other Governments - Issuer Obligations** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - All Other Governments - Residential Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - All Other Governments - Commercial Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - All Other Governments - Other Loan-Backed and Structured Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Issuer Obligations** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Residential Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Commercial Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Other Loan-Backed and Structured Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Issuer Obligations** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Residential Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Commercial Mortgage-Backed Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Other Loan-Backed and Structured Securities** | | | | | | | | | | | | | | | | | | | | | |
| **Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Issuer Obligations** | | | | | | | | | | | | | | | | | | | | | |
| 25938M-AA-3 | Douglas CO NE SID 583 | | | | 5.C | 150,000 | 100.0000 | 150,000 | 150,000 | 150,000 | | | | | 6.000 | 6.000 | | 6,000 | 9,000 | 12/24/2019 | 10/23/2022 |
| 25938M-AB-1 | Douglas CO NE SID 583 | | | | 5.C | 600,000 | 100.0000 | 600,000 | 600,000 | 600,000 | | | | | 6.000 | 6.000 | | 24,000 | 36,000 | 12/24/2019 | 12/20/2022 |
| 25938M-AC-9 | Douglas CO NE SID 583 | | | | 5.C | 1,108,242 | 100.0000 | 1,108,242 | 1,108,242 | 1,108,242 | | | | | 6.000 | 6.000 | | 44,330 | 66,495 | 12/24/2019 | 01/10/2023 |
| 25938M-AD-7 | Douglas CO NE SID 583 | | | | 5.C | 1,606,744 | 100.0000 | 1,606,744 | 1,606,744 | 1,606,744 | | | | | 6.000 | 6.000 | | 64,270 | 96,405 | 12/24/2019 | 02/02/2023 |
| 25938M-AE-5 | Douglas CO NE SID 583 | | | | 5.C | 1,099,015 | 100.0000 | 1,099,015 | 1,099,015 | 1,099,015 | | | | | 6.000 | 6.000 | | 43,961 | 65,941 | 12/24/2019 | 02/23/2023 |
| 25938M-AF-2 | Douglas CO NE SID 583 | | | | 5.C | 610,494 | 100.0000 | 610,494 | 610,494 | 610,494 | | | | | 6.000 | 6.000 | | 24,420 | 36,630 | 12/24/2019 | 03/12/2023 |
| 25938M-AG-0 | Douglas CO NE SID 583 | | | | 5.C | 1,434,414 | 100.0000 | 1,434,414 | 1,434,414 | 1,434,414 | | | | | 6.000 | 6.000 | | 57,377 | 86,065 | 12/24/2019 | 04/06/2023 |
| 25938M-AH-8 | Douglas CO NE SID 583 | | | | 5.C | 456,180 | 100.0000 | 456,180 | 456,180 | 456,180 | | | | | 6.000 | 6.000 | | 18,247 | 27,371 | 12/24/2019 | 05/03/2023 |
| 25938M-AJ-4 | Douglas CO NE SID 583 | | | | 5.C | 1,672,824 | 100.0000 | 1,672,824 | 1,672,824 | 1,672,824 | | | | | 6.000 | 6.000 | | 66,913 | 100,369 | 12/24/2019 | 05/09/2023 |
| 25938M-AL-9 | Douglas CO NE SID 583 | | | | 5.C | 2,736,131 | 100.0000 | 2,736,131 | 2,736,131 | 2,736,131 | | | | | 6.000 | 6.000 | | 109,445 | 164,168 | 12/24/2019 | 06/15/2023 |
| 25938M-AM-7 | Douglas CO NE SID 583 | | | | 5.C | 1,061,067 | 100.0000 | 1,061,067 | 1,061,067 | 1,061,067 | | | | | 6.000 | 6.000 | | 42,443 | 63,664 | 12/24/2019 | 07/05/2023 |
| 25938M-AN-5 | Douglas CO NE SID 583 | | | | 5.C | 14,794 | 100.0000 | 14,794 | 14,794 | 14,794 | | | | | 6.000 | 6.000 | | 592 | 888 | 12/24/2019 | 08/10/2023 |
| 25938M-AP-0 | Douglas CO NE SID 583 | | | | 5.C | 1,866,114 | 100.0000 | 1,866,114 | 1,866,114 | 1,866,114 | | | | | 6.000 | 6.000 | | 74,645 | 111,967 | 12/24/2019 | 07/25/2023 |
| 25938M-AQ-8 | Douglas CO NE SID 583 | | | | 5.C | 1,275,339 | 100.0000 | 1,275,339 | 1,275,339 | 1,275,339 | | | | | 6.000 | 6.000 | | 51,014 | 76,520 | 12/24/2019 | 08/10/2023 |
| 25938M-AR-6 | Douglas CO NE SID 583 | | | | 5.C | 2,378,846 | 100.0000 | 2,378,846 | 2,378,846 | 2,378,846 | | | | | 6.000 | 6.000 | | 95,154 | 142,731 | 12/24/2019 | 09/08/2023 |
| 25938M-AS-4 | Douglas CO NE SID 583 | | | | 5.C | 1,688,477 | 100.0000 | 1,688,477 | 1,688,477 | 1,688,477 | | | | | 6.000 | 6.000 | | 67,539 | 101,309 | 12/24/2019 | 09/21/2023 |
| 25938M-AT-2 | Douglas CO NE SID 583 | | | | 5.C | 2,868,012 | 100.0000 | 2,868,012 | 2,868,012 | 2,868,012 | | | | | 6.000 | 6.000 | | 114,720 | 172,081 | 12/24/2019 | 10/12/2023 |
| 25938M-AU-9 | Douglas CO NE SID 583 | | | | 5.C | 751,451 | 100.0000 | 751,451 | 751,451 | 751,451 | | | | | 6.000 | 6.000 | | 30,058 | 45,087 | 12/24/2019 | 10/30/2023 |
| 25938M-AV-7 | Douglas CO NE SID 583 | | | | 5.C | 2,077,014 | 100.0000 | 2,077,014 | 2,077,014 | 2,077,014 | | | | | 6.000 | 6.000 | | 83,081 | 124,621 | 12/24/2019 | 12/07/2023 |
| 25938M-AW-5 | Douglas CO NE SID 583 | | | | 5.C | 1,175,122 | 100.0000 | 1,175,122 | 1,175,122 | 1,175,122 | | | | | 6.000 | 6.000 | | 47,005 | 70,507 | 12/24/2019 | 12/26/2023 |

# SCHEDULE D - PART 1

Showing All Long-Term **BONDS** Owned December 31 of Current Year

| 1 | 2 | | Codes | | 6 | 7 | Fair Value | | 10 | 11 | Change in Book / Adjusted Carrying Value | | | | | Interest | | | | | Dates | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3 | 4 | 5 | NAIC Designation, NAIC Designation Modifier and SVO Administrative Symbol | | 8 | 9 | | | 12 | 13 | 14 | 15 | | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| CUSIP Identification | Description | Code | Foreign | Bond CHAR | | Actual Cost | Rate Used to Obtain Fair Value | Fair Value | Par Value | Book/ Adjusted Carrying Value | Unrealized Valuation Increase/ (Decrease) | Current Year's (Amortization)/ Accretion | Current Year's Other Than Temporary Impairment Recognized | Total Foreign Exchange Change In B./A.C.V. | | Rate of | Effective Rate of | When Paid | Admitted Amount Due & Accrued | Amount Rec. During Year | Acquired | Stated Contractual Maturity Date |
| 25938W-AX-3 | Douglas CO NE SID 583 | | | 5.C | | 709.004 | 100.0000 | 709.004 | 709.004 | 709.004 | | | | | | 6.000 | 6.000 | | 28.360 | 42.540 | 12/24/2019 | 01/16/2024 |
| 25938W-AY-1 | Douglas CO NE SID 583 | | | 5.C | | 764.923 | 100.0000 | 764.923 | 764.923 | 764.923 | | | | | | 6.000 | 6.000 | | 30.597 | 45.895 | 12/24/2019 | 02/28/2024 |
| 25938W-AZ-8 | Douglas CO NE SID 583 | | | 5.C | | 1,858.876 | 100.0000 | 1,858.876 | 1,858.876 | 1,858.876 | | | | | | 6.000 | 6.000 | | 74.355 | 111.533 | 12/24/2019 | 04/04/2024 |
| 25938W-BA-2 | Douglas CO NE SID 583 | | | 5.C | | 87.619 | 100.0000 | 87.619 | 87.619 | 87.619 | | | | | | 6.000 | 6.000 | | 3.505 | 5.476 | 12/24/2019 | 04/04/2024 |
| 25938W-BB-0 | Douglas CO NE SID 583 | | | 5.C | | 773.007 | 100.0000 | 773.007 | 773.007 | 773.007 | | | | | | 6.000 | 6.000 | | 30.920 | 43.417 | 12/24/2019 | 05/08/2024 |
| 25938W-BC-8 | Douglas CO NE SID 583 | | | 5.C | | 1,108.038 | 100.0000 | 1,108.038 | 1,108.038 | 1,108.038 | | | | | | 6.000 | 6.000 | | 44.322 | 57.433 | 12/24/2019 | 06/12/2024 |
| 25938W-BD-6 | Douglas CO NE SID 583 | | | 5.C | | 724.564 | 100.0000 | 724.564 | 724.564 | 724.564 | | | | | | 6.000 | 6.000 | | 28.983 | 31.277 | 12/24/2019 | 07/19/2024 |
| 25938W-BE-4 | Douglas CO NE SID 583 | | | 5.C | | 508.661 | 100.0000 | 508.661 | 508.661 | 508.661 | | | | | | 6.000 | 6.000 | | 20.346 | 21.194 | 12/24/2019 | 08/07/2024 |
| 25938W-BF-1 | Douglas CO NE SID 583 | | | 5.C | | 959.735 | 100.0000 | 959.735 | 959.735 | 959.735 | | | | | | 6.000 | 6.000 | | 38.389 | 35.510 | 12/24/2019 | 09/12/2024 |
| 25938W-BG-9 | Douglas CO NE SID 583 | | | 5.C | | 785.326 | 100.0000 | 785.326 | 785.326 | 785.326 | | | | | | 6.000 | 6.000 | | 31.413 | 21.073 | 01/16/2020 | 11/01/2024 |
| 25938W-BH-7 | Douglas CO NE SID 583 | | | 5.C | | 876.695 | 100.0000 | 876.695 | 876.695 | 876.695 | | | | | | 6.000 | 6.000 | | 35.068 | 18.703 | 01/29/2020 | 12/10/2024 |
| 25938W-BJ-3 | Douglas CO NE SID 583 | | | 5.C | | 153.998 | 100.0000 | 153.998 | 153.998 | 153.998 | | | | | | 6.000 | 6.000 | | 6.160 | 1.848 | 03/26/2020 | 02/07/2025 |
| 25938W-BK-0 | Douglas CO NE SID 583 | | | 5.C | | 773.764 | 100.0000 | 773.764 | 773.764 | 773.764 | | | | | | 6.000 | 6.000 | | 30.951 | | 07/14/2020 | 04/09/2025 |
| 25938W-BL-8 | Douglas CO NE SID 583 | | | 5.C | | 1,699.465 | 100.0000 | 1,699.465 | 1,699.465 | 1,699.465 | | | | | | 6.000 | 6.000 | | 67.979 | | 07/14/2020 | 04/09/2025 |
| 25938W-BM-6 | Douglas CO NE SID 583 | | | 5.C | | 687.108 | 100.0000 | 687.108 | 687.108 | 687.108 | | | | | | 6.000 | 6.000 | | 25.996 | | 07/14/2020 | 04/30/2025 |
| 2599999 | Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Issuer Obligations | | | | | 39,101.063 | XXX | 39,101.063 | 39,101.063 | 39,101.063 | | | | | | XXX | XXX | XXX | 1,562.558 | 2,033.718 | XXX | XXX |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| 3132CW-CR-3 | FHLMC SUPER 15Y FIXED | | | 1.A | | 6,913.511 | 104.4900 | 7,135.852 | 6,829.213 | 6,908.740 | | (5.526) | | | | 2.500 | 2.241 | MON. | 14.228 | 170.730 | 12/26/2019 | 08/01/2031 |
| 3132CW-HQ-0 | FHLMC SUPER 15Y FIXED | | | 1.A | | 18,999.062 | 106.1280 | 19,599.753 | 18,468.104 | 18,977.624 | | (25.338) | | | | 3.000 | 2.491 | MON. | 46.170 | 554.043 | 12/26/2019 | 12/01/2034 |
| 3133LP-SB-4 | FHLMC UMBS 10Y FIXED | | | 1.A | | 11,566.117 | 104.2700 | 11,909.302 | 11,421.562 | 11,555.240 | | (12.118) | | | | 2.500 | 2.213 | MON. | 23.795 | 285.539 | 12/26/2019 | 12/01/2029 |
| 31410L-SW-3 | FNMA MEGA JUMBO 15 YEAR | | | 1.A | | 4,576.207 | 102.7780 | 4,668.303 | 4,542.141 | 4,574.018 | | (2.460) | | | | 2.500 | 2.358 | MON. | 9.463 | 113.553 | 12/26/2019 | 03/01/2031 |
| 31418D-KC-5 | FNMA UMBS INT 20 YEAR | | | 1.A | | 7,753.417 | 104.8610 | 7,955.065 | 7,586.281 | 7,751.293 | | (3.827) | | | | 3.000 | 2.591 | MON. | 18.966 | 227.588 | 12/26/2019 | 01/01/2040 |
| 2699999 | Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Residential Mortgage-Backed Securities | | | | | 49,808.314 | XXX | 51,268.275 | 48,847.301 | 49,766.915 | | (49.269) | | | | XXX | XXX | XXX | 112.622 | 1,351.453 | XXX | XXX |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | | | | |
| 3199999 | Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Subtotals - U.S. Special Revenue and Special Assessment Obligations of Agencies of Governments and Their Political Subdivisions | | | | | 88,909.377 | XXX | 90,369.338 | 87,948.364 | 88,867.978 | | (49.269) | | | | XXX | XXX | XXX | 1,675.180 | 3,385.171 | XXX | XXX |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Issuer Obligations | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Issuer Obligations | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates - Issuer Obligations | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates - Affiliated Bank Loans - Issued | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates - Affiliated Bank Loans - Acquired | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - SVO Identified Funds - Exchange Traded Funds - as Identified by the SVO | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - SVO Identified Funds - Bond Mutual Funds - as Identified by the SVO | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Unaffiliated Bank Loans - Unaffiliated Bank Loans - Issued | | | | | | | | | | | | | | | | | | | | | | |
| Bonds - Unaffiliated Bank Loans - Unaffiliated Bank Loans - Acquired | | | | | | | | | | | | | | | | | | | | | | |

E10.1

# SCHEDULE D - PART 1

Showing All Long-Term **BONDS** Owned December 31 of Current Year

| 1 CUSIP Identification | 2 Description | Codes 3 Code | Codes 4 Foreign | Codes 5 Bond CHAR | 6 NAIC Designation, NAIC Designation Modifier and SVO Administrative Symbol | 7 Actual Cost | Fair Value 8 Rate Used to Obtain Fair Value | Fair Value 9 Fair Value | 10 Par Value | 11 Book/Adjusted Carrying Value | Change in Book / Adjusted Carrying Value 12 Unrealized Valuation Increase/ (Decrease) | 13 Current Year's (Amortization)/ Accretion | 14 Current Year's Other Than Temporary Impairment Recognized | 15 Total Foreign Exchange Change In B./A.C.V. | Interest 16 Rate of | Interest 17 Effective Rate of | Interest 18 When Paid | 19 Admitted Amount Due & Accrued | 20 Amount Rec. During Year | Dates 21 Acquired | Dates 22 Stated Contractual Maturity Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7699999 - Bonds - Total Bonds - Subtotals - Issuer Obligations | | | | | | 380,715,811 | XXX | 382,071,865 | 379,555,063 | 380,246,853 | | (1,010,612) | | | XXX | XXX | XXX | 4,217,163 | 9,766,100 | XXX | XXX |
| 7799999 - Bonds - Total Bonds - Subtotals - Residential Mortgage-Backed Securities | | | | | | 49,808,314 | XXX | 51,268,275 | 48,847,301 | 49,766,915 | | (49,269) | | | XXX | XXX | XXX | 112,622 | 1,351,453 | XXX | XXX |
| 8399999 Subtotals - Total Bonds | | | | | | 430,524,125 | XXX | 433,340,140 | 428,402,364 | 430,013,768 | | (1,059,881) | | | XXX | XXX | XXX | 4,329,785 | 11,117,553 | XXX | XXX |

Book/Adjusted Carrying Value by NAIC Designation Category Footnote:
1A  $  390,912,705 ....  1B  $ .....................  1C  $ .....................  1D  $ .....................  1E  $ .....................  1F  $ .....................  1G  $ .....................
2A  $ .....................  2B  $ .....................  2C  $ .....................
3A  $ .....................  3B  $ .....................  3C  $ .....................
4A  $ .....................  4B  $ .....................  4C  $ .....................
5A  $ .....................  5B  $ .....................  5C  $ 39,101,063 ....
6  $ .....................

E10.2

## SCHEDULE D - PART 2 - SECTION 1

Showing All **PREFERRED STOCKS** Owned December 31 of Current Year

| 1 | 2 | Codes | | 5 | 6 | 7 | 8 | Fair Value | | 11 | Dividends | | | Change in Book/Adjusted Carrying Value | | | | | 20 | 21 |
| | | 3 | 4 | | | | | 9 | 10 | | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | | |
| CUSIP Identification | Description | Code | Foreign | Number Of Shares | Par Value Per Share | Rate Per Share | Book/ Adjusted Carrying Value | Rate Per Share Used to Obtain Fair Value | Fair Value | Actual Cost | Declared but Unpaid | Amount Received During Year | Nonadmitted Declared But Unpaid | Unrealized Valuation Increase/ (Decrease) | Current Year's (Amortization) Accretion | Current Year's Other-Than-Temporary Impairment Recognized | Total Change In B./A.C.V. (15+16-17) | Total Foreign Exchange Change In B./A.C.V. | NAIC Designation, NAIC Designation Modifier and SVO Administrative Symbol | Date Acquired |
| | | | | | | | | | | | | | | | | | | | | |

NONE

| 8999999 Total Preferred Stocks | | | | | | | | XXX | | | | | | | | | | XXX | XXX |

Book/Adjusted Carrying Value by NAIC Designation Category Footnote:

| | | | | | | |
|---|---|---|---|---|---|---|
| 1A $ .................... | 1B $ .................... | 1C $ .................... | 1D $ .................... | 1E $ .................... | 1F $ .................... | 1G $ .................... |
| 2A $ .................... | 2B $ .................... | 2C $ .................... | | | | |
| 3A $ .................... | 3B $ .................... | 3C $ .................... | | | | |
| 4A $ .................... | 4B $ .................... | 4C $ .................... | | | | |
| 5A $ .................... | 5B $ .................... | 5C $ .................... | | | | |
| 6 $ .................... | | | | | | |

E11

Case 1:19-cv-01414-JTN-SJB ECF No. 101-5, PageID.4172 Page 194 of 472

# SCHEDULE D - PART 2 - SECTION 2

Showing all **COMMON STOCKS** Owned December 31 of Current Year

| 1 | 2 | Codes | | 5 | 6 | Fair Value | | 9 | Dividends | | | Change in Book/Adjusted Carrying Value | | | | 17 | 18 |
| | | 3 | 4 | | | 7 | 8 | | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | NAIC Designation, NAIC Designation Modifier and SVO Administrative Symbol |
| CUSIP Identification | Description | Code | Foreign | Number of Shares | Book / Adjusted Carrying Value | Rate per Share Used To Obtain Fair Value | Fair Value | Actual Cost | Declared but Unpaid | Amount Received During Year | Nonadmitted Declared But Unpaid | Unrealized Valuation Increase/ (Decrease) | Current Year's Other-Than-Temporary Impairment Recognized | Total Change in B./A.C.V. (13-14) | Total Foreign Exchange Change in B./A.C.V. | Date Acquired | |
| Industrial and Miscellaneous (Unaffiliated) Publicly Traded | | | | | | | | | | | | | | | | | |
| Industrial and Miscellaneous (Unaffiliated) Other | | | | | | | | | | | | | | | | | |
| 56848*-10-6 | PQN Holdings Ltd | | D | 3,408,262 | 46,213,228 | 13,559,180 | 46,213,228 | 55,849,103 | | | | (9,635,875) | | (9,635,875) | | 10/09/2019 | XXX |
| 9199999 - Industrial and Miscellaneous (Unaffiliated) Other | | | | | 46,213,228 | XXX | 46,213,228 | 55,849,103 | | | | (9,635,875) | | (9,635,875) | | XXX | XXX |
| Parent, Subsidiaries and Affiliates Publicly Traded | | | | | | | | | | | | | | | | | |
| Mutual Funds | | | | | | | | | | | | | | | | | |
| Unit Investment Trusts | | | | | | | | | | | | | | | | | |
| Closed-End Funds | | | | | | | | | | | | | | | | | |
| 9799999 Total Common Stocks | | | | | 46,213,228 | XXX | 46,213,228 | 55,849,103 | | | | (9,635,875) | | (9,635,875) | | XXX | XXX |
| 9899999 Total Preferred and Common Stocks | | | | | 46,213,228 | XXX | 46,213,228 | 55,849,103 | | | | (9,635,875) | | (9,635,875) | | XXX | XXX |

Book/Adjusted Carrying Value by NAIC Designation Category Footnote:

1A  $ ............................  1B  $ ............................  1C  $ ............................  1D  $ ............................  1E  $ ............................  1F  $ ............................  1G  $ ............................

2A  $ ............................  2B  $ ............................  2C  $ ............................

3A  $ ............................  3B  $ ............................  3C  $ ............................

4A  $ ............................  4B  $ ............................  4C  $ ............................

5A  $ ............................  5B  $ ............................  5C  $ ............................

6  $ ............................

E12

# SCHEDULE D - PART 3

Showing All Long-Term Bonds and Stocks **ACQUIRED** During Current Year

| 1 CUSIP Identification | 2 Description | 3 Foreign | 4 Date Acquired | 5 Name of Vendor | 6 Number of Shares of Stock | 7 Actual Cost | 8 Par Value | 9 Paid for Accrued Interest and Dividends |
|---|---|---|---|---|---|---|---|---|
| Bonds - U.S. Governments | | | | | | | | |
| 912828-5L-0 | United States Treasury Notes | | 06/11/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 7,477,913 | 7,200,000 | 15,750 |
| 912828-5X-4 | United States Treasury Notes | | 01/31/2020 | Wells Fargo Brokerage Services | XXX | 19,698,945 | 19,500,000 | 4,018 |
| 912828-6Y-1 | United States Treasury Notes | | 12/14/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 111,720 | 109,000 | |
| 912828-6Y-1 | United States Treasury Notes | | 12/14/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 4,612,292 | 4,500,000 | |
| 912828-YC-8 | United States Treasury Notes | | 03/02/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 4,040,844 | 4,000,000 | 489 |
| 912828-YC-8 | United States Treasury Notes | | 06/05/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 9,654,956 | 9,500,000 | 38,723 |
| 0599999 - Bonds - U.S. Governments | | | | | | 45,596,670 | 44,809,000 | 58,980 |
| Bonds - All Other Governments | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions | | | | | | | | |
| 25938M-BG-9 | Douglas CO NE SID 583 | | 01/16/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 785,326 | 785,326 | 8,115 |
| 25938M-BH-7 | Douglas CO NE SID 583 | | 01/29/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 876,695 | 876,695 | 5,991 |
| 25938M-BJ-3 | Douglas CO NE SID 583 | | 03/26/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 153,998 | 153,998 | 1,104 |
| 25938M-BK-0 | Douglas CO NE SID 583 | | 07/14/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 773,764 | 773,764 | 9,801 |
| 25938M-BL-8 | Douglas CO NE SID 583 | | 07/14/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 1,699,465 | 1,699,465 | 21,527 |
| 25938M-BM-6 | Douglas CO NE SID 583 | | 07/14/2020 | FIRST NATIONAL CAPITAL MARKETS | XXX | 687,108 | 687,108 | 7,215 |
| 3199999 - Bonds - U.S. Special Revenue and Special Assessment and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions | | | | | | 4,976,356 | 4,976,356 | 53,753 |
| Bonds - Industrial and Miscellaneous (Unaffiliated) | | | | | | | | |
| Bonds - Hybrid Securities | | | | | | | | |
| Bonds - Parent, Subsidiaries, and Affiliates | | | | | | | | |
| Bonds - SVO Identified Funds | | | | | | | | |
| Bonds - Subtotals - Unaffiliated Bank Loans | | | | | | | | |
| 8399997 - Bonds - Subtotals - Bonds - Part 3 | | | | | | 50,573,026 | 49,785,356 | 112,733 |
| 8399999 - Bonds - Subtotals - Bonds | | | | | | 50,573,026 | 49,785,356 | 112,733 |
| Preferred Stocks - Industrial and Miscellaneous (Unaffiliated) Perpetual Preferred | | | | | | | | |
| Preferred Stocks - Industrial and Miscellaneous (Unaffiliated) Redeemable Preferred | | | | | | | | |
| Preferred Stocks - Parent, Subsidiaries and Affiliates Perpetual Preferred | | | | | | | | |
| Preferred Stocks - Parent, Subsidiaries and Affiliates Redeemable Preferred | | | | | | | | |
| Common Stocks - Industrial and Miscellaneous (Unaffiliated) Publicly Traded | | | | | | | | |
| Common Stocks - Industrial and Miscellaneous (Unaffiliated) Other | | | | | | | | |
| Common Stocks - Parent, Subsidiaries, and Affiliates Publicly Traded | | | | | | | | |
| Common Stocks - Parent, Subsidiaries and Affiliates Other | | | | | | | | |
| Common Stocks - Mutual Funds | | | | | | | | |
| Common Stocks - Unit Investment Trusts | | | | | | | | |
| Common Stocks - Closed-End Funds | | | | | | | | |
| | | | | | | | | |
| 9999999 Totals | | | | | | 50,573,026 | XXX | 112,733 |

E13

# SCHEDULE D - PART 4

Showing all Long-Term Bonds and Stocks **SOLD, REDEEMED** or Otherwise **DISPOSED OF** During Current Year

| 1 | 2 | 3 For eign | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Change in Book/Adjusted Carrying Value | | | | | | | | | | |
| CUSIP Identi- fication | Description | | Disposal Date | Name of Purchaser | Number of Shares of Stock | Consideration | Par Value | Actual Cost | Prior Year Book/ Adjusted Carrying Value | Unrealized Valuation Increase/ (Decrease) | Current Year (Amortization)/ Accretion | Current Year's Other-Than- Temporary Impairment Recognized | Total Change in B./A.C.V. (11+12-13) | Total Foreign Exchange Change in B./A.C.V. | Book/ Adjusted Carrying Value at Disposal Date | Foreign Exchange Gain (Loss) on Disposal | Realized Gain (Loss) on Disposal | Total Gain (Loss) on Disposal | Bond Interest/Stock Dividends Received During Year | Stated Contractual Maturity Date |
| **Bonds - U.S. Governments** | | | | | | | | | | | | | | | | | | | | |
| 912828-2J-8 | United States Treasury Notes, | | 07/15/2020 | VARIOUS, | XXX | 66,053,383 | 66,000,000 | 64,955,580 | 65,766,623 | | 204,312 | | 204,312 | | 65,970,935 | | 82,448 | 82,448 | 926,868 | 07/15/2020 |
| 912828-3G-3 | United States Treasury Notes, | | 11/15/2020 | MATURITY, | XXX | 50,000,000 | 50,000,000 | 49,703,342 | 49,822,078 | | 177,922 | | 177,922 | | 50,000,000 | | | | 875,000 | 11/15/2020 |
| 912828-3G-5 | United States Treasury Notes, | | 11/15/2020 | MATURITY, | XXX | 45,825,000 | 45,825,000 | 45,553,112 | 45,661,934 | | 163,066 | | 163,066 | | 45,825,000 | | | | 801,938 | 11/15/2020 |
| 912828-3L-2 | United States Treasury Notes, | | 12/15/2020 | MATURITY, | XXX | 48,000,000 | 48,000,000 | 47,208,340 | 47,686,362 | | 313,638 | | 313,638 | | 48,000,000 | | | | 900,000 | 12/15/2020 |
| 912828-4B-3 | United States Treasury Notes, | | 04/21/2020 | Wells Fargo Brokerage Services, | XXX | 2,039,316 | 2,000,000 | 1,988,566 | 1,994,578 | | 1,353 | | 1,353 | | 1,995,932 | | 43,384 | 43,384 | 28,655 | 03/15/2021 |
| 912828-H5-2 | United States Treasury Notes, | | 01/31/2020 | MATURITY, | XXX | 84,000,000 | 84,000,000 | 83,732,562 | 83,991,137 | | 8,863 | | 8,863 | | 84,000,000 | | | | 525,000 | 01/31/2020 |
| 912828-X2-1 | United States Treasury Notes, | | 04/15/2020 | MATURITY, | XXX | 28,600,000 | 28,600,000 | 28,521,045 | 28,590,611 | | 9,389 | | 9,389 | | 28,600,000 | | | | 214,500 | 04/15/2020 |
| 0599999 - Bonds - U.S. Governments | | | | | | 324,517,699 | 324,425,000 | 321,662,547 | 323,513,323 | | 878,543 | | 878,543 | | 324,391,867 | | 125,832 | 125,832 | 4,271,961 | XXX |
| **Bonds - All Other Governments** | | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) | | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) | | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions | | | | | | | | | | | | | | | | | | | | |
| 31320W-CR-3 | FHLMC SUPER 15Y FIXED, | | 12/25/2020 | PRINCIPAL RECEIPT, | XXX | 2,123,011 | 2,123,011 | 2,149,217 | 2,149,452 | | (26,441) | | (26,441) | | 2,123,011 | | | | 29,515 | 08/01/2031, |
| 31320W-HQ-0 | FHLMC SUPER 15Y FIXED, | | 12/25/2020 | PRINCIPAL RECEIPT, | XXX | 6,216,688 | 6,216,688 | 6,395,418 | 6,396,731 | | (180,043) | | (180,043) | | 6,216,688 | | | | 128,308 | 12/01/2034, |
| 3133LP-S8-4 | FHLMC UMBS 10Y FIXED, | | 12/25/2020 | PRINCIPAL RECEIPT, | XXX | 5,167,057 | 5,167,057 | 5,232,453 | 5,233,014 | | (65,957) | | (65,957) | | 5,167,057 | | | | 83,306 | 12/01/2029, |
| 31410L-SW-3 | FNMA MEGA JUMBO 15 YEAR, | | 12/25/2020 | PRINCIPAL RECEIPT, | XXX | 2,459,310 | 2,459,310 | 2,477,755 | 2,477,902 | | (18,592) | | (18,592) | | 2,459,310 | | | | 40,925 | 03/01/2031, |
| 31418D-KC-5 | FNMA UMBS INT 20 YEAR, | | 12/25/2020 | PRINCIPAL RECEIPT, | XXX | 3,480,912 | 3,480,912 | 3,557,600 | 3,558,382 | | (77,471) | | (77,471) | | 3,480,912 | | | | 76,857 | 01/01/2040 |
| 3199999 - Bonds - U.S. Special Revenue and Special Assessment and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions | | | | | | 19,446,978 | 19,446,978 | 19,812,443 | 19,815,481 | | (368,504) | | (368,504) | | 19,446,978 | | | | 358,911 | XXX |
| Bonds - Industrial and Miscellaneous (Unaffiliated) | | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities | | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries, and Affiliates | | | | | | | | | | | | | | | | | | | | |
| Bonds - SVO Identified Funds | | | | | | | | | | | | | | | | | | | | |
| Bonds - Subtotals - Unaffiliated Bank Loans | | | | | | | | | | | | | | | | | | | | |
| 8399997 - Bonds - Subtotals - Bonds - Part 4 | | | | | | 343,964,677 | 343,871,978 | 341,474,990 | 343,328,804 | | 510,039 | | 510,039 | | 343,838,845 | | 125,832 | 125,832 | 4,630,872 | XXX |
| 8399999 - Bonds - Subtotals - Bonds | | | | | | 343,964,677 | 343,871,978 | 341,474,990 | 343,328,804 | | 510,039 | | 510,039 | | 343,838,845 | | 125,832 | 125,832 | 4,630,872 | XXX |
| Preferred Stocks - Industrial and Miscellaneous (Unaffiliated) Perpetual Preferred | | | | | | | | | | | | | | | | | | | | |
| Preferred Stocks - Industrial and Miscellaneous (Unaffiliated) Redeemable Preferred | | | | | | | | | | | | | | | | | | | | |
| Preferred Stocks - Parent, Subsidiaries and Affiliates Perpetual Preferred | | | | | | | | | | | | | | | | | | | | |
| Preferred Stocks - Parent, Subsidiaries and Affiliates Redeemable Preferred | | | | | | | | | | | | | | | | | | | | |
| Common Stocks - Industrial and Miscellaneous (Unaffiliated) Publicly Traded | | | | | | | | | | | | | | | | | | | | |
| Common Stocks - Industrial and Miscellaneous (Unaffiliated) Other | | | | | | | | | | | | | | | | | | | | |
| Common Stocks - Parent, Subsidiaries, and Affiliates Publicly Traded | | | | | | | | | | | | | | | | | | | | |
| Common Stocks - Parent, Subsidiaries and Affiliates Other | | | | | | | | | | | | | | | | | | | | |
| Common Stocks - Mutual Funds | | | | | | | | | | | | | | | | | | | | |
| Common Stocks - Unit Investment Trusts | | | | | | | | | | | | | | | | | | | | |
| Common Stocks - Closed-End Funds | | | | | | | | | | | | | | | | | | | | |
| **9999999 Totals** | | | | | | 343,964,677 | XXX | 341,474,990 | 343,328,804 | | 510,039 | | 510,039 | | 343,838,845 | | 125,832 | 125,832 | 4,630,872 | XXX |

**ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company**

Schedule D - Part 5
# NONE

Schedule D - Part 6 - Section 1
# NONE

Schedule D - Part 6 - Section 2
# NONE

# SCHEDULE DA - PART 1

Showing all **SHORT-TERM INVESTMENTS** Owned December 31 of Current Year

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Codes | | | | | | Change In Book/Adjusted Carrying Value | | | | | | Interest | | | | | | |
| Description | Code | Foreign | Date Acquired | Name of Vendor | Maturity Date | Book/ Adjusted Carrying Value | Unrealized Valuation Increase/ (Decrease) | Current Year's (Amortization)/ Accretion | Current Year's Other-Than-Temporary Impairment Recognized | Total Foreign Exchange Change in B./A.C.V. | Par Value | Actual Cost | Amount Due And Accrued Dec. 31 of Current Year On Bond Not In Default | Non-Admitted Due and Accrued | Rate of | Effective Rate of | When Paid | Amount Received During Year | Paid for Accrued Interest |
| Bonds - U.S. Governments Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| United States Treasury Bill Co:CIC Lot:1... | SD... | | 05/29/2020. | FIRST NATIONAL CAPITAL MARKETS | 05/20/2021. | 16,978,330 | | | | | 17,000,000 | 16,978,330 | 13,203 | | | 0.131 | N/A... | | |
| 0199999 - Bonds - U.S. Governments - Issuer Obligations | | | | | | 16,978,330 | | | | | 17,000,000 | 16,978,330 | 13,203 | | XXX | XXX | XXX | | |
| Bonds - U.S. Governments - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Governments - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S Governments - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| 0599999 - Bonds - Subtotals - U.S. Governments | | | | | | 16,978,330 | | | | | 17,000,000 | 16,978,330 | 13,203 | | XXX | XXX | XXX | | |
| Bonds - All Other Governments - Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| Bonds - All Other Governments - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - All Other Governments - Single Class Mortgage-Backed/Asset-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - All Other Governments - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and their Political Subdivisions - Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and their Political Subdivisions - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and their Political Subdivisions - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and their Political Subdivisions - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Hybrid Securities - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Issuer Obligations | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Residential Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Commercial Mortgage-Backed Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Other Loan-Backed and Structured Securities | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Affiliated Bank Loans - Issued | | | | | | | | | | | | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Affiliated Bank Loans - Acquired | | | | | | | | | | | | | | | | | | | |
| Bonds - SVO Identified Funds - Exchange Traded Funds - as Identified by the SVO | | | | | | | | | | | | | | | | | | | |
| Bonds - SVO Identified Funds - Bond Mutual Funds - as Identified by the SVO | | | | | | | | | | | | | | | | | | | |
| Bonds - Unaffiliated Bank Loans - Unaffiliated Bank Loans - Issued | | | | | | | | | | | | | | | | | | | |
| Bonds - Unaffiliated Bank Loans - Unaffiliated Bank Loans - Acquired | | | | | | | | | | | | | | | | | | | |
| 7699999 - Bonds - Total Bonds - Subtotals - Issuer Obligations | | | | | | 16,978,330 | | | | | 17,000,000 | 16,978,330 | 13,203 | | XXX | XXX | XXX | | |
| 8399999 - Bonds - Total Bonds - Subtotals - Bonds | | | | | | 16,978,330 | | | | | 17,000,000 | 16,978,330 | 13,203 | | XXX | XXX | XXX | | |
| Parent, Subsidiaries and Affiliates - Mortgage Loans | | | | | | | | | | | | | | | | | | | |
| Parent, Subsidiaries and Affiliates - Other Short-Term Invested Assets | | | | | | | | | | | | | | | | | | | |
| Mortgage Loans | | | | | | | | | | | | | | | | | | | |
| Other Short-Term Invested Assets | | | | | | | | | | | | | | | | | | | |
| 9199999 Totals | | | | | | 16,978,330 | | | | | XXX | 16,978,330 | 13,203 | | XXX | XXX | XXX | | |

Book/Adjusted Carrying Value by NAIC Designation Category Footnote:
1A $ 16,978,330 .......... 1B $ ..................... 1C $ ........................... 1D $ ........................... 1E $ ........................ 1F $ ......................... 1G $ ........................
2A $ ..................... 2B $ ..................... 2C $ ........................
3A $ ..................... 3B $ ..................... 3C $ ........................
4A $ ..................... 4B $ ..................... 4C $ ........................
5A $ ..................... 5B $ ..................... 5C $ ........................
6 $ .....................

E17

ANNUAL STATEMENT FOR THE YEAR 2020 OF THE California Insurance Company

Schedule DB - Part A - Section 1
# NONE

Schedule DB - Part A - Section 2
# NONE

Schedule DB - Part B - Section 1
# NONE

Schedule DB - Part B - Section 2
# NONE

Schedule DB - Part D - Section 1
# NONE

Schedule DB - Part D - Section 2
# NONE

Schedule DB - Part E
# NONE

Schedule DL - Part 1
# NONE

Schedule DL - Part 2
# NONE

E18, E19, E20, E21, E22, E23, E24, E25, E26

## SCHEDULE E - PART 1 - CASH

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Depository | Code | Rate of Interest | Amount of Interest Received During Year | Amount of Interest Accrued December 31 of Current Year | Balance | * |
| **OPEN DEPOSITORIES** | | | | | | |
| Security National Bank Checking..................Omaha, NE... | | | | | 3,195,749 | XXX |
| Security National Bank Money Market..........Omaha, NE... | | 0.003 | 13,688 | | 111,998 | XXX |
| First National Bank Checking.......................Omaha, NE... | | | | | 5,786,179 | XXX |
| Bank of America Checking............................Wilmington, DE... | | | | | 113,315 | XXX |
| Union Bank Checking....................................Los Angeles, CA... | | | | | 437,158 | XXX |
| U.S. Bank Checking......................................Saint Paul, MN... | | | | | (197,054) | XXX |
| Citibank.......................................................New York, NY... | | | | | 105,800,000 | XXX |
| U.S. Bank Money Market..............................Washington DC... | | | | | 31,300,000 | XXX |
| Brean Capital Investment Cash.....................New York, NY... | | | | | 55,398,918 | XXX |
| 0199998   Deposits in ........................0   depositories that do not exceed the allowable limit in any one depository - Open Depositories | XXX | XXX | | | | XXX |
| 0199999 Totals - Open Depositories | XXX | XXX | 13,688 | | 201,946,263 | XXX |
| 0399999 Total Cash on Deposit | XXX | XXX | 13,688 | | 201,946,263 | XXX |
| 0499999 Cash in Company's Office | XXX | XXX | XXX | XXX | | XXX |
| 0599999 Total Cash | XXX | XXX | 13,688 | | 201,946,263 | XXX |

### TOTALS OF DEPOSITORY BALANCES ON THE LAST DAY OF EACH MONTH DURING THE CURRENT YEAR

| 1. January | 24,131,646 | 4. April | 28,120,271 | 7. July | 12,962,706 | 10. October | 101,853,066 |
|---|---|---|---|---|---|---|---|
| 2. February | 13,199,418 | 5. May | 29,231,200 | 8. August | 93,959,594 | 11. November | 109,057,808 |
| 3. March | 16,542,567 | 6. June | 51,142,758 | 9. September | 9,665,376 | 12. December | 201,946,263 |

Exhibit 5, Page 149 of 152

## SCHEDULE E - PART 2 - CASH EQUIVALENTS

Show Investments Owned December 31 of Current Year

| 1<br>CUSIP | 2<br>Description | 3<br>Code | 4<br>Date Acquired | 5<br>Rate of Interest | 6<br>Maturity Date | 7<br>Book/Adjusted Carrying Value | 8<br>Amount of Interest Due & Accrued | 9<br>Amount Received During Year |
|---|---|---|---|---|---|---|---|---|
| Bonds - U.S. Governments - Issuer Obligations | | | | | | | | |
| XXX | United States Treasury Bills | | 10/30/2020 | | 01/28/2021 | 49,990,335 | 6,766 | |
| XXX | United States Treasury Bills | | 10/30/2020 | | 01/28/2021 | 37,992,653 | 5,142 | |
| 0199999 - Bonds - U.S. Governments - Issuer Obligations | | | | | | 87,982,988 | 11,908 | |
| Bonds - U.S. Governments - Residential Mortgage-Backed Securities | | | | | | | | |
| Bonds - U.S. Governments - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - U.S. Governments - Other Loan-Backed and Structured Securities | | | | | | | | |
| 0599999 - Bonds - U.S. Governments - Subtotals - U.S. Governments | | | | | | 87,982,988 | 11,908 | |
| Bonds - All Other Governments - Issuer Obligations | | | | | | | | |
| Bonds - All Other Governments - Residential Mortgage-Backed Securities | | | | | | | | |
| Bonds - All Other Governments - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - All Other Governments - Other Loan-Backed and Structured Securities | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Issuer Obligations | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Residential Mortgage-Backed Securities | | | | | | | | |
| Bonds - .S. States, Territories and Possessions (Direct and Guaranteed) - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - U.S. States, Territories and Possessions (Direct and Guaranteed) - Other Loan-Backed and Structured Securities | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Issuer Obligations | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Residential Mortgage-Backed Securities | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - U.S. Political Subdivisions of States, Territories and Possessions (Direct and Guaranteed) - Other Loan-Backed and Structured Securities | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Issuer Obligations | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Residential Mortgage-Backed Securities | | | | | | | | |
| U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - U.S. Special Revenue and Special Assessment Obligations and all Non-Guaranteed Obligations of Agencies and Authorities of Governments and Their Political Subdivisions - Other Loan-Backed and Structured Securities | | | | | | | | |
| Bonds - Industrial and Miscellaneous - Issuer Obligations | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Residential Mortgage-Backed Securities | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - Industrial and Miscellaneous (Unaffiliated) - Other Loan-Backed and Structured Securities | | | | | | | | |
| Bonds - Hybrid Securities - Issuer Obligations | | | | | | | | |
| Bonds - Hybrid Securities - Residential Mortgage-Backed Securities | | | | | | | | |
| Bonds - Hybrid Securities - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - Hybrid Securities - Other Loan-Backed and Structured Securities | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Issuer Obligations | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Residential Mortgage-Backed Securities | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Commercial Mortgage-Backed Securities | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Other Loan-Backed and Structured Securities | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Affiliated Bank Loans - Issued | | | | | | | | |
| Bonds - Parent, Subsidiaries and Affiliates Bonds - Affiliated Bank Loans - Acquired | | | | | | | | |
| Bonds - SVO Identified Funds - Exchange Traded Funds -as Identified by the SVO | | | | | | | | |
| Bonds - SVO Identified Funds - Bond Mutual Funds - as Identified by the SVO | | | | | | | | |
| Bonds - Unaffiliated Bank Loans - Unaffiliated Bank Loans - Issued | | | | | | | | |
| Bonds - Unaffiliated Bank Loans - Unaffiliated Bank Loans - Acquired | | | | | | | | |
| 7699999 - Bonds - Total Bonds - Subtotals - Issuer Obligations | | | | | | 87,982,988 | 11,908 | |
| 8399999 - Bonds - Total Bonds - Subtotals - Bonds | | | | | | 87,982,988 | 11,908 | |
| Sweep Accounts | | | | | | | | |
| Exempt Money Market Mutual Funds - as Identified by SVO | | | | | | | | |
| 31846V-41-9 | First Amer Treas Oblig Fd Instl | | 12/01/2020 | 0.006 | XXX | 5,938 | | 1 |
| 38141W-32-3 | GS FIN SQ TREAS OBLIG FD INSTL #46 | | 12/18/2020 | 0.035 | XXX | 574,369 | 30 | 27,053 |
| 8699999 - Exempt Money Market Mutual Funds - as Identified by SVO | | | | | | 580,307 | 30 | 27,054 |
| All Other Money Market Mutual Funds | | | | | | | | |
| 949921-12-6 | WF GOV MMF SEL 3802 | | 12/01/2020 | 0.030 | XXX | 82,569 | 2 | 82,569 |
| MM0000-01-6 | First Financial Cash Sweep | | 12/01/2020 | 0.020 | XXX | 4,468 | | 21 |
| SA0001-99-8 | CNB Fund Combined P&I | | 12/28/2020 | 0.070 | XXX | | | 46 |
| 8699999 - All Other Money Market Mutual Funds | | | | | | 87,037 | 2 | 82,636 |
| Other Cash Equivalents | | | | | | | | |
| **8899999 Total Cash Equivalents** | | | | | | 88,650,332 | 11,940 | 109,690 |

Case 2:24-cv-01091-WBS-AC Filed 03/15/21 Page 202 of 472

Book/Adjusted Carrying Value by NAIC Designation Category Footnote:

1A  $  87,982,988 ............  1B  $ ...........................  1C  $ ...........................  1D  $ ...........................  1E  $ ...........................  1F  $ ...........................  1G  $ ...........................
2A  $ ...........................  2B  $ ...........................  2C  $ ...........................
3A  $ ...........................  3B  $ ...........................  3C  $ ...........................
4A  $ ...........................  4B  $ ...........................  4C  $ ...........................
5A  $ ...........................  5B  $ ...........................  5C  $ ...........................
6   $ ...........................

E28.1

## SCHEDULE E - PART 3 - SPECIAL DEPOSITS

| | 1 | 2 | Deposits For the Benefit of All Policyholders | | All Other Special Deposits | |
|---|---|---|---|---|---|---|
| States, etc. | Type of Deposits | Purpose of Deposits | 3 Book/Adjusted Carrying Value | 4 Fair Value | 5 Book/Adjusted Carrying Value | 6 Fair Value |
| 1. Alabama .................... AL | | | | | | |
| 2. Alaska ....................... AK | | | | | | |
| 3. Arizona ..................... AZ | | | | | | |
| 4. Arkansas ................... AR | | | | | | |
| 5. California .................. CA | 0 | Multiple Purposes | 2,581,338 | 2,604,024 | 247,703,354 | 248,455,103 |
| 6. Colorado ................... CO | | | | | | |
| 7. Connecticut ............... CT | B | Workers' Compensation | | | 21,572,261 | 21,701,100 |
| 8. Delaware ................... DE | | | | | | |
| 9. District of Columbia ..... DC | | | | | | |
| 10. Florida ..................... FL | | | | | | |
| 11. Georgia .................... GA | B | Multiple Purposes | 34,969 | 35,152 | 49,962 | 50,457 |
| 12. Hawaii ..................... HI | | | | | | |
| 13. Idaho ...................... ID | B | Workers' Compensation | | | 63,118 | 63,405 |
| 14. Illinois .................... IL | B | Workers' Compensation | | | 28,590,786 | 28,717,837 |
| 15. Indiana .................... IN | B | Workers' Compensation | | | 104,742 | 104,903 |
| 16. Iowa ....................... IA | | | | | | |
| 17. Kansas .................... KS | B | Workers' Compensation | | | 1,439,492 | 1,454,179 |
| 18. Kentucky .................. KY | | | | | | |
| 19. Louisiana ................. LA | | | | | | |
| 20. Maine ...................... ME | | | | | | |
| 21. Maryland .................. MD | B | Workers' Compensation | | | 8,540,535 | 8,608,749 |
| 22. Massachusetts ........... MA | | | | | | |
| 23. Michigan .................. MI | | | | | | |
| 24. Minnesota ................ MN | | | | | | |
| 25. Mississippi ............... MS | | | | | | |
| 26. Missouri ................... MO | B | Property & Casualty | 998,957 | 1,002,809 | | |
| 27. Montana ................... MT | B | Workers' Compensation | | | 24,981 | 25,229 |
| 28. Nebraska .................. NE | | | | | | |
| 29. Nevada .................... NV | B | Multiple Purposes | 209,814 | 210,911 | 109,903 | 110,477 |
| 30. New Hampshire ........... NH | | | | | | |
| 31. New Jersey ................ NJ | | | | | | |
| 32. New Mexico ............... NM | | | | | | |
| 33. New York .................. NY | B | Workers' Compensation | | | 170,911,784 | 171,631,511 |
| 34. North Carolina ........... NC | B | Property & Casualty | 249,778 | 251,085 | | |
| 35. North Dakota ............. ND | | | | | | |
| 36. Ohio ....................... OH | | | | | | |
| 37. Oklahoma ................. OK | | | | | | |
| 38. Oregon .................... OR | B | Multiple Purposes | 378,929 | 378,701 | 4,380,617 | 4,414,693 |
| 39. Pennsylvania ............. PA | | | | | | |
| 40. Rhode Island ............. RI | | | | | | |
| 41. South Carolina ........... SC | | | | | | |
| 42. South Dakota ............. SD | | | | | | |
| 43. Tennessee ................ TN | | | | | | |
| 44. Texas ...................... TX | | | | | | |
| 45. Utah ....................... UT | | | | | | |
| 46. Vermont ................... VT | | | | | | |
| 47. Virginia ................... VA | B | Property & Casualty | 249,778 | 251,085 | | |
| 48. Washington ............... WA | | | | | | |
| 49. West Virginia ............. WV | | | | | | |
| 50. Wisconsin ................. WI | | | | | | |
| 51. Wyoming .................. WY | | | | | | |
| 52. American Samoa .......... AS | | | | | | |
| 53. Guam ...................... GU | | | | | | |
| 54. Puerto Rico ............... PR | | | | | | |
| 55. US Virgin Islands ......... VI | | | | | | |
| 56. Northern Mariana Islands. MP | | | | | | |
| 57. Canada .................... CAN | | | | | | |
| 58. Aggregate Alien and Other .... OT | XXX | XXX | 499,557 | 502,169 | | |
| 59. Total | XXX | XXX | 5,203,120 | 5,235,936 | 483,491,535 | 485,337,643 |
| **DETAILS OF WRITE-INS** | | | | | | |
| 5801. United States Department of Labor. | B | Property & Casualty | 499,557 | 502,169 | | |
| 5802. | | | | | | |
| 5803. | | | | | | |
| 5898. Sum of remaining write-ins for Line 58 from overflow page | XXX | XXX | | | | |
| 5899. Totals (Lines 5801 - 5803 + 5898) (Line 58 above) | XXX | XXX | 499,557 | 502,169 | | |

# EXHIBIT 6

MICHAEL J. STRUMWASSER (SBN 58413)
DALE K. LARSON (SBN 266165)
CAROLINE CHIAPPETTI (SBN 319547)
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: mstrumwasser@strumwooch.com
E-mail: dlarson@strumwooch.com

CYNTHIA J. LARSEN (SBN 123994)
JUSTIN GIOVANNETTONE (SBN 293794)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California  95814-4497
Telephone:  (916) 447-9200
Facsimile:  (916) 329-4900
E-mail: clarsen@orrick.com
E-mail: jgiovannettone@orrick.com

*Attorneys for Insurance Commissioner for the
State of California and Conservator of
California Insurance Company*

**Exempt from filing fees pursuant to
Government Code section 6103**

**FILED**
SAN MATEO COUNTY

JUL 3 0 2020

Clerk of the Superior Court
By _____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

INSURANCE COMMISSIONER OF THE
STATE OF CALIFORNIA,

                                   Applicant,

        v.

CALIFORNIA INSURANCE COMPANY, a
California corporation,

                                   Respondent.

**Case No. 19-CIV-06531**

[~~PROPOSED~~] ORDER SETTING BRIEFING
SCHEDULE, HEARING DATE,  AND
PROCEDURES FOR CONSERVATOR'S
APPLICATION FOR ORDER APPROVING
REHABILITATION PLAN FOR
CALIFORNIA INSURANCE COMPANY

Date:        July 30, 2020
Time:        2:00 p.m.
Dept.:       28
Judge:       Hon. George A. Miram

[PROPOSED] ORDER SETTING BRIEFING SCHEDULE, HEARING DATE, AND PROCEDURES FOR CONSERVATOR'S
APPLICATION FOR ORDER APPROVING REHABILITATION PLAN FOR CALIFORNIA INSURANCE COMPANY

Exhibit 6, Page 1 of 5

1 **[~~PROPOSED~~] ORDER**

2     The California Insurance Commissioner in his role has Conservator (Conservator) of

3 California Insurance Company (CIC) moved this Court for an Order (1) setting a briefing

4 schedule and date for the hearing (Hearing) on an application to be brought by the Conservator

5 for an Order Approving a Rehabilitation Plan for CIC; (2) setting a date by which the

6 Conservator will provide notice of the Hearing to CIC's policyholders, shareholders, creditors,

7 and other interested parties; and (3) establishing certain procedures for briefing papers and the

8 Hearing. This Motion came for a hearing at 2:00 p.m. on July 30, 2020. The Court has reviewed

9 and considered the papers filed in connection with the Motion, including exhibits, as well as the

10 other papers and pleadings on file herein. The matter having been fully argued, briefed, and

11 submitted, and the Court having considered the evidence, applicable law, and arguments of

12 counsel,

13     **IT IS FOUND, DETERMINED, AND ORDERED THAT:**

14     1.     **Conservator's Rehabilitation Plan Application.** On or before August 31, 2020,

15 the Conservator shall file his Application for an Order Approving the Rehabilitation Plan for CIC

16 (Rehabilitation Plan Application), including the proposed Rehabilitation Plan, a memorandum of

17 points and authorities not exceeding 30 pages, and such declarations and other evidence

18 concerning the proposed Rehabilitation Plan as the Conservator wishes the Court to consider

19 (collectively Moving Papers). The Conservator shall serve the Moving Papers by email on CIC,

20 its counsel, and all other persons and entities that have made an appearance in this docket and on

21 their respective counsel of record. The Conservator shall also serve the Moving Papers by email

22 and First Class mail on Steven M. Menzies on behalf of all entities affiliated with CIC or with

23 which CIC has a pooling arrangement, specifically including Applied Underwriters, Inc.;

24 Applied Underwriters Captive Risk Assurance Company, Inc.; Applied Risk Services, Inc.;

25 Continental Indemnity Company; Illinois Insurance Company; North American Casualty

26 Company; Pennsylvania Insurance Company; and Texas Insurance Company.

27     2.     **Written Notice.** On or before September 8, 2020, the Conservator shall give, at

28 the last known address, written notice of the Rehabilitation Plan Application to (1) every holder

---

2

[PROPOSED] ORDER SETTING BRIEFING SCHEDULE, HEARING DATE, AND PROCEDURES FOR CONSERVATOR'S
APPLICATION FOR ORDER APPROVING REHABILITATION PLAN FOR CALIFORNIA INSURANCE COMPANY

Exhibit 6, Page 2 of 5

of an in-force or expired Policy, of such policyholder as shown on CIC's records; (2) the shareholders and directors of CIC; (3) known creditors; (4) reinsurers; and (5) other interested parties (collectively, Noticed Persons). The notice shall (i) summarize the proposed Rehabilitation Plan and any ancillary rehabilitation agreements; (ii) notify recipients of the hearing date on the Conservator's Rehabilitation Plan Application; (iii) provide a link to the proposed Rehabilitation Plan and Rehabilitation Plan Application on the Internet and advise recipients how they may request and receive paper copies of those documents; (iv) explain the opportunity to file papers in connection with the Hearing and notify recipients that only persons or entities filing papers will be entitled to make presentations at the Hearing; and (v) notify recipients that any person or entity not filing papers shall be deemed to have forever waived any and all objections, comments, suggestions, or any other matter they may have made with respect to the Rehabilitation Plan Application and the proposed Rehabilitation Plan. The interested parties who shall receive notice shall include, but are not limited to, the following entities, which are affiliated with CIC: Applied Underwriters, Inc.; Applied Underwriters Captive Risk Assurance Company, Inc.; Applied Risk Services, Inc.; Continental Indemnity Company; Illinois Insurance Company; North American Casualty Company; Pennsylvania Insurance Company; and Texas Insurance Company.   Upon request of the Conservator, officers and managers of CIC shall provide names and contact information of all Noticed Persons, and shall fully cooperate with the Conservator in providing notice to such Noticed Persons.

       3.     **CIC's Pre-Conservation Management's Position Papers.** On or before October 15, 2020, CIC's pre-conservation management may file papers in support of or opposition to the Rehabilitation Plan Application (CIC's Pre-Conservation Management's Position Papers), including a memorandum of points and authorities not to exceed 30 pages and such declarations and other evidence concerning the proposed Rehabilitation Plan as CIC's pre-conservation management wishes the Court to consider. Should any affiliates of CIC listed in paragraph (1) wish to provide their views, evidence, or argument supporting or opposing the proposed Rehabilitation Plan Application, those views, evidence, or argument shall be included in CIC's Pre-Conservation Management's Position Papers. CIC's Pre-Conservation

1 | Management's Position Papers shall be served by email upon the Conservator, his counsel, and

2 | all persons and entities that have made an appearance in this case and on their respective counsel

3 | of record.

4 |       4.     **Conservator's Reply.** On or before November 16, 2020, the Conservator may

5 | file and serve any reply to the CIC's Pre-Conservation Management's Position Papers (Reply),

6 | which may include a memorandum of points and authorities not to exceed 20 pages and such

7 | declarations and other evidence replying to CIC's Pre-Conservation Management's Position

8 | Papers as the Conservator may wish the Court to consider. Reply Papers shall be served by email

9 | on all persons or entities listed in paragraph (1).

10 |       5.     **Non-Party Papers.** On or before November 16, 2020, any other person or entity

11 | other than an affiliate of CIC (Non-Party) that is interested in the estate or the business, assets, or

12 | property of CIC may file and serve papers in support of, or opposition to, the Rehabilitation Plan

13 | Application (Non-Party Papers) by email and First Class mail upon the Conservator and his

14 | counsel, CIC and its counsel, and all persons and entities that have made an appearance in this

15 | case and on their respective counsel of record. Non-Party Papers may consist of a memorandum

16 | of points and authorities not exceeding 20 pages containing the Non-Party's arguments in

17 | support or opposition and may be accompanied by relevant declarations.

18 |       6.     **Responses to Non-Party Papers.** On or before December 7, 2020, the

19 | Conservator may file and serve a single response to the Non-Party Papers (Response to Non-

20 | Party Papers), which may include a memorandum of points and authorities not to exceed 20

21 | pages and declarations and other evidence in reply. The Response to Non-Party Papers shall be

22 | served by email on all persons and entities that have made an appearance in this case and on their

23 | respective counsel of record.

24 |       7.     **Page Limits.** The page limits specified herein are exclusive of caption pages,

25 | tables of contents, tables of authorities, and proofs of service.

26 |       8.     **Hearing Date.** A hearing is hereby set for January 14, 2021 at 2:00

27 | p.m. in Department 28 of this Court to hear the Rehabilitation Plan Application and hearing

28 | any objections, suggestions, support, or comments related thereto.

[PROPOSED] ORDER SETTING BRIEFING SCHEDULE, HEARING DATE, AND PROCEDURES FOR CONSERVATOR'S
APPLICATION FOR ORDER APPROVING REHABILITATION PLAN FOR CALIFORNIA INSURANCE COMPANY

1  **9.    Presentations at the Hearing.** Any person or entity interested in the estate or the

2  business, assets, or property of CIC who has filed papers pursuant to paragraphs (3) or (5) may

3  appear at the hearing to argue (i) why the proposed Rehabilitation Plan and any rehabilitation

4  agreement ancillary thereto should or should not be approved or ratified, or (ii) why the Order of

5  the Rehabilitation should or should not be entered.

6  **10.    Waiver.** Any person or entity who fails to file papers under paragraphs (3) or (5)

7  shall be deemed to have forever waived any and all objections, comments, suggestions, or any

8  other matter they may have made with respect to the Rehabilitation Plan Application, the

9  proposed Rehabilitation Plan and any document or agreement incorporated in or ancillary

10  thereto, and any Order approving those applications, plans, and agreements. Any objection,

11  comment, suggestion, or other matter that is not raised before or at the hearing is forever barred.

12  **11.    Powers of this Court and the Conservator.** This Court shall continue to assert

13  and to maintain sole and exclusive jurisdiction, to the exclusion of all other courts or tribunals,

14  over and to all assets of CIC of whatsoever kind or nature and wherever or however owned or

15  held. No liens, judgments, awards, or claims of any kind not entered by this Court in accordance

16  with this and the previous orders of this Court, all of which orders are hereby reaffirmed, shall be

17  valid as against CIC or any of its said assets. All injunctions and other orders of this Court in the

18  Conservation Order or thereafter are reaffirmed and remain in full force and effect. All powers or

19  authority granted to the Conservator herein are in addition to, and not in limitation of, the powers

20  of the Conservator under the Insurance Code, the Conservation Order, and applicable case law.

21

22  Dated: ___**JUL 3 0 2020**_____

23                                                    THE HONORABLE GEORGE MIRAM

24

25

26

27

28

[PROPOSED] ORDER SETTING BRIEFING SCHEDULE, HEARING DATE, AND PROCEDURES FOR CONSERVATOR'S
APPLICATION FOR ORDER APPROVING REHABILITATION PLAN FOR CALIFORNIA INSURANCE COMPANY

# EXHIBIT 7

1  MICHAEL J. STRUMWASSER (SBN 58413)
   DALE K. LARSON (SBN 266165)
2  JULIA MICHEL (SBN 331864)
   STRUMWASSER & WOOCHER LLP
3  10940 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90024
4  Telephone: (310) 576-1233
   Facsimile: (310) 319-0156
5  E-mail: mstrumwasser@strumwooch.com
   E-mail: dlarson@strumwooch.com
6  E-mail: jmichel@strumwooch.com

7  CYNTHIA J. LARSEN (SBN 123994)
   JUSTIN GIOVANNETTONE (SBN 293794)
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
9  400 Capitol Mall, Suite 3000
   Sacramento, California 95814-4497
10 Telephone: (916) 447-9200
   Facsimile: (916) 329-4900
11 E-mail: clarsen@orrick.com
12 E-mail: jgiovannettone@orrick.com

13 *Attorneys for Insurance Commissioner for the*
   *State of California as Conservator of*
14 *California Insurance Company*

15

16

Electronically
## FILED
By Superior Court of California, County of San Mateo
ON      2/19/2021
By    /s/  Lacey, Joel
       **Deputy Clerk**

**Exempt from filing fees pursuant to**
**Government Code section 6103**

17          SUPERIOR COURT OF THE STATE OF CALIFORNIA

18        FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

19 INSURANCE COMMISSIONER OF THE       **Case No. 19-CIV-06531**   DYC
20 STATE OF CALIFORNIA,
                                        **STIPULATION AND [PROPOSED] ORDER**
21                          Applicant,   **TO CONTINUE HEARING DATE AND**
                                         **CERTAIN BRIEFING DEADLINES ON**
22                                       **THE CONSERVATOR'S APPLICATION**
        v.                               **FOR ORDER APPROVING THE**
23                                       **REHABILITATION PLAN**

24 CALIFORNIA INSURANCE COMPANY, a      Dept.: 22
   California corporation,              Judge: Hon. Danny Y. Chou
25
                           Respondent.
26

27

28                        DYC

STIPULATION AND [PROPOSED] ORDER TO CONTINUE
HEARING DATE AND CERTAIN BRIEFING DEADLINES FOR THE
CONSERVATOR'S APPLICATION FOR ORDER APPROVING THE REHABILITATION PLAN

1

**STIPULATION**

2  Applicant Insurance Commissioner of the State of California, in his capacity as

3  statutory Conservator of California Insurance Company ("Conservator") and Respondent

4  California Insurance Company ("CIC", and collectively, the "Parties"), having agreed to a

5  continuance of the hearing on the Conservator's Application for Order Approving the

6  Rehabilitation Plan for CIC ("Rehabilitation Plan Application") from April 15, 2021 to May 27,

7  2021, and associated continuances of briefing deadlines, HEREBY STIPULATE AND

8  AGREE as follows:

9  WHEREAS, by its Order on July 30, 2020, the Court set a hearing date and briefing

10  schedule for the Conservator's expected Rehabilitation Plan Application, set a date by which the

11  Conservator will provide notice of the hearing to CIC's policyholders, shareholders, creditors,

12  and other interested parties, and established certain procedures for briefing papers and the

13  hearing (the "Rehabilitation Procedural Order");

14  WHEREAS, by its further Orders on August 11, 2020, September 11, 2020, and

15  September 21, 2020, the Court continued the dates established in the Rehabilitation Procedural

16  Order;

17  WHEREAS, on October 4, 2020, Respondent filed a Motion for Leave of Court to

18  Conduct Discovery ("Discovery Motion");

19  WHEREAS, on October 28, 2020, the Court further continued certain briefing deadlines

20  established in the Rehabilitation Procedural Order;

21  WHEREAS, on October 29, 2020, Respondent filed a Special Anti-SLAPP Motion to

22  Strike Complaint ("Motion to Strike");

23  WHEREAS, on December 9, 2020, the Court issued its tentative ruling denying the

24  Discovery Motion without prejudice to Respondent filing a further motion for leave of Court to

25  conduct discovery after Notice of Entry of the Court's ruling on the Motion to Strike, which was

26  then set for hearing on January 13, 2021 at 2:00 p.m. in Department 2;

27  ///

28

2   DYC

STIPULATION AND [PROPOSED] ORDER TO CONTINUE
HEARING DATE AND CERTAIN BRIEFING DEADLINES FOR THE
CONSERVATOR'S APPLICATION FOR ORDER APPROVING THE REHABILITATION PLAN

1    WHEREAS, on December 14, 2020 the Court further continued certain briefing
2   deadlines established in the Rehabilitation Procedural Order;

3        WHEREAS, the hearing on the Motion to Strike is currently set for February 25, 2021;

4        WHEREAS, under the current briefing schedule established in the Court's December 14,
5   2020 Order, Respondent's and its Affiliates' Position Papers on the Rehabilitation Plan
6   Application are due on February 25, 2021, the Conservator's Reply to Non-Parties' Position
7   Papers is due on March 8, 2021; and the Conservator's Reply to Respondent's Position Papers is
8   due on March 29, 2021;

9        WHEREAS, the Court's December 14, 2020 Order granting continuance of the hearing
10   on the Rehabilitation Plan Application was subsequently docketed for April 15, 2021 at 9:00
11   a.m. in Department 22;

12       WHEREAS, the Respondent has requested continuances of the hearing on the
13   Rehabilitation Plan Application and certain associated briefing deadlines, and the Respondent
14   and Conservator have agreed to a continuance of the hearing on the Rehabilitation Plan
15   Application from April 15, 2021 at 9:00 a.m. to May 27, 2021 at 9:00 a.m.; to a continuance of
16   the deadline for Respondent's Position Papers from February 25, 2021 to April 8, 2021; a
17   continuance of the deadline for the Conservator's Reply to Non-Parties' Position Papers from
18   March 8, 2021 to April 19, 2021; and a continuance of the deadline for the Conservator's Reply
19   to Respondent's Position Papers from March 29, 2021 to May 10, 2021;

20       Now, therefore, the Parties, through their respective attorneys of record, HEREBY
21   STIPULATE AND AGREE to the entry of an order providing the following:

22       (1)   The deadline for Respondent's Position Papers will be extended from
23             February 25, 2021 to April 8, 2021;

24       (2)   The deadline for Conservator's Reply to Non-Parties' Position Papers will be
25             extended from March 8, 2021 to April 19, 2021;

26       (3)   The deadline for Conservator's Reply to Respondent's Position Papers will be
27             extended from March 29, 2021 to May 10, 2021; and

28

3      **DYC**

STIPULATION AND [PROPOSED] ORDER TO CONTINUE
HEARING DATE AND CERTAIN BRIEFING DEADLINES FOR THE
CONSERVATOR'S APPLICATION FOR ORDER APPROVING THE REHABILITATION PLAN

1      (4)   The hearing on the Rehabilitation Plan Application will be continued from

2      April 15, 2021 at 9:00 a.m. to May 27, 2021 at 9:00 a.m.

3      All other deadlines established in the Court's December 14, 2020 Order remain

4  unchanged.

5  Dated: February 2, 2021             STRUMWASSER & WOOCHER LLP

6                              Michael J. Strumwasser
                            Dale K. Larson

7                              Caroline Chiappetti

8                              ORRICK, HERRINGTON & SUTCLIFFE LLP

9                              Cynthia J. Larsen
                            Justin Giovannettone

10

11

12                              By_____

13                                    Cynthia J. Larsen
                          *Attorneys for Applicant Insurance*

14                            *Commissioner of the State of California and*
                          *Conservator for California Insurance*

15                            *Company*

16

17  Dated: February 2, 2021             DLA PIPER LLP

18                              Shand S. Stephens
                            Amanda L. Morgan

19

20                              By_____

21                                    Shand S. Stephens

22                            *Attorneys for Respondent California*
                          *Insurance Company*

23

24

25

26

27

28

4   **DYC**

STIPULATION AND [PROPOSED] ORDER TO CONTINUE
HEARING DATE AND CERTAIN BRIEFING DEADLINES FOR THE
CONSERVATOR'S APPLICATION FOR ORDER APPROVING THE REHABILITATION PLAN

Exhibit 7, Page 4 of 5

**[PROPOSED] ORDER**

Having received the Parties' request to continue the certain briefing deadlines for the Conservator's Rehabilitation Plan, and good cause appearing, it is hereby ordered as follows:

(1)    The deadline for Respondent's Position Papers will be extended from February 25, 2021 to April 8, 2021;

(2)    The deadline for Conservator's Reply to Non-Parties' Position Papers will be extended from March 8, 2021 to April 19, 2021;

(3)    The deadline for Conservator's Reply to Respondent's Position Papers will be extended from March 29, 2021 to May 10, 2021; and

(4)    The hearing on the Rehabilitation Plan Application will be continued from April 15, 2021 at 9:00 a.m. to May 27, 2021 at ~~9:00 a.m.~~ 2:00 p.m. DYC

All other deadlines established in the Court's December 14, 2020 Order remain unchanged.

**IT IS SO ORDERED.**

Electronically

**SIGNED**

By /s/ Chou, Danny

02/17/2021

Dated: _____, 2021

THE HONORABLE DANNY CHOU

4131-4210-8459

STIPULATION AND [PROPOSED] ORDER TO CONTINUE
HEARING DATE AND CERTAIN BRIEFING DEADLINES FOR THE
CONSERVATOR'S APPLICATION FOR ORDER APPROVING THE REHABILITATION PLAN

Exhibit 7, Page 5 of 5

# EXHIBIT 8

MICHAEL J. STRUMWASSER (SBN 58413)
DALE K. LARSON (SBN 266165)
CAROLINE CHIAPPETTI (SBN 319547)
JULIA MICHEL (SBN 331864)
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: mstrumwasser@strumwooch.com
E-mail: dlarson@strumwooch.com

CYNTHIA J. LARSEN (SBN 123994)
JUSTIN GIOVANNETTONE (SBN 293794)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California  95814-4497
Telephone:  (916) 447 9200
Facsimile:   (916) 329 4900
Email: clarsen@orrick.com
Email: jgiovannettone@orrick.com

*Attorneys for Insurance Commissioner for the State of California and Conservator of California Insurance Company*

**Electronically**
**FILED**
by Superior Court of California, County of San Mateo
ON _____ 10/19/2020
By _____ /s/ Una Finau
Deputy Clerk

**EXEMPT FROM FILING FEES PURSUANT TO GOVERNMENT CODE SECTION 6103**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

| | |
|---|---|
| INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA,<br><br>Applicant,<br><br>v.<br><br>CALIFORNIA INSURANCE COMPANY, a California corporation,<br><br>Respondent. | **Case No. 19-CIV-06531**<br><br>**DECLARATION OF JOSEPH HOLLOWAY IN SUPPORT OF CONSERVATOR'S APPLICATION FOR APPROVAL OF REHABILITATION PLAN**<br><br>DATE:          March 4, 2021<br>TIME:          2:00 p.m.<br>JUDGE:        George A. Miram<br>PLACE:        Dept. 28 |

1

**DECLARATION OF JOSEPH HOLLOWAY**

2

I, JOSEPH HOLLOWAY, declare:

3

1.      I make this declaration in support of the Conservator's Application for Approval of

4

Rehabilitation Plan of California Insurance Company ("Application"). The following facts are known

5

by me to be true and correct based on my personal knowledge. If called as a witness to testify thereon,

6

I could and would competently testify thereto.

7

2.      I am currently the Chief Executive Officer of the California Insurance Commissioner's

8

("Commissioner's") Conservation & Liquidation Office ("CLO") and Conservation Manager for

9

California Insurance Company ("CIC") in Conservation. I was appointed Conservation Manager of

10

CIC by the Court in its November 4, 2019 Order Appointing Insurance Commissioner as Conservator

11

and Restraining Orders ("Conservation Order"), and have served in this role continuously from the

12

date of the Conservation Order. I was appointed CEO of the CLO and Deputy Conservator of CIC in

13

March 2020, upon the retirement of David Wilson, who formerly held those positions.

14

3.      I have a Bachelor of Arts degree in Accounting from North Carolina State University

15

and hold the designation of Certified Financial Examiner from the Society of Financial Examiners.

16

From 1985 to 2005, I worked as an examiner, regulatory specialist, and chief forensic accountant for

17

the North Carolina Department of Insurance. I have worked at the CLO since 2005. I have over 35

18

years of experience working with insurance companies under supervision, conservation, rehabilitation,

19

and liquidation. I have served as Conservation Manager and/or Liquidation Manager in several

20

previous conservation and liquidation proceedings on behalf of the Insurance Commissioner.

21

4.      I am empowered under paragraphs 3 through 5 of the Conservation Order to carry out

22

all the duties of and exercise the authority of the Insurance Commissioner, in his statutory capacity as

23

Conservator of CIC ("Conservator"), as he may delegate to me. In my roles as Deputy Conservator

24

and Conservation Manager, I have been delegated responsibility for the supervision and management

25

of all matters relating to the conservation of CIC. Based on my background and experience described

26

above, my supervision and management of the conservation of CIC, my knowledge of the events

27

leading to the conservation of CIC as well as the conduct of the conservation itself, my knowledge of

28

2

the rehabilitation plan of CIC and my role in its development, and my review of the Application and documents to be filed by the Conservator in support thereof, I further declare as follows:

### The CIC Conservation

5.      CIC is a property and casualty insurance company incorporated under the laws of California and holds a Certificate of Authority issued by the Commissioner authorizing it to transact workers' compensation business in California. It has been authorized to sell insurance in California since 1980. CIC has identified an address in Foster City, California as its principal office. It is a wholly owned subsidiary of North American Casualty Company ("NACC"), which is a wholly owned subsidiary of AU Holding Company, Inc. Pursuant to its Certificate of Authority, CIC is authorized to transact various types of property and casualty insurance, but primarily sells workers' compensation insurance in California. Steven M. Menzies is the Founder, President, and sole shareholder of AU Holding Company, and sole indirect shareholder of CIC.

6.      On November 4, 2019, the Commissioner applied to the Court pursuant to Insurance Code section 1011 for the Conservation Order citing regulatory violations of Mr. Menzies, including his attempt to merge into and with California Insurance Company II ("CIC II"), a New Mexico domiciled insurance company, without first obtaining the Commissioner's consent in violation of California Insurance Code Section 1215.2(a). The Conservation Order appointed the Conservator, vested in him the title to all assets of CIC, and authorized and/or directed the Conservator to perform the activities set forth in the Conservation Order. In addition, the Conservation Order authorized the Conservator "to act in all ways and exercise all powers necessary or appropriate for the purpose of carrying out [the Conservation Order]." In carrying out his responsibilities, the Conservator exercises the police power of the State and also acts as a trustee for all persons with interests in the conserved estate.

7.      During the period of the conservation, the Conservator has permitted CIC personnel to continue to perform day-to-day operations, subject to the oversight of the Conservator and his representatives. I and Court-appointed Conservation Supervisor Scott Pearce have been physically present at CIC's office in Omaha, Nebraska for such periods of time as necessary to carry out the

Conservator's responsibilities with respect to CIC. While under the oversight of the Conservator, CIC has continued to renew business, write new policies, and adjust and pay claims. In June 2020, I became aware that on March 31, 2020, CIC made a $20 million non-collateralized loan to AUI without prior notice to and authorization from the CDI or the Conservator. This transaction violated paragraph 15 of the Conservation Order, which enjoins all CIC personnel and management from transacting any business outside the ordinary course of business without the express written consent of the Conservator. I informed CIC's General Counsel and Secretary Jeffrey Silver of the violation in writing on June 10, 2020, and instructed him to remedy the violation and that any such transactions in the future should be submitted to the Conservator for approval prior to execution.

8.      Since the commencement of the conservation, it has been the Conservator's objective to develop a rehabilitation plan with associated rehabilitation agreement(s) for CIC ("Rehabilitation Plan") pursuant to Insurance Code sections 1037 and 1043, and related provisions of the Code, with terms that correct the deficiencies that led to the imposition of the conservation and resolve ongoing disputes between the Commissioner and CIC, while protecting the interests of policyholders, creditors, other beneficiaries of CIC, or the public. The Conservator has now finalized his Rehabilitation Plan, discussed in detail below, and is presenting it to the Court for consideration and approval, after notice to interested parties and an opportunity for them to be heard.

9.      A true and correct copy of the Conservator's Rehabilitation Plan is attached to this declaration as **Exhibit A.**

10.     While developing a rehabilitation plan for CIC, the Conservator and his representatives have taken appropriate measures to preserve the stability of the company. Prior to the conservation, A.M. Best had downgraded its ratings of CIC, its parent company, and its affiliates, and placed their ratings "under review with negative implications," citing the impending sale of the CIC and its affiliated insurance companies by Berkshire Hathaway Inc. to Steven Menzies (http://news.ambest.com/presscontent.aspx?refnum=28660&altsrc=9). However, CIC's credit rating has remained stable during the conservation and, in June 2020, A.M. Best affirmed CIC's and its affiliated insurance companies' Financial Strength Rating of "A" (Excellent) and Long-Term Issuer

Credit Ratings of "a" and removed its "under review with negative implications" status (http://news.ambest.com/newscontent.aspx?AltSrc=23&RefNum=225827). I have continued to be in contact with A.M. Best to report on the condition of CIC and the status of the conservation together with pre-conservation management.

**CIC's Corporate Structure and Affiliate Connections**

11.     As part of our duties, I and other representatives of the Conservator possess an understanding of the corporate structure and relationships of CIC and its affiliated companies. There is substantial overlap between CIC and its affiliated companies' Boards of Directors and they also share common addresses, registered agents, and executives. For example, CIC, Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA"), Applied Underwriters, Inc. ("AUI"), Applied Risk Services ("ARS"), and North American Casualty Company ("NACC") all have the same mailing address, registered agent,[1] and principal office in California. These companies also share management, with Mr. Menzies serving as President or CEO and Mr. Silver serving as Secretary. As of the date of this declaration, the Nebraska Secretary of State's website reflects that Messrs. Menzies and Silver are the sole directors of AUI, ARS, and NACC. They are also directors of CIC and AUCRA.

12.     CIC's operations largely depend on a system of intertwined agreements between itself and its parent and affiliate entities. Through its Management Services Agreement ("MSA"), a true and correct copy of which is attached as **Exhibit B** of this declaration,[2] AUI provides actuarial and claims services on CIC's policies; provides underwriting services; pays CIC's bills and collects its receivables; manages CIC's investments; performs accounting services, including the filing of CIC's statutory financial statements and tax returns; and owns the computer equipment and software used for these functions. Under the MSA, AUI also provides CIC "necessary and appropriate personnel, administrative, office and building services." Finally, in the performance of its duties under the MSA, AUI is subject to the direction and supervision of CIC. Though AUI provides all claims-handling

---

[1] Following imposition of the conservation, I became CIC's registered agent for service of process in California.

[2] Attached as **Exhibit C** to this declaration is a true and correct copy of an addendum to the MSA that makes it operative through the present day.

5

services for CIC under the MSA, CIC retains the ultimate responsibility for all adjustments and claim payments made on its behalf.

13.     CIC also operates within an intercompany pool structure with four affiliated insurance companies under the Applied umbrella: Continental Indemnity Company, Illinois Insurance Company, Pennsylvania Insurance Company, and Texas Insurance Company. The Pooling Agreement consolidates the businesses of each of these companies and distributes a pooled share of all premiums and losses that the companies experience.

### SolutionOne and EquityComp Programs

14.     CIC is authorized to sell workers' compensation insurance policies to employers in California. Every worker's compensation insurance policy issued in California must be approved by the Insurance Commissioner prior to being offered to the public. The SolutionOne and EquityComp programs are targeted at small and medium sized businesses and included guaranteed-costs insurance policies that were approved by the Commissioner. However, customers who signed up for these programs were also required to execute a Reinsurance Participation Plan ("RPA") issued by CIC affiliate AUCRA. The RPA was not filed or approved with the Commissioner, and while it was marketed as a profit-sharing program, it had the effect of modifying obligations of the parties to the SolutionOne and EquityComp programs. In the administrative proceeding *Matter of the Appeal of Shasta Linen Supply, Inc.*, the Commissioner found that the RPA amounted to a misapplication of the filed rates of CIC in violation of California Insurance Code section 11737, and that the RPA was void as a matter of law. Pursuant to a Stipulated Consent Cease and Desist Order the RPA was not to be marketed after September 2016.

### Ongoing Litigation with Policyholders

15.     Upon entry of the Conservation Order, I and my staff undertook a full review of the status of litigation and other proceedings in which CIC and its affiliates were parties. CIC and its affiliates are involved in over 50 ongoing lawsuits, arbitrations, and administrative actions with policyholders involving CIC's SolutionOne or EquityComp program, and associated RPAs, in California. These include cases pending in California Superior Court, the California Court of Appeal,

Federal District Court, in arbitration, and in administrative actions at the CDI. These suits generally involve policyholder challenges to the RPA, which was declared illegal and void by the Commissioner in the *Shasta Linen* case. These suits seek a variety of remedies, including rescission, restitution, disgorgement of wrongful gains, compensatory and punitive and exemplary damages, and costs. I am also aware of numerous similar lawsuits outside of California, some of which involve CIC, others involve affiliated insurance companies with whom CIC shares all premiums and losses via the Pooling Agreement. In some lawsuits, AUI and AUCRA are the named plaintiffs seeking to enforce the RPA against policyholders.

16.     Paragraph 17 of the Conservation Order enjoins, among other things, actions against CIC and the Conservator during the pendency of the conservation. In anticipation of the development of the Rehabilitation Plan to address the issues leading to the conservation, the Conservator has worked diligently to enforce these injunctions and obtained stays of these actions. All such proceedings in California have been stayed.

17.     As discussed in more detail below, the ongoing RPA litigation was a serious concern of the Commissioner that held up approval of Mr. Menzies' Form A and establishing a structure to fairly and justly resolve the litigation is a primary focus of the Rehabilitation Plan.

**Other State Regulatory Actions**

18.     I am aware that several other state insurance regulators have taken issue with the SolutionOne and EquityComp programs offered by AUI and CIC affiliates. Among them:

    a.     Vermont first stopped sales by AUCRA and other CIC affiliates of RPA products in 2016, with the Vermont Department of Financial Regulation Commissioner levying a $300,000 administrative penalty and a $35,000 bill to reimburse investigative expense. A true and correct copy of the Vermont consent decree is attached to this declaration as **Exhibit D** (see page 8). Vermont regulators also required several CIC affiliates, including AUI, AUCRA, and ARS, to repay Vermont business for overcharging insureds (see Exhibit D, pages 9-10).

b.  In March 2019, the New Jersey Department of Banking and Insurance issued an order to several CIC affiliates, including AUI, AUCRA, and ARS, to show cause as to why its subsidiary should not be suspended from transacting workers' compensation insurance and why it should not be ordered to "unwind" the EquityComp and SolutionOne programs back to 2008. A true and correct copy of the order is attached to this declaration as **Exhibit E** (see pages 9 - 10).

c.  Further, in July 2019, the New York Department of Financial Services fined several CIC affiliates $3 million for including unapproved side agreements in their insurance products. A true and correct copy of the New York consent order is attached to this declaration as **Exhibit F**. In the consent order, the affiliates agreed they would not collect any additional funds from insureds who paid less under the illegal program than they would have paid pursuant to the filed and approved guaranteed-cost rates, and should it attempt to do so for any reason, it would have to return all additional premiums owed to all residents who were assessed greater amounts under the program than would have been otherwise owed under the filed and approved rates (see Exhibit F, page 8).

d.  The SolutionOne and EquityComp programs were banned in Wisconsin in 2015, and the state fined the CIC affiliate a total of $205,000. A true and correct copy of the Wisconsin Office of the Commissioner of Insurance 2019 Market Conduct Examination is attached to this declaration as **Exhibit G**. (A summary of prior Wisconsin Insurance Commission actions is on pages 6 and 7.)

**The Rehabilitation Plan**

19.  It is been the Conservator's objective to develop the Rehabilitation Plan with terms that correct the deficiencies that led to the imposition of conservation and resolve ongoing disputes between the Commissioner and CIC, while protecting the interests of policyholders, creditors, other beneficiaries of CIC, and the public. In accordance with these principles, the Conservator developed the Rehabilitation Plan with the following objectives: (1) complete and perfect CIC's attempt to

redomesticate from California to New Mexico; (2) provide for the reinsurance and assumption of all in-force workers' compensation policies issued by CIC and the reinsurance of all liabilities of CIC to California policyholders with the reinsurer granting the California policyholders the right to recover directly from the reinsurer any of CIC's obligations under the policies; (3) provide for the surrender for cancellation of CIC's California certificate of authority authorizing CIC to transact insurance in California by withdrawing from the state; (4) provide a means to resolve pending litigation and subsequent claims in California related to CIC's SolutionOne or EquityComp programs, and associated RPAs; and (5) upon the consummation of the merger of CIC into and with California Insurance Company, Inc. II ("CIC II"), require CIC II to change its name to a name that does not include the word "California" or any derivation of the word "California".

20.     In order to accomplish these objectives, the Conservator's Rehabilitation Plan is centered around two primary features: (1) transferring and reinsuring CIC's book of California business to another California-admitted insurer to assume that business while avoiding harm to the policyholders and their employees; and (2) providing CIC and policyholders a reasonable opportunity to resolve their respective rights under the SolutionOne and EquityComp programs, including the associated RPAs, on terms fair to them, to CIC, and to the public.

21.     The Conservator attempted to reach an agreement with CIC's pre-conservation management on the provisions of the Rehabilitation Plan. Accordingly, in December 2019, I and other representatives of the Conservator began negotiations with CIC's pre-conservation management over what we hoped would become a consensual plan for the company's rehabilitation. Over the course of several months, the parties made significant progress towards agreement on the consensual plan. However, in October 2020, the parties reached an impasse and were unable to conclude an agreement on a consensual plan. Accordingly, the Conservator is now presenting his Rehabilitation Plan to the Court for consideration and approval.

### Primary Features of the Rehabilitation Plan

#### *(1) Reinsuring CIC's California Business*

22.     As the Commissioner stated in his application for the Conservation Order, CIC's attempt to merge with New Mexico-based CIC II without the Commissioner's consent would have had the effect of forfeiting by operation of law its Certificate of Authority to transact the business of insurance in California. The Conservator has determined it is in the best interest of CIC, its policyholders, and the public to allow CIC to complete its merger with CIC II on terms that would complete CIC's forfeiture of its California Certificate of Authority. In order to accomplish this while avoiding harm to the policyholders and their employees, the Rehabilitation Plan includes an assumption reinsurance agreement ("Reinsurance Agreement") providing for another admitted insurer (the "Reinsurer") to assume CIC's book of California business. Assumption reinsurance agreements are common in the insurance industry when an insurer seeks to remove a block of policies off its books.

23.     The Rehabilitation Plan provides for the Conservator to conduct a selection process to select a California-admitted insurer to assume CIC's gross liabilities and obligations arising under or in connection with the insurance policies issued to California policyholders or to cover, in whole or in part, employees in California. The Conservator will evaluate any submissions, may negotiate with one or more of the submitting insurers, and will then select a Reinsurer and submit its offer to the Court for approval.

24.     The Rehabilitation Plan permits an affiliate of CIC to submit a bid. Pre-conservation management of CIC have indicated that CIC's affiliate, Continental Indemnity Company ("Continental"), a California-admitted insurer, may be prepared to assume its portfolio. However, in light of the regulatory violations related to the conservation proceeding and the Conservator's ongoing concerns about pre-conservation management, he has determined that it would not be in the interest of the CIC estate or its beneficiaries to consider a bid by Continental unless it agrees to contract for claims administration with an independent third-party administrator appointed by the Conservator.

With these assurances, the Conservator believes that the Plan will adequately protect policyholders and the public while taking into consideration the interests of CIC's shareholder.

### (2) Resolution of Pending and Expected Litigation

25.     The second feature of the Rehabilitation Plan that the Conservator has determined is necessary to rehabilitate CIC and end the conservation is to provide CIC and its policyholders a reasonable opportunity to resolve their respective rights in relation to the SolutionOne and EquityComp programs, including the associated RPAs, on terms that are fair and reasonable, using a process that is equitable. The large body of pending RPA litigation by and against policyholders was one of the main issues that held up the Commissioner's approval of Mr. Menzies' Form A, which sought approval for his acquisition of CIC from Berkshire Hathaway. Mr. Menzies attempted to circumvent the Form A approval by merging CIC with CIC II when he was unable to obtain the Commissioner's approval in time. This is what led to the conservation. Although pre-conservation management represented to the Court in their Application to Vacate the Conservation that they would agree to an injunction against consummation of the merger between CIC and CIC II, such an injunction would have been meaningless because Menzies already consummated his acquisition of CIC from Berkshire Hathaway. He did this without completing the CIC/CIC II merger and without obtaining the Commissioner's approval of his Form A. Thus, the Commissioner's concerns over ongoing litigation were left unaddressed.

26.     The Conservator is vested under section 1037, subdivision (c), of the Insurance Code with the authority "to compound, compromise or in any other manner negotiate settlements of claims against that person upon such terms and conditions as the commissioner shall deem to be most advantageous to the estate of the person being administered or liquidated or otherwise dealt with under this article." Section 1037 goes on to state that the Conservator may do such acts as he "may deem necessary or expedient for the accomplishment or in aid of the purpose of [the conservation] proceedings."

27.     Pursuant to section 1037, the Conservator has established a fair and equitable process for resolving the respective rights of CIC and its policyholders in relation to the SolutionOne and

---

11

EquityComp programs that the Commissioner was unable to address prior to Mr. Menzies' attempt to circumvent the Form A process. The process for addressing these issues is detailed in Section 2.6 of the Rehabilitation Plan and Schedule 2.6 attached thereto. These provisions entitle each litigant or claimant desiring to resolve claims by or against CIC and its affiliates arising out of the illegal RPA to participate in a process designed to deliver a resolution reflecting the respective rights of all parties under the principal theories of recovery to which policyholders would be entitled in litigation, and to deliver that resolution more fairly, quickly, and economically than continued litigation. Litigants and claimant are not required to pursue recovery through this process and can elect to pursue their claims through other channels. At the end of the process, Conservator shall determine a reserve amount sufficient to cover all claims not resolved during the process. CIC will be required to deposit 150% of that reserve amount in a special deposit account approved by the Conservator to secure all final claims, which will be controlled by the Reinsurer upon Closing. The Conservator has determined that this process for resolution of the claims described above is an appropriate exercise of his discretion and is neither arbitrary nor improperly discriminatory.

28.     A resolution of the litigation is also necessary. CIC and its affiliates have leveraged their size and resources to repeatedly litigate the legality of the RPA, which the Commissioner has already declared illegal. It would be inconsistent with the Conservator's duties to release CIC from conservation after their illegal attempt to circumvent the Form A process, only to allow the company and its affiliates to continue to prosecute lawsuits premised on an insurance product which the Commissioner has found to be illegal.

29.     After careful analysis and consideration, the Conservator has concluded that the Rehabilitation Plan is an appropriate and lawful means for resolving the conservation of CIC and should therefore be approved by the Court.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

////

////

Executed at __Livermore__, California on October __19__, 2020.

_Joe Holloway_

Joseph B. Holloway, Jr.

4146-3514-2440

# EXHIBIT A

## CALIFORNIA INSURANCE COMPANY
## REHABILITATION PLAN

This REHABILITATION PLAN (the "Plan"), dated October 19, 2020, is made and established by Ricardo Lara, Insurance Commissioner of the State of California ("Commissioner"), in his capacity as the statutory conservator ("Conservator") of California Insurance Company ("CIC"), a California domiciled property and casualty insurance company in statutory conservation under California Insurance Code sections 1010-1062.

RECITALS

A.      On November 4, 2019, CIC was placed into conservation ex parte by the Superior Court of San Mateo County, California, in the action entitled *Insurance Commissioner of the State of California v. California Insurance Company* (Case No. 19 CIV 06531 CPF-11-511261) at the request of the Commissioner, who was appointed the Conservator of CIC pursuant to Insurance Code section 1011(c). The court proceeding concerning the conservation shall be referred to herein as the "Conservation Proceeding" and the San Mateo Superior Court assigned to preside over the Conservation Proceeding shall be referred to as the "San Mateo Superior Court."

B.      The Commissioner brought the Conservation Proceeding to respond to issues relating to Steven M. Menzies, an individual and pre-conservation Chief Executive Officer and sole indirect shareholder of CIC ("Menzies"), and CIC's attempt to consummate the sale of CIC to Menzies by unlawfully seeking to merge CIC into a newly created New Mexico entity, California Insurance Company, Inc. II ("CIC II"), without prior approval of the Commissioner as required by Insurance Code section 1215.2. The November 4, 2019, Order issued by the San Mateo Superior Court shall be referred to herein as the "Conservation Order."

C.      The Conservator, having determined it to be in the best interests of the Policyholders, creditors, the shareholder of CIC and the public to resolve the issues requiring the Conservation Proceeding, to address the various issues underlying and pertaining to this Conservation Proceeding and litigation involving Policies, and to structure a plan for the rehabilitation of CIC, has now established this Plan and the other Transaction Documents to set forth all material terms and provisions for a comprehensive and integrated plan of rehabilitation for CIC. The Conservator shall have full authority to perform or take actions he deems necessary to ensure performance by CIC of any and all obligations required to be performed by CIC under this Plan.

D.      Pursuant to this Plan and the other Transaction Documents described herein, effective as of the Closing, CIC shall, among other things, (1) perfect its attempted redomestication from California to New Mexico, on the terms and subject to the conditions set forth in this Plan; (2) enter into the Assumption Reinsurance and Administration Agreement to provide for the reinsurance and assumption of all in-force California Policies issued by CIC and the reinsurance of all liabilities of CIC to California Policyholders incurred prior to the Closing, and providing that the California Policyholders have the right to recover directly from the Reinsurer any of CIC's obligations under the Policies; (3) surrender for cancellation its

California certificate of authority authorizing CIC to transact insurance in California by withdrawing from the state pursuant to Insurance Code section 1070 et seq.; (4) offer to settle Pending Litigation and Subsequent Litigation, as those terms are defined in Schedule 2.6, on reasonable terms as set forth herein; and (5) upon the consummation of the merger of CIC into and with CIC II, change the name of CIC II to a name that does not include the word "California" or any derivation of the word "California".

E.     The Conservator has determined that this Plan, including the transactions contemplated by it, and the other Transaction Documents are fair and equitable to, and in the best interests of, the Policyholders, creditors, the shareholder of CIC, and to the insurance-buying public of the states in which CIC operates.

F.     Any obligations that Menzies is required to perform under this Plan shall be performed by Menzies or his successors (including, but not limited to, his successors in interest or successors in position with CIC), or by CIC itself.

ARTICLE I
DEFINITIONS

In this Plan, unless otherwise specifically provided or the context so requires, the terms listed below shall have the following definitions and shall include the plural as well as the singular:

"Affiliate" means, with respect to a Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person.

"AUI" means Applied Underwriters, Inc., a corporation domiciled in Nebraska and Affiliate of CIC and AUCRA.

"AUCRA" means Applied Underwriters Captive Risk Assurance Company, Inc., an Iowa domiciled corporation and Affiliate of CIC and AUI.

"Business" means CIC's California business and operations consisting of the issuance and administration of any insurance policy including all contracts, policies, certificates, binders, slips, covers or other agreements of workers' compensation and employers liability insurance as defined in the Transaction Documents, including all supplements, riders and endorsements issued or written in connection therewith.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions in the State of California are authorized or obligated by law or executive order to be closed.

"CDI" means the California Department of Insurance.

"CIC" has the meaning set forth in the Preamble of this Plan, or a successor in interest.

"CIC II" means California Insurance Company II, a New Mexico domiciled property and casualty insurance company.

"Closing" means the closing of the transactions contemplated by this Plan.

"Closing Date" means 10:00 a.m., local time, on the date of Closing, as described in Article VII of this Plan.

"Commissioner" has the meaning set forth in the Recitals.

"Conservation Order" has the meaning set forth in the Recitals.

"Conservation Proceedings" has the meaning set forth in Recitals.

"Conservator" has the meaning set forth in the Preamble.

"Effective Date" means the date that the San Mateo Superior Court issues its Rehabilitation Order.

"Effective Time" has the meaning set forth in Article I of the Reinsurance Agreement.

"Governmental Authority" means any government or political subdivision thereof, whether federal, state or local, or any agency, commission, department or other instrumentality of any such government or political subdivision.

"Insurance Code" means the California Insurance Code, including the regulations thereunder in effect from time to time.

"Knowledge" means, as to a specific matter, actual knowledge after reasonable investigation of the circumstances pertaining to the specific matter.

"Law" means all applicable laws, decisions, rules, regulations, ordinances, codes, statutes, judgments, injunctions, orders, decrees, licenses, permits, policies, administrative interpretations and other requirements of Governmental Authorities.

"Lien" means any mortgage, pledge, hypothecation, assignment, lien (statutory or otherwise), preference, priority, charge or other encumbrance, adverse claim (whether pending or, to the knowledge of the Person against whom the adverse claim is being asserted or threatened) or restriction of any kind affecting title or resulting in an encumbrance against property, real or personal, tangible or intangible, or a security interest of any kind, including, without limitation, any conditional sale or other title retention agreement, any right of first refusal on real property, and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statute) of any jurisdiction (other than a financing statement which is filed or given solely to protect the interest of a lessor). "Lien" shall not include liens that arise out of a workers' compensation claim for which the Workers'

Compensation Appeals Board may have jurisdiction.

"<u>Litigation</u>" means any action, cause of action (whether at law or in equity), arbitration, hearing, inquiry, proceeding claim or complaint by any Person alleging potential liability, wrongdoing or misdeed of another Person, or any administrative or other similar proceeding, criminal prosecution or investigation by any Governmental Authority or arbitration panel alleging potential liability, wrongdoing or misdeed of another Person.

"<u>Management Services Agreement</u>" means the Agreement made by and between CIC and AUI, pursuant to which AUI performs certain services for CIC in the conduct of CIC's insurance operations, that was executed on July 26, 2005, as well as the addendum executed September 3, 2019, that stipulates that the Agreement remains in force for two years from September 30, 2019.

"<u>Notification Package</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Permits</u>" means all licenses, franchises, permits, orders, approvals, consents, authorizations, qualifications and filings with and under all Federal, state or local laws and of all Governmental Authorities, including, without limitation, state insurance regulatory authorities.

"<u>Person</u>" means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, public, governmental, judicial or regulatory authority or body or other entity.

"<u>Plan</u>" has the meaning set forth in the Preamble.

"<u>Policies</u>" means insurance policies issued to California Policyholders or to cover, in whole or in part, employees in California. "Policies" includes (1) all guaranteed-cost workers' compensation and employers' liability insurance policies issued by CIC, and (2) all workers' compensation and employers' liability insurance policies, supplements, endorsements, riders and ancillary agreements in connection therewith, classified by CIC as SolutionOne Profit Sharing or EquityComp, including Reinsurance Participation Agreements entered into by CIC Affiliates but excluding FELA and Jones Act exposures. As used in this Plan, "Policies" includes policies or other agreements that are (1) in effect as of the Effective Time; (2) become effective after the Effective Time, including through (a) the reinstatement of lapsed policies pursuant to provisions therein or of applicable Law, (b) the issuance or renewal thereof by CIC after the Effective Time to honor quotes outstanding as of the Effective Time, or to satisfy renewal rights of employers under contractual provisions or applicable Law, or (c) modifications agreed to by the Reinsurer on behalf of CIC pursuant to the authority granted to the Reinsurer under <u>Section 7.01</u> of the Reinsurance Agreement; and (3) guaranteed-cost workers' compensation and employers liability insurance policies issued by CIC to California Policyholders that have expired prior to the Closing Date, where the gross liabilities and obligations of CIC arising under or in connection with such policies are unpaid or unperformed as of the Effective Time.

"<u>Policyholder</u>" means (a) any Person that is named as an insured under a Policy or (b) any Person other than the CIC or an Affiliate of CIC that is named as a party to an RPA issued in conjunction with a Policy.

"Policy Liabilities" means those Policy liabilities of CIC reinsured and assumed by the Reinsurer and as more specifically defined in the Reinsurance Agreement.

"Procedural Order" means the San Mateo Superior Court's July 30, 2020 Order Setting Briefing Schedule, Hearing Date, and Procedures for Conservator's Application for Order Approving Rehabilitation Plan for California Insurance Company, as well as any subsequent orders granting stipulations as to the hearing date and briefing schedule contained therein, or any other subsequent court-authorized amendments to the July 30, 2020 Order.

"Rehabilitation Order" means the order of the San Mateo Superior Court approving this Plan and the other Transaction Documents (including all transactions contemplated hereby and thereby), as submitted to the Court by the Conservator with his motion to approve this Plan, without modification, unless such modification has been approved by the Conservator.

"Reinsurance Agreement" means the Assumption Reinsurance and Administration Agreement to be entered into among the Conservator, on behalf of CIC, and Reinsurer on the Closing Date, substantially in the form of Exhibit A attached hereto, as such form may be modified by agreement between the Conservator and Reinsurer.

"Reinsurer" means an insurer that is authorized to transact workers' compensation insurance in the State of California, and which is approved by the Conservator as the Reinsurer hereunder.

"San Mateo Superior Court" has the meaning set forth in Recitals.

"SAP" means statutory accounting principles prescribed or permitted by the CDI consistently applied throughout the specified period and in the comparable period in the immediately preceding year in connection with the preparation of the statutory financial statements of CIC.

"Statutory Workers' Compensation Deposits" has the meaning set forth in Section 2.3.

"Transaction Documents" means this Plan, the Assumption Reinsurance and Administration Agreement, and all exhibits thereto.

"Transferred Assets" means the sum of (1) admitted assets of CIC free and clear of any Liens, having a net admitted asset value determined in accordance with SAP as prescribed or permitted by the CDI equal to CIC's net unearned premium reserve, loss and loss adjustment expense (including losses that have been incurred but not reported) reserve, if any, with respect to the Policies; (2) any collateral posted by a Policyholder maintained by CIC or a CIC Affiliate pursuant to the terms of the Policies to secure the obligations of the Policyholders under the Policies; (3) any amounts due CIC under any reinsurance agreements in effect on the Closing Date between CIC and any reinsurer (other than the Reinsurer) relating to the Policies; and (4) if the Reinsurer is an Affiliate of CIC, the cash instruments or approved interest-bearing securities or approved stocks readily convertible into cash, investment certificates or such other assets

authorized by Insurance Code section 11691 in an amount no less than the reserves required of CIC to be maintained under Insurance Code section 11550 et seq. relating to loss reserves on the Policies as of the Closing Date.

In the event of a conflict between the defined terms in this Plan and the defined terms in the Transaction Documents and Schedule 2.6, the defined terms in the Transaction Documents and Schedule 2.6 shall control. Any defined term used herein that is not expressly defined in this Plan shall have the meaning set forth in the applicable Transaction Document or Schedule 2.6, as applicable. The Recitals set forth are incorporated as part of this Plan.

ARTICLE II
TRANSACTIONS

Section 2.1. Transaction Documents. Subject to the terms, provisions and conditions of this Plan, the Conservator, on behalf of CIC, and where applicable, the Reinsurer, shall enter into the transactions set forth in this Plan and the Transaction Documents.

Section 2.2. Reinsurance Agreement. CIC shall enter into the Assumption Reinsurance and Administration Agreement to provide for the reinsurance and assumption of all in-force California Policies issued by CIC and the reinsurance of all liabilities of CIC to California Policyholders incurred prior to the Closing with the Reinsurer granting the California Policyholders the right to recover directly from the Reinsurer any of CIC's obligations under the Policies.

(a)      Selection of Reinsurer. The Conservator shall select an insurer authorized to write workers' compensation insurance in California that is qualified to enter into the Reinsurance Agreement, as follows:

(1) The Conservator shall prepare and publish a Solicitation of Expressions of Interest inviting certain insurers that are authorized to transact workers' compensation business in California to submit an Expression of Interest to indicate their possible interest in entering into the Reinsurance Agreement as the Reinsurer.  The Solicitation of Expressions of Interest shall include a detailed summary of the Policies to be reinsured and assumed, which shall detail the loss and unearned premium reserves; all related reinsurance, and other rights; rights to future premiums; and such additional information that the Conservator determines may be useful to an insurer to evaluate whether to respond to the Solicitation of Interest. The Solicitation of Expressions of  Interest shall be accompanied by an actuarial opinion by an actuary retained by the Conservator, the cost of which shall be paid from the assets of CIC, attesting to the accuracy of the information provided. The Solicitation of Expressions of Interest shall specify a date by which Expressions of Interest shall be submitted to the Conservator.

(2) Expressions of Possible Interest shall indicate the financial terms that would be required for the insurer to enter into the Reinsurance Agreement. Expressions of Interest shall be treated as confidential if so requested by the submitting insurer.

(3) An Affiliate of CIC may submit an Expression of Interest but shall indicate therein that it agrees to be bound by the requirement of <u>Section 2.2(c)</u> regarding administration of claims by a third-party administrator.

(4) The Conservator shall evaluate the Expressions of Interest and may engage in negotiations with individual insurers that have submitted Expressions of Interest, which negotiations shall be confidential. Upon completions of his evaluation, the Conservator in his sole discretion shall select the Reinsurer, taking into consideration the interests of Policyholders, creditors, and shareholders, consistent with the public interest.

(5) Notwithstanding the confidentiality provision in paragraph (2) above, the Expression of Interest submitted by the selected Reinsurer shall be a public document.

(6) In the course of evaluating and selecting the Reinsurer, the Conservator may retain such experts as he deems necessary or appropriate, the costs of which shall be paid out of the assets of CIC pursuant to <u>Section 8.2 hereof</u>.

(7) Upon selection of a Reinsurer, the Conservator shall promptly file with the Conservation Court an application for approval of the Reinsurer.

(b)  <u>Reinsurance Agreement</u>. Effective as of the Closing Date, CIC and the Reinsurer shall enter into the Reinsurance Agreement, in form and substance attached hereto as <u>Exhibit A</u>, whereby, effective as of the Closing Date, CIC shall cede to Reinsurer and Reinsurer shall reinsure and assume the Policies and the Policy Liabilities, which, if the Reinsurer is an Affiliate of CIC, shall be administered by a third-party administrator as set forth in this section. The primary purpose and intent of the Reinsurance Agreement is to provide, subject to the terms and limitations set forth in the Reinsurance Agreement, for the transfer and assumption of all in-force Policies and the reinsurance of all liabilities incurred under all such in-force and expired Policies to the extent the same are unpaid or unperformed on or after the Closing, before deduction for all other applicable cessions, if any, under CIC's reinsurance programs. The provisions for the transfer and assumption of the Policies and the unpaid or unperformed liabilities and obligations incurred under such Policies prior to the Closing are set forth in the Reinsurance Agreement.

(c)  <u>Third-Party Administrator</u>. If the Reinsurer is an Affiliate of CIC, the Policies and Policy Liabilities reinsured and assumed pursuant to the Reinsurance Agreement shall be administered by a qualified third-party administrator appointed by the Conservator. The third-party administrator shall administer all claims arising under the Policies reinsured and assumed by the Reinsurer, including adjustment and payment of claims and setting of loss reserves, until all of the Policies and Policy Liabilities reinsured and assumed pursuant to this Plan have been paid or otherwise extinguished.

Section 2.3.  <u>Transfer of California Workers' Compensation Deposits</u>. If the Reinsurer is an Affiliate of CIC, effective as of the Closing Date, CIC shall transfer to the Reinsurer the cash instruments or approved interest-bearing securities or approved stocks readily convertible into cash, investment certificates or such other assets authorized by Insurance Code section 11691 in

an amount no less than 100% of the reserves required of CIC to be maintained under Insurance Code section 11550 et seq. relating to loss reserves on workers' compensation business of CIC in California as of the Closing Date, no less than the sum of the amounts specified in Insurance Code section 11693(a), whichever is greater (the "Statutory Workers' Compensation Deposits"). In the event that the Reinsurer is not an Affiliate of CIC, such Reinsurer shall be required to establish a Statutory Workers' Compensation Deposit consistent with the requirements of California Law prior to the Effective Time of the Reinsurance Agreement.

Section 2.4. Redomestication of CIC. As of the Closing Date, the Conservator on behalf of CIC shall effectuate the merger of CIC into and with California Insurance Company II, Inc. ("CIC II"), a New Mexico domiciled property and casualty insurance company, thereby completing the attempted redomestication of CIC from California to New Mexico, and upon the effective date of the merger of CIC into and with CIC II and the transfer of the domicile of CIC to New Mexico, CIC shall cease to be a California domestic insurer. The Conservator, on behalf of CIC, shall provide the CDI with information and documentation reasonably necessary to complete the proposed transfer of domicile of CIC from California to New Mexico. The CDI shall perform any ministerial acts necessary to complete the redomestication of CIC from California to New Mexico.

Section 2.5. Cancellation of California Certificate of Authority. As of the Closing Date, the California Certificate of Authority of CIC shall be cancelled by operation of law pursuant to Insurance Code section 701 as of the effective date of the merger of CIC into and with CIC II as provided in Section 2.4. Prior to the effective date of the merger of CIC into and with CIC II and the cancellation of the California certificate of authority of CIC, the Conservator, on behalf of CIC, shall discharge the liabilities of CIC to residents of California by causing the primary liabilities under policies insuring residents of California to be reinsured and assumed by the Reinsurer pursuant to the Reinsurance Agreement. The CDI shall perform any ministerial acts necessary to cancel the California Certificate of Authority of CIC.

Section 2.6. Pending and Subsequent Litigation. Schedule 2.6 hereto, which is hereby incorporated by reference as if fully set forth in this Plan, sets forth the terms and conditions under which Claimants, as defined in Schedule 2.6, will be offered by CIC the opportunity to settle Pending Litigation and Subsequent Litigation, as defined therein. Where such a Claimant accepts the offer to settle, the Claimant, CIC, and any affected Affiliate of CIC, as defined in Schedule 2.6, shall enter into a mutual release in accordance with the provisions of Schedule 2.6. Any liability to CIC that results from the Pending Litigation and Subsequent Litigation in which the Claimant has not accepted the offer shall be transferred to the Reinsurer pursuant to the Reinsurance Agreement and thereafter shall be an obligation of the Reinsurer pursuant to the Reinsurance Agreement. The Reinsurer shall assume and shall be authorized to defend against any claims and matters, and to pursue and collect on any counterclaims and matters, arising in that Pending Litigation or in Subsequent Litigation.

After every such Claimant has made an Election, as defined in Schedule 2.6, the Conservator shall determine a reserve amount sufficient to cover all Pending Litigation not resolved by settlement and all matters identified in the Schedule of Subsequent Litigation and Potential Subsequent Litigation pursuant to Schedule 2.6. CIC will deposit 150% of that reserve

amount in a special deposit account, pursuant to the terms and conditions of that account, which shall be approved by the Conservator, to secure all final claims in said Pending Litigation and Subsequent Litigation against CIC or its Affiliates. Control of the special deposit account shall be transferred to the Reinsurer upon the Closing. CIC, its successors, and their Affiliates shall preserve all papers, books, claims files, accounting records and other records pertaining to the Pending Litigation and Subsequent Litigation for no less than five years after the Closing; for Pending Litigation and Subsequent Litigation not settled during the Conservation, such papers, books, claims files, accounting records and other records pertaining to the Pending Litigation and Subsequent Litigation shall be preserved for no less than five years after final resolution of the relevant case except as pertaining to workers' compensation claims in which benefits are potentially payable to an injured worker; in that event, such papers, books, claims files, accounting records and other records shall be indefinitely preserved. On the Closing Date, CIC shall transfer to the Reinsurer all such papers, books, claims files, accounting records and other records pertaining to the Pending Litigation and Subsequent Litigation in its possession to the Reinsurer, which shall likewise preserve the papers, books, claims files, accounting records and other records pertaining to the Pending Litigation and Subsequent Litigation for the same period of time.

The Elections set forth in Schedule 2.6 shall be available exclusively to the Claimants in the Pending Litigation and Subsequent Litigation, as defined in Schedule 2.6, and CIC shall not be required to offer the Elections to any Person other than such Claimants pursuant to this Agreement.

Section 2.7. Assignment of Medical Provider Agreements. The Rehabilitation Order shall assign from CIC to the Reinsurer any agreements between CIC and providers of medical services that are or may be necessary for the Reinsurer to service the Policies being reinsured and assumed by the Reinsurer.

Section 2.8. Transfer of CIC Assets to Reinsurer by Conservator. Subject to the terms and conditions contained in this Plan and the Reinsurance Agreement, at the Closing, the Conservator on behalf of CIC shall (1) cause CIC to convey and transfer to the Reinsurer, CIC's right, title and interest to admitted assets of CIC free and clear of any Liens, having a net admitted asset value determined in accordance with SAP as prescribed or permitted by the CDI equal to CIC's net unearned premium reserve, loss and loss adjustment expense (including losses that have been incurred but not reported) reserve, if any, relating to the Policies reinsured and assumed by Reinsurer under the Reinsurance Agreement; (2) cause CIC to convey and transfer to the Reinsurer any collateral posted by any CIC California Policyholder pursuant to the terms of the Policies maintained by CIC or an Affiliate of CIC to secure the obligations of the Policyholders under the Policies; (3) cause CIC to assign to Reinsurer any amounts due CIC on or after the Closing Date under any reinsurance agreements in effect on or after the Closing Date between CIC and any reinsurer (other than the Reinsurer) relating to the Policies reinsured and assumed by the Reinsurer pursuant to the Reinsurance Agreement; and (4) cause CIC to assign to Reinsurer any premiums receivable on and after the Closing Date attributable to the Polices reinsured and assumed by Reinsurer pursuant to the Reinsurance Agreement.

Section 2.9. Execution of Documents Evidencing Transfers and Assignments. At the

Closing, the Conservator on behalf of CIC shall deliver to the Reinsurer, such bills of sale, assignments, stock powers, bond powers, evidences of consent and such other transfer instruments or documents, all in form and substance satisfactory to the Reinsurer as may be reasonably necessary or desirable to evidence or perfect the sale, conveyance, transfer, assignment and delivery of, title to and right to use the assets transferred to Reinsurer by CIC pursuant to Section 2.8 to Reinsurer, and at the Closing Reinsurer shall deliver receipts to CIC for the assets transferred to Reinsurer pursuant Section 2.8.

Section 2.10. Name Change. After the Closing Date, upon the consummation of the merger of CIC into and with CIC II, Menzies shall cause CIC II to cease using any and all trade names, trademarks, logos and trade dress, including without limitation, those containing the words "California", or any other name, term or identification that includes any derivation of the word "California", in its policies, advertising, literature, inventory, products, labels, packaging, supplies or other materials relating to CIC and CIC II as soon as practicable, but in any event, subject to any approval by applicable Governmental Authorities, within one hundred and twenty (120) days after the Closing Date. After one hundred and twenty (120) days after the Closing Date, any inventory of CIC and CIC II supplies utilized by CIC or CIC II shall be relabeled (by sticker or other reasonable method) with a trade name and trademarks that do not include the words "California" or "CA" or any derivation of the foregoing. Insofar as CIC's name is used in CIC's outstanding agreements, CIC shall be entitled to use the names set forth therein to the extent necessary to enforce fully the provisions of those agreements until the termination or renewal of those agreements in the ordinary course.

ARTICLE III
COURT APPROVAL AND NOTICE

Section 3.1. Court Approval of Plan and Notification Package. Pursuant to the Procedural Order, there will be a Hearing on the Rehabilitation Plan Application at the San Mateo Superior Court at a time and date specified in that Order, at which the Conservator will request the San Mateo Superior Court to issue the Rehabilitation Order. Pursuant to the Procedural Order, the Conservator shall give, at the last known address and no later than the date specified in the Procedural Order, written notice of the Rehabilitation Plan Application to (1) every Policyholder of an in-force or expired Policy, at the last known address of such Policyholders as set forth in the records of ClC; (2) the direct and indirect shareholders of CIC and their respective directors, if any; (3) known creditors of CIC; (4) reinsurers other than the Reinsurer; and (5) other interested parties. As required by the Procedural Order, the notice, referred to herein as the "Notification Package" shall (i) summarize the proposed Rehabilitation Plan and the Transaction Documents; (ii) notify recipients of the hearing date on the Conservator's Rehabilitation Plan Application; (iii) provide an Internet link to the proposed Rehabilitation Plan and Rehabilitation Plan Application and advise recipients of the Notification Package how they may request and receive paper copies of such documents; (iv) explain the opportunity to file papers in connection with the Hearing on the Rehabilitation Plan Application and notify recipients of the Notification Package that only persons or entities filing papers will be entitled to make presentations at such Hearing; and (v) notify recipients of the Notification Package that any person or entity not filing papers shall be deemed to have forever waived any and all objections, comments, suggestions, or

any other matter they may have made with respect to the Rehabilitation Plan Application and the proposed Rehabilitation Plan.

ARTICLE IV
CONSERVATOR ACTIONS

From the Effective Date to the Closing Date, the Conservator shall do the following:

Section 4.1. Conduct of Business. Prior to the Closing Date, except for the transactions contemplated hereby, and except as otherwise required or contemplated hereunder to effectuate the transactions set forth in Article II, the Conservator shall use its reasonable efforts to:

(a)     Cause CIC to carry on the Business in the ordinary course except as modified to comply with applicable Law and to effectuate the transactions contemplated by this Plan and the other Transaction Documents;

(b)     Cause CIC to use its reasonable best efforts to preserve its assets and the Business;

(c)     Cause CIC not to enter into any contract or agreement relating to the Business, other than (1) such contracts or agreements that are entered into in the ordinary course of business consistent with applicable Law, and (2) any such contract or agreement not entered into in the ordinary course of business necessary or appropriate to consummate the transactions contemplated by this Plan and the Transaction Documents;

(d)     Cause CIC not to make, without prior written consent of the Conservator (1) any material change, except in the ordinary course of business, in its assets (including, but not limited to, any change in the composition of such assets so as to materially alter the proportion of cash thereof) or liabilities, or (2) any commitment for any capital expenditures including, without limitation, replacements of equipment in the ordinary course of business, involving, in the aggregate, more than $100,000;

(e)     Cause CIC not to carry on any negotiations or enter any agreement with any other Person relating to the sale of any of CIC's Business;

(f)     Cause CIC not to cancel, surrender or let lapse any insurance or reinsurance policies issued to CIC, solely as such policies relate to CIC's Business;

(g)     Cause CIC to cooperate and take all actions necessary or appropriate to effectuate the provisions of this Plan and the Transaction Documents and to refrain from taking any action that would prevent compliance with any of the provisions of this Plan or the Transaction Documents; and

(h)     Cause CIC to direct AUI to cooperate with the Conservator and perform all duties set forth in the Management Services Agreement, as is necessary or appropriate to carry out the

terms of this Plan.

Section 4.2. <u>Notice of Changes and Defaults</u>. Conservator shall promptly notify Menzies and the Reinsurer of the occurrence or the non-occurrence of any event, condition or circumstance, or the discovery of any inaccuracy, omission or mistake, of which it becomes aware during such period that would materially adversely affect the ability of Conservator to consummate the transactions contemplated by this Plan.

Section 4.3. <u>Delivery of Motion, Notice, etc</u>. The Conservator shall provide to Menzies and his counsel copies of any motion or notice filed with the San Mateo Superior Court or with any other Person by the Conservator as contemplated by this Plan and of any order issued by the San Mateo Superior Court to the Conservator.

Section 4.4. <u>Orderly Transition</u>. Prior to the Closing, the Conservator, Menzies and the Reinsurer shall: (1) mutually cooperation and provide to each other all reasonable assistance in furtherance of the implementation and effectuation of the Plan and the Transaction Documents; (2) execute, acknowledge, deliver, file and record such further certificates, amendments, instruments, agreements and documents (including the filing of any notices with any Governmental Authorities); and (3) take all other actions as may be required by applicable Law or as may be necessary or advisable to carry out the intent of this Agreement and the other Transaction Documents following San Mateo Superior Court approval of the Plan. The Conservator shall have full authority to perform or take actions he deems necessary to ensure performance by CIC of any and all obligations required to be performed by CIC under this Plan.

ARTICLE V<br>COVENANTS OF MENZIES AND REINSURER

Section 5.1. <u>Additional Consents and Approvals</u>. Within thirty (30) days of the issuance of the Rehabilitation Order, Menzies and the Reinsurer shall file with the appropriate Governmental Authorities any applications, notices or other documents necessary to obtain any authorizations, consents or approvals that are required to be obtained, made or given to consummate the transactions contemplated hereby and Menzies and the Reinsurer shall use their respective reasonable efforts to obtain any such necessary authorization, consent, approval from such Governmental Authorities as is required to be obtained, made or given by such Person to consummate the Transactions contemplated by this Plan.

Section 5.2. <u>Notice of Litigation and Investigations</u>. From the Effective Date through the Closing Date, Menzies shall promptly notify Conservator of any Litigation at law or in equity, that individually or in the aggregate have or may reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement or the Transaction Documents or on the ability of Menzies and the Reinsurer to perform their respective obligations under this Agreement and the other Transaction Documents, and any investigation by any Governmental Authority or law enforcement agency that is commenced or, to the Knowledge of Menzies, threatened against CIC, against any property or asset of CIC, against any officer or director of CIC with respect to the affairs of CIC, or with respect to the Business, and of any request for additional information or documentary materials by any Governmental Authority, in connection

with the transactions contemplated hereby.
.

Section 5.3. <u>Notice of Changes and Defaults</u>. From the Effective Date through the Closing Date, Menzies shall promptly notify Conservator of the occurrence or the non-occurrence of any event, condition or circumstance, or the discovery of an inaccuracy, omission or mistake, of which it becomes aware during such period that would that would materially adversely affect the ability of Conservator, CIC, or Reinsurer to consummate the transactions contemplated by this Plan.

ARTICLE VI
<u>CONDITIONS PRECEDENT TO CLOSING</u>

Section 6.1. <u>Conditions Precedent to Closing</u>. Except as otherwise expressly provided herein, the obligations of each of the Conservator, Menzies, and Reinsurer to proceed with the Closing are subject to the fulfillment, satisfaction or written waiver, prior to or at the Closing, of each of the following conditions precedent:

(a)     <u>Rehabilitation Order</u>. The San Mateo Superior Court shall have issued the Rehabilitation Order as defined in <u>Article I</u>, and all appeals or other appellate court review thereof have been waived, time-barred, or determined;

(b)     <u>Terms of the Rehabilitation Order</u>. The Rehabilitation Order shall confirm: (1) the enforceability of the terms and conditions of this Plan and the other Transaction Documents, and the transactions contemplated hereby and thereby; (2) that this Plan, and the other Transaction Documents are fair, just and reasonable to Policyholders, creditors, the shareholder of CIC, and the public; (3) that all executory portions of the Transaction Documents are approved and made valid, binding and enforceable in the event of a future insolvency of CIC; (4) that the reinsurers of CIC (other than the Reinsurer) are not prejudiced by and have no lawful basis to avoid or terminate their contractual obligations to CIC pursuant to such reinsurance agreements as a result of the transactions contemplated herein or in the Transaction Documents, and (4) such other matters relating to this Plan, the Transaction Documents and the transactions contemplated hereby and thereby as the Conservator shall deem necessary or desirable;

(c)     <u>Consents</u>. All consents, approvals and certifications, in form and substance reasonably satisfactory to the Conservator, Menzies, and Reinsurer, of third parties or Governmental Authorities whose consent, approval or certification is required for the consummation of the transactions contemplated by this Plan and the other Transaction Documents;

(d)     <u>Notification Package</u>. The Notification Package shall have been sent to each Policyholder and other recipient in accordance with <u>Section 3.1</u> and with the Procedural Order; and

(e)     <u>No Prohibition</u>. There shall not have been any action taken, or any statute, regulation, judgment, or order enacted, entered or issued that, directly or indirectly (1) prohibits

or makes illegal the consummation of the transactions contemplated by this Plan or the other Transaction Documents; or (2) imposes any material conditions or limitations on the Conservator's ability to exercise his full rights under this Plan or the other Transaction Documents.

Section 6.2. <u>Conditions Precedent to Menzies' and Reinsurer's Obligation to Close</u>. The obligation of Menzies and Reinsurer to proceed with the Closing is subject to the fulfillment, satisfaction or written waiver, prior to or at the Closing, of each of the following conditions precedent (in addition to those described in <u>Section 6.1</u> hereof):

(a)     <u>Performance by the Conservator and Menzies</u>. The Conservator and Menzies shall have performed and complied, in all material respects, with all provisions of the agreements and covenants required by this Plan and the other Transaction Documents to be performed or complied with by each of them prior to or at the Closing, and there shall have been no adverse event or occurrence which materially impairs or interferes with the ability to consummate the transactions contemplated by this Plan or the other Transaction Documents and to perform each of their respective obligations under this Plan and the other Transaction Documents;

(b)     <u>Corporate Matters</u>. The Conservator shall have delivered to Menzies and Reinsurer such other documents, instruments, certifications and further assurances reasonable and necessary to effect the transactions contemplated by this Plan and the other Transaction Documents; and

(c)     <u>Transaction Documents</u>. On or prior to the Closing Date, the Conservator and the Reinsurer shall have executed and delivered to Menzies the Transaction Documents, and all of the conditions precedent stated in the Transaction Documents shall have been satisfied.

Section 6.3. <u>Conditions Precedent to Conservator's Obligations to Close</u>. The obligation of the Conservator to proceed with the Closing shall be subject to the fulfillment, satisfaction or written waiver, prior to or at the Closing, of each of the following conditions precedent (in addition to those described in <u>Section 6.1</u> hereof):

(a)     <u>Performance by Menzies and Reinsurer</u>. Menzies and the Reinsurer shall have performed and complied, in all material respects, with all provisions of the covenants and agreements required by this Plan to be performed or complied with by it prior to or at Closing, and there shall have been no adverse event which materially impairs or interferes with the ability of Menzies or Reinsurer to consummate the transactions contemplated by this Plan and the other Transaction Documents and to perform their respective obligations under this Plan and the other Transaction Documents;

(b)     <u>Satisfaction of Judgments</u>. CIC shall have fully satisfied all outstanding judgments entered prior to the Closing Date against CIC in any Litigation. For purposes of this provision, "outstanding judgment" means any final judgment on a matter brought in any state or federal court, arbitration, or mediation, where CIC has not paid the full amount required to satisfy the judgment. A "final judgment" includes final orders that have been affirmed on appeal, or where the final order is no longer appealable because, as of the Closing Date, the time for

Exhibit 8, Page 28 of 159

appeal has lapsed and there is no appeal on file. In addition, all outstanding judgments entered against any Affiliate arising out of a Policy shall have been satisfied;

(c)     <u>Transaction Documents</u>. On or prior to the Closing Date, Menzies and Reinsurer shall have executed and delivered the Transaction Documents; and

(d)     <u>Expenses.</u> On or prior to the Closing Date, CIC shall have paid any unpaid outstanding invoices for expenses described in <u>Section 8.2</u> hereof.

ARTICLE VII<br><u>CLOSING</u>

Section 7.1. <u>Closing</u>. The Closing shall take place on the first Business Day following the satisfaction or waiver of all of the conditions set forth in <u>Article VI</u> (other than a condition which contemplate or require only delivery or filing of one or more documents immediately prior to or contemporaneously with the Closing) on the Closing Date at the principal offices of the Conservator, commencing at 10:00 a.m., local time, or at such other place and time as Menzies, the Conservator and the Reinsurer shall mutually agree.

Section 7.2. <u>Sequence of Actions Necessary to Closing</u>. The transactions necessary to Close under this Plan and the other Transaction Documents shall occur in the following sequence:

(a)     After every such Claimant has received their Settlement Offer and made an Election or declined to make such an Election, as set forth in <u>Schedule 2.6</u>, the Conservator shall determine a reserve amount sufficient to cover all Pending Litigation and Subsequent Litigation not resolved by settlement. CIC shall deposit 150% of that reserve amount in a special deposit account with the Reinsurer, pursuant to the terms and conditions of that account, which shall be approved by the Conservator, to secure all final claims in said Pending Litigation and Subsequent Litigation against CIC, Reinsurer or the CIC Affiliates;

(b)     CIC shall, within thirty (30) days of the Election by each Claimant, pay, or cause to be paid, the amount to which the Claimant is entitled. If CIC is entitled to receive payment from the Claimant under the Election, the Claimant shall make that payment within thirty (30) days of the Election or such further date as the Conservator may permit. Notwithstanding the foregoing, the failure of a Claimant to make payment under the Election shall not delay Closing; and

(c)     After each of the Claimants has made their Election and received payment pursuant to <u>Schedule 2.6</u> and each of the conditions precedent to the Closing set forth in <u>Article VI</u> hereof have been met or waived, the transactions set forth in this Plan and the other Transaction Documents shall be consummated pursuant to the terms and subject to the conditions set forth herein and therein.

Section 7.3. <u>Items to be Delivered at Closing by the Conservator</u>. At the Closing, upon the terms and subject to the conditions contained in this Plan, the Conservator on behalf CIC shall deliver or cause to be delivered to Menzies and Reinsurer the following:

(a)     A certificate of the Conservator, dated as of the Closing Date, certifying that CIC has performed and complied in all material respects with all agreements and conditions required by this Plan to be performed and complied with by CIC at the Closing;

(b)     Such orders of the San Mateo Superior Court confirming the terms of this Plan and the other Transaction Documents and the transactions contemplated hereby and thereby relative to the respective transactions and interests under this Plan; and

(c)     Such other certificates and Closing documents as may be necessary for the consummation of the transactions contemplated by this Plan and the other Transaction Documents.

Section 7.4. <u>Items to be Delivered at Closing by the Reinsurer</u>. At the Closing, upon the terms and subject to the conditions contained in this Plan, the Reinsurer shall deliver, as appropriate, to the Conservator the following:

(a)     A certificate of a duly authorized officer of Reinsurer, dated the Closing Date, certifying (1) that Reinsurer has performed and complied in all material respects with all agreements and conditions required by this Plan and the other Transaction Documents to be performed by Reinsurer at the Closing; (2) that Reinsurer has all requisite power and authority to execute and deliver the Reinsurance Agreement and any other documents required for the Closing to which it is a party and to consummate the transactions contemplated hereby and thereby; (3) that the execution, delivery and performance by Reinsurer of the Reinsurance Agreement will not violate any laws or statutes to which Reinsurer is subject, or its corporate charter or bylaws or any material indenture, contract or agreement to which Reinsurer is a party or by which it is bound; (4) that the Reinsurance Agreement has been duly executed and delivered by Reinsurer and constitute the legal, valid and binding obligations of Reinsurer, enforceable against Reinsurer in accordance with its terms; and (5) if the Reinsurer is an Affiliate of CIC, an undertaking executed by Reinsurer confirming that the Reinsurer shall not issue or renew any policies in California unless such policies are in full compliance with all the applicable laws and regulatory requirements of the State of California;

(b)     A copy of all resolutions adopted by the Board of Directors of Reinsurer, in each case relating to the transactions contemplated by this Plan and the other Transaction Documents, certified on the Closing Date to be true and correct and in effect by the Secretary or Assistant Secretary of Reinsurer, as the case may be; and

(c)     CIC shall have delivered the Transferred Assets to Reinsurer in compliance with the terms and subject to the conditions set forth in this Plan and the Reinsurance Agreement; and such other certificates and Closing documents as may be necessary for the consummation of the transactions contemplated by this Plan and the other Transaction Documents.

Section 7.5. <u>Further Assurances after the Closing</u>.  Reinsurer shall, from time to time after the Closing, take such other proper actions and execute and deliver such other documents, instruments, certifications and further assurances as may reasonably be requested by another Person as required or necessary to effectuate the intent and purpose of this Plan and the other Transaction Documents.

Section 7.6. <u>Reports to the Court Regarding Closing of Transactions, and Motion for Order Concluding Conservation Proceedings and Discharge of Conservator</u>. After the Closing, the Conservator shall file such documents with the San Mateo Superior Court as are necessary to advise the Court of the Closing of the transactions contemplated by the Plan and the other Transaction Documents.

(a)     After Closing, and at other times where the Conservator deems that significant milestones in the implementation of this Rehabilitation Agreement have been reached, the Conservator will file with the Court his Status Report making public the progress that has been made toward conclusion of the conservation.

(b)     After the Closing and the consummation of the transactions set forth in this Plan, including full performance of <u>Schedule 2.6</u>, the Conservator shall apply to the Court for an order concluding the Conservation Proceedings and discharging the Commissioner as Conservator, but maintaining jurisdiction for the purpose of ensuring the enforcement of the Plan.

(c)     Any and all claims arising out of or related to this Plan or to any of the other Transaction Documents shall be heard and determined by the San Mateo Superior Court, which shall have exclusive jurisdiction over any such disputes and shall have sole authority to determine the scope and nature of any remedies to be granted in connection with such claims.

ARTICLE VIII<br><u>GENERAL PROVISIONS</u>

Section 8.1. <u>Termination</u>. This Plan may be terminated prior to Closing only as follows:

(a)     By the Conservator, if the San Mateo Superior Court does not grant the Conservator's motion to approve the Plan, if any Governmental Authority that must grant a requisite regulatory approval has denied approval of the transaction, or if any Governmental Authority has issued an injunction prohibiting the transaction that has become final and nonappealable; or

(b)     By the Conservator, upon his reasonable determination, that the financial condition of CIC has materially deteriorated to the point that the Conservator will be unable to pay the Reinsurer all amounts due under the Reinsurance Agreement, and thereafter retain adequate free assets and sufficient cash flow to fund the anticipated costs of administering the Conservation Proceeding; or

(c)     In the event of the termination of this Plan, this Plan shall thereafter become void and have no effect, and no Person shall have any liability or obligation to any other Person under

this Plan or the other Transaction Documents, provided, however, that if this Plan is terminated as a result of the violation of this Plan by any Person, such Person shall not be relieved of its liability for such violation.

Section 8.2. Expenses. All costs and expenses, including attorneys' fees, of taking possession of, conserving, conducting, and rehabilitating CIC (including the pre-conservation costs of preparing to take possession of and conserving CIC, and all costs and expenses, including attorneys' fees, incurred by the Conservator and the CDI in bringing and prosecuting the conservation proceeding and order, and incurred with regard to or in relation to the Rehabilitation Agreement and Rehabilitation Order, including but not limited to, the costs of or associated with the Independent Consultant as defined in Schedule 2.6, and otherwise dealing with the business, conduct, and property of CIC under the provisions of Insurance Code sections 1010 et seq.) shall be paid out of the funds and assets of CIC. The Commissioner does not waive or limit any right, authority, or discretion with respect to entitlement to costs, expenses or compensation to be paid out of the assets of CIC under Insurance Code sections 1010 et seq. or any other provisions of the Insurance Code or applicable law.

(a)     If there are any unpaid outstanding invoices for expenses described in Section 8.2 hereof, such invoices shall be paid at Closing. CIC and its successors-in-interest shall pay any additional invoices tendered after Closing and arising out of the Conservation (including the pre-conservation costs of preparing to take possession of and conserving CIC, and all costs and expenses, including attorneys' fees, incurred by the Conservator and the CDI in bringing and prosecuting the conservation proceeding and order, and incurred with regard to or in relation to the Rehabilitation Agreement and Rehabilitation Order, including but not limited to, the costs of or associated with the Independent Consultant as defined in Schedule 2.6, and otherwise dealing with the business, conduct, and property of CIC under the provisions of Insurance Code sections 1010 et seq.).

(b)     In the interest of expediting performance of this Rehabilitation Agreement, the Conservator may commence the process of retaining the Independent Consultant and associated experts provided for in Schedule 2.6, and may commence their work, prior to approval by the Court of the Rehabilitation Order.

Section 8.3. Indemnification by Menzies and CIC with Respect to Third-Party Claims. Menzies and CIC shall hold the Conservator harmless against, and pay, any and all claims made by third parties, as such claims are suffered, sustained, incurred or required to be paid by the Conservator resulting from the breach of any representation, warranty, covenant or agreement of Menzies contained in or made pursuant to this Plan.

Section 8.4. Entire Plan. This Plan and the other Transaction Documents (including the exhibits and schedules attached hereto and thereto) supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Persons affected by this Plan. There are no representations, promises, warranties, covenants or undertakings, other than those expressly set forth or referred to in this Plan, and the other Transaction Documents.

Section 8.5. Amendment. This Plan may be amended only by the Conservator with leave

of Court upon a showing of good cause.

Section 8.6. <u>No Assignment</u>. None of the rights or obligations under this Plan or the other Transaction Documents may be assigned or transferred to or assumed by any other person, except as expressly provided herein.

Section 8.7. <u>Governing Law</u>. This Plan shall be governed and construed in accordance with the Laws of the State of California, including the Insurance Code, applicable to agreements made and to be performed entirely within the State of California, without giving effect to the principles of conflicts of law thereof, and jurisdiction and venue for any action arising under this Plan shall be in the San Mateo Superior Court.

Section 8.8. <u>Headings: Gender and Person</u>. All section headings contained in this Plan are for convenience of reference only, do not form a part of this Plan and shall not affect in any way the meaning or interpretation of this Plan. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

Section 8.9. <u>Notices</u>. Any notice, request, demand, waiver, consent, approval or other communication required or permitted to be made hereunder shall be in writing and shall be deemed given only if delivered by hand, or mailed by certified or registered mail with postage prepaid and return receipt requested, or sent by facsimile transmission, as follows:

(a)    If to the Commissioner, the Conservator or CIC, to:

California Insurance Company in Conservation
c/o Conservation & Liquidation Office
100 Pine Street, 12th Floor
San Francisco, CA 94111
Attention: Joe Holloway, CEO

with concurrent copies to:

California Department of Insurance
1901 Harrison Street, 6th Floor
Oakland, CA 94612
Attention: Kenneth B. Schnoll, Esq.

and to:

Orrick, Herrington & Sutcliffe LLP
400 Capitol Mall, Suite 300
Sacramento, CA 95814-4407
Attention: Cynthia Larson, Esq.

(b)    If to Menzies, to:

6515 North 159 Street
Omaha, NE 68116

with concurrent copies to:

DLA Piper, LLP
555 Mission Street, Suite 2400
San Francisco, CA 94105
Attention: Shand S. Stephens, Esq.

(c)     If to AUI, to:

10805 Old Mill Road
Omaha, NE 68154
Attention: Alan Quasha

with concurrent copies to:

DLA Piper, LLP
555 Mission Street, Suite 2400
San Francisco, CA 94105
Attention: Shand S. Stephens, Esq.

(d)     If to AUCRA, to:

10805 Old Mill Road
Omaha, Nebraska 68154
Attention: Jeffrey A. Silver

with concurrent copies to:

DLA Piper, LLP
555 Mission Street, Suite 2400
San Francisco, California 94105
Attention: Shand S. Stephens, Esq.

(e)     If to Reinsurer, to:

with concurrent copies to:

October 19, 2020                                                                    Page 20

or to such other address as may be designated by a party by written notice to the other parties. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, sent by facsimile (with confirmation of receipt) or mailed.

Section 8.10. <u>Severability</u>. If any provision of this Plan is held by a court of competent jurisdiction to be invalid, illegal or unenforceable, the remainder of the provisions of this Plan shall remain in full force and effect.

Section 8.11. <u>Non-Liability of the Conservator and Commissioner</u>. The Commissioner, acting in his capacity as Conservator of CIC or in any other official capacity, shall have no liability whatsoever, in any capacity, for any acts or omissions arising out of or related to this Plan, or to the conservation of CIC, or to alleged acts or omissions during the conservation of CIC. In addition, the Commissioner, acting in his capacity as Conservator or in any other capacity, shall have no obligation or liability whatsoever, in any capacity, to indemnify CIC, Menzies or the Reinsurer, or any officer, director, employee or agent thereof, for any claims, actions, demands, suits, losses, liabilities, expenses or costs (including attorneys' fees) asserted against any of them, or their officers, directors, employees or agents, including but not limited to those arising out of or related to this Plan, or to the conservation of CIC, or to alleged acts or omissions during the conservation of CIC. The State of California is not a party to this Plan and shall have no liability with respect to this Plan or the conservation of CIC, or any acts or omissions during the conservation of CIC.

IN WITNESS WHEREOF, the Conservator executes and adopts this Plan by and on behalf of CIC, as of the day and year first above written.

> RICARDO LARA, Insurance
> Commissioner, in his capacity as
> Conservator of California Insurance
> Company and not in his individual capacity

By: _____
Joseph B. Holloway
Deputy Conservator

# SCHEDULE 2.6

# TERMS FOR SETTLING PENDING AND SUBSEQUENT LITIGATION

I.     DEFINITIONS ........................................................................................ 1

II.    POLICYHOLDERS' OPTIONS TO SETTLE LITIGATION ......................................... 4

III.   OPTION 1 ............................................................................................ 5

IV.   OPTION 2 ............................................................................................ 5

V.    OPTION 3 ............................................................................................ 9

VI.   PROCEDURE FOR SETTLEMENT OFFERS AND ELECTIONS ............................. 10

VII.  REVIEW OF INCURRED LOSSES ............................................................ 12

VIII. PROCEDURE FOR SUBSEQUENT LITIGATION .................................... 14

IX.   ADDITIONAL TERMS .......................................................................... 15

## I.    DEFINITIONS

The following definitions are for use solely in this Schedule 2.6 and Section 2.6 of the Rehabilitation Plan that references it. For purposes of this Schedule 2.6 and Section 2.6, to the extent the definitions below may differ from those in the Rehabilitation Plan, the Definitions in this Schedule 2.6 control.

1.    "Affiliate" means any corporation or other business that owns, is owned by, or shares common or substantially common ownership or management with the Company, including, but not limited to, Applied Underwriters, Inc.; Applied Underwriters Captive Risk Assurance Co., Inc.; Applied Risk Services, Inc.; Applied Risk Services, Inc. of New York; Continental Insurance Company; Continental National Indemnity; Pennsylvania Insurance Company; and North American Casualty Company.

2.    "Cal Retro Plan" means the California Retrospective Rating Plan published by the WCIRB.

3.    "CIC Guaranteed-Cost Premium" means the premiums set pursuant to the filed rates for the Company's Guaranteed Cost Policy over the term of the Policy, calculated as the Policyholder's manual rates applied to the payroll of each classification, adjusted for schedule credits and debits and the Policyholder's experience modification factor, waivers of subrogation, and any premium for employer liability increased limits. Insofar as the approved rate includes premium taxes and assessments, they are included in CIC Guaranteed-Cost Premium.

4. "Claimant" means a Party to Pending Litigation or Subsequent Litigation who is asserting or may assert an interest in that Proceeding contrary to the interest of the Company, its Affiliates, or its Successors.

5. "Claims-Handling Expert" means a Qualified Expert retained by the Independent Consultant.

6. "Closed Out" means a Policy for which Policyholder has no future liability to the Company, including to its Affiliates. Obligations related to coverage for employees under a Closed Out Policy remains in effect.

7. "Company" means the California Insurance Company, in conservation pursuant to November 4, 2019, order of the Superior Court of San Mateo County.

8. "Conservation Court" means the San Mateo County Superior Court.

9. "Conservation Date" means November 4, 2019.

10. "Conservator" means the Deputy Insurance Commissioner and Deputy Conservator of the Company pursuant to the Order of Conservation.

11. "Days" means calendar days.

12. "Election" means a Claimant's choice to exercise one of the options specified in Article II, below, or a Claimant's failure to timely exercise one of the options specified therein.

13. "IBNR Reserves" means reserves for claims incurred but not reported.

14. "Incurred Losses," as used in this Schedule 2.6, means the sum of claim payments, case reserves on reported claims, allocated loss adjustment expenses, and IBNR Reserves.

15. "Independent Consultant" is the person or firm designated to perform the duties specified below.

16. "Order of Conservation" means the "Order Appointing Insurance Commissioner as Conservator and Restraining Order" issued and filed by the Conservation Court on the Conservation Date.

17. "Overpayment" and "Overpaid" refer to payment, reserving, or both on a workers' compensation claim where the sum of the amount paid and the amount reserved exceeds the amount that should be paid or reserved, or has been paid or reserved, in accordance with California law and accepted claims-adjustment practices.

18. "Party" means a plaintiff, petitioner, appellant (including, but not limited to, appellants before the Administrative Hearing Bureau of the California Department of Insurance), defendant, respondent, appellee, intervenor, or real party in interest.

19. "Pending Litigation" means a Proceeding pending on the Conservation Date.

20. "Person" means any natural person or group of natural persons, association, organization, business trust, partnership, limited liability company, or corporation, or any affiliate thereof.

21. "Policy" means a workers' compensation insurance policy written to cover, in whole or in part, employees in California and issued on or before June 28, 2018.

22. "Policyholder" means (a) any Person that is named as an insured under a Policy or (b) any Person other than the Company or an Affiliate who is named as a party to an RPA in connection with a Policy.

23. "Proceeding" means a matter brought in any state or federal court, before the Commissioner, or in an arbitration, in which a Claimant is a Party and is asserting a claim against, or defending against a claim by, the Company, its Affiliate, or a Successor regarding a Policy or RPA. For purposes of this Schedule 2.6, an action on a promissory note or other document brought in whole or in part to collect money that the Company, its Affiliate, or a Successor claims to be due, or to have been due, in whole or in part, under a Policy or an RPA is deemed to be "regarding a Policy or an RPA."

24. "Pure Premium Rate" means the approved fixed-cost pure premium rate filing published by the WCIRB on the effective date of the policy.

25. "Qualified Expert" means a person who possesses special knowledge, skill, experience, training, or education sufficient to qualify them under Evidence Code section 720 as an expert in the field for which they have been selected to provide expert services under the terms of this Schedule.

26. "Redundant" refers to a case reserve that has been set at an amount greater than a reasonable actuarial estimate of the amount necessary to pay the ultimate settlement value of a workers' compensation claim.

27. "Rehabilitation Order" has the meaning assigned to it in the Conservator's Rehabilitation Plan for CIC.

28. "Reserves Expert" means an actuary who is a Fellow of the Casualty Actuarial Society retained by the Independent Consultant.

29. "Restitution Amount" means the Option 1 Restitution Amount, Option 2 Restitution Amount, or Option 3 Restitution Amount, as prescribed in Articles III, IV, and V, respectively, and as adjusted pursuant to the provisions of Article VII. The Restitution Amount may be negative where it is determined that the Claimant has a net liability to the Company pursuant to Article III, Section 4, Article IV, Section 6, or Article V, Section 5.

30. "RPA" means a Reinsurance Participation Agreement issued by an Affiliate in connection with a Policy covering California employees.

31.   "Settlement Offer" means the written offer specified in Article II, below.

32.   "Subsequent Litigation" is a Proceeding brought after the Conservation Date by the Company, its Affiliate, or a Successor or a claim asserted by a Policyholder deemed eligible to be a Claimant pursuant to Article 8, Section 2 of this Schedule.

33.   "Successor" means an assignee or other successor in interest of a promissory note or other evidence of indebtedness or obligation of a Policyholder where the indebtedness or obligation arises or arose in connection with an RPA.

34.   "Total Payments" means the sum of all payments made by or on behalf of a Claimant and its affiliates for workers' compensation coverage, whether denominated premiums, collateral, fees, deposits, assessments, premium taxes, commissions, adjustments, or other terms, for or in connection with a Policy or an RPA. "Total Payments" shall not include any payments by Claimant and its affiliates for payroll processing services.

35.   "WCIRB" means the Workers' Compensation Insurance Rating Bureau of California.

## II.   POLICYHOLDERS' OPTIONS TO SETTLE LITIGATION

1.   Every Claimant will be offered an opportunity to make an Election to settle any Pending Litigation or Subsequent Litigation to which it is a Party. Election shall be made by exercising in writing and submitting to the Conservator a notice of election to settle under "Option 1," "Option 2," or "Option 3," as defined in Article III,  Article IV, and Article V, respectively. These options are available exclusively to a Claimant Party to Pending Litigation or to Claimants in Subsequent Litigation. The Company is not expected or required to offer these options to any other Person. The availability of these options shall not be construed as an admission of liability, and it is the intent of the Conservator that neither the existence of the options nor the acceptance of any option by particular Claimants shall be admissible for any purpose against the Company or its Affiliates.

2.   A Claimant may, either by express declination of the written offer or by failing to act within the prescribed time, decline to settle under any of the options specified here, in which case that Claimant remains at liberty to pursue against the Company, its Affiliate, or their successor in interest its claims after the termination of the conservation, or such earlier date that the Conservator may specify.

3.   Except as otherwise specified in this paragraph, upon election of Option 1, Option 2, or Option 3, the Policy that is the subject of the Pending Litigation or Subsequent Litigation will be Closed Out. Nothing herein shall be deemed to affect the obligations of the Company or the Reinsurer owed to any injured employee, or otherwise related to coverage, under a Policy.

### III.    OPTION 1

1. Option 1 is available to any Claimant who purchased a Guaranteed Cost Policy from the Company under its EquityComp or SolutionOne programs and who also executed an RPA.

2. The Claimant that elects Option 1 will be entitled to its "Option 1 Restitution Amount," calculated as follows:

    a.  The Total Payments;

    b.  Minus the CIC Guaranteed-Cost Premium, using the audited payroll and rates set forth in the Policy.

3. If the result of the calculation prescribed in Section 2 of this Article is positive, the Company shall pay, or cause to be paid, to the Claimant the Option 1 Restitution Amount.

4. If the result of the calculation prescribed in Section 2 is negative, the Company may collect that amount, converted to a positive number. In no case may the sum of the Total Payments prior to the collection authorized in this Section plus the collection authorized in this Section exceed the CIC Guaranteed Cost Premium.

5. Claimant shall not be liable for, and neither the Company, its Affiliates, nor a Successor shall seek to collect, any amounts in excess of the collection authorized in Section 4.

6. Whether or not the Claimant executed an RPA, the Claimant electing Option 1 will not be liable for, and neither the Company, its Affiliates, nor a Successor will be entitled to collect, any charges under the RPA.

### IV.    OPTION 2

1. Option 2 is available to any Claimant who purchased a Guaranteed Cost Policy from the Company under its EquityComp or SolutionOne programs and who also executed an RPA.

2. The Claimant that elects Option 2 will be entitled to its Option 2 Restitution Amount, calculated as Total Payments minus the Retrospective Premium that would have been operative at the time of the Policy's inception:

    a.  The Retrospective Premium is calculated as the sum of the Cal Retro Plan California Standard Premium and the Non-California Standard Premium, multiplied by the sum of the Expense Ratio and the Insurance Charge, that quantity added to Incurred Losses and Incurred Allocated Loss Adjustment Expenses, subject to a Maximum Cost.

    b.  The California Standard Premium is defined as:

      i.   The actual payroll by class code;

     ii.   Multiplied by the rate per \$100 for that class code, as specified in the filed and approved WCIRB pure premium rates operative at the time of the Policy's inception;

   iii.   Multiplied by the Experience Modification Rating (Xmod) for the Policy operative at the time of the Policy's inception;

   iv.   Multiplied by 1.15;

    v.   Summed across all class codes for all Policies. If the Claimant has more than one RPA, each RPA is calculated separately. If the Claimant had an extension from one agreement, the original and extension years are calculated together.

c.   The Non-California Standard Premium is defined as the workers' compensation insurance premium for risks with exposures outside California, determined on the basis of the insurer's authorized rates, by classification and by state, any applicable experience modifications, and any other authorized premium charge applicable, excluding premium discount.

d.   The Expense Ratio is taken from the WCIRB's Quarterly Experience Report as of December 31, 2019, calculated by subtracting the page 5 accident year loss and ALAE ratio from the page 6 combined ratio averaged by weighting on the Standard Premium average of each policy's expense ratio.

e.   The Insurance Charge is taken from the WCIRB Table ML in effect at the inception of the first Policy,

      i.   using the Ultimate Loss Group column determined from Section 1 of Schedule 1 of the RPA and

     ii.   the Entry ratio determined by

        (1)    dividing the Maximum Loss and ALAE Ratio, taken from Section 2 of Schedule 1 of the RPA (referred to therein as "Cumulative Aggregate Limit")

        (2)    by the Expected Loss and ALAE Ratio, calculated by dividing the CIC Permissible Loss and LAE Ratio, taken from CIC's filed and approved Workers' Compensation Insurance – Rate Filing Form for the relevant period, by 1.1 to take into account unallocated loss adjustment expenses (ULAE).

f.   Case Incurred losses and Incurred ALAE are determined by summing the Total Incurred column from the most recent Analysis of Ultimate Claims Costs section of the Plan Analysis.

3.  For purposes of the calculation prescribed in Section 2 of this Article, "Actual Losses" means Paid Losses plus Case Reserves plus IBNR Reserves, as follows.

    a.  "Paid Losses" means amounts recorded paid on and attributable to claims under the Claimant's Policy, including amounts paid under an RPA, subject to the provisions of Article VII.

    b.  "Case Reserves" means any reserves maintained by the Company for losses or loss adjustment expenses attributable to the Claimant's claims at issue in the Pending Litigation, subject to the provisions of Article VII, Section 1.

    c.  IBNR Reserves shall be calculated from CIC's 2009 through 2018 Annual Statements, Schedule P, Part 1, for direct and assumed loss payments (column 4), direct and assumed defense and cost-containment expenses (DCC) (column 6), direct and assumed losses unpaid – case basis (column 13), and direct and assumed DCC unpaid (column 17), as follows:

        i.  The direct and assumed loss and DCC case incurred for each accident year 2009 through 2018 is calculated by summing the data taken from the four columns specified in the preceding paragraph c, above, which will represent the diagonals of the direct and assumed loss and DCC case incurred data triangle, with the 2018 Annual Statement data being the bottom-most diagonal.

        ii. Age-to-age loss and defense and cost-containment expenses (DCC) loss development factors for each accident year are derived by dividing the case incurred figure calculated as specified in subparagraph i of this paragraph c, above, for a given accident year at a given maturity by its equivalent at the prior maturity, producing-averages of the age-to-age factors by maturity upon which the development pattern up to 120 months are determined.

        iii. The ultimate tail factor at 120 months is calculated from the 2018 Annual Statement, Schedule P, Part 1, as the average, for accident years 2009, 2010, and 2011, of 1 plus

            (1) the sum of the direct and assumed losses unpaid – bulk and IBNR (column 15) and the direct and assumed DCC unpaid – bulk and IBNR (column 19)

            (2) divided by the corresponding case incurred loss and DCC figure at the bottom of the corresponding data triangles.

            (3) The calculated tail factor for accident year 2010 is adjusted to 120 months by dividing by the selected 108-120 month age-to-age development factor.

Exhibit 8, Page 42 of 159

(4) The calculated tail factor for accident year 2011 is adjusted to 120 months by dividing the selected 108-120 month and 96-108 month age-to-age development factors.

    iv. The final age-to-ultimate development factors are determined by multiplying the various age-to-age factors from subparagraph ii of this paragraph c by the selected 120-month ultimate tail factor from subparagraph iii of this paragraph c.

    v. The specific age-to-ultimate factor for a given policyholder will be the factor from subparagraph iv of this paragraph c, above, which corresponds to the midpoint between the given policy effective and expiry dates.

    vi. The IBNR provision prior to discount, as specified below in subparagraph vii of this paragraph c, will equal the specific age-to-ultimate development factor minus 1.0, multiplied by the sum of the policyholder's paid losses and case reserves.

    vii. The IBNR provision shall be discounted to reflect an investment yield of 2.7% per year, which reflects the returns realized by CIC and property-casualty insurers for 2010 through 2019, by multiplying the IBNR provision prior to discount in subparagraph vi of this paragraph c, above, by 0.9, which reflects the 2.7% annual investment yield applied to loss payment patterns.

  d. Paid losses and reserves shall be determined as of June 30, 2020.

4. The calculation prescribed in this Section 2 of this Article shall be made separately for each policy year and summed across all policies.

5. If the result of the calculation prescribed in Section 2 of this Article is positive, the Company shall pay, or cause to be paid, to the Claimant the Option 2 Restitution Amount.

6. If the result of the calculation prescribed in Section 2 of this Article is negative, the Company may collect that amount, converted to a positive number, but in no case may the sum of the Total Payments prior to the collection authorized in this Article plus the collection authorized in this Section exceed the result of the calculation prescribed in Section 2.a through 2.b.v of this Article.

7. If there is a dispute regarding how the Cal Retro Plan is properly applied to the Claimant's Policy, that dispute shall be resolved by the Independent Consultant, whose determination will be final and non-reviewable.

# V.   OPTION 3

1. Option 3 is available to any Claimant who purchased a Guaranteed Cost Policy from the Company under its EquityComp or SolutionOne programs and who also executed an RPA.

2. The Claimant that elects Option 3 will be entitled to its "Option 3 Restitution Amount," calculated as follows:

   a. The Total Payments;

   b. Minus the "Final Cost" as prescribed in the "Scenario Worksheet" for Cumulative 3-Year Program Amounts on the Claimant's "Workers' Compensation Program Summary & Scenarios". Locate the equivalent "Ultimate Claims Cost" for Claimant's Actual Loss Ratio by dividing the Estimated LPCA by the Actual LPCA and multiplying that by the Actual Losses. Use the result to interpolate the Worksheet's equivalent "Ultimate Claims Cost" to determine the "Final Cost." Adjust that result for the Claimant's change in Actual LPCA over Estimated LPCA as well as the period of the Claimant's actual Active Term if other than 36 months.

3. For purposes of the calculation prescribed in Section 2 of this Article:

   a. Any case reserves maintained by the Company on the Conservation Date and attributable to the Claimant's claims at issue in the Pending Litigation shall be treated as losses, subject to the provisions of Article VII;

   b. IBNR Reserves, computed as for Option 2, shall be treated as losses, subject to the provisions of Article VII;

   c. Recorded paid losses shall be treated as losses, subject to the provisions of Article VII; and

   d. Paid losses and reserves shall be determined as of June 30, 2020.

4. If the result of the calculation prescribed in Section 2 of this Article is positive, the Company shall pay, or cause to be paid to the Claimant, the Option 3 Restitution Amount.

5. If the result of the calculation prescribed in Section 2 of this Article is negative, the Company may collect that amount, converted to a positive number, but in no case may the sum of the Total Payments prior to the collection authorized in this Section plus the collection authorized in this Section exceed the result of the calculation prescribed in Sections 2 and 3 of this Article.

6. If there is a dispute regarding how the RPA is properly applied to the Claimant's Policy, that dispute shall be resolved by the Independent Consultant, whose determination will be final and non-reviewable.

## VI.    PROCEDURE FOR SETTLEMENT OFFERS AND ELECTIONS

1. The Independent Consultant shall adopt templates prescribing how the Option 1, Option 2, and Option 3 Refund Amounts will be calculated. The templates shall prescribe each data element of the calculation and the formulas for combining the data elements into refund amounts. The Independent Consultant shall commence work on these templates upon appointment. Adoption of the templates shall be as follows:

   a. Not later than 30 days after commencing its duties, the Independent Consultant shall make public draft templates prescribing how the Option 2 Refund Amount and the Option 3 Refund Amount will be calculated;

   b. Not later than 15 days after the draft templates are made public, any person may offer comments on the draft templates; and

   c. Not later than 60 after commencing its duties, the Independent Consultant shall make public the final versions of the templates. The Independent Consultant may, with the approval of the Conservator, extend this 60-day period. The Independent Consultant's determination of the templates shall be final.

2. Beginning not more than 10 days after the final versions of the templates are made public, and completing no more than 30 days after the final versions of the templates are made public, the Company shall submit to the Independent Consultant a data file for each Pending Litigation and Subsequent Litigation matter, specifying the values prescribed by the templates. The values the Company submits for case reserves and paid losses shall be the values on the Company's books as of June 30, 2020, which the Company may not dispute in a review conducted pursuant to Article VII.

3. Simultaneous with submission of the data file prescribed in Section 2 of this Article, the Company shall provide a copy of the data file to each Claimant and its counsel in the Pending Litigation or Subsequent Litigation matter. Each Claimant may, within 15 days of receipt of the data file, dispute the data contained in the file. Any such dispute shall be in writing, may include supporting evidence, and shall be simultaneously provided to the Company. At this stage, loss reserves and paid claims may not be challenged as they are subject to separate challenge under Article VII. Other values (e.g., premium and other amounts paid, payroll, experience modification factors, and schedule credits and debits) may be challenged in the dispute provided for in this Section. The Company, acting through its pre-conservation management, may, within 15 days of receipt of the dispute, submit a written answer to the Independent Consultant, with a simultaneous copy to the Claimant. The Independent Consultant may request from the Company, and the Company, acting through its pre-conservation management, shall provide any information necessary to resolve such a dispute. The Independent Consultant shall set forth in the settlement offer prescribed in Section 4 of this Article its determination of each disputed item, and the Independent Consultant's determination of such disputes shall be final.

4. Within 30 days of latest submission prescribed in Section 2 or permitted in Section 3 of this Article, the Independent Consultant shall submit to the Conservator, a written Settlement Offer to each Claimant, which the Conservator shall promptly tender to each Claimant. The Settlement Offer shall explain the Claimant's Election options, including the option not to settle Pending Litigation or Subsequent Litigation, and shall include the Independent Consultant's calculation of the Claimant's prospective restitution from, or liability to, the Company under Option 1, Option 2, and Option 3. The Settlement Offer shall also explain the Claimant's rights to obtain a Request for Claim Information and Review of Incurred Losses pursuant to Article VII. The Settlement Offer shall also explain to the Claimant that, if either party fails to make payment as specified in this Schedule 2.6, its sole and exclusive remedy is to seek enforcement of the Rehabilitation Order and the transactions entered into thereunder in the Conservation Court.

5. Each Settlement Offer under Option 1, Option 2, and Option 3 shall provide for the payment of interest as follows:

   a. If the Restitution Amount is positive, CIC shall pay interest to the Claimant, over the period from the dollar-average date of Total Payments made to the date the Restitution Amount is paid, which shall be designated in the offer, at 2.7%, compounded annually.

   b. If the Restitution Amount is negative, CIC shall collect interest from the Claimant, over the period from the dollar-average date of Total Payments due to the date the Restitution Amount is paid, which shall be designated in the offer, at 2.7%, compounded annually.

6. The Settlement Offer shall specify a date, not later than 30 days after the date of the Settlement Offer, by which the Claimant to whom it is addressed may make the Election. If the Claimant has requested a Review of Incurred Losses, the period for Election shall be extended as specified in Article VII, Section 4. Failure to make a timely Election shall be deemed declination of the Settlement Offer. A Claimant may request, and the Conservator may, in his discretion, grant a reasonable extension of the period for the Claimant to make the Election.

7. The Company shall, within 30 days of the Election, pay, or cause to be paid, the amount to which the Claimant is entitled. If the Company is entitled to receive payment from the Claimant under the Election, the Claimant shall make that payment within 30 days of the Election or such further date as the Conservator may permit. The Conservator may, upon a showing of hardship, prescribe such additional period, not to exceed 120 days, for a Claimant to make the payment prescribed in this Section. If the Company fails to make payment as specified in this Schedule 2.6, Claimant's sole and exclusive remedy is to seek enforcement of the Rehabilitation Order and the transactions entered into thereunder in the Conservation Court.

8. In making an Election, the Claimant shall irrevocably submit to the jurisdiction of the San Mateo Court in the Conservation Proceeding.

# VII.   REVIEW OF INCURRED LOSSES

## 1.  Request for Claim Information

a.  Any Party who is a Claimant in Pending Litigation or Subsequent Litigation and contends that payments or case reserves are Redundant may make a written Request for Claim Information.

    i.  The Request for Claim Information shall be made to the Company, with a copy to the Independent Consultant.

    ii.  The Request for Claim Information shall specify the claim number or, if the Claimant cannot provide the claim number, sufficient other information necessary to identify the claim.

    iii.  The Request for Claim Information may be made at any time after the Rehabilitation Plan's Effective Date and shall be made no later than 14 days after receipt of the Settlement Offer prescribed in Article VI. The Independent Consultant, with the approval of the Conservator, may extend the foregoing deadlines in this paragraph for good cause.

b.  In response to a Request for Claim Information, the Company shall provide to the requesting Claimant at the Company's expense a loss run, a complete copy of the claim file, and, to the extent not included in the claim file, a copy of every email, memo, or other document pertaining to the setting of reserves for each requested claim.

c.  The requested information shall be provided to the Claimant within 30 days of the date the Request for Claim Information was transmitted to the Company. If more than three claims are specified in the Request for Claim Information, the Independent Consultant may grant the Company additional time to provide the information.

d.  A Claimant need not make a Request for Claim Information to be entitled to make a Request for Review of Incurred Losses.

## 2.  Request for Review of Incurred Losses

a.  Any Party who is a Claimant in Pending Litigation or Subsequent Litigation and contends that any claim was Overpaid case or that case reserves on a claim are Redundant as of June 30, 2020, may make a written Request for Review of Incurred Losses.

b.  The Request for Review of Incurred Losses shall be made to the Independent Consultant, with a copy to the Company.

c.  The Request for Review of Incurred Losses shall be made no later than 14 days after receipt of the Settlement Offer prescribed in Article VI or, if a Request for Claim Information is made, within 30 days of receipt of the complete response to the Request for Claim Information. Multiple Requests for Review of Incurred Losses may be made for different claims, provided that each request is made within 30 days of receipt of the complete response to the Request for Claim Information pertaining to that claim. For good cause, the Independent Consultant may grant the Claimant additional time to make a Request for Review of Incurred Losses.

d.  The Request for Review of Incurred Losses shall specify the claim number or, if the Claimant cannot provide the claim number, sufficient alternative information necessary to identify each claim to which the request pertains.

e.  The Request for Review of Incurred Losses shall specify whether the request is for a review of case reserves, of claim payments, or both.

f.  The Request for Review of Incurred Losses may, but is not required to, contain argument why the Claimant contends the case reserves are Overstated or the reserves are materially Redundant, and may, but is not required to, be accompanied by a statement of opinion by a Qualified Expert retained by and at the expense of the Claimant.

**3.  Review of Incurred Losses**

a.  Where the Request for Review of Incurred Losses alleges that a claim was Overpaid, the review shall be limited to reviewing the claim files for instances of failure to comply with the following claim-handling standards, based on evidence in the claim file and reasonable inferences from that evidence:

  i.  Amount paid or settlement not supported by the injury documented in the claim file or is otherwise unreasonable;

  ii.  Inadequate inquiry into whether the claim arose out of and in the course and scope of employment in accordance with Labor Code section 3600 et seq.;

  iii.  Impairment rating that is not supported by admissible evidence;

  iv.  Authorization of treatment that is inconsistent with Medical Treatment Utilization Schedule unless adequately rebutted by credible medical evidence;

  v.  Failure to pursue apportionment;

  vi.  Failure to pursue evidence of a fraudulent claim; or

  vii.  Failure to pursue subrogation.

Exhibit 8, Page 48 of 159

b. The Independent Consultant shall retain the services of such Qualified Experts as are necessary to determine whether the claim was Overpaid or the case reserves are Redundant.

c. When determining whether claims were Overpaid or case reserves are Redundant, the Independent Consultant may take into consideration any expert opinions that have been submitted, including those of the retained Qualified Experts, those submitted by the Company, and those submitted by the Claimant, but the determination shall reflect the independent judgment of the Independent Consultant. The payments made and reserves set by the Company shall be given no more or less weight than any other expert opinion.

d. Within 30 days of receipt of a Request for Review of Incurred Losses, the Independent Consultant shall issue a written decision determining, as to each claim, whether the claim was Overpaid and whether the case reserves are Redundant. If the Independent Consultant determines either that the claim was Overpaid or case reserves are Redundant, the Independent Consultant shall determine the amounts by which the claim was Overpaid or the reserves are Redundant and shall revise the Option 2 Restitution Amount and the Option 3 Restitution Amount accordingly. The Independent Consultant's determination of the Review of Incurred Losses and of the Restitution Amounts shall be final.

**4. Revised Settlement Offer**

a. If a Claimant makes a timely Request for Review of Case Reserves or Request for Review of Claims Files pursuant to this Article, the time for Claimant to make an Election shall be tolled during the period of the requested review or reviews.

b. Upon issuance of the Independent Consultant's decision and determination of revised Restitution Amounts, if any, pursuant to Section 3.d of this Article, the Independent Consultant shall tender to Claimant a revised Settlement Offer giving written notice of the Restitution Amounts as they may have been revised. If the review of Incurred Losses results in any change in paid losses or reserves, the remaining components of Incurred Losses shall be adjusted accordingly. If the review of Incurred Losses results in any change in the Restitution Amount, the adjusted amount shall also reflect any reduction of other expenses, such as premium taxes and assessments, that are calculated as a percentage of premium.

c. A revised Settlement Offer shall give Claimant 30 days to make an Election. A Claimant may request, and the Conservator may, in his discretion, grant a reasonable extension of the period for the Claimant to make the Election.

## VIII.   PROCEDURE FOR SUBSEQUENT LITIGATION

1. No later than 60 days after the Rehabilitation Plan's Effective Date, the Company shall provide the Conservator a Schedule of Subsequent Litigation and Potential Subsequent Litigation listing the policies on which it, an Affiliate, or a Successor has asserted, or may believe it has a right to assert, the right to bring Subsequent Litigation. The schedule shall

identify the policyholder and the identities of the obligee and obligor. The schedule shall state the following as to each policy: policy dates; the amounts and dates paid as premiums, collateral, or other payments; the amount the Company, its Affiliate, or a Successor claims is due and to whom; and the dates on which demands may have been made for payment and the amounts demanded.

2. Any potential Claimant who is not presently a Party to Pending Litigation may file a Notice of Claim with the Conservator within 60 days of the publication of the Notice provided for in Rehabilitation Plan, <u>Section 3.1</u>. The Conservator shall confirm that the Policyholder was Party to an RPA that had not been Closed Out as of the Conservation Date. Upon the Conservator's determination, the Conservator shall give notice to the Policyholder and CIC that the Policyholder shall be treated as a Claimant and eligible for Subsequent Litigation under this Schedule 2.6.

3. No Subsequent Litigation may be initiated if it has not been identified in the Schedule of Subsequent Litigation and Potential Subsequent Litigation or been designated as eligible for Subsequent Litigation pursuant to Section 2 of this Article.

4. Any Subsequent Litigation, other than that described in Section 2 of this Article, must be initiated no later than 45 days after the Schedule of Subsequent Litigation has been tendered to the Conservator. Thereafter, all rights of the Company, its Affiliates, and any Successors under such policies shall be extinguished, except in the form of a counterclaim the Company, its Affiliate, or a Successor may have in litigation initiated by an adverse party.

5. In any Subsequent Litigation, the Claimant shall be entitled to the election of options provided in Articles II through V, including the review of case reserves and claim payments provided in Article VII.

<h3 style="text-align:center">IX.   ADDITIONAL TERMS</h3>

1. The Conservator shall, after consultation with the Company's pre-conservation management, and any other persons he deems appropriate, appoint the Independent Consultant, who shall commence the duties prescribed under this Schedule 2.6 within 60 days of the Rehabilitation Plan's Effective Date.

2. The Independent Consultant shall have the following qualifications:

   a. He or she shall have expertise in the following fields:

      i. Actuarial science as applied to workers' compensation retrospective rating programs; and

      ii. Financial management of a workers' compensation retrospective rating program.

   b. He or she shall be familiar with insurance-industry accounting rules and practices as they apply to the workers' compensation line of business.

   c.  He or she shall be familiar, or able to obtain timely familiarity, with information systems maintained by CIC and containing data required to perform the duties of the Independent Consultant. This expertise may be established by having an identified expert on such systems to whom the Independent Consultant would have demonstrated availability.

   d.  He or she shall, as a part of a firm or firms with which he or she is associated, or by demonstrated availability on a contract basis, have available persons (i) qualified to serve as the Claims Handling Expert and (ii) qualified to serve as the Reserves Expert.

   e.  "Demonstrated availability," as used in this Article, may be established by affirmative representations by the person confirming his or her availability and willingness to perform the duties specified.

3.  The Independent Consultant shall appoint the Reserves Expert, who shall be a Qualified Expert in setting reserves for workers' compensation claims, and the Claims-Handling Expert, who shall be a Qualified Expert in adjusting workers' compensation claims.

4.  The Independent Consultant and every person he or she may appoint or retain to provide services under this Schedule 2.6 shall be a disinterested person satisfying the following criteria.

   a.  Neither he or she, nor any firm in which he or she has an employment position or an ownership interest, shall have provided any services to the Company or an Affiliate in the five years preceding his or her appointment pursuant to this Article. He or she shall agree, as a condition of appointment, not to accept any employment and not to contract for professional services with the Company or an Affiliate for three years following completion of his or her services under this Schedule 2.6.

   b.  Neither he or she, nor any firm in which he or she has an employment position or ownership interest, shall have provided any services to any Claimant, or any person who has provided professional services to a Claimant, in the five years preceding his or her appointment pursuant to this Article. He or she shall agree, as a condition of appointment, not to accept any employment and not to agree to contract for professional services with any Claimant, or any person who has provided legal services to a Claimant, for three years following completion of his or her services under this Schedule 2.6.

5.  Neither the Company nor the Claimant may have any substantive ex parte communications with the Independent Consultant or any person appointed by him to provide services under this Schedule 2.6. Written communications shall reflect that the opposing party (Company or Claimant) received a timely copy of the communication. Oral communications shall be memorialized by an email to the other party, with copy to the Independent Consultant or his or her appointee, summarizing the full substance of the

communication. An adverse party shall be afforded timely opportunity to respond to the substance of such a written or oral communication.

6. The Company and a Claimant may, with the approval of the Independent Consultant, agree to vary the calculations prescribed in Articles III, IV, or V.

7. All costs of the Independent Consultant, the Reserves Expert, and the Claims-Handling Expert shall be paid by the Company until such time as the Company is redomesticated. Thereafter, any such costs shall be paid by the Reinsurer selected pursuant to the Rehabilitation Plan.

8. The Company and any Affiliate or Successor that is a Party or asserts a right against the Claimant arising out of a Policy or RPA will execute a waiver and full release of liability of any Claimant who exercises Option 1, Option 2, or Option 3. The Company and its officers will take all steps necessary to secure the cooperation of any and all Affiliates and Successors from which cooperation may be required for Pending Litigation or Subsequent Litigation to be settled according to the terms of the Rehabilitation Plan and this Schedule 2.6.

# Exhibit A

To the California Insurance Company Rehabilitation Plan

**ASSUMPTION REINSURANCE AND ADMINISTRATION AGREEMENT**

THIS ASSUMPTION REINSURANCE AND ADMINISTRATION AGREEMENT (this "Agreement"), dated as of [_____], 2020, is made by and between CALIFORNIA INSURANCE COMPANY, a California domiciled property and casualty insurance company in conservation ("CIC"), and _____, a/an _____ domiciled property and casualty insurance company (the "Reinsurer").  CIC and the Reinsurer are referred to herein collectively as the "Parties".

WHEREAS, CIC desires to cede, transfer, assign and sell to the Reinsurer all of CIC's right, title and interest in and to the Policies;

WHEREAS, the Reinsurer desires to assume CIC's duties and obligations in connection with, relating to, or arising out of such Policies upon the terms and subject to the conditions set forth herein;

WHEREAS, CIC desires to cede, on an indemnity reinsurance basis, to the Reinsurer, CIC's Policy Liabilities in connection with, relating to and arising out of the Policies, upon the terms and conditions set forth herein;

WHEREAS, the Reinsurer desires to reinsure and assume one hundred percent (100%) of CIC's Policy Liabilities arising under or in connection with the Policies, upon the terms and subject to the conditions set forth herein; and

WHEREAS, in connection with the foregoing, the Superior Court for the County of San Mateo has issued an order approving a Rehabilitation Plan (the "Rehabilitation Plan") that calls for the execution and delivery of this Reinsurance Agreement as of the Closing of the transactions contemplated thereunder;

NOW, THEREFORE, in consideration of the mutual covenants and promises, and upon the terms and conditions hereinafter set forth, the Parties hereto agree as follows.

ARTICLE I
DEFINITIONS

Capitalized terms used in this Agreement and not otherwise defined shall have the meanings given such terms in the Rehabilitation Plan.  For purposes of this Agreement, the following terms shall have the meanings specified below.

"Claims" shall have the meaning set forth in Section 7.03.

"Dispute" shall have the meaning set forth in Section 11.02.

"Disputed Complaint" shall have the meaning set forth in Section 7.05.

"Effective Time" means 11:59 p.m. Pacific Time, on the Closing Date.

"Extra-Contractual Liabilities" means any and all liabilities and obligations of any nature, kind or description for (1) consequential, extra-contractual, tort, bad faith, exemplary, punitive, special or similar damages; and (2) statutory or regulatory damages, fines, penalties, forfeitures, and similar charges of a penal or disciplinary nature.

"GAAP" means generally accepted accounting principles consistently applied throughout the specified period and in a comparable period in the immediately preceding year.

"JAMS" shall have the meaning set forth in Section 11.03.

"Law" means all applicable laws, decisions, rules, regulations, ordinances, codes, statutes, judgments, injunctions, orders, decrees, licenses, permits, policies, administrative interpretations and other requirements of Governmental Authorities.

"Non-Novated Policies" shall have the meaning set forth in Section 2.04.

"Novated Policies" means those Policies transferred to the Reinsurer by novation as of the Novation Date and under which Policies the Reinsurer shall have become the successor to CIC under the Policies as described in Section 2.03.

"Novation Date" shall have the meaning set forth in Section 3.02 hereof.

"Obligations" shall have the meaning set forth in Section 2.01 hereof.

"Policies" means insurance policies issued to California Policyholders or to cover, in whole or in part, employees in California. "Policies" includes (1) all guaranteed-cost workers' compensation and employers' liability insurance policies issued by CIC, and (2) all workers' compensation and employers' liability insurance policies, supplements, endorsements, riders and ancillary agreements in connection therewith, classified by CIC as SolutionOne Profit Sharing or EquityComp, including Reinsurance Participation Agreements entered into by CIC Affiliates but excluding FELA and Jones Act exposures. As used in this Agreement "Policies" includes policies or other agreements that are (1) in effect as of the Effective Time; (2) become effective after the Effective Time, including through (a) the reinstatement of lapsed policies pursuant to provisions therein or of applicable Law, (b) the issuance or renewal thereof by CIC after the Effective Time to honor quotes outstanding as of the Effective Time, or to satisfy renewal rights of employers under contractual provisions or applicable Law, or (c) modifications agreed to by the Reinsurer on behalf of CIC pursuant to the authority granted to the Reinsurer under Section 7.01 of the Reinsurance Agreement; and (3) guaranteed-cost workers' compensation and employers liability insurance policies issued by CIC to California Policyholders that have expired prior to the Closing Date, where the gross liabilities and obligations of CIC arising under or in connection with such policies are unpaid or unperformed as of the Effective Time.

"Policyholder" means (a) any Person that is named as an insured under a Policy, or (b) any Person other than the CIC or an Affiliate of CIC that is named as a party to an RPA issued in conjunction with a Policy.

2

"Policy Liabilities" means CIC's gross liabilities and obligations arising under or in connection with the Policies to the extent the same are unpaid or unperformed on or after the Effective Time, before deduction for all other applicable cessions, if any, under CIC's reinsurance programs.  In addition, the term "Policy Liabilities" shall include:

(a)     all Extra-Contractual Liabilities that arise from any act, error or omission after the Effective Time, whether or not intentional, in bad faith or otherwise, by the Reinsurer or any of its affiliates, or any of their respective officers, employees, agents or representatives relating to the Policies, and any attorneys' fees incurred by the Reinsurer or CIC related to such Extra-Contractual Liabilities;

(b)     all liabilities and obligations for premium taxes arising on account of any premiums with respect to the Policies allocable to coverage after the Effective Time;

(c)     all liabilities and obligations for returns or refunds of premiums (irrespective of when due) under the Policies;

(d)     any assessment required by any insurance guaranty, insolvency, or other similar fund maintained by California relating to the Policies assessed or imposed on the basis of premium for coverage after the Effective Time;

(e)     all liabilities and obligations for commission payments and other compensation, if any, due and payable with respect to the Policies to or for the benefit of agents and brokers to the extent that such amount accrues after the Effective Time; and

(f)     any obligation arising as a result of the Reinsurer's failure to perform its obligations pursuant to Section 7.07.

"SAP" means statutory accounting principles prescribed or permitted by the CDI consistently applied throughout the specified period and in the comparable period in the immediately preceding year in connection with the preparation of the statutory financial statements of CIC.

"Services" shall have the meaning set forth in Section 7.02.

## ARTICLE II
## BUSINESS TRANSFERRED AND REINSURED

Section 2.01.  Assignment of Policies.  As of the Effective Time (1) except as is otherwise provided in Section 5.01 below, CIC hereby cedes, transfers, assigns and sells to the Reinsurer all of CIC's right, title and interest in the Policies identified in Schedule 2.01 attached hereto and made a part hereof, and delegates to the Reinsurer all of CIC's duties and obligations of performance and payment under the Policies arising after the Effective Time, and (2) the Reinsurer hereby accepts, assumes and agrees to perform all of CIC's duties and obligations, whether direct, indirect, contingent, unliquidated, unmatured or otherwise arising after the

3

Effective Time (collectively, "Obligations"), in connection with, relating to, or arising out of the Policies.

Section 2.02.  Novation.  As soon as practicable after the Effective Time, the Conservator and the Reinsurer shall each use their commercially reasonable efforts to effect the assumption by novation by the Reinsurer of the Policies (each such Policy being referred to herein as a "Novated Policy" and Novated Policies shall include any such subsequently novated Policies). If the Reinsurer does not for any reason assume by novation any Policy, then the Reinsurer shall assume, accept and reinsure, on an indemnity reinsurance basis, 100% of the Policy Liabilities related to such Non-Novated Policies in accordance with the terms and conditions of this Agreement.

Section 2.03.  Direct Obligations. To the extent that the Reinsurer assumes by novation any Policies under applicable Law, as of the Novation Date (1) the Reinsurer shall be the successor to CIC under such Novated Policies as if such Novated Policies were direct obligations originally issued by the Reinsurer and the Reinsurer shall be responsible for the performance of all obligations and the payment of all benefits and amounts due under the Novated Policies in accordance with their terms; (2) the Reinsurer shall be substituted in the place and stead of CIC, and each policyholder under any such Novated Policy shall disregard CIC as a party thereto and treat the Reinsurer as if it had been originally obligated thereunder except as otherwise provided herein; (3) CIC shall be released of all liability with respect to such Novated Policies; (4) the Policyholders under such Novated Policies shall have the right to file claims arising under such Novated Policies directly with the Reinsurer and shall have a direct right of action for indemnification, benefits and services under such Novated Policies against the Reinsurer, and the Reinsurer hereby consents to be subject to any such direct action taken by any such Policyholder; and (5) if the Reinsurer is an Affiliate of CIC, the Policies and Policy Liabilities reinsured and assumed pursuant to this Agreement shall be administered by an independent third-party administrator as provided in Section 2.2 of the Rehabilitation Plan, including adjustment and payment of claims and setting of loss reserves until all Policies and Policy Liabilities reinsured and assumed hereunder have been fully discharged and extinguished.

Section 2.04.  Indemnity Reinsurance.  Effective as of the Effective Time, CIC shall cede to the Reinsurer, and the Reinsurer shall assume from CIC on an indemnity reinsurance basis, 100% of the Policy Liabilities under all Policies that are identified in Schedule 2.01 attached hereto and made a part hereof which the Reinsurer has not for any reason (including the lack of any required approval or consent of a Policyholder under a Policy) as of the Effective Time assumed by novation (each such Policy being referred to herein as a "Non-Novated Policy"). It is understood and agreed that the Policyholders shall have the right to file claims arising under such Non-Novated Policies directly with the Reinsurer and shall have a direct right of action for indemnification, benefits and services under such Non-Novated Policies against the Reinsurer, and the Reinsurer hereby consents to be subject to any such direct action by any such policyholders. Notwithstanding the foregoing, the term "Non-Novated Policy" shall not include any Policy from and after the date of its assumption by novation at any time by the Reinsurer.

Section 2.05.  Policy Liabilities.  The Reinsurer  accepts, reinsures, and assumes the

4

Policies and Policy Liabilities subject to any and all defenses, setoffs, and counterclaims to which CIC would be entitled with respect to the Policy Liabilities, it being expressly understood and agreed by the Parties hereto that no such defenses, setoffs, or counterclaims are or shall be waived by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, and that the Reinsurer is and shall be fully subrogated in and to all such defenses, setoffs, and counterclaims.  From and after the Effective Time, as among the Parties, the Reinsurer shall bear and shall have responsibility for paying or performing all Policy Liabilities. The Policy Liabilities ceded under this Agreement shall be subject to any changes required by Law and the same rates, terms, conditions, waivers, interpretations, modifications and alterations as the Policies.

ARTICLE III
ASSUMPTION CERTIFICATES; OPTION LETTERS

Section 3.01.  Notification Materials.  The Conservator shall prepare and deliver a Notice of Transfer and Certificate of Assumption together with those notices and materials substantially in the form set forth in Exhibit A attached hereto (collectively, the "Notification Materials"), which shall inform each Policyholder to a Policy of the proposed transfer, assumption and novation of such Policy.  The Conservator shall prepare the Notification Materials for inclusion in the Notification Package as soon as feasible, but no later than 10 days after the Effective Date of the Rehabilitation Plan.

Section 3.02.  Mailing.  No assumption by novation of a Policy shall take effect until the earlier of the acceptance of the assumption by the Policyholder to a Policy or thirty (30) days (or such other period, if any, as may be required by applicable Law) (the "Novation Date") after the Notification Materials have been mailed to each Policyholder.

Section 3.03.  Expenses.  All expenses incurred by the Parties hereto to prepare and mail the Notification Materials pursuant to this Article shall be the exclusive responsibility of CIC.

ARTICLE IV
TERM

Section 4.01.  Term.  This Agreement shall remain in force and effect until all Policy Liabilities reinsured and assumed by Reinsurer have been discharged in full, or all Policies are transferred and assumed by the Reinsurer by novation and all obligations of the Reinsurer hereunder have been fully discharged and extinguished.

ARTICLE V
CONSIDERATION

Section 5.01.  Consideration to the Reinsurer.  The Reinsurer shall be entitled to all premium, premium adjustments and other consideration allocable to coverage provided by the Policies after the Effective Time (irrespective of when due) received by CIC or the Reinsurer with respect to the Policies. In the event that CIC receives any premium or other consideration with

5

respect to a Policy allocable to coverage after the Effective Time, CIC shall promptly remit such premiums and other consideration to the Reinsurer along with all pertinent information pertaining thereto including the nature of the payment, source of funds, policy number and period to which it relates. In the event that the Reinsurer receives any premium or other consideration with respect to a contractual liability or contractual obligation arising under a Policy paid or performed by CIC prior to the Effective Time, the Reinsurer shall promptly remit such premiums and other consideration to CIC along with all pertinent information pertaining thereto including the nature of the payment, source of funds, policy number and period to which it relates.

Section 5.02.  Application of Future Consideration.  Any premium, premium adjustments and other consideration received and retained by the Reinsurer pursuant to Section 5.01 shall be applied by the Reinsurer to the oldest unpaid obligations or outstanding invoices relating to the period after the Effective Time.

Section 5.03.  Additional Consideration for Indemnity Reinsurance.  As additional consideration for the assumption by Reinsurer of the Policy Liabilities, CIC shall (1) transfer to Reinsurer as of the Effective Time CIC's right, title and interest to admitted assets of CIC free and clear of any Liens, having a net admitted asset value determined in accordance with SAP equal to CIC's net unearned premium reserve, loss, and loss adjustment expense (including losses that have been incurred but not reported) reserve, if any, attributable to claims arising under the Policies prior to the Effective Time; (2) assign to Reinsurer as of the Effective Time CIC's right, title and interest to all collateral posted by any CIC Policyholder pursuant to the terms of the Policies and maintained by CIC or an Affiliate of CIC to secure the obligations of the Policyholders under the Policies; and (3) assign to Reinsurer any amounts due to CIC under any reinsurance agreements in effect on or after the Effective Time including any renewals or extensions thereof, between CIC and any reinsurer (other than the Reinsurer) relating to the Policy Liabilities assumed by the Reinsurer under this Agreement.  All recoveries by CIC from reinsurers other than the Reinsurer, to the extent such reinsurance agreements, treaties and contracts provide reinsurance coverage for the Policy Liabilities shall be paid promptly by CIC to the Reinsurer.

Section 5.04.  Statutory Workers' Compensation Deposits.  Effective as of the Effective Time, if the Reinsurer is an Affiliate of CIC, CIC shall assign and transfer to the Reinsurer the cash instruments or approved interest-bearing securities or approved stocks readily convertible into cash, investment certificates or such other assets authorized by Insurance Code section 11691 in an amount no less than the reserves required of CIC to be maintained under Insurance Code section 11550 et seq. relating to loss reserves on workers' compensation business of CIC in California as of the Closing Date, no less than the sum of the amounts specified in Insurance Code section 11693(a), whichever is greater.   If the Reinsurer is not an Affiliate of CIC, as of the Effective Time, the Reinsurer shall establish the statutory Workers' Compensation Deposit required under California Law in the amount required by Insurance Code.

6

ARTICLE VI
ACCOUNTING AND SETTLEMENT

Section 6.01.  Accounting Reports.  On or before the last Business Day of each month, the Reinsurer shall provide CIC with reports of activities under this Agreement with respect to the Policies for the preceding month showing any amounts due CIC or the Reinsurer, as the case may be, as reimbursement for paid claims, premiums or other amounts due with respect to the Policies and any information required by the Statement of Statutory Accounting Principles, as amended, of the National Association of Insurance Commissioners. On or before the last Business Day of January, April, July and October, the Reinsurer shall provide CIC with quarterly reports or an annual report of such activities as appropriate.

Section 6.02.  Financial Statement Information. The Reinsurer and CIC shall each provide the other with the financial, accounting and actuarial information necessary to prepare SAP regulatory, tax and GAAP monthly, quarterly and annual financial statements and returns and satisfy other requirements including reserve and related calculations regarding the Policies in the form reasonably required by the Reinsurer and CIC.  CIC and the Reinsurer shall agree to mutually acceptable procedures and time schedules for the transmission and receipt of such information.

Section 6.03.  Settlements. Within ten (10) Business Days after delivery of each monthly report, the Reinsurer and CIC shall settle on an estimated basis, all amounts then due under this Agreement for that month. The Reinsurer and CIC shall make a final settlement of all amounts due for each calendar year within twenty (20) Business Days after the delivery of the annual report referred to in Section 6.01 hereof.

Section 6.04.  Net Payment Basis. Amounts payable under this Agreement by the Parties hereto shall be settled against each other, dollar for dollar, and only a net payment shall be due; provided, however, that no balance or amount due by the Parties under any other agreement shall be offset against any obligation arising under this Agreement.

Section 6.05.  Late Payments.  If any payment due either Party is received by the other Party more than sixty (60) days after the due date for such payment under this Agreement, interest shall accrue from the date on which such payment was due (taking into account the provisions of Section 6.06 hereof) until payment is received by the Party entitled thereto, at an annual rate equal to the Bank of America Reference Rate quoted for six-month periods as reported in The Wall Street Journal on the first Business Day of the month in which such payment first becomes due.

Section 6.06.  Federal Funds.  All settlements in accordance with this Agreement shall be made by wire transfer of immediately available funds on the due date, or if such day is not a Business Day, on the next day which is a Business Day. Payment may be made by check payable in immediately available funds in the event the Party entitled to receive payment has failed to provide wire transfer instructions.

Section 6.07.  Reports to Governmental Authorities.  During the term of this Agreement,

7

the Reinsurer and CIC shall promptly furnish each other copies of any and all filings with, and reports or communications received from, any Governmental Authority which relates directly and materially to the Policies, including, without limitation, each annual statement, each quarterly financial report to the Governmental Authority of the Party's domicile having principal jurisdiction over the Party and each report on periodic examination issued by such Governmental Authority to the extent it relates to the Policies.

ARTICLE VII
POLICY ADMINISTRATION; REPORTING

Section 7.01.  Administration of Policies. The Reinsurer, or, if the Reinsurer is an Affiliate of CIC, an independent third-party administrator appointed by the Conservator of CIC as provided in Section 2.2 of the Rehabilitation Plan, shall administer the Policies and Policy Liabilities reinsured and assumed by Reinsurer pursuant to this Agreement including adjustment and payment of claims and setting of loss reserves with respect to all Policies and Policy Liabilities reinsured and assumed hereunder until all Policies and Policy Liabilities reinsured and assumed pursuant to this Agreement have been fully discharged and extinguished. Without limiting the foregoing, the Reinsurer or the third party administrator on behalf of the Reinsurer, shall provide reasonable advance notice to CIC of its intent to cancel specific Policies for non-payment of premium. Unless CIC objects to the proposed cancellations within five calendar days of receipt of the notice from the Reinsurer or the third party administrator, the Reinsurer or the third party administrator on behalf of Reinsurer shall have the right to cancel the referenced Policies for non-payment of premium in a manner consistent with applicable Law. If CIC objects to the proposed cancellation of any Policy for non-payment of premium, CIC shall indemnify the Reinsurer for any unpaid premium with respect to any such Policy until such Policy is cancelled.

Section 7.02.  Administration.  The Reinsurer or a third-party administrator on behalf of the Reinsurer shall, at the Reinsurer's expense, provide the technical and administrative service, assistance and support functions described in Schedule 7.02 attached hereto (the "Services") reasonably necessary or appropriate for the proper management and administration of the Policies, which shall include, but not be limited to, the Services required for the proper administration of the Policies prior to the Effective Time and not performed as of the Effective Time. The Services by Reinsurer or a third-party administrator on behalf of the Reinsurer shall at all times be consistent with applicable Law, regulatory actions, and pronouncements.

Section 7.03.  Claims Payment Instructions. The Reinsurer or a third-party administrator on behalf of the Reinsurer, as appropriate, at the expense of the Reinsurer, shall administer and process all payments to injured workers for covered claims under the Policies (the "Claims") in conformance with applicable Law, including review, investigation, adjustment, settlement, defense and payment of Claims, special investigation and anti-fraud compliance, and preparation of any report required concerning the foregoing Services and will, in connection with such Claims administration, retain, at its sole discretion, any outside investigation firms, adjusters, attorneys or other professionals that the third party administrator or Reinsurer, as appropriate, deems necessary in the adjustment of such Claims.

8

Section 7.04.  Communications Relating to Policies.  On and after the Effective Time, CIC shall forward promptly to the Reinsurer all notices and other written communications it receives relating to the Policies (including all inquiries or complaints from state insurance regulators, agents, brokers and policyholders and all notices of claims, suits and actions for which it receives service of process). CIC shall be entitled to retain copies of all such materials.

Section 7.05. Complaint Handling Procedure. The Parties shall cooperate with each other in providing information necessary to respond to any inquiries and complaints concerning the Policies.  All inquiries and complaints concerning the Policies received by CIC shall be forwarded immediately by email, facsimile or overnight mail to a contact person designated by the Reinsurer for reply.  After consultation with CIC, except as provided below, the Reinsurer shall answer all inquiries and complaints received by it concerning the Policies. If the Reinsurer and CIC disagree as to the appropriate response to an inquiry or complaint, CIC shall be entitled to assume, at its own expense, the control of the handling of the response to such inquiry or complaint (a "Disputed Complaint"), including employment of counsel.  CIC shall apprise the Reinsurer of and consult with the Reinsurer with respect to the progress of a Disputed Complaint.  In exercising such control, CIC shall act in good faith with respect to similar inquiries or complaints. Any payment arising out of a Disputed Complaint controlled by CIC, to the extent such payment constitutes an Extra-Contractual Liability, shall be added to the Policy Liabilities and shall be unconditionally binding on the Reinsurer; provided, however, that if CIC receives an offer of settlement or compromise from the other parties to a Disputed Complaint for a specific amount or obtains a commitment from such other parties that they would accept a compromise or settlement requiring only the payment of a specific amount, the granting of an appropriate release or similar accommodation, and CIC, after mandatory consultation with and over the objection of the Reinsurer, refuses to consent thereto and elects to continue to dispute or otherwise pursue such Disputed Complaint, then the liability of the Reinsurer with respect to such Disputed Complaint shall be deemed limited to that amount including expenses for which CIC would have been liable if such compromise and settlement had been accepted by CIC.  Upon answering such inquiries or complaints, the Reinsurer shall furnish CIC with a copy of the complaint file.  The Reinsurer shall be solely responsible for maintaining any complaint files, complaint registers or other reports of any kind, that are required to be maintained under applicable Law.

Section 7.06. Filings.  The Reinsurer shall be responsible for all compliance and regulatory matters relating to the administration of the Policies, including monitoring changes in applicable Law, filing and refiling forms and rates, and preparing and filing all reports and other filings required by applicable Law. The Reinsurer shall provide to CIC copies of all reports and filings with respect to the Policies required to be made with any Governmental Authority.

Section 7.07.  Communications Relating to Policies.  On and after the Effective Time, CIC shall forward promptly to the Reinsurer all notices and other written communications received by it relating to the Policies (including all inquiries or complaints from Governmental Authorities, agents, brokers and insureds and all notices of claims, suits and actions for which it receives service of process). CIC shall be entitled to retain copies of all such materials.

Section 7.08.  Inspection.  Each Party hereto and its respective authorized representatives

9

shall have the right, upon prior written notice, at reasonable times during normal business hours, to inspect and review all books, records, accounts, reports, tax returns, files and information  of the other party hereto reasonably relating to this Agreement.  The Parties shall keep all non-public information received from the other Party strictly confidential, and unless otherwise required by applicable Law or Governmental Authority, shall not disclose any of the same without obtaining the prior approval of the Party providing the information.  The rights of the Parties under this Section 7.08 shall survive termination of this Agreement.

ARTICLE VIII
REGULATORY APPROVALS; STATEMENT CREDIT

Section 8.01.  Regulatory Approvals. The consummation of this Agreement and the transactions contemplated hereby are expressly contingent upon and subject to obtaining any and all such approvals and consents as may be required by applicable Law, regulation, or from the Conservation Court and any Governmental Authority. No provision in this Agreement shall be deemed to require any Party hereto to take any action prohibited by applicable Law, regulation, or Governmental Authority. The form of any application for any such approvals or consents as may be required by applicable Law, regulation, or Governmental Authority shall be approved by CIC and the Reinsurer prior to the filing of any such application.

Section 8.02.  Statement Credit. The Reinsurer shall at its own expense take all actions reasonably necessary to permit CIC to obtain full financial statement credit in all applicable jurisdictions for the reinsurance provided to it by the Reinsurer and the assumptions by novation pursuant to this Agreement, including, if necessary, posting acceptable security.

ARTICLE IX
INDEMNIFICATION

Section 9.01.  Indemnification by the Reinsurer. The Reinsurer shall indemnify, defend and hold CIC harmless from and against all Policy Liabilities and all losses, liabilities, claims, damages and expenses (including reasonable attorneys' fees and expenses) that are based upon or arise out of the breach of any obligation of the Reinsurer provided for in this Agreement.

Section 9.02.  Indemnification by CIC.  CIC shall indemnify the Reinsurer against, and hold Reinsurer harmless from, all losses, liabilities, claims, damages and expenses (including reasonable attorneys' fees and expenses) that are based upon or arise out of the breach of any obligation of CIC provided for in this Agreement.

ARTICLE X
INSOLVENCY

Section 10.01.  Payments by the Reinsurer.  With respect to any Policy, the Reinsurer hereby agrees that all amounts due under this Agreement with respect to the Policies shall be payable by the Reinsurer to any conservator, liquidator, or statutory successor of CIC on the basis

10

of the claims allowed against CIC by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of CIC having authority to allow such claims, without diminution because of that insolvency; or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims. Payments by the Reinsurer as set forth in this Section 10.01 shall be made directly to CIC or to its conservator, liquidator, or statutory successor, except where the Policy specifically provides another payee of such reinsurance in the event of the insolvency of CIC.

Section 10.02.  Claims.  It is agreed that in the event of the insolvency of CIC, the liquidator, receiver or other statutory successor of CIC shall give prompt written notice to the Reinsurer of the pendency or submission of a Claim under the Policies reinsured and assumed hereunder. During the pendency of such claim, the Reinsurer may investigate such Claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense available to CIC or its receiver. The expense thus incurred by the Reinsurer is chargeable against CIC, subject to any court approval, as a part of the expense of insolvency, liquidation, or rehabilitation to the extent of a proportionate share of the benefit which accrues to CIC solely as a result of the defense undertaken by the Reinsurer.

Section 10.03.   Amounts Due under the Policies. All amounts due under the Policies shall be payable by the Reinsurer on the basis of the liability of the Reinsurer under the Policies, without diminution because of the insolvency of CIC. Any benefits or amounts due to insureds with respect to a Policy shall be paid or performed by the Reinsurer in accordance with the Policy.

ARTICLE XI
ARTICLATION

Section 11.01.  Conciliation.  If a dispute between the Parties relating to this Agreement is not resolved within ten (10) Business Days from the date that a Party has notified the other Party that such dispute exists, then such dispute shall be submitted on the next Business Day for conciliation to a senior executive officer or his or her designee of each Party. If such senior executive officers are unable to resolve the dispute within fifteen (15) Business Days from the date that it is first presented to them, then such dispute shall be referred to binding arbitration.

Section 11.02.  Arbitration.  In the event of any dispute between the Parties hereto relating to, arising out of, or in connection with any provision of this Agreement (hereinafter a "Dispute"), the Parties to this Agreement and their representatives, designees, successors and assigns agree that any such Dispute shall be settled by binding arbitration to take place in California.

Section 11.03.  Appointment of Arbitrator. Any arbitration hereunder shall be conducted by a single arbitrator chosen from the panel of arbitrators of the Judicial Arbitration & Mediation Services ("JAMS") with experience and expertise in the workers' compensation insurance business.  If a JAMS arbitrator with specific experience in the workers' compensation insurance business is not available, the arbitrator must have general experience in the property and casualty insurance industry. Within ten (10) days of notice of a Dispute from CIC to Reinsurer or notice from Reinsurer to CIC, CIC and Reinsurer shall use their best efforts to choose a mutually

11

agreeable arbitrator. If CIC and the Reinsurer cannot agree on an arbitrator, the arbitrator shall promptly be selected by JAMS.

Section 11.04.  <u>Procedures</u>.  The Party submitting a Dispute to arbitration hereunder shall present its case to the arbitrator and the other Party hereto in written form within twenty (20) days after the appointment of the arbitrator. The other Party hereto shall then have twenty (20) days to submit a written response to the arbitrator and the original party who submitted the Dispute to arbitration. After timely receipt of each Party's case, the arbitrator shall have twenty (20) days to render his or her decision.

Section 11.05.  <u>Judicial Formalities</u>.  The arbitrator is relieved from judicial formalities and, in addition to considering the rules of law, the limitations contained in this Agreement and the customs and practices of the workers' compensation insurance industry, shall make his or her award with a view to effectuating the intent of this Agreement.

Section 11.06.  <u>Decisions Final</u>. The decision of the arbitrator shall be final and binding upon the Parties, and judgment may be entered thereon in a court of competent jurisdiction.

Section 11.07.  <u>Costs</u>.  Each Party shall bear its own cost of arbitration, and the costs of the arbitrator shall be shared equally by the Parties.

Section 11.08.  <u>Equitable Relief</u>.  <u>Sections 11.01</u> and <u>11.02</u> shall not apply to any claim for equitable relief, including, without limitation, claims for specific performance, a preliminary injunction, or a temporary restraining order.  Such claims shall be submitted to a court of competent jurisdiction, and neither Party shall be required to post any bond or other security. If a Party chooses to pursue equitable relief, such conduct shall not constitute a waiver of, or be deemed inconsistent with, the arbitration provisions set forth in this <u>Article XI</u>.  Once the claims for equitable relief are finally decided, any and all remaining claims shall be submitted to arbitration pursuant to <u>Section 11.02</u> and the arbitrator shall be bound by the findings and rulings of the court on the claims for equitable relief.

Section 11.09.  <u>Survival of Article</u>.  This <u>Article XI</u> shall survive termination of this Agreement.

ARTICLE XII
<u>MISCELLANEOUS</u>

Section 12.01.  <u>Notices</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered by hand by certified process server, certified or registered mail (postage prepaid and return receipt requested), by a nationally recognized overnight courier service (appropriately marked for overnight delivery) or by facsimile (with request for immediate confirmation of receipt in a manner customary for communications of such respective type). Notices shall be effective upon receipt and shall be addressed as follows:

12

If to the Reinsurer:

      with a copy to:


If to the Commissioner, the Conservator or CIC, to:

          California Insurance Company in Conservation
          c/o Conservation & Liquidation Office
          100 Pine Street, 12th Floor
          San Francisco, CA 94111
          Attention: Joe Holloway, CEO

      with copies to:

          California Department of Insurance
          1901 Harrison Street, 6th Floor
          Oakland, CA 94612
          Attention: Kenneth B. Schnoll, Esq.

          Orrick, Herrington & Sutcliffe LLP
          400 Capitol Mall, Suite 300
          Sacramento, CA 95814-4407
          Attention: Cynthia Larson, Esq.

          10805 Old Mill Road
          Omaha, NE 68154
          Attention: Jeffrey A. Silver

          DLA Piper, LLP
          555 Mission Street, Suite 2400
          San Francisco, CA 94105
          Attention: Shand S. Stephens, Esq

All notices and other communications required or permitted under the terms of this Agreement that are addressed as provided in this Section shall (i) if delivered personally or by overnight express, be deemed given upon delivery; (ii) if delivered by facsimile transmission, be deemed given when electronically confirmed; and (iii) if sent by registered or certified mail, be deemed given when received. Any Party from time to time may change its address for notice purposes by giving a similar notice specifying a new address, but no such notice shall be deemed to have been given until it is actually received by the party sought to be charged with the contents thereof.

      Section 12.02.  <u>Entire Agreement</u>.  This Agreement (including the Exhibits and Schedules hereto) and the Transaction Documents contain the entire agreement and understanding among the Parties with respect to the transactions contemplated hereby, and supersedes all prior agreements

13

and understandings, written or oral, with respect thereto.

Section 12.03.  <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each of the Parties hereto shall pay its own costs and expenses incident to preparing for, entering into and carrying out this Agreement and the consummation of the transactions contemplated hereby.

Section 12.04.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.

Section 12.05.  <u>No Third-Party Beneficiary</u>.  Except as otherwise specifically provided in this Agreement, nothing in this Agreement is intended or shall be construed to give any person, other than the Parties hereto, their successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provisions contained herein.

Section 12.06.  <u>Amendment</u>.  This Agreement may only be amended or modified by a written instrument executed on behalf of the Parties hereto and any such amendment shall be subject to receipt of any and all consents, approvals, permits and authorizations required to be obtained from Governmental Authorities.

Section 12.07.  <u>Assignment; Binding Effect</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by either of the Parties hereto without the prior written consent of the other Party, and any such assignment that is attempted without such consent shall be null and void. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and permitted assigns.

Section 12.08.  <u>Invalid Provisions</u>.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future Law, and if the rights or obligations of the Parties under this Agreement will not be materially and adversely affected thereby, (a) such provision shall be fully severable; (b) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; and (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.

Section 12.09.  <u>Duty of Cooperation</u>. Each Party hereto shall cooperate fully with the other party hereto in all reasonable respects in order to accomplish the objectives of this Agreement.

Section 12.10.  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Law of the State of California.

Section 12.11.  <u>Waiver</u>.  Any term or condition of this Agreement may be waived in

writing at any time by the Party that is entitled to the benefit thereof. A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach or nonfulfillment on a future occasion.  All remedies, either under the terms of this Agreement, or by Law or otherwise afforded, shall be cumulative and not alternative, except as otherwise provided by Law.

Section 12.12.  <u>Errors and Omissions</u>.  Inadvertent delays, errors or omissions that occur or are made in connection with the transactions contemplated by this Agreement shall not relieve any Party from any liability that would have attached had such delay, error or omission not occurred, provided that such error or omission is rectified by the Party making such error or omission as soon as possible after discovery thereof and such error or omission does not prejudice any other Party.

Section 12.13.  <u>Interpretation</u>.  For purposes of this Agreement, the terms "<u>hereof</u>", "<u>herein</u>", "<u>hereto</u>", "<u>hereunder</u>", and derivative or similar words refer to this Agreement (including the exhibits hereto) as a whole unless otherwise indicated. Whenever the words "<u>include</u>", "<u>includes</u>" or "<u>including</u>" are used in this Agreement, they shall be deemed to be followed by the words "<u>without limitation</u>".  Whenever the singular is used herein, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate. The headings used in this Agreement have been inserted for convenience and do not constitute matter to be construed or interpreted in connection with this Agreement.

Section 12.14.  <u>Business Associate</u>.  In performing functions, activities, or services for, or on behalf of CIC involving the use or disclosure of Protected Health Information, as that term is defined in 45 CFR 164.501, the Reinsurer shall comply with the Business Associate Addendum set forth in <u>Schedule 12.14</u> hereto.

IN WITNESS WHEREOF, CIC and the Reinsurer have each executed this Agreement as of the date first written above.

CALIFORNIA INSURANCE COMPANY

By:_____

[REINSURER]

By:_____

15

16

SCHEDULE 2.01

**CALIFORNIA INSURANCE COMPANY POLICIES**

The Policies identified by contract number:

17

SCHEDULE 7.02
**SERVICES**

The Reinsurer, or the third-party administrator on behalf of the Reinsurer shall perform, consistent with applicable Law and the terms of the Policies, all services reasonably necessary for, and incident to the proper management and administration of, the Policies, including but not limited to the following services:

A.      All policyholder services relating to the Policies including the following:

    1.      Billing and collection of premiums for Policies;

    2.      Setting renewal rates for the Novated Policies in a manner consistent with the rates and rating plans filed by CIC with applicable Governmental Authorities;

    3.      Handle policyholder service requests (including adding new employees to Policies, deleting insureds from Policies), inquiries and complaints relating to the Policies;

    4.      Preparation and mailing of premium notices on a timely basis to policyholders of the Policies; transmission of additional premium notices, lapse notices, reinstatement offers and other notices to policyholders of the Policies;

    5.      Underwriting and processing of any and all policy changes and reinstatements;

    6.      Policyholder mailings of any necessary endorsements or other contract documents;

    7.      Preparation of quarterly financial statement data (within ten (10) Business Days after the end of a calendar quarter) and annual financial statement data (within thirty-five (35) calendar days after the end of the calendar year), for inclusion in CIC's financial statements;

    8.      Administration of any agreement providing for the payment of commissions relating to any Policy; and

    9.      Development, as necessary, and maintenance of computer systems required to provide the Services.

SCHEDULE 12.14

## BUSINESS ASSOCIATE ADDENDUM

This Business Associate Addendum (the "Addendum") supplements and is made a part of the Assumption Reinsurance and Administration Agreement (the "Agreement") by and between California Insurance Company ("CIC'') and _____, a/an _____ domiciled property and casualty insurance company (the "Reinsurer"), and is effective as of the effective date of the Agreement.

Recitals

A.   CIC may disclose certain information to the Reinsurer pursuant to the terms of the Agreement, some of which may constitute Protected Health Information, as defined below.

B.   The parties intend to protect the privacy and provide for the security of Protected Health Information in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-191 ("HIPAA") and the regulations promulgated thereunder by the U.S. Department of Health and Human Services (the "HIPAA Regulations") and other applicable laws.

C.   The purpose of this Addendum is to satisfy certain standards and requirements of HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR 164.502(e) and 45 CFR 164.504(e).

In consideration of the mutual promises below and the exchange of information pursuant to the Agreement and this Addendum, the parties agree as follows:

1.   Definitions

(a)   "Business Associate" means the Reinsurer to the extent it performs functions, activities, or services for, or on behalf of, CIC pursuant to the Agreement involving the use or disclosure of Protected Health Information.

(b)   "Covered Entity" means CIC.

(c)   "Privacy Rule" means the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.

(d)   "Protected Health Information" has the same meaning as the term "protected health information" in 45 CFR 164.501, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

(e)   Capitalized terms used but not otherwise defined in this Addendum have the same meaning as those terms in the Privacy Rule.

19

2.      Obligations and Activities of Business Associate

(a)     Business Associate shall not use or disclose Protected Health Information other than as permitted or required by this Addendum or as Required By Law.

(b)     Business Associate shall use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by the Agreement and this Addendum.

(c)     Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

(d)     Business Associate shall report to Covered Entity any use or disclosure of the Protected Health Information not provided for by this Addendum of which it becomes aware.

(e)     Business Associate shall ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity agrees to the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

(f)     Business Associate shall provide access, at the request of Covered Entity, and in the time and manner designated by Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR 164.524.

(g)     Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by Covered Entity.

(h)     Business Associate agrees to make its internal practices, books, and records, including policies and procedures, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(i)     Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

(j)     Business Associate agrees to provide to Covered Entity, in the time and manner

20

designated by Covered Entity, information collected in accordance with Section (2)(i) of this Addendum, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information  in accordance with 45 CFR 164.528.

3.   Permitted Uses and Disclosures by Business Associate General Use and Disclosure Provisions

Except as otherwise limited in this Addendum, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Covered Entity.

4.    Specific Use and Disclosure Provisions

(a)   Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate.

(b)   Except as otherwise limited in this Addendum, Business Associate may disclose Protected Health Information for the proper management and administration of Business Associate, provided that disclosures are Required By Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person (which purpose shall be consistent with the limitations imposed by this Addendum) and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(c)   Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information to provide Data Aggregation services to Covered Entity as permitted by 42 CFR 164.504(e)(2)(i)(B).

(d)   Business Associate may use Protected Health Information to report violations of Law to appropriate Federal and State authorities, consistent with 45 CFR 164.502G)(l).

5.   Obligations of Covered Entity Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions

(a)   Covered Entity shall notify Business Associate of any limitation in its notice of privacy practices in accordance with 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of Protected Health Information.

(b)   Covered Entity shall notify Business Associate of any changes in, or revocation of,

21

permission by an Individual to use or disclose Protected Health Information, to the extent that such changes may affect Business Associate's use or disclosure of Protected Health Information.

(c)     Covered Entity shall notify Business Associate of any restriction on the use  or disclosure of Protected Health Information that Covered Entity has agreed to in accordance with 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of Protected Health Information.

(d)     Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Covered Entity, except as permitted by Sections 4(b) and 4(c) of this Addendum.

6.     Term and Termination

(a)     This Addendum shall be effective as of the effective date of the Agreement, and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

(b)     Upon Covered Entity's knowledge of a material breach of this Addendum by Business Associate, Covered Entity shall either: (i) provide an opportunity for Business Associate to cure the breach or end the violation and terminate this Addendum, and the provision for performance of functions, activities, or services for, or on behalf of Covered Entity under the Agreement, if Business Associate does not cure the breach or end the violation within the time specified by Covered Entity; (ii) immediately terminate this Addendum, and the provision for performance of functions, activities, or services for, or on behalf of Covered Entity under the Agreement, if Business Associate has breached a material term of this Addendum and cure is not possible; or if neither termination nor cure is feasible, report the violation to the Secretary.

(c)     Effect of Termination.

(i)     Except as provided in paragraph (ii) of this section, upon termination of this Addendum, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, and shall retain no copies of the Protected Health Information. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate.

(ii)     In the event that Business Associate determines that returning or destroying

22

the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Addendum to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

7.   Miscellaneous

(a)   <u>Regulatory References</u>.  A reference in this Addendum to a section in the Privacy Rule means the section as in effect or as amended.

(b)   <u>Amendment</u>. The Parties agree to take such action as is necessary to amend this Addendum from time to time as is necessary for Covered Entity to comply with the requirements of the Privacy Rule and the HIPAA.

(c)   <u>Survival</u>. The respective rights and obligations of Business Associate under Section 6(c) of this Addendum shall survive the termination of this Addendum.

(d)   <u>Interpretation</u>. The provisions of this Addendum shall prevail over any provisions in the Agreement that may conflict with or appear inconsistent with any provision of this Addendum. Any ambiguity in this Addendum shall be resolved to permit Covered Entity to comply with the Privacy Rule.

EXHIBIT A

**NOTIFICATION MATERIALS**

NOTICE OF TRANSFER

Dear Policyholder:

This notifies you of an agreement reached between California Insurance Company ("CIC") and _____, a/an _____ domiciled property and casualty Insurance Company ("Reinsurer"), for the transfer of your California workers' compensation insurance policy from CIC to Reinsurer. This assumption will be effective as of 12:01 a.m. Pacific Time, on _____, 2020.  Your policy is being transferred from CIC to Reinsurer pursuant to the terms and subject to the conditions set forth in a Rehabilitation Plan relating to the conservation of CIC and as ordered by the Conservation Court supervising the conservation of CIC.

The Reinsurer is authorized to provide workers' compensation insurance in California. To introduce you to the Reinsurer, attached is a summary of essential information about Reinsurer.

Your rights as a policyholder and the terms of your policy will not change as a result of the transfer.  Additionally, your benefits will not change as a result of the transfer. Upon the effective date of the policy transfer, Reinsurer will provide your coverage.  It will have direct responsibility for the payment of all claims and benefits and for all other policy obligations.

You have the following options with regard to the assumption of your policy:

> Option 1.  Accept the transfer of your policy from CIC to Reinsurer.
>
> Option 2.  Object to the Rehabilitation Plan and the proposed transfer of your policy from CIC to Reinsurer. If you choose this option, you will have the opportunity to appear before the Conservation Court to object to the Rehabilitation Plan and the transfer of your policy from CIC to Reinsurer.

CIC and Reinsurer recommend that you choose Option 1.

If you wish to choose Option 1, simply do not return the Rejection Form and you will automatically be deemed to have accepted this option as of [date].  You should then attach the [enclosed] Certificate of Assumption [that you will be receiving under separate cover] to your policy.

24

If you wish to choose Option 2, you must complete the enclosed Rejection Form, sign it and return it within 30 days of this Notice.  If you do not return the Rejection Form within that time, you will be deemed to have accepted the transfer of your policy. [You should also return the [enclosed] Certificate of Assumption.]

In considering whether to accept the assumption, please note as of the date of the agreement between CIC and Reinsurer, CIC will withdraw entirely from the California insurance market and cease offering workers' compensation insurance in California.  Please also note that the Reinsurer will be responsible for the administration of the CIC California workers' compensation insurance policies after CIC withdraws completely from the California market.  As a result, if you reject the assumption, although CIC would remain legally responsible for its policy obligations to you, Reinsurer will be responsible for administering your CIC policy until your insurance terminates.

The enclosed Certificate of Assumption should be attached to your policy unless you choose to reject the assumption of your policy.

Your current and future premiums should be paid as indicated by your premium notices.

If you have any questions about the assumption of your policy or about CIC or [Reinsurer] _____, please feel free to call CIC at _____.  Written inquiries may be mailed to: CIC at [Address], [City], [State] [Zip Code].

Sincerely,

_____          _____
CALIFORNIA INSURANCE                               [REINSURER]
COMPANY

25

CERTIFICATE OF ASSUMPTION

You are hereby notified that [Reinsurer] _____ has, effective as of _____, 2020 (the "<u>Effective Time</u>"), assumed all rights, liabilities, and obligations of CIC under your workers' compensation insurance policy with CIC.

From and after the Effective Time, all references in your policy or certificate to "CIC" are hereby changed to [Reinsurer] "_____".  Except for the substitution of [Reinsurer] _____ for CIC as your insurer, your rights as an insured will not be affected by the change in companies, and the terms and conditions of your policy or certificate will not be changed by reason of the assumption.

All correspondence and inquiries concerning your policy or certificate, including premium payments, policy or certificate changes, and notices of claims, should be submitted to:

[Reinsurer]
[Street Address]
[City], [State [Zip Code]

This Certificate of Assumption, as of the Effective Time, forms a part of and should be attached to the policy or certificate issued to you by CIC.

IN WITNESS WHEREOF, _____ has caused this Certificate of Assumption to be duly signed and issued.


_____

[Reinsurer]

NOTICE OF REJECTION OF ASSUMPTION

To:  California Insurance Company

<u>REJECTION</u>

I have reviewed the Notice of Transfer and the Certificate of Assumption whereby [Reinsurer] would assume all of the rights, liabilities, and obligations of California Insurance Company under my workers' compensation insurance policy previously issued by California Insurance Company.

I hereby notify you that I REJECT the proposed assumption of my policy and the substitution of [Reinsurer]  thereunder, and I wish to retain my policy with California Insurance Company.

DATE:

_____
Policyholder Signature


_____
Print or Type Name


_____
California Insurance Company Policy ID #

27

# EXHIBIT D

**STATE OF VERMONT**

**DEPARTMENT OF FINANCIAL REGULATION**

| | |
|---|---|
| **In re:** | ) |
| **Continental Indemnity Company,** | ) |
|    **NAIC Code 28258** | ) |
| **Applied Underwriters, Inc.** | ) |
| **Applied Risk Services Inc., VT License #283** | ) |
| **Applied Underwriters Captive Risk Assurance** | ) |
|    **Company, Inc.** | )   **Docket No. 15-026-I** |
| | ) |

**STIPULATION AND CONSENT ORDER**

The Insurance Division of the Vermont Department of Financial Regulation (the "Department"),

Continental Indemnity Company ("Continental"), Applied Underwriters, Inc. ("AUI"), Applied

Risk Services Inc. ("ARS"), and Applied Underwriters Captive Risk Assurance Company, Inc.

("AUCRA") hereby stipulate and agree as follows:

    1.     Pursuant to the authority contained in 8 V.S.A. §§ 11, 12, 13, 4726 and 4804, the

Commissioner of the Department is charged with administering and enforcing the insurance laws

of the State of Vermont and is authorized to investigate insurers to determine compliance with

these laws and regulations.

    2.     Continental, AUI, ARS, and AUCRA (collectively, "Respondents") acknowledge

and admit the jurisdiction of the Commissioner over the subject matter of this Stipulation and

Consent Order set forth herein.

3.    Continental is a foreign insurer domiciled in Iowa, with an address of record of 10805 Old Mill Rd, Omaha, NE 68154. Continental is licensed in the State of Vermont to issue accident and health, property and casualty, and workers' compensation insurance policies. Continental is an indirect subsidiary of Applied Underwriters, Inc. ("AUI").

4.    AUI is a non-insurer with an address of record of 10805 Old Mill Rd, Omaha, NE 68154. AUI is not a licensed insurer authorized to enter in insurance contracts or engage in the insurance business in Vermont.

5.    ARS is a non-resident producer firm holding Vermont License #283 with an address of record of 10805 Old Mill Rd, Omaha, NE 68154. ARS is a subsidiary of AUI.

6.    AUCRA is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business in Omaha, Nebraska, and with an address of record of 10805 Old Mill Rd, Omaha, NE 68154. AUCRA also is a subsidiary of AUI. AUCRA is not a licensed insurer authorized to enter into workers' compensation insurance contracts or engage in the insurance business in Vermont.

7.    The Department has conducted an investigation of the Respondents' role in the sale of workers' compensation coverage to Vermont resident businesses; specifically, sales of AUI's SolutionOne® product(s). From 2007 to the present, SolutionOne® with the SolutionOne® Profit-Sharing product[1] was sold to fifty-three (53) Vermont businesses seeking workers' compensation coverage and comprised 172 separate workers' compensation insurance policies. See Exhibit 1.

---

[1] "SolutionOne®" as used below will refer to the SolutionOne® product sold with the profit sharing component.

2

8. The SolutionOne® product is described in AUI's marketing materials as an integrated package combining workers' compensation with payroll services, risk management tools, and employment protection coverage, and was targeted to small- and medium-sized employers with workers' compensation premiums between $5,000 and $250,000. In 2007, AUI began marketing SolutionOne® primarily to small- and medium-sized Vermont businesses seeking workers' compensation coverage through Vermont licensed independent producers.

9. The Department's investigation revealed that, in fact, several distinct programs were sold in Vermont under the common registered name "SolutionOne." Per Respondents' nomenclature, these will be referred to as a "pooled" program, a "fixed cost" or "capped loss" program, and a "single risk" program. Each of the these consist of the following common components: (i) a guaranteed-cost workers' compensation policy issued by Continental as a licensed insurer in Vermont; (ii) a "profit sharing" component effected via a separate agreement described as a "reinsurance participation agreement" entered into between the insured and AUCRA; and (iii) payroll processing effected via a SolutionOne® Services Agreement with AUI.

10. However, the various SolutionOne® programs differed in significant ways. For example, in the so-called pooled version of SolutionOne® initially brought to the Department's attention by Vermont complainants, the loss experience of a range of heterogeneous small companies was aggregated in a single cell of AUCRA and then divided proportionately according to the relative premium amounts among the various insureds. There was a minimum base cost and maximum ceiling cost established at inception. This, combined with Applied's

3

methods for estimating future losses, resulted in several Vermont companies receiving unanticipated large assessments based on the loss experience of the heterogeneous pool.[2]

11.     In contrast, the single risk version of SolutionOne® segregated the loss experience and a portion of premium of each individual insured to its own cell within AUCRA, whereby the credit or debit assessed on the insured was a function of the losses experienced by each such insured itself, with a minimum base cost and maximum ceiling cost established at inception.

12.     Another key difference between the various SolutionOne® programs is whether additional assessments may be charged. The pooled and single risk versions of SolutionOne® allowed for additional assessments by AUI depending on the claims experience of the insureds aggregated in a single cell. In contrast, under the fixed cost/capped loss version of SolutionOne®, there is no possibility of an additional assessment, regardless of the insured's claims experience.

13.     In each of the SolutionOne® programs, the guaranteed-cost workers' compensation component was effected by the issuance of Continental's workers' compensation policies using forms and rates that were filed and approved by the Department. However, the Department has concluded that all SolutionOne® Profit-Sharing transactions in Vermont – each effected via a separate "Reinsurance Participation Agreement" (RPA) with AUCRA – materially modified the terms of Continental's approved and filed guaranteed-cost workers' compensation policy, bypassing the required review and approval of the Department.

---

[2] Respondents have represented to the Department that new sales of this product were discontinued in all jurisdictions in July 2012.

4

14.     In the case of the pooled and single risk products, the Department asserts that SolutionOne® de facto operated as a retrospective rating plan, replacing Continental's guaranteed-cost worker's compensation insurance policy with an unfiled, unapproved retrospective rating plan which had the potential for higher and unpredictable assessments should a certain level of claims occur. In the case of the fixed cost/capped loss program, SolutionOne® resembles a dividend plan, replacing Continental's guaranteed-cost worker's compensation insurance policy with an unfiled, unapproved plan holding out the promise of a refund of premium in the future depending on experience.

15.     The Department acknowledges that Respondents fully cooperated with the Department to address the concerns of Vermont policyholders enrolled in SolutionOne®, including but not limited to providing requested information, voluntarily ceasing new sales of SolutionOne®, as well as ceasing assessments on Vermonters under SolutionOne® while a resolution was sought with the Department.

16.     Respondents, without admitting the Department's allegations or conclusions and solely for the purpose of resolving this administrative action, being aware of the expenses, consumption of time and uncertainty inherent in litigation, have agreed to enter into this Stipulation and Consent Order with the Department on the terms and conditions hereinafter set forth in lieu of proceeding with a hearing, but agree not to contest their validity in the event of any future administrative or judicial action by or involving the Department. To the extent any violations may exist, Respondents deny any intentional wrongdoing.

5

## VIOLATIONS OF LAW

17.     As a result of its investigation the Department has concluded that, with regard to the sale of the SolutionOne® product, Respondents were not in compliance with Vermont insurance laws and regulations because:

> a.  While Continental used rates and forms approved by the Department for the guaranteed-cost workers' compensation component of SolutionOne®, because: (i) Continental policies were only sold in Vermont as part of the bundled SolutionOne package, which included a separate Reinsurance Participation Agreement (RPA) between Continental's affiliate AUCRA and the insured; and (ii) as a result of the separate RPA, the ultimate cost of the workers' compensation insurance could differ and other key contractual terms were materially different from the Continental guaranteed cost workers' compensation policy issued, therefore Respondents de facto engaged in the sale of an unfiled, unapproved insurance product in Vermont (See 8 V.S.A. § 3541);
>
> b.  The pooled and single risk SolutionOne® programs were not suitable for many of the Vermont businesses to which they were marketed, given the smaller premiums, unpredictable variations in claim frequency and claim size, and liquidity constraints of these businesses. (See 8 V.S.A. §§ 4723 and 4724(16)).
>
> c.  All SolutionOne programs were misleadingly characterized as both a "profit sharing" arrangement and a valid reinsurance transaction in Vermont, in

6

violation of 8 V.S.A. § 4723 and of 8 V.S.A. § 4724(1)(A).

18.     Respondents have been made aware that the Department may proceed with an administrative action against them for the violations cited above.

19.     The Department has concluded its investigation of the Respondents' SolutionOne® product and this is a final settlement of all matters involving the Department's investigation of Respondents' sale of the SolutionOne® product in Vermont.

20.     **NOW THEREFORE,** in consideration of the mutual covenants contained herein, the Department and Respondents further stipulate and agree as follows:

> a. Within fifteen (15) business days of signing this Stipulation & Consent, Continental agrees to send immediate initial notice (the "Initial Notice) to SolutionOne® policyholders of and producers of record for all in-force policies, advising these policyholders that, pursuant to a Stipulation and Consent Order with the Department concerning Applied Underwriter's SolutionOne® Profit Sharing Program, their Continental guaranteed cost workers' compensation policy will non-renew at policy expiration; provided however, that policyholders may choose to enter into a new Continental guaranteed cost workers' compensation policy issued using only Continental's filed and approved rates. In the event a policyholder does not enter into a new Continental guaranteed cost workers' compensation policy at least 50 days prior to the renewal date, the existing policy will be non-renewed by Continental. The Initial Notice is subject to prior review and approval by the Department and shall contain language clearly explaining the above, as well as that, if a

7

policy is to be non-renewed, then in accordance with the requirements of 21 V.S.A. § 697, each policyholder will receive a legal notice of non-renewal at least 45 days prior to the renewal date.

b. If the Continental guaranteed cost policy is/will be non-renewed in accordance with a. above, the Initial Notice will be followed by a separate legal notice of non-renewal prepared for and sent to each policyholder in accordance with 21 V.S.A. § 697, as well as to the producers of record.

c. Respondents agree that upon sending the Initial Notice, any Continental guaranteed cost policy that cancels prior to the natural expiration date of the policy term shall receive a "pro rata" return of premium and no "short rate" penalty should be applied by Respondents or their affiliates.

d. Respondents agree to:

i. Pay an administrative penalty of **Three Hundred Thousand ($300,000.00)** Dollars, paid by check payable to the Vermont Department of Financial Regulation within thirty (30) days of execution of this Stipulation and Consent Order. and;

ii. Reimburse the Department for investigative and other expenses, in the sum of **Thirty Five Thousand ($35,000.00)** Dollars, paid by check payable to the Vermont Department of Financial Regulation within thirty (30) days of execution of this Stipulation and Consent Order.

iii. With regard to insureds in Vermont who purchased workers' compensation policies issued by Continental and entered into one or more

8

RPAs with AUCRA (or its affiliates) under SolutionOne®, Respondents agree to make whole all Vermonters who were assessed more under SolutionOne® (i.e., under the RPA(s)), including any interest/financing charges, than they would have paid under Continental's approved and filed guaranteed-cost workers' compensation insurance rates, based on data as of March 31, 2015. Restitution to Vermont insureds is to be calculated and paid as follows:

1. For any given insured, if the aggregated total of all sums collected under the RPA(s) for all policy periods exceeds the aggregated total of all corresponding policies' guaranteed cost premiums, then restitution in the amount of the difference is to be made by Respondents to the insured. For purposes of this calculation, all in-force and expired policies for each insured are to be included regardless of whether the SolutionOne program was pooled, single risk, or fixed cost/capped loss, and the calculations are to be made using data and amounts as of March 31, 2015.

2. In calculating a. above, restitution shall be paid as per Exhibit 2, and shall be made within sixty (60) days of the signing of this Stipulation & Consent Order.

3. Respondents agree that no further billings, assessment or collections of additional premium are permitted for policies that expired prior to March 31, 2015.

9

4.  If payments to insureds are accompanied by a waiver or release, such form of waiver or release shall be subject to the Department's prior approval.

For those insureds having policies that are/were still in-force as of March 31, 2015, the final premium to be collected by Continental and its affiliates for the remaining policy period between March 31, 2015, and the expiration date of the policy, shall not exceed the premium computed according to the lesser of the guaranteed cost rate and the "Loss Pick Containment Rate" (per $100 payroll) specified for the insured in Schedule 1 of the relevant RPA, multiplied by the final audited payroll for such in-force policy.

e.  As a result of the SolutionOne® Program, a number of Vermont insureds paid less for workers' compensation insurance than they would have paid under Continental's approved and filed guaranteed cost workers' compensation rates. As a condition to this Stipulation and Consent, Continental and the other Respondents waive any claim to those payments.

f.  Respondents represent that in order to ensure future compliance with regard to Vermont laws, they have already instituted the following:

i.  Discontinuing the sale and renewal of all SolutionOne® product(s) in Vermont until reviewed and approved by the Department;

ii.  Initiating an internal audit procedure to ensure that Respondents' insurance products, as well as their affiliates' insurance products and marketing

10

efforts, comply with Vermont insurance laws and regulations, including but not limited to those pertaining to trade practices and rates and form regulations.

21.     Respondents hereby waive their statutory right to notice and a hearing before the Commissioner of the Department, or her designated appointee.

22.     Respondents acknowledge and agree that this stipulation is entered into freely and voluntarily and that except as set forth herein, no promise was made to induce the Respondents to enter into it. Respondents acknowledge their understanding of and agree to all terms, conditions, and obligations contained in this Stipulation and Consent Order.

23.     Respondents consent to the entry of this Stipulation and Consent Order and agree to be fully bound by its terms and conditions. Respondents acknowledge that noncompliance with any of the terms of this Stipulation and Consent Order may constitute a separate violation of the insurance laws of the State of Vermont and may subject them to sanctions under the provisions of 8 V.S.A. §§ 4804. Respondents further acknowledge that the Commissioner retains jurisdiction over this matter for the purpose of enforcing this order.

24.     The undersigned representative of each of the Respondents affirms that he or she has taken all necessary steps to obtain the authority to bind each of the Respondents to the obligations stated herein and has the authority to bind each of the Respondents to the obligations stated herein.

11

AGREED AND ACCEPTED:

Division of Insurance, Vermont Department of Financial Regulation

By: _____     Date: 10/30/15
　　　Kay Samson, Deputy Commissioner of Insurance


Continental Indemnity Company

By: _____     Date: 10/19/15


Applied Underwriters, Inc.

By: _____     Date: 10/19/15


Applied Risk Services Inc.

By: _____     Date: 10/19/15


Applied Underwriters Captive Risk Assurance Company, Inc.

By: _____     Date: 10/19/15


12

## ORDER

**IT IS HEREBY ORDERED**:

1.  Respondents Continental Indemnity Company, Applied Underwriters, Inc., Applied Risk Services Inc., and Applied Underwriters Captive Risk Assurance Company, Inc., shall comply with all agreements, stipulations, and undertakings as recited above.

2.  Nothing contained in this Order shall restrain the Department from responding to and addressing any complaint involving Continental Indemnity Company, Applied Underwriters, Inc., Applied Risk Services Inc., and/or Applied Underwriters Captive Risk Assurance Company, Inc. filed with the Department or shall preclude the Department from pursuing any other violation of law with respect to the sale of the SolutionOne® product occurring after the date this Order is signed.

Dated at Montpelier, Vermont this 30th day of $October$, 2015.

Susan L. Donegan, Commissioner
Vermont Department of Financial Regulation

13

**Exhibit 1.**

14

**EXHIBIT 1.**

| Number | Policy Begin Date | End Date | Policy Premium | Amount Collected Via RPA | Interest | Total | Difference |
|---|---|---|---|---|---|---|---|
| 46-889156-01-01 | 05/04/14 | 05/04/15 | $22,095.00 | $13,666.73 | $0.00 | $13,666.73 | $8,428.27 |
| 46-848821-01-01 | 12/27/11 | 12/27/12 | 9,997.00 | 7,498.07 | 0.00 | 7,498.07 | 2,498.93 |
| 46-848821-01-02 | 12/27/12 | 12/27/13 | 10,183.00 | 7,353.21 | 0.00 | 7,353.21 | 2,829.79 |
| 46-848821-01-03 | 12/27/13 | 12/27/14 | 10,053.00 | 13,043.06 | 0.00 | 13,043.06 | (2,990.06) |
| 46-848821-01-04 | 12/27/14 | 05/08/15 | 1,808.00 | 486.97 | 0.00 | 486.97 | 1,321.03 |
| 46-806202-01-01 | 09/03/08 | 09/03/09 | 5,685.00 | 12,180.46 | 0.00 | 12,180.46 | (6,495.46) |
| 46-806202-01-02 | 09/03/09 | 09/03/10 | 9,718.00 | 17,473.17 | 0.00 | 17,473.17 | (7,755.17) |
| 46-806202-01-03 | 09/03/10 | 09/03/11 | 9,243.00 | 20,317.46 | 0.00 | 20,317.46 | (11,074.46) |
| 46-806202-01-04 | 09/03/11 | 09/03/12 | 7,996.00 | 21,401.90 | 0.00 | 21,401.90 | (13,405.90) |
| 46-806202-01-05 | 09/03/12 | 09/03/13 | 7,441.00 | 17,043.62 | 0.00 | 17,043.62 | (9,602.62) |
| 46-806202-01-06 | 09/03/13 | 09/03/14 | 7,054.00 | 14,784.58 | 0.00 | 14,784.58 | (7,730.58) |
| 46-806202-01-07 | 09/03/14 | 09/03/15 | 3,541.00 | 2,731.88 | 0.00 | 2,731.88 | 809.12 |
| 46-810325-01-01 | 12/06/08 | 12/06/09 | 13,436.00 | 9,818.18 | 0.00 | 9,818.18 | 3,617.82 |
| 46-810325-01-02 | 12/06/09 | 12/06/10 | 16,043.00 | 18,290.73 | 0.00 | 18,290.73 | (2,247.73) |
| 46-810325-01-03 | 12/06/10 | 12/06/11 | 14,603.00 | 17,234.85 | 0.00 | 17,234.85 | (2,631.85) |
| 46-810325-01-04 | 12/06/11 | 12/06/12 | 18,966.00 | 18,051.92 | 0.00 | 18,051.92 | 914.08 |
| 46-810325-01-05 | 12/06/12 | 12/06/13 | 20,591.00 | 19,514.10 | 0.00 | 19,514.10 | 1,076.90 |
| 46-810325-01-06 | 12/06/14 | 12/06/15 | 7,240.00 | 6,343.68 | 0.00 | 6,343.68 | 896.32 |
| 46-845692-01-01 | 12/01/11 | 12/01/12 | 6,088.00 | 4,220.51 | 0.00 | 4,220.51 | 1,867.49 |
| 46-845692-01-02 | 12/01/12 | 12/01/13 | 6,172.00 | 5,273.64 | 0.00 | 5,273.64 | 898.36 |
| 46-845692-01-03 | 12/01/13 | 12/01/14 | 7,006.00 | 8,017.26 | 0.00 | 8,017.26 | (1,011.26) |
| 46-845692-01-04 | 12/01/14 | 12/01/15 | 1,823.00 | 1,565.73 | 0.00 | 1,565.73 | 257.27 |
| 46-098632-01-09 | 10/01/14 | 10/01/15 | 5,651.00 | 4,612.29 | 0.00 | 4,612.29 | 1,038.71 |
| 46-842350-01-01 | 09/01/11 | 09/01/12 | 21,070.00 | 20,991.98 | 0.00 | 20,991.98 | 78.02 |
| 46-842350-01-02 | 09/01/12 | 09/01/13 | 24,611.00 | 27,827.77 | 0.00 | 27,827.77 | (3,216.77) |
| 46-842350-01-03 | 09/01/13 | 09/01/14 | 24,922.00 | 36,251.48 | 0.00 | 36,251.48 | (11,329.48) |
| 46-851959-01-01 | 05/01/12 | 05/01/13 | 7,653.00 | 6,038.35 | 0.00 | 6,038.35 | 1,614.65 |
| 46-851959-01-02 | 05/01/13 | 05/01/14 | 11,831.00 | 9,252.15 | 0.00 | 9,252.15 | 2,578.85 |
| 46-851959-01-03 | 05/01/14 | 05/01/15 | 10,910.00 | 14,130.18 | 0.00 | 14,130.18 | (3,220.18) |
| 46-806667-01-01 | 10/02/08 | 10/02/09 | 25,928.00 | 24,067.56 | 0.00 | 24,067.56 | 1,860.44 |
| 46-806667-01-02 | 10/02/09 | 10/02/10 | 36,542.00 | 36,871.00 | 0.00 | 36,871.00 | (329.00) |
| 46-806667-01-03 | 10/02/10 | 10/02/11 | 29,997.00 | 34,323.33 | 0.00 | 34,323.33 | (4,326.33) |
| 46-873295-01-02 | 06/11/14 | 06/11/15 | 6,617.00 | 4,423.13 | 0.00 | 4,423.13 | 2,193.87 |
| 46-827832-01-01 | 06/07/10 | 06/07/11 | 61,760.00 | 72,967.71 | 0.00 | 72,967.71 | (11,207.71) |

# EXHIBIT 1.

| | Policy | | Policy | Amount Collected | | | |
|---|---|---|---|---|---|---|---|
| Number | Begin Date | End Date | Premium | Via RPA | Interest | Total | Difference |
| 46-827832-01-02 | 06/07/11 | 06/07/12 | 68,042.00 | 74,594.29 | 0.00 | 74,594.29 | (6,552.29) |
| 46-827832-01-03 | 06/07/12 | 06/07/13 | 69,455.00 | 107,627.42 | 0.00 | 107,627.42 | (38,172.42) |
| 46-857402-01-03 | 07/15/14 | 07/15/15 | 8,129.00 | 6,903.32 | 0.00 | 6,903.32 | 1,225.68 |
| 46-801623-01-01 | 03/06/08 | 03/06/09 | 27,413.00 | 38,603.37 | 0.00 | 38,603.37 | (11,190.37) |
| 46-801623-01-02 | 03/06/09 | 03/06/10 | 40,289.00 | 24,638.18 | 0.00 | 24,638.18 | 15,650.82 |
| 46-801623-01-03 | 03/06/10 | 07/29/10 | 14,463.00 | 13,645.15 | 0.00 | 13,645.15 | 817.85 |
| 46-836383-01-01 | 02/10/11 | 02/10/12 | 8,817.00 | 7,173.38 | 0.00 | 7,173.38 | 1,643.62 |
| 46-836383-01-02 | 02/10/12 | 02/10/13 | 11,355.00 | 10,407.53 | 0.00 | 10,407.53 | 947.47 |
| 46-836383-01-03 | 02/10/13 | 02/10/14 | 10,552.00 | 14,268.15 | 0.00 | 14,268.15 | (3,716.15) |
| 46-836383-01-04 | 02/10/14 | 02/10/15 | 17,697.00 | 10,838.61 | 0.00 | 10,838.61 | 6,858.39 |
| 46-819471-01-01 | 11/01/09 | 11/01/10 | 17,860.00 | 17,337.46 | 0.00 | 17,337.46 | 522.54 |
| 46-819471-01-02 | 11/01/10 | 11/01/11 | 19,938.00 | 19,545.52 | 0.00 | 19,545.52 | 392.48 |
| 46-819471-01-03 | 11/01/11 | 11/01/12 | 19,924.00 | 27,319.14 | 0.00 | 27,319.14 | (7,395.14) |
| 46-819471-01-04 | 11/01/12 | 11/01/13 | 17,798.00 | 25,140.98 | 0.00 | 25,140.98 | (7,342.98) |
| 46-819471-01-07 | 01/01/15 | 01/01/16 | 6,229.00 | 5,552.21 | 0.00 | 5,552.21 | 676.79 |
| 46-869912-01-02 | 04/24/14 | 04/24/15 | 13,649.00 | 11,065.58 | 0.00 | 11,065.58 | 2,583.42 |
| 46-841642-01-01 | 07/04/11 | 07/04/12 | 42,780.00 | 33,244.62 | 0.00 | 33,244.62 | 9,535.38 |
| 46-841642-01-02 | 07/04/12 | 07/04/13 | 37,946.00 | 32,283.57 | 0.00 | 32,283.57 | 5,662.43 |
| 46-841642-01-03 | 07/04/13 | 07/04/14 | 39,588.00 | 51,452.75 | 0.00 | 51,452.75 | (11,864.75) |
| 46-837784-01-01 | 03/17/11 | 03/17/12 | 15,133.00 | 13,298.33 | 0.00 | 13,298.33 | 1,834.67 |
| 46-837784-01-02 | 03/17/12 | 03/17/13 | 18,412.00 | 17,935.37 | 0.00 | 17,935.37 | 476.63 |
| 46-837784-01-03 | 03/17/13 | 06/17/13 | 4,873.00 | 6,422.76 | 0.00 | 6,422.76 | (1,549.76) |
| 46-837784-03-05 | 06/17/13 | 03/17/14 | 10,889.00 | 14,940.60 | 0.00 | 14,940.60 | (4,051.60) |
| 46-837784-04-07 | 04/24/14 | 03/17/15 | 17,036.00 | 14,679.37 | 0.00 | 14,679.37 | 2,356.63 |
| 46-847538-01-01 | 01/04/12 | 01/04/13 | 26,880.00 | 20,838.75 | 0.00 | 20,838.75 | 6,041.25 |
| 46-847538-01-02 | 01/04/13 | 01/04/14 | 26,285.00 | 22,641.49 | 0.00 | 22,641.49 | 3,643.51 |
| 46-847538-01-03 | 01/04/14 | 01/04/15 | 29,792.00 | 35,795.06 | 0.00 | 35,795.06 | (6,003.06) |
| 46-847538-01-04 | 01/04/15 | 01/04/16 | 6,164.00 | 4,778.44 | 0.00 | 4,778.44 | 1,385.56 |
| 46-839412-01-01 | 05/18/11 | 05/18/12 | 214,466.00 | 487,267.67 | 531.40 | 487,799.07 | (273,333.07) |
| 46-839412-01-02 | 05/18/12 | 05/18/13 | 169,083.00 | 143,782.43 | 0.00 | 143,782.43 | 25,300.57 |
| 46-839412-01-03 | 05/18/13 | 05/18/14 | 265,822.00 | 56,178.95 | 65.43 | 56,244.38 | 209,577.62 |
| 46-841696-01-01 | 07/09/11 | 07/09/12 | 45,170.00 | 34,974.34 | 0.00 | 34,974.34 | 10,195.66 |
| 46-841696-01-02 | 07/09/12 | 07/09/13 | 52,255.00 | 51,845.23 | 0.00 | 51,845.23 | 409.77 |
| 46-841696-01-03 | 07/09/13 | 07/09/14 | 49,055.00 | 60,935.82 | 0.00 | 60,935.82 | (11,880.82) |

**EXHIBIT 1.**

| | Policy | | Policy | Amount Collected | | | |
|---|---|---|---|---|---|---|---|
| Number | Begin Date | End Date | Premium | Via RPA | Interest | Total | Difference |
| 46-841696-01-04 | 07/09/14 | 05/19/15 | 61,959.00 | 44,345.55 | 0.00 | 44,345.55 | 17,613.45 |
| 46-801256-01-01 | 02/04/08 | 02/04/09 | 21,308.00 | 29,217.15 | 0.00 | 29,217.15 | (7,909.15) |
| 46-801256-01-02 | 02/04/09 | 02/04/10 | 26,460.00 | 31,666.15 | 0.00 | 31,666.15 | (5,206.15) |
| 46-801256-01-03 | 02/04/10 | 02/04/11 | 24,184.00 | 39,152.58 | 0.00 | 39,152.58 | (14,968.58) |
| 46-801256-01-04 | 02/04/11 | 02/04/12 | 22,214.00 | 33,751.67 | 0.00 | 33,751.67 | (11,537.67) |
| 46-801256-01-05 | 02/04/12 | 02/04/13 | 23,571.00 | 29,064.06 | 0.00 | 29,064.06 | (5,493.06) |
| 46-801256-01-06 | 02/04/13 | 02/04/14 | 28,128.00 | 37,976.24 | 0.00 | 37,976.24 | (9,848.24) |
| 46-801256-01-07 | 02/04/14 | 02/04/15 | 31,225.00 | 55,501.18 | 0.00 | 55,501.18 | (24,276.18) |
| 46-843043-01-01 | 09/05/11 | 09/05/12 | 45,635.00 | 35,047.34 | 0.00 | 35,047.34 | 10,587.66 |
| 46-843043-01-02 | 09/05/12 | 09/05/13 | 60,402.00 | 69,182.31 | 0.00 | 69,182.31 | (8,780.31) |
| 46-843043-01-03 | 09/05/13 | 09/05/14 | 47,169.00 | 58,236.75 | 0.00 | 58,236.75 | (11,067.75) |
| 46-843043-01-04 | 09/05/14 | 09/05/15 | 21,451.00 | 13,586.42 | 0.00 | 13,586.42 | 7,864.58 |
| 46-841352-01-01 | 06/30/11 | 06/30/12 | 21,895.00 | 16,927.08 | 0.00 | 16,927.08 | 4,967.92 |
| 46-841352-01-02 | 06/30/12 | 06/30/13 | 17,133.00 | 15,255.44 | 0.00 | 15,255.44 | 1,877.56 |
| 46-841352-01-03 | 06/30/13 | 06/30/14 | 19,323.00 | 25,071.48 | 0.00 | 25,071.48 | (5,748.48) |
| 46-815090-01-01 | 05/01/09 | 05/01/10 | 10,642.00 | 7,664.56 | 0.00 | 7,664.56 | 2,977.44 |
| 46-815090-01-02 | 05/01/10 | 05/01/11 | 10,966.00 | 13,114.59 | 0.00 | 13,114.59 | (2,148.59) |
| 46-815090-01-03 | 05/01/11 | 05/01/12 | 9,427.00 | 10,758.91 | 0.00 | 10,758.91 | (1,331.91) |
| 46-815090-01-04 | 05/01/12 | 05/01/13 | 9,891.00 | 7,520.59 | 0.00 | 7,520.59 | 2,370.41 |
| 46-815090-01-05 | 05/01/13 | 05/01/14 | 9,420.00 | 7,901.25 | 0.00 | 7,901.25 | 1,518.75 |
| 46-815090-01-06 | 05/01/14 | 05/01/15 | 9,589.00 | 11,518.39 | 0.00 | 11,518.39 | (1,929.39) |
| 46-875198-01-02 | 08/10/14 | 05/23/15 | 33,593.00 | 25,308.87 | 0.00 | 25,308.87 | 8,284.13 |
| 46-805319-01-01 | 09/01/08 | 09/01/09 | 9,211.00 | 9,742.97 | 0.00 | 9,742.97 | (531.97) |
| 46-805319-01-02 | 09/01/09 | 09/01/10 | 7,770.00 | 14,431.21 | 0.00 | 14,431.21 | (6,661.21) |
| 46-805319-01-03 | 09/01/10 | 09/01/11 | 6,659.00 | 17,656.14 | 0.00 | 17,656.14 | (10,997.14) |
| 46-874833-01-02 | 08/16/14 | 08/16/15 | 58,933.00 | 48,570.06 | 0.00 | 48,570.06 | 10,362.94 |
| 46-807361-01-01 | 10/16/08 | 01/19/09 | 5,692.00 | 7,391.01 | 0.00 | 7,391.01 | (1,699.01) |
| 46-062300-01-02 | 09/30/11 | 09/30/12 | 13,317.00 | 9,472.37 | 0.00 | 9,472.37 | 3,844.63 |
| 46-062300-01-03 | 09/30/12 | 09/30/13 | 21,616.00 | 15,924.59 | 0.00 | 15,924.59 | 5,691.41 |
| 46-062300-01-04 | 09/30/13 | 09/30/14 | 23,771.00 | 22,581.83 | 0.00 | 22,581.83 | 1,189.17 |
| 46-062300-01-05 | 09/30/14 | 09/30/15 | 12,255.00 | 7,464.87 | 0.00 | 7,464.87 | 4,790.13 |
| 46-330871-01-01 | 11/26/14 | 11/26/15 | 1,533.00 | 1,474.06 | 0.00 | 1,474.06 | 58.94 |
| 46-889518-01-01 | 05/20/14 | 05/20/15 | 58,873.00 | 43,416.07 | 0.00 | 43,416.07 | 15,456.93 |
| 46-064961-01-03 | 12/31/09 | 12/31/10 | 13,427.00 | 14,364.52 | 0.00 | 14,364.52 | (937.52) |

# EXHIBIT 1.

| | Policy | | Policy | Amount Collected | | | |
|---|---|---|---|---|---|---|---|
| Number | Begin Date | End Date | Premium | Via RPA | Interest | Total | Difference |
| 46-064961-01-04 | 12/31/10 | 12/05/11 | 16,897.00 | 14,625.71 | 0.00 | 14,625.71 | 2,271.29 |
| 46-851530-01-01 | 03/20/12 | 03/20/13 | 11,028.00 | 8,419.99 | 0.00 | 8,419.99 | 2,608.01 |
| 46-851530-01-02 | 03/20/13 | 03/20/14 | 12,662.00 | 11,102.91 | 0.00 | 11,102.91 | 1,559.09 |
| 46-851530-01-03 | 03/20/14 | 03/20/15 | 11,689.00 | 14,876.02 | 0.00 | 14,876.02 | (3,187.02) |
| 46-865823-01-02 | 02/11/14 | 02/11/15 | 12,708.00 | 10,618.73 | 0.00 | 10,618.73 | 2,089.27 |
| 46-810625-01-01 | 04/01/09 | 04/01/10 | 55,436.00 | 35,820.35 | 0.00 | 35,820.35 | 19,615.65 |
| 46-810625-01-02 | 04/01/10 | 04/01/11 | 41,320.00 | 56,313.09 | 0.00 | 56,313.09 | (14,993.09) |
| 46-810625-01-03 | 04/01/11 | 04/01/12 | 51,958.00 | 64,548.58 | 0.00 | 64,548.58 | (12,590.58) |
| 46-810625-01-04 | 04/01/12 | 04/01/13 | 57,706.00 | 90,626.47 | 0.00 | 90,626.47 | (32,920.47) |
| 46-841807-01-01 | 07/21/11 | 07/21/12 | 45,239.00 | 34,152.33 | 0.00 | 34,152.33 | 11,086.67 |
| 46-841807-01-02 | 07/21/12 | 07/21/13 | 50,382.00 | 50,921.26 | 0.00 | 50,921.26 | (539.26) |
| 46-841807-01-03 | 07/21/13 | 07/21/14 | 52,214.00 | 64,950.24 | 0.00 | 64,950.24 | (12,736.24) |
| 46-815405-01-01 | 07/01/09 | 07/01/10 | 32,158.00 | 37,527.89 | 0.00 | 37,527.89 | (5,369.89) |
| 46-815405-01-02 | 07/01/10 | 07/01/11 | 27,770.00 | 34,465.85 | 0.00 | 34,465.85 | (6,695.85) |
| 46-815405-01-03 | 07/01/11 | 07/01/12 | 34,357.00 | 43,988.69 | 0.00 | 43,988.69 | (9,631.69) |
| 46-810325-02-06 | 04/10/13 | 12/06/13 | 3,383.00 | 71.25 | 0.00 | 71.25 | 3,311.75 |
| 46-810325-02-01 | 12/06/14 | 12/06/15 | 431.00 | 0.00 | 0.00 | 0.00 | 431.00 |
| 46-853483-01-01 | 04/13/12 | 04/13/13 | 16,105.00 | 12,474.21 | 0.00 | 12,474.21 | 3,630.79 |
| 46-853483-01-02 | 04/13/13 | 04/13/14 | 14,508.00 | 11,550.66 | 0.00 | 11,550.66 | 2,957.34 |
| 46-853483-01-03 | 04/13/14 | 04/13/15 | 13,443.00 | 17,291.61 | 0.00 | 17,291.61 | (3,848.61) |
| 46-882253-01-02 | 12/15/14 | 12/15/15 | 4,552.00 | 3,820.07 | 0.00 | 3,820.07 | 731.93 |
| 46-808636-01-01 | 12/01/08 | 12/01/09 | 8,171.00 | 11,527.32 | 0.00 | 11,527.32 | (3,356.32) |
| 46-808636-01-02 | 12/01/09 | 12/01/10 | 10,844.00 | 10,363.94 | 0.00 | 10,363.94 | 480.06 |
| 46-808636-01-03 | 12/01/10 | 12/01/11 | 10,572.00 | 12,192.73 | 0.00 | 12,192.73 | (1,620.73) |
| 46-808636-01-04 | 12/01/11 | 12/01/12 | 12,485.00 | 15,611.87 | 0.00 | 15,611.87 | (3,126.87) |
| 46-808636-01-05 | 12/01/12 | 12/01/13 | 20,694.00 | 25,318.36 | 0.00 | 25,318.36 | (4,624.36) |
| 46-808636-01-07 | 12/01/14 | 12/01/15 | 20,334.00 | 12,167.92 | 0.00 | 12,167.92 | 8,166.08 |
| 46-842011-01-01 | 08/17/11 | 08/17/12 | 12,310.00 | 9,496.40 | 0.00 | 9,496.40 | 2,813.60 |
| 46-842011-01-02 | 08/17/12 | 08/17/13 | 15,862.00 | 13,362.37 | 0.00 | 13,362.37 | 2,499.63 |
| 46-842011-01-03 | 08/17/13 | 08/17/14 | 21,484.00 | 27,250.01 | 0.00 | 27,250.01 | (5,766.01) |
| 46-842011-01-04 | 08/17/14 | 08/17/15 | 17,116.00 | 12,347.65 | 0.00 | 12,347.65 | 4,768.35 |
| 46-810135-01-01 | 01/06/09 | 01/06/10 | 15,083.00 | 12,489.22 | 0.00 | 12,489.22 | 2,593.78 |
| 46-810135-01-02 | 01/06/10 | 01/06/11 | 15,070.00 | 13,830.03 | 0.00 | 13,830.03 | 1,239.97 |
| 46-810135-01-03 | 01/06/11 | 09/23/11 | 8,735.00 | 9,701.07 | 0.00 | 9,701.07 | (966.07) |

**EXHIBIT 1.**

| Number | Policy Begin Date | Policy End Date | Policy Premium | Amount Collected Via RPA | Interest | Total | Difference |
|---|---|---|---|---|---|---|---|
| 46-038081-02-05 | 11/10/10 | 11/10/11 | 21,296.00 | 26,170.55 | 0.00 | 26,170.55 | (4,874.55) |
| 46-038081-02-06 | 11/10/11 | 11/10/12 | 62,414.00 | 60,259.36 | 0.00 | 60,259.36 | 2,154.64 |
| 46-038081-02-07 | 11/10/12 | 11/10/13 | 75,099.00 | 55,894.05 | 0.00 | 55,894.05 | 19,204.95 |
| 46-038081-02-08 | 11/10/13 | 11/10/14 | 44,798.00 | 35,731.49 | 0.00 | 35,731.49 | 9,066.51 |
| 46-038081-02-09 | 11/10/14 | 11/10/15 | 19,704.00 | 18,361.11 | 0.00 | 18,361.11 | 1,342.89 |
| 46-849480-01-01 | 02/20/12 | 02/20/13 | 11,576.00 | 11,390.27 | 0.00 | 11,390.27 | 185.73 |
| 46-849480-01-02 | 02/20/13 | 01/01/14 | 13,413.00 | 13,019.13 | 0.00 | 13,019.13 | 393.87 |
| 46-038081-01-03 | 11/10/08 | 11/10/09 | 17,611.00 | 24,157.71 | 0.00 | 24,157.71 | (6,546.71) |
| 46-038081-01-04 | 11/10/09 | 11/10/10 | 21,143.00 | 21,512.81 | 0.00 | 21,512.81 | (369.81) |
| 46-814771-01-01 | 05/12/09 | 05/12/10 | 5,540.00 | 3,554.28 | 0.00 | 3,554.28 | 1,985.72 |
| 46-814771-01-02 | 05/12/10 | 05/12/11 | 5,012.00 | 3,873.64 | 0.00 | 3,873.64 | 1,138.36 |
| 46-814771-01-03 | 05/12/11 | 06/26/11 | 761.00 | 700.27 | 0.00 | 700.27 | 60.73 |
| 46-830471-01-01 | 08/13/10 | 08/13/11 | 102.00 | 94.20 | 0.00 | 94.20 | 7.80 |
| 46-830471-01-02 | 08/13/11 | 01/20/12 | 292.00 | 236.20 | 0.00 | 236.20 | 55.80 |
| 46-803531-01-01 | 05/05/08 | 05/05/09 | 16,506.00 | 20,016.16 | 0.00 | 20,016.16 | (3,510.16) |
| 46-803531-01-02 | 05/05/09 | 05/05/10 | 19,106.00 | 11,872.69 | 0.00 | 11,872.69 | 7,233.31 |
| 46-803531-01-03 | 05/05/10 | 05/05/11 | 16,862.00 | 18,807.57 | 0.00 | 18,807.57 | (1,945.57) |
| 46-803531-01-04 | 05/05/11 | 05/05/12 | 14,651.00 | 19,704.75 | 0.00 | 19,704.75 | (5,053.75) |
| 46-803531-01-05 | 05/05/12 | 05/05/13 | 15,530.00 | 12,010.45 | 0.00 | 12,010.45 | 3,519.55 |
| 46-803531-01-06 | 05/05/13 | 05/05/14 | 17,035.00 | 14,131.92 | 0.00 | 14,131.92 | 2,903.08 |
| 46-803531-01-07 | 05/05/14 | 05/05/15 | 16,116.00 | 20,800.10 | 0.00 | 20,800.10 | (4,684.10) |
| 46-875667-01-02 | 08/12/14 | 08/12/15 | 70,823.00 | 70,562.61 | 0.00 | 70,562.61 | 260.39 |
| 46-801381-01-01 | 01/19/08 | 01/19/09 | 8,491.00 | 8,153.82 | 0.00 | 8,153.82 | 337.18 |
| 46-801381-01-02 | 01/19/09 | 01/19/10 | 10,806.00 | 7,652.10 | 0.00 | 7,652.10 | 3,153.90 |
| 46-801381-01-03 | 01/19/10 | 01/19/11 | 12,540.00 | 13,487.00 | 0.00 | 13,487.00 | (947.00) |
| 46-801381-01-04 | 01/19/11 | 01/19/12 | 13,153.00 | 11,467.42 | 0.00 | 11,467.42 | 1,685.58 |
| 46-801381-01-05 | 01/19/12 | 01/19/13 | 13,075.00 | 10,247.61 | 0.00 | 10,247.61 | 2,827.39 |
| 46-801381-01-06 | 01/19/13 | 01/19/14 | 15,439.00 | 12,847.55 | 0.00 | 12,847.55 | 2,591.45 |
| 46-801381-01-07 | 01/19/14 | 01/19/15 | 18,309.00 | 23,521.34 | 0.00 | 23,521.34 | (5,212.34) |
| 46-854930-01-01 | 06/06/12 | 06/06/13 | 34,470.00 | 26,473.62 | 0.00 | 26,473.62 | 7,996.38 |
| 46-854930-01-03 | 06/06/13 | 06/06/14 | 33,847.00 | 27,561.25 | 0.00 | 27,561.25 | 6,285.75 |
| 46-854930-01-05 | 06/06/14 | 06/06/15 | 26,242.00 | 33,990.77 | 0.00 | 33,990.77 | (7,748.77) |
| 46-857839-01-01 | 07/01/12 | 07/01/13 | 17,796.00 | 13,825.70 | 0.00 | 13,825.70 | 3,970.30 |
| 46-857839-01-02 | 07/01/13 | 07/01/14 | 15,394.00 | 14,453.47 | 0.00 | 14,453.47 | 940.53 |

Exhibit 8, Page 100 of 159

## Exhibit 2.  Restitution to be paid

**Refund to be Made to Vermont Policyholders Who Purchased SolutionOne Products
To be Computed on an Account Basis & Based on 3/31/2015 Valuation
For All Expired & In-Force Policies as of 03/31/15**

| First 8 Digits of Policy Number | {a}<br>Guaranteed Cost Premium | {b}<br>Program Charges Collected | {c} = {b} - {a} | {d}<br>Amount to be Refunded |
|---|---|---|---|---|
| 46-801256 | 177,090 | 256,329 | 79,239 | 79,239 |
| 46-803531 | 115,806 | 117,344 | 1,538 | 1,538 |
| 46-805319 | 23,640 | 41,830 | 18,190 | 18,190 |
| 46-806202 | 50,678 | 105,933 | 55,255 | 55,255 |
| 46-806667 | 92,467 | 95,262 | 2,795 | 2,795 |
| 46-807361 | 5,692 | 7,391 | 1,699 | 1,699 |
| 46-808636 | 83,100 | 87,182 | 4,082 | 4,082 |
| 46-810625 | 206,420 | 247,308 | 40,888 | 40,888 |
| 46-815405 | 94,285 | 115,982 | 21,697 | 21,697 |
| 46-819471 | 81,749 | 94,895 | 13,146 | 13,146 |
| 46-827832 | 199,257 | 255,189 | 55,932 | 55,932 |
| 46-837784 | 66,343 | 67,276 | 933 | 933 |
| 46-839412 | 649,371 | 687,826 | 38,455 | 38,455 |
| 46-841807 | 147,835 | 150,024 | 2,189 | 2,189 |
| 46-842350 | 70,603 | 85,071 | 14,468 | 14,468 |
| 46-843043 | 174,657 | 176,053 | 1,396 | 1,396 |
| **Grand Total** | **2,238,993** | **2,590,895** | | **351,902** |

15

## EXHIBIT 1.

| Policy | | | Policy | Amount Collected | | | |
|---|---|---|---|---|---|---|---|
| Number | Begin Date | End Date | Premium | Via RPA | Interest | Total | Difference |
| 46-857839-01-03 | 07/01/14 | 07/01/15 | 13,106.00 | 17,956.88 | 0.00 | 17,956.88 | (4,850.88) |
| 46-865702-01-03 | 01/20/15 | 01/20/16 | 973.00 | 1.04 | 0.00 | 1.04 | 971.96 |
| | | | $4,199,892.00 | $4,384,608.43 | $596.83 | $4,385,205.26 | |

Respondents certify that the information provided in Exhibits 1 and 2 is true, complete and accurate:

**Continental Indemnity Company**
By:

Date: _____

**Applied Underwriters, Inc.**
By:

Date: _____

**Applied Risk Services Inc.**
By:

Date: _____

**Applied Underwriters Captive Risk Assurance Company, Inc.**
By:

Date: _____

16

# EXHIBIT E

ORDER NO. E19-25

## STATE OF NEW JERSEY
## DEPARTMENT OF BANKING AND INSURANCE

IN THE MATTER OF:

| | |
|---|---|
| Proceedings by the Commissioner of Banking ) | **ORDER** |
| and Insurance, State of New Jersey, to have Applied ) | **TO** |
| Underwriters, Inc., Applied Underwriters Captive Risk ) | **SHOW CAUSE** |
| Assurance Company, Inc., Applied Risk Services, Inc., Ref. ) | |
| No. 0091510, and Continental Indemnity Company, NAIC ) | |
| Code 28258, cease and desist from selling the EquityComp, ) | |
| SolutionOne, and PremierExclusive workers' compensation ) | |
| programs, unwind the programs, and pay restitution; to ) | |
| suspend the authority of Continental Indemnity Company to ) | |
| write workers' compensation insurance; and to fine, suspend, ) | |
| and/or revoke the insurance producer license of ) | |
| Applied Risk Services, Inc. ) | |

TO:

Applied Underwriters, Inc.
c/o Jeffrey A. Silver, Esq., Registered Agent
10805 Old Mill Road
Omaha, Nebraska 68154

Applied Risk Services, Inc.
c/o Jeffrey A. Silver, Esq., Registered Agent
10805 Old Mill Road
Omaha, Nebraska 68154

Applied Underwriters Captive Risk Assurance Company, Inc.
c/o C T Corporation System, Registered Agent
400 E Court Ave.
Des Moines, Iowa 50309

Continental Indemnity Company
c/o Jeffrey A. Silver, Esq., Registered Agent
10805 Old Mill Road
Omaha, Nebraska 68154

This matter, having been opened by the Commissioner of Banking and Insurance ("Commissioner"), State of New Jersey, upon information that Applied Underwriters, Inc. ("Applied"), Applied Risk Services, Inc. ("ARS"), Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA"), and Continental Indemnity Company ("Continental") (collectively, "Respondents") may have violated various provisions of the insurance laws of the State of New Jersey; and

WHEREAS, Respondents are subject to the provisions of the New Jersey Insurance Producer Licensing Act of 2001, N.J.S.A. 17:22A-26 to -48 ("Producer Act"), the general penalty provision of N.J.S.A. 17:33-2, and the Employers' Liability Insurance Law, N.J.S.A. 34:15-70 to -95.5; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40(a)(2), an insurance producer shall not violate any insurance laws, or violate any regulation, subpoena or order of the Commissioner or of another state's insurance regulator; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40(a)(5), an insurance producer shall not intentionally misrepresent the terms of an actual or proposed insurance contract, policy, or application for insurance; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40(a)(8), an insurance producer shall not use fraudulent, coercive or dishonest practices, or demonstrate incompetence, untrustworthiness or financial irresponsibility in the conduct of insurance business; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40(a)(16), an insurance producer shall not commit any fraudulent act; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40(a)(17), an insurance producer shall not knowingly facilitate or assist another person in violating any insurance laws; and

WHEREAS, pursuant to N.J.S.A. 17:33-2, the penalty for any violation of N.J.S.A. 17:17-1 to 17:51B-4, other than the failure of an insurance company to file an annual statement, shall be a penalty not exceeding $1,000 for the first offense and not exceeding $2,000 for each subsequent offense; and

WHEREAS, pursuant to N.J.S.A. 34:15-88, every insurance company or mutual association which insures employers against liability either under the Employers' Liability Insurance Law or for damages imposed by law arising out of any other liability to employees because of personal injuries including death at any time resulting therefrom, or both, shall file with the Commissioner its classification of risks and premiums and rules pertaining thereto, together with the basis rates and system of merit or schedule rating applicable to such insurance; and

WHEREAS, N.J.S.A. 34:15-88 further provides that no insurance company or mutual association writing workmen's compensation or employer's liability insurance in this state shall issue, renew, or carry any insurance against the liability of an employer either for compensation or for damages imposed by law, because of personal injuries, including death at any time resulting therefrom, sustained by his employees, or for both, except in accordance with the classifications, rules, basis rates, and system of merit or schedule rating approved by the Commissioner as aforesaid and applied by the New Jersey Compensation Rating and Inspection Bureau ("CRIB"); and

WHEREAS, N.J.S.A. 34:15-88 further provides that if any insurance company or mutual association authorized to write workmen's compensation or employer's liability insurance in this state shall violate any of the provisions of the Employers' Liability Insurance Law, the Commissioner, may, in her discretion, after public hearing, suspend the

3

authority of said insurance company or mutual association to transact workmen's compensation or employer's liability insurance in this state for such period as said Commissioner shall fix; and

WHEREAS, pursuant to N.J.S.A. 34:15-90.2(f), CRIB shall have authority to establish and maintain rules, regulations and premium rates for workers' compensation and employers' liability insurance and equitably adjust the same; and

WHEREAS, pursuant to N.J.S.A. 34:15-90.2(i), CRIB shall have authority to prepare and file, for the approval of the Commissioner, and for the use by all of its members, any amendments to its policy forms and its system of classification of risks and premiums thereto, together with the basis rates and system of merit or schedule rating applicable to such insurance, as currently set forth in the New Jersey Workers' Compensation and Employers' Liability Insurance Manual; and

WHEREAS, pursuant to the New Jersey Workers' Compensation and Employers' Liability Insurance Manual, Part Three, Section 3, Page 1, Paragraph 9, no endorsement shall be issued or attached to any Workers Compensation or Employers Liability Policy which purports to construe, alter, limit, waive or extend any of the provisions of the policy or the applicable provisions of the Employers' Liability Insurance Law, except as otherwise provided by the Manual; and

## **FACTUAL ALLEGATIONS**

IT APPEARING, that Applied is an indirect subsidiary of Berkshire Hathaway Inc. and is the parent company of AUCRA and ARS. Applied is a Nebraska financial service corporation that provides payroll processing services and underwrites workers' compensation insurance through its affiliated insurance companies to small and medium-

4

sized employers. Applied's address is 10805 Old Mill Road, Omaha, Nebraska 68154. Applied is not an authorized or admitted insurer and is not permitted to enter into insurance contracts or engage in the business of insurance in New Jersey; and

IT FURTHER APPEARING, that ARS is currently licensed as a non-resident business entity insurance producer in the State of New Jersey, pursuant to N.J.S.A. 17:22A-34, with an address of 10805 Old Mill Road, Omaha, Nebraska 68154. ARS is a subsidiary of Applied and also acts as a billing agent; and

IT FURTHER APPEARING, that AUCRA is an insurance company organized and existing under the laws of Iowa with its principal place of business in Omaha, Nebraska, with an address of 10805 Old Mill Road, Omaha, Nebraska 68154. AUCRA is a subsidiary of Applied, and its purpose is to serve as a reinsurance arm for Applied. AUCRA is not an authorized or admitted insurer and is not permitted to enter into insurance contracts or engage in the business of insurance in New Jersey; and

IT FURTHER APPEARING, that Continental is a foreign insurer domiciled in Iowa, with an address of 10805 Old Mill Road, Omaha, Nebraska 68154. Continental is licensed in the State of New Jersey to issue accident and health, property, and casualty, and workers' compensation insurance policies. Continental is an indirect subsidiary of Applied; and

IT FURTHER APPEARING, that the Boards of Directors for Applied, ARS, AUCRA, and Continental are identical in composition. Jeffrey A. Silver, Esq., Applied's General Counsel, serves on each of these Boards; and

5

IT FURTHER APPEARING, that from 2008 to present, Respondents marketed and sold workers' compensation programs called EquityComp, SolutionOne, and/or PremierExclusive (collectively, the "programs") to at least 300 New Jersey employers; and

IT FURTHER APPEARING, that these programs combine issuance of a guaranteed cost workers' compensation policy[1] sold by Continental and a "reinsurance participation agreement" ("RPA") with AUCRA; and

IT FURTHER APPEARING, that the guaranteed cost workers' compensation component of the programs uses forms and rates that were filed with CRIB and approved by the Commissioner, but that the RPA and the programs were never filed with CRIB nor approved by the Commissioner; and

IT FURTHER APPEARING, that Applied has patented the RPA. The patent states that the purpose of the RPA is to allow small and medium sized employers to utilize retrospective rating plans,[2] a practice which is only permitted in New Jersey under certain circumstances not applicable to the RPA, including but not limited to filing and compliance with CRIB's parameters for retrospective rating plans as approved by the Commissioner:[3]

---

[1] A guaranteed cost policy essentially fixes an employer's insurance premiums, meaning that the actual cost of claims against the policy will not cause premiums to fluctuate during the life of the policy. Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assur. Co., 239 F. Supp. 3d 761, 769 (S.D.N.Y. Mar. 9, 2017).

[2] A retrospective rating plan is a loss sensitive insurance policy, meaning that premiums can fluctuate during the life of the policy depending on the actual cost of the claims. Ibid.

[3] In New Jersey, retrospective rating plans are available on a one or three year rating period to any insured with estimated annual standard premium of at least $25,000. The Large Risk Alternative Rating Option, another optional form of Retrospective Rating, is available to any insured with estimated annual workers compensation and employers liability standard premium of $100,000 of New Jersey or countrywide premium, or in any combination with any other commercial casualty line of insurance for the rating term. New

6

> One of the challenges of introducing a fundamentally new premium structure into the marketplace is that the structure must be approved by the respective insurance departments regulating the sale of insurance in the states in which the insureds operate.
>
> In the United States, each state has its own insurance department and each insurance department must give its approval to sell insurance with a given premium plan in its respective jurisdiction. Getting approval can be extremely time consuming and expensive, particularly with novel approaches that a department hasn't had experience with before.  Also, many states require insurance companies to only offer small sized and medium sized companies a Guaranteed Cost plan, without the option of a retrospective plan. In part, this is because of governmental rules and laws that regulate the insurance industry.
>
> Disclosed herein is a reinsurance based approach to providing non-linear retrospective premium plans to insureds that may not have the option of such a plan directly.
>
> [Reinsurance Participation Plan, US Patent No. 7,908,157 B1 (issued Mar. 15, 2011), at col. 6, lines 22-40.]

IT FURTHER APPEARING, that the patent continues to describe how

Respondents attempt to evade regulatory oversight of their programs:

> [C]ompliance with regulatory requirements that do not make specific provision for these plans . . . is based on the fact that an insurance carrier can cede a certain portion of an insurance risk to a reinsurance company. Said reinsurance company can, in turn, enter into a separate Participation Agreement with the insured whereby a credit or debit is assessed on the insured as a function of the losses experienced by each insured.
>
> An admitted insurance carrier . . . has a license from a state insurance department . . . to sell Guaranteed Cost workers' compensation insurance in a given state. The insurance carrier obtains approval by using an industry standard Guaranteed Cost policy and filing premium rate requests

---

Jersey Workers Compensation Employers Liability Insurance Manual (2018), Part Three, Sec. 12, p. 1.

7

> with the insurance department . . . . The insurance
> department, already familiar with the policy, approves the
> rates. . . .
>
> The insurance carrier then contractually arranges with a
> broker . . . to sell said standard policies to a targeted class of
> companies. These targeted classes include small sized . . .
> and medium sized . . . companies.

[Id. at col. 6, lines 45-63.]

IT FURTHER APPEARING, that the patent explains how an employer's use of the

RPA results in an employer obtaining a retrospective rating plan:

> The reinsurance company . . . can now provide funds to
> implement a non-linear retrospective rating plan as a
> "participation plan." The reinsurance company does this by
> entering into a separate contractual arrangement with the
> insured. If the insured has lower than average losses in the
> next year, then the reinsurance company can provide a
> premium reduction . . . according to the participation plan. If
> the insurance has higher than average losses in a given year,
> then the reinsurance company will assess additional
> premium . . . accordingly. The insured can now, in effect,
> have a retrospective rating plan because of the arrangement
> among the insurance carrier . . . , the reinsurance company .
> . . , and the insured, even though, in fact, the insured has
> Guaranteed Cost insurance coverage with the insurance
> carrier . . . .

[Id. at col. 7, lines 41-54.]

IT FURTHER APPEARING, that the RPA potentially leads to higher and

unpredictable assessments against an employer should a certain level of claims occur; and

IT FURTHER APPEARING, that the RPA causes the ultimate cost and other key

contractual terms of the guaranteed-cost workers' compensation policy to be materially

different than those filed with CRIB and approved by the Commissioner; and

IT FURTHER APPEARING, that the state insurance departments of California,

Vermont, and Wisconsin have concluded that the programs do not comply with their states'

8

insurance laws, because the RPA is a collateral agreement that modifies the underlying guaranteed cost policy, and that the RPA was required to be filed with and approved by the insurance departments of those states; and

IT FURTHER APPEARING, that the Supreme Court of Nebraska, Respondents' home state, in Citizens of Humanity, LLC v. Applied Underwriters Captive Risk Assur. Co., 909 N.W. 2d 614, 620-21, 632-33 (Neb. 2018), found that the RPA was a retrospective rating plan and that it was not a reinsurance contract; and

IT FURTHER APPEARING, that on June 4, 2012, Applied's General Counsel met with representatives of CRIB and spoke about the programs, but the conversation did not constitute approval of the program by the Commissioner; and

IT FURTHER APPEARING, that the RPA is a de facto Retrospective Rating Plan Endorsement that materially modifies the guaranteed-cost workers' compensation policy of the programs; therefore, the RPA and the programs must be filed with CRIB and approved by the Commissioner; and

## VIOLATIONS OF LAW

### COUNT 1

IT FURTHER APPEARING, that from 2008 to present, Respondents marketed and sold an unfiled and unapproved workers' compensation program with impermissible retrospective rating to at least 300 New Jersey employers that, based on a sampling, resulted in approximately 85% of those employers owing approximately $18.9 million to Respondents, often in excess of CRIB's approved premium rates, in violation of N.J.S.A. 17:22A-40(a)(2), (5), (8), (16), and (17); and N.J.S.A. 34:15-88;

NOW, THEREFORE, IT IS on this  6th  day of  *March*  , 2019;

9

ORDERED, Respondent Continental appear and show cause why its authority to transact workmen's compensation or employer's liability insurance should not be suspended, pursuant to N.J.S.A. 34:15-88; and

IT IS FURTHER ORDERED, that Respondents appear and show cause why they should not be ordered to unwind the programs, pursuant to N.J.S.A. 34:15-88; and

IT IS FURTHER ORDERED, that Respondents appear and show cause why they should not be ordered to cease and desist from collecting additional premiums from insured New Jersey businesses that may have paid less than they would have under their Continental policy including voiding all contracts, liens or promissory notes entered into by New Jersey businesses with the Respondents regarding payment of the additional premium due under the retrospective rating, pursuant to N.J.S.A. 34:15-88; and

IT IS FURTHER ORDERED, that Respondent ARS appear and show cause why its insurance producer license shall not be revoked by the Commissioner, pursuant to N.J.S.A. 17:22A-40a; and

IT IS FURTHER ORDERED, that Respondents appear and show cause why the Commissioner should not assess a fine of up to $5,000 for the first violation, and $10,000 for each subsequent violation of the Producer Act, and/or $1,000 for the first offense and not exceeding $2,000 for each subsequent offense as applicable under N.J.S.A. 17:33-2, and order Respondents to pay restitution of moneys owed to any person, pursuant to N.J.S.A. 17:22A-45c. Restitution shall include return of all insurance premiums in excess of the premiums that should have been charged by Continental in accordance with the approved CRIB rating system, after any applicable payroll audits, and excluding specified

10

fees for non-insurance services under the RPA, such as those for payroll processing, with interest; and

IT IS FURTHER ORDERED, that Respondents appear and show cause why they should not be required to reimburse the Department of Banking and Insurance for the costs of the investigation and prosecution authorized pursuant to N.J.S.A. 17:22A-45c; and

IT IS PROVIDED, that Respondents have the right to request an administrative hearing, to be represented by counsel or other qualified representative, at their own expense, to take testimony, to call or cross-examine witnesses, to have subpoenas issued, and to present evidence or argument if a hearing is requested; and

IT IS FURTHER PROVIDED, that, unless a request for a hearing is received within twenty (20) days of the service of this Order to Show Cause, the right to a hearing in this matter shall be deemed to have been waived by Respondents, and the Commissioner shall dispose of this matter in accordance with law. A hearing may be requested by mailing the request to Virgil Dowtin, Chief of Investigations, Department of Banking and Insurance, P.O. Box 329, Trenton, New Jersey 08625, or by faxing the hearing request to the Department at (609) 292-5337. A copy shall also be sent to Deputy Attorney General Adam B. Masef, R.J. Hughes Justice Complex, 25 Market Street, P.O. Box 117, Trenton, New Jersey 08625. The request shall contain the following:

(a)     Respondent's full name, address and daytime telephone number;

(b)     A statement referring to each charge alleged in this Order to Show Cause and identifying any defense intended to be asserted in response to each charge. Where the defense relies on facts not contained in the Order to Show Cause, those specific facts must be stated;

(c)     A specific admission or denial of each fact alleged in this Order to Show Cause. Where the Respondent has no specific knowledge regarding a fact alleged in the Order to Show Cause, a statement to that effect must be

11

contained in the hearing request. Allegations of this Order to Show Cause not answered in the manner set forth above shall be deemed to have been admitted; and

(d)    A statement requesting the hearing.

Marlene Caride
Commissioner

12

# EXHIBIT F

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of:

Continental Indemnity Company,
Applied Underwriters, Inc.,
Applied Risk Services Inc.,
Applied Risk Services of NY, Inc.,
and Applied Underwriters Captive Risk Assurance Company, Inc.

Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **CONSENT ORDER**

WHEREAS the New York State Department of Financial Services (the "Department") commenced an investigation in December 2015 of Continental Indemnity Company ("Continental"), Applied Underwriters, Inc. ("Applied"), Applied Risk Services Inc. ("ARSI"), Applied Risk Services of NY, Inc. ("ARSNY") (collectively, Applied Risk Services, or "ARS") and Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA") (collectively, "Respondents") pursuant to the New York Insurance Law and Financial Services Law (the "Investigation");

WHEREAS the Department investigated whether Respondents' design, offering, and marketing and subsequent sale to New York employers of a program consisting of workers' compensation insurance offered with a separate agreement that was not filed with the Department (the "Program") violated the Insurance Law and Financial Services Law;

WHEREAS Respondents voluntarily ceased offering the Program in New York after the Department's Investigation began;

NOW, THEREFORE, the Department and Respondents are willing to resolve all matters involving the Program cited herein in lieu of proceeding by notice and a hearing.

## FINDINGS

The findings of the Department are as follows:

### Relevant Entities

1.  Applied is based in Omaha, Nebraska that, through its subsidiaries, offers workers' compensation insurance to employers in New York. Among its affiliates are Continental and AUCRA. Applied manages most of Continental's insurance business, pursuant to a Management Services Agreement with Continental, including establishing underwriting standards and managing claims.

2.  Continental is a subsidiary of North American Casualty Co. ("NAC"), which is, in turn, a subsidiary of Applied, and is incorporated in Iowa. Continental is a property/casualty insurer duly licensed in New York to issue workers' compensation policies.

3.  AUCRA is a subsidiary of NAC, and a property casualty company incorporated and licensed in Iowa. AUCRA is not licensed or otherwise authorized to offer insurance in New York.

4.  ARS is a subsidiary of Applied, and is incorporated in Nebraska with its principal place of business in Nebraska. ARS acts as a billing agent, collecting and remitting funds on a pass-through basis for the Program.

5.  ARSNY d/b/a ARS Insurance Agency, is a subsidiary of Applied and is incorporated in New York with its principal place of business in Omaha, Nebraska. ARSNY is duly licensed by the Department as a property/casualty agent to produce workers' compensation

2

insurance in New York and is listed as a third-party administrator, with a New York City address and phone number, by the New York Workers' Compensation Board.

## Background

6.    New York Workers' Compensation Law §§ 2 and 3 require that nearly all New York employers provide workers' compensation coverage for their employees. Workers' compensation insurance is one of the biggest expenses for nearly any business, large or small. Most workers' compensation insurance written in New York is in the form of guaranteed-cost policies, by which insurers charge a set premium based on identified employee classifications and corresponding payroll.

7.    Pursuant to Insurance Law § 2313, the New York Compensation Insurance Rating Board ("CIRB") serves as the nongovernment rate service organization ("RSO") for New York State workers' compensation insurers. CIRB is a private unincorporated association of insurance carriers responsible for the collection of workers' compensation data, and the development of workers' compensation rates and rules regarding the proper application of these rates to workers' compensation policies. CIRB also administers various individual risk-rating plans such as the Retrospective Rating Plan, which is publicly available on the CIRB website.

8.    Retrospective rating, set out in the Retrospective Rating Plan, is an optional program which is mutually agreed-upon by the employer and the insurer. Retrospective rating premiums are based on projected loss experience and are subject to a contractual adjustment after policy expiration based upon the individual employer's actual loss experience. In contrast, a guaranteed-cost policy sets premiums at a monthly amount that is not subject to change based on an individual employer's loss experience. Retrospective rating programs are approved by the

3

Superintendent in accordance with Article 23 of the Insurance Law, provided that premiums are calculated using uniformly-applied criteria applicable to all insured employers in a non-discriminatory manner.

9.    New York's smallest employers, who generally pay the least in premiums for workers' compensation insurance, are not eligible for retrospective rating and cannot thereby reduce their workers' compensation costs if they manage their claims and have a robust safety program. Pursuant to CIRB's Retrospective Rating Plan Manual, which the Department has approved, retrospective ratings is an option in New York only for policies with at least $25,000 of standard workers' compensation premium.

**The Insurance Program**

10.    Applied offered the Program in New York under multiple names, including "SolutionOne" and "EquityComp." The Program included guaranteed-cost workers' compensation policies issued by Continental on forms and rates approved by the Department along with another contract titled a "Reinsurance Participation Agreement" ("RPA"), that employers entered into with AUCRA. Respondents offered policies under the Program to New York employers ("New York Policies") from as early as January 2010, to late 2016. While some New York employers paid less for coverage under the Program than they would have paid under the workers' compensation policies alone, some New York employers paid more for coverage under the Program than they would have paid under the workers' compensation policies alone, many significantly more.

11.    Although the guaranteed-cost policy forms represented that "[t]he only agreements relating to this insurance are stated in this policy," to participate in the Program

4

employers obtaining guaranteed-cost policies were required to sign the RPAs, which were related to the policies. The RPAs established a loss-sensitive formula, which modified and superseded the agreement established by the guaranteed-cost policies, operating similarly to a retrospective rated workers' compensation insurance policy. The RPAs required the employer to fund a segregated cell with AUCRA from which the insurer's losses would be paid subject to a minimum and maximum estimated at the inception of each Program although Continental remained exclusively responsible for the payment of any and all losses under the policies.

12.     Employers remitted monthly payments to ARS, which forwarded the payments to Continental. Continental allocated the monthly payments to AUCRA to fund the employer's segregated cell. When a claim was filed, Continental would pay the claim, but then would cede the liability to AUCRA, which would in turn cede the liability to the employer's segregated cell. As disclosed in Program documents, because the RPAs required the employer to fund the segregated cell, the terms of the RPAs controlled the amount of the employers' monthly payments regardless of the terms of the guaranteed-cost policy.

13.     On March 15, 2011, officers of Applied were granted Patent No. 7,908,157 B1 for a "Reinsurance Participation Plan," the formula used in the RPA. The patent explicitly states that its purpose is to introduce a novel premium structure into the marketplace enabling the offering of retrospective-style insurance to small and medium-sized insureds and describes the program as "a reinsurance based approach to providing non-linear retrospective plans to insureds . . . while at the same time complying with state regulation." However, the Program as implemented did not comply with New York law. The patent is filed and publicly available.

14.     The RPA was not filed with the Department, and as a result the RPA and the Program as a whole were not reviewed or approved by the Department.

5

15.     Despite the fact that the Program was marketed as a way that employers could "share in the underwriting profit" of their workers' compensation insurance, and because workers' compensation claims have a long tail, the RPAs required the employer to wait three years to receive any "profit distributions," and gave AUCRA the option to withhold funds in some cases for up to four more years.

16.     The formula by which the RPAs calculate costs was complex and the way in which it was presented to employers was misleading. When offered the Program, employers were given a visual representation that showed their lowest and highest possible costs, but that did not give an indication of what their total payments might be. The Program's formula was based on a non-linear model, which was novel enough that the Respondents received a patent for it. Under the formula, Program fees can rise rapidly with the first few claims to levels substantially higher than what would have been paid under a typical linear retrospective model.

17.     The Department determined that parts of the Program constituted an unlicensed insurance business. Some of the Respondents engaged in the unlicensed business while others actively aided it. Moreover, the RPAs were policy forms that should have been filed with the Department but Respondents issued them for delivery to employers without doing so. The RPAs resulted in fees that were different from the rates in the filed and approved guaranteed-cost policy.

18.     Applied has cooperated with the Department's investigation.

19.     Respondents have agreed to this Consent Order to avoid the time, expense and distraction of litigation. This Consent Order includes Findings of the Department which have not been the subject of an adjudicatory hearing or judicial process in which Respondents have had an opportunity to present evidence and examine witnesses. The parties agree that this Consent Order

6

does not create any private rights or remedies against Respondents, create any liability for Respondents, constitute evidence of wrongdoing by Respondents for the purpose of any third-party proceeding, or waive any defenses of Respondents against any person or entity not a party to this Consent Order.

## Violations

20.   By reason of the foregoing, the Department finds that Respondents violated Sections 1102, 2117, 2307, and 2324 of the Insurance Law and Section 408 of the Financial Services Law:

> a.   As described under Insurance Law § 1101(b)(1)(E), Applied has engaged in doing an unlicensed insurance business in this state in violation of Insurance Law § 1102;
>
> b.   ARS and AUCRA aided unlicensed insurance business in violation of Insurance Law § 2117;
>
> c.   AUCRA issued for delivery, and ARS delivered, unfiled policy forms in violation of Insurance Law § 2307;
>
> d.   Continental and ARS offered and provided inducements and rebates to consumers in violation of Insurance Law § 2324; and
>
> e.   Applied violated Financial Services Law § 408.

## AGREEMENT

**IT IS HEREBY UNDERSTOOD AND AGREED** by Respondents and all subsidiaries, affiliates, successors, assigns, agents, representatives and employees, that:

7

## Injunctive Relief

21.     Respondents have voluntarily ceased offering the Program in New York and will not resume offering the Program in New York without the Department's approval. Respondents shall not issue new RPAs, or any documents equivalent to RPAs, or renew existing RPAs relating to any New York Policies.

22.     Respondents shall not collect or seek to collect any additional funds from insureds who paid less under the Program than they would have paid pursuant to Continental's filed and approved guaranteed-cost rates. Should Respondents attempt to do so for any reason, including in relation to any private action, Respondents shall return all additional premiums owed to all New York residents who were assessed greater amounts pursuant to the Program than otherwise would have been owed pursuant to Continental's filed and approved guaranteed-cost workers' compensation insurance rates.

23.     After the effective date of this Consent Order, Respondents shall not commence arbitration proceedings or enforce arbitration provisions pursuant to contracts entered into in the State of New York or by New York employers.

24.     Should any New York employer wish to maintain coverage through Respondents, Respondents shall offer such employer the opportunity to renew the filed policy.

25.     Respondents shall comply with New York Insurance Law provisions specified in Paragraph 20, and with New York Financial Services Law § 408, as well as all other applicable laws and regulations.

8

**Civil Penalty**

26.     No later than ten (10) business days after the Effective Date of this Consent Order, Applied, on behalf of Respondents, shall pay a civil penalty in the amount of three million dollars ($3,000,000) to the Department. The payment shall be made by wire transfer in accordance with the Department's instructions.

27.     Neither Respondents, nor any of their parents, subsidiaries, or affiliates shall, collectively or individually, seek or accept, directly or indirectly, reimbursement or indemnification, including but not limited to payment made pursuant to any insurance policy referenced in this Consent Order, or from any of its parents, subsidiaries, or affiliates, with regard to any or all of the amounts payable pursuant to this Consent Order.

28.     Respondents agree that they will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax, directly or indirectly, for any portion of the civil penalty paid pursuant to this Consent Order.

**Other Relief**

29.     Respondents will not contest the authority of the Department to effectuate this Consent Order.  Respondents will cease and desist from engaging in any acts in violation of the New York Insurance Law and will comply with those and any other applicable New York laws and regulations.

**Breach of the Consent Order**

30.     If any of Respondents default on any material obligation under this Consent Order, the Department may terminate this Consent Order in its entirety, at its sole discretion, upon five (5) business days' written notice.  In the event of such termination, Respondents

9

expressly agree and acknowledge that this Consent Order shall in no way bar or otherwise preclude the Department from commencing, conducting or prosecuting any investigation, action, or proceeding against Respondents, however denominated, related to the provisions of the Consent Order, or from using in any way statements, documents or other materials produced or provided by Respondents prior to or after the date of this Consent Order, including, without limitation, such statements, documents or other materials, if any, provided for purposes of settlement negotiations.

31.     In the event that the Department believes any Respondent to be materially in breach of this Consent Order ("Breach"), the Department will provide written notice to such Respondent of the Breach. Within ten (10) business days from the date of receipt of said notice, or on a later date if so determined in the sole discretion of the Superintendent, such Respondent must appear before the Department and shall have an opportunity to rebut the Department's assertion that a Breach has occurred, and, to the extent pertinent, demonstrate that any such Breach is not material or has been cured.

32.     Respondents understand and agree that failure to provide the required submission to the Department within the specified period as set forth in Paragraph 31 of this Consent Order is presumptive evidence of a Breach thereof. Upon a finding of Breach, the Department has all the rights and remedies available to it under the New York Insurance Law, Financial Services Law, or other applicable laws and may use any and all evidence available to the Department for all ensuing hearings, notices, orders and other remedies that may be available under the New York Insurance Law, Financial Services Law, or other applicable laws.

10

## **Other Provisions**

33.     Respondents shall submit to the Department annual affidavits of compliance with the terms of this Consent Order for a period of three (3) years commencing from the Effective Date of this Consent Order.

34.     The Department has agreed to the terms of this Consent Order based on, among other things, the representations made to the Department by Respondents.  To the extent that representations made by Respondents—either directly or through their counsel—are later found to be materially incomplete or inaccurate, this Consent Order is voidable by the Department in its sole discretion.

35.     Upon the request of the Department, Respondents shall provide all documentation and information reasonably necessary for the Department to verify compliance with this Consent Order.

36.     Respondents represent and warrant, through the signatures below, that the terms and conditions of this Consent Order are duly approved, and execution of this Consent Order is duly authorized.

37.     All notices, reports, requests, certifications, and other communications to any party pursuant to this Consent Order shall be in writing and shall be directed as follows:

**For the Department:**

> Bruce Wells
> Associate Counsel, Enforcement
> New York State Department of Financial Services
> One State Street
> New York, New York 10004-1511

11

**For Continental:**

> 10805 Old Mill Road
> Omaha, Nebraska 68154
> Attention: Jeffrey A. Silver
>
> with a copy to:
> DLA Piper LLP
> 1251 Avenue of the Americas
> New York, New York 10020
> Attention: Shand Stephens

**For Applied:**

> 10805 Old Mill Road
> Omaha, Nebraska 68154
> Attention: Jeffrey A. Silver
>
> with a copy to:
> DLA Piper LLP
> 1251 Avenue of the Americas
> New York, New York 10020
> Attention: Shand Stephens

**For Applied Risk Services Inc.:**

> 10805 Old Mill Road
> Omaha, Nebraska 68154
> Attention: Jeffrey A. Silver
>
> with a copy to:
> DLA Piper LLP
> 1251 Avenue of the Americas
> New York, New York 10020
> Attention: Shand Stephens

**For Applied Risk Services of NY, Inc.:**

    10805 Old Mill Road
    Omaha, Nebraska 68154
    Attention: Jeffrey A. Silver

    with a copy to:
    DLA Piper LLP
    1251 Avenue of the Americas
    New York, New York 10020
    Attention: Shand Stephens

**For AUCRA:**

    10805 Old Mill Road
    Omaha, Nebraska 68154
    Attention: Jeffrey A. Silver

    with a copy to:
    DLA Piper LLP
    1251 Avenue of the Americas
    New York, New York 10020
    Attention: Shand Stephens

38.    This Consent Order and any dispute thereunder shall be governed by the laws of the State of New York without regard to any conflicts of laws principles.

39.    Respondents waive all rights to further notice and hearing in this matter as to any allegations of past violations up to and including the Effective Date of this Consent Order and agrees that no provision of the Consent Order is subject to review in any court or tribunal outside the Department.

40.    This Consent Order may not be amended except by an instrument in writing signed on behalf of all the parties to this Consent Order.

41.     In the event that one or more provisions contained in this Consent Order shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Consent Order.

42.     This Consent Order may be executed in one or more counterparts, and shall become effective when such counterparts have been signed by each of the parties hereto and the Consent Order is So Ordered by the Superintendent of Financial Services or her designee (the "Effective Date").

43.     Upon execution of this Consent Order by the parties, the Department will discontinue the Investigation as to and against Respondents solely with respect to the practices set forth herein through the Effective Date of this Consent Order.  No further action will be taken by the Department against Respondents for the conduct set forth in this Consent Order provided Respondents comply fully with the terms of the Consent Order.

14

WHEREFORE, the signatures evidencing assent to this Consent Order have been affixed hereto on the dates set forth below.

DEPARTMENT OF FINANCIAL SERVICES

By: _____
R. BRUCE WELLS
Associate Counsel, Enforcement
Consumer Protection and Financial
Enforcement Division

July 17, 2019

By: _____
CHRISTOPHER B. MULVIHILL
Deputy Superintendent, Enforcement
Consumer Protection and Financial
Enforcement Division

July 17, 2019

By: Katherine A. Lemire /s/ SF
KATHERINE A. LEMIRE
Executive Deputy Superintendent
Consumer Protection and Financial
Enforcement Division

July 17, 2019

APPLIED UNDERWRITERS, INC.,

By: _____
JEFFREY A. SILVER, Secretary
July 17, 2019

CONTINENTAL INDEMNITY COMPANY,

By: _____
JEFFREY A. SILVER, Secretary
July 17, 2019

15

APPLIED RISK SERVICES INC.,

By: _____
    JEFFREY A. SILVER, Secretary
July 17, 2019

APPLIED RISK SERVICES OF NY, INC.

By: _____
    JEFFREY A. SILVER, Secretary
July 17, 2019

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC.

By: _____
    JEFFREY A. SILVER, Secretary
July 17, 2019


THE FOREGOING IS HEREBY APPROVED.
IT IS SO ORDERED.

_____
LINDA A. LACEWELL
Superintendent of Financial Services

July 17, 2019

16

# EXHIBIT G

**State of Wisconsin** / OFFICE OF THE COMMISSIONER OF INSURANCE

*Tony Evers, Governor*
*Mark Afable, Commissioner*

*Wisconsin.gov*

125 South Webster • P.O. Box 7873
Madison, Wisconsin 53707-7873
Phone: (608) 266-3585 • Fax: (608) 266-9935
E-Mail: ocicomplaints@wisconsin.gov
Web Address: oci.wi.gov

Notice of Adoption and Filing of Examination Report

Take notice that the proposed report of the market conduct examination of the

CONTINENTAL INDEMNITY COMPANY
10805 OLD MILL ROAD
OMAHA, NE 68154-2607

dated August 29, 2018, and served upon the company on January 18, 2019, has been adopted as the

final report, and has been placed on file as an official public record of this Office.

Dated at Madison, Wisconsin, this 11th day of March, 2019.

Mark Afable
Commissioner of Insurance

**STATE OF WISCONSIN**
**OFFICE OF THE COMMISSIONER OF INSURANCE**

**MARKET CONDUCT EXAMINATION**

**OF**

**CONTINENTAL INDEMNITY COMPANY**
**OMAHA, NEBRASKA**

**AUGUST 20, 2018 – AUGUST 29, 2018**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PURPOSE AND SCOPE ................................................................................... 5

III.  PRIOR WISCONSIN OCI ACTIONS ............................................................... 6

IV.   CURRENT EXAMINATION FINDINGS .......................................................... 8

V.    CONCLUSION ................................................................................................ 20

VI.   SUMMARY OF RECOMMENDATIONS ......................................................... 21

VII.  ACKNOWLEDGEMENT ................................................................................. 22



**State of Wisconsin** / OFFICE OF THE COMMISSIONER OF INSURANCE

*Scott Walker, Governor*
*Theodore K. Nickel, Commissioner*

**Wisconsin.gov**

Bureau of Market Regulation
125 South Webster Street • P.O. Box 7873
Madison, Wisconsin 53707-7873
(608) 266-3585 • (800) 236-8517
Fax: (608) 264-8115
E-Mail: ocicomplaints@wisconsin.gov
Web Address: oci.wi.gov

August 29, 2018

Honorable Theodore K. Nickel
Commissioner of Insurance
Madison, WI 53702

Commissioner:

Pursuant to your instructions and authorization, a targeted market conduct examination was conducted August 20, 2018 to August 29, 2018, of:

CONTINENTAL INDEMNITY COMPANY
Omaha, Nebraska

and the following report of the examination is respectfully submitted.

**I. INTRODUCTION**

Continental Indemnity Company f/k/a/ Continental National Indemnity Company (the company) is a stock company domiciled in Iowa with an address of record of 10805 Old Mill Rd, Omaha, NE 68154.  The company is a subsidiary of Applied Underwriters, Inc.  In 2005, Berkshire Hathaway Inc. purchased eighty-one per cent (81%) of the holding company that owns the company.  Applied Risk Services, Inc. is a general agency that is also a subsidiary of Applied Underwriters, Inc.

1

In 2016 the company was licensed in 47states and 2 jurisdictions, American Samoa, and District of Columbia.   The company was writing business in 35 states and jurisdictions, including; Alabama, Arkansas, Colorado, District of Columbia, Delaware, Florida, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Missouri, Mississippi, North Carolina, Nebraska, New Hampshire, New Jersey, New Mexico,

2

New York, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Virginia, Vermont, Wisconsin, and West Virginia.

The national direct premiums written and Wisconsin direct premiums written for the years 2016, 2015 and 2014 were as follows:

**National Direct Premium Written to Wisconsin Direct Premium Written**

| Year | National Direct Premiums Written | Wisconsin Direct Premiums Written | WI as Percentage of National Premium |
|------|------|------|------|
| 2016 | $291,543,835 | $2,807,781 | 0.96% |
| 2015 | $303,910,242 | $4,621,221 | 1.52% |
| 2014 | $291,651,106 | $4,139,446 | 1.42% |

From 2014 to 2016 the entirety of the Wisconsin premium earned by the company was in the workers' compensation line of business.  The following table summarizes the premium earned and incurred losses in Wisconsin from 2014 to 2016 for the workers' compensation line of business.

**Wisconsin Direct Premium and Loss Summary**

| Year | Direct Premiums Written | Direct Premiums Earned | Direct Losses Paid |
|------|------|------|------|
| 2016 | $2,807,781 | $2,807,781 | $1,218,694 |
| 2015 | $4,621,221 | $4,621,221 | $2,235,228 |
| 2014 | $4,139,446 | $4,139,446 | $1,718,736 |

The Office of the Commissioner of Insurance (OCI) received three (3) complaints against the company between 2013 through 2017.  A complaint is defined as 'a written communication

3

received by the Commissioner's Office that indicates dissatisfaction with an insurance company or agent.'   The 3 complaints received by OCI are all categorized under the Worker's Compensation line of business with reasons being for claims handling, policyholder service and market and sales.

4

## II.   PURPOSE AND SCOPE

A targeted examination was conducted to determine whether the company's practices and procedures comply with the Wisconsin insurance statutes and rules.   The examination focused on the period from January 1, 2014 through December 31, 2017.   In addition, the examination included a review of any subsequent events deemed important by the examiner-in-charge during the examination.

The examination included a review of workers' compensation insurance business in Wisconsin and consisted of a review of company operations and management; policyholder service and complaints; policy forms and rates; marketing, sales, and advertising; claims; underwriting and rating; and producer licensing.

A specific issue reviewed in the examination is the company's compliance with ch. 626, Wis. Stat.   This chapter in Wisconsin statutes addresses rate regulation in workers' compensation insurance and establishes the Wisconsin Compensation Rating Bureau (WCRB). Wisconsin is a "controlled rate state," meaning, no insurer writing  workers' compensation insurance under s. 626.03, Wis. Stat., may use a rate, rating plan or classification nor an expense loading not approved by the commissioner (OCI).   The rates that must be used by an insurer are rates that have been filed by the WCRB with the commissioner on behalf of its members (insurers) for every manual of classifications, rules and rates, every rating plan and every modification of any of them proposed for use in Wisconsin.

The report is prepared on an exception basis and comments on those areas of the company's operations where adverse findings were noted.

5

### III.   PRIOR WISCONSIN OCI ACTIONS

The company has not been subject to prior market conduct examinations by Wisconsin, however, it has been subject to a series of regulatory actions taken by Wisconsin regarding the company's workers' compensation line of business.  A summary of specific actions (OCI Case No. 13-C35597) is listed below.

**Order of Forfeiture and Order (February 13, 2015)**

An order issued by OCI requiring the company to cease and desist from marketing, binding and renewing SolutionOne policies and any similarly designed policy or programs in Wisconsin or to Wisconsin employers.

**Order of Forfeiture and Order (April 29, 2015)**

An order issued by OCI to the company to pay a forfeiture of fifteen thousand dollars ($15,000.00) and to cancel any policy that was renewed in violation of the February 13, 2015 Order.

**Stipulation and Order (June 22, 2015)**

The company entered into a stipulation  to cease and desist from marketing, binding, issuing and renewing SolutionOne and EquityComp policies and any similarly designed workers' compensation policy including, but not limited to, reinsurance agreements; or any other policy or program that has not been approved by the WCRB.  The company also agreed to mid-term cancel all of the SolutionOne and EquityComp policies with Wisconsin coverage that was issued after February 13, 2015.  The company was able to offer replacement workers' compensation policies or Wisconsin endorsements to those policyholders as long as the replacement workers' compensation policy/endorsement was a WCRB approved policy form, used WCRB mandated rates and was not subject to any unapproved side agreements including, but not limited to, a reinsurance agreement.

The company was able to offer a payroll service agreement to policyholders as long as it did not contain any terms related to or affecting workers' compensation insurance, including, but

6

not limited to, policy cancellation terms, claims handling, and/or participation in a medical or pharmaceutical network for workers' compensation claimants.

The company agreed to the imposition of a forfeiture of twenty thousand dollars ($20,000.00) payable to the State of Wisconsin as well as a potential forfeiture of twenty thousand dollars ($20,000.00) per policy sold or renewed in Wisconsin after the date of the order (June 22, 2015) if the company did not comply with the terms of the order.

**Order of Forfeiture and Order (November 24, 2015)**

An order issued by OCI for the company to pay a forfeiture of one hundred and forty thousand dollars ($140,000.00), payable to the State of Wisconsin for the renewal of seven SolutionOne and EquityComp products after the June 22, 2015 Stipulation and Order took effect.

**Stipulation and Order (January 7, 2016)**

The company agreed to the forfeiture in the November 24, 2015 order.  The company confirmed that all in-force SolutionOne and EquityComp policies with Wisconsin coverage had been cancelled in accordance with the Stipulation and Order dated June 22, 2015, each of which cancellations included an offer of a replacement workers' compensation policy, or Wisconsin endorsement, on a WCRB approved policy form and using WCRB mandated rates.

7

## IV.   CURRENT EXAMINATION FINDINGS

**Company Operations and Management**

The examiners reviewed the company's response to the Company Operations and Management interrogatory, Board of Directors meeting minutes and the Berkshire Hathaway audit.   The company offers two main products; SolutionOne for small to medium sized employers and EquityComp for large employers.   The company stated that it did not offer either of these products in Wisconsin after the July 2, 2015, stipulation.

The company indicated that it did not have formal business or long-range strategic plans.   The examiners found that the company does not have a written compliance plan and has few written policies and procedures.   The company does not have a department responsible for agent oversight.   The company indicated an agent oversight department is not necessary since it operates through independent brokers.

The company indicated that it has no contracts with any third party entities.   The examiners found that duties, such as advertising, not performed by the company were performed by associated companies under the same Applied Underwriters Inc. umbrella.   The company also does not have its own internal audit department.   The company indicated that internal audits are performed every three years by Berkshire Hathaway Inc.   The most recent audit was conducted on November 14, 2016.   The examiners reviewed the audit and noted that there were recommendations regarding security access, to reinforce existing claims practices and verify adherence, to enhance the claim quality assurance program regarding process adherence and broaden the claim settlement review process, to improve claim triage and assignment process regarding conversion of medical only claims to indemnity claims, to enhance claim fraud monitoring procedures, and to enhance underwriting documentation for individual customer accounts.   The examiners did not find any documentation indicating that the results of the Berkshire Hathaway audit were reported to the Board of Directors.

8

The general counsel is the company compliance officer and the Board secretary.   All departments report to the general counsel regarding compliance.   Per the general counsel, the company and its Board do not have any other committees.   The general counsel indicated that significant compliance issues are reported to the Board, however, the examiners did not find any issues reported in the Board minutes during the period of review.

1.   **Recommendation:**   It is recommended that the company document that all audit results and enforcement actions are reported to the Board of Directors.

**Policyholder Service and Complaints**

The examiners reviewed the company's response to the Policyholder Service and Complaints interrogatory and three (3) complaint files.

The examiners found that all complaints the company receives from a department of insurance are handled by the general counsel and recorded in the complaint register.   All other complaints are handled by customer service.   The company states that it does not have a definition or guideline as to what constitutes a complaint.   However the examiners found that the company's Claims Practices and Procedures Guide provides a definition of a complaint as "an insured, Injured Worker, medical provider, vendor or other party providing a written or verbal complaint in regards to the company's service or lack of service".   This is in line with OCI's and the National Association of Insurance Commissioners' (NAIC) definition of a complaint.

The company has a Policyholder Service (PHS) section responsible for handling customer calls.   The company states that it does not have PHS official training documents. Policy renewal is automated and all billings are automated clearing house (ACH) transactions. The company's underwriting section handles requests for policy cancellation.   The company indicated it does not have any written policy and procedures for handling this request.   The company's Claim Practices and Procedures Guide states that the claim section is responsible

9

for handling any customer calls regarding claim questions or verbal complaints regarding claims.

The examiners reviewed the company's complaint log and the three (3) complaints received during the period of review, all of which were OCI complaints. The examiners found no issues with the two (2) closed complaints. The one (1) open complaint is related to a finding discussed in the Underwriting and Rating section of this report. The open complaint involves the use of non-filed workers' compensation rates for workers' compensation quotes.

**Policy Forms and Rates**

The examiners reviewed the company's response to the Policy Forms and Rates interrogatory, the company's WCRB Carrier Elections web form and related correspondence. The examiners also reviewed data provided by the WCRB regarding the company's policies issued during the exam review period.

The company's Actuarial Department is responsible for filing forms and rates with the WCRB. As a result of Wisconsin being a controlled rate state for workers' compensation, carriers licensed in the state must file forms and rates with the WCRB rather than with OCI. For this reason, the company's Actuarial Department has minimal communication with OCI. The only workers' compensation filings that OCI accepts from carriers are carrier specific workers' compensation dividend filings. The company states that it does not have any dividend filings with OCI. An examiner review of the System for Electronic Rate and Form Filing (SERFF) verified that the company had not filed dividends with OCI.

The company indicated that the Actuarial Department has multiple sources of information concerning Wisconsin insurance laws and regulations and monitors all states for changes to rates and insurance laws and regulations.

10

The company further indicated that all workers' compensation insurance policies are rated in accordance with the company's filed rates, forms, and underwriting manual.  In response to the Policy Forms and Rates interrogatory, the company stated that its forms and manuals would be available for review while examiners were onsite at the company's office. The examiners reviewed a copy of the company's specific carrier elections that it filed with the WCRB.  The examiners found that the only other rating or underwriting manuals provided by the company were WCRB manuals, specifically the WCRB's Wisconsin Workers' Compensation and Employers Liability Insurance Manual (WI Basic Manual) and the WCRB filed class rates for the years 2016, 2017 and 2018.  The examiner's review of the carrier election form included filing information regarding terrorism and catastrophe coverage charges, use of a premium discount table, use of a short-rate cancellation penalty, a choice in how to charge for Waiver of Right to Recover from Others, and electing not to participate in the Wisconsin Apprenticeship Program.  The examiners reviewed the WI Basic Manual provided by the company and verified that it was up to date.

2.   **Recommendation:** It is recommended that the company develop and implement an underwriting manual for Wisconsin business in order to ensure compliance with Wisconsin regulation.

**Marketing, Sales and Advertising**

The examiners reviewed the company's response to the Marketing, Sales and Advertising interrogatory, two (2) agency agreements and a sample of nine (9) national advertisements.

The nine national advertisements reviewed were magazine advertisements which appeared on the back of the Insurance Journal magazine.  The examiners found that the advertisements were general advertisements for Applied Underwrtiers and did not list any specific policy product.  The advertisements had no Wisconsin-specific advertising.

11

The examiners found that the company's Sales Department is responsible for working with independent agents regarding their marketing and sales activities. The company indicated that Brand Communications manages its advertising, including planning contests, trade shows and events. Brand Communications is a part of Applied Underwriters, Inc.

The company indicated it has no long-term marketing plans for Wisconsin. Currently, it is not actively selling or marketing plans in Wisconsin. The company is continually reevaluating its marketing practices nationwide, including in Wisconsin.

The company indicated that current sales are usually renewals or Wisconsin coverage being requested as an add-on to current multi-state policies by the insureds. The examiners reviewed WCRB policy data along with a sample of new and renewal policies provided by the company (included in the underwriting portion of this exam) that supported the company's statement. The examiners also found that the renewals with an effective date after the Wisconsin Stipulation and Order dated January 7, 2016, were in compliance with the Order.

The company indicated it does not allow sales employees to prepare advertising. In addition, the company does not review advertising prepared by independent brokers. If the company becomes aware of inaccurate information and the broker doesn't correct it immediately, the issue is referred to the company's general counsel.

The company currently has two (2) broker appointments in Wisconsin, American Advantage and The Starr Group. The agency agreements state the company has the right to audit books and records of the agent on the policies. The company did not provide documentation of any agent audits performed. The agreement further states the situs of the agreement is Nebraska and the agent hereby submits to the jurisdiction of Nebraska. However, the Schedule 1 to the Agreement states the authorized territory is Wisconsin.

No exceptions were noted.

12

**Claims**

The examiners reviewed the company's response to the Claims interrogatory, the Claims Practices and Procedures Guide, claims forms, standard letters, claims reports and a sample of twenty-five (25) paid claims and twenty-five (25) unpaid claims.

The company stated that its claims department is responsible for workers' compensation insurance claims and manages all aspects of claims handling including calls with verbal complaints and written complaints. The company indicated that it does not use a third-party administrator for processing Wisconsin claims.

The examiners reviewed the Claims Practices and Procedures Guide. The guide states that, after receiving the claim the claim adjuster should make contact with three (3) parties: (1) the employer, (2) the employee, and (3) the medical provider. This task should be completed within seventy-two (72) hours. The examiners found that all claim files sampled documented that this task was completed within seventy-two (72) hours and the majority were completed within the first twenty-four (24) hours of receiving notice of the incident report from the employer.

The examiners noted while reviewing the Claims Practices and Procedures Guide that the company uses an intake report form when contacting the three (3) parties. The form focuses on documenting information that is relevant to the company and its relationship to each party. The employer section focuses on the employer's contact and policy information. The employee section focuses on the employee's contact, workplace, and injury information. The medical provider section focuses on the provider's contact and treatment information. The form also has a section to document other information, such as who completed the form and when it was completed.

The company stated that adjusters review and process claims and managers are consulted as needed if proposed settlements exceed an adjuster's authority. The company handles all utilization review of medical claims. Retrospective review determinations are made within thirty (30) days of the written request. Prospective medical review determinations are

made within five (5) business days of the written request, and expedited review determinations are made within seventy-two (72) hours of the written request. The company stated that claim payments are generally verbally explained to its insureds. The company acknowledged providing a loss run report if additional information is requested. The company stated that it expects all benefits payable to be issued in a timely manner and interest due is applied in the event of an untimely payment. The examiners found the company did not have a written procedure as to how the company would determine when interest is due on a late claim payment and how to pay such interest, as required by s. 102.22, Wis. Stat. In the sample of twenty-five (25) paid claims that the examiners reviewed there were no instances of late or nonpayment on behalf of the company.

The company's claim adjusters handle verbal claim complaints, adjusters and team leaders handle written complaints and legal counsel and the Vice President of Claims handle any department of insurance complaint involving claims.

3. **Recommendation:** It is recommended that the company develop and implement a written policy and procedure to identify when interest is due on late claim payments and how to pay such interest, as required by s. 102.22, Wis. Stat.

## Underwriting and Rating

The examiners reviewed the company's response to the Underwriting interrogatory and a sample of files including twenty-five (25) renewal files, twenty-five (25) new business files, twenty-five (25) cancellation/termination files and ten (10) quote files.

The examiners found the company did not have manuals for use in processing new business applications or underwriting applications. The company indicated that new business is processed by the New Business Unit and each application is reviewed by the company's Special Investigation Unit (SIU) to confirm accuracy. The company indicated it did not produce underwriting reports for new or renewal policies.

14

During the review of the renewal and new business sample files, the examiners found that four (4) new business files and one (1) renewal file did not have any reference to Wisconsin coverage in the policy or elsewhere in the file.  When notified of this, the company provided documentation to the examiners that in each case the policyholder requested that Wisconsin coverage be added to the policy midterm.  The company then provided proof of coverage and file notes of the request made by the policyholder.

During the review of the new and renewal samples the examiners found that policies that were issued after the January 7, 2016, Stipulation and Order did not include any reinsurance language in the policy file.  This is in accordance with the OCI Stipulation and Order dated June 22, 2015.

The examiners found that the company mid-term canceled SolutionOne and EquityComp polices that were in effect before the June 22, 2015, Stipulation and Order and offered a replacement workers' compensation policy using WCRB mandated rates in accordance to the June 22, 2015, and January 7, 2016, Stipulations and Orders.

The examiners found that all renewals issued by the company after January 7, 2016, Stipulation and Order were issued in accordance with the Stipulation and Order.

While reviewing the cancellation/termination files, the examiners found in the nine (9) files listed below that the nonrenewal notice did not include instructions for obtaining insurance through the Wisconsin Workers' Compensation Insurance Pool (WWCIP) as required by s. Ins 21.01 (9), Wis. Adm. Code.

**Cancellation/Termination Files**



15



When presented with this finding, the company acknowledged that its notices do not comply with the Wisconsin Administration Code and would be amended to bring them into compliance.

The examiners found in the seventeen (17) new business files and nine (9) quote files listed below, that the quoted rates associated with the policies did not match the rates filed with OCI by the WCRB.  Section 626.25, Wis. Stat., provides that no insurer writing any insurance specified under s. 626.03 may use a rate, rating plan or classification nor expense loading not approved by the commissioner.



16



When presented with these findings the company stated,

> "*The rates in each of the proposals reflect anticipated results of a second separate reinsurance transaction between the insured and Applied Underwriters Captive Risk Assurance Company to which Continental Indemnity Company is not a party.  In the event any of the Proposals were accepted, the Wisconsin workers' compensation policy would have been issued with the approved rates filed with the Wisconsin Compensation Rating Bureau."*

The quotes for the policies listed above that fall between the examination review period of January 1, 2014 to January 7, 2016, are documented and acknowledged to have been issued before the issue date of the last Stipulation and Order as referenced in the "Prior Wisconsin OCI Actions" section.  For that period of time the company was still issuing SolutionOne and EquityComp policies in Wisconsin that included a second separate reinsurance agreement between the insured and Applied Underwriters Captive Risk Assurance Company.  For all quotes and policies after the Stipulation and Order dated January 7, 2016, when the company agreed to stop providing SolutionOne and EquityComp policies on Wisconsin coverage the correct WCRB filed workers' compensation class code rates should be used.

17

4.   **Recommendation:** It is recommended that the company amend its cancellation and termination notices to include instructions for obtaining insurance through the Wisconsin Workers' Compensation Insurance Pool (WWCIP) as required     by    s. Ins 21.01 (9), Wis. Adm. Code.

5.   **Recommendation:** It is recommended that the company amend its quotes to show the WCRB filed class code rates for any Wisconsin workers' compensation exposure, as required by s. 626.25, Wis. Stat.

## Producer Licensing

During the marketing, sales and advertising review and the underwriting review, the examiners found the company contracts only with agencies/brokers.

The company indicated that it does not have agents; its contracts are with the agencies/brokers. The company requires all agencies to maintain current and valid licenses. The brokers provide a copy of their license to the company's licensing department.   The examiners found that the company provided no agent training materials, stating it had none, as product information is communicated by phone calls to independent agents working on an open brokerage basis.   The company does not monitor agent sales activity for review/investigation, nor does it conduct agent audits.   The company has not terminated any agents for cause.   In addition, it does not give agents the authority to collect premium payments.

A result of this company procedure, the examiners found that thirty-two (32) policies listed agents on the polices who were not licensed to write business in Wisconsin, as required by s. 628.03, Wis. Stat., and s. Ins 659, Wis. Adm. Code (Attachment 1).   Forty-nine (49) policies listed agents on the policies who were not appointed by the company as required by s. Ins 6.57, Wis. Adm. Code (Attachment 2).   When presented with these findings, the company provided information showing that the agents associated with the policies were licensed in the state in which the policyholder was domiciled, but they were not licensed in the state of Wisconsin.   The company does acknowledge that while it only does business with independent

brokers and while the internal sales representatives for the company are licensed and appointed

in Wisconsin, going forward it will license and appoint all brokers in Wisconsin.

6.  **Recommendation:**  It is recommended that the company develop and implement a written policy and procedure to ensure that all individual agents doing business in Wisconsin are licensed in Wisconsin, as required by s. 628.03, Wis. Stat., and s. Ins 6.59, Wis. Adm. Code.

7.  **Recommendation:**  It is recommended that the company develop and implement a written policy and procedure to ensure that all individual agents doing business in Wisconsin are appointed with the company, as required by s. Ins 6.57, Wis. Adm. Code.

## V.   CONCLUSION

The company agreed to the final Stipulation and Order on January 7, 2016, stating that all SolutionOne and EquityComp policies with Wisconsin coverage had been cancelled and that it would not issue either program going forward unless it was filed and approved by the WCRB. The company was found to be in compliance with this Stipulation and Order as the examiners did not find any active SolutionOne or EquityComp policies with Wisconsin coverage.   All policies the examiners reviewed after January 7, 2016 had the correct WCRB rates.   However, the quotes for the policies after January 7, 2016, continue to have "blended" rates listed for Wisconsin coverage.   This report contains seven (7) recommendations in the areas of company operations and management, policyholder service and complaints, policy forms and rates, claims, underwriting and rating and producer licensing.

20

## VI.   SUMMARY OF RECOMMENDATIONS

**Company Operations and Management**

Page 8      1.      It is recommended that the company document that all audit results are reported to the Board of Directors.

**Policy Forms and Rates**

Page 10     2.      It is recommended that the company develop and implement an underwriting manual for Wisconsin business in order to ensure compliance with Wisconsin regulation.

**Claims**

Page 14     3.      It is recommended that the company develop and implement a written policy and procedure to identify when interest is due on late claim payments and how to pay such interest, as required by s. 102.22, Wis. Stat.

**Underwriting and Rating**

Page 18     4.      It is recommended that the company amend its cancellation and termination notices to include instructions for obtaining insurance through the Wisconsin Workers' Compensation Insurance Pool (WWCIP) as required by s. Ins 21.01 (9), Wis. Adm. Code.

Page 18     5.      It is recommended that the company amend its quotes to show the WCRB filed class code rates for any Wisconsin workers' compensation exposure, as required by s. 626.25, Wis. Stat.

**Producer Licensing**

Page 19     6.      It is recommended that the company develop and implement a written policy and procedure to ensure that all individual agents doing business in Wisconsin are licensed in Wisconsin, as required by s. 628.03, Wis. Stat., and s. Ins 6.59, Wis. Adm. Code.

Page 19     7.      It is recommended that the company develop and implement a written policy and procedure to ensure that all individual agents doing business in Wisconsin are appointed with the company, as required by s. Ins 6.57, Wis. Adm. Code.

21

## VII.   ACKNOWLEDGEMENT

The courtesy and cooperation extended to the examiners during the course of the examination by the officers and employees of the company is acknowledged and appreciated.

In addition to the undersigned, the following representatives of the Office of the Commissioner of Insurance, state of Wisconsin, participated in the examination.

| Name | Title |
|------|-------|
| David Haushalter | Insurance Examiner |
| Darcy Paskey | Insurance Examiner |
| Moua Yang | Insurance Examiner |

Respectfully submitted,

Andrew Stoughton
Examiner-in-Charge

22

# EXHIBIT 9

JULY 11, 2019 10:56 AM (EDT)

🖨 Print This Page

## AM Best Downgrades Credit Ratings of California Insurance Company and Its Affiliates; Places Credit Ratings Under Review

**Related Companies**
For information about each company, including the Best's Credit Reports, group members (where applicable) and news stories, click on the company name. An additional purchase may be required.

| AMB# | Company Name |
| --- | --- |
| 058334 | Berkshire Hathaway Inc. |
| 002637 | California Insurance Company |
| 013065 | Continental Indemnity Company |
| 011132 | Illinois Insurance Company |
| 018683 | North American Casualty Group |

1  2

**CONTACTS:**

Filippo Novella
Financial Analyst
+1 908 439 2200, ext. 5486
filippo.novella@ambest.com

Christopher Sharkey
Manager, Public Relations
+1 908 439 2200, ext. 5159
christopher.sharkey@ambest.com

Mariza Costa
Senior Financial Analyst
+1 908 439 2200, ext. 5154
mariza.costa@ambest.com

Jim Peavy
Director, Public Relations
+1 908 439 2200, ext. 5644
james.peavy@ambest.com

**FOR IMMEDIATE RELEASE**

OLDWICK - JULY 11, 2019 10:56 AM (EDT)

**AM Best** has downgraded the Financial Strength Rating to A (Excellent) from A+ (Superior) and the Long-Term Issuer Credit Ratings to "a+" from "aa-" of California Insurance Company (Foster City, CA), Continental Indemnity Company (Cedar Rapids, IA), Illinois Insurance Company (Cedar Rapids, IA), Texas Insurance Company (Dallas, TX) and Pennsylvania Insurance Company (Cedar Rapids, IA). In addition, AM Best has placed these Credit Ratings (ratings) under review with negative implications. All companies are collectively referred to as North American Casualty Group (NAC).

The ratings reflect NAC's balance sheet strength, which AM Best categorizes as strongest, as well as its strong operating performance, limited business profile and appropriate enterprise risk management.

The ratings have been downgraded as NAC is no longer a strategic investment to its current ultimate parent, Berkshire Hathaway Inc. [NYSE: BRK.A and BRK.B], which is currently negotiating the sale of the company. NAC's ratings will remain under review pending the completion of the transaction, with the negative implications reflecting the execution risk around the deal. AM Best will continue discussions with NAC's management and monitor the company's risk-adjusted capitalization, operating performance and business profile.

**This press release relates to Credit Ratings that have been published on AM Best's website. For all rating information relating to the release and pertinent disclosures, including details of the office responsible for issuing each of the individual ratings referenced in this release, please see AM Best's Recent Rating Activity web page. For additional information regarding the use and limitations of Credit Rating opinions, please view Understanding Best's Credit Ratings. For information on the proper media use of Best's Credit Ratings and AM Best press releases, please view Guide for Media - Proper Use of Best's Credit Ratings and AM Best Rating Action Press Releases.**

**AM Best is a global rating agency and information provider with a unique focus on the insurance industry.**

  

**Copyright © 2021 A.M. Best Company, Inc.** and/or its affiliates ALL RIGHTS RESERVED
No part of this report may be distributed in any electronic form or by any means, or stored in a database or retrieval system, without the prior written permission of AM Best. Refer to our terms of use for additional details.

Exhibit 9, Page 1 of 1

# EXHIBIT 10

Case 2:21-cv-00030-WBS-AC    Document 24    Filed 03/15/21    Page 379 of 472

OCTOBER 31, 2019 03:13 PM (EDT)                                    🖶 Print This Page

## AM Best Downgrades Issuer Credit Ratings of California Ins Co. and Affiliates; Maintains Under Review With Negative Implications

**CONTACTS:**

Mariza Costa
Senior Financial Analyst
+1 908 439 2200, ext. 5154
mariza.costa@ambest.com

Christopher Sharkey
Manager, Public Relations
+1 908 439 2200, ext. 5159
christopher.sharkey@ambest.com

Robert DeRose
Senior Director
+1 908 439 2200, ext. 5453
robert.derose@ambest.com

Jim Peavy
Director, Public Relations
+1 908 439 2200, ext. 5644
james.peavy@ambest.com

**Related Companies**

For information about each company, including the Best's Credit Reports, group members (where applicable) and news stories, click on the company name. An additional purchase may be required.

| AMB# | Company Name |
|------|--------------|
| 058334 | Berkshire Hathaway Inc. |
| 002637 | California Insurance Company |
| 013065 | Continental Indemnity Company |
| 011132 | Illinois Insurance Company |
| 018683 | North American Casualty Group |

1  2

**FOR IMMEDIATE RELEASE**

OLDWICK - OCTOBER 31, 2019 03:13 PM (EDT)

**AM Best** has downgraded the Long-Term Issuer Credit Ratings to "a" from "a+" and affirmed the Financial Strength Rating of A (Excellent) of California Insurance Company (Foster City, CA), Continental Indemnity Company (Cedar Rapids, IA), Illinois Insurance Company (Cedar Rapids, IA), Texas Insurance Company (Dallas, TX) and Pennsylvania Insurance Company (Cedar Rapids, IA). In addition, AM Best has maintained the under review with negative implications status on these Credit Ratings (ratings). All companies are collectively referred to as North American Casualty Group (NAC).

The ratings reflect NAC's balance sheet strength, which AM Best categorizes as very strong, as well as its strong operating performance, limited business profile and appropriate enterprise risk management.

The ratings have been downgraded following the close of the sale of Applied Underwriters Holding Company Inc. by Berkshire Hathaway Inc. [NYSE: BRK.A and BRK.B], which has resulted in NAC now being wholly owned by its founder, Steve Menzies. The rating downgrades reflect the weakening in the companies' financial flexibility due to this change in ownership. The ratings will remain under review with negative implications pending further discussions with management. AM Best will continue to monitor NAC's rating fundamentals as well as the potential impact stemming from the ongoing controversy between the company and the California Department of Insurance.

**This press release relates to Credit Ratings that have been published on AM Best's website. For all rating information relating to the release and pertinent disclosures, including details of the office responsible for issuing each of the individual ratings referenced in this release, please see AM Best's Recent Rating Activity web page. For additional information regarding the use and limitations of Credit Rating opinions, please view Understanding Best's Credit Ratings. For information on the proper media use of Best's Credit Ratings and AM Best press releases, please view Guide for Media - Proper Use of Best's Credit Ratings and AM Best Rating Action Press Releases.**

**AM Best is a global rating agency and information provider with an exclusive focus on the insurance industry.**

  

**Copyright © 2021 A.M. Best Company, Inc.** and/or its affiliates ALL RIGHTS RESERVED

No part of this report may be distributed in any electronic form or by any means, or stored in a database or retrieval system, without the prior written permission of AM Best. Refer to our terms of use for additional details.

# EXHIBIT 11

JUNE 10, 2020 08:41 AM (EDT)

☐ Print This Page

## AM Best Removes From Under Review With Negative Implications and Affirms Credit Ratings of California Ins Co and Its Affiliates

**CONTACTS:**

Mariza Costa
Associate Director
+1 908 439 2200, ext. 5154
mariza.costa@ambest.com

Christopher Sharkey
Manager, Public Relations
+1 908 439 2200, ext. 5159
christopher.sharkey@ambest.com

Robert DeRose
Senior Director
+1 908 439 2200, ext. 5453
robert.derose@ambest.com

Jim Peavy
Director, Public Relations
+1 908 439 2200, ext. 5644
james.peavy@ambest.com

**Related Companies**
For information about each company, including the Best's Credit Reports, group members (where applicable) and news stories, click on the company name. An additional purchase may be required.

| AMB# | Company Name |
|------|--------------|
| 002637 | California Insurance Company |
| 013065 | Continental Indemnity Company |
| 011132 | Illinois Insurance Company |
| 018683 | North American Casualty Group |
| 022134 | Pennsylvania Insurance Company |

1  2

**FOR IMMEDIATE RELEASE**

OLDWICK - JUNE 10, 2020 08:41 AM (EDT)

**AM Best** has removed from under review with negative implications and affirmed the Financial Strength Rating of A (Excellent) and Long-Term Issuer Credit Ratings of "a" of California Insurance Company (CIC) (Foster City, CA), Continental Indemnity Company, Illinois Insurance Company, Texas Insurance Company (Dallas, TX) and Pennsylvania Insurance Company. All companies collectively are referred to as North American Casualty Group (NAC). The outlook assigned to the Credit Ratings (ratings) is negative. All companies are domiciled in Santa Fe, NM, unless otherwise specified.

The ratings reflect NAC's balance sheet strength, which AM Best categorizes as very strong, as well as its strong operating performance, limited business profile and appropriate enterprise risk management (ERM).

A California judge on Nov. 4, 2019, appointed the California Department of Insurance as conservator of CIC after the state regulator legally challenged the company's merger and relocation to New Mexico. AM Best remains in close dialogue with company management, as they work to resolve these outstanding regulatory issues. Currently, there is no clear date for a resolution of this matter; however, the company does continue to operate unencumbered by this action.

AM Best will continue to monitor NAC's rating fundamentals and the potential impact stemming from the ongoing controversy between the company and the California Department of Insurance.

NAC's risk-adjusted capitalization, as measured by Best's Capital Adequacy Ratio (BCAR), is assessed at the strongest level, and AM Best expects it to remain at a similar level in prospective years. Balance sheet strength also benefits from the company's strong liquidity profile, conservative investment strategy, and disciplined reserving.

NAC has a track record of strong operating earnings, underpinned by its robust underwriting performance and demonstrated by a five-year average return on equity ratio of 13.1% and a combined ratio averaging 75% (2015-2019). However, operating performance has deteriorated over the past couple of years as the workers' compensation industry remains under pressure, and the company's EquityComp product is now a smaller contributor to underwriting results. The expectation is for the company to maintain returns at historical levels to warrant the strong assessment for operating performance.

NAC's business profile remains concentrated in the workers' compensation line of business, which accounted for 80.7% of NAC's gross written premiums (GWP) in 2019. Although management has achieved measured growth in other states, California remains the company's primary market (i.e., 37% of 2019 GWP).

NAC's risk management capabilities are viewed to be aligned with its risk profile; however, AM Best will continue to monitor the company's capabilities in maintaining regulatory compliance. NAC's ERM assessment could be revised downward if current regulatory issues are not resolved with a favorable outcome.

**This press release relates to Credit Ratings that have been published on AM Best's website. For all rating information relating to the release and pertinent disclosures, including details of the office responsible for issuing each of the individual ratings referenced in this release, please see AM Best's Recent Rating Activity web page. For additional information regarding the use and limitations of Credit Rating opinions, please view Guide to Best's Credit Ratings. For information on the proper media use of Best's Credit Ratings and AM Best press releases, please view Guide for Media - Proper Use of Best's Credit Ratings and AM Best Rating Action Press Releases.**

**AM Best is a global credit rating agency, news publisher and data analytics provider specializing in the insurance industry. Headquartered in the United States, the company does business in over 100 countries with regional offices in New York, London, Amsterdam, Dubai, Hong Kong, Singapore and Mexico City.**

Exhibit 11, Page 1 of 1

# EXHIBIT 12



   

# Table of Contents

1. Written Premium

2. Industry Average Charged Rates

3. Quarterly Written Premium – Year-to-Year Percent Change

4. Projected Accident Year Combined Ratios

5. Percent of Open Indemnity Claims Closed in Next Year

6. Change in Incremental Claim Counts

7. Cumulative Trauma Claims per 100 Indemnity Claims

8. Ultimate Total Loss and ALAE Severities

9. Ultimate Indemnity Severities

10. Ultimate Medical Severities

11. Ultimate ALAE (excl. MCCP) Severities

12. Ultimate Medical Cost Containment Program (MCCP) Severities

13. Change in Medical Service Cost Levels

14. Change in Pharmaceutical Cost Levels

15. Number of Liens Filed

16. Ratios of Paid ALAE to Paid Losses

17. Projected Ultimate Losses Less Reported Losses

   General Notes

   More Info

**Exhibit 12, Page 2 of 23**

   
## Chart 1

- Written premium for the first nine months of 2020 is 12% below that for the first nine months of 2019.

- Written premium for the full calendar year of 2020 is expected to be the lowest since 2012.



# Written Premium | Gross of Deductible Credits

As of September 30, 2020



Exhibit 12, Page 3 of 23


## Chart 2



- The average charged rate for the first nine months of 2020 is 9% below that of 2019 and 40% below the peak in 2014.

- The January 1, 2021 approved advisory pure premium rates, which do not include the cost of COVID-19 claims, are on average 50% below those for January 1, 2015 and 4.6% below those for January 1, 2020.

# Industry Average Charged Rates

As of September 30, 2020




   



  

## Chart 3

- Premium decreases through the first quarter of 2020 had been driven by decreases in insurer charged rates. After adjusting to a common charged rate level, premiums grew consistent with economic growth.

- The large decrease in premium for the second and third quarters of 2020 is driven by the sudden and sharp slowdown in the economy.

**More Info**

# Quarterly Written Premium – Year-to-Year Percent Change

As of September 30, 2020



Exhibit 210  Page 5 of 23



  

## Chart 4



- The projected combined ratio for 2019 is 16 points higher than the low point in 2016.

- Despite the recent increase, combined ratios for 2013 through 2019 are the lowest since the 2003 through 2007 period.

- Claim activity in the second quarter of 2020 was significantly slower due to the pandemic and shelter-in-place period and may not be indicative of future claim activity.

- Claim activity started to return to a more typical pattern in the third quarter of 2020.

# Projected Accident Year Combined Ratios

As of March 31, 2020



Exhibit 12, Page 6 of 23


   

## Chart 5



- Indemnity claims have settled quicker over the last several years, largely driven by SB 863 and SB 1160 reforms.

- Average claim closing rates declined sharply in the second and third quarters of 2020 as a result of the pandemic.

# Percent of Open Indemnity Claims Closed in Next Year

As of September 30, 2020



Calendar Year Ending September 30

Exhibit 12, Page 7 of 23

   

## Chart 6

- Reported indemnity claims in the second quarter of 2020 were 13% lower than the second quarter of 2019, while medical-only claims were 30% lower in both the second and third quarters.

- Reported indemnity claims in the third quarter of 2020 were 6% higher than the third quarter of 2019 as many COVID-19 claims have been filed.

- The recent lower (non-COVID-19) claim counts are due to the slowdown of economic activity, less work being done outside the home, and delays in reporting of claims during the shelter-in-place period.

**More Info**



# Change in Incremental Claim Counts
As of September 30, 2020

Exhibit 12, Page 8 of 23

   
## Chart 7

- Cumulative trauma (CT) claim rates increased through 2016 to be more than 80% above the 2005 level.

- CT claim rates since 2016 have begun to decline but are still well above the pre-Great Recession levels.

- CT claim rates may increase again in 2020 as WCIRB research has shown that increases in CT claims have been correlated with economic downturns.





**Cumulative Trauma Claims per 100 Indemnity Claims**

Accident Year

Preliminary

Exhibit 12, Page 9 of 23


## Chart 8

- Projected total claim severity for 2019 is generally consistent with that for 2018.

- Since 2013, the change in total claim severity has been relatively modest.

- Average claim severities for accident year 2020 will be heavily impacted by COVID-19 claims and other claims-related issues arising from the pandemic.

**More Info**

# Ultimate Total Loss and ALAE Severities

As of March 31, 2020



■ Average Ultimate Indemnity + Medical + MCCP + ALAE per Indemnity Claim

| Accident Year | Value |
|---|---|
| 01 | 65,500 |
| 02 | 65,341 |
| 03 | 64,103 |
| 04 | 56,596 |
| 05 | 55,216 |
| 06 | 59,732 |
| 07 | 65,835 |
| 08 | 71,321 |
| 09 | 75,472 |
| 10 | 75,214 |
| 11 | 74,728 |
| 11 | 71,577 |
| 12 | 68,248 |
| 13 | 68,041 |
| 14 | 67,054 |
| 15 | 65,030 |
| 16 | 64,949 |
| 17 | 67,336 |
| 18 | 67,610 |

$ Dollars — Accident Year

Exhibit 12, Page 10 of 23

    
## Chart 9

- Following several years of flat indemnity severities, the projected indemnity severity for 2019 is 7% higher than 2017.

- Average indemnity costs may continue to increase as claims are remaining open longer in 2020.

**More Info**

# Ultimate Indemnity Severities

As of March 31, 2020



Exhibit 12, Page 11 of 23






## Chart 10

- Medical severities have been relatively flat since 2016.

- Medical severities in 2020 may be impacted by delays in medical treatment during the shelter-in-place period. WCIRB research has shown that early delays in medical treatment are associated with higher medical costs later.



# Ultimate Medical Severities
As of March 31, 2020



Exhibit 12, Page 12 of 23



## Chart 11

- ALAE severities have been flat from 2009 through 2019.

- Projections of ultimate accident year ALAE costs have declined compared to recent prior quarters, in part driven by the quicker settling of indemnity claims.

**More Info**

# Ultimate ALAE (excl. MCCP) Severities
As of March 31, 2020



Exhibit 12, Page 13 of 23








# Chart 12

- Average MCCP costs have generally declined in the last several years as average medical costs have moderated and claim settlement rates have accelerated.

**More Info**

## Ultimate Medical Cost Containment Program (MCCP) Severities

As of March 31, 2020



Exhibit 12, Page 14 of 23



## Chart 13

- Medical service costs per claim decreased by 26% from 2012 through 2019, driven by decreases in the number of transactions per claim.

- Overall medical service costs per claim in the first half of 2020 are flat. However, costs per claim increased modestly in early 2020 but declined after the onset of the pandemic.

**More Info**



# Change in Medical Service Cost Levels
As of October 7, 2020

Exhibit 12, Page 15 of 23



## Chart 14

- Pharmaceutical costs per claim decreased by 84% from 2012 through 2019.

- The flat pharmaceutical cost level for the first half of 2020 is driven by continued declines in early 2020 offset by sharp increases during the pandemic period.

**More Info**



# Change in Pharmaceutical Cost Levels
As of October 7, 2020

Exhibit 12, Page 16 of 23





## Chart 15

- SB 1160 and AB 1244 made changes to the lien filing process effective in 2017.

- The number of liens filed in 2019 and 2020 are more than 60% below pre-SB 1160 and AB 1244 levels.

**More Info**

# Number of Liens Filed

As of September 30, 2020



Filing Year & Quarter

Exhibit 12, Page 17 of 23

   

## Chart 16

- Ratios of ALAE to loss increased significantly from 2011 to 2015 in part due to increased cumulative trauma claim filings and the transition to SB 863.

- From 2015 to 2019, these ratios have been generally consistent as savings from recent reforms have not materialized in lower ALAE costs.

**More Info**

# Ratios of Paid ALAE to Paid Losses
As of March 31, 2020



Exhibit 12, Page 18 of 23

    
# Chart 17

- Projected total statewide ultimate losses for 2004 through 2019 evaluations are below the amounts reported by insurers.

**More Info**

## Projected Ultimate Losses Less Reported Losses

As of March 31, 2020



Exhibit 12, Page 19 of 23





# General Notes

▪ This report reflects a compilation of individual insurer submissions of accident year and calendar year premium and loss data to the WCIRB. While the individual insurer data submissions are regularly checked for consistency and comparability with other data submitted by the insurer as well as with data submitted by other insurers, the source information underlying each insurer's data submission is not verified by the WCIRB.

▪ Some of the figures and ratios shown are based on WCIRB actuarial projections of future claim payments using information reported by insurers through March 31, 2020 or September 30, 2020. Although the actuarial methodologies and assumptions upon which these projections are predicated are periodically reviewed by the WCIRB's Actuarial Committee, the actual costs that will ultimately emerge could differ from the amounts projected. Many of these projections will be updated regularly by the WCIRB as more mature information on these claims is reported in subsequent quarters.

▪ The amounts and ratios shown represent statewide totals based on the amounts reported by insurers writing workers' compensation insurance in California. The results for any individual insurer can differ significantly from the statewide average. An individual insurer's results are related to its underwriting book of business, claims and reserving practices, as well as the nature of its reinsurance arrangements.

▪ Beginning with claims incurred on policies incepting on or after July 1, 2010, the cost of medical cost containment programs (MCCP) is reported to the WCIRB as allocated loss adjustment expense (ALAE) rather than as medical loss. As a result, some portions of MCCP costs for accident years 2010 and 2011 have been reported as medical loss and some portions have been reported as ALAE. For consistency, the amounts and ratios shown in these exhibits are adjusted to either include or exclude MCCP costs for all years shown to the extent possible.

  
# More Info

**Chart 1: Written Premium**
- Source: WCIRB aggregate financial data calls.
- Written premium is gross of deductible credits.

**Chart 2: Industry Average Charged Rates**
- Rates are based on WCIRB unit statistical data through 2017 and estimated based on aggregate financial data calls for 2018 and later.
- Rates are per $100 of payroll.
- Rates are averages over policies incepting in the year (January 1 to December 31).

**Chart 3: Quarterly Written Premium – Year-to-Year Percent Change**
- Source: WCIRB aggregate financial data calls.
- Written premium is gross of deductible credits.
- Figures represent the percent change in quarterly written premium amounts from a comparable period for the prior calendar year.

**Chart 4: Projected Accident Year Combined Ratios**
- Ratios are projected based on WCIRB aggregate financial data call data as of March 31, 2020.
- Combined ratios include losses, loss adjustment expenses, and other insurer expenses.

**Chart 5: Percent of Open Indemnity Claims Closed in Next Year**
- Source: WCIRB aggregate financial data call data as of September 30, 2020.
- Figures represent the number of indemnity claims aged between 21 to 105 months closed during the year as a ratio of the number of estimated ultimate claims open or not yet reported as of September 30 of the prior year.

**Chart 6: Change in Incremental Claim Counts**
- Source: WCIRB aggregate financial data call data as of September 30, 2020.
- Figures represent the percent change in newly reported indemnity or medical-only claim counts in the quarter from the comparable amount for the same quarter of the prior calendar year.

**Chart 7: Cumulative Trauma Claims per 100 Indemnity Claims**
- Source: WCIRB unit statistical data based on partial accident years. Claim counts are developed to an estimated ultimate level.
- Accident year 2018 data is preliminary.

**Chart 8: Ultimate Loss & ALAE Severities**
- Severities are projected based on WCIRB aggregate financial data call data as of March 31, 2020.
- Includes data for indemnity claims only.

   
# More Info (…continued)

<u>Chart 9</u>: **Ultimate Indemnity Severities**
- Severities are projected based on WCIRB aggregate financial data call data as of March 31, 2020.

<u>Chart 10</u>: **Ultimate Medical Severities**
- Severities are projected based on WCIRB aggregate financial data call data as of March 31, 2020.
- Includes data for indemnity claims only. MCCP costs have been excluded from all years for consistency of comparison.

<u>Chart 11</u>: **Ultimate ALAE (excl. MCCP) Severities**
- Severities are projected based on WCIRB aggregate financial data call data as of March 31, 2020.
- Includes data for indemnity claims only. MCCP costs are excluded from all years for consistency of comparison.

<u>Chart 12</u>: **Ultimate Medical Cost Containment Program (MCCP) Severities**
- Severities are projected based on WCIRB aggregate financial data call data as of March 31, 2020.
- Includes data for indemnity claims only.

<u>Chart 13</u>: **Change in Medical Service Cost Levels**
- Source: WCIRB medical transaction data as of October 7, 2020.

<u>Chart 14</u>: **Change in Pharmaceutical Cost Levels**
- Source: WCIRB medical transaction data as of October 7, 2020.

<u>Chart 15</u>: **Number of Liens Filed**
- Source: The Division of Workers' Compensation.

<u>Chart 16</u>: **Ratios of Paid ALAE to Paid Losses**
- Source: WCIRB aggregate financial data calls.
- MCCP costs paid on policies incepting prior to July 1, 2010 are considered loss and costs paid on policies incepting after July 1, 2010 are considered ALAE.

<u>Chart 17</u>: **Projected Ultimate Losses Less Reported Losses**
- Insurer-reported losses include insurers' estimates of incurred but not reported (IBNR) losses that may, in part, reflect allocations of IBNR losses to line of business, state, and accident year, and are on a basis that does not reflect anticipated reinsurance recoveries or employer-paid deductibles. As a result, the amounts shown do not necessarily equate to specific estimates of the adequacy of insurers' reserves for unpaid losses.
- Projected ultimate losses are based on WCIRB aggregate financial data call data as of March 31, 2020.



# Notice & Copyright

The *WCIRB Quarterly Experience Report* (Report) was developed by the Workers' Compensation Insurance Rating Bureau of California (WCIRB) for the convenience of its users. The WCIRB has made reasonable efforts to ensure the accuracy of this Report. You must make an independent assessment regarding the use of this Report based upon your particular facts and circumstances.

© 2020 Workers' Compensation Insurance Rating Bureau of California. All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including, without limitation, photocopying and recording, or by any information storage or retrieval system without the prior written permission of the Workers' Compensation Insurance Rating Bureau of California (WCIRB), unless such copying is expressly permitted in this copyright notice or by federal copyright law. No copyright is claimed in the text of statutes and regulations quoted within this work.

Each WCIRB member company, including any registered third party entities, (Company) is authorized to reproduce any part of this work solely for the following purposes in connection with the transaction of workers' compensation insurance: (1) as necessary in connection with Company's required filings with the California Department of Insurance; (2) to incorporate portions of this work, as necessary, into Company manuals distributed at no charge only to Company employees; and (3) to the extent reasonably necessary for the training of Company personnel. Each Company and all agents and brokers licensed to transact workers' compensation insurance in the state of California are authorized to physically reproduce any part of this work for issuance to a prospective or current policyholder upon request at no charge solely for the purpose of transacting workers' compensation insurance and for no other purpose. This reproduction right does not include the right to make any part of this work available on any website or any form of social media.

Workers' Compensation Insurance Rating Bureau of California, WCIRB, WCIRB California, WCIRB Connect, WCIRB Inquiry, WCIRB CompEssentials, X-Mod Direct, eSCAD, Comprehensive Risk Summary, X-Mods and More and the WCIRB California logo (WCIRB Marks) are registered trademarks or service marks of the WCIRB. WCIRB Marks may not be displayed or used in any manner without the WCIRB's prior written permission. Any permitted copying of this work must maintain any and all trademarks and/or service marks on all copies.

**Workers' Compensation Insurance Rating Bureau of California**
1221 Broadway, Suite 900
Oakland, CA 94612
888.CA.WCIRB (888.229.2472)



Exhibit 12, Page 23 of 23

# EXHIBIT 13

*Public—Redacts materials from conditionally sealed record*

1  MICHAEL J. STRUMWASSER (SBN 58413)
2  DALE K. LARSON (SBN 266165)
   STRUMWASSER & WOOCHER LLP
3  10940 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90024
   Telephone: (310) 576-1233
4  Facsimile: (310) 319-0156
   E-mail: mstrumwasser@strumwooch.com
5  E-mail: dlarson@strumwooch.com

6  *Attorneys for Applicant*
   *Insurance Commissioner of the State of California*
7

**FILED**
**SAN MATEO COUNTY**

NOV 0 4 2019

Clerk of the Superior Court
By _____
        DEPUTY CLERK

**Exempt from filing fees pursuant to**
**Government Code section 6103**

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10        FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

11  INSURANCE COMMISSIONER OF THE
12  STATE OF CALIFORNIA,

13                              Applicant,

14  v.

15  ████████████████████

16                              Respondent.

17

18

19

20

Case No.   **19 C I V 0 6 5 3 1**

**VERIFIED EX PARTE APPLICATION FOR
ORDER APPOINTING INSURANCE
COMMISSIONER AS CONSERVATOR;
POINTS AND AUTHORITIES IN SUPPORT
THEREOF**

**[Ins. Code, § 1011]**

Date:       November 4, 2019
Time:       2:00 p.m.
Dept.:

19 – CIV – 06531
EPA
Ex Parte Application
2136818

21

22

23

24

25

26

27

28

Printed on Recycled Paper

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

Applicant Insurance Commissioner of the State of California (the "Commissioner"), hereby respectfully requests that he be appointed Conservator in the above-captioned proceeding pursuant to California Insurance Code section 1011 et seq.[1] This Application is based upon the following:

1.    Commissioner is the duly elected Insurance Commissioner of the State of California. For the protection of the State's policyholders and the public, the Commissioner is entitled to a court order vesting title in the Commissioner to the assets of an insurer that has, among other things, transferred or merged its business without the consent of the Commissioner, as set forth in section 1011, subdivision (c).

2.    Respondent, ███████████████████████████████████, is now and at all times mentioned herein has been, a corporation duly organized and existing under and by virtue of the laws of the State of California and domiciled therein, with its principal office in ███████ California. ███████████████████████████████████████████ ████████████████████████████ Pursuant to a Certificate of Authority issued by the Commissioner, Respondent is authorized in California to transact the following classes of insurance: fire, marine, workers' compensation, surety, disability, plate glass, liability, burglary, common carrier liability, boiler and machinery, burglary, credit, sprinkler, team and vehicle, automobile, aircraft and miscellaneous. ██████████████████████████████ ████████████████████████████████████████

3.    Commissioner is statutorily tasked with the responsibility of reviewing applications for transactions that affect any licensed domestic insurer for purposes of determining, before permitting a transaction, whether the proposed transaction is fair and reasonable to the insurer's policyholders, and does not prejudice the interests of the policyholders or the public. These responsibilities include the review and approval by the Commissioner of any proposed transaction to acquire control of the insurer, including the purchase of the insurer or any agreement to merge with or otherwise to acquire control of a domestic insurer. (Ins. Code, § 1215.2.)

---

[1] All further statutory references will be to the California Insurance Code unless stated otherwise.

Exhibit 13, Page 2 of 19

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

4.      Any attempt by a person to acquire control of an insurer without first obtaining approval of the Commissioner risks and jeopardizes the interests of its policyholders and the California public, and is a direct violation of the Insurance Code.  (Ins. Code, § 1215.2.)  As explained below, Respondent ████ is in the midst of an attempt to merge with a newly formed New Mexico entity, thereby transferring control of ████ without obtaining the Commissioner's approval as required by law.  The Commissioner has filed this application to prevent this illegal transfer and to protect the interest of California policyholders and the public, upon which ██████████████████████ premiums in California in the first half of 2019.  ██████████████████████ ██████████████  If ████ is permitted to consummate this illegal transfer, ████ ████████ in California will be left holding policies of a non-admitted insurer.

5.      On April ██, ████████████████████████████████████████ of North American ██████████████ company, ████████████████████████ filed a Form A application with the California Department of Insurance ("CDI") pursuant to section 1215.2 seeking approval to allow ██████████████████████████████████████████████  According to the documents submitted, the terms of purchase required that the ████████████████████████████ Due to material deficiencies in the application submitted, however, the application was withdrawn on ██████████████

6.      On June 12, 2019, ████████ submitted a second Form A application.  Again due to material deficiencies, the CDI deemed the second application incomplete.  The CDI requested additional information to cure the deficiencies, but the application remained materially deficient.[2]  On August 23, 2019, the CDI returned the application as incomplete.

7.      On September 6, 2019, a few weeks before the deadline for the sale to close, ████ submitted a third Form A application.  The CDI subsequently notified ████████ in writing that Department review could not be completed before the September 30, 2019 closing deadline.[3]

8.      On October 2, 2019, ████ informed the CDI that the terms of the purchase had been

_____

[2] Insurance Code section 1215.8 prevents the Commissioner from divulging further information related to ████████ Form A process.

[3] Section 1215.2, subdivision (d), provides the Commissioner with 60 days to approve or deny a Form A application.

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    amended so that the closing date for the transaction was now extended to October 10.

2        9.      Unbeknownst to CDI, ███████ created a new company in ███████ on or before

3    October 8, 2019.  The new company—████████████████████████████████—is not

4    admitted or licensed to transact the business of insurance in California.

5        10.     CDI first learned that ███████ had filed an application to merge ████████

6    into ███████████████████ on October 7, 2019, after receiving a call from the Office of the

7    Superintendent of Insurance for the State of ███████.   At no point did ███████ notify the

8    Commissioner or file a Form A application to merge the two companies, as required under California

9    law.  Attached hereto as **Exhibit A** is a true and correct copy of the Order Establishing Proceeding,

10   Appointing Hearing Officer and Providing Notice of Hearing, which the CDI received on October 8,

11   2019.

12       11.     The effect of the unapproved and therefore illegal merger, if recognized, would be to

13   terminate ███'s authority to transact business in California and in turn create immediate harm to ███

14   policyholders in the State.  The merger would extinguish ███ California Certificate of Authority by

15   operation of law, and the surviving entity will not be qualified to transact insurance in California. (See

16   Ins. Code, § 701 ["every certificate of authority shall be for an indefinite term and shall expire with the

17   expiration or termination of a corporate existence of the holder thereof"].)  Further, it is unlawful for

18   the new, "nonadmitted insurer" to transact insurance in the State.  (Ins. Code, § at § 700.)  ███ is a

19   "nonadmitted insurer" in California; thus, it is not entitled to transact insurance business in the State.

20   (Ins. Code, § 1760.1, subd. (h).)  Therefore, if ███ is permitted to consummate the illegal merger, ███

21   policyholders in California will be left holding policies of a non-admitted insurer.  Since ███ could

22   not legally service those policies, policyholders, including employees with serious work-related

23   injuries and other claimants entitled to vital and necessary insurance benefits, may not have recourse

24   to benefits.  At minimum, claims handling and process delays would ensue.

25       12.     The ███████████████████████████████████████ the Form A application

26   authorizing the merger of ███ into ███, under ███████ law on October 9, 2019, just one day

27   after receiving the application to do so, and just one day before a revised deadline to close the sale of

28

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   ▮▮▮▮ parent company.   Attached hereto as **Exhibit B** is a true and correct copy of the Order

2   Approving Merger issued by the ▮▮▮▮▮▮Superintendent of Insurance. ▮▮

3   13.   The Commissioner is informed by the California Secretary of State that to date neither

4   ▮▮▮▮ nor Respondent has yet filed a certificate of merger with the California Secretary of State, so

5   the merger has not yet been effected pursuant to California law.   The merger would become effective

6   immediately upon the filing in California of a certificate of merger.   (Corp. Code, § 1108, subd. (d).)

7   14.   The lack of authority to transact business in California would place ▮▮▮▮ current

8   policyholders, beneficiaries, and the California public in immediate jeopardy unless the Commissioner

9   promptly acts to protect them.

10   15.   Pursuant to section 1215.2, subdivision (a), "**a person shall not enter into an**

11   **agreement to merge with** or otherwise to acquire control of a domestic insurer, unless, at the time

12   copies of the offer, purchase, request, or invitation are first published, sent, or given to security holders

13   or the agreement or transaction is entered into, as the case may be, the person has filed with the

14   commissioner" specified information required pursuant to section 1215.2, subdivision (a), "and any

15   additional information as the commissioner may by rule or regulation prescribe as necessary or

16   appropriate in the public interest or the protection of policyholders or shareholders."   (Emphasis

17   added.)

18   16.   Section 1215.2, subdivision (d), specifically provides in part: "The purchases,

19   exchanges, mergers, or other acquisitions of control referred to in subdivision (a) may not be made

20   until the commissioner approves the purchases, exchanges, mergers, or other acquisitions of control."

21   ▮▮▮▮ attempted to merge ▮▮▮ into and with ▮▮▮▮ without obtaining the prior approval of the

22   California Insurance Commissioner in direct violation of section 1215.2.

23   17.   ▮▮▮ has established a pattern of flouting California regulatory processes designed to

24   protect California policyholders from unfair and deceptive practices.   For example, the Commissioner

25   must approve workers' compensation insurance products sold in California under Insurance Code

26   section 11658.[4]   In 2005, ▮▮▮ sought and received approval to sell insurance policies at a guaranteed

27   _____

28   [4] All further statutory references will be to the California Insurance Code unless stated
otherwise.

1  cost—policies with guaranteed monthly premiums, no matter the employer's experience with

2  employee claims. ███ then wrote unfiled contract amendments, frequently marketed to

3  unsophisticated employers, replacing the original guaranteed cost policies with an unapproved and

4  illegal scheme that appeared to offer premium cost savings, but actually required employers to

5  reimburse ███ for certain payouts for years to come.  These new, three-year-minimum agreements

6  imposed significant penalties for early cancellation.   Had ███ sought requisite approval, the

7  Commissioner could have prevented the sale of these illegal policies.   The Commissioner

8  subsequently found them void.  (See *Matter of Shasta Linen Supply, Inc.* (June 22, 2016) Cal.

9  Insurance Commissioner, No. AHB-WCA-14-31; see also *Nielsen Contracting, Inc. v. Applied*

10  *Underwriters, Inc.* (2018) 22 Cal.App.5th 1096, 1113-1116 & *Luxor Cabs, Inc. v. Applied*

11  *Underwriters Captive Risk Assurance Co. et al.* (2018) 30 Cal.App.5th 970, 986 ["[o]bviously,

12  allowing an insurer to circumvent the comprehensive regulatory structure applicable to the issuance of

13  workers' compensation insurance in this state simply by amending its approved policy forms through a

14  side agreement with a subsidiary is contrary to the public policy underlying California's workers'

15  compensation law and cannot be countenanced."].)

16      18.   ███ attempt to merge ███ into and with ███ without having filed and obtained

17  written approval of the Commissioner to merge ███ into a ███ domestic insurer is ground for

18  conservation of an insurer pursuant to section 1011.  That section states in part:

19      The superior court of the county in which the principal office of a person described in
   section 1010 is located, upon the filing by the commissioner of the verified application
20  showing any of the conditions in this subdivision exist . . . **shall** issue its order vesting title
   to all of the assets of the person, wheresoever situated, in the commissioner or his or her
21  successor in office, in his or her official capacity, and direct the commissioner forthwith to
   take possession of its books, records, property, real and personal, and assets and to
22  conduct, as conservator, the business of the person, or such thereof as to the commissioner
   may seem appropriate, and enjoining the person and its officers, directors, agents,
23  servants, and employees from the transaction of its business or disposition of its property
   until any of the following further order of the court:

24      . . .

25      (c) That the person, without first obtaining the consent in writing of the commissioner, **has
   transferred, or attempted to transfer, substantially its entire property or business or,**
26  **without consent, has entered into any transaction the effect of which to merge,**
   consolidate, or reinsure substantially its entire property or business in or with the property
27  or business of any other person., has entered into any transaction the effect of which to
   merge, consolidate, or reinsure substantially its entire property or business in or with the
28  property or business of any other person.  (Emphasis added.)

Exhibit 13, Page 6 of 19

19.     In accordance with section 1011, the Commissioner files this ex parte application for an order appointing him as conservator of ■■■  The Commissioner has determined that actions have been taken to merge ■■ into ■■ in violation of California law and that such an illegal merger will be, and is, hazardous to its policyholders, creditors and the public, and such condition is a ground for conservation under section 1011, subdivision (c).  The Commissioner therefore seeks this Court's order to conserve ■■ and take possession of ■■'s property and business so that he can act promptly as conservator to avoid the completion of ■■'s merger into an unlicensed foreign insurer that is not subject to the authority or control of the Commissioner.

20.     In obtaining an ex parte order pursuant to section 1011, the Commissioner need only show that he has determined and found that one of the conditions enumerated exists.  (*Financial Indemnity Co. v. Superior Court* (1955) 45 Cal.2d 395, 402; *Rhode Island Ins. Co. v. Downey* (1949) 95 Cal.App.2d 220, 230-231; *Caminetti v. Imperial Mut. Life Ins. Co.* (1943) 59 Cal. App. 2d 476, 487–488 ["In obtaining his original ex parte order, the commissioner is not required to show to the court that the company was in fact in a hazardous condition, but only that he. as a state officer, invested by legislative authority with the power, has so 'determined' and 'found'."].)    The Commissioner has determined that the grounds for conservation in section 1011(c) exists.

21.     The Commissioner brings this Application ex parte and without notice because immediate and substantial harm could result from giving notice to ■■ before conservation is effected. Because a California corporation's merger with a corporation in another state becomes effective upon the filing in California of a certificate of merger, ■■ could attempt to evade California jurisdiction, and transfer assets to New Mexico simply by filing a certificate of merger in California.  (Corp. Code, § 1108, subd. (d).)

22.     In situations like this, courts may grant section 1011 orders ex parte.  (See, e.g., *Hesperia Land Dev. Co. v. Superior Court* (1960) 184 Cal.App.2d 865, 872–873; *Rhode Island Ins. Co. v. Downey, supra,* 95 Cal.App.2d at pp. 230-231; *Caminetti, supra,* 59 Cal.App.2d at pp. 487–488.)  Here, the Commissioner has established good cause to believe that the State of California would be prejudiced were it to provide respondent advanced notice of this proceeding in that ■■ has within its authority power to at any time complete the ostensible consummation of the transaction, which

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1  would have the effect of at least forfeiting ████ Certificate of Authority, rendering California

2  policyholders ostensibly insured by an out-of-state insurer without authority to transact insurance in

3  California, and thereby reducing the Commissioner's regulatory authority over ████.

4

5      WHEREFORE, the Commissioner prays that this Court issue an order:

6      1.     Appointing the California Insurance Commissioner as the Conservator of ████ as set

7  forth in section 1011, and directing him as Conservator to conduct the business of ████ or so much

8  thereof as he may deem appropriate, to pay or defer payment of all proper claims and obligations

9  against ████ accruing prior to or subsequent to his appointment as Conservator and directing him to act

10 in all ways and exercise all powers necessary or appropriate for the purpose of carrying out such order.

11     2.     Enjoining ████, its officers, directors, agents and employees and any person that acts or

12 purports to act on behalf of any of the foregoing from taking any actions or filing any document with

13 any governmental entity or any governmental subdivision necessary to consummate the merger of ████

14 into and with ████, to otherwise transfer the ████████████████ to

15 otherwise adversely affect the California Certificate of Authority ████.

16     3.     Appointing David E. Wilson, Special Deputy Insurance Commissioner, as Deputy

17 Conservator empowered to carry out any and all duties and exercise the authority of the Conservator

18 granted herein and the Insurance Code; appointing Joseph B. Holloway, Jr. as Conservation Manager

19 and Scott Pearce as Conservation Supervisor empowered to carry out any and all duties and exercise

20 the authority of the Conservator and Deputy Conservator, and as may be delegated by the Conservator

21 and Deputy Conservator.

22     4.     Providing that the Conservator's immunity and related protections from claims, suits or

23 liability under applicable law, including but not limited to Government Code 820.2, shall apply

24 equally to the Deputy Conservator, Conservation Manager and the Conservation Supervisor in their

25 capacities as ████████████ their successors in office, the Conservation & Liquidation Office

26 ("CLO"), and their agents and employees.

27     5.     Authorizing the Commissioner as Conservator to appoint and employ special deputies,

28 estate managers, other professionals, clerks and assistants and to give each of them such power and

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    authority as he may deem necessary and authorizing the Commissioner as Conservator to compensate

2    these persons from the assets of ███ as he may deem appropriate.

3        6.    Authorizing the Conservator to assist ███ in addressing their Form A deficiencies with

4    the goal of obtaining Form A approval and settlement of disputes with CDI.

5        7.    Ordering ███ except upon the express written authorization of the Conservator, not to

6    cancel or otherwise terminate or attempt to cancel or terminate any insurance policy or contract in-

7    force as of the date of this Order, and ordering ███ to continue to administer such in-force policies and

8    contracts in the ordinary course consistent with past practices.

9        8.    Directing that, except as otherwise determined by the Conservator in his or her

10   discretion, any contract or agreement to provide administrative, claims, or other management services

11   to ███ necessary or appropriate for the efficient operations of ███ during the pendency of the

12   conservation shall remain in full force and effect unless rejected, modified or terminated by the

13   Conservator in writing, and unless directed otherwise by the Conservator, each such person or entity

14   shall continue to perform its respective obligations under such contract or agreement during the

15   pendency of the conservation consistent with past practice.

16       9.    Authorizing the Conservator, in his or her discretion, to pay or defer payment of some

17   or all proper claims, expenses, liabilities, and obligations of ███, in whole or in part, accruing prior or

18   subsequent to his appointment as Conservator.

19       10.   Authorizing the Conservator to assume, reject, or modify any executory contracts

20   including, without limitation, any lease, rental or utilization contract or agreement (including any

21   schedule to any such contract or agreement), and any license or other arrangement for the use of

22   computer software of business information systems, to which ███ is a party or as to which ███ agrees

23   to accept an assignment of such contract.

24       11.   Authorizing the Conservator in his or her discretion to take possession of any and all

25   assets of ███ including books, records, property (both real and personal), accounts, safe deposit

26   boxes, rights of action, and all such assets as may be in the name of ███ wheresoever situated.

27       12.   Ordering that title to all property and assets of ███, designated by the Conservator in

28   his or her discretion, including deposits, securities, contracts, rights of actions, books, records, and

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1 | other assets of every type and nature, and including both those presently in ▮▮▮s possession and those
2 | that may be discovered hereafter, wheresoever situated, that are necessary or appropriate for the
3 | orderly conservation of ▮▮▮ to be vested in the Conservator or his or her successor in office, in his
4 | official capacity as Conservator and authorizing the Conservator to deal with such assets in his or her
5 | own name as Conservator or in the name of ▮▮▮ and enjoining all persons from interfering with
6 | Conservator's possession and title to such assets.

7 |     13.    Authorizing the Conservator to maintain and invest such of ▮▮▮ assets and funds in
8 | such a manner as the Conservator determines in his or her discretion is in the best interest of ▮▮▮
9 | creditors.

10 |     14.    Authorizing the Conservator to exercise all the powers of the directors, officers, and
11 | managers of ▮▮▮ necessary or appropriate for the orderly conservation of ▮▮▮ whose authorities are
12 | suspended except as such powers may be redelegated to them in writing by the Conservator.

13 |     15.    Enjoining, except upon the express written authorization of the Conservator or as is
14 | necessary to continue to administer in the ordinary course consistent with past practices any in-force
15 | insurance policies as of the date of this Order, ▮▮▮ and its officers, directors, agents, and employees
16 | from transacting any of the business of ▮▮▮ whether in the State of California or otherwise, disposing
17 | of, using, transferring, selling, assigning, canceling, alienating, hypothecating, or concealing in any
18 | manner or any way, or assisting any person in any of the foregoing, the property or assets of ▮▮▮ or
19 | property or assets in the possession of ▮▮▮ of any nature or kind, including claims or causes of action,
20 | until further order of the Court. Further, such persons are enjoined from obstructing or interfering with
21 | the Conservator's conduct of his or her duties as Conservator.

22 |     16.    Enjoining ▮▮▮ and its officers, directors, agents and employees from issuing any new
23 | or renewing any insurance policies except upon the written consent of the Conservator.

24 |     17.    Enjoining, except upon the written consent of the Conservator, all persons from
25 | instituting, prosecuting, or maintaining any action at law or suit in equity, including but not limited to,
26 | actions or proceedings to compel discovery or production of documents or testimony, and matters in
27 | arbitration, except for matters before the California Workers' Compensation Appeals Board or
28 | equivalent administrative boards in other states, against ▮▮▮ or against the Conservator, and from

1  attaching, executing upon, redeeming of or taking any other legal proceedings against any of the

2  property of ████, and from doing any act interfering with the conduct of said business by the

3  Conservator, except after an order of this Court obtained after reasonable notice to the Conservator.

4        18.    Directing ████ and all officers, directors, agents, employees, successors, assigns,

5  affiliates of ████, and other persons acting in concert or participation with ████ to deliver to and

6  immediately make available to the Conservator those assets, books, records, accounts, records,

7  information, computers, tapes, discs, writings, other recordings of information, equipment, and other

8  property of ████, wheresoever situated, in said persons' custody or control specified in writing by the

9  Conservator, and further, directing the aforesaid persons to disclose verbally, or in writing if requested

10  by the Conservator, the exact whereabouts of the foregoing items if such items are not in the

11  possession custody, or control of said persons.

12        19.    Ordering all officers, directors, trustees, employees, or agents of ████ or any other

13  person, firm, association, partnership, corporate parent, holding company, affiliate, or other entity in

14  charge of any aspect of ████s affairs, either in whole or in part, and including but not limited to banks,

15  savings and loan associations, financial or lending institutions, brokers, stock or mutual associations,

16  or any parent, holding company, subsidiary or affiliated corporation, or any other representative acting

17  in concert with ████ to cooperate with the Conservator in the performance of his or her duties.

18        20.    Authorizing the Conservator to pay all reasonable costs of taking possession of and

19  conserving ████ (including but not limited to the Conservator's pre-conservation costs in examining

20  ████ financial condition, and preparing to take possession and conserve ████ and the attorneys' fees

21  and costs incurred by the Commissioner in bringing and prosecuting this proceeding) out of the funds

22  and assets of the ████

23        21.    Authorizing the Conservator to pay all reasonable costs of operating ████ as

24  Conservator (including direct and allocated direct costs, direct and allocated general and

25  administrative costs and overhead, and all other allocated costs) out of any and all funds and assets of

26  ████ and if there are insufficient funds, to pay for the costs out of the Insurance Fund pursuant to

27  Insurance Code section 1035.

28        22.    Ordering all persons who maintain records for ████ pursuant to written contract or any

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   other agreement, shall maintain such records and deliver to the Conservator such records upon his

2   request.

3        23.    Ordering all agents of ████, and all brokers who have done business with ████, to make

4   remittances of all funds collected by them or in their hands designated by the Conservator in his or her

5   discretion, directly to the Conservator.

6        · 24.    Ordering all persons having possession of any lists of policyholders of ████ to deliver

7   such lists to the Conservator upon his or her written request and enjoining all such persons from using

8   any such lists or any information contained therein without the written consent of the Conservator.

9        25.    Authorizing the Conservator to initiate such equitable or legal actions or proceedings in

10  this or other states that the Conservator determines is in his or her discretion are necessary to carry out

11  his or her functions as Conservator.

12       26.    Enjoining ████ its officers, directors, agents and employees from disposing of, or

13  assisting any person in the transfer or alienation of, the property or assets of ████, until further order of

14  this Court.

15       27.    Enjoining all persons, except with leave of this Court issued after a hearing in which

16  the Conservator has received reasonable notice, from obtaining preferences, judgments, attachments,

17  or other liens, or making any levy against ████ or its assets or property, and from executing or issuing

18  or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other

19  process, for the purpose of impounding or taking possession of or interfering with or creating or

20  enforcing a lien upon any property or assets owned or in the possession of ████ or the Conservator,

21  wheresoever situated, and from doing any act interfering with the conduct of said business by

22  Conservator.

23       28.    Enjoining all persons, except with leave of this Court issued after a hearing in which

24  Conservator has received reasonable notice, all persons from accelerating the due date of any

25  obligation or claimed obligation; exercising any right of set-off; taking, retaining, retaking, or

26  attempting to retake possession of any real or personal property; withholding or diverting any rent or

27  other obligation; doing any act or other thing whatsoever to interfere with the possession of or

28  management by the Conservator of the property and assets, owned or controlled by ████ or in the

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1  possession of ▇▇, or in any way interfering with the Conservator or interfering in any manner during

2  the pendency of this proceeding with the exclusive jurisdiction of this Court over ▇▇.

3      29.    Ordering that any and all provisions of any agreement entered into by and between any

4  third party and ▇▇ that provide in any manner that selection, appointment, or retention of a

5  conservator, receiver, or trustee by any court, or entry of any order such as hereby made, shall be

6  deemed to be or otherwise operate as a breach, violation, event of default, termination, event of

7  dissolution, event of acceleration, insolvency, bankruptcy, or liquidation, shall be stayed, and the

8  assertion of any and all rights and remedies relating thereto shall also be stayed and barred, except as

9  otherwise ordered by this Court.  This Court shall retain jurisdiction over any cause of action that has

10  arisen or may otherwise arise under any such provision.

11      30.    Enjoining all persons from wasting the assets of ▇▇.

12      31.    For such other or further relief as may be necessary and proper.

13

14  Dated: November 1, 2019

    Respectfully submitted,

15      STRUMWASSER & WOOCHER LLP

16      Michael J. Strumwasser
    Dale K. Larson

17

18

19      By _____

20         Michael J. Strumwasser

21

22      *Attorneys for Applicant Insurance*
    *Commissioner of the State of California*

23

24

25

26

27

28

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

## AN IMMEDIATE CONSERVATION ORDER IS REQUIRED

The Insurance Commissioner of the State of California is authorized by Insurance Code section 1011[5] to obtain an ex parte order appointing him Conservator of entities regulated by him. Section 1011 states in part:

> The superior court of the county in which the principal office of a person described in section 1010 is located, upon the filing by the commissioner of the verified application showing that the conditions in this subdivision exist . . . **shall** issue its order vesting title to all of the assets of the person, wheresoever situated, in the commissioner or his or her successor in office, in his or her official capacity, and direct the commissioner forthwith to take possession of its books, records, property, real and personal, and assets and to conduct, as conservator, the business of the person, or such thereof as to the commissioner may seem appropriate, and enjoining the person and its officers, directors, agents, servants, and employees from the transaction of its business or disposition of its property until any of the following further order of the court:
>
> . . .
>
> (c) That the person, without first obtaining the consent in writing of the commissioner, **has transferred, or attempted to transfer, substantially its entire property or business or, without consent, has entered into any transaction the effect of which to merge,** consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person., has entered into any transaction the effect of which to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person. (Emphasis added.)

Sections 1010 et seq., which authorize, inter alia, conservation and liquidation, provides that its provisions "apply to all persons subject to examination by the commissioner or purporting to do insurance business in this state . . . or from whom the commissioner's certificate of authority is required for the transaction of business . . ." (§ 1010.) The Commissioner is authorized under California law to obtain an ex parte order appointing him Conservator of the entities which he is mandated by law to regulate. (*Garamendi v. Golden Eagle Ins. Co.* (2005) 128 Cal.App.4th 452, 463-464; *Financial Indemnity Co. v. Superior Court* (1955) 45 Cal.2d 395, 402; *Rhode Island Ins. Co. v. Downey* (1949) 95 Cal.App.2d 220, 230-231.) As an officer of this State, the Commissioner, as Conservator, exercises the State's police power to promote the public interest and protect policyholders and creditors of the insurer. (*Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 465-466; *In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 356.)

---

[5] Unless otherwise indicated, all code references shall be to the Insurance Code.

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    In obtaining an ex parte order pursuant to section 1011, the Commissioner need only show that

2  he has determined and found that one of the conditions enumerated exists. (*Financial Indemnity Co.*,

3  *supra*, 45 Cal.2d at p. 402; *Rhode Island Ins. Co.*, *supra*, 95 Cal.App.2d at pp. 230-231.)  Under the

4  insolvency and delinquency provisions of the Insurance Code, the issuance of an order under section

5  1011 is mandatory. (*Financial Indemnity Co.*, *supra*, 45 Cal.2d at p. 402.)  The seized company may

6  apply for and have a full hearing pursuant to Section 1012 after an ex parte order pursuant to Section

7  1011 has been obtained. (*Rhode Island Ins. Co.*, *supra*, 95 Cal.App.2d at pp. 235-36.)

8    The Commissioner applies to this Court for an order appointing him as Conservator of

9  respondent ███████████████████████████. The Commissioner's verified application is based

10  upon his determination that an attempt was made to merge ████████████████████████████

11  without seeking and receiving the Commissioner's prior written approval.  Pursuant to section 1011, it

12  is appropriate and necessary to ████████████.

13    Any person subject to examination by the Commissioner, or for whom the Commissioner's

14  Certificate of Authority is required for the transaction of business in the State of California, is subject

15  to an order of conservation issued by the superior court of the county in which the principal office of

16  such person is located. (Ins. Code, §§ 1010-1011.) ███████████████████████████████

17  ████████████.

18    As stated in this verified application, the Commissioner has established that an attempted

19  merger of ████ has occurred in violation of section 1215.2, subdivision (a).

20    Section 1020 provides that this Court shall issue orders as may be deemed necessary to, among

21  other things, prevent waste of assets, obtaining of preferences, and interference with the Commissioner

22  as Conservator or the conservation proceeding.

23    Section 1035 provides that the Commissioner as Conservator may appoint and employ deputy

24  commissioners, clerks, and assistants to carry out his function and to pay the costs and expenses of

25  conserving the insurer out of the assets of the insurer, and then to the extent necessary, out of the funds

26  of the Department of Insurance.

27    Section 1037 specifies the powers that accrue to the Commissioner upon his appointment as

28  Conservator.  These include, but are not limited to, the authority to collect all monies and debts due to

1    the insurer, to conserve the assets of the insurer, to compromise and settle claims against the insurer, to

2    acquire and dispose of property belonging to the insurer, and to prosecute and defend all lawsuits

3    against the insurer.

### CONCLUSION

5    Based on the facts set forth in this verified application, appointment of the Commissioner as

6    Conservator of Respondent is fully warranted.   For all the foregoing reasons, the Commissioner

7    respectfully submits that his request for an order appointing the Commissioner as Conservator and to

8    conserve Respondent should be granted.

9

10   Dated: November 1, 2019                    Respectfully submitted,

11                                              STRUMWASSER & WOOCHER LLP
                                                Michael J. Strumwasser
12                                              Dale K. Larson

13

14

15                                              By _____

16                                                      Michael J. Strumwasser

17                                              *Attorneys for Applicant Insurance*
                                                *Commissioner of the State of California*
18

19

20

21

22

23

24

25

26

27

28

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

## VERIFICATION

I, BRYANT HENLEY, state that:

I am employed by the Insurance Commissioner of the State of California as the Deputy Commissioner and Special Counsel of the California Department of Insurance. I make this verification in my official capacity. I have read the foregoing VERIFIED EX PARTE APPLICATION FOR ORDER APPOINTING INSURANCE COMMISSIONER AS CONSERVATOR and know the contents. The facts contained therein are all within my personal knowledge except for statements based upon information provided by the ▓▓▓▓▓▓▓ ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and assembled by authorized employees of the California Department of Insurance, and I am informed and believe that the statements based upon that information are true. As to those matters that are within my own personal knowledge, the statements are true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of November, 2019, at Sacramento, California.

BRYANT HENLEY
Deputy Commissioner and Special Counsel
California Department of Insurance

VERIFIED EX PARTE APPLICATION FOR ORDER OF CONSERVATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF

Exhibit A

Redacted in its

entirety

Exhibit B
Redacted in its
entirety

# EXHIBIT 14

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON 2/12/2020
By ___/s/ Jennifer Tannous___
Deputy Clerk

1  SHAND S. STEPHENS (Bar No. 67694)
   shand.stephens@dlapiper.com
2  **DLA PIPER LLP (US)**
   555 Mission Street, Suite 2400
3  San Francisco, California 94105-2933
   Tel:   415.836.2500
4  Fax:   415.836.2501

5
   Attorneys for Respondent California Insurance
6  Company, Inc., a California corporation, and its
   Successor, California Insurance Company, Inc., a
7  New Mexico corporation

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10         **FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION**

11

12  INSURANCE COMMISSIONER OF THE          Case No. 19CIV06531
    STATE OF CALIFORNIA.,
13                                          *[REDACTED]* **MEMORANDUM OF**
                   Applicant,              **POINTS AND AUTHORITIES IN**
14                                          **SUPPORT OF VERIFIED APPLICATION**
            vs.                             **TO VACATE ORDER APPOINTING**
15                                          **INSURANCE COMMISSIONER AS**
    CALIFORNIA INSURANCE COMPANY, a         **CONSERVATOR**
16  California corporation,

17                 Respondent.
                                            Hearing Date:    February 20, 2020
18                                          Hearing Time:    2:00 p.m.
                                            Department:      28
19                                          Courtroom:       2F
                                            Judge:           Hon. George Miram
20
                                            Application Filed: November 4, 2019
21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................. 5

II.  FACTUAL AND LEGAL BACKGROUND ........................... 6

    A.   The CDI Was Aware of the Proposed Sale And Merger And Did Not Object ......... 6

    B.   ████████████████████████████████████ ............................ 8

    C.   The Order Irreparably Harms CIC ........................................ 10

III. ARGUMENT ..................................................................... 11

    A.   The Nov. 4 Order Should Be Vacated Because It Was Obtained Under False Pretenses ................................................................. 11

    B.   The Nov. 4 Order Should Be Vacated Under Cal. Ins. Code § 1012 Because the Grounds for the Nov. 4 Order Do Not Exist or Have Been Removed .............. 13

    C.   The Commissioner Has Acted Arbitrarily, Capriciously, and in Bad Faith ........... 16

    D.   Allegations That CIC "Flouted" Regulations Are Irrelevant And Misleading ........ 19

    E.   The Nov. 4 Order Should Be Vacated Because It Continues to Harm CIC ............ 20

IV.  CONCLUSION .................................................................. 20

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Carpenter v. Pac. Mut. Life Ins. Co. of Cal.*,
   10 Cal. 2d 307 (1937) ...........................................................................................17

*City of Los Angeles v. Decker*,
   18 Cal. 3d 860 (1977) ......................................................................................12, 13

*Exec. Life Ins. Co. v. Aurora Nat'l Life Assurance Co.*,
   32 Cal. App. 4th 344 (1995) ...............................................................................17

*Fin. Indem. Co. v. Superior Court*,
   45 Cal. 2d 395 (1955) ...........................................................................................14

*Jutkowitz v. Bourns, Inc.*,
   118 Cal. App. 3d 102 (1981 ...............................................................................15

*Khan v. L.A. City Emps.' Ret. Sys.*,
   187 Cal. App. 4th 98 (2010) ...............................................................................15

*Lennane v. Franchise Tax Bd.*,
   9 Cal. 4th 263 (1994) ...........................................................................................15

*Rhode Island Ins. Co. v. Downey*,
   95 Cal. App. 2d 220 (1949) ...............................................................14, 15, 16, 17

*Roadrunner Mgmt. Servs., Inc., v. Applied Underwriters, Inc.*,
   Case No. 56-2017-00493391-CU-CO-VTA (Ventura Cty. Sup. Ct.)...........................19

*Schafer v. City of Los Angeles*,
   237 Cal. App. 4th 1250 (2015) ...........................................................................13

*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*,
   2017 WL 4652758 (E.D. Cal. Oct. 17, 2017)...........................................................9, 19

*Williams v. Super. Ct.*,
   46 Cal. App. 4th 320 (1996) ...............................................................................12

**STATUTES**

Cal. Bus. & Profs. Code § 6068(d) .........................................................................12

Cal. Corp. Code § 1312(b) .......................................................................................15

Cal. Ins. Code § 1011 ..........................................................................................14, 16

Cal. Ins. Code § 1012 .......................................................................................5, 14, 15

Cal. Ins. Code § 1101(c) ..................................................................15

Cal. Ins. Code § 1215.10 ..................................................................16

Cal. Ins. Code § 1215.10(a) ..............................................................21

Cal. Ins. Code § 12928.6 .............................................................16, 21

Cal. R. Prof'l Conduct 3.3 ...............................................................12

Cal. R. Prof'l Conduct 3.3(d) ...........................................................12

**OTHER AUTHORITIES**

30 Cal. Jur. 3d Equity § 26 ..............................................................13

Cal. Prac. Guide: Admin. Law Ch. 20-E § 20:251 (Rutter Group 2019) ..........................12

Memo of P&A ISO Verified Application to Vacate Order Appointing Conservator
Case No. 19CIV06531

## I.   INTRODUCTION

Respondents California Insurance Company, a California corporation ("CIC"), and California Insurance Company II, Inc., a New Mexico corporation ("CIC II," together "CIC"), submit this Memorandum in support of their Verified Application to Vacate the November 4 Order ("Nov. 4 Order") Appointing Insurance Commissioner as Conservator ("CIC Application" or "CIC App.").  CIC moves to vacate the Nov. 4 Order on the separate grounds that the Nov. 4 Order was obtained under false pretenses, and that any purported basis for the Nov. 4 Order "does not exist or has been removed," requiring that the Nov. 4 Order "shall" be vacated under California Insurance Code § 1012.

This dispute arises from a proposed sale and merger involving CIC and CIC II, which the California Department of Insurance ("CDI") claims it never approved.  In seeking the Nov. 4 Order, the California Insurance Commissioner ("Commissioner") alleged that conservation of CIC was necessary to protect California policyholders by preventing consummation of the merger.  But the Nov. 4 Order was obtained under false pretenses because the Commissioner omitted contradictory and materially adverse facts from his *ex parte* application ("*Ex Parte* Application" or "*Ex Parte* App."), including that (1) the CDI participated in a conference call and merger approval hearing with the New Mexico insurance department and ***failed to object to the merger*** during those proceedings; (2) the CDI by October 9 had concluded and represented to the New Mexico Superintendent of Insurance that the merger presented ***no risks to California policyholders***; and (3) the CDI again failed to object in response to a letter notifying the CDI that CIC intended to finalize the sale.

Not only was the *Ex Parte* Application misleading and incomplete, but the grounds for the Nov. 4 Order "do[] not exist or ha[ve] been removed," requiring that it be vacated under Cal. Ins. Code § 1012.  Because the Commissioner admitted that the merger presented no risk to CIC policyholders, and because CIC voluntarily agreed to suspend completion of the merger while the parties negotiated, the purported need to protect policyholders and prevent consummation of the merger "do[] not exist" as grounds for the Nov. 4 Order—and in fact never did.  But even if grounds for the Nov. 4 Order ever did exist, those grounds now "have been removed" because CIC consents to an injunction to stay the merger pending further negotiations and the CDI's approval.

5

Memo of P&A ISO Verified Application to Vacate Order Appointing Conservator
Case No. 19CIV06531
Exhibit 14, Page 5 of 21

1       Moreover, since the Nov. 4 Order was issued, ███████████████████

2   █████████████████████████████████████████████████████████████████

3   █████████████████████████████████████████████████████████

4   ████—yet another separate reason to vacate the Nov. 4 Order. █████████████

5   ████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████

7   ███████████████████████████████████████

8       For all these reasons and as set forth below and in CIC's Application, the Order should be

9   vacated and the conservatorship over CIC terminated.

10   **II.     FACTUAL AND LEGAL BACKGROUND[1]**

11       **A.     The CDI Was Aware of the Proposed Sale And Merger And Did Not Object**

12       In January 2019, CIC's President and Chief Operating Officer (and owner of 11.5% of CIC's

13   shares), Steven M. Menzies ("Menzies"), entered into an agreement with Berkshire Hathaway Inc.

14   ("Berkshire")—which at that time owned 81% of the holding company that indirectly owned CIC—

15   to purchase Berkshire's interest in CIC. (CIC App. ¶ 2.) That agreement included a $50 million

16   "breakup fee" if the transaction could not be completed by September 30, 2019. (*Id.*) Menzies and

17   CIC immediately set about informing the CDI of the proposed sale—including the closing date and

18   $50 million penalty—and filing the necessary paperwork to obtain the CDI's approval in time to

19   ensure the timely completion of the deal. (*Id.*) But despite Menzies' and CIC's diligence and

20   acquiescence to the CDI's demands throughout the approval process, including the filing of *three*

21   separate Form A documents to address issues raised by the CDI, on Friday, September 27, 2019, just

22   three days before the September 30, 2019 closing deadline, the CDI suddenly declared that it could

23   not approve or disapprove the Form A or the sale despite months of notice and review. (*Id.*)

24       Facing a $50 million penalty, Menzies and CIC were left scrambling for a solution. (*Id.* ¶ 3.)

25   After obtaining a short 10-day extension of the closing—at a cost of $10 million, not to be credited

26   against the purchase price—Menzies contacted the New Mexico Superintendent of Insurance,

27

28   ---

[1] The factual background is set forth in greater detail in CIC's Verified Application.

6

Memo of P&A ISO Verified Application to Vacate Order Appointing Conservator
Case No. 19CIV06531
Exhibit 14, Page 6 of 21

John G. Franchini ("Superintendent Franchini," or "the Superintendent"), to determine if the transaction could instead be approved under the authority of New Mexico's Insurance Department. (*Id.*)  Superintendent Franchini proposed that CIC could be re-domesticated to New Mexico under an expedited approval process, which would allow for approval of the sale and closing before the extended deadline.  (*Id.*)  With no real alternative available, CIC and Menzies began working with the Superintendent to finalize the sale and the necessary approvals, which included the formation of a new entity under New Mexico law, CIC II, that ultimately would be merged with CIC.  (*Id.*)

The CDI was informed of this process by the Superintendent, who communicated with the CDI and other insurance departments to obtain their approval.  (*Id.*)  These communications culminated in a conference call and Form A approval hearing on October 9, 2019, at which the CDI was represented by at least three senior officials.  (*Id.*)  Tellingly, the CDI ***did not object*** to the merger or the sale during either the conference call or the Form A hearing at which the merger was approved by the Superintendent.  (*Id.*)  On the contrary, the CDI represented to the Superintendent that "because of CIC's considerable capital, surplus and deposits, the proposed merger ***presented no risks to California policyholders***."  (*Id.*, Ex. 7.)  Nor did the CDI object (or even respond) when Berkshire informed the CDI by e-mail letter on October 9, 2019, that it would proceed with the closing on October 10, 2019, based on the CDI's lack of objection at the Form A hearing.  (*Id.* ¶ 4, Ex. 17.)  This would allow CIC to remain in California under Insurance Code § 709.5(c).

After the Superintendent approved the merger, and after Berkshire and Menzies completed the sale (reasonably relying on the CDI's non-objection), the CDI unexpectedly reversed course, claiming that, although it did not object to the merger before or during the hearing on it, now it did. (*Id.* ¶ 5.)  While CIC was in discussions with the CDI about the merger, the CDI asked CIC to refrain from taking further steps to consummate the merger, and CIC voluntarily complied.  (*Id.* ¶ 47.)  The CDI never informed CIC that it was contemplating *ex parte* legal action.  (*Id.* ¶ 48.)

On November 4, 2019, despite ongoing discussions and without any notice to CIC, the CDI filed the *Ex Parte* Application asking this Court to impose the extreme remedy of placing CIC in conservatorship under the Commissioner's authority.  (*Id.* ¶ 50.)  The Commissioner did so despite having failed to object to the merger, despite having represented to the New Mexico Superintendent

7

Memo of P&A ISO Verified Application to Vacate Order Appointing Conservator
Case No. 19CIV06531
Exhibit 14, Page 7 of 21

1    that the merger posed no risk to California policyholders, and despite CIC's agreement that it would

2    not take further steps to consummate the merger while it worked to resolve the CDI's concerns.  (*Id.*

3    ¶¶ 4 & 47, Ex. 7.)  Most tellingly, the Commissioner *omitted* these key facts from the *Ex Parte*

4    Application and told this Court exactly the opposite:  that the Nov. 4 Order was necessary "[f]or the

5    protection of the State's policyholders and the public."  (*Ex Parte* App. ¶ 1.)

6        **B.**    ████████████████████████████████████████

7

8        Shortly after the Nov. 4 Order was issued, CIC served on the CDI an *ex parte* application to

    vacate the Order that it intended to file on November 13, 2019.  ████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████████████████

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████████

21   ██████████████████████████████████

22   ████████████████████████████████████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████

26   ████████████████████████████████████████

27   ████████████████████████████████████████

28

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████

6     ████████████████████████████████████████████████

7 ██████████████████████████████████████████████████

8 ████████████████   Although the Commissioner has conceded that CIC has "considerable capital,

9 surplus and deposits" and that the conservation is not based on any "financial impairment," ██

10 ██████████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ██████████████████████████████████████████

15     Concerning the litigation, there are currently some 60 pending litigations involving CIC

16 relating to EquityComp®, pending in California and other states, involving at least 16 different

17 plaintiffs' counsel, and each involving different legal issues, facts, and defenses.  (*Id.* ¶ 66.)  The

18 litigation generally arises from the Commissioner's 2016 decision in the *Shasta Linen* administrative

19 proceeding, in which the Commissioner ruled that the profit-sharing component of EquityComp®—

20 which was offered by CIC's affiliate, Applied Underwriters Captive Risk Assurance Company

21 ("AUCRA"), *not* CIC—was void and unlawful because it was not filed under certain insurance

22 regulations.  (*Id.*)  As such, AUCRA and other affiliates and subsidiaries of Applied Underwriters,

23 Inc. ("Applied"), CIC's then parent corporation, are also named as co-defendants in the litigations,

24 and often the insured's insurance broker as well.  (*Id.*)  ████████████████████████████

25 ████████████████████████████████████████████

26 ██████████████████████████████████████████████

27 ██████████████████████████████████████████████████

28     ██████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13    **C.    The Order Irreparably Harms CIC**

14    The conservatorship imposed by the Nov. 4 Order has caused considerable harm to CIC's

15    business and its future prospects—harm which far outweighs any purported benefits, particularly

16    given the Commissioner's admissions that there are no financial concerns with respect to CIC.  (*Id.*

17    ¶ 73, Ex. 2.)  There has been significant confusion in the marketplace regarding CIC's operations, as

18    brokers, potential clients, and policyholders have assumed, wrongly, that the conservation was

19    financially motivated (as conservatorships typically are).  (*Id.* ¶ 74.)  This reputational damage

20    continues each day that the Nov. 4 Order remains in place.

21    It is not only CIC that is damaged by the conservatorship.  CIC's affiliated insurers, which

22    are not subject to the CDI's authority, have also been harmed because they are part of a Reinsurance

23    Pooling Agreement with CIC.  (*Id.* ¶ 75.)  If CIC's AM Best rating is downgraded due to concerns

24    related to the conservatorship, that would result in a possible downgrade of the entire pool, making it

25    impossible for CIC's affiliated insurers to operate and compete in the market.  (*Id.* ¶ 76.)  This risk is

26    not merely theoretical.  AM Best stated on November 13, 2019 that its rating of CIC and its pooled

27    insurance affiliates "remain under review with negative implications."  (*Id.* ¶ 77, Ex. 9.)  CIC's

28    reinsurance contracts and other future prospects are also at risk due to the conservatorship and the

10

Memo of P&A ISO Verified Application to Vacate Order Appointing Conservator
Case No. 19CIV06531
Exhibit 14, Page 10 of 21

1   false impression that CIC is under financial strain.  (*Id.* ¶ 77.)  Further, CIC's renewal rate,

2   consistently at 90%, has dropped to 78% since the conservation was imposed.  (*Id.* ¶ 15.)

3        The conservation order also has irreparably harmed CIC's future prospects.  (*Id.* ¶ 78.)  When

4   CIC seeks to obtain a new Certificate of Authority or purchase another insurance company, CIC

5   (like any insurance company) is required to complete a Uniform Certificate of Authority

6   Application, including a Biographical Affidavit from all directors and officers of the company.  (*Id.*)

7   Those forms ask whether the company has ever been subject to certain judicial, administrative,

8   regulatory, or disciplinary actions, specifically including conservatorship, and requires a full

9   explanation of any such actions.  (*Id.*)  This improper conservatorship is something CIC will now

10  have to disclose in connection with any future expansion plans, damaging those prospects.  (*Id.*)

11  **III.    ARGUMENT**

12        **A.    The Nov. 4 Order Should Be Vacated Because It Was Obtained Under False Pretenses**

13        The Nov. 4 Order was predicated on the Commissioner's representations to this Court that

14  the Nov. 4 Order was necessary to protect California policyholders by avoiding consummation of the

15  CIC merger.  But those assertions were false and misleading.  The Commissioner failed to disclose

16  to this Court that, contrary to what was stated in the Application, the CDI had in fact concluded that

17  the merger presented ***no risks*** to policyholders—and had expressed that position to the New Mexico

18  Superintendent in a phone conference on October 9.  The Commissioner likewise failed to disclose

19  to the Court that the CDI participated in the New Mexico approval proceedings and failed to raise a

20  single objection to the merger, nor advise the Court that it had received the October 9, 2019 e-mail

21  from Berkshire to which it did not respond.  Nor did the Commissioner inform the Court that CIC

22  had agreed, after the CDI raised concerns with the merger, to suspend any further steps to

23  consummate the merger while the CDI and CIC negotiated.

24        All of these are key material facts, adverse to the Commissioner's positions, that the CDI was

25  required to disclose to the Court in the Application.  The Commissioner's failure to disclose these

26  important facts is in direct violation of his duty of candor to this Court, including as set forth in

27  California Code of Professional Conduct Rule 3.3.  That rule requires a lawyer in an *ex parte*

28  proceeding where the opposing party is not present and has not received notice to "inform the

1   tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed

2   decision, whether or not the facts are adverse to the position of the client."  Cal. R. Prof'l Conduct

3   3.3(d); *see also* Cal. Bus. & Prof. Code § 6068(d) (attorney shall employ "those means only as are

4   consistent with truth, and never…seek to mislead the judge or any judicial officer by an artifice or

5   false statement of fact or law"); *see also Williams v. Super. Ct.*, 46 Cal. App. 4th 320, 330 (1996)

6   ("Honesty in dealing with the courts is of paramount importance, and misleading a judge is,

7   regardless of motives, a serious offense.") (internal quotations omitted); *Rhode Island Ins. Co. v.*

8   *Downey*, 95 Cal. App. 2d 220, 230-31 (1949) (application under § 1011 must be in "good faith").

9        That duty is *heightened* for lawyers representing the government, such as the Commissioner.

10   "Every lawyer has an ethical duty of candor and honesty to the court, but the Supreme Court has set

11   a high standard for attorneys representing the government."  Cal. Prac. Guide: Admin. Law Ch. 20-E

12   § 20:251 (Rutter Group 2019).  Accordingly, where a government lawyer obtains relief by

13   misleading the court or the trier of fact, that relief should be invalidated.  In *City of Los Angeles v.*

14   *Decker*, 18 Cal. 3d 860, 870-72 (1977), an eminent domain case, the California Supreme Court held

15   that the city attorney's misleading argument to the jury was misconduct that required the verdict in

16   favor of the government to be set aside, and a new trial ordered.  At trial, the city attorney disputed

17   the condemnee's claim that her property could be used as an airport parking lot—which would result

18   in a higher valuation of the property—despite the fact that the city knew the land was suitable for

19   that purpose, and in fact intended to use it for that purpose.  *Id.*  The Supreme Court held that the city

20   attorney committed misconduct in concealing evidence of the city's knowledge regarding the

21   suitability of the land for airport parking and making contrary arguments to the jury, which were

22   misleading.  *Id.*  The Supreme Court relied on the duty of candor and in particular the "even higher

23   duty" of a government lawyer "to seek justice and to develop a full and fair record."  *Id.*

24        The Commissioner here presented a misleading *ex parte* application that concealed material

25   facts, which led the Court to enter the Nov. 4 Order and the conservatorship.  Because the Nov. 4

26   Order was predicated on a misleading and incomplete record—far from a "full and fair" one—and

27   especially because it was made *ex parte*, it should be invalidated like the verdict in *Decker*.

28        The Commissioner's omission of these facts from the *Ex Parte* Application also runs counter

to the principle that one seeking relief in equity "must do so with clean hands." 30 Cal. Jur. 3d

Equity § 26. The unclean hands doctrine "demands that a plaintiff act fairly in the matter for which

he or she seeks a remedy," and "is available to protect the court from having its powers used to bring

about an inequitable result in the litigation before it." *Id.* This principle, too, dictates that the Nov. 4

Order should be vacated because the Commissioner did not act "fairly" in seeking the Nov. 4 Order.

The Commissioner rushed to court, with no notice to CIC, despite the fact that the CDI had not

timely objected to the merger (on which CIC relied) and despite the fact that CIC voluntarily agreed

not to move forward with the merger while it negotiated with the CDI regarding its concerns—

meaning there was no exigency.[2] The Commissioner then omitted these key facts from the *Ex Parte*

Application. None of this was fair or equitable, and the resulting Nov. 4 Order should be vacated.

### B.    The Nov. 4 Order Should Be Vacated Under Cal. Ins. Code § 1012 Because the Grounds for the Nov. 4 Order Do Not Exist or Have Been Removed

The Nov. 4 Order should be vacated and the conservatorship dissolved because, under Cal.

Ins. Code § 1012, the conditions for the Nov. 4 Order "do[] not exist or [ha]ve been removed,"

requiring that the Order be lifted. To obtain a conservatorship, Cal. Ins. Code § 1011 requires that

the Commissioner verify a condition justifying a conservatorship under the statute. *See Fin. Indem.*

*Co. v. Superior Court*, 45 Cal. 2d 395, 401 (1955). But Section 1012 provides that, in a post-order

hearing such as this, a conservation order "***shall***" be lifted where it is shown "that the ground for the

order … does not exist or has been removed and that the person can properly resume title and

possession of its property and the conduct of its business." Cal. Ins. Code § 1012. As the court

observed in *Fin. Indem.*, "[t]he Legislature undoubtedly assumed that in most cases the company

involved would dispute the commissioner's contentions, and accordingly provided, in section 1012,

---

[2] In fact, the CDI should be estopped from taking a different position in these proceedings from those taken in New Mexico. *See, e.g., Schafer v. City of Los Angeles*, 237 Cal. App. 4th 1250, 1261-62 (2015). Governments are subject to equitable estoppel where: (1) the party to be estopped knew of the facts; (2) intended the conduct to be acted on (or acted such that the party asserting estoppel had a right to believe it was intended); (3) the other party was ignorant of the truth; and (4) reasonable reliance on the conduct caused harm. *Id.* Courts must also consider whether "the avoidance of injustice in the particular case" will "effectively nullify 'a strong rule of policy, adopted for the benefit of the public….'" *Id.* Here, the CDI fully participated in the New Mexico merger hearing and registered no objection. The CDI had its due process but chose not to timely object, and CIC acted accordingly. (CIC App. ¶ 3.) Then the CDI sought relief from its own acquiescence almost four weeks after the fact. The CDI should be estopped from this reversal.

for a full hearing before the trial court." 45 Cal. 2d at 400 (quoting *Rhode Island Ins. Co. v. Downey*, 95 Cal. App. 2d 220, 230-31 (1949)).

Section 1012 provides that a conservation order "shall" only remain in force as long as the ground for the conservatorship still exists, meaning the order ***must*** be vacated once that ground "does not exist or has been removed." That is precisely the case here. The principal ground asserted in the Application was to protect California policyholders by preventing consummation of the merger, which is not supported by fact. As noted above, contrary to the assertions in the Application that policyholders were at risk, the Commissioner had concluded, as late as October 9, 2019, that the merger "presented no risks to California policyholders." (CIC App. ¶ 3.) The purported threat that CIC would rush to file a certificate of merger in California, thereby consummating the merger (*see Ex Parte* App. ¶ 21), is similarly unsupported. There was no actual risk that CIC would finalize the merger because CIC had voluntarily acceded to the CDI's request to refrain from taking any further steps to merge. (CIC App. ¶¶ 46-50.) The Commissioner's allegations that CIC "***could*** attempt to evade California jurisdiction" (*Ex Parte* App. ¶ 21) by filing the certificate of merger were purely speculative and inconsistent with CIC's actual conduct, which evidenced no intent to secretly finalize the merger over the CDI's belated objection. If that was the case, CIC would have long ago filed the merger papers in California. Thus, the main grounds for the Nov. 4 Order "do[] not exist" (in fact, they never did), and the Order must be vacated.

Even if the above grounds arguably did exist at the time the *Ex Parte* Application was made and the Nov. 4 Order was entered, those grounds have now "been removed," requiring that the Nov. 4 Order be lifted under Section 1012. Under Cal. Ins. Code § 1101(c), a conservation order may be entered where a "person, without first obtaining the consent in writing of the commissioner,…has entered into any transaction ***the effect of which is to merge***…." (Emphasis added.) But as noted above, CIC has agreed *not* to finalize the merger pending further discussions with the CDI, and has consented to the entry of a more limited order to enjoin the merger pending the CDI's approval or further order of the Court.[3] This condition having been removed, the

---

[3] Injunctions typically are imposed to stay mergers. *Cf.* Cal. Corp. Code § 1312(b) (authorizing injunctions for proposed reorganization or short-form merger); *Jutkowitz v. Bourns, Inc.*, 118 Cal.

1   conservatorship must be vacated as a matter of law.  *See, e.g., Lennane v. Franchise Tax Bd.*, 9 Cal.

2   4th 263, 268 (1994) ("If there is no ambiguity in the language of the statute, then the Legislature is

3   presumed to have meant what it said, and the plain meaning of the language governs."); *Khan v. L.A.*

4   *City Emps.' Ret. Sys.*, 187 Cal. App. 4th 98, 106 (2010) (clear statutory language governs).

5        The case law cited by the Commissioner, particularly *Rhode Island Ins. Co. v. Downey*, 95

6   Cal. App. 2d 220 (1949), does not hold otherwise and is inapposite to the facts here.  (*See Ex Parte*

7   App., ¶¶ 20, 22; MPAs at 14-15.)  In *Rhode Island Ins.*, the commissioner sought a conservatorship

8   based on an "audit show[ing] petitioner to be insolvent."  95 Cal. App. 2d at 228.  As the court

9   explained, the company's insolvency and resulting risk to policyholders could not be alleviated or

10  removed by an injunction only, requiring the more drastic remedy of conservation.  *Id.* at 243-46

11  (commissioner was justified in taking action based on company's "hazardous" financial situation,

12  including losing over a million dollars a year for the last three years").

13       Here, in contrast, there are absolutely no allegations that CIC is "insolvent" or facing any

14  financial strain whatsoever—quite the opposite.  ████████████████████

15  ████████████████████████████████████  ████████████

16  Accordingly, an injunction to stay any further action on the merger will afford the Commissioner

17  exactly the relief he seeks without the unnecessary collateral harm to CIC specifically caused by the

18  imposition of the conservatorship, and eliminates the purported need for a conservator.  There is no

19  dispute that the Commissioner has the authority to apply for such an injunction, and CIC consents to

20  the entry of such an order subject to the Nov. 4 Order being vacated.  *See, e.g.*, Cal. Ins. Code

21  § 1215.10; § 12928.6.  An injunction will help minimize the adverse collateral consequences to CIC

22  and allow the parties to continue their negotiations regarding the proposed merger.  In fact, with the

23  weight of the conservatorship and the imminent threat to CIC's business removed, the parties will be

24  in a much better position to continue their discussions and work toward an expedited resolution.

25

26  ─────────────────────────
    App. 3d 102, 106 (1981) (summarizing shareholder action where injunctive relief granted to prohibit
27  merger), *disapproved of on other grounds by Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480 (2016).
    [4] At the time of the Nov. 4 Order, CIC was an A-rated, solvent, and well-capitalized insurance
28  company with total assets of $1,127,849,525; capital and surplus of $614,992,148; and $250,000,000
    on deposit with the CDI.  (CIC App. ¶ 18.)

### C.   The Commissioner Has Acted Arbitrarily, Capriciously, and in Bad Faith

The Nov. 4 Order should be vacated for the added reason that the Commissioner has acted arbitrarily, capriciously, and in bad faith, including in ways that are inconsistent with the stated purpose of the Nov. 4 Order.  The Commissioner's application under Ins. Code § 1011 must be made in "good faith."  *Rhode Island Ins.*, 95 Cal. App. 2d at 231 (requiring a "good faith determination by the commissioner of the existence of one of the conditions").  That standard was not met here for the reasons enumerated above—namely, the Commissioner's omission of key facts and the absence of factual support for the stated grounds for the conservatorship.

Exercise of the State's power under Section 1011 requires more than just good faith.  The Commissioner unlawfully abuses his discretion when his actions are "arbitrary, i.e. <u>unsupported by a rational basis</u>, or [ ] contrary to specific statute, <u>a breach of the fiduciary duty of the conservator as trustee</u>, or improperly discriminatory."  *Exec. Life Ins. Co. v. Aurora Nat'l Life Assurance Co.*, 32 Cal. App. 4th 344, 358 (1995) (emphasis added).  The Commissioner's actions must be "<u>reasonably related to the public interest and <u>shall not be arbitrary</u> or improperly discriminatory," and "[t]he public has a grave and important interest in <u>preserving the business if that is possible</u>."  *Carpenter v. Pacific Mut. Life Ins. Co. of Cal.*, 10 Cal. 2d 307, 329 (1937) (emphasis added).  "It is the conservator's duty to try to remove the causes leading to the company's difficulties. If this cannot be done, he must attempt to rehabilitate its business."  *Rhode Island Ins.*, 95 Cal. App. 2d at 252 (citing *Carpenter*).  ███████████████████████████████████████

████████████████████████████  Here the Commissioner has violated all these legal requirements by arbitrarily seeking an unnecessary conservatorship █████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████ here is no rational basis for the Commissioner's actions.

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                  As explained above and in CIC's

21 Application, the litigations largely concern the alleged illegality of the profit-sharing portion of the

22 EquityComp® program, which was offered by CIC's affiliate, AUCRA, *not CIC*. (*Id.* ¶ 67.) In fact,

23 the Commissioner and his predecessor have both issued numerous decisions *upholding* the legality

24 and enforceability of the workers' compensation insurance policies sold by CIC as part of

25 EquityComp®, notwithstanding the purported illegality of other aspects of the program. (*See Id.*

26 ¶ 71.) Thus, CIC may not even have any legal liability

27 or at a minimum that liability (if any) would be shared among CIC and its co-

28 defendants.

17

Memo of P&A ISO Verified Application to Vacate Order Appointing Conservator
Case No. 19CIV06531
Exhibit 14, Page 17 of 21

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ██████████████████████████████████████████████ IC and its

5 affiliates have obtained numerous trial and arbitration victories defeating claims by plaintiffs

6 challenging the EquityComp® program, including even the filed CIC rates that have been upheld by

7 the Commissioner.  For example, in a court trial in October 2019, *Roadrunner Mgmt. Servs., Inc., v.*

8 *Applied Underwriters, Inc.,* Case No. 56-2017-00493391-CU-CO-VTA (Ventura Cty. Super. Ct.),

9 the plaintiff sought to avoid paying both the filed rate charges for CIC policies and the amounts due

10 under the EquityComp® profit-sharing plan.  The court's "Statement of Intended Decision" denied

11 all of plaintiffs' claims and held that CIC and the other defendants were entitled to judgment on their

12 cross-claims "in the amount of $340,419.00."  (CIC App. ¶ 65, Ex. 3.)

13      Similarly, in *Shasta Linen v. Applied Underwriters, Inc.*, a putative class action before the

14 Hon. William B. Shubb of the United States District Court for the Eastern District of California, CIC

15 and its affiliates defeated the plaintiffs' motion to certify a California class of EquityComp®

16 participants and obtained summary judgment on the merits.  (*Id.* ¶ 66.)  Judge Shubb found that

17 despite the plaintiffs' fraud allegations concerning the program, the court could not infer from the

18 facts "that [CIC] actively concealed the structure of the insurance program or the existence of the

19 RPA from regulators, plaintiffs, or the public generally."  *See Shasta Linen Supply, Inc. v. Applied*

20 *Underwriters, Inc.*, 2017 WL 4652758, at *5 (E.D. Cal. Oct. 17, 2017) ("*Shasta Linen*").  In fact, the

21 court found that "[CIC] disclosed in program documents that the RPA is not a filed retrospective

22 rating plan, and detailed how the profit sharing would work," and that the CDI "was aware of the

23 RPA's existence" through annual Reports of Examination that took place over the course of many

24 years.  (CIC App. ¶ 55.)  After class certification was denied, named plaintiff Pet Food Express filed

25 a motion for summary judgment, arguing that the program's profit-sharing agreement was illegal and

26 void per the Commissioner's decision in the *Shasta Linen* administrative matter, entitling Pet Food

27 to restitution as a matter of law.  (*Id.* ¶ 66.)  CIC and its affiliates filed a cross-motion for summary

28 judgment that Pet Food had no claim because it could show no actual loss.  (*Id.*)  The Court denied

18

Memo of P&A ISO Verified Application to Vacate Order Appointing Conservator
Case No. 19CIV06531
Exhibit 14, Page 18 of 21

1    Pet Food's motion, finding that the EquityComp® program and its profit-sharing component in

2    particular was *not* void or illegal simply because it was not filed, and noting the Court's

3    "disagreement with the Commissioner" on that point.  (*See* CIC App. Ex. 31.)  The Court granted

4    CIC's motion and awarded judgment to CIC and its co-defendants.  (*Id.*)

5           These cases and others are favorable precedent on which CIC and its co-defendants can rely

6    in defeating and defending against meritless claims by other plaintiffs.  ██████████████████

7    ████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9           **D.    Allegations That CIC "Flouted" Regulations Are Irrelevant And Misleading**

10          In addition to the material fact omissions discussed above, the Application is also misleading

11   in accusing CIC of "flouting" regulatory processes in connection with its participation in the

12   EquityComp® workers' compensation program.  (*Ex Parte* App. ¶ 17.)  To begin with, regulatory

13   disputes concerning EquityComp® have nothing to do with the CIC merger or the purported grounds

14   for the Nov. 4 Order.  But by invoking these unrelated regulatory issues in the Application, the

15   Commissioner was obligated to ensure that those references were not misleading or incomplete.

16          The Application omits a number of material facts on these issues.  The Commissioner failed

17   to disclose, for instance, that the CDI examined the EquityComp® workers' compensation program

18   over the course of many years and never indicated that any aspect of it was unlawful or needed to be

19   filed.  (CIC App. ¶ 54 & 55., Exs. 9, 22, 23, 24, 25, 26, & 27.)  The Commissioner also failed to

20   disclose that details about the program's operation and structure were available to the public through

21   a publicly filed federal patent.  (*Id.* ¶ 53, Ex. 20.)  And he failed to disclose that the CDI settled the

22   dispute with CIC in June 2017, subject to which CIC and its Applied Underwriters affiliates were

23   permitted to continue selling an amended version of EquityComp® in California that was

24   substantively the same.  (*Id.* ¶ 56, Exs. 28 & 29.)  Not only that, the CDI agreed as part of that

25   settlement that there was a "good faith dispute" between it and CIC regarding "whether the RPA is

26   void as a matter of law" and the appropriate remedy.  (*Id.* ¶ 56, Ex. 28 at ¶ 1.)  What the CDI agreed

27   was a "good faith dispute" two and a half years ago is now, inexplicably, "flouting" the law.  These

28   omitted material facts contradict the allegation that CIC has "flouted" regulations, let alone that it

19

1   has a "pattern" of doing so.

2       **E.**    **The Nov. 4 Order Should Be Vacated Because It Continues to Harm CIC**

3       Finally, the Nov. 4 Order also should be vacated because it continues to cause irreparable

4   harm to CIC, its reputation, and its future business prospects—which does not support the goal of

5   "conserving" CIC.  The conservatorship already has irrevocably harmed CIC's reputation, goodwill,

6   and business, and will continue to do so as long as it is in place.  After the Nov. 4 Order was entered,

7   the CDI issued a press release accusing CIC of a "pattern and practice" of "illegal actions,

8   misrepresentations, and willful disregard" for regulatory authority.  (CIC App. ¶ 58.)  Brokers and

9   policyholders have expressed concern to CIC regarding its financial condition and the impact of the

10   Nov. 4 Order on their coverage.  (*Id.* ¶ 74.)  And A.M. Best is undergoing a review of CIC and its

11   pooled insurance affiliates, which could potentially result in a downgrade of CIC's rating, inhibiting

12   CIC's and its affiliates' ability to write insurance.  (*Id.* ¶¶ 76 & 77, Ex. 9.)  Moreover, CIC will be

13   required to disclose and explain this conservatorship in connection with any future expansion plans,

14   which may severely impair CIC's ability to expand its business.  (*Id.* ¶ 78.)

15       This marketplace confusion is unwarranted and unnecessary because the Commissioner's

16   concern is to enjoin a merger, not to harm CIC's business, which it is charged to "conserve."  The

17   Commissioner has acknowledged there are no concerns regarding CIC's finances or ability to carry

18   out its insurance obligations, ██████████████  (*Id.* ¶¶ 10, 12, 60, 61, & 75.) ████████

19   ███████████████████████████████████████████████████

20   ██████████████████████████  The CDI's charge is to protect the public,

21   not take over healthy companies and weaken their ability to conduct business and provide insurance

22   to policyholders.  The conservation should be vacated to avoid further harm to CIC.

23   **IV.**    **CONCLUSION**

24       For the foregoing reasons, CIC respectfully requests that the Nov. 4 Order be vacated.  In

25   place of the conservatorship, CIC consents to the entry of an injunction under Ins. Code Section

26   1215.10(a) or § 12928.6, or similar applicable authority, that stays the proposed merger pending the

27   CDI's approval or further order of this Court, subject to a full reservation of rights in the future by

28   both parties, and for such other and further relief as may be proper.

Dated:  January 21, 2020

DLA PIPER LLP (US)

By: _____
  SHAND S. STEPHENS

*Attorneys for Respondent California Insurance Company, Inc., a California corporation, and its Successor, California Insurance Company, Inc., a New Mexico corporation*

WEST/288971437

# EXHIBIT 15

1    Shand S. Stephens (Bar No. 67694)
     shand.stephens@dlapiper.com
2    **DLA PIPER LLP (US)**
     555 Mission Street, Suite 2400
3    San Francisco, California 94105-2933
     Tel:    415.836.2500
4    Fax:    415.836.2501

5    Attorneys for Respondent CALIFORNIA INSURANCE
     COMPANY, INC., a California corporation, and its
6    Successor, CALIFORNIA INSURANCE COMPANY, INC.,
7    a New Mexico corporation

8

9                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10              **FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION**

11   INSURANCE COMMISSIONER OF THE          CASE NO.  19CIV06531
     STATE OF CALIFORNIA,
12                                           **_[REDACTED]_ RESPONDENT**
                      Applicant,             **CALIFORNIA INSURANCE COMPANY,**
13                                           **INC.'S REPLY IN SUPPORT OF ITS**
          v.                                 **APPLICATION TO VACATE**
14                                           **CONSERVATORSHIP**
     CALIFORNIA INSURANCE COMPANY,
15   INC., a California corporation,         Hearing Date:   February 27, 2020
                                             Hearing Time:   2:00 p.m.
16                    Respondent.            Judge:          Hon. George Miram
                                             Department:     28
17                                           Courtroom:      2F

18                                           Application Filed:  November 4, 2019
19

20

21

22

23

24

25

26

27

28

---

RESPONDENT'S REPLY ISO OF ITS APPLICATION TO VACATE CONSEVATORSHIP
CASE NO. 19CIV06531

## I.      INTRODUCTION

In his Opposition, the Commissioner fails to demonstrate why an injunction prohibiting the merger at issue would be an inadequate remedy, choosing instead to irrationally argue that CIC would simply violate any such injunction.  This argument is unsupported in law or by the evidence. Likewise unfounded is the Commissioner's argument that the conservatorship is necessary because of ████████████████████████.  This argument, which was never cited by the Commissioner as a ground for conservatorship in its application, is not a reason to conserve a financially vibrant insurance company.  If it were, then every insurance company would be in conservatorship because ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

## II.     ARGUMENT

### A.    The Commissioner Fails to Show Why An Injunction Is Insufficient

#### 1.    Respondent's Consent to An Appropriate Injunction Removes the Basis for the Order And Requires Dissolution of the Conservation

Respondent moved to vacate the conservatorship under Ins. Code § 1012, which provides that the conservation "***shall***" be lifted if the moving party demonstrates that the grounds for the order "does not exist or has been removed."  *See* § 1012.  The Commissioner's Opposition inaccurately frames CIC's motion as challenging the Commissioner's authority to choose between enforcement options—§ 1011(c) (conservation) versus § 1215.10 (injunction).  (*See* Opp'n § V.) But the Commissioner's discretion to choose between § 1011(c) and § 1215.10 is immaterial to Respondent's challenge under § 1012.  The only question now before the Court is whether the ground on which the conservation order is based "does not exist or has been removed."

The lone ground cited in seeking the Ex Parte order was "to avoid the completion of CIC's merger into an unlicensed foreign insurer that is not subject to the authority or control of the

1    Commissioner." (Comm'r Appl. ¶ 19 at p. 7.) Because Respondent in its Verified Application to

2    Vacate expressly consents to the imposition of an injunction to stay the consummation of the merger

3    pending resolution of the Commissioner's asserted concerns, the condition for imposing the

4    conservation "has been removed." An appropriate injunction preventing completion of the merger

5    alleviates any supposed risk to California policyholders that may result from the merger. Under the

6    mandatory language of Section 1012, therefore, the conservation order "***shall***" be vacated.

7            The CDI argues that an injunction "would be ineffective to prevent the flight from his

8    jurisdiction" because "Respondents already have attempted to flee the state" and would not

9    "hesitate" to violate an injunction. (Opp'n at 18.) That argument is baseless.

10                          **a.  The Court Can Enforce Its Own Injunctions**

11           This Court has the power to *void* any conduct violating its injunctions, thereby removing

12    any purported (yet unfounded) concern that CIC would risk contempt or other sanctions by violating

13    a court-ordered injunction. *Signal Oil & Gas Co. v. Ashland Oil & Refining Co*., 49 Cal. 2d 764,

14    768 (1958). In *Signal Oil*, the trial court issued a temporary restraining order ("TRO") directing a

15    company to refrain from recognizing certain challenged actions taken at a board meeting. *Id.* at

16    769-72. When the company ignored the TRO and adopted the challenged actions, the trial court

17    issued a preliminary injunction "enjoining [it] from giving effect to any action taken at the

18    December 16 meeting…." *Id.* at 772. The California Supreme Court concluded the preliminary

19    injunction was an "appropriate" "remedial measure" and specifically held that, where violations of

20    an injunction would directly harm or deprive a complainant of a substantial right, "it is within the

21    power of the court to declare the action invalid and to prevent its effectuation." *Id.* at 780-81.

22           This Court has the same powers under § 1215.10 to stay consummation of the merger and

23    void any attempt to violate the injunction (a completely unfounded concern). A court-ordered

24    injunction is plainly adequate, and Respondent's consent removes the basis for conservation,

25    requiring dissolution under § 1012. Indeed, the Commissioner himself admits that any "enforceable

26    order removing CIC's ability to flee the jurisdiction *would have afforded the necessary protection*

27    *to California policyholders*." (Opp'n at 11, emphasis added.)

28

---

### b. The Commissioner's Suggestion That CIC Could Flee the State And Be Beyond His Regulatory Reach Is Baseless

The Commissioner further argues that an injunction would have been, and is, insufficient because CIC was intending to "flee" California and "take [its] resources out of the state." (Opp'n at 10-11.) The evidence shows the opposite. The California Department of Insurance ("CDI") was informed of the proposed merger and the New Mexico proceedings in advance. The CDI conferred with its sister New Mexico regulator *before* the merger hearing and attended the merger hearing, where it had its opportunity to object, but did not do so. After the October 9 hearing and New Mexico order, the CDI expressed concerns to CIC about the merger and asked CIC not to complete the merger pending further discussions. Respondent *agreed and voluntarily did not take any further steps to consummate the merger*. (Appl. ¶ 9; Silver Decl. ¶ 3) Respondent had ample time between October 9, 2019 and November 4, 2019 to revoke that agreement and finalize the merger, but it did not, preferring to resolve matters with the CDI. Although CIC was voluntarily refraining from completing the merger, the CDI then, without notice, asked this Court for a conservatorship.[1]

Moreover, the argument that a merged CIC would somehow be beyond the Commissioner's regulatory reach, and would suddenly be without sufficient assets to cover its liabilities to its California policyholders and other creditors, is completely unfounded. (*See* Opp'n at 15 (arguing that California would "lose[] its regulatory authority over the company"); *id.* at 11.) The CDI maintains regulatory authority over foreign insurers operating in California all the time, which is precisely what the merged entity would have become. *See* Ins. Code § 709.5.[2] Indeed, the vast majority of insurers providing workers' compensation insurance in California are foreign insurers,

---

[1] Were the CDI truly concerned about Respondent potentially leaving the state, it could have sought an *ex parte* order as early as October 8, 2019, when it first learned of the New Mexico proceedings. Instead, the CDI waited for nearly a month even after Respondent voluntarily halted any further steps toward finalizing the merger.

[2] Ins. Code § 709.5(c) provides that a Certificate of Authority in existence at the time any licensed insurer in California transfers its corporate domicile to another state by merger shall continue in full force and effect upon that transfer if the insurer remains duly qualified to transact insurance in California. Ins. Code § 1215.14 provides that a foreign insurer licensed in California will be deemed a California commercially domiciled insurer if it writes more business in California than in its state of domicile. Because CIC writes more business in California than New Mexico, it would be required after the merger to comply with California's Holding Company System Regulation Act as if it were still a California-domiciled insurer, with the concomitant regulatory oversight.

1   over whom the CDI exercises regulatory authority: only 21 of 220 workers' compensation insurers

2   with $50,000 or more in premium volume in the past year are actually domiciled in California.  (*See*

3   Request for Judicial Notice ("RJN") Ex. 1.)  The merged CIC entity would have been in the same

4   position as all other qualified foreign insurers.  Nevertheless, the Commissioner agrees that had the

5   merger been completed, California policyholders would have been "left holding policies of a non-

6   admitted insurer" because CIC would no longer have authority to transact business in California.

7   (Opp'n at 10.)  This is a red herring.  The CDI could simply maintain the CIC Certificate of

8   Authority or issue a new Certificate of Authority to CIC II.  The notion that CIC would be beyond

9   the CDI's reach is nonsense.

10          The same is true for CIC's financial assets, which the Commissioner contends would be

11   beyond its reach and that of policyholders making claims.  (*See, e.g.,* Opp'n at 11 (claiming CIC

12   intended to "take [its financial] resources out of the state"); *id.* at 19.)  First, CIC has $250 million

13   on special deposit with the CDI, plus an additional $250 million located in the state.  (Silver Decl.

14   ¶ 4.)  Second, the physical location of CIC's assets is irrelevant to its liability to policyholders or

15   other creditors in California and its ability to satisfy those obligations.  And to ensure that California

16   policyholders would remain protected, the New Mexico Order expressly provides:

17          California Insurance Company II, Inc. will assume and be liable for any and
        all liabilities of California Insurance Company including, but not limited to
18          any issued policies as if such policies were issued directly by California
        Insurance Company, II, and that it will maintain the current [$250 million]
19          deposit of California Insurance Company with the California Department
        of Insurance for the benefit of its policyholders.
20

21   (Appl. Ex. 16 ¶ B.)  This is hardly evidence of an attempt to abscond with all of CIC's financial

22   resources and leave policyholders in the lurch.

23          Moreover, even if the order approving the merger had not expressly provided for CIC II to

24   assume CIC's debts and liabilities, that would happen automatically by operation of law.  Both

25   California and New Mexico corporations law provide that the surviving entity in a merger succeeds

26

27

28

1  to the debts and liabilities of the disappearing corporation.[3]  There simply is no credible argument

2  that Respondent attempted to "flee the jurisdiction" and the Commissioner's regulatory authority.

3      **B.**  **The Conservation Cannot Be Maintained Based on** ███████████████

4         **1.**  ██████████████████  **Does Not Justify the Conservatorship**

5      Despite having sought the conservation order on an entirely different ground (the desire to

6  halt the merger), the Commissioner now claims in his Opposition that the true driving force behind

7  keeping CIC in conservation is ███████████████████████████████████████████

8  ███████████████████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████████████

13  ████████████████

14  ████████████████████████████████  the Commissioner's 2017 and 2019 financial

15  examinations of CIC failed to identify or even mention ████████████████████████

16  ██████████████████████  Further, every insurance company routinely has to estimate

17  liabilities and post reserves.  When CIC had its last financial examination, the CDI's own actuary

18  reviewed *and approved* CIC's reserves.  (*Id.* ¶ 6.)

19  ███████████████████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████████████

21  ████████████████████████████████  CIC did not issue and was never a party

22  to the Reinsurance Participation Agreement ("RPA"), but rather only issued guaranteed cost

23  workers' compensation policies with filed rates approved by the CDI.  The Commissioner himself

---

[3] Cal. Corp. Code § 1107 ("Any action or proceeding pending by or against any disappearing corporation may be prosecuted to judgment, which shall bind the surviving corporation, or the surviving corporation may be proceeded against or substituted in its place."); N. M. S. A. 1978, § 53-14-6(E) ("any claim existing or action or proceeding pending by or against any of [the disappearing] corporations may be prosecuted as if the merger or consolidation had not taken place, or the surviving or new corporation may be substituted in its place.").

1  and California courts have issued numerous decisions consistently holding that the filed CIC

2  guaranteed cost policies issued as part of the EquityComp® program, and their premium, remain

3  valid, lawful, enforceable agreements notwithstanding the alleged illegality of the separate profit-

4  sharing plan, the RPA.[4]  (*See* RJN Ex. 2 (*Van de Pol* ruling); Appl. ¶¶ 65, 67, 70-71.)  CIC is not a

5  party to the RPA, and therefore is not liable to any policyholder for any alleged overcharges arising

6  from that separate agreement.  CIC can only *benefit* from the litigation, *i.e.*, in cases where an insured

7  has underpaid the filed CIC policy rates.  No arbitrator or court, nor the Commissioner, has found

8  *CIC* liable to any policyholder for premiums charged under the CIC policies, or on any other theory,

9  or liable for RPA charges made by a different company.  (*See* Declaration of Shand S. Stephens

10 ("Stephens Decl.") ¶¶ 6 & 11.)  In fact, the Commissioner opined in September 2019 that any

11 holding that policy premium on CIC policies issued as part of EquityComp® is not payable is

12 "inconsistent with a growing list of decisions" regarding "the very same Respondents [including

13 CIC] and the very same insurance products [EquityComp®]."  (*See* RJN Ex. 2 (*Van de Pol*).)

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26

27 ───────────────

[4] In fact, the Commissioner's ruling that a "long line of decisions" makes CIC's policies issued in connection with EquityComp® enforceable is signed by Bryant Henley, the same person who

28 verified the CDI's application for this conservatorship.

7
RESPONDENT'S REPLY ISO OF ITS APPLICATION TO VACATE CONSEVATORSHIP
CASE NO. 19CIV06531

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮

3     ***Fourth***, CIC and its affiliates have successfully defended the litigation and obtained

4 significant procedural and substantive victories.  Respondent's counsel has reduced the original 100

5 or so arbitrations, lawsuits, and administrative proceedings to about 50, including defeating *three*

6 class actions, regularly eliminating plaintiffs' bad faith and fraud claims, and obtaining orders

7 affirming the enforceability of the CIC guaranteed cost policies.  (Appl. ¶¶ 64-65, 67, 70-71;

8 Stephens Decl. ¶ 5.)   CIC has not paid a single penny in settlement or judgments on the

9 EquityComp® litigation. (Silver Decl. ¶ 8.)  Although many (but not all) courts have followed the

10 *Shasta Linen* order in finding the RPA unenforceable,[5] not a single arbitrator or court has found any

11 fraud or breach of fiduciary duty by CIC, or its affiliates.  (Stephens Decl. ¶ 12.)  On the contrary,

12 the United States District Court in Sacramento ruled that the disclosures about the program negated

13 any "intent to defraud," such that courts could not "infer that [CIC] actively concealed the structure

14 of the insurance program or the existence of the RPA from regulators, plaintiffs, or the public

15 generally." *Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, 2017 WL 4652758, at \*5 (E.D.

16 Cal. Oct. 17, 2017).  Accordingly, the Commissioner's contention that "allegations of fraud or other

17 causes of action…mak[e] it more difficult to assess CIC's exposure" is meritless because, to date,

18 no plaintiff has successfully proven fraud or bad faith against CIC or any of its affiliates.[6]

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24

25 [5] The Commissioner states that "[t]wo appellate courts have now held the RPAs to be unlawful"
(Opp'n at 7), but that is false.  Both the *Nielsen* and *Luxor* decisions were limited to whether the

26 RPA's separate, severable arbitration agreement was unlawful under California's form-filing
regulations, but expressly did not decide the question of whether the entire RPA was unlawful.

27 [6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ███████████████████

2 ██ ████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████████████████

13 █████████████████████████████████████████████

14 ███████   (1) CIC's claim reviews and audits, including a CDI Market Conduct Examination of

15 CIC, adopted September 27, 2019, just 5 months ago, did not reveal any wrongdoing or irregularities

16 (Declaration of Justin Smith ("Smith Decl.") ¶ 8,); (2) CIC is not aware of *any* justified complaint

17 regarding its claims practices in all of 2019, having received no notice as required under Ins. Code

18 § 12921.1 (*Id.* ¶ 10, Ex. B); and (3) CIC has experienced very low numbers of justified complaints

19 from policyholders in recent years (*Id.* ¶ 12). ████████████████████████████████

20 ██████████████████████████████

21    The CDI has a formal process mandated by statute for resolving complaints so insurers may

22 know the complaints lodged against them and respond or address them as needed.  (Smith Decl. ¶

23 10.) ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████

26 **C.   The Commissioner Failed to Object to the Merger And Gave Implied Consent**

27 The CDI was notified in advance about the New Mexico merger hearing, multiple CDI

28

RESPONDENT'S REPLY ISO OF ITS APPLICATION TO VACATE CONSEVATORSHIP
CASE NO. 19CIV06531

1   representatives participated[7] in those proceedings, and no objection to the merger was lodged by

2   any CDI representative during those proceedings.   (Appl. ¶¶ 3-7.)   The New Mexico Order

3   specifically finds that the CDI attended the merger hearing with all the other parties and there was

4   "no objection to the proposed merger." (Appl. Ex. 16, ¶ 4.)

5          The Commissioner does not directly dispute these facts, but attempts to rewrite the record

6   by implying an objection was made on the October 9, 2019 regulatory call, without specifying what

7   the supposed objection was or who made it—because, remarkably, those discussions were

8   "confidential," just like the concealed complaint from plaintiff's attorneys, but are evidence

9   nonetheless. (Komjathy Decl. ¶ 13.)  Citing partial testimony from the merger hearing, the CDI

10  asserts that a New Mexico witness "was asked whether she was 'aware of any objections to this

11  transaction by other regulators,' and she answered 'After the meeting this morning, yes.'"   (Opp'n

12  at 12.)  The Commissioner disingenuously omits to advise the Court that the witness then swore she

13  "[did] not know" *what* the objection was, nor identified who made it. (Appl. Ex. 15 at 24:4-8.) Sly

14  innuendo and half-truths offered on incomplete citations to testimony have no legitimate place in an

15  attempt to keep CIC under government control.

16         The CDI could have objected at the merger hearing that CIC was "fleeing" California and

17  taking its resources with it, but it did not. Mr. Komjathy's declaration states that the CDI "registered

18  ***no objection***" because "the question before that Office was whether to approve a transaction under

19  New Mexico law," apparently under the remarkable theory that fleeing the state like a felon with all

20  the loot would not matter under New Mexico law. (Komjathy Decl. ¶ 17 (emphasis added).)  The

21  failure to object is highly pertinent and indeed constitutes consent by implication to the merger.

22  "Implied consent is that manifested by signs, actions, or facts, or by inaction or silence, from which

23

24  ――――――――――――――――――

    [7] The Commissioner disingenuously contends that the CDI did not "participate" in the New Mexico
25  proceedings.  (Komjathy Decl. ¶ 13.)  The New Mexico order recites that the OSI staff, CIC II,
    Applied Underwriters, United Insurance, Berkshire Hathaway and "the California Department of
26  Insurance attended the hearing." (Ex. 16, ¶ 4.) Multiple CDI representatives engaged in discussions
    with New Mexico and other regulators and were present during the Form A approval hearing, during
27  which they could have raised an objection on the record had they wished to do so.  They simply did
    not.
28

1  arises an inference that the consent has been given." *Wade v. Southwest Bank*, 211 Cal. App. 2d

2  392, 406 (1962) (internal citations and quotations omitted).[8]

3      **D.**    **The Conservatorship Causes Irreparable Harm**

4      The Commissioner dismisses the harm Respondent has suffered as a result of the

5  conservatorship as both legally "irrelevant" and factually "small" and "speculative." (Opp'n at 16.)

6  But the harm is real, and is further support for this Court to vacate an unnecessary conservation

7  order in favor of an adequate, and far less harsh, injunction remedy.  Respondent has faced additional

8  adverse consequences from the conservation in just the few weeks since it filed the Verified

9  Application, as set forth in the accompanying Declaration of Jeffrey A. Silver.

10  **III.**    **CONCLUSION**

11      For the foregoing reasons and those stated in its opening papers, Respondent respectfully

12  requests that the November 4 Order be vacated.  As further discussed in Respondent's Opening

13  papers, CIC consents to an injunction under Ins. Code Section 1215.10(a) or Section 12928.6 that

14  stays the proposed merger pending the CDI's approval or further order of this court.

15  ///

16  ///

17  ///

18  ///

19

---

20  [8] The CDI mistakenly asserts its consent to a merger must be in writing.  "Consent" to the merger

21  is all that Ins. Code § 1011(c) requires—***not*** "consent in writing," as the Commissioner contends. (*See* Opp'n at 5, 6, 13.)  Section 1011(c) provides that the Commissioner may take possession of a

22  "person" if he shows

    That the person, without first obtaining the consent in writing of the commissioner,

23      has transferred, or attempted to transfer, substantially its entire property or business
    ***or, without consent, has entered into any transaction the effect of which is to***

24      ***merge***, consolidate, or reinsure substantially its entire property or business in or
    with the property or business of any other person.

25  (§ 1011(c) (emphasis added).)

    Because of the use of the disjunctive "or," the statute is clear that a merger or attempted merger

26  requires only "consent," not "consent *in writing*."  That is the only reading consistent with well-established principles of statutory construction.  "The plain and ordinary meaning of the word 'or'

27  is well established.  When used in a statute, the word 'or' indicates an intention to designate separate, disjunctive categories." *Boy Scouts of Am. Nat'l Found. v. Superior Court*, 206 Cal. App. 4th 428,

28  444 (2012) (citations omitted).

11

1   Dated:  February 20, 2020

2

3   By: _____
    SHAND S. STEPHENS

4
    *Attorneys for Respondent California Insurance*
5   *Company, Inc., a California corporation, and its*
    *Successor, California Insurance Company, Inc., a*
6   *New Mexico corporation*

7

DLA PIPER LLP (US)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 16

Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically FILED on 11/25/2020 by M. Garcia, Deputy Clerk

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| CALIFORNIA INSURANCE COMPANY,<br><br>     Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO<br><br>     Respondent;<br><br>INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA,<br><br>     Real Party in Interest. | A161049<br><br>San Mateo County Super. Ct. No. 19CIV06531 |

THE COURT[*]:


The petition for writ of mandate or other appropriate relief is denied.



Date: _____          _____ P.J.

_____
[*] Pollak, P.J., Tucher, J., and Brown, J.

# EXHIBIT 17

**FILED**

**SAN MATEO COUNTY**

FEB 26 2021

Clerk of the Superior Court

By _____

DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA, <br><br> Applicant, <br><br> v. <br><br> CALIFORNIA INSURANCE COMPANY, a California corporation, <br><br> Respondent. | Case No.: 19-CIV-06531 <br><br> Assigned for All Purposes to Hon. Danny Y. Chou <br><br> **ORDER DENYING RESPONDENT'S SPECIAL ANTI-SLAPP MOTION TO STRIKE** |

On November 4, 2019, this Court appointed Applicant the Insurance Commissioner of California (Commissioner) the Conservator of Respondent California Insurance Company (CIC) pursuant to Insurance Code section 1011. (See Order Appointing Ins. Comr. as Conservator and Restraining Orders.) On October 19, 2020, the Commissioner filed an Application for Order Approving Rehabilitation Plan (Rehabilitation Application). In response CIC filed this motion to strike the Rehabilitation Application (Motion or Anti-SLAPP Motion) pursuant to Code of Civil Procedure section 425.16 (section 425.16).[1]

The Court heard CIC's Motion on February 25, 2021. Michael Strumwasser and Cynthia Larsen appeared on behalf of the Commissioner. Shand Stephens appeared on behalf of CIC. Having considered all papers filed in support of and in opposition to the Motion, oral arguments of the parties, all testimony and evidence presented at the hearing, and all other pleadings and papers on file herein, the Court denies the Anti-SLAPP Motion.

## BACKGROUND

On November 4, 2019, the Commissioner filed a Verified Ex Parte Application for Order Appointing Insurance Commissioner as Conservator (Conservator Application). In the Conservator

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Application, the Commissioner sought to be appointed as the conservator of CIC under Insurance Code section 1011, subdivision (c). (Conservator Appl., ¶¶ 1-2, 19.) In support, the Commissioner alleged that: (1) CIC had taken actions to "merge CIC into" "California Insurance Company, Inc. II" (CIC II), a newly created New Mexico Company, that "is not admitted or licensed to transact the business of insurance in California" (*id.*, ¶ 9); (2) CIC did so "without having filed and obtained written approval of the Commissioner" (*id.*, ¶ 18); and (3) CIC's failure to obtain the Commissioner's approval "is ground for conservation" under Insurance Code section 1011 (*ibid.*). The Commissioner further alleged that, because CIC II cannot transact business in California, the merger "would place CIC's current policyholders, beneficiaries, and the California public in immediate jeopardy unless the Commissioner promptly acts to protect them." (*Id.*, ¶ 14.) The Commissioner therefore sought "to conserve CIC's property and business so that he can act promptly as conservator to avoid the completion of CIC's merger into an unlicensed foreign insurer that is not subject to the authority or control of the Commissioner." (*Id.*, ¶ 19.)

The Court granted the Conservator Application and appointed the Commissioner the conservator of CIC pursuant to Insurance Code section 1011, subdivision (c). (Order Appointing Insurance Commissioner as Conservator and Restraining Order (Appointment Order), p. 1.) As part of the Appointment Order, the Court gave the Commissioner the power "to pay or defer payment of all proper claims and obligations against CIC accruing prior to or subsequent to his appointment as Conservator, and to act in all ways and exercise all powers necessary or appropriate for the purpose of carrying out" the Order. (*Id.*, ¶ 1.)

On August 11, 2020, the Court denied Respondents' Verified Application to Vacate the November 4 Order Appointing the Commissioner as Conservator. (Order Denying Resp.'s Verified App. To Vacate the Nov. 4 Order Appointing the Comr. as Conservator, ex. A.) In its order, the Court explained that the conservatorship was ordered because "Respondents attempted to take CIC and its assets out of California via a merger without adequate protection of policyholders and the public . . . ." (*Ibid.*)

On October 19, 2020, the Commissioner filed the Rehabilitation Application pursuant to Insurance Code section 1043. Section 2.6 of the Commissioner's proposed California Insurance

---

1   Company Rehabilitation Plan (Rehabilitation Plan) requires that all "Claimants . . . be offered by CIC

2   the opportunity to settle Pending Litigation and Subsequent Litigation" in accordance with Schedule 2.6.

3   (Decl. of J. Holloway ISO Conservator's App. for Approval of Rehab. Plan, ex. A.) "Claimants" are

4   defined in Schedule 2.6 as "a Party to Pending Litigation or Subsequent Litigation who is asserting or

5   may assert an interest in that Proceeding contrary to the interest of the Company, its Affiliates, or its

6   Successors." (*Ibid.*) "Pending Litigation" is defined as a "Proceeding pending on the Conservation

7   Date." (*Ibid.*) "Subsequent Litigation" is defined as "a Proceeding brought after the Conservation Date

8   by the Company, its Affiliate, or a Successor or a claim asserted by a Policyholder deemed eligible to be

9   a Claimant . . . ." (*Ibid.*) And a "Proceeding" is defined as "a matter brought in any state or federal court,

10  before the Commissioner, or in an arbitration, in which a Claimant is a Party and is asserting a claim

11  against, or defending against a claim by, the Company, its Affiliate, or a Successor regarding a Policy or

12  RPA." (*Ibid.*) Finally, a "Policy" is defined as "a workers' compensation insurance policy written to

13  cover, in whole or in part, employees in California and issued on or before June 28, 2018," and "RPA"

14  is defined as "a Reinsurance Participation Agreement issued by an Affiliate in connection with a Policy

15  covering California employees." (*Ibid.*)

16        In response, CIC filed this Anti-SLAPP Motion. Focusing solely on Section 2.6 and Schedule 2.6

17  of the Rehabilitation Plan governing the settlement of pending and future claims involving CIC, CIC

18  moves to strike the Rehabilitation Application filed by the Commissioner pursuant to section 425.16.

19  (Not. of Mot. and Special Anti-SLAPP Mot. to Strike Compl. of Resp. Cal. Ins. Co., Through Pre-

20  Conservation Management; MPA, pp. 2, 9 ["The relevant provisions are contained in Schedule 2.6 of

21  the Rehabilitation Plan"], 14-17.)

22                                    **DISCUSSION**

23        As a threshold matter, the Court must determine whether an anti-SLAPP motion under Code of

24  Civil Procedure section 425.16 may be brought in a conservatorship proceeding under the Insurance

25  Code. The Court concludes that it may not and therefore denies CIC's Motion.[2]

26

27  [2] Because the Court concludes that section 425.16 does not apply in conservatorship proceedings under

28  Insurance Code sections 1010 to 1062, the Court does not address whether CIC has established the two
    prongs for relief under section 425.16.

                        ORDER DENYING ANTI-SLAPP MOTION - 3

"The provisions of Part 2 of the Code of Civil Procedure specially apply to special proceedings of a civil nature [that are identified] in Part 3, Title 1 (Writs of Review, Mandamus, and Prohibition) unless either inconsistent with those proceedings or the special proceeding statutes indicate otherwise." (*Bagration v. Superior Court* (2003) 110 Cal.App.4th 1677, 1685 (*Bagration*), internal citations omitted; see also § 1109 ["the provisions of Part II of this Code are applicable to and constitute the rules of practice in the proceedings mentioned in" the Code of Civil Procedure].) But for any *other* special proceeding – i.e., a special proceeding other than a writ proceeding brought under Part 3 of the Code of Civil Procedure – the California Supreme Court concluded long ago "that the Legislature's failure to make Code of Civil Procedure Part 2 expressly applicable to" that proceeding " 'must be held to have been intentional.' " (*Bagration*, at p. 1685.) Thus, the state high court has consistently "held that Part 2 of the Code of Civil Procedure extends generally only to civil 'actions,' and not to" those *other* "special proceedings." (*Agricultural Labor Relations Bd. v. Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 707 (*Tex-Cal Land Management*).) "[U]nless the statutes establishing the special proceeding expressly incorporate Code of Civil Procedure Part 2 provisions" (*Bagration*, at p. 1685), those provisions "are inapplicable" (*Tex-Cal Land Management*, at p. 707).

"[F]or purposes of applicability of Part 2 of the Code of Civil Procedure," the definitions of the terms "actions" and "special proceedings" "are those set forth in" sections 22 and 23. (*Tex-Cal Land Management, supra*, 43 Cal.3d at p. 707.) Thus, "[a]n action is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." (§ 22.) And "[e]very other remedy is a special proceeding." (§ 23.)

Applying these definitions, the California Supreme Court, over 80 years ago, held that a conservatorship proceeding under Insurance Code sections 1010 to 1062 is a special proceeding that is *not* subject to the provisions of Part 2 of the Code of Civil Procedure. (See *Carpenter v. Pacific Mutual Life Ins. Co. of Cal.* (1937) 10 Cal.2d 307, 328 (*Carpenter I*); see also *Carpenter v. Pacific Mutual Life Ins. Co. of Cal.* (1939) 13 Cal.2d 306, 311-312 (*Carpenter II*).) This is because that conservatorship "proceeding is not one in which another party is prosecuting another party at all. It is simply a proceeding in which the state is invoking its power over a corporate entity permitted by the state to

engage in a business activity vitally affected with the public interest upon condition of continuing compliance with the requirements provided by the state. It is not a controversy between private parties but a proceeding by the state in the interest of the public." (*Carpenter I*, at p. 327.) Thus, California courts have regularly held that the provisions found in Part 2 of the Code of Civil Procedure do not apply in conservatorship proceedings under the Insurance Code.[3]

Code of Civil Procedure section 425.16 – the statute providing for an anti-SLAPP motion – is located in Part 2 of the Code of Civil Procedure. CIC points to nothing in the Insurance Code that expressly renders section 425.16 applicable to this conservatorship proceeding, and the Court could find none. Indeed, the Legislature knew how to make particular Code of Civil Procedure Part 2 provisions applicable to conservatorship proceedings (see, e.g., Ins. Code, § 1038 ["Any application under section 1011 or 1016 shall be served upon the person named in such application *in the manner prescribed by law for personal service*," emphasis added]; Code Civ. Proc., § 1109 ["Except as otherwise provided in this Title, the provisions of Part II of the Code are applicable to and constitute the rules of practice in the proceedings mentioned in this Title"]), but chose not to do so for Code of Civil Procedure section 425.16. This omission is telling. (See *People v. Sinohui* (2002) 28 Cal.4th 205, 213 [holding that where the Legislature knows how to include a provision but declines to do so, there is a presumption that the omission was intentional].) Consistent with the many decisions holding that various provisions of Code of Civil Procedure Part 2 are inapplicable to conservatorship proceedings under the Insurance Code, this Court finds that Code of Civil Procedure section 425.16 does not apply to those proceedings either. (See, e.g., *Carpenter II*, *supra*, 13 Cal.2d at pp. 311-312; *Carpenter I*, *supra*, 10 Cal.2d at pp. 327-328; *Abraugh*, *supra*, 203 Cal.App.3d at p. 468.)

---

[3] (See, e.g., *Carpenter II*, at pp. 311-312 [holding that former Code of Civil Procedure sections 946 and 949 governing automatic stays pending appeal do not apply in conservatorship proceedings under the Insurance Code]; *Carpenter I*, at pp. 327-328 [holding that Code of Civil Procedure sections 632 and 633 governing statements of decision do not apply to conservatorship proceedings under the Insurance Code]; *Abraugh v. Gillespie* (1988) 203 Cal.App.3d 462, 468 (*Abraugh*) [holding that Code of Civil Procedure section 473 governing relief for "mistake, inadvertence, surprise or excusable neglect" does not apply to conservatorship proceedings under the Insurance Code]; *Caminetti v. Guaranty Union Life Ins. Co.* (1943) 22 Cal.2d 759, 765 [reiterating that former Code of Civil Procedure sections 946 and 949 of do not apply in conservatorship proceedings under the Insurance Code].)

ORDER DENYING ANTI-SLAPP MOTION - 5

Contrary to CIC's assertion, the language of section 425.16 does not reveal a legislative intent to render that section applicable to this conservatorship proceeding. To the contrary, the subdivisions in that section governing the award of attorney fees on an anti-SLAPP motion, identifying the actions excluded from its application, and staying discovery pending the resolution of an anti-SLAPP motion expressly reference an "action," but do not reference a "proceeding." (See § 425.16, subds. (c)(1) & (2), (d), and (g).) By omitting the terms "proceeding" or "special proceeding" from these subdivisions, the Legislature actually signaled its intent to exempt conservatorship proceedings from the purview of section 425.16. (See *Sinohui*, *supra*, 28 Cal.4th at p. 213; see also *In re Glacier General Ins. Co.* (1991) 234 Cal.App.3d 1549, 1554 [finding "the general appeal provisions of the Code of Civil Procedure" applicable because "[t]hose statutes are expressly made applicable to any 'civil action *or proceeding*,' " emphasis in original].)

The use of the word "proceeding" in subdivision (e) of section 425.16 does not compel a contrary conclusion. As relevant here, subdivision (e) defines an "act in furtherance of a person's right of petition or free speech" to include "any written or oral statement or writing made before a . . . judicial proceeding" or "in connection with an issue under consideration by . . . any other official proceeding authorized by law." (See § 425.16, subds. (b)(1) & (e)(1) & (2).) In using the term "proceeding," the subdivision merely establishes that a "cause of action" alleged in an *action* "arising from" any statement or writing made before or in connection with a special proceeding is subject to an anti-SLAPP motion. (§ 425.16, subd. (b)(1).) It does not establish that section 425.16 applies to a cause of action alleged in *any* special proceeding, including a conservatorship proceeding under Insurance Code section 1011.

Likewise, CIC's reliance on the exemption found in subdivision (d) of section 425.16 is misplaced. By its terms, subdivision (d) only creates an exception to the general rule that section 425.16 applies to all civil *actions* as defined by section 22. (See § 425.16, subd. (d) ["This section shall not apply to any enforcement *action* brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor," emphasis added].) Because an exception, as a matter of logic, cannot extend the reach of a general rule beyond what it would be without that exception, subdivision (d) cannot be construed to expand the application of section 425.16 to special proceedings like this one. (See *Mountain Lion Foundation v. Fish & Game*

*Com.* (1997) 16 Cal.4th 105, 116 [holding that doctrine of expressio unius est exclusion alterius only limits the exceptions to "a general rule"].)

At the hearing, CIC argued that section 425.16 should apply because the Rehabilitation Application is a "continuation" of an earlier writ proceeding. But this argument is flawed. Although a writ proceeding is subject to an anti-SLAPP motion (see Code Civ. Proc., § 1109), this is *not* a writ proceeding. It is a conservatorship proceeding under Insurance Code section 1011. Even if, as CIC contends, the Rehabilitation Plan seeks to undo a settlement in a prior writ proceeding, this does not transform this special proceeding brought under the Insurance Code into a writ proceeding brought under the Code of Civil Procedure.[4] Indeed, the Commissioner's authority to propose and seek court approval of the Rehabilitation Plan comes from the Insurance Code – and not from Part 3 of the Code of Civil Procedure.

Finally, allowing anti-SLAPP motions in this proceeding would defeat the purpose behind the conservatorship provisions of the Insurance Code. Those provisions contain measures "intended to prevent dissipation of the company's assets when it fails to comply with regulations adopted for" the protection of "policyholders, creditors, and the public" or "when it is found by the Commissioner to be in a hazardous condition." (*Garamendi v. Executive Life Ins. Co.* (1993) 17 Cal.App.4th 504, 515 (*Garamendi*).) These measures include "the 'drastic remedy' provided by [Insurance Code] section 1011" (*ibid.*) and the rehabilitation and liquidation remedies found in Insurance Code section 1043 (see *Carpenter I, supra,* 10 Cal.2d at p. 329 [noting that "rehabilitation and liquidation of insurance companies" are "extremely important" for the public interest]). Through these measures, the Legislature intended "to create a system to protect the public interest in insurance companies." (*Financial Indem. Co. v. Superior Court* (1955) 45 Cal.2d 395, 402 (*Financial Indem.*).)

To that end, the Legislature has given the Commissioner broad powers over "the assets of the insurer" – including the power "to take possession of its property" and "to conduct so much of its business as he or she deems appropriate" (*Commercial Natl. Bank v. Superior Court* (1993) 14

---

[4] In denying this anti-SLAPP Motion, the Court does not address the merits of any challenge to the Rehabilitation Plan or preclude CIC from raising the earlier writ proceeding and the settlement in that proceeding in its opposition to the Rehabilitation Application.

ORDER DENYING ANTI-SLAPP MOTION - 7

Cal.App.4th 393, 402) – based solely on a "good faith determination by the [C]ommissioner of the existence of one of the conditions enumerated in" Insurance Code section 1011 (*Rhode Island Ins. Co. v. Downey* (1949) 95 Cal.App.2d 220, 231). And due to "public necessity" and the need for "prompt action," the Commissioner may exercise many of these powers *before* a hearing on its legality. (*Id.*, at pp. 235-236.) Subjecting every action of the Commissioner as conservator to a potential anti-SLAPP motion with the attendant costs and delay would significantly hinder the ability of the Commissioner to protect the public interest and "defeat the purpose" behind the conservatorship. (See *Financial Indem.*, at p. 403 [holding that delay of conservatorship would defeat the purpose behind the conservatorship provisions].)

Indeed, the actions of the Commissioner challenged by CIC in this anti-SLAPP motion illustrate this very point. It is well-established that the Insurance Commissioner, when acting as the conservator of an insurer, has broad powers "to settle claims against" that insurer under Insurance Code section 1037, subdivision (c). (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 370.) If, as CIC contends, every action taken in court by the Commissioner to settle a claim against the insurer – such as the filing of a motion to enter judgment pursuant to Code of Civil Procedure section 646.6 -- subjects the Commissioner to an anti-SLAPP motion and the risk of significant delay and an attorney fees award, then the ability of the Commissioner to prevent the dissipation of the conserved insurer's assets through settlement would be significantly compromised, if not destroyed. This would be wholly inimical to the purpose behind the conservatorship provisions of the Insurance Code. (See *Garamendi, supra,* 17 Cal.App.4th at p. 515.) Rather than allow such an "anomalous result," this Court holds that anti-SLAPP motions are not available in conservatorship proceedings under the Insurance Code. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 64-65, internal quotations omitted [holding that "Legislature's intent" to "broadly . . . protect the right of petition" cannot trump "fundamental rule of statute construction that statutes should be construed to avoid anomalies," internal quotations omitted].) Accordingly, CIC's Anti-SLAPP Motion is denied.

1

## ORDER

2          Based on the foregoing, IT IS HEREBY ORDERED that CIC's Anti-SLAPP Motion is

3  DENIED.

4

5  Dated:  Feb. 26, 2021

6                                                      Danny Y. Chou
                                                       Judge of the Superior Court
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER DENYING ANTI-SLAPP MOTION - 9